UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                                 Case No. 17-CR-20595

v.                                                   Hon. Marianne O. Battani

YOUSEF MOHAMMAD RAMADAN,

        Defendant.
_____/

**REPLY IN SUPPORT OF MOTION TO SUPPRESS STATEMENTS**

Yousef Ramadan disagrees with the government's description of how agents conducted the interrogation at the airport. An evidentiary hearing is necessary to resolve these disputes. At the end of the hearing, this Court should grant the motion to suppress to deter illegal interrogation tactics. Five issues warrant reply.

    **I.**    **This interrogation was not a "routine" secondary inspection.**

The agents were not conducting a "routine" secondary border inspection when they interrogated Mr. Ramadan. "[R]*outine* customs inspections are non-custodial and do not require the reading of *Miranda* rights." *United States v. Galloway*, 316 F.3d 624, 630 (6th Cir. 2003). But border agents must still read a person *Miranda* warnings if the questioning and inspection becomes more than "routine." *See id.* In *Galloway*, the court examined the nature of the questions posed to answer that question. These questions

1

are routine and directly related to the purpose of a border inspection: Where did you go? What did you do when you traveled? Did you purchase anything abroad? *See id.* at 630–31. The Sixth Circuit also looked at whether the traveler was taken to another part of the airport and was visible to other passengers during the questioning. *Id.* at 631.

In stark contrast, Mr. Ramadan was never questioned in public and was moved from room to room. Mr. Ramadan did not hide his citizenship status. His description of his travel plans never changed. Nonetheless, agents asked questions unrelated to these travel plans about his religious and political views; whether he owned firearms; where they were kept; and how to make pipe bombs. The agents knew (or should have known) that these questions are "reasonably likely to evoke an incriminating response from a suspect," and so *Miranda* warnings were required. *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). Moreover, the use of handcuffs is hardly routine at the border and highly indicative of a custodial interrogation. *See United States v. Ray*, 690 F. App'x 366, 372 (6th Cir. 2017) ("[T]here is no dispute that Ray was handcuffed at the time and, thus, 'in custody' for *Miranda* purposes."). The moment the agents took Mr. Ramadan into a separate room, away from the public's view, they should have provided *Miranda* warnings. But they certainly should have provided such warnings once they decided to ask non-routine questions while he was in handcuffs.

## II.   Mr. Ramadan's statements were involuntary.

Mr. Ramadan's statements were involuntary, and the fruits of involuntary statements must be suppressed. "Because voluntariness is a matter of the suspect's state

of mind, we focus our analysis on the way in which suspects experience interrogation." *Missouri v. Seibert*, 542 U.S. 600, 624 (2004). An evidentiary hearing will show that the agents' conduct was objectively coercive and that conduct was the motivating factor that overbore Mr. Ramadan's will to remain silent. *See United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (describing the voluntariness factors).

The use of handcuffs is coercive. *See New York v. Quarles*, 467 U.S. 649, 684–85 (1984) (Marshall, J., dissenting) (explaining that it "strain[ed] credulity" to suggest questioning was not coercive when a suspect's "hands were handcuffed behind his back"). So, too, is physical force. *See Mincey v. Arizona*, 437 U.S. 385, 401 (citing *Brown v. Mississippi*, 297 U.S. 278, 280 (1936)). And exploiting concern for a person's children is coercive, as well. *See Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (confessions motivated out of concern for the custody and safety of children are coercive). The agents employed all three of these tactics. They also failed to honor Mr. Ramadan's repeated requests for counsel. Failure to honor a suspect's invocation of his right to counsel carries a "presumption of involuntariness." *Maryland v. Shatzer*, 559 U.S. 98, 105 (2010).

To make matters worse, Mr. Ramadan told the agents that he suffered a closed head injury, and yet they never took the time to explain his rights, held him late into the night, moved him from room to room, cuffed and uncuffed him, and physically punished him when he refused to provide passwords. All of these actions were overbearing. *See Mahan*, 190 F.3d at 422–23. And the agents conduct caused Mr. Ramadan to speak despite his expressed desire not to do so.

### III. Fruits of Mr. Ramadan's involuntary statements must be suppressed.

Involuntary statements and their fruit must be suppressed. *Mincey v. Arizona*, 437 U.S. 385, 396 (1978). In contrast to the voluntary statements of those who have not been given *Miranda* warnings, "[t]hose subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial." *United States v. Patane,* 542 U.S. 630, 640 (2004) (plurality opinion). Moreover, when agents extract involuntary statements from suspects, they violate due process. Due process violations implicate the fruits doctrine. *See, e.g.*, *United States v. Crews*, 445 U.S. 463, 470 (1980) (holding that exclusion "applies to any 'fruits' of a constitutional violation—whether such evidence be tangible, physical material actually seized in an illegal search . . . or confessions or statements of the accused obtained during an illegal arrest and detention.").

So, the government is wrong to claim that this Court may not suppress fruits of Mr. Ramadan's statements. Indeed, the Sixth Circuit has identified this critical distinction, explaining that, if a defendant's statements were "involuntary or coerced, as opposed to simply unwarned, [resulting physical evidence] should have been excluded at trial." *United States v. Reese*, 509 F. App'x 494, 503 n.2 (6th Cir. 2012); *see also United States v. Sangineto-Miranda*, 859 F.2d 1501, 1518 (6th Cir. 1988) (noting that, when police fail to provide *Miranda* warning, "admissibility of nontestimonial physical evidence derived from the uncounseled statements should turn on whether the statements were

4

voluntary"). And exclusion of all fruits of involuntary statements serves the deterrent purpose of the exclusionary rule—particularly when evidence of coercion is so great.

### IV. When agents ignore an interrogee's invocation of the right to counsel any fruits of subsequent questioning must be suppressed.

When agents do not scrupulously honor a suspect's invocation of the right to counsel, all fruits—physical and otherwise—must be suppressed. Mr. Ramadan requested a lawyer. Agents ignored his request for counsel's help. When the interrogators deny access to a lawyer to a suspect who has made such a request, and the police have not even warned the suspect of his rights to counsel and to remain silent, they violate the Sixth Amendment. *Escobedo v. Illinois*, 378 U.S. 478, 490–91 (1964).

Contrary to the government's contention, the physical fruits of any statements made after the police fail to honor that request must be suppressed. *Michigan v. Tucker*, 417 U.S. 433, 438 (1974), recognized that, if in a "proper case," with circumstances similar to those in *Escobedo*, the fruits doctrine would apply. Mark S. Bransdorfer, *Miranda Right-to-Counsel Violations and the Fruit of the Poisonous Tree Doctrine*, 62 Ind. L.J. 1061, 1077 (1987) ("*Tucker* strongly suggests the fruits doctrine should apply to an *Escobedo* violation."). That is because the exclusionary rule's purpose—deterrence—would be served if physical fruits are suppressed. As *Tucker* explained, suppression after a violation of the right to counsel would "compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." 417 U.S. at 446–47. Moreover, a person subject to a custodial

interrogation can control whether to remain silent but cannot summon a lawyer without access to a phone, funds, Rolodex, or a public defender.

Moreover, unlike in *Patane*, where the police did not even violate *Miranda*, 42 U.S. at 637, the conduct here involved an actual violation of the clear directives of *Miranda* and *Escobedo*: officers must cease questioning once a suspect has invoked the right to counsel. *Edwards v. Arizona*, 451 U.S. 477 (1981); *see also Davis v. United States*, 512 U.S. 452, 458 (1994). Officers who violate that unambiguous directive must be deterred. *See United States v. Gilkeson*, 431 F. Supp. 2d 270, 293–94 (N.D.N.Y. 2006) (suppressing evidence seized from the defendant's barn uncovered after police failed scrupulously to honor the defendant's request for a lawyer during a custodial interrogation).

As in *Escobedo*, federal agents had focused on Mr. Ramadan as a suspect of criminal activity, they had a duty to honor his request for counsel. *See* 378 U.S. at 490–91. Accordingly, Mr. Ramadan's responses to the uncounseled question that led to the search of the storage unit, as well as the fruits of that search must be suppressed.

### V. Any evidence found in the storage locker is the direct result of the unconstitutional search and Mr. Ramadan's involuntary statements.

Contrary to the government's suggestion, federal agents would not have learned about the storage shed without the unconstitutional search of the hard drive or Mr. Ramadan's responses to questions about photos on it. (R. 23, Gov't Resp., PageID

6

#272–73.)[1] The government bears the burden of persuasion to show the issuance of the search warrant was attenuated from and independent of the unconstitutional conduct, or that discovery was inevitable. *United States v. Alexander*, 540 F.3d 494, 502 (6th Cir. 2008); *United States v. Lopez-Arias*, 344 F.3d 623, 630 (6th Cir. 2003).

Simply put, no agents would have known to look for firearms—let alone to look for firearms in a storage unit in Ann Arbor—had the agents not asked Mr. Ramadan questions about photos found on the hard drives. The search warrant reveals exactly how agents learned about the firearms and storage locker: Mr. Ramadan's uncounseled and involuntary statements. Without those statements the warrant lacks probable cause.

## CONCLUSION

All fruits seized as a result of Mr. Ramadan's unwarned, uncounseled, and involuntary statements must be suppressed.

Dated: December 6, 2017　　　　　　　　　Respectfully Submitted,

　　　　　　　　　　　　　　　　　　　　FEDERAL DEFENDER OFFICE

　　　　　　　　　　　　　　　　　　　　s/Andrew Densemo
　　　　　　　　　　　　　　　　　　　　andrew_densemo@fd.org

　　　　　　　　　　　　　　　　　　　　s/Colleen P. Fitzharris
　　　　　　　　　　　　　　　　　　　　colleen_fitzharris@fd.org

　　　　　　　　　　　　　　　　　　　　Attorneys for Yousef Ramadan
　　　　　　　　　　　　　　　　　　　　613 Abbott St., 5th Floor
　　　　　　　　　　　　　　　　　　　　Detroit, MI 48226
　　　　　　　　　　　　　　　　　　　　Phone: 313-967-5542

---

[1] The government does not contend that the search of the storage locker in Ann Arbor is attenuated from the unconstitutional search of his electronic devices.

## CERTIFICATE OF SERVICE

Counsel certifies that on the above date, the foregoing paper was filed with the clerk of the Court using the ECF system, which will send notification to opposing counsel.

s/Colleen P. Fitzharris
colleen_fitzharris@fd.org
Attorney for Defendant
613 Abbott St., 5th Floor
Detroit, MI 48226
Phone: 313-967-5542
