```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION
                              —  —  —
 3
      UNITED STATES OF AMERICA,
 4
                   Plaintiff,
 5
        vs.                              Case No. 17-20595
 6
      YOUSEF RAMADAN,                     Hon. Marianne O. Battani
 7
                   Defendant.
 8    _____/

 9                      EVIDENTIARY HEARING

10          BEFORE THE HONORABLE MARIANNE O. BATTANI
                   United States District Judge
11          Theodore Levin United States Courthouse
                   231 West Lafayette Boulevard
12                       Detroit, Michigan
                   Tuesday, January 30, 2018
13

14    APPEARANCES:

15    For the Plaintiff:       RONALD W. WATERSTREET
                               MICHAEL M. MARTIN
16                             U.S. Attorney's Office
                               211 W. Fort Street, Suite 2001
17                             Detroit, MI 48226
                               (313) 226-9100
18
      For the Defendant:       ANDREW DENSEMO
19                             COLLEEN P. FITZHARRIS
                               Federal Defender Office
20                             613 Abbott, 5th Floor
                               Detroit, MI 48226
21                             (313) 967-5555

22

23

24
            To obtain a copy of this official transcript, contact:
25               Robert L. Smith, Official Court Reporter
                 (313) 234-2612 • rob_smith@mied.uscourts.gov
```

```
 1                      TABLE OF CONTENTS

 2   WITNESS                                       PAGE

 3   SHANNON VASHER
     Direct Examination by Mr. Waterstreet............. 39
 4   Cross-Examination by Mr. Densemo.................. 47
     Redirect Examination by Mr. Waterstreet........... 55
 5
     OFFICER MITCHELL ARMENTROUT
 6   Direct Examination by Mr. Waterstreet............. 58
     Cross-Examination by Mr. Densemo..................129
 7   Redirect Examination by Mr. Waterstreet...........188

 8   OFFICER MATTHEW ROBINSON
     Direct Examination by Mr. Waterstreet............192
 9   Cross-Examination by Mr. Densemo.................221
     Redirect Examination by Mr. Waterstreet..........241
10   Recross-Examination by Mr. Densemo...............242

11   EXHIBITS                                   RECEIVED

12   Government's I-5 and I-6.......................... 44
     Government's I-1 through I-27.....................101
13   Government's J-1..................................102
     Government's C-2, C-5, C-7, C-8, C-9..............114
14   Government's C-4..................................115
     Government's O-1, O-3, O-4, O-5, O-7, O-8, O-10,
15               O-13, O-14, O-15, O-18 and O-19.......122
     Government's L-1 and L-3..........................126
16

17

18

19

20

21

22

23

24

25
```

 1   Detroit, Michigan

 2   Tuesday, January 30, 2018

 3   at about 10:00 a.m.

 4                        —   —   —

 5              (Court, Counsel and Defendant present.)

 6              THE LAW CLERK:  Please rise.

 7              The United States District Court for the Eastern

 8   District of Michigan is now in session, the Honorable

 9   Marianne O. Battani presiding.

10              You may be seated.

11              Calling Case No. 17-20595, United States of America

12   vs. Ramadan.

13              THE COURT:  Good morning.

14              MR. DENSEMO:  Good morning, Your Honor.

15              THE COURT:  May I have your appearances, please?

16              MR. MARTIN:  Yes, Your Honor, Michael Martin and

17   Ronald Waterstreet for the government.  With us today are FBI

18   Special Agent David Banach, who's the case agent, and

19   Ms. Darlene Secord, who is a paralegal.

20              MR. DENSEMO:  Good morning, Your Honor.

21   Andrew Densemo on behalf of Yousef Ramadan.

22              MS. FITZHARRIS:  Colleen Fitzharris also on behalf

23   of Yousef Ramadan.

24              THE COURT:  I'm sorry.  I didn't get your last

25   name.

*Evidentiary Hearing • January 30, 2018*

**4**

```
 1            MS. FITZHARRIS:  Fitzharris.

 2            THE COURT:  Fitzharris.

 3            MR. DENSEMO:  Your Honor, would the Court mind if

 4  Mr. Ramadan's hands were unshackled during the hearing so he

 5  can take notes?

 6            THE COURT:  No, not at all.

 7            MR. DENSEMO:  Thank you, Judge.

 8            THE COURT:  All right.  Before the Court today we

 9  have the defendant's two motions to suppress.

10            MR. DENSEMO:  Yes, Your Honor.  I believe that the

11  burden is on the government to show that there is a

12  justifiable basis for the statements in this case given that

13  there were no Miranda warnings provided to Mr. Ramadan, and

14  there was no arrest warrant that was issued at the time that

15  he was taken off of the plane.

16            I believe the government has a number of witnesses

17  here today, so we would ask the government to proceed in

18  showing that there was a legal basis for the statements that

19  were taken from Mr. Ramadan, and that those statements were

20  eventually utilized in a search warrant.

21            Also there was a -- we are contesting the search of

22  Mr. Ramadan's electronic equipment at the border, so we would

23  ask the Court to ask the government to put on its

24  witnesses --

25            THE COURT:  All right.
```

```
 1              MR. DENSEMO:  -- to establish the basis for the
 2   search.
 3              MR. MARTIN:  Your Honor?
 4              THE COURT:  Mr. Martin.
 5              MR. MARTIN:  Your Honor, if I may address a couple
 6   of things before we begin?  One is --
 7              THE COURT:  Do you want to approach the podium?  I
 8   can hear better with the microphone here.
 9              MR. MARTIN:  Yes, Your Honor.  As a preliminary
10   matter, I wanted to address the issue of burden because I
11   think that's an important question to address right from the
12   beginning.  And in any suppression motion the burden is
13   always on the party seeking to suppress evidence.  Now,
14   typically in a suppression hearing the government just calls
15   its witnesses and presents its evidence even though it
16   doesn't have the burden, it just goes first.  That's
17   typically the way it is done.
18              But under the law -- the law is that in a
19   suppression hearing the burden of persuasion and proof is
20   always with the party seeking to suppress the evidence.  And
21   in support of that proposition I'd cite to United States vs.
22   Smith at 783 F.2d 648, that's a Sixth Circuit case from 1986,
23   so that point of law has been in existence for some time.
24              And then with respect to the issue of Miranda, the
25   same rule applies, and according to United States vs.
```

 1   Lawrence, a Sixth Circuit case from 1989, which is at 892

 2   F.2d 80, in a suppression hearing the burden of proof rests

 3   with the party seeking to suppress evidence, and when these

 4   seeking to suppress evidence becomes a violation of Miranda

 5   warnings, he must demonstrate, meaning the defendant, by a

 6   preponderance of evidence that he was entitled to receive

 7   those warnings and that he was subjected to custodial

 8   interrogation.  Now -- so the burden of proof rests with

 9   them.

10          What I wanted to suggest to the Court is there are

11   a number of motions I think pending before the Court.  There

12   was the motion to suppress evidence seized from a storage

13   locker in violation of the Fourth Amendment.  There is a

14   motion to suppress statements that the defendant alleges were

15   taken in violation of his Fifth Amendment right because he

16   was not given Miranda warnings and his Fourteenth Amendment

17   right to due process.  There is a motion to dismiss the

18   indictment for alleged destruction of evidence, which I

19   believe has been briefed and --

20          THE COURT:  I don't -- I don't have a motion to

21   dismiss for destruction of evidence, or is that the one that

22   was just replied to?  Is that the one you are talking about

23   that was just replied to today?

24          MR. MARTIN:  Yes, Your Honor.

25          THE COURT:  I just got that reply so I know now

 1    which one you are talking about.   Sorry.

 2              MR. MARTIN:   Then there was a motion for return of

 3    seized property.

 4              I don't know if the Court is intending to hear

 5    those last two today, but we are certainly prepared to

 6    address them.

 7              With respect to the first two, the motion to

 8    suppress evidence from the storage locker in violation of the

 9    Fourth Amendment, my suggestion to the Court would be to

10    consider at least hearing argument on the legal questions

11    because on that motion I don't think there is really much

12    factual, if any factual, dispute.   There is no dispute that

13    the searches of the defendant that the defendant is saying

14    violated his Fourth Amendment rights took place at the

15    border, and there is no real dispute about the scope of those

16    searches or what was searched, they were search of an

17    electronic hard drive, electronic media.

18              And the government's position is that under Supreme

19    Court case law and Sixth Circuit case law, there was no

20    warrant required to conduct that search at the border as a

21    matter of law, not as a matter of fact, as a matter of law,

22    that no warrant and no probable cause is required to search

23    frankly anything at the border including electronic media.

24              And if that were the Court's decision, then there

25    would be no need to take testimony on the search.   It is

 1    really a question of law.  And that can be -- that motion I

 2    think can be decided on legal argument, not factual issues,

 3    and that would cut down on the number of witnesses that the

 4    Court would need to hear from today.

 5          The motion to suppress statements I think does have

 6    factual disputes that does need the Court to hear testimony.

 7    The defendant alleges that he was assaulted and treated badly

 8    and in a variety of other ways, and the government's position

 9    is that's not true and it didn't happen, so the Court needs

10    to hear evidence on that for sure.

11          THE COURT:  Okay.  Let me stop you there because we

12    have probably three hours this morning to proceed.  I don't

13    know how long of an evidentiary hearing, but I do agree with

14    you that we should probably start with the motion to suppress

15    the statements and do the evidentiary hearing that is

16    necessary for that particular motion.  All right.  And we

17    will hold the motion to see how far we get, the other motion,

18    which does require a legal argument first.

19          MR. MARTIN:  Yes, Your Honor.  Just so you know, if

20    that's the way the Court wants to proceed, to take the

21    suppression of the statements issue first, the presentation

22    of the evidence may appear a little disjointed because the

23    evidence related to the search takes place first in time.

24          THE COURT:  Before?

25          MR. MARTIN:  Yes, before.  So the general outline

1    of the case is that the defendant shows up at the airport to

2    travel with his family to Jordan.  He checks a number of bags

3    that are going to be checked on to the plane.  As the

4    Transportation Security Administration is examining those

5    bags before they're loaded onto the plane, they find export

6    controlled body armor in one of the bags.  They then pull all

7    of the bags that have already been loaded onto the plane off.

8    The defendant is removed from the plane.  He's then

9    interviewed by Customs and Border Protection officers at the

10   same time other Customs and Border Protection officers are

11   examining all of the rest of the checked bags.

12          And so the events that relate to the search of the

13   bags and ultimately the search of electronic devices actually

14   starts earlier in time than the statement.

15          THE COURT:  Well, I agree, I read that in the

16   briefs.  I was just trying to streamline this based on

17   your -- the first issue which requires one of law.

18          MR. MARTIN:  So --

19          THE COURT:  But since you have your witnesses, I

20   don't want them do come here for naught, but go ahead.

21          MR. MARTIN:  Well, that's not a problem.  They are

22   here obviously and will be here and can come back if need be.

23   My -- I think what would make most sense would be to proceed

24   with the motion to suppress evidence from the storage locker

25   because then when we get -- if the Court were to either rule

1   in the government's favor, then those witnesses related to

2   the storage locker could just go and be done and not have to

3   come back another day potentially.  Or if you decided no, I

4   want to hear from them, then we can present the evidence in a

5   chronological fashion and I think it would make sense as it

6   would come in for the Court.

7           THE COURT:  Okay.  So you want to do the storage

8   locker first?

9           MR. MARTIN:  Yes, ma'am.

10          THE COURT:  Mr. Densemo?

11          MR. DENSEMO:  Go ahead.

12          THE COURT:  I'm sorry.  Ms. Fitzharris?

13          MS. FITZHARRIS:  I wanted to begin very quickly on

14   the burden of persuasion because we actually disagree with

15   the government's characterization of the burden in this case.

16   This was a warrantless search of his electronic devices, and

17   when there is a warrantless search, the government bears the

18   burden of showing that there were circumstances that justify

19   a warrantless search.  So they have to show some sort of

20   special need or some sort of exigency in order to engage in a

21   warrantless search.

22          As for as the voluntariness of Mr. Ramadan's

23   statements, again, because there were no Miranda warnings,

24   the burden is on the government to show that the statements

25   were voluntary, and so we just wanted to put that point on

1  the record.

2         As far as presentation of evidence, we agree with

3  the government and perhaps Your Honor that it just makes

4  sense to have an evidentiary hearing and then talk about the

5  legal standards so it is all fleshed out because there's some

6  dispute about the level of suspicion involved in addition to

7  the legal questions about what level of suspicion the

8  government must have before searching electronic devices at

9  the border.

10         THE COURT:  Okay.  Can I hear your response to

11  that, Mr. Martin, first of all, on the burden given that this

12  was a warrantless search?

13         MR. MARTIN:  Yes.  I don't believe that the burden

14  changes because of the warrantless search.  The burden is

15  always on the party moving to suppress.  Now, certainly if

16  the government is going to invoke an exception to the warrant

17  requirement, there has to be a basis for that, but that's not

18  in dispute because there's no question that the search here

19  took place at the international border, and that's the

20  exception in play.  So there is no testimony that needs to be

21  heard from the Court I think on that because I think both

22  parties concede that's where the search took place.

23         THE COURT:  Okay.  How about on the motion to

24  suppress the statements?

25         MR. MARTIN:  Yes.  The motion to suppress the

```
 1    statements, I don't disagree with defense counsel because
 2    there are two issues with respect to the statements.  They
 3    are seeking to suppress the statements on two grounds.  One
 4    is that Miranda warnings were not given in violation of the
 5    Fifth Amendment right of self-incrimination, that's one.  In
 6    that scenario, the Sixth Circuit case that I cited to you
 7    earlier, the Lawrence case, says the burden is on them to
 8    show that the defendant is entitled to Miranda warnings in
 9    that situation.
10         The second claim they have is that the government's
11    conduct in interrogating the defendant, questioning the
12    defendant, was so outrageous that it violated his due process
13    rights under the Fourteenth Amendment.  In that scenario the
14    government has the burden of showing that there was no
15    coercion, that there was no outrageous conduct on the part of
16    the government that coerced him into making statements.
17         Two different lines of argument, two different
18    legal theories for suppression, two different burdens of
19    proof.  And I think that the reason that they are two
20    different burdens of proof is that the due process violation
21    is a claim that carries -- you know, is a claim that the
22    government has engaged in some kind of, you know, really
23    outrageous conduct and therefore the burden is placed on him,
24    whereas the Miranda violation there doesn't need to be any
25    outrageous government conduct, it is just simply were the
```

*Evidentiary Hearing • January 30, 2018*

1    warnings given or not.  You could can have a perfectly

2    uncoercive interview where a defendant would be moving to

3    suppress for lack of Miranda warnings simply because the

4    warnings weren't given, so in that case the burden rests with

5    the defense.

6              THE COURT:  All right.  Does the defendant have any

7    case law that supports its discussion on the burden?

8              MS. FITZHARRIS:  Your Honor, the government did not

9    raise this issue in its response at all, so I did not come

10   prepared with specific case citations on this issue.  And so

11   if the Court during the lunch hour would permit me to do some

12   research, I would be happy to come back and do that.

13             THE COURT:  Okay.

14             MS. FITZHARRIS:  But there is the general

15   proposition that when there is a warrantless search, the

16   government has the burden to prove some reason.  And if you

17   look at Riley vs. California, which I'm sure is going to be

18   discussed a lot in this case, the government -- the Court --

19   the Supreme Court instructs that this Court needs to balance

20   the privacy interest on one hand against the law enforcement

21   interest on the other hand, and a lot of that comes down to

22   evidence about the type of information that the government is

23   seeking and the circumstances that the government believes

24   justifies the warrantless or suspicionless search.

25             And so I submit that there is some need for

1    evidence in this case so we can discuss the nature of

2    electronic devices, the privacy interests involved, the

3    quantity and the quality of the information that is stored on

4    electronic devices, as well as the government's needs at the

5    border.

6            THE COURT:  All right.  The Court -- I really don't

7    want to rule on this until I see if there is anything -- I

8    was not prepared for it, and ordinarily I agree with the

9    government, but I will give you an opportunity to submit a

10   brief later on this particular issue, but right now we will

11   proceed with the hearing.

12           Mr. Martin?

13           MR. MARTIN:  Yes, Your Honor.  So what I would like

14   to discuss is the legal standard for conducting a border

15   search because, as I said, it appears to me that it is

16   undisputed that the search at issue took place at the border,

17   and it also appears to me that it is undisputed that the

18   search in question is the search of electronic device, namely

19   an external hard drive, that was found by the Customs and

20   Border Protection officers in the defendant's checked luggage

21   which was removed from the airplane and then inspected.

22           THE COURT:  This external hard drive, as I believe

23   I read, was not password protected?

24           MR. MARTIN:  Yes, Your Honor.

25           THE COURT:  Is that correct?

```
 1          MR. MARTIN:  That's correct, not password
 2    protected, and it was examined by the Customs officers there
 3    at the airport as he was being interviewed by other Customs
 4    officers.  So this is all taking place at the border
 5    essentially, and that's significant because there is a very,
 6    very broad, very longstanding exception to the warrant
 7    requirement of searches that take place at the border.
 8          I just want to read to you a quote from the Supreme
 9    Court which was from 2004 which I think is their most recent
10    decision on border searches.  And it says, quote, time and
11    again we have stated that searches made at the border,
12    pursuant to the longstanding right of the sovereign to
13    protect itself, are reasonable simply by virtue of the fact
14    that they occur at the border.
15          In other words, if the search takes place at the
16    border, it is by definition reasonable under the Fourth
17    Amendment, and the Supreme Court -- that's United States vs.
18    Flores-Montano, 541 U.S. 149, and as I said, it is a 2004
19    case.
20          There is a series of Supreme Court cases from the
21    1970s through the '80s ending with this Flores-Montano case
22    where the Supreme Court has said that over and over again
23    that searches at the border are reasonable under the Fourth
24    Amendment and do not require any reasonable suspicion or
25    probable cause.
```

1           The cases also point out that the reason that
2    this -- these are -- pardon me -- the reason that these
3    searches are reasonable is because the Congress, the very
4    first Congress that adopted the Fourth Amendment passed a
5    statute authorizing Customs officers to conduct warrantless
6    searches.  So the court said this has been a tradition in our
7    country from the very founding.  You are talking about a
8    tradition that's over 220 years old.  And there is no case
9    from any federal court at any level in those 220 years that
10   has held that a warrant is required to conduct a search at
11   the border, which is exactly what the defendants say you
12   should require now.  You know, what they are asking you to do
13   is -- and I use this word intentionally -- is a dramatic
14   departure from what the existing law is.
15           Now, the defense says, if I read their pleading
16   correctly, that this new case, Riley vs. California from the
17   Supreme Court in 2014, completely changed the landscape with
18   respect to searching electronic devices.
19           Riley vs. California was not a case involving
20   border searches.  Riley vs. California was a case involving
21   the search by police officers of people's cellphones incident
22   to their arrest.
23           And as the Court I'm sure is familiar, there is an
24   exception to the warrant requirement for searches conducted
25   incident to someone's arrest.  In those two cases I believe

*Evidentiary Hearing • January 30, 2018*

**17**

 1   somebody had been pulled over and arrested for drugs and the

 2   police officer then searched their cellphone.  In the other I

 3   think the person was pulled over for a traffic violation, was

 4   arrested for illegally possessing a gun, and the police

 5   officers again searched their cellphones.

 6          And in Riley the Supreme Court looked at the

 7   reasons for the exception to the warrant requirement for

 8   searches incident to arrest and they said, look, searches

 9   incident to arrest, we adopted that exception for officer

10   safety so they could conduct searches to look for weapons

11   when they are conducting an arrest because an arrest is a

12   volatile situation and we want to make sure officers have the

13   ability to search for weapons and also to prevent the

14   destruction of evidence.  We don't want, say, defendants

15   arrested for drugs, swallowing the drugs at the last minute

16   or throwing them out the window or something like that.  So

17   it was officer safety and preservation of evidence.  And they

18   said searching cellphones don't really fit in either of those

19   reasons.  You know, a cellphone -- there is nothing on a

20   cellphone that's going to be immediately dangerous to a

21   police officer when he makes an arrest, and evidence on a

22   cellphone can be preserved simply by turning a cellphone off,

23   and so therefore we don't think it makes a lot of sense to

24   apply this exception to the warrant requirement for

25   cellphones.

 1            However, and this is a very, very important point,
 2    the Supreme Court did not say that a warrant is required
 3    anytime the police or the government want to search a
 4    cellphone.  Other exceptions to the warrant requirement are
 5    still valid.
 6            Here is what the Supreme Court said from Riley.
 7    Quote, moreover, even though the search incident to arrest
 8    does not apply to cellphones, other case specific exceptions
 9    may still justify a warrantless search of a particular phone.
10    One well-recognized exception applies when the exigencies of
11    the situation make the needs of law enforcement so compelling
12    that a warrantless search is objectively reasonable under the
13    Fourth Amendment.
14            And then they go on to say hypothetically what type
15    of exigent circumstances may permit a warrantless search of a
16    phone.
17            They don't specifically say, hey, border searches
18    are one of these exceptions that would allow you to conduct a
19    warrantless search, but they don't say it is not either.
20    They simply say we are not holding in this decision that a
21    warrant is required to search all cellphones or electronic
22    devices all the time.  They are saying our other exceptions
23    to the warrant requirement are all valid.  And the border
24    search exception, as I said at the beginning, is probably the
25    oldest and most longstanding and well-entrenched legally

*Evidentiary Hearing • January 30, 2018*

```
 1    exception to the warrant requirement in our country's
 2    history.  There is an unbroken line of cases from the
 3    founding to now saying that border search exceptions do
 4    not -- or border searches do not require a warrant.
 5            There is a fairly well-developed body of case law
 6    that has developed in the years since Riley was decided, it
 7    was a 2014 decision.  And if I may, Your Honor, hand up a
 8    document that I created?
 9            THE COURT:  All right.
10            MR. MARTIN:  When I Shepardized the Riley decision,
11    I found approximately 20 federal cases that dealt with border
12    searches after the Riley decision was decided.  These
13    decisions come from all types of different districts from
14    around the country, many of them are in California but some
15    are not.  One is actually in this district, a Judge Cleland
16    decision, and I will talk about that in a minute, but they
17    are from Virginia and Texas and Illinois and Georgia.  I
18    mean, they are all over, and all of those cases hold that
19    Riley did not change or alter the border search exception,
20    all of them.  There is no case since 2014 that has held that
21    Riley has changed or altered the border search exception in
22    any way, and those cases are set forth here on this document
23    that I have provided to you, which just further reinforces
24    this longstanding, well-entrenched exception to the warrant
25    requirement.
```

```
 1              As I mentioned, one of the cases was a case from
 2    our district decided in 2016 by Judge Cleland, United States
 3    vs. Fenton.  And in that case defendant was detained at the
 4    Detroit airport for four hours.  Customs and Border
 5    Protection officers searched his laptop computers.  They
 6    could not complete the search at the airport so they searched
 7    the computers -- they took the computers offsite, searched
 8    them at another location the next day.  And the defendant in
 9    that case said, hey, the Supreme Court case Riley was decided
10    that shows that you need a warrant.  And Judge Cleland said
11    no, it does not, essentially saying -- laying forth the same
12    arguments I just made about how Riley dealt with search
13    incident to arrest and not the border search.
14              I think the defendant's fallback position is, well,
15    okay, maybe a warrant was not required but reasonable
16    suspicion was required because cellphones contain a lot of
17    personal information, and there's a lot of privacy issues
18    involved with electronic devices.  And, again, there is
19    controlling case law on point.
20              This is the United States vs. Stewart decision from
21    the Sixth Circuit which is cited in our brief, it is 729 F.3d
22    517.  I think a little background on Stewart is important to
23    understand its significant.  Stewart was a case which
24    originated in our district.  It was a case decided by
25    Judge Lawson.  And like the Judge Cleland case I just
```

 1   mentioned, it was a case where an individual was at the
 2   border, at the airport.  His laptop computer was searched.
 3   He had actually multiple electronic devices that were
 4   searched by Customs at the airport at the border, but a
 5   couple of the computers could not be powered on, they needed
 6   a special cable to be able to be powered on and searched, and
 7   so the Customs officers actually had to transport the
 8   computers to their office downtown in Detroit and search them
 9   the next day and power them on and then conducted their
10   search.
11            And Judge Lawson said, you know, your search of
12   some of the electronic devices at the airport itself did not
13   need a warrant or any type of reasonable suspicion, so those
14   are okay, but when you transported the computers downtown,
15   you took them away from the border and therefore the extended
16   border search doctrine applied, which isn't at issue in this
17   case, but it is a doctrine that says searches that take place
18   not at the border but close to the border are permitted so
19   long as there's reasonable suspicion.  So Judge Lawson said
20   when you transported the computers downtown and then searched
21   them the next day, that was an extended border search and it
22   required reasonable suspicion.  The defendant -- and
23   Judge Lawson said that and I find reasonable suspicion
24   existed here, so therefore he denied the defendant's motion
25   to suppress.

 1          The defendant was convicted.  He then appealed to

 2     the Sixth Circuit arguing that the searches of his electronic

 3     devices were unconstitutional because the government needed a

 4     warrant.  And the Sixth Circuit affirmed Judge Lawson's

 5     decision denying the motion, but it did so on different

 6     grounds that are significant for this case.

 7          The Sixth Circuit said there was not an extended

 8     border search conducted.  They said that the search of those

 9     computers the next day in downtown Detroit was at the

10     border -- pardon me, was at the border.  It's as if they had

11     happened at the airport itself because the Customs officers

12     never cleared the devices through customs, they simply

13     couldn't power them on so they had to take them to a

14     different location.  That search did not require reasonable

15     suspicion.

16          Here's the quote from the Sixth Circuit:  That the

17     government had to travel 20 miles and wait 24 hours to

18     perform the same search that they could have done the

19     previous day had the proper equipment been present at the

20     airport does not transform a routine border search into an

21     extended border search for which reasonable suspicion is

22     required.

23          That is binding precedent.  That was a published

24     decision.  That means that a search of the defendant's hard

25     drive at the airport did not require reasonable suspicion.

```
 1    If a search of a laptop computer the next day in downtown
 2    Detroit does not require reasonable suspicion then certainly
 3    the search of a hard drive at the border itself does not.
 4         And Judge Cleland found the same conclusion in the
 5    Fenton case I mentioned earlier.
 6         So that's two fairly recent cases from our district
 7    and circuit that have said no reasonable suspicion is
 8    necessary to search electronic devices at the border, and
 9    Riley did not change the landscape of the border search
10    exception to the warrant requirement.
11         Those are the main points I want to make with
12    respect to the law on border searches, Your Honor.
13         THE COURT:  Thank you.  Response?
14         MS. FITZHARRIS:  To begin, Your Honor, I would like
15    to lay out as I see it the case law of Riley and the doctrine
16    of border searches lays out.  The Court has three options to
17    go with in terms of deciding what level of suspicion and
18    what's required to search a digital electronic device at the
19    border.
20         The first -- and we advocate that one of these
21    three is required at the border for many of the reasons
22    outlined in Riley, and I will get to that in a second, but
23    there are three options: a warrant supported by probable
24    cause, probable cause alone such as in an automobile
25    exception case, or reasonable suspicion such as is required
```

1    at the border when the government wishes to detain a person

2    for a lengthy period of time because they believe that she is

3    smuggling narcotics in her alimentary canal.  Those are the

4    three options, or anything goes, suspicionless searches.

5              Now, the last option I just discussed I noticed

6    that the government --

7              THE COURT:  So the fourth option is a --

8              MS. FITZHARRIS:  No suspicion required, but I

9    submit Riley does not make that an option when you are

10   talking about a digital device in this case, and so I will

11   begin with that.  Riley was talking about various exceptions

12   to the warrant requirements.  The Fourth Amendment requires

13   for a search that a warrant issue on probable cause issued by

14   a neutral magistrate.  The Supreme Court has carved out a few

15   exceptions to these doctrines, searches incident to arrest,

16   probation searches, parolee searches, anything requiring

17   special needs.  And the border search doctrine is just one of

18   the circumstances when there is some compelling government

19   interest that changes the balance between a person's

20   individual privacy interests and the government's interest in

21   conducting the search.  And in Riley the Supreme Court made

22   clear that those special needs need to somehow be tethered to

23   the government's interest, the search has to be tethered to

24   what the government is trying to accomplish in each of those

25   cases.

 1          So in Riley when the Court discussed the search

 2   incident to arrest, it talked about the reasons for this

 3   warrant -- the exception to the warrant requirement.

 4          THE COURT:  But what case do you have of border

 5   searches that required a reason or suspicion?

 6          MS. FITZHARRIS:  Yeah, Montoya de Hernandez, that's

 7   about smuggling narcotics in an alimentary canal, and I

 8   pointed this out in my briefing, that in that case the

 9   Supreme Court said because of the dignity interest at stake

10   by holding somebody for I believe it was something like eight

11   hours, you know, trying to get her to submit to an X-ray and

12   basically just waiting for her to pass the narcotics

13   naturally, that that was so uncomfortable and demeaning and

14   intruded on her liberty interest to such a degree that some

15   level of suspicion is required.

16          Now, that was just about holding her.  The Court

17   did not address what level of suspicion would be required to

18   actually -- not to be crude, but manually go into her body to

19   uncover the narcotics, and so that's been left for another

20   day whether something like probable cause or a warrant would

21   be required to do that.

22          And so I really direct the Court to that case

23   because the government's rights and ability to search is

24   constrained at the border, it is still constrained by the

25   Fourth Amendment's requirement that it must be reasonable.

 1          So to return to the conversation of Riley, Riley
 2    made clear that when we are talking about cellphones or other
 3    digital devices, we need to think -- take a different
 4    approach and we need to start thinking again about what the
 5    government's interests are and how those interests balance
 6    against the privacy interests of the individual and the
 7    sensitive and enormous quantity of data on the digital
 8    devices.  And so the Court began by looking at the reasons
 9    for the warrant exception; safety and destruction of
10    evidence.  So in this case what we need to do is look at the
11    reasons for the border exception.  The border exception has
12    to do with customs inspection, making sure people pay tariffs
13    and making sure that people are eligible to enter or exit the
14    country.  We balance that against the privacy interests of
15    the individual.  And the Sixth Circuit has acknowledged that
16    in Lichtenberger in 2015 after Riley.  The Sixth Circuit
17    recognized that Riley did change the conversation and tipped
18    the balance when you are doing the balancing scale between
19    government interests and privacy interests and said that the
20    privacy interests are increased since then.  And
21    Lichtenberger is also a published case that is after Stewart
22    and Riley.
23          So what the Court needs to do now, and I have
24    provided some cases to show examples of when courts have done
25    this, United States vs. Laura, for example, in the Ninth

```
 1    Circuit.  The Ninth Circuit looked at I believe the probation
 2    exception to the warrant requirement, and those -- that
 3    exception is also another form of special needs exception,
 4    tethered to ensuring compliance with the court order, and the
 5    Court said, well, after Riley we need to balance the
 6    interest -- the government's interest in ensuring compliance
 7    with the privacy interest in a cellphone.  And in Laura the
 8    Ninth Circuit said that in that case the privacy interests of
 9    the individual were more important than the government's
10    interest.  And so if you -- extending the logic and reasoning
11    and analysis that Riley requires, I think you have to do the
12    same in the border search exception.
13            And so when the Court looks at this circumstance
14    and the facts presented in this case, this Court needs to
15    look at whether the government was searching Mr. Ramadan's
16    electronic devices for the reasons that are permissible under
17    the border search exception; customs, and ensuring that he's
18    eligible to leave or enter the country.
19            THE COURT:  What do you mean when you say that?
20    When you say customs, which do you include in customs?
21            MS. FITZHARRIS:  Paying tariffs, making sure
22    contraband is not being imported, that sort of thing.  But
23    they must have --
24            THE COURT:  Not whether the person may be a
25    terrorist or have terrorist ties or anything like that?
```

 1             MS. FITZHARRIS:  Well, if you are talking -- that
 2   veers into an investigative search, right, and so if the
 3   purpose -- the border is not about law enforcement and
 4   criminal investigation.  So at the point when the search
 5   becomes focused on a criminal investigation, the level of
 6   suspicion required to search an electronic device increases
 7   because it is no longer tether to the reasons articulated for
 8   the border search.  And so that's why I think the evidentiary
 9   hearing is really important, and we will get -- we will go
10   into a lot of that, but it is about the nature -- what the
11   purpose of the search is and if it is appropriately tethered
12   to the government's interest and the special needs
13   articulated by the government.  And here I would say it is
14   not the case.
15             To -- I recognize that no court in the country has
16   yet decided this.  This is a very hot topic, a very novel
17   legal issue that is actually under consideration in the
18   Fourth Circuit right now.  Kolsuz, which is on the
19   government's list of cases, was argued a few months ago -- a
20   number of months ago in the Fourth Circuit, and we are still
21   awaiting an opinion, we don't know what the court is going to
22   say in that case.
23             And in the case United States vs. Caballero, that
24   was a Southern District of California case where the District
25   Court said, well, if I didn't -- wasn't bound by Cotterman, I

1   might find something different, but it felt like it was bound
2   by Cotterman because the Ninth Circuit was the only circuit
3   up to that point that talked about the difference between
4   manual search or any kind of border search of an electronic
5   device at the border.
6           I'm going to talk now a little bit about why
7   Cotterman really shouldn't apply in case.  In Cotterman the
8   Ninth Circuit created a distinction between what it called a
9   routine manual search of a digital device and a forensic
10  search, something that takes place offsite or whether some
11  sort of software used to create a digital copy.  And they
12  said that forensic nature of the search changed -- it was
13  just far more intrusive than a manual search.  And I think
14  that that logic simply does not hold up because a manual
15  search of someone's cellphone, for example, can reveal an
16  extraordinary amount of sensitive and personal information
17  about the person.  There are apps that connect to health
18  records, insurance records, bank accounts, not to mention
19  e-mail communications, GPS locations, and that is all that
20  does not require advance software, and so the intrusion on
21  person's liberty interest and privacy just through manual
22  search alone is quite extensive.
23          We are going to -- and the evidence will come out
24  but we are also going to talk about the length of the search,
25  whether it is a routine search or not.  And so I think there

 1   may be some line to draw between some -- like a casual scan

 2   through someone's photos or e-mails at the border which takes

 3   ten minutes versus a multi-hour search of someone's device at

 4   the border.  I think all of these issues are live and they're

 5   worthy of the Court's consideration because ultimately this

 6   Court needs to decide where the balance lies: the level of

 7   invasiveness versus Mr. Ramadan's privacy interest.

 8            So to talk a little bit about Stewart.  I have

 9   explained in my reply brief why Stewart is not the

10   controlling case law in this circuit.  It was decided before

11   Riley, and as Lichtenberger recognizes, Lichtenberger I

12   believe, sorry, Riley really changed the conversation about

13   warrantless searches of digital media, and so Stewart really

14   is dated and no longer binds this Court because there has

15   been an intervening Supreme Court case law that the

16   Sixth Circuit has already acknowledged.  The other reason to

17   really treat Stewart as an exception is that the -- that

18   wasn't -- this issue about the level of suspicion required to

19   search digital devices at the border, it was not presented

20   the way Mr. Ramadan presents this argument now.  It was about

21   extended border search.  The defense lawyer conceded that the

22   search of the computer at the border would have been fine.

23   We are not conceding that here.  And so a lot about Stewart

24   boils down to what was preserved and what was argued and what

25   the actual holding of the Sixth Circuit was because it was

 1    not presented with this question.  So the agents in this case

 2    cannot argue that they were following binding holdings of the

 3    Sixth Circuit to a tee.  And so that's to address that point.

 4    Does Your Honor have any questions?

 5              THE COURT:  No.

 6              MS. FITZHARRIS:  Thank you.

 7              THE COURT:  Thank you.  All right.  Mr. Martin,

 8    anything else or are you ready to proceed?

 9              MR. MARTIN:  I did want to just address one -- a

10    couple points, Your Honor, if I may?

11              THE COURT:  Okay.

12              MR. MARTIN:  One is counsel's representation that,

13    you know, border search exception exists to provide for

14    customs inspection, immigration-related things and just

15    contraband as if, you know, you can only search things to see

16    if people are bringing in, you know, fruit from another

17    country or something like that.  Of course it is much

18    broader.  Customs officers are conducting the search to do

19    those things, plus look for criminal activity, evidence of

20    child predators, drug trafficking, and terrorism.  The

21    Sixth Circuit in 2009 United States vs. Humphries, 308

22    Federal Appendix, that's A-P-P-X, 892, said, quote, because

23    of our government's need to protect national security, the

24    government's interest in preventing the entry of unwanted

25    persons and effects is at its zenith at the international

1    border.

2            THE COURT:  How does that go the other way?  Here

3    the person was leaving, so if we were -- if somebody was

4    coming in, say, with was it armor and different things like

5    that, the government would be interested, of course, in that.

6    But now they are leaving.  Do we have an obligation to

7    prevent them from going to another country with -- let's just

8    say terrorist for the purpose of argument -- with suspicions

9    of being terrorists?

10           MR. MARTIN:  Yes, absolutely, the government has a

11   very strong interest in making sure that people from this

12   country are -- who are terrorists are not traveling overseas

13   to another country because they may -- if they are

14   terrorists, they may very well be engaged in a terrorist act,

15   that's number one.  Number two, we all know after 9/11 that

16   the government has a very strong interest in making sure that

17   a terrorist, if that's the hypothetical, is not going to get

18   on an airplane because we know what terrorists do with

19   airplanes once they are on board.  So, yes, there are very

20   strong governmental reasons to screen people by the -- for

21   the customs officers to screen people for terrorism, and, of

22   course, it would make no sense to say that, well, a customs

23   officer can conduct a warrantless search for child

24   pornography but not terrorism.  I mean, that just defies

25   common sense, and the Constitution would draw that line.

1      The other thing that I wanted to address was the

2   alimentary canal decision because that is the only case where

3   the Supreme Court has required a level of suspicion to

4   conduct a search at the border.  And I think it is

5   significant that, number one, that search was essentially the

6   search -- although they didn't actually go into somebody's

7   body, it was described as an alimentary canal search and that

8   involved a high degree of intrusion on somebody's privacy and

9   dignity.  It was a search that lasted over 16 hours because

10  they detained the woman who had secreted balloons of drugs

11  into her stomach.  It took her that long, but she was able to

12  hold them inside of her body for that length of time.  And

13  they kept her in a room incommunicado, would not her

14  communicate with anybody for over 16 hours before a warrant

15  was actually obtained.  And significantly, the Supreme Court

16  did not require a warrant or probable cause to conduct that

17  kind of search, holding someone 16 hours to essentially

18  search their alimentary canal.  They said only reasonable

19  suspicion was required.  And that's a search of the most --

20  they were involved -- a situation that involved a high degree

21  of invasion into someone's dignity and privacy.

22      And I would suggest that that is the only time they

23  have required reasonable suspicion.  And the Sixth Circuit,

24  as I said in Stewart, did not require any reasonable

25  suspicion to search someone's electronic devices.

 1             Lastly, I just want to point out that I think the
 2    good faith exception would apply.  Defense counsel hit on
 3    this at the very end saying that the landscape of the law had
 4    changed so dramatically that any officer would have realized
 5    that the law had changed so dramatically and therefore would
 6    have known that they needed to get a warrant.  That's
 7    certainly not the case because of all of those cases I gave
 8    you on the handout where -- all of those federal cases after
 9    Riley have all held that Riley does not change the border
10    search exception.
11             THE COURT:  Thank you.
12             MR. MARTIN:  So, Your Honor, I would ask that --
13    the Court to find that no warrant and no probable cause was
14    required for the search here and that no reasonable suspicion
15    was required, and so for that reason the searches were lawful
16    and to deny the defendant's motion to suppress the searches
17    of the electronic device and hence the search warrant for the
18    storage locker and deny that motion right now and then
19    proceed to take evidence on the issue of the Miranda and the
20    statements.
21             MS. FITZHARRIS:  First, I'm not suggesting that
22    there is a different standard for investigations into
23    searches for child pornography or searches for terrorism.  I
24    think Your Honor asked a very interesting question, the
25    difference between people who are leaving the country and

1   people who are coming in.  I think there is a really
2   important factual distinction in this case.  Mr. Ramadan had
3   cleared the border, he had answered questions, he had given
4   his passport, he had put all of his luggage where it was
5   supposed to be, he was on the plane, and so at that point he
6   had regained his reasonable expectation of privacy, and I
7   think the government's interests were limited.

8           There is the additional issue that the search here
9   went beyond just issues related to whether he can leave the
10  country.  You know, he didn't have anything in his carry-on
11  luggage that could be used for any kind of terrorist act.  He
12  answered the questions about the items in his luggage.  In
13  fact, none of the items in his luggage were illegal to
14  possess.  Only one item he had to declare and pay tariffs on.
15  And so we are not talking about someone who was in possession
16  of any kind of contraband, and I think that will be fully
17  developed when we get to the record.

18          I also want to talk about the level of -- the
19  Montoya de Hernandez case because the government suggests
20  that the invasion on the dignity interests and the privacy
21  interests of Ms. Hernandez was less than -- less invasive
22  than a search of someone's computer.  Again, I think that
23  Riley really alters the way we think about this.  In addition
24  to Riley's discussion, I have provided a very interesting law
25  review article about how intrusive people perceive searches

```
 1    of just their cell phone or any digital device in particular.
 2    By searching a digital device, the government can learn far
 3    more information than they could ever learn about somebody by
 4    just searching an alimentary canal.  Again, this was not a
 5    search into her alimentary canal, and the Supreme Court may
 6    still say that probable cause or a warrant would be required
 7    to do so.  There are cases in the Sixth Circuit that talk
 8    about searches of someone's alimentary canal.
 9              THE COURT:  Okay.  We are not there.  Let me ask
10    this question.
11              MS. FITZHARRIS:  Yes.
12              THE COURT:  I'm just wondering about this
13    evidentiary hearing as it relates to the legal issues that
14    have been argued by -- raised by the government, argued by
15    both of you, because the circumstances of what happened in
16    terms of the evidence up to the point of taking the
17    electronic evidence is not really disputed, right?
18              MS. FITZHARRIS:  We need to explore what exactly
19    Mr. Ramadan's answers to the questions about the items in his
20    luggage.
21              THE COURT:  You need to explore what?
22              MS. FITZHARRIS:  Mr. Ramadan's answers to questions
23    about the items in his luggage, but up until that point there
24    is no dispute about really what happened.  I mean, there is
25    some dispute about what happened on the airplane.
```

1        THE COURT:  I'm going to ask this too of Mr. Martin
2   because evidently some of this information is -- would be
3   background to what follows so that you may want to take it
4   just as you would in a trial just to set up what happened.
5   Maybe that's the way we should proceed because I don't see it
6   as necessary for the basic question that this Court has to
7   resolve which is the question of the search of a personal
8   laptop or disk at the border.  I think that's a legal
9   question.

10        So I think we will begin with the testimony.  I'm
11  going to turn this back over to Mr. Martin so he can present
12  his evidence as to what happened.  I'm going to withhold my
13  ruling on that issue until I can review these cases that have
14  been submitted.

15        MS. FITZHARRIS:  Very well, Your Honor.  I just
16  respectfully request the right to address the government's
17  good faith exception at some point when the Court is ready to
18  address it.

19        THE COURT:  All right.

20        MR. MARTIN:  So, Your Honor, I think what we will
21  do then in light of your ruling is we will just start at the
22  beginning and we will present -- -

23        THE COURT:  I don't know how else to do it, you
24  didn't really tell me.  You said --

25        MR. MARTIN:  Well, what --

```
 1          THE COURT:  You want the background information and
 2    I don't know how to get it in without starting at the
 3    beginning it.  If there is a way, let me know.
 4          MR. MARTIN:  Well, what I was proposing was that
 5    the Court basically rule on the motion to suppress on the
 6    border search by saying, you know, look, the --
 7          THE COURT:  Okay.  I know what I could say, so
 8    let's say I do not suppress it, okay, and I agree with you,
 9    where would you start in testimony?
10          MR. MARTIN:  We would start with the officer that
11    first encountered him at the jetway to show that there was
12    no, you know, coercive conduct by any agents towards the
13    defendant when we first encountered him.  We wouldn't be
14    presenting any testimony about how the search of the bags
15    first came about, the finding of the body armor and that sort
16    of thing.  So we save a couple of witnesses but I don't think
17    they are going to be that long anyway so I'm happy to present
18    them.
19          THE COURT:  I don't either.  Let's just continue
20    and we will have it all on the record.
21          MR. MARTIN:  Very well.
22          THE COURT:  Okay.
23          MR. WATERSTREET:  Your Honor, the first witness the
24    United States is going to call is Shannon Vasher,
25    V-A-S-H-E-R, from TSA, and hopefully my agent is going to get
```

1    that witness right now.

2              THE COURT:  Okay.

3              MR. WATERSTREET:  Go ahead and step forward,

4    please.

5              THE CASE MANAGER:  Would you please raise your

6    right hand.

7              Do you solemnly swear or affirm that the testimony

8    you are about to give this Court will be the truth, the whole

9    truth, and nothing but the truth, so help you God?

10             MR. VASHER:  I do.

11                        SHANNON VASHER,

12   called at about 10:56 a.m., was examined and testified on his

13   oath as follows:

14                        DIRECT EXAMINATION

15   BY MR. WATERSTREET:

16   Q.  Turn your chair a little bit so you are speaking into

17   microphone and address your comments to the judge if you

18   would please.

19   A.  Okay.

20   Q.  And for the benefit of the court reporter and those

21   people here, can you give us your full name and spell it for

22   us?

23   A.  Sure.  It is Shannon Phillip Vasher, S-H-A-N-N-O-N,

24   P-H-I-L-L-I-P, Vasher, V-A-S-H-E-R.

25   Q.  And I see you are wearing a TSA uniform.  Are you

1     employed by TSA?

2     A.   I am.

3     Q.   Okay.  And what role or what position do you have at

4     TSA?

5     A.   Currently I work in the baggage area that handles the

6     luggage that goes underneath the belly of the aircraft.

7     Q.   Okay.  You are you what is called a TSA officer?

8     A.   Correct.

9     Q.   Okay.  And how long have you been with TSA?

10    A.   I'm over 15 years.

11    Q.   Okay.  Since its inception basically?

12    A.   Correct.  I was in the first group that rolled out DTW.

13    Q.   Now, you say you currently are in the baggage area, and

14    -- but has that been your position the entire time, your

15    15 years you have been working at TSA?

16    A.   No.  I have worked both with passengers and baggage --

17    Q.   Okay.

18    A.   -- throughout my 15 years.

19    Q.   Those of us who travel, you are one of those people that

20    tells us to take our shoes off, take off our belts, and step

21    through to the magnetometer?

22    A.   Correct.  I have done that before, and still can.

23    Q.   Or stand there -- you stand there with your hands over

24    your head as some machine rolls around you, and then you step

25    over barefoot until you say, yes, you are free to go?

1   A.   Yes, I can also do that as well.

2   Q.   Okay.  But now you are down in the baggage area?

3   A.   Correct.

4   Q.   Now, is it TSA's responsibility to make sure that

5   nothing goes on an aircraft here in the United States that

6   can potentially cause harm to the passengers in that

7   aircraft, correct?

8   A.   Yes, it is.

9   Q.   Okay.  That doesn't just include -- that's not just the

10  carry-on bags that we carry on, it is the ones that we check

11  in and go into the belly of the airplane?

12  A.   100 percent of the bags.

13  Q.   Okay.  And without going into great detail, can you give

14  us an idea of the system of how it works with the baggage

15  being checked, is it a one-person operation, two-person

16  operation or a multi-person operation?

17  A.   Without getting into too many details, it is -- bags are

18  automatically alarmed and then sent to me in a room.

19  Q.   Okay.  An alarm comes because of some piece of equipment

20  tells you that this baggage is of some concern?

21  A.   Correct.

22  Q.   And it identifies what bag it is and that you should

23  open up and take a look at it to find out what the concern

24  is?

25  A.   Yes.  The bag automatically comes to me at my location.

1    Q.   Okay.  Do you know anything about the person who owns

2    that bag before you open it?

3    A.   I do not.  There's a bag tag on the bag with the

4    destination, but other than that -- and that's not something

5    we normally have to address.

6    Q.   But it is a bag that is sent to you without you having

7    any of that information ahead of time?

8    A.   Correct.

9    Q.   Now, were you working on August 15th, 2017 in the -- at

10   Detroit Metropolitan Airport?

11   A.   I was.

12   Q.   What terminal were you working at, the McNamara or the

13   North?

14   A.   I was at the North terminal.

15   Q.   Okay.  And were you working any particular -- were any

16   particular flights going out around the time in which an

17   alarm went off in which a bag was directed to you to search?

18   A.   Yes.  It was around 19:30 hours, 7:30, which is the --

19   we were finishing up our last bank of flights for the day

20   since DTW -- we are not a redeye at the North terminal, and

21   it was a situation where we were semi-busy --

22   Q.   Okay.

23   A.   -- doing bags, bags were actively coming into the room

24   to be checked.

25   Q.   Okay.  And an alarm went off and a bag was sent to you

 1   for you to inspect?

 2   A.  Correct.  A bag came into the room, it stops right in

 3   front me, it is now my bag to check.

 4   Q.  Okay.  And without going into great detail, what type of

 5   bag was it that you ended up searching?

 6   A.  In this situation it was a -- it was a brown

 7   military-style duffel bag.

 8   Q.  Okay.  And what did you find during that search that was

 9   of interest and caused the alarm?

10   A.  The primary item that I needed to check in the bag

11   were an item I couldn't see in the bag, so when I opened up

12   the bag and looked at the alarm item, it was the ballistics

13   plates or the vest plates.

14   Q.  And you say ballistics plates.  What do you mean by

15   that?

16   A.  They are -- plates that go into like armor or flak

17   jackets or vests.  I'm familiar with a lot of the military

18   style ones since we have a lot of domestic military people

19   flying, but, yeah, a plate that would fit into some type of

20   article of clothing, whether it be a vest or a jacket, that

21   would be armor.

22   Q.  Okay.  I'm going to show you what has been marked as --

23   for the purposes of this hearing as I-5 and I-6 and tell me

24   if you can take a look at those for a moment, please.  Tell

25   me if you can identify the items depicted in I-5 and I-6.

1    A.  Yes, I'm able to identify it, especially I-6 since I see

2    two in the photos, and I had two --

3    Q.  In that bag?

4    A.  -- in the bag, yes.

5         MR. WATERSTREET:  Okay.  For purposes of this

6    hearing, Your Honor, may I move for their admission?

7         MR. DENSEMO:  May we see those for a second, Your

8    Honor?

9         THE COURT:  Yes.

10         MR. DENSEMO:  No objection, Your Honor.

11         THE COURT:  They may be received.

12         (Government's Exhibit I-5 and I-6 received into

13         evidence.)

14         MR. WATERSTREET:  Can we put them up on the screen?

15    BY MR. WATERSTREET:

16    Q.  This is item I-5.  What exactly is this?  It is kind of

17    hard to see with this black background.  I will give the

18    Court my copy.

19         THE COURT:  Thank you.

20    BY MR. WATERSTREET:

21    Q.  Can you explain to Your Honor what exactly this is?

22    A.  It looks like -- in my opinion, it is a body armor plate

23    used to stop projectiles.

24    Q.  Okay.

25    A.  I have seen enough of them to identify them.

1  Q.  Okay.  And you mentioned on there that it is an AR500

2  armor right there at the top?

3  A.  Correct.

4  Q.  It was manufactured on August 3rd, 2017, which was

5  approximately two weeks before you did the search?

6  A.  Brand new.

7  Q.  Brand new.  Now, you said there were two of them in

8  there.

9        Can you bring up I-6 for me, please?

10        Were these the two items -- look like the two items

11  that you --

12  A.  Yes, they looked an awful lot like those.

13  Q.  Okay.  Now, as part of your search responsibilities, you

14  also searched the surrounding area around the item that

15  caused the alarm?

16  A.  In a situation like this there is additional searching

17  in the bag, yes.

18  Q.  Okay.  And did you find any other items that you found

19  of interest?

20  A.  I found other items.  Some of the items I found were --

21  I had two-way radios in the bag, I had like a military style

22  jumpsuit, like a flight suit, some military style combat

23  boots.  I had a handful of remote controls that looked like

24  they were for -- they were dusty and dirty, like Blu-ray

25  players and things like that, but there were no Blu-ray

1  players in the bag.

2  Q.  Okay.

3  A.  I also found -- there was a couple -- two slingshots and

4  there was like a laser rangefinder that you would -- a

5  carpenter would use.

6  Q.  Did you find a voltage --

7  A.  I also found loose wires that had been like

8  hand-spooled, not on a spool, and then a volt meter.

9  Q.  Okay.  Now, you said that you are familiar with this

10  armor.  Are you also familiar with -- there was some laws

11  about export control of particular items, military items, and

12  things of that nature from the United States?

13  A.  I am familiar with that.

14  Q.  Okay.  And I'm not asking you if you are a professor

15  that you can give us chapter and verse, but are you familiar

16  enough with them to ask an associate to come over and take a

17  look at them as well?

18  A.  I know that if I see any of those items in a bag, I

19  reference the tag if it is an international destination and

20  then there needs to be some type of documentation.  And in

21  this case I did reach out to a coworker to verify to make

22  sure I wasn't making the wrong call.

23  Q.  Okay.  And who was that?

24  A.  That was Ahmad Rammal, A-H-M-A-D, R-A-M-M-A-L.

25  Q.  And did you have him come over and take a look at them

1    as well?

2    A.  He did.  We talked about it, we both agreed that some

3    type of documentation needed to be -- to go along with this

4    item.

5    Q.  And did you bring it to your supervisor's attention?

6    A.  At this point we reach out to leadership, which

7    TSO Rammal and I did.

8    Q.  Who was that?

9    A.  His name was LTSO Jesse Nagy.

10   Q.  N-A-G-Y?

11   A.  N-A-G-Y.

12   Q.  And as a result of that, your supervisor contacted

13   somebody from Customs and Border Protection?

14   A.  Correct.  We reached out to LTSO Nagy and he reached out

15   to customs.

16   Q.  You brought this bag and its contents to their

17   attention?

18   A.  LTSO Nagy did, yes.

19              MR. WATERSTREET:  I have no further questions at

20   this time, Your Honor.

21              THE COURT:  Any cross?

22              MR. DENSEMO:  Yes.

23                          CROSS-EXAMINATION

24   BY MR. DENSEMO:

25   Q.  Officer Vasher --

1    A.   Yes, sir.

2    Q.   -- this bag -- these bags -- was there one bag or two

3    bags that you searched?

4    A.   I only had one bag.

5    Q.   You only had one bag?

6    A.   I wasn't aware of any other officer searching any of the

7    gentleman's other bags, no.

8    Q.   So it was your position that all of these things were

9    contained in one bag?

10   A.   The items that I discussed were all in my bag.

11   Q.   The metal plates?

12   A.   Correct.

13   Q.   The electric wires?

14   A.   Correct.

15   Q.   The dusty and dirty Blu-ray remotes?

16   A.   The remote controls, yes.

17   Q.   What else did you say you found?

18   A.   I found a military style flight suit.

19   Q.   Okay.

20   A.   Military style combat boots.

21   Q.   Okay.

22   A.   A rangefinder that a contractor would use.

23   Q.   Okay.

24   A.   Two slingshots, I believe.

25   Q.   Okay.

1  A.  And there was some other random clothing.

2  Q.  Gotcha.

3         Now, you indicated that you were familiar with

4  these metal plates because you had seen enough of them to

5  identify them?

6  A.  I have.  We have a lot of military gentlemen flying

7  domestically.

8  Q.  A lot of military gentlemen flying domestically, that's

9  U.S. military?

10  A.  Correct.

11  Q.  And so it is not unusual for these guys and women to put

12  their metal plates in their luggage?

13  A.  Correct.  I have seen enough of them to know it is

14  common.

15  Q.  You see that often?

16  A.  Correct.

17  Q.  Okay.  And do all of these metal -- so I would assume

18  then that these metal plates eventually find their way to

19  you?

20  A.  Yeah, I would assume so as well.

21  Q.  Because the -- I guess the alarm beeps and, Vasher, you

22  are on, check out the bag?

23  A.  Yes, sir.

24  Q.  Okay.  And you go and you see metal plates?

25  A.  Correct.

1  Q.  When you get this -- when these bags come to Vasher, do

2  you know whose bag it is, is there a name identified with the

3  bag?

4  A.  There is a name on the bag tag that's connected to the

5  bag, yes.

6  Q.  Okay.  And in this case did you see the name Ramadan on

7  the bag?

8  A.  I did not.

9  Q.  Did you eventually -- was the name Ramadan on the bag?

10  A.  It was -- I couldn't tell you if the name Ramadan was on

11  the bag or not.  I didn't reference the bag tag, just -- but

12  just to see that it was an international departure.

13  Q.  Did the name Ramadan -- did you ever come to know that

14  this was Mr. Yousef Ramadan's bag?

15  A.  Days later -- I believe I even went on vacation right

16  after this event, and days later I found out the gentleman's

17  name.

18  Q.  Okay.  But at that time you did not know?

19  A.  No.

20  Q.  You don't know if Nagy or Rammal, if they were aware of

21  whose bag it was?

22  A.  I have no idea if they were aware.

23  Q.  But it was Nagy's decision to call customs?

24  A.  Correct.

25  Q.  Is it typical to call customs when you see these metal

1  plates?  When you get a bulletproof metal plate, do you

2  always call customs?

3  A.  When I get a bulletproof metal plate, I reference the

4  bag tag, and if it is domestic carrier with no international

5  connections, there is no need to reach out to anyone besides

6  doing the regular search I do.

7  Q.  I didn't understand any of that, Mr. Vasher.

8  A.  Okay.

9  Q.  If you could just do it real simply for me.

10  A.  If the bag is staying inside of the United States.

11  Q.  Okay.

12  A.  If the plane is not --

13  Q.  If so it is coming into the U.S.?

14  A.  I don't do any bags that come into the U.S.  I only do

15  departing, planes that are leaving the airport.  I don't

16  search any bags that are coming into the airport.

17  Q.  Okay.

18  A.  Departures only, not arrivals.

19  Q.  Is that just your specific job just to do departures?

20  A.  Correct.

21  Q.  Okay.

22  A.  Because a bag that is arriving has already been searched

23  by somebody at a different airport.

24  Q.  Okay.  And when you get these -- let's say you have a

25  military person's bag that's leaving the country with a metal

```
 1   plate, did you say that you then refer --
 2   A.  I have never had -- I have never had a military -- and
 3   this is me assuming.  When military is deployed out of
 4   country, I believe that whatever branch of the military they
 5   are with deals with the transportation of their gear.  I have
 6   only seen domestic military body armor that is staying within
 7   the United States.
 8   Q.  I understand what you are saying?
 9   A.  I have never seen any leave the country.
10   Q.  So you are familiar with military body armor?
11   A.  Correct.
12   Q.  But typically those flights are within the continental
13   United States?
14   A.  Correct, and I have seen civilian as well, it wasn't
15   necessary all military, but the civilian ones were also
16   domestics staying in the country.
17   Q.  You have seen civilians with the same kind of metal
18   plates?
19   A.  Yes.
20   Q.  Okay.  So seeing these metal plates in and of itself
21   wasn't unusual?
22   A.  No, it was not unusual.
23   Q.  Okay.  Now, you sure this bag wasn't black?
24   A.  I don't believe so.  I believe it was a brown, an earth
25   tone of some type.
```

```
 1   Q.  But are you 100 percent certain or that's your best
 2   recollection?
 3   A.  That's my best recollection.
 4   Q.  All right.  Give me one second, Judge.
 5           (An off-the-record discussion was held at
 6           11:14 a.m.)
 7   BY MR. DENSEMO:
 8   Q.  Did you see -- do you remember the kind of clothing that
 9   was in the bag?
10   A.  I do not remember the type of clothing that was in the
11   bag.
12   Q.  If I showed you a picture, do you think it would refresh
13   your recollection?
14   A.  No, but feel free.
15           MR. DENSEMO:  May I, Your Honor?
16           THE COURT:  You may.
17           MR. DENSEMO:  Thank you.
18   BY MR. DENSEMO:
19   Q.  Showing you a photograph of what purports to be pictures
20   taken of items taken from Mr. Ramadan's bag.  Do you
21   recalling seeing those jeans, that -- that footwear and that
22   press pass?
23   A.  I do not.
24   Q.  You do not recall seeing any of that?
25   A.  I do not recall seeing any of that.
```

1   Q.  All right.

2            (An off-the-record discussion was held at

3            11:15 a.m.)

4   BY MR. DENSEMO:

5   Q.  Are you -- Officer Vasher, are you certain -- did you

6   take any photographs --

7   A.  I did not.

8   Q.  -- of what have was in the bag?

9            You say you are certain there was a slingshot

10  inside this bag?

11  A.  Yes.

12  Q.  All right.  And you believe the bag was brown and not

13  black?

14  A.  I believe it was a brown -- an earth tone brown.

15  Q.  Okay.

16            MR. DENSEMO:  I don't have anything further.

17            THE COURT:  Anything else, Mr. Waterstreet?

18            MR. WATERSTREET:  May I just -- just a couple

19  questions, Your Honor.

20            Your Honor, I believe the item that was shown to

21  the officer has been marked as Defendant's Exhibit A; is that

22  correct?

23            MR. DENSEMO:  Yes.

24            MR. WATERSTREET:  Okay.  We also have that same

25  picture, Your Honor, it is I-4, so to stay with the

1  government's.

2                    REDIRECT EXAMINATION

3  BY MR. WATERSTREET:

4  Q.  Is this the same photograph that you were shown a second

5  ago, I-4?

6  A.  Correct, it is the same photograph.

7  Q.  And you never recall seeing any of those items?

8  A.  I do not.

9  Q.  So you don't know where those may have come from or

10  anything?

11  A.  I do not.

12  Q.  Okay.  When you said because it is an international

13  flight, there was some documents to be -- were required

14  because there is a thing called export control?

15  A.  Correct.

16  Q.  Okay.  What is your understanding about export control?

17  A.  My understanding is that there are certain items that

18  are not allowed to leave the country without some type of

19  documentation from the government.

20  Q.  Okay.

21  A.  And when we come across these items, we reference the

22  bag tag to make sure that it is not leaving the country, and

23  if it does that's when we reach out to leadership.

24  Q.  Okay.  And you said it was very -- it may have been

25  usual or not unusual to see domestically, but because it was

1    international, was it unusual?

2    A.   This is the first I've ever seen.

3    Q.   Okay.  And this bag that you searched and you found

4    these plates in, this was a bag that was eventually given to

5    CBP, you saw Nagy hand it to CBP, CBP then did whatever they

6    did with it?

7    A.   I did -- CBP arrived in our work area and then they took

8    possession of the bag.

9    Q.   Okay.

10                MR. WATERSTREET:  One moment, Your Honor?

11                (An off-the-record discussion was held at

12                11:17 a.m.)

13                MR. WATERSTREET:  Thank you.  Thank you very much.

14   Does the Court have any questions, Your Honor?

15                THE COURT:  No.  You may step down, sir.

16   A.   Thank you.

17                THE COURT:  Thank you.

18                (Witness excused at 11:17 a.m.)

19                MR. WATERSTREET:  The agent is going to get my next

20   witness, Your Honor.

21                THE COURT:  All right.

22                MR. DENSEMO:  Your Honor, we did not do so, but if

23   there are any other witnesses that haven't been sequestered,

24   we ask they be sequestered.

25                THE COURT:  Are there any other witnesses in the

 1    courtroom?

 2           MR. WATERSTREET:  Potentially the case agent, Your

 3    Honor.

 4           THE COURT:  That's all right.

 5           Counsel, in terms of scheduling, I want to tell you

 6    that I have only -- I have two pleas to take at 2:30 but

 7    outside of that we are free until 4:30.  Okay.

 8           MR. WATERSTREET:  I understand, Your Honor.  We

 9    don't want to take up any more time than you do.  We will try

10    to move through this as quick as possible.

11           Your Honor, when I had this hearing originally

12    scheduled, I did talk to your clerk and I suggested that she

13    block off some time for tomorrow as well.  I don't know if

14    that's been done or not.

15           THE COURT:  Let me just take a look.  We have two

16    hours tomorrow.

17           MR. WATERSTREET:  Okay.

18           THE COURT:  That's -- or we have all day Thursday,

19    she did mention that, and so we couldn't clear things

20    tomorrow but we do have Thursday.

21           MR. WATERSTREET:  I know I have a meeting, a

22    sentencing and an event outside of the court on Thursday

23    myself.

24           THE COURT:  Well let's try to get done.

25           MR. WATERSTREET:  Okay.

1          THE COURT:  Okay.  Is your witness here?

2          MR. WATERSTREET:  Yes, Your Honor.  Actually they

3  brought the wrong one, so, sir, would you please step

4  forward.

5          THE CASE MANAGER:  Would you please raise your

6  right hand.

7          Do you solemnly swear or affirm that the testimony

8  you are about to give this Court will be the truth, the whole

9  truth, and nothing but the truth, so help you God?

10         OFFICER ARMENTROUT:  I do.

11           OFFICER MITCHELL ARMENTROUT,

12  called at about 11:21 a.m., was examined and testified on his

13  oath as follows:

14            DIRECT EXAMINATION

15  BY MR. WATERSTREET:

16  Q.  Turn your chair, if you would please, so that you are

17  speaking to the Court.  For the benefit of the court reporter

18  and Her Honor, could you please spell and -- state your name

19  and spell your first and last name?

20  A.  Mitchell Armentrout, M-I-T-C-H-E-L-L,

21  A-R-M-E-N-T-R-O-U-T.

22  Q.  Good morning, Mr. Armentrout.  How are you?

23  A.  Good morning.

24  Q.  Is it -- are you involved -- employed by the Customs and

25  Border Protection Agency?

1   A.   Yes, sir, I am.

2   Q.   How long have you been so employed?

3   A.   Since June of 2005.

4   Q.   Okay.  So you are coming up on 15, 16 years, am I right?

5   A.   13.

6   Q.   I'm sorry.  13 years.  And what position do you hold

7   with CBP?

8   A.   I work for the Tactical Terrorism Response Team right

9   now.

10  Q.   Are you an agent, an officer or an investigator or --

11  A.   Just an officer.

12  Q.   Okay.  And have you held that position your entire

13  career here with TTRT?

14  A.   No, we started TTRT in October of 2015.

15  Q.   Okay.  And were you ever one of those guys in the blue

16  suit that welcome you as you get on a plane or talk to you

17  before you get on a plane to leave the United States?

18  A.   The dark blue, yes.  The light blue of TSA, no.

19  Q.   Okay.  And what are some of the duties of Customs and

20  Border Protection here at the airport?

21  A.   Well --

22          THE COURT:  Wait a minute.  Can you go back?  Did

23  you say TTRT?  What is that?

24  BY MR. WATERSTREET:

25  Q.   Explain to Her Honor what TTRT stands for.

1   A.   Ma'am, in 2015 headquarters developed a program of

2   special training for officers that deal with terrorism, and

3   they sent us to some training in D.C. and other advanced

4   training to better prepare us to fill that role.   The first

5   rollout I believe there were 300 officers nationwide, and

6   since then they have added more at more ports.

7        THE COURT:   What do those initials TTRT stand for?

8   A.   Tactical Terrorism Response Team.

9        THE COURT:   Thank you.

10  A.   Yes, ma'am.

11  BY MR. WATERSTREET:

12  Q.   Okay.   You said that you were in the dark blue uniforms.

13  When you work now are you in a uniform?

14  A.   No, sir.

15  Q.   Plainclothes?

16  A.   Yes, sir.

17  Q.   Do you have handcuffs and a firearm?

18  A.   Yes, sir.

19  Q.   Are they visible?

20  A.   No.

21  Q.   Okay.

22  A.   Sometimes my baton sticks out of my pocket but they are

23  not generally visible.

24  Q.   And when you -- what role did you play when you were

25  wearing the blue uniform?

1   A.  Between 2005 and 2008 I was a primary inspector or

2   officer.  I worked in the booth and/or in baggage control

3   secondary.

4   Q.  Okay.

5   A.  After 2008 I worked on the CTRRT, Counter Terrorism

6   Rover Response Team, kind of the precursor to what TTRT is

7   now.

8   Q.  Okay.  And when you were wearing the blue uniform, what

9   kind of people would you encounter in the day in and day out

10  basis?

11  A.  Well, people from all around the world.

12  Q.  People generally travelling, general travel?

13  A.  Yeah, almost exclusively people traveling but from

14  almost every country and every continent.

15  Q.  Okay.  And so you deal with the general public

16  basically?

17  A.  Yes, sir.

18  Q.  Or do you just only narrow in on people who you think

19  are breaking the law or do you deal with everybody?

20  A.  We dealt with everybody.  There would be a multitude of

21  reasons to stop and talk to somebody.  I mean, it could be

22  something as simple of helping somebody with their bag or

23  somebody smoking in the bathroom and getting sent up there by

24  the supervisor to deal with it.  I mean everybody.

25  Q.  Okay.  And on outbound flights, what are some of the

1    concerns with -- that customs has about outbound flights?

2    A.   Well, we're interested in merchandise that is -- it

3    used to -- it is ITAR violations, certain tactical things,

4    certain items.  I know a number of years ago specialized had

5    a mountain bike that was made out of a special alloy that

6    couldn't be exported to certain countries.  There are certain

7    items that you are not allowed to take out of the country.

8    We also deal with cash interdiction, currency interdiction,

9    outbound, firearms, that kind of thing.

10   Q.   Okay.  When you were talking about ITAR and the mountain

11   bike, for example, are there certain items that you can't

12   take out of the country at all, are there certain category or

13   is there a certain category that you can take out of the

14   country but you have to get certain paperwork squared away,

15   and there's certain things that you can take out of the

16   country but you can't take to certain other countries?

17   A.   Correct.

18   Q.   So all of -- that whole universe of things?

19   A.   Yes, sir.

20   Q.   Okay.  Let's have someone coming inbound, what are some

21   of the concerns you have about people coming inbound?

22   A.   Generally speaking, we start with are they admissible to

23   the United States, are they a returning alien resident or are

24   they a U.S. citizen.  After you start filtering it down, are

25   they carrying contraband, did they fail to report merchandise

*Evidentiary Hearing • January 30, 2018*

 1  they purchased or acquired, or had they been committing

 2  crimes in foreign countries and now they are coming back.

 3  Q.  So there is a whole host of reasons?

 4  A.  A multitude of reasons why.  And, again, it could be

 5  something as easy as their name matches somebody else's and

 6  we just have to sort that out, all the way through to there

 7  is a warrant for their arrest.

 8  Q.  And every person -- and that is -- that takes care of --

 9  at the primary inspection on inbound?

10  A.  Yes, sir.

11  Q.  Okay.  There is a thing called secondary, I think you

12  and I talked about this before, but what is secondary as

13  compared to primary?

14  A.  It would be most easily classified as a more in-depth

15  opportunity to talk to the person to rectify any sort of

16  issue or perception of an issue that there might be.  The

17  goal is to filter the people that need more time in their

18  inspection into the secondary area where the officers have

19  more time whereas primary, 98 percent, based on a national

20  average of the travelers, are bona fide travelers and we want

21  to process them in an expedited manner.

22  Q.  And even those people who are asked to go to secondary,

23  are those people that you have now suddenly decided they are

24  criminal and we are going to do something about this or is

25  there --

1    A.   Absolutely not.   There is a whole host of reasons.

2    There might be a special stamp on their visa, it might be

3    they have advance parole, they might be immigrating that day.

4    Q.   Okay.

5    A.   It is just they need something different than what the

6    primary inspector has and we keep those tools in a different

7    location.

8    Q.   And what are some of the common questions that you would

9    ask either primary or secondary to anybody who you happen to

10   have come in contact with?

11   A.   Where did you travel to, how long were you there, what

12   did you go to see or do, and then get into what is it you are

13   bringing back, are you carrying any agriculture items, how

14   much currency are you carrying, and have you been on a farm,

15   ranch or pasture.

16   Q.   And that's because you are asking one question to

17   resolve a whole series of issues?

18   A.   Yeah.   Prior to maybe three, four years ago we had a

19   written form 6059 -- 6051 -- no, 59, and they would answer

20   all of the questions on it.   Our port management has done

21   away with it, but in the basic training you learn how to ask

22   all of the questions.

23   Q.   How about outbound, similar type of questions?

24   A.   Very similar, where are you going, how long will you be

25   there, how much currency are you carrying, what's in your

1    luggage.

2    Q.   Okay.  Now, let's say I just got off of a plane -- no,

3    I'm about to leave and something comes up in my luggage and

4    there is a question and I'm taken down to secondary.  Am I

5    under arrest at that time?

6    A.   No.

7             MS. FITZHARRIS:  Objection; calls for legal

8    conclusion.

9             THE COURT:  Overruled.

10             MR. WATERSTREET:  Excuse me.

11             THE COURT:  I overruled that.

12   BY MR. WATERSTREET:

13   Q.   Am I under arrest in your mind?

14   A.   No.

15             THE COURT:  In his --

16             MR. DENSEMO:  Objection as to what's in his mind,

17   that's irrelevant.

18             THE COURT:  As to what he believes if this person

19   is under arrest or not, it is relevant, so --

20   BY MR. WATERSTREET:

21   Q.   Are you placing me under arrest because I have been sent

22   over to secondary?

23   A.   Absolutely not.

24   Q.   What is the purpose of having me come over to secondary

25   because there was something that you want to clear up about

1  something in any bag?

2  A.   We need to resolve what it is, why you have it, where it

3  is going and whether or not it actually needs a license to

4  leave the country.

5  Q.   Is this a -- is this like an interrogation where you put

6  me under the hot lights and you browbeat me until --

7         MS. FITZHARRIS:  Objection, again, calls for a

8  legal conclusion about whether this was interrogation.

9         THE COURT:  You can use a different word.

10  Sustained.

11  BY MR. WATERSTREET:

12  Q.   Do you use tactics such as that?

13  A.   No, sir.

14  Q.   I mean, there could be an innocent explanation of why I

15  have --

16         MR. DENSEMO:  Objection, he's leading the witness,

17  Your Honor, and --

18         THE COURT:  Sustained.

19         MR. DENSEMO:  And he is sermonizing.  That's not a

20  question.

21         THE COURT:  So for all I have is could there be.

22  Ask a question and I will rule on it.

23  BY MR. WATERSTREET:

24  Q.   Are there innocent explanations for why I'm being sent

25  over to secondary after you do a further investigation?

1    A.   Frequently there are.

2    Q.   And what is your job to do, to figure -- to try to

3    separate the two or figure out what is going on or what?

4    A.   To resolve whatever the issue might be and bring it to a

5    logical conclusion.

6    Q.   Okay.  And what are some of the different methods by

7    which you go through to try to sort this whole issue out if

8    there is an issue about something in my bag, what are the

9    different steps you take and what are the different things

10   you do?

11   A.   Well, the first and foremost, the easiest one is to ask

12   you about it.

13   Q.   Okay.

14   A.   Obviously you go through the baseline of questions, we

15   are going to talk about what it is, we are going to talk

16   about where you are going, what you intend to do, and try to

17   make what it is that you have with you make sense.

18   Q.   Okay.  If in the process of talking to me my story makes

19   sense, do you do anything else to like verify my story?

20   A.   Absolutely.

21   Q.   Like what?

22   A.   Well, we can use Internet, government databases and

23   other things that are provided to us to verify what you are

24   telling me is true.  Let's say you tell me that I am going to

25   go visit my family in Innsbruck.  What's their phone number,

 1    let me ring them up.

 2    Q.   Okay.  Or if I was going to Russia during this time of

 3    year and the issue was that I had a gun in there and I had

 4    nothing but swimsuits and like flip-flops and sunglasses?

 5    A.   We would probably talk about that, yes, sir.

 6    Q.   Okay.  Why?

 7    A.   Well, it tends to be cold this time of year in Russia.

 8    Q.   Okay.

 9    A.   And most people don't take their firearm for shooting in

10    their swimsuit.

11    Q.   Okay.

12    A.   It would be unusual to encounter that.

13    Q.   Okay.  And if my story doesn't make sense, what would

14    you do, would you try to follow up some other way?

15    A.   Well, then we would go to database or Internet and try

16    to figure out -- put the pieces together or call somebody

17    that knows you and start trying to make the puzzle make

18    sense.

19    Q.   Okay.  If I have a cellphone or some other electronic

20    device and I'm saying I'm going to Russia with my swimsuit

21    and my gun, would you be interested in seeing what's in my

22    phone or other electronics?

23    A.   Well, in the course of the inspection we would review

24    all of the things that you were carrying with you to include

25    electronic media.

*Evidentiary Hearing • January 30, 2018*

1    Q.   Okay.  So would it be unusual then to ask to look at the

2    luggage that I have with me or the carry-ons that I have with

3    me?

4    A.   Well, we don't necessarily have to ask.  We will because

5    we want to be polite and civil, but absolutely the carry-ons

6    as well as the checked bags from under the aircraft.

7    Q.   So what is your regular pattern then if somebody like me

8    was asked to step aside because they found something in my

9    luggage, would you look through all of my luggage?

10   A.   Yes, sir.

11   Q.   Okay.  What about the luggage that was placed on the

12   airplane?

13   A.   Yeah, we would have that brought to us to review as

14   well.

15   Q.   Okay.  Now, is this something that is out of the

16   ordinary, something unusual that you do, or is this something

17   that happens day in and day out?

18   A.   Every day.

19   Q.   Some have conclusions that there's nothing going on here

20   and some that still leave you scratching your head?

21   A.   The ones that leave you scratching your head you usually

22   call the special agent and turn it over to them.

23   Q.   Okay.

24   A.   I mean, when you don't reach that logical conclusion, we

25   are not investigators, so we call the people that we know

1    are.

2    Q.   Okay.  And what establishes the amount of time in your

3    mind in order to resolve whatever issue of why I'm traveling

4    with a gun and my swimsuit in my bag and whatever other items

5    you may get off the bags from the airplane that I have

6    already checked through, what establishes the amount of time

7    that you will spend with me?

8    A.   How quickly we can discern what we believe to be the

9    truth.

10   Q.   Okay.  And if I am being somewhat cooperative but then

11   at other times uncooperative, would that cause it to change

12   the amount of time that it takes?

13   A.   Anytime you run into uncooperative or partial truth, it

14   takes more time because the logical conclusion doesn't

15   include any of those, it includes simple truth.

16   Q.   And if I have one bag versus 16 bags, would that take

17   much longer?

18   A.   Well, yeah, there is more to inspect.

19   Q.   And if I had just my cellphone versus, let's say, four

20   hard drives that have -- a couple of them have five terabyte

21   memory capability, would that take much longer?

22   A.   That would certainly take a significant amount of time

23   longer.

24   Q.   Now, if I was being uncooperative, would you

25   intentionally punish me by making me stay longer --

1          MR. DENSEMO:  Your Honor, I'm going to object to

2    this line of questioning.  One, these are all speculative

3    questions, hypotheticals.  There is no -- there does not seem

4    does be anything tied to the specific circumstances of

5    Mr. Ramadan's case, so we would object.

6          THE COURT:  Okay.  Counsel?

7          MR. WATERSTREET:  Your Honor, I apologize to the

8    Court.  The defendant has made very vague claims in his

9    motion.  As a matter of fact, he's made no true factual

10   allegations other than he was assaulted and he was harassed,

11   and based on that, I have very little to go on to assume --

12   to figure out what harassment or what assault or who

13   assaulted whom at the airport.

14         THE COURT:  Why don't we get to what happened in

15   this case.

16         MR. WATERSTREET:  Okay.

17         THE COURT:  Okay.

18         MR. WATERSTREET:  Thank you very much.

19   BY MR. WATERSTREET:

20   Q.  Let me ask you this.  If I was sent over to secondary

21   and I simply said forget it, I'm not talking to you, I'm just

22   going right out that door there, would I be able to do that?

23         MR. DENSEMO:  Your Honor, I'm going to object.  Why

24   doesn't he just ask if Mr. Ramadan did that, then we can get

25   right to the heart of this matter.  This man interviewed

1   Mr. Ramadan, he spent hours with him, the other agent, he can

2   ask this man what did Yousef Ramadan do.

3              THE COURT:  Sustained, just so we can move along

4   here.

5   BY MR. WATERSTREET:

6   Q.  I want to bring you back to August 15th, 2017.  Were you

7   on duty that day?

8   A.  Yes, sir.

9   Q.  Okay.  That evening?

10  A.  Yes, sir.

11  Q.  And were you partnered up with anybody else?

12  A.  I was working with Officer Schmeltz.

13  Q.  Okay.  And is Officer Schmeltz your regular partner or

14  do you choose who your partner is or how does that work?

15  A.  It is whoever is on the schedule for the day.

16  Q.  Okay.  It is not somebody you choose?

17  A.  No, sir.

18  Q.  Some supervisor that makes a decision that you and --

19  A.  Whoever is on the schedule.

20  Q.  Okay.  Do you know in your experience why do you work

21  with a partner?

22  A.  Different people look at things differently and might

23  see other things than what I see.  Different people have

24  different experiences.  Generally speaking, when we work

25  together, it is quicker for the passenger and it's a safer

 1  environment for everybody to work in.

 2  Q.  When you say safer, is it safer for you or the passenger

 3  as well?

 4  A.  For everybody.

 5  Q.  Why is that?

 6  A.  Another set of eyes, another set -- have somebody else

 7  in the interview.  Let's say you are interviewing somebody

 8  and for whatever reason your personalities don't work well.

 9  Your backup officer can then become the primary inspector and

10  hopefully have a better rapport with your passenger.

11  Q.  Okay.  That day were you -- did you meet a person named

12  Yousef Mohammad Ramadan?

13  A.  Yes, sir.

14  Q.  Is he in the courtroom today?

15  A.  Yes, sir.

16  Q.  Can you point him out, please.

17  A.  Sitting here.

18          MR. WATERSTREET:  Your Honor, can the record

19  reflect he's identified the defendant?

20          THE COURT:  Yes.

21          MR. WATERSTREET:  Thank you.

22  BY MR. WATERSTREET:

23  Q.  Where is it that you first met him?

24  A.  In the -- I guess the easiest way to describe it is in

25  the secondary inspection area in the seating area.

1    Q.  I'm going to show you what we are going to mark as

2    Government's Exhibit X --

3              THE COURT:  Exhibit what?

4              MR. WATERSTREET:  X.  There are a whole bunch of

5    other letters, Your Honor, that we already have premarked and

6    I want to make sure we don't have any duplicates.

7    BY MR. WATERSTREET:

8    Q.  For the benefit of the parties involved here, you have

9    -- I gave you a copy of that?

10   A.  Yes, sir.

11   Q.  Can you identify what area where you first met

12   Mr. Ramadan?

13   A.  Where it is marked lobby.

14   Q.  In the lobby area.  And is that in the secondary

15   inspection area?

16   A.  It is.

17   Q.  So he was directed down there by some other CBP

18   officers?

19   A.  Yes, sir.

20   Q.  And who were they?

21   A.  That would be Officer Haeck and Officer Robinson.

22             MR. DENSEMO:  Who?

23   A.  Officer Haeck and Officer Robinson.

24             MR. DENSEMO:  Robinson, Haeck?

25   A.  Yes, sir, it is two people.

1   BY MR. WATERSTREET:

2   Q.   Were they -- did you or your partner ask them to bring

3   Mr. Ramadan down to the secondary inspection area?

4   A.   My partner did.

5   Q.   Okay.  And there is this open seating area, that is --

6   you have marked that as lobby?

7   A.   Yes, sir.

8   Q.   And then below that lobby are two interview rooms?

9   A.   Correct.

10  Q.   And one of them has been marked interview room?

11  A.   Yes, sir.

12  Q.   And the one to the left of that is an interview room as

13  well?

14  A.   It is.

15  Q.   And there is -- is there glass partitions in those

16  interview rooms where somebody sitting out in the lobby area

17  can see in and the people can see out?

18  A.   Yes, sir.  There is a glass partition between the two

19  rooms as well.

20  Q.   Okay.  So any passerby happens to be looking in can see

21  what is going on in that interviews?

22  A.   You can see us sitting there.

23  Q.   Okay.  And the approximate size of that room?

24  A.   Eight by ten.

25  Q.   And there is a desk in there?

1    A.   There is.

2    Q.   And chairs?

3    A.   Yes, sir.

4    Q.   Now, when Mr. Ramadan came down, did he also have his

5    wife and his children with him?

6    A.   Yes, sir.

7    Q.   At this point in time what information did you have

8    about Mr. Ramadan when he first came into the secondary?

9    A.   We had been told there was some Level III body armor in

10   his checked bag.

11   Q.   Which is an item that is export controlled?

12   A.   Yes, sir.

13   Q.   Okay.  And you need certain documentation to be able to

14   take it outside of the United States?

15   A.   Correct.

16   Q.   That was the purpose of trying to find out --

17          MR. DENSEMO:  Objection, leading.

18   BY MR. WATERSTREET:

19   Q.   What was the purpose --

20          MR. DENSEMO:  Objection.

21   BY MR. WATERSTREET:

22   Q.   What was the purpose of meeting with Mr. Ramadan?

23   A.   To try to determine why the Level III body armor was

24   being exported.

25   Q.   Okay.  See if he had paperwork or didn't have paperwork,

1    find the details?

2    A.  Yes, sir, logical conclusion.

3    Q.  Where was Mr. Ramadan asked to sit down or to go to when

4    he first was brought into the secondary area?

5    A.  We went into the interview room that would be on the

6    left on the diagram.

7    Q.  All right.  And was he able to see his children and his

8    wife waiting in the lobby area?

9           MR. DENSEMO:  Objection, calls for speculation on

10   the part of the witness.

11   BY MR. WATERSTREET:

12   Q.  Were you able to see them from that office?

13   A.  I was.  There is a window that looks out into the lobby

14   area.

15   Q.  Okay.  Did you have Mr. Ramadan sit in such a way that

16   if he wanted to, he could look out into that area, wave to

17   his children and his children could wave to him?

18   A.  The chairs even have wheels.

19          MR. DENSEMO:  I didn't hear the answer.

20   A.  Yes, he could have if he had chosen to.  The chairs have

21   wheels, you can roll them to and fro and look out the window.

22   BY MR. WATERSTREET:

23   Q.  Okay.  And because he had a family, is there a specific

24   concern in your mind about the length of time that this may

25   take because he has young children?

1  A.   The primary concern with young children and/or a spouse

2  is specifically access to food, making sure the temperature

3  is okay, water, bathroom.  It is a family, you don't want to

4  hold them any longer than you have to, and while you are

5  inconveniencing them, you would like to make sure the

6  children are taken care of.  We make sure to extend that

7  courtesy and make sure they know that we have food available

8  for the children.

9  Q.   Okay.  And the parents if they want?

10  A.   Yes.  We usually have a coloring book or two or

11  something else to occupy the children as well.

12  Q.   Did you say anything to Mr. Ramadan when he first sat

13  down about that process, that if you wanted --

14  A.   Yes, sir.  We ensured that we offered him all of those

15  things because he was traveling with children.

16  Q.   Okay.  Did you also talk about wanting to get out of

17  that -- how long it would take to get out of there and how --

18  if you wanted to move it along quickly or move it along

19  slowly?

20  A.   We kind of started right with where are you going, what

21  are you doing, how long are you going to be gone, how much

22  cash, the regular questions that I had said we start with

23  normally.

24  Q.   Was the door left open in that room?

25  A.   I believe it was propped open, yes, sir.

```
1   Q.  When you asked him where he was going, did he tell you
2   where he was going?
3   A.  Yes, he said he was going to Palestine.
4   Q.  Did he indicate what the purpose of his trip was?
5   A.  It changed several times.  It is kind of a vague
6   question.
7   Q.  Okay.  Well, why don't you walk us through what took
8   place.
9   A.  The initial response was going to be a reporter and
10  cover the conflict between Israelis and the Palestinians.
11          THE COURT:  Could you pull that microphone a little
12  closer to you.
13  A.  Yes, ma'am.  Is this better?
14          THE COURT:  That is much better.  Thank you.
15  A.  I'll scoot -- oh, I guess the chair doesn't roll.
16          THE COURT:  No, chair doesn't move.
17  BY MR. WATERSTREET:
18  Q.  He said he was going to be a reporter to do what?
19  A.  To cover the ongoing conflict between Palestinians and
20  Israelis.
21  Q.  Did you ask him some questions about being a reporter?
22  A.  We asked for who.
23  Q.  What was his response?
24  A.  That there was not a specific who but that it would be
25  done and posted online.
```

1  Q.  Did you ask him any other questions concerning being a

2  reporter?

3  A.  We asked if he had been a reporter before, if he had any

4  training or press credentials or any contacts that could help

5  him in that business venture overseas.

6  Q.  What was his answer to the first question?

7  A.  It was no to all of the questions, sir.

8  Q.  Okay.  So he had no contacts, no prior training, no

9  nothing?

10  A.  To work as a reporter, no, sir.

11  Q.  To work as a reporter, that's what he said?

12  A.  Yes, sir.

13  Q.  Did you ask him if he had anybody lined up to sell

14  anything to?

15  A.  Yes, sir.

16  Q.  What was his response to that?

17  A.  That was a no.  Again, because when we asked, it was I

18  will post it online.

19  Q.  Did you -- what was the next question you asked then?

20  A.  I wasn't asking the bulk of the questions but the next

21  logical question was why would you take your children

22  someplace that you feel like you need Level III body armor?

23  Q.  So you had already told him that he had -- he was there

24  because of the Level III body armor?

25  A.  That was the gist of what we were getting at at that

*Evidentiary Hearing • January 30, 2018*

```
 1    point.  We needed to figure out why it was in his luggage.
 2    Q.  Did ask him how long he planned on being in Palestine?
 3    A.  Yes.
 4    Q.  What was his response to that?
 5    A.  That it was going to be indefinite.
 6    Q.  Okay.  And did you ask him who was traveling with him
 7    and who was going to Palestine with him?
 8    A.  I believe we just assume -- I, sitting where I was
 9    sitting taking notes, knew his family was with him, I just
10    assumed it was his family going with him.
11    Q.  Okay.  Did he say he was going to move there or just
12    stay there for a short period of time?
13    A.  I think it was an indefinite move if things went well.
14    Q.  Okay.  And was a report written concerning this
15    conversation that you had with Mr. Ramadan?
16    A.  Yes.  Officer Schmeltz wrote a report at the end of the
17    evening or early the next morning.
18    Q.  Okay.  Did he say where in particular that he was going
19    to be moving in Palestine?
20    A.  Bethlehem.
21    Q.  Did he say why he was going to Bethlehem with his
22    children?
23    A.  I believe his father has property there.
24    Q.  Okay.  Did he say anything about the way his children
25    could be raised here in the United States?
```

1   A.   Well, it kind of ties back into the question we asked

2   why would you go somewhere where you feel like you need Level

3   III body armor.  The answer we got was you can't raise your

4   children right here.

5   Q.   Okay.  Now, as a member of TTRT, did that seem

6   interesting to you, that response?

7   A.   It was a little different than what most people would

8   say.

9   Q.   All right.  Did you ask him whether he had body armor

10  for his children?

11  A.   I repeated the question indicating that I knew he only

12  had body armor for himself.  Still, why would you go

13  someplace where you feel like you need body armor, what about

14  your children?

15  Q.   Did ask you him whether they planned on going to school

16  or where they would go or where they would live?

17  A.   I did, and he said that they would stay in the house.

18  Q.   So based upon what you know up to this point, he is --

19  he claims to be a journalist with no past training experience

20  or any contacts?

21          MR. DENSEMO:  Objection, Your Honor,

22  mischaracterization of what the witness just said and what

23  Mr. Ramadan told him.  It is a complete mischaracterization.

24          MR. WATERSTREET:  That's not a mischaracterization

25  at all.

1          THE COURT:  You don't need to repeat anyway what

2     has already been testified to.

3          MR. WATERSTREET:  Right.

4     BY MR. WATERSTREET:

5     Q.  But at this point in time his only explanation -- what

6     did he explain why he needed body armor?

7     A.  For himself.

8     Q.  For himself.  But his children are going to stay in the

9     house because he can't raise them right here in the

10    United States?

11    A.  Yes, sir.

12    Q.  Did you eventually come to learn that Mr. Ramadan was

13    born and raised in that area --

14    A.  Yes, sir.

15    Q.  -- in Bethlehem?

16    A.  Yes.

17    Q.  Did you also talk to him about how much money he was

18    carrying?

19    A.  We did.  That would be one of our normal first 12

20    questions.

21    Q.  What was his response that?

22    A.  $10,000.

23    Q.  Did he do anything at that time?

24    A.  He showed us a bundle of money from what we call a fanny

25    pack but we didn't count it, we didn't verify.  We've handled

1   currency enough to know that based on approximate size how

2   much is roughly how much, and we were satisfied at that.

3   Q.   So did you keep that -- did you seize that money then?

4   A.   No, sir.

5   Q.   Okay.  What happened with that money?

6   A.   I wasn't --

7   Q.   Did you take it from him or did he get to keep it?

8   A.   He kept it on him.

9   Q.   Okay.  Did you ask him about any other items in his

10  luggage?

11  A.   Well, we would have asked about other items that he

12  might have with him.  I usually -- because I have worked

13  inbound so frequently, I usually still ask about food going

14  outbound even.

15  Q.   Okay.

16  A.   Not controlled but it's a habit.

17  Q.   Now, did you feel that at that point -- hypothetically

18  speaking, if you come to the conclusion that the answers are

19  not adding up in your mind, what was the next logical step

20  that you would take?

21  A.   Well, again, we are going to try to look deeper into the

22  situation.  We've asked for contacts, professional contacts.

23  That couldn't be verified that way, so the next step would be

24  to start reviewing all of the merchandise traveling with him

25  to include digital media.

1  Q.   Okay.  Do you circle back and then go over the questions

2  again and try to compare and contrast it with what he just

3  told you versus what he first told you at the very beginning?

4  A.   Yes.

5  Q.   Okay.  Now, you said there were -- in my hypothetical

6  before, you would also check other databases.  Did you have a

7  chance to check any databases?

8  A.   I did not personally.  I was not running any computers

9  that evening until later on in the inspection.

10  Officer Schmeltz did.

11  Q.   Did he come across something that was in the TEC System?

12  A.   Yes, sir, he did.

13  Q.   Okay.  And did he bring it to your attention?

14  A.   Yes, he did.

15  Q.   I'm going to show you what has been marked as

16  Government's Exhibit Y.  Tell me if you came across --

17        MS. FITZHARRIS:  Could we have a copy,

18  Mr. Waterstreet?

19        MR. WATERSTREET:  You already have a copy.  It was

20  sent as part of discovery back on December 19th.

21        MS. FITZHARRIS:  What is he looking at?

22        MR. WATERSTREET:  I know.  I was just about to say

23  what it was.

24        MR. DENSEMO:  Okay.

25        MR. WATERSTREET:  It is an HSI report, a tip,

1  concerning a Yousef Mohammad Ramadan.

2         MR. DENSEMO:  Can we see it so we can find it?

3         THE COURT:  Show it to them.

4         MR. WATERSTREET:  Sure.

5         THE COURT:  Is this to be a government's exhibit?

6         MR. WATERSTREET:  I'm just marking it for clarity

7  purposes so the record is clear, Your Honor.

8  BY MR. WATERSTREET:

9  Q.  Did you come across in the TEC System an HSI tip?

10  A.  Yes, sir.

11  Q.  Did reading that tip over, did that give you some

12  concern about Mr. Ramadan himself?

13  A.  Yes, sir, it did.

14  Q.  And without going into chapter and verse of that tip,

15  that was a tip to HSI back in 2010?

16  A.  Yes, sir.

17  Q.  And what -- again, not going into every detail, what

18  generally was that tip about?

19         MR. DENSEMO:  Objection, Your Honor, triple

20  hearsay.

21         THE COURT:  Sustained.

22         MR. WATERSTREET:  It is not being offered for the

23  truth of the matter asserted therein, Your Honor.  It is to

24  explain why they would have continued to investigate him --

25         THE COURT:  All right.  Overruled.

```
 1              MR. WATERSTREET:  -- and to have unusual suspicion.
 2              THE COURT:  Overruled.  Go ahead.  You may answer
 3    it, sir.
 4    A.   Ma'am, do I just read what it says?
 5              THE COURT:  Not directly, no.
 6    BY MR. WATERSTREET:
 7    Q.   Okay.
 8    A.   The gist of the record was that Mr. Ramadan or somebody
 9    by that name and roughly the same age from a place we had --
10    a certain Mr. Ramadan had lived may be involved with Hamas.
11    Q.   And specifically the tipster was contacted by a person
12    named Yousef Ramadan?
13              MR. DENSEMO:  Objection, Your Honor.  The
14    prosecutor is reading from a report that the Court hasn't
15    neither admitted or said --
16              THE COURT:  Sustained.
17              MR. DENSEMO:  -- that he can use.
18              THE COURT:  Sustained.
19    BY MR. WATERSTREET:
20    Q.   Did it talk about how old the person, the
21    Yousef Ramadan, was and from what country he was from?
22    A.   Yes, sir.  It narrowed down age, first and last.
23    Q.   Tell us what it is.
24    A.   It is Yousef Ramadan, approximately 25 years old, from
25    Bethlehem, Israel.
```

1  Q.  Okay.  And that he was working as a security -- mall

2  security officer at the time?

3  A.  Yes, sir.

4  Q.  And?

5  A.  I believe El Cajon, California.

6  Q.  Okay.  What did Mr. -- what did the tipster say

7  Mr. Ramadan did?

8          MR. DENSEMO:  I still object, Your Honor.

9          THE COURT:  Overruled.

10  A.  The report --

11  BY MR. WATERSTREET:

12  Q.  Right.

13  A.  -- said that he claimed to have killed people when he

14  was only 17 or 18 years old.

15  Q.  Okay.  And that was interested in whether the tipster

16  wanted to make money?

17  A.  Yes, sir.

18  Q.  And how was it that Mr. Ramadan suggested that the

19  tipster could make money?

20  A.  By killing people.

21  Q.  And back in 2010 did they provide some more information

22  about where he had been married?

23  A.  The TEC System wouldn't have had all of this.  We would

24  have kind of only gotten the first part.

25  Q.  Okay.

1          THE COURT:  Could I stop you there because I'm not

2    familiar with this -- the tech -- you are talking about a

3    tech system and you are saying --

4    BY MR. WATERSTREET:

5    Q.   What is the TEC System?

6    A.   Ma'am, it actually -- it's had two names in its

7    incarnation.  When Customs was part of the Department of the

8    Treasury, it was the Treasury Enforcement Communication

9    System, and now that we are Department of Homeland Security,

10   it is The Enforcement Communication System.  They changed the

11   name to be inclusive to legacy immigration and agriculture,

12   to not be Department of Treasury but to include everyone.

13          THE COURT:  Thank you.

14          MR. DENSEMO:  Let me interpose an objection at this

15   point.  The reason I'm doing this is because I believe that

16   the -- that this line of questioning is designed specifically

17   to try to prejudice this Court.  The government knows that

18   the document that it is trying to get -- trying to have the

19   agent testify to has been investigated -- was investigated in

20   2010.  The government knows that this supposed tip came from

21   Mr. Ramadan's mother-in-law at a time when Mr. Ramadan and

22   his wife were going through a divorce proceeding.  The

23   government knows that this tip is bogus.  The government

24   knows that it was investigated and that there is no substance

25   or that it is not credible in any way, shape or form or

1  fashion.

2        THE COURT:  Overruled.

3        MR. DENSEMO:  So knowing that --

4        THE COURT:  Overruled.  The question -- the reason

5  I do that is not for the truth of this tip but as to why they

6  stopped.  You raised the issue of suspicion, and it seems to

7  me that that may give reason.  Whether they know it is true

8  or not, I don't know, but I'm going to allow it for the

9  purposes of this hearing.

10        MR. WATERSTREET:  That's exactly my point, Your

11  Honor.  Hang on.

12        THE COURT:  Just a minute.

13        MR. WATERSTREET:  That's exactly my point, Your

14  Honor.  They had no way of knowing the veracity of this tip.

15  They only had a person in front of them who has provided them

16  information that he grew up in Bethlehem, that he's from

17  Israel, and that he came here to the United States, and then

18  they go on to their database that has information, and lo and

19  behold, they come across a Yousef Mohammad Ramadan from

20  Israel, the exact the same thing.

21        THE COURT:  All right.  Is there any indication in

22  your system whether this is true or not true?

23  A.  No, ma'am.

24        THE COURT:  Just the fact that it was reported?

25  A.  Just that it was reported.

1          THE COURT:  Thank you.

2          MR. WATERSTREET:  Thank you, Your Honor.

3   BY MR. WATERSTREET:

4   Q.  Sir --

5   A.  Just for the record --

6          MR. DENSEMO:  Your Honor, hold on.  This is -- he

7   cannot do this.

8          MR. WATERSTREET:  Okay.

9          (An off-the-record discussion was held at

10          12:01 p.m.)

11   BY MR. WATERSTREET:

12   Q.  The -- since he was claiming that he wanted to go over

13   and photograph the Palestinian conflict and you came across

14   something supposedly about him being a member of Hamas, did

15   you ask him about that?

16   A.  Yes, sir, we did.

17   Q.  And why would you ask him about that?

18   A.  Well, that's a fairly serious allegation to make, but in

19   addition, if you're carrying Level III body armor, you might

20   want to know -- it is worth a question: are you with them or

21   are you not with them, do you support what they do, do you

22   not support what they do?

23   Q.  Do you deal with a lot of people through -- especially

24   living here in the Eastern District of Michigan and working

25   here in the Eastern District of Michigan, of people going

```
 1  over to that region and being Hamas?
 2  A.  Yes, sir.
 3  Q.  And what typically happens when you ask somebody about
 4  Hamas?
 5  A.  Well, not to just narrow down only Hamas, but we can
 6  include Hezbollah and certain factions in Fatah.  The
 7  overwhelming response is I wouldn't do what they do, I'm not
 8  giving them money to support them, but I don't discount the
 9  service they provide me.
10  Q.  Okay.
11  A.  I'm not going to tell you that I would discredit them or
12  disown them, but I don't directly support them.
13  Q.  Okay.  Did you ask Mr. Ramadan about Hamas?
14  A.  Yes, sir, we did.
15  Q.  What response did he give you?
16          Your Honor, there is going to be some course
17  language, and I apologize to the Court ahead of time.
18          What did he say?
19  A.  Well, I mean, there are women here, sir.
20  Q.  I understand that.
21  A.  It is okay?
22  Q.  Yes.
23  A.  He said fuck Hamas.
24  Q.  Okay.  Does that seem odd to you as a TTRT officer for
25  him, a person who grow up in Palestine, to say that?
```

1    MR. DENSEMO:  Objection, Your Honor; it is

2    irrelevant how this man feels.

3        THE COURT:  Sustained.

4    BY MR. WATERSTREET:

5    Q.  Did that give you some concern?

6    A.  My experience said that that response was out of the

7    ordinary.

8    Q.  Okay.  Why?

9    A.  Again, most people would kind of hedge up to that based

10   on the way that the Palestinian-Israeli conflict going,

11   especially from the Palestinian side.

12       MR. DENSEMO:  Your Honor, I'm going to object to

13   this.  This man is not an expert in Israeli-Palestinian

14   conflict.

15       THE COURT:  Sustained.

16   BY MR. WATERSTREET:

17   Q.  Now, it appears that these proceedings seem to be rather

18   contentious, there are objections being made, things of that

19   nature, but the situation that you were talking to

20   Mr. Ramadan, was it contentious at all?

21   A.  Not at all, no, sir.

22   Q.  Was he totally cooperative?  Well, let me rephrase that.

23   Did he give you answers appearing to be cooperative?

24   A.  Yes, sir.

25   Q.  No issues with him, you know, being upset, you being

1    upset, yelling, screaming, anything of that nature?

2    A.  No, sir.

3    Q.  In this situation -- I asked a hypothetical earlier, but

4    in this situation was all of Mr. Ramadan's luggage retrieved

5    from the belly of the airplane that he was supposed to fly

6    out on?

7    A.  Yes, sir.  It was being delivered while our interview

8    was being conducted.

9    Q.  Is that something out of the ordinary?

10   A.  No, sir.

11   Q.  It wasn't something that you just did just because it is

12   Mr. Ramadan?

13   A.  No.

14   Q.  This is something that would have happened in every

15   investigation?

16   A.  It is frequent, it happens daily.

17   Q.  Okay.  What was going on with the items that were being

18   taken off of the airplane?

19   A.  The luggage would be searched.

20   Q.  By you personally?

21   A.  No, sir.  The Antiterrorism Contraband Enforcement,

22   ATCET Team.  They work the jetways, the folks are leaving,

23   they would search that luggage.

24   Q.  Okay.  Somebody else from CBP?

25   A.  Yes, sir.

Evidentiary Hearing • January 30, 2018

```
 1    Q.   Have you been in situations in which somebody has lost
 2    their temper during these interviews?
 3    A.   Yes, sir.
 4    Q.   Have there been times that you have had to place people
 5    under arrest because they lost their temper?
 6    A.   Place them under arrest, no, sir.
 7    Q.   What do you do to try to avoid that from happening?
 8    A.   We use handcuff restraints.
 9    Q.   Why?
10    A.   Especially if someone's traveling with their children
11    and they are becoming agitated, we would use the restraint to
12    prevent them from making a even worse choice.  At the end of
13    the night I want everybody to go home.
14    Q.   You want to go home safely?
15    A.   Absolutely.
16    Q.   You don't want to have to arrest somebody who's --
17              MR. DENSEMO:  Objection, leading.
18              THE COURT:  Sustained.
19    BY MR. WATERSTREET:
20    Q.   Do you want to arrest somebody who is getting upset?
21              THE COURT:  Pardon me?  Do you want to arrest
22    somebody?
23    BY MR. WATERSTREET:
24    Q.   Just simply because they are getting upset?
25              THE COURT:  You may answer that.
```

1    A.   No, sir.

2    BY MR. WATERSTREET:

3    Q.   Did there come a point in time that you started -- your

4    conversation turned to Mr. Ramadan's cellphones and

5    electronic devices?

6    A.   Yes, sir.

7    Q.   Can you tell Her Honor what that -- what those

8    conversations were about?

9    A.   Well, our perception of how the interview was going was

10   that it didn't seem like there was a lot of truth involved,

11   and we wanted to review his cellular telephones to see if the

12   story he was telling us matched the data or things and images

13   found on the cellular telephone.

14   Q.   Up to this point in time he does not appear to have any

15   documentation allowing him to take these objects -- that

16   object out of the United States?

17   A.   No, sir.

18   Q.   Did you ask him about that?

19   A.   Yes, sir.

20   Q.   And what did he say?

21   A.   No.

22   Q.   So you asked him about his cellphone.  Do you -- when

23   people have cellphones, a lot of them are password protected.

24   Is that a question that you bring up?

25   A.   We would provide him the documentation explaining our

1    legal authority to search.

2    Q.   Okay.

3    A.   Then ask for the phone and then ask for the password.

4    Q.   Okay.  And did he provide you that password?

5    A.   No, sir.

6    Q.   Did he have some provisions that he brought up for you

7    to allow you to look at his phone?

8    A.   It was a roundabout conversation, but when we got to the

9    other side of the roundabout, it was a request for immunity

10   from whatever we might find on the telephone.

11   Q.   Did you say you were willing to do that?

12   A.   No.

13   Q.   Okay.  Okay.

14   A.   I'm just an officer.  I can't provide any sort of

15   immunity from anything.

16   Q.   And did you say I'm sorry, we are going to have to take

17   your phone and we are going to have to look at it?

18   A.   Yes.

19   Q.   Okay.  Did his demeanor change at that time?

20   A.   It was like turning a light switch.

21   Q.   What do you mean by that?

22   A.   He became agitated, upset, and visibly aggressive.

23   Q.   Did you place him in handcuffs at this time?

24   A.   Officer Schmeltz placed him in handcuffs.

25   Q.   Did you explain to him why you were placing him in

1  handcuffs?

2  A.  Yes, sir.

3  Q.  What did you say?

4  A.  For your safety and mine, you seem like you are getting

5  upset.  We don't want anybody to make a bad choice.  We are

6  going to use the restraints until you calm down and then we

7  will take them off.

8  Q.  Did you tell him you are under arrest?

9  A.  Absolutely not.

10  Q.  Did you tell him that he wasn't under arrest?

11  A.  For your safety and mine, you are not under arrest, just

12  until you calm down, then we'll take them off.

13  Q.  At that time did you decide that the conversation had

14  come to a conclusion?

15  A.  We had probably reached all of the conversation we were

16  going to have at that point in time, yes, sir.

17  Q.  Okay.  And approximately how long did it take for

18  Mr. Ramadan to calm down?

19  A.  No more than 15 minutes.

20  Q.  Okay.  And at that time were the cuffs removed?

21  A.  Yes, sir, they were.

22  Q.  Just like you had promised?

23  A.  Yes.

24  Q.  Did he say anything to you before you had to put the

25  cuffs on him when you say we are looking at your phone?

1    A.   At that point it became rather explicative filled.

2    Q.   What did he say?

3    A.   It was basically fuck you, you are not getting my

4    password.

5    Q.   The time period that it took for you to be engaged in

6    this conversation asking him where he was going, what was he

7    doing, finding out about what he planned on doing, where he

8    was from, looking up the tip, talking about the phone,

9    estimate how long of a time period from the time Mr. Ramadan

10   was -- you started talking to Mr. Ramadan until you decided

11   to stop talking to Mr. Ramadan.

12   A.   Between 40 and 45 minutes.

13   Q.   Okay.  At that time did you take a break?

14   A.   Yes, sir.

15   Q.   Well, take a break from talking to Mr. Ramadan.  You

16   didn't take a break that day?

17   A.   No, sir.

18   Q.   Okay.  Did you go out to the area where they were

19   looking at some of the items?

20   A.   Yes, sir.

21   Q.   Okay.  And referring back to X, can you explain to the

22   Judge what area that you went and maybe describe it as best

23   as you can?

24   A.   The Antiterrorism Contraband Enforcement Team, also CBP

25   officers, were utilizing the agriculture exam belts that are

 1   located vertically from the two interview rooms but it is

 2   outside of a closed door.

 3   Q.   So if we --

 4   A.   It would be in this area.

 5   Q.   If we were looking at it, these are the agricultural

 6   belts that you're talking about?

 7   A.   Yeah, down here.

 8   Q.   Down here.  So you came out of this interview room, came

 9   over to this area here?

10   A.   Yes, sir.

11   Q.   Okay.  And what was -- what did you do when you were

12   looking at the items on that belt?

13   A.   We reviewed all of the -- well, not all of but the items

14   that the other team had set out for us to see.

15   Q.   Officer Armentrout, I'm going to show you what has been

16   marked Government's Proposed Exhibits I-1 through I-27, if

17   you would just do me a favor, please, and look through those

18   photographs and tell me if you can -- if you recognize the

19   items depicted in those photographs.

20        Your Honor, I believe you already have 5 and 6 up

21   there.

22        THE COURT:  Yes.

23   A.   Yes, sir, I do.

24   BY MR. WATERSTREET:

25   Q.   You have had a chance to look through them?

1   A.   Yes, sir.

2   Q.   Were those some of the items that were laid out that

3   were found as part of the search of Mr. Ramadan's luggage

4   while you were involved in talking to Mr. Ramadan?

5   A.   Yes, sir, they are.

6          MR. WATERSTREET:   Move for admission of I-1 through

7   27?

8          THE COURT:   Any objections?

9          MR. DENSEMO:   No, Your Honor.

10          THE COURT:   It may be received.

11          (Government's Exhibits I-1 through I-27 received

12          into evidence.)

13  BY MR. WATERSTREET:

14  Q.   And if you could for our benefit, just without

15  belaboring the point, could you go through for the benefit of

16  the Court and let the Court know what's being depicted in the

17  different pages, and go one by one on page 1?

18  A.   A Tactical Load-Bearing Vest.

19  Q.   What is -- a Tactical Load-Bearing Vest, what is that?

20  A.   It is a plate carrier, and then there is the Molle

21  straps designed for your other kit.

22  Q.   Okay.   So the plates that became the subject of the

23  initial inquiry, this is a vest for the plates to go into?

24  A.   Yes, sir.

25  Q.   Okay.   I-2.

1    A.   Magazine pouches and a jump pouch.

2    Q.   Okay.  And these are things that can be attached to I-1?

3    A.   Yes, sir.  There is -- straps on the back that weave in

4    and out.  If you were to look at the front one, you can see

5    the Molle straps across the front.

6    Q.   Okay.

7    A.   You weave it in and out.  That way it sits on your vest

8    and it is easier to load out of those pouches.

9    Q.   If I showed you photograph -- this may be -- describe it

10   a little bit better, J-1.

11   A.   Yes, sir, that's an accurate depiction.  The plates

12   would be inside of the carrier though.

13            MR. WATERSTREET:  Move for admission of J-1, Your

14   Honor?

15            THE COURT:  Any objection?

16            MR. DENSEMO:  No, Your Honor.

17            THE COURT:  It may be received.

18            (Government's Exhibit J-1 received into evidence.)

19            MR. WATERSTREET:  Can you bring up J-1, please?

20   BY MR. WATERSTREET:

21   Q.   So this is how somebody who was using it with those

22   magazine holders on the front would have it, the two plates

23   being on the side to indicate those are the two plates, one

24   in the front, one in the back?

25   A.   Yes, sir.

1    Q.   Okay.   Thank you.

2              Moving on to I-3, can you identify the item on the

3    left-hand side and the right-hand side?

4    A.   The left-hand side is another load-bearing vest with

5    belts, the one on the right would be a PRESS Body Armor Plate

6    Carrier.

7    Q.   Another load-bearing vest?

8    A.   Yes, sir.

9    Q.   That has is a Velcro thing that says PRESS on it?

10   A.   Yes, sir.   There's four knives, assault gloves, the ones

11   with the plastic knuckles, a pair of boots, some probably

12   chemical resistant gloves.

13   Q.   Okay.   I-4?

14   A.   5-11 tactical pants, you can see the same boots, the

15   same PRESS load-bearing vest, and another pair of boots.

16   Q.   I-5 and I-6, what are those?

17   A.   Those are Level III body armor.

18   Q.   And --

19   A.   Those are the plates.

20   Q.   Those are the plates we were talking about?

21   A.   Yes, sir.

22   Q.   Those are the items that are export controlled?

23   A.   That is correct.

24   Q.   I-7, what is that?

25   A.   Level II soft body armor.

1   Q.   Okay.  Is that export controlled?

2   A.   No.

3   Q.   Okay.  8?

4   A.   L-8, that would be a close-up of the four knives.

5   Q.   9?

6   A.   Gas mask.

7   Q.   10?

8   A.   Magazine pouches and OC spray.

9   Q.   What is OC spray?

10  A.   Oleoresin capsaicin.  It's sprayed in someone's eyes and

11  it debilitates them for up to 15 minutes.

12  Q.   I-11, that's a close-up of that?

13  A.   Yes, sir.  There you can see where it says Law

14  Enforcement Formula right on it.

15  Q.   I-12?

16  A.   In the middle you can see a shoulder holster, you can

17  see the gas mask, a camera, and I can't make out what's in

18  the foreground, it's all black.

19  Q.   Okay.

20  A.   A pair of binoculars.

21  Q.   Let's move on to 13.

22  A.   You can see the shoulder holster more in depth, more

23  knives and flashlights.

24  Q.   What about this green thing in the forefront?

25  A.   The hearing protection.

1  Q.  Is that hearing protection for shooting?

2  A.  Yes, sir.

3  Q.  Okay.  And 14?

4  A.  14 you can see a TACO mag pouch, it is the open top one,

5  same shoulder holster, same knives.

6  Q.  Okay.  15?

7  A.  A drop leg holster.

8  Q.  What's a drop leg holster?

9  A.  It goes with the load bearing belt and the load bearing

10  vest.  It allows the firearm to be carried further down your

11  thigh.  It is more comfortable.

12  Q.  16?

13  A.  That would be OC spray inside of a shoe.

14  Q.  17?

15  A.  Flashlights and the Backcountry water filtration straws.

16  Q.  Okay.  18?

17  A.  Garmon GPS.

18  Q.  19?

19  A.  Taser.

20  Q.  Is that export controlled?

21  A.  That is absolutely export controlled.

22  Q.  What about I-20, what is that?

23  A.  That is a rifle scope.

24  Q.  Is that export controlled?

25  A.  They are.

1   Q.   What is I-21?

2   A.   A mount for the scope.

3          THE COURT:  A what?

4   A.   The scope can't be loaded onto firearms just in and of

5   itself, it requires a separate mount.

6   BY MR. WATERSTREET:

7   Q.   So this is -- 21 is something that you put onto the

8   ground or the rifle, handgun, rifle, whatever it is, and then

9   you attach the scope?

10  A.   Secure the scope to the mount, yes.

11  Q.   Thank you.   22?

12  A.   A foregrip for a firearm.

13  Q.   What do you mean, a foregrip for a firearm?

14  A.   Well, modern sporting firearms, when you go to fire them

15  in this manner, tends to be uncomfortable.  If they have a

16  rail on the bottom, you put this on it and it puts you in a

17  much more comfortable, stable shooting platform with the

18  foregrip.

19  Q.   So a combination of the magazine holders, rifle scope,

20  rifle mounts, rifle grip, foregrip, some indication -- what

21  does that mean to you?

22          MR. DENSEMO:  Objection; calls for speculation.

23  Your Honor.

24          MR. WATERSTREET:  It is not speculation.

25  BY MR. WATERSTREET:

1  Q.  What does that mean to you?

2       THE COURT:  I will allow it.

3  A.  It meant to me there is going to be a firearm put to use

4  somewhere.

5  Q.  Okay.  And I-23, is that another picture of body armor?

6  A.  That's the Level III plate, yes, sir.

7  Q.  I-24?

8  A.  Chem-resistant gloves, straw, knife, it looks like maybe

9  an iBook, some Apple computer.

10  Q.  I-25?

11  A.  Pile of electronics.

12  Q.  Okay.  Some walkie-talkies in the foreground?

13  A.  Yes, sir.

14  Q.  It looks like some remote controls on the right-hand

15  side?

16  A.  I was going to say you could see the remote controls

17  sitting there.

18  Q.  26?

19  A.  A multitude of phones.  You can see the wallet sitting

20  there with the cards, you can see the mag pouches, the dump

21  pouch, the battery for the computer.

22  Q.  Okay.  27?

23  A.  Personal IDs.

24       MR. WATERSTREET:  And Your Honor, the copies I have

25  given to the Court and defense counsel do not have the

1   address of California license holder Pittman blacked out, but

2   they are on the ones being shown on the overhead.  Those

3   items, because they are personal identification information,

4   should not be disseminated.

5            THE COURT:  Okay.

6   BY MR. WATERSTREET:

7   Q.  Did you also find some electronics as well, some items

8   being put aside for you to review?

9   A.  Yes, sir, there were.

10  Q.  Did you come across a gaming computer?

11  A.  We did.

12  Q.  A Hitachi hard drive?

13  A.  Yes, sir.

14  Q.  Toshiba laptop computer?

15  A.  Yes, sir.

16  Q.  A Lenova laptop computer?

17  A.  I believe it is Lenova.

18  Q.  Lenova.  Thank you.  Lenova?

19  A.  Yes, sir.

20  Q.  Several digital camera SD cards?

21  A.  Yes, sir.

22  Q.  External hard drives?

23  A.  There were a number of them, yes.

24  Q.  There were two Seagate backups?

25  A.  That is correct.

1  Q.  Now, let me finish going through the list.  A Toshiba

2  external hard drive?

3  A.  Yes, sir.

4  Q.  And some other external hard drives as well?

5  A.  And some thumb drives and --

6  Q.  Thumb drives, DVD disks?

7  A.  Yes, sir.

8  Q.  Things of that nature.  And some iPhones?

9  A.  Yes, sir.

10  Q.  On the Seagate backup, do you know how many terabytes

11  that particular -- that one external hard drive of

12  information was kept on there or -- excuse me.  Let me back

13  up.  That was poorly worded.

14      What was the capacity of one of those Seagates?

15  A.  I have no idea.

16  Q.  You don't know how many terabytes it would hold?

17  A.  No, sir.

18  Q.  Okay.  Did there come a point in time that you started

19  reviewing those -- the -- those items?

20  A.  Yes, sir.

21  Q.  Where did you go to do that review?

22  A.  On the diagram that you provided, it is listed as the

23  command center.

24  Q.  Why did you do there?

25  A.  We have a computer that is not connected to any other

Case 2:17-cr-20595-VAR-EAS   ECF No. 41   filed 02/26/18   PageID.514   Page 110 of 250
*Evidentiary Hearing • January 30, 2018*

110

1  system, no Internet, nothing, that we call it a standalone

2  because it stands alone that we use for reviewing digital

3  media.

4  Q.   And the external hard drives, they are just a box,

5  correct?

6  A.   Yes, sir.

7  Q.   And they have no screens so you can't look through it

8  without hooking it up to some type of screen?

9  A.   Correct.

10 Q.   Did you use any type of forensic tool to go through it

11 forensically?

12 A.   No.

13 Q.   Can you explain to the Court what process you went

14 through?

15         THE COURT:   Counsel, I think before we start this

16 part of it, we are going to take a break.

17         MR. WATERSTREET:   Okay.

18         THE COURT:   We will take our lunch break at this

19 time so we will resume at 1:30.   Thank you.

20         MR. WATERSTREET:   Thank you, Your Honor.

21         THE LAW CLERK:   All rise.

22         (Court recessed at 12:27 p.m.)

23                     —   —   —

24         (Court reconvened at 1:42 p.m.; Court, Counsel and

25         all parties present.)

```
1          THE LAW CLERK:  All rise.  Court is again in
2     session.
3          THE COURT:  You say be seated.  We will continue.
4     You are still under oath, sir.
5     A.   Yes, ma'am.
6          MR. WATERSTREET:   Thank you, Your Honor.
7     BY MR. WATERSTREET:
8     Q.   I think we left off when you were just about to start
9     your review, your manual review of some of the electronic
10    hardware.
11    A.   Yes, sir.
12    Q.   Okay.  Were you able -- what items were you able to open
13    up and take a look at, do you remember?
14    A.   Some of the hard drives, the thumb drives and the SD
15    cards like you would use in your camera.
16    Q.   What about the telephone that became a point of
17    contention?
18    A.   No, sir, I was not able to review those.
19    Q.   What about some of the laptops?
20    A.   No, sir.
21    Q.   Can you explain to the Judge what procedures you went
22    through when you were looking through the manual examination
23    of the external hard drives?
24    A.   Ma'am, we plug it into the standalone computer, open the
25    file and review quickly because there's a lot there just to
```

Case 2:17-cr-20595-VAR-EAS  ECF No. 41  filed 02/26/18  PageID.516  Page 112 of 250
*Evidentiary Hearing • January 30, 2018*

**112**

 1  sort of screen and see what sort of thing can I see, and then

 2  move on quickly to the next file and the next and so on.

 3  Q.  Are you looking at the thumbnail pictures and things of

 4  that nature or how do you use --

 5  A.  I use the large icons, I'm kind of old, wear bifocals,

 6  but yeah.

 7  Q.  And you tried to move through this as expeditiously as

 8  possible?

 9  A.  Yes, sir.

10  Q.  And how long approximately did it take for you to go

11  through these?

12  A.  Approximately four hours.

13  Q.  Wow.  Okay.  Now, are you -- were you using any forensic

14  tools with that to try to speed up the process by typing in

15  code words or something to look for?

16  A.  No, sir.

17  Q.  Okay.  Did you try to download or save any of those

18  images?

19  A.  No, sir.

20  Q.  You were just reviewing them?

21  A.  Just reviewing them.

22  Q.  And I'm going to show you some photographs here and tell

23  me -- I want you to look through them and tell me if you

24  recognize any of the items in C-1 through C-9.

25  A.  In C-1 I do not.  C-2 I do.

Evidentiary Hearing • January 30, 2018

1  Q.  Okay.  Why don't you put that in a separate pile if you

2  would please.

3  A.  C-3 I do not.

4  Q.  Put that in a separate file.  Put 3 with 1 if you would

5  please.

6  A.  Yes, sir.  In C-4 I don't recognize the photo.  I

7  recognize the rifle in the photo.

8  Q.  Okay.  And do you recognize the individual in that

9  photo?

10  A.  Yes, sir, I do.  Which pile do you want me to sort it

11  to?

12  Q.  C-4 is a person that you recognize, you recognize the

13  rifle but you don't remember seeing this particular photo?

14  A.  That is correct.

15  Q.  Okay.  Put that in with number 1 and 3.

16  A.  C-5 I do recall.

17  Q.  Okay.

18  A.  C-6 I do not recall.  C-7 I do recall.  C-8 I do recall.

19  And C-9 I do recall.

20  Q.  Okay.  So we have 2 -- C-2, C-5, C-7, C-8 and C-9 --

21  A.  Yes, sir.

22  Q.  -- that you remember seeing as you were quickly going

23  through the images?

24  A.  Yes, sir.

25          MR. WATERSTREET:  Okay.  Move for their admission,

1   Your Honor.

2           THE COURT:  Any objection?

3           MR. DENSEMO:  None.

4           THE COURT:  They may be received.

5           (Government's Exhibits C-2, C-5, C-7, C-8 and C-9

6           received into evidence.)

7           MR. WATERSTREET:  Can you put C-2 up, please?

8   BY MR. WATERSTREET:

9   Q.  Who is the individual in this photograph?

10  A.  The defendant.

11  Q.  Okay.  He's wearing a load-bearing vest and carrying a

12  rifle with a scope on it, correct?

13  A.  Yes, sir.

14  Q.  C-5, who is that?

15  A.  The defendant.

16  Q.  And he has a handgun stuck down in the waistband of his

17  pants?

18  A.  It appears to be inside the waistband holster.  That's

19  the black item you can see just above his belt.

20  Q.  Okay.  C-7?

21  A.  You would never know who C-7 is until you see --

22  Q.  C-8?

23  A.  -- C-8, that's correct.

24  Q.  Who is in C-8?

25  A.  That would be the defendant, sir.

1    Q.   On C-9?

2    A.   Who is in the photograph?

3    Q.   Yes.

4    A.   That would be the defendant also.

5    Q.   Are you familiar with the two rifles that appear in

6    there, have you seen them before?

7    A.   Yes, sir.

8    Q.   Okay.  Did you see any videos as part of your search?

9    A.   Yes, sir, I did.

10   Q.   Okay.  Could you tell the Court about those videos that

11   you saw concerning with those firearms?

12   A.   The rifle was being shot at a considerable distance.

13   Q.   Okay.

14   A.   It was just a video of him and one other person

15   shooting.

16   Q.   Okay.  And you said C-4, you recognize this rifle and

17   the individual in there?

18   A.   Yes, sir.

19           MR. WATERSTREET:  Move for admission.

20           MR. DENSEMO:  No objection.

21           MR. WATERSTREET:  What's the objection?

22           MR. DENSEMO:  I said no objection.

23           MR. WATERSTREET:  Okay.  Sorry.  My apologies.

24   Move for admission of C-4.

25           (Government's Exhibit C-4 received into evidence.)

1    BY MR. WATERSTREET:

2    Q.   And who is the individual in that photograph?

3    A.   That's C-4?

4    Q.   Yes.

5    A.   That would be the defendant, sir.

6    Q.   Okay.  And holding one of the rifles that you saw a

7    video of him shooting?

8    A.   Well, it appears to be the exact same rifle as in C-9.

9    Q.   Okay.  Showing you F-1 -- F-9 through --

10   A.   F-1 through --

11   Q.   Through F-10.  Do you recognize any of those photographs

12   from your review that evening?

13   A.   F-1, yes.  F-2, yes.  F-3, I do not.

14          MS. FITZHARRIS:  Mr. Waterstreet, may we have a

15   copy?

16          MR. WATERSTREET:  I'm sorry.  I apologize.

17   A.   Continue?

18   BY MR. WATERSTREET:

19   Q.   Yes.  I'm sorry.  You are separating out which ones you

20   recognize?

21   A.   Yes, sir.  F-4 I do not.  F-5 I do not.  F-6 I do.  F-7

22   I do.  F-8 I do.  F-9 I do.  And F-10 I do.

23          MR. WATERSTREET:  Move for admission of F-1, F-2,

24   F-6, 7, 8, 9 and 10?

25          THE COURT:  Okay.

1    MR. DENSEMO:  These I do object --

2    THE COURT:  Any objection?

3    MR. DENSEMO:  Yes, I do object to these, Your

4  Honor.  I think they are more prejudicial than probative,

5  they are not relevant, and I think they are merely being

6  introduced just to inflame the passions of the Court, so we

7  would object to all of these photos.

8    MR. WATERSTREET:  Nothing -- Your Honor, this is

9  not a jury trial where passions become inflamed.  This is the

10  finder of fact in this particular case, and I'm sure the

11  Court can put aside that.

12    MR. DENSEMO:  I also --

13    MR. WATERSTREET:  That being said, these are to

14  depict -- these are the type of items the defendant has --

15  feels important to share -- to save onto his hard drive.

16    MR. DENSEMO:  Again, they are not relevant.  They

17  have nothing to do with Mr. Ramadan.  They are not being

18  offered to suggest that they created any kind of reasonable

19  suspicion.

20    THE COURT:  Well, since I don't know what they are,

21  I can't tell you that.

22    MR. DENSEMO:  Well --

23    THE COURT:  It's difficult for the Court to rule

24  without seeing the photographs.

25    MR. DENSEMO:  They are pictures of Mr. Ramadan's

1    children, Your Honor.

2           THE COURT:  Of his children?

3           MR. DENSEMO:  Children, pictures of small children,

4    and there are also firearms in the photographs, and that's

5    what the government is attempting to introduce at this time.

6           MR. WATERSTREET:  It is not that they are merely

7    firearms but they are holding the very firearms that have

8    been seen in some of other photos.

9           MR. DENSEMO:  Well, that's speculative, nobody can

10   testify to that.

11          THE COURT:  Sustained.

12   BY MR. WATERSTREET:

13   Q.  But these are photographs that you saw as part of your

14   review?

15   A.  Yes, sir.  The ones I listed are the ones I can recall

16   seeing.

17   Q.  O-1 through 19?

18   A.  19.

19   Q.  19.  Were these -- can you take a look at that and

20   identify which photographs you recognize from --

21          MR. DENSEMO:  Ron?

22          MR. WATERSTREET:  Yes.

23          (An off-the-record discussion was held at

24          1:54 p.m.)

25

1  BY MR. WATERSTREET:

2  Q.  -- from the evening you were reviewing the items on

3  Mr. Ramadan's media?

4  THE COURT:  I take it it is really O-1?

5  MR. WATERSTREET:  Yes, O.  Did I say zero?  My

6  apologies.

7  THE COURT:  I assumed you followed the alphabet.

8  MR. WATERSTREET:  Yes, I tried to.

9  BY MR. WATERSTREET:

10  Q.  O-1 through 19.

11  A.  O-1, yes.  O-2, no.  O-3, yes.  O-4, yes.  O-5, yes.

12  O-6, no.  O-7, yes.  O-8, yes.  O-9, no.  O-10, yes.  O-11,

13  no.  O-12, no.  O-13, yes.  O-14, yes.  O-15, yes.

14  Q.  Okay.  So --

15  THE COURT:  You said there were 19.

16  A.  Yes, ma'am.  I'm still going.  The other talking in the

17  courtroom, I didn't know if I was supposed to wait.

18  THE COURT:  No, go ahead.

19  A.  Okay.  O-16, I do not.  O-17, I do not.  O-18, I do.

20  O-19 I to.

21  BY MR. WATERSTREET:

22  Q.  Okay.  When you say I do or yes, that's indicating you

23  recall seeing those that night?

24  A.  Yes, sir, that's -- I recall seeing those photographs

25  that evening.

1          MR. WATERSTREET:  Okay.  O-1, O-3, O-4, O-5, O-7,

2     O-8, O-10, O-13, O-14, O-15, O-18, O-19, move for admission,

3     Your Honor.

4          THE COURT:  Any objection?

5          MR. DENSEMO:  Yes, Your Honor.  These photos have

6     nothing to do with the issue at hand, the issue at hand being

7     the voluntariness of the statements made by Mr. Ramadan and

8     whether these agents engaged in any kind of unlawful tactics

9     in order to extract those statements from him.

10          These photos that the government wants you to look

11    at are war photos obviously with photos of individuals being

12    injured during the course of a conflict.  They also -- the

13    photos also depict other images from organizations, groups,

14    military organizations, but essentially, Your Honor, these

15    are photos of a -- of violent conflicts and everything that

16    goes along with war and violent conflicts.

17          THE COURT:  Okay.

18          MR. DENSEMO:  The government wants you to look at

19    this but it has nothing to do with the voluntariness of these

20    statements, has nothing to do with if these agents engaged in

21    unlawful conduct in that room.  None of these photographs,

22    Judge, have anything to do with what went on between these

23    agents and Mr. Ramadan insofar as was he advised of his

24    Miranda Rights, did he ask for an attorney, did you put your

25    hands on him.  So these statements are completely irrelevant.

1   They have nothing to do with any of those things, Judge.  And

2   again, the Court -- the prosecutor wants you to look at them

3   so they can poison your mind against Mr. Ramadan so that you

4   can tilt your decision in favor of the government instead of

5   Mr. Ramadan having looked at these photos, but there is

6   actually no connection between these photos and the issue --

7   the ultimate issue that you have to decide whatsoever, and it

8   is -- they are completely objectionable and should not be

9   admitted.

10          MR. WATERSTREET:  Your Honor, if I understand

11  defense correctly, they are now waiving any argument that

12  says that the officers were further investigating him and any

13  additional delay from this point forward was perfectly

14  appropriate.

15          MR. DENSEMO:  I'm not waiving anything, Your Honor,

16  but I know the purpose of admitting these photographs, and

17  these issues can be litigated through facts.  You don't need

18  to look at these photos in order for that agent to testify we

19  were investigating Mr. Ramadan for terrorism.  That's the --

20  we all know that's what this case is about even though he's

21  just charged with gun possession.  The underlying theme here

22  is we were investigating this man for terrorism.  We all know

23  that, it was all in the news.

24          THE COURT:  Okay.  But does it -- does it not go to

25  why the investigation, the timeline of the investigation, the

Case 2:17-cr-20595-VAR-EAS   ECF No. 41   filed 02/26/18   PageID.526   Page 122 of 250
*Evidentiary Hearing • January 30, 2018*

122

 1    suspicion, those types of things?  If you discover that, it

 2    raises more questions.

 3              MR. DENSEMO:  I'm sorry.

 4              THE COURT:  Overruled.  No.

 5              MS. FITZHARRIS:  Your Honor --

 6              THE COURT:  I'm going to allow them in.

 7              MS. FITZHARRIS:  -- may I make one additional

 8    point?

 9              THE COURT:  Yes.

10              MS. FITZHARRIS:  The search issue is entirely about

11    whether when they accessed these photos they could do so

12    without any -- with the level of suspicion they had at the

13    moment they accessed the photos and whether they needed a

14    warrant or probable cause or reasonable suspicion.  So what

15    they found after the search is not relevant to the search

16    question.

17              MR. WATERSTREET:  So they must be waiving then the

18    issue of voluntariness because it goes to the issue of how

19    long he was there, why he was there, and why they were

20    questioning him, that goes to voluntariness.

21              MS. FITZHARRIS:  No, we are not waiving

22    voluntariness.

23              THE COURT:  Overruled.  I have allowed them in.

24              (Government's Exhibits O-1, O-3, O-4, O-5, O-7,

25              O-8, O-10, O-13, O-14, O-15, O-18, O-19 received

1          into evidence.)

2    BY MR. WATERSTREET:

3    Q.   Now, you did not download these photographs?

4    A.   Absolutely not.

5    Q.   These were photographs that were downloaded on

6    Mr. Ramadan's media, correct?

7    A.   Yes, sir.

8    Q.   O-1 -- I apologize.  O-3, O-4, O-5, O-7, O-8, O-10,

9    O-13, O-14.

10         MR. DENSEMO:  Are these questions, Your Honor, or

11   are we just watching the photos?

12         MR. WATERSTREET:  We are going through these and

13   I'm going to ask him questions.

14         MR. DENSEMO:  I don't understand it, I don't

15   understand it.  Is there a question here?

16         MR. WATERSTREET:  We are going through them.

17         THE COURT:  I take it you are simply introducing

18   them if he recognizes them?  He said he recognized them.

19   Okay.  Let's just move along.  Very good.

20   BY MR. WATERSTREET:

21   Q.   Well, I will ask you to take a look at 15, 18, and 19 as

22   well.  We won't have to look at them.  As a result of looking

23   through the ones that have been published, were there some

24   additional questions or some concerns you had with

25   Mr. Ramadan and the purpose of him taking export controlled

Case 2:17-cr-20595-VAR-EAS  ECF No. 41  filed 02/26/18  PageID.528  Page 124 of 250
*Evidentiary Hearing • January 30, 2018*

124

1    items outside of the United States?

2    A.  Yes, sir.

3    Q.  As a result of that, did you conduct further

4    investigation or did you contact any other agency to do a

5    further investigation?

6    A.  Well, at the point we were at, we would need to contact

7    our investigators in HSI or more colloquially known as ICE,

8    JTTF and the FBI.

9    Q.  And some of the symbols that appear in several of these

10   photographs --

11        MR. DENSEMO:  I'm going to object to him leading

12   the witness, Your Honor.

13        THE COURT:  Sustained.

14   BY MR. WATERSTREET:

15   Q.  You are a trained TTRT officer, correct?

16   A.  Yes, sir.

17   Q.  Have you been trained to look for certain indicia of

18   terrorist icons?

19   A.  Yes, sir.

20   Q.  Specifically with ISIS, Hezbollah, Hamas?

21   A.  Yes, sir.

22   Q.  In looking through the photographs that we went through

23   that have been introduced, do you see any of those typical

24   type of markings for a terrorist organization?

25   A.  Yes, sir, I do.

1   Q.  I'm not going to ask you to go through every single one

2   of them, but can you identify a couple of them?

3   A.  Well, all of the insignia you can see would be

4   associated either with ISIS or Daesh, the same group.

5          MR. DENSEMO:  Would you repeat that?  I didn't hear

6   you.

7   A.  The insignia that I saw would either be associated with

8   ISIS or we colloquially refer to them in Arabic as Daesh.

9   BY MR. WATERSTREET:

10  Q.  Can you identify someplace on one of those photos?

11  A.  O-4, the flag in the upper right-hand corner.

12  Q.  Maybe another one?

13  A.  O-5 the flag in the upper right-hand corner as well as

14  the one being held in the center of the right hand of the

15  photo.

16  Q.  That's good enough.  We don't have to go through every

17  single one of them.

18          In the process of going through these items, were

19  you the only person reviewing this or -- were you the only

20  person reviewing these items?

21  A.  I was the primary person reviewing the items.  When I

22  would arrive at an item of interest, I would call either

23  Officer Schmeltz, or later after they arrived the FBI, HSI

24  agent or JTTF liaison to review items of special interest.

25  Q.  Okay.  So as a result of your investigation up to this

Case 2:17-cr-20595-VAR-EAS   ECF No. 41   filed 02/26/18   PageID.530   Page 126 of 250
*Evidentiary Hearing • January 30, 2018*

126

1    point, items that you found on Mr. Ramadan's media, other law

2    enforcement agencies were contacted?

3    A.   Yes, sir.

4    Q.   I'm going to show you L-1 and L-3.  Do you recognize L-1

5    and L-3?  Before you answer --

6         MR. DENSEMO:   Thank you.

7    BY MR. WATERSTREET:

8    Q.   Do you recognize either of one those?

9    A.   I recognize both L-1 and L-3, sir.

10   Q.   Is that something that came up as part of your review?

11   A.   Yes, sir, it did.

12   Q.   Did that become an area in which you said that you would

13   speak to some of the other agents or agencies of an item of

14   interest?

15   A.   Yes, sir, I did.

16        MR. WATERSTREET:   Move for admission of L-1 and

17   L-3, Your Honor.

18        MR. DENSEMO:   No objection, Your Honor.

19        THE COURT:   It may be received.

20        (Government's Exhibits L-1 and L-3 received into

21         evidence.)

22        MR. WATERSTREET:   Can you bring up L-1, please.

23   BY MR. WATERSTREET:

24   Q.   L-1 is a photograph and it looks to be of what?

25   A.   Crystal object broken on the floor.

Case 2:17-cr-20595-VAR-EAS  ECF No. 41  filed 02/26/18  PageID.531  Page 127 of 250
*Evidentiary Hearing • January 30, 2018*

**127**

1   Q.   What is L-3?

2   A.   L-3 appeared to be a pipe bomb or IED.

3   Q.   This is what was found on Mr. Ramadan's media that you

4   recall seeing that evening?

5   A.   Yes, sir.

6   Q.   Now, the defendant has claimed in his motion that he was

7   assaulted by somebody, he didn't identify in his motion who

8   it was.  Did you assault him?

9   A.   Absolutely not.

10  Q.   Did you see anybody in the area, any of the other agents

11  assault him?

12  A.   No, sir.

13  Q.   Other than cuffing him, which you've previously

14  explained and was put in the report, was there any other

15  incident where hands were laid on Mr. Ramadan that you

16  observed?

17  A.   No, sir.

18  Q.   Also there was a claim made in his motion that he asked

19  for a lawyer and you ignored his request, or somebody -- he

20  asked somebody for a lawyer and whoever he asked ignored his

21  request.  Did that happen in your presence at all?

22  A.   No, sir.

23  Q.   Like an event having to cuff him, what would you have

24  done if he would have asked about that and you would have

25  denied him, would that have been put in your report as well?

1    A.   If he would have asked about what?

2    Q.   A lawyer.

3    A.   When he was handcuffed?

4    Q.   No.  Let me back up.

5              THE COURT:  Rephrase that question.

6              MR. WATERSTREET:  I will rephrase it.

7    BY MR. WATERSTREET:

8    Q.   Did he ever ask you or any other officer in your

9    presence for a lawyer?

10   A.   No, sir.

11   Q.   Okay.  Did he ever ask for you or anybody else in your

12   presence for the events of that evening to be recorded?

13   A.   No, sir.

14   Q.   And I hesitate to ask this question because it looks --

15   may I have a moment, Your Honor?

16              (An off-the-record discussion was held at

17              2:08 p.m.)

18   BY MR. WATERSTREET:

19   Q.   Did you steal any money, jewelry, gold or gold bars from

20   the defendant?

21   A.   Absolutely not.

22   Q.   Did anybody in your presence -- did you see anybody in

23   your presence do such?

24   A.   No.

25              MR. WATERSTREET:  One more second, Your Honor.

 1              THE COURT:  Cross-examination?

 2              MR. WATERSTREET:  Just one -- if I may have one

 3  moment, Your Honor.

 4              (An off-the-record discussion was held at

 5              2:08 p.m.)

 6  BY MR. WATERSTREET:

 7  Q.   And during the process you were reviewing all of this

 8  media that you were able to gain access to, were the other

 9  agents -- were other CBP officers reviewing some of the

10  materials that had been taken out of his luggage?

11  A.   The -- the enforcement team that did the review of the

12  checked bags?

13  Q.   Yes.

14  A.   Yes.  They did continue to search all of the checked

15  luggage.

16              MR. WATERSTREET:  Okay.  Thank you.

17              THE COURT:  Mr. Densemo?

18              MR. DENSEMO:  Thank you, Judge.

19                         CROSS-EXAMINATION

20  BY MR. DENSEMO:

21  Q.   Officer Armentrout, on April 15th, 2017 you say that you

22  were in a room with Yousef Ramadan and Charles -- is it

23  Schmeltz.

24              MR. WATERSTREET:  Your Honor, I believe --

25  A.   Sir, I was not there on April 15th.

 1              MR. WATERSTREET:  I believe you may have misspoke.

 2   You said April 15th.

 3              MR. DENSEMO:  I said August.

 4              MR. WATERSTREET:  I heard April.

 5   A.   I heard it April as well.  I was not there on

 6   April 15th.

 7   BY MR. DENSEMO:

 8   Q.   All right.  Well, August.

 9   A.   I was there on August 15th, yes, sir.

10   Q.   All right.  And you said that you were the primary

11   officer?

12   A.   No, sir, I did not say that.

13   Q.   I believe you said you were the primary person reviewing

14   the items?

15   A.   I said I was the primary person reviewing the digital

16   media.

17   Q.   Okay.  And during the course of the interview you

18   weren't the primary person questioning Mr. Ramadan?

19   A.   No, sir, I was not.

20   Q.   So you are testifying as to what Agent or

21   Officer Schmeltz was asking Mr. Ramadan, yes or no?

22              MR. WATERSTREET:  Well, Your Honor, can he answer

23   in a yes or no or -- can you answer it in just simply yes or

24   no?

25              MR. DENSEMO:  I don't think you get to ask that

Case 2:17-cr-20595-VAR-EAS  ECF No. 41  filed 02/26/18  PageID.535  Page 131 of 250
*Evidentiary Hearing • January 30, 2018*

131

```
1    question, it's the Judge.
2              THE COURT:  I think that's fine, he can answer yes
3    or no if he can.
4    A.  Sir, could you repeat the question for me?
5    BY MR. DENSEMO:
6    Q.  Was Officer Schmeltz the person who was asking
7    Mr. Ramadan the questions?
8    A.  No.  Officer Schmeltz was not the only person asking
9    Mr. Ramadan the questions.
10   Q.  I didn't use the word only.
11   A.  I misunderstood your question then.  I apologize.
12   Q.  Let me make this easy for you.  You walked -- you and
13   Schmeltz walk Mr. Ramadan into a room; is that right?
14   A.  We escorted him into an interview room, yes, sir.
15   Q.  Is that -- is escorting the same as walking?
16   A.  Yes.
17   Q.  Okay.
18   A.  We walked with him.
19   Q.  Okay.  Thanks.  So you and Schmeltz walk Mr. Ramadan
20   into a room, right?
21   A.  Yes, sir.
22   Q.  And you have Mr. Ramadan sit down, right?
23   A.  We asked him to sit down, yes, sir.
24   Q.  Is having him to sit down the same as asking him to sit
25   down?
```

1      THE COURT:  Counsel, yes, counsel, this is not

2  necessary.

3      MR. DENSEMO:  Well, I don't like the officer

4  changing my words.

5      THE COURT:  I don't like the way you are asking the

6  questions.  Restate your question, please.

7  BY MR. DENSEMO:

8  Q.  You told him to sit down at the desk, right, at a table?

9  A.  I asked him to sit down in the chair, yes, sir.

10 Q.  And you say that your gun was hidden; is that right?

11 A.  My shirt generally covers my firearm.

12 Q.  Pardon me?

13 A.  My untucked shirt generally covers the entirety of my

14 firearm, yes, sir.

15 Q.  And Schmeltz's shirt -- I mean gun, was that hidden?

16 A.  Yes, sir.

17 Q.  And you say your baton sometimes sticks out of your

18 pocket?

19 A.  Yes, sir, it does.

20 Q.  What about your handcuffs, were they visible?

21 A.  No, sir, they were not.

22 Q.  On this date were you wearing a blue uniform?

23 A.  No, sir.

24 Q.  You were in plainclothes?

25 A.  Yes, sir.

```
 1    Q.  And Schmeltz, was he in a uniform or plainclothes?
 2    A.  Plainclothes also.
 3    Q.  So Ramadan is brought into the room, you and Schmeltz
 4    are in the room with him.  You close the door, right?
 5    A.  The door was open and closed at various points in time.
 6    Q.  When you walked into the room, did you close the door
 7    behind you?
 8    A.  No, sir.  The door closes automatically on its own.
 9    Q.  Okay.  So the door was closed?
10    A.  Yes, sir.
11    Q.  Automatically on its own, right?
12    A.  Yes, sir.
13    Q.  And so now Schmeltz -- who starts to ask him questions
14    first, you or Schmeltz?
15    A.  Officer Schmeltz.
16    Q.  And you have a yellow legal pad with you; isn't that
17    right?
18    A.  It may have been white, it might have been yellow; we
19    have both.
20    Q.  What color was it?
21    A.  I can't testify to the color of the legal pad.
22    Q.  You don't remember?
23    A.  No, sir, I don't.
24    Q.  You don't know where you got it from?
25    A.  I got it from work.
```

Case 2:17-cr-20595-VAR-EAS   ECF No. 41   filed 02/26/18   PageID.538   Page 134 of 250
*Evidentiary Hearing • January 30, 2018*

134

1  Q.  From where?

2  A.  Somewhere on my desk.  I have a pile of legal pads.  I'm

3  particularly bad about leaving them laying around our port,

4  so I will have a pile of them, I will take one off the top

5  and take it with me.

6  Q.  So you grabbed a legal pad?

7  A.  Yes, sir.

8  Q.  Because you knew you wanted to take notes, right?

9  A.  We had just finished another inspection that I had to

10  take notes for so I had it on hand.

11  Q.  So you grabbed a legal pad because you wanted to take

12  notes, right?  You didn't grab the legal pad to fan yourself

13  with, did you?

14  A.  No, sir.

15  Q.  You grabbed a legal pad to write on, didn't you?

16  A.  Yes, sir.

17  Q.  And you grabbed a legal pad to write on to talk about

18  your conversations with Mr. Ramadan; is that right?

19  A.  We are required at the end of our inspection to write a

20  report.

21  Q.  All right.

22  A.  So we would want to have something to write.

23  Q.  All right.  And so you made notes?

24  A.  Yes, sir.

25  Q.  And you took notes for the entire -- for the time that

 1    you were involved for -- for the time that you were in the

 2    interview with Mr. Ramadan; is that right?

 3    A.  Yes, sir, I did.

 4    Q.  All right.  And you -- did you make copies of those

 5    notes?

 6    A.  I did not.

 7    Q.  Did you put those notes into a file regarding the

 8    investigation of Mr. Ramadan?

 9    A.  I'm not a criminal investigator, sir.  I did provide the

10    notes that I had taken at the end of the evening to

11    Officer Schmeltz.

12    Q.  Do you know what Officer Schmeltz did with your notes?

13    A.  No, sir, I do not.  I do know he wrote a report that

14    included the context of my notes.

15    Q.  Did you see your notes again -- have you seen your notes

16    again after you gave them to Officer Schmeltz?

17    A.  No, sir, I have not.

18    Q.  You were told this afternoon, weren't you, that

19    Officer Schmeltz destroyed your notes or shredded them, you

20    heard that, didn't you?

21    A.  Yes, sir, I was sitting right behind you.

22    Q.  And when did you become aware that Officer Schmeltz had

23    destroyed your interview notes?

24    A.  This afternoon.

25    Q.  Now, let's walk back a minute.  Was Mr. Ramadan the only

1    person you interviewed on August 15th, 2017?

2    A.   No, sir.

3    Q.   How many people had you interviewed on August 15th,

4    2017, approximately?

5    A.   Approximately it would be between two and five.

6    Q.   Between two and five?

7    A.   Yes, sir.

8    Q.   Were any of them Palestinian?

9    A.   Excluding Mr. Ramadan?

10   Q.   Yes.

11   A.   I don't remember off of the top of my head.

12   Q.   Were any of them Muslim?

13   A.   That's not a routine question I ask.

14   Q.   Do you know who you interviewed?

15   A.   I know -- not their names.  I know I at least

16   interviewed one person that day.

17   Q.   Okay.  You know you interviewed how many people?

18   A.   At least one.  It's generally between two and five per

19   day.  You asked me approximately.

20   Q.   Okay.  And you said between two and five people you

21   interviewed that day?

22   A.   Yes, sir.

23   Q.   And that's not very many people?

24   A.   No, it is not.

25   Q.   Now, you know Mr. Ramadan through your interview?

1   A.   Yes.

2   Q.   You knew him -- you asked him where he was going, right?

3   A.   Yes, sir.

4   Q.   And he told you that he was going Palestine?

5   A.   Yes, sir.

6   Q.   That he was going to Bethlehem?

7   A.   Yes, sir.

8   Q.   That would make him a Palestinian, wouldn't it, by

9   birth?

10  A.   More --

11  Q.   You don't know the answer to that question?

12  A.   More than likely, yes, it could be Jordanian, generally

13  Palestinian, could be Israeli.

14  Q.   You asked Mr. Palestinian where he was going, you asked

15  him about his place of --

16  A.   I'm sorry.  We asked Mr. Ramadan.

17  Q.   I'm sorry.  You asked Mr. Ramadan about his place of

18  birth, correct?

19  A.   Yes, sir.

20  Q.   You asked him where he was going, correct?

21  A.   Yes, sir.

22  Q.   The other -- is that a routine question?  You said that

23  you ask routine questions; is that right?

24  A.   Yes.

25  Q.   Where are you going?

1    A.   Yes, sir.

2    Q.   What are your plans?

3    A.   Who do you know there?  How long are you staying?

4    Q.   You would have asked these questions of the other people

5    that went through your secondary inspection; is that right?

6    A.   Yes, sir.

7    Q.   Did any of these people tell you that they were Muslim?

8    A.   I don't ask someone's religion, sir.

9    Q.   Did any of these people tell you that they were Arabic?

10   A.   Tell me that they were Arabic?  No, sir.

11   Q.   What questions did you ask these other individuals,

12   these other two to five individuals --

13        MR. WATERSTREET:  Objection, Your Honor.  What's

14   the relevance of an interview of someone else not connected

15   with this case?

16        THE COURT:  Counsel, what's the relevance?

17        MR. DENSEMO:  The relevance is, Your Honor, if, in

18   fact, these officers treated Mr. Ramadan the same as they had

19   other people who had been stopped and gone through second

20   inspection that day, or was he treated differently, which is

21   one of the things we are arguing in this case.

22        THE COURT:  All right.  Overruled.

23        MR. WATERSTREET:  Your Honor --

24        THE COURT:  Overruled.  He can ask him.

25   A.   Could you repeat the question?

1   BY MR. DENSEMO:

2   Q.   My question is, was the first person -- was Mr. Ramadan

3   the first person you interviewed that evening or was he the

4   last?

5   A.   He was my last inspection of the day.

6   Q.   The first individual that you interviewed that day, did

7   you get any information about that individual?

8   A.   I couldn't tell you anything about the first person I

9   talked to that day.

10  Q.   You don't remember anybody else other than Mr. Ramadan?

11  A.   There is one other person I can for sure talk about

12  vaguely.

13  Q.   And that person was?

14  A.   I couldn't tell you his name.

15  Q.   Where was he going?

16  A.   Coming home.

17  Q.   Pardon me?

18  A.   He was coming back to the United States.

19  Q.   From where?

20  A.   I don't remember.

21  Q.   Do you know if that person was coming back from an

22  Islamic or Muslim country?  Do you know anything about the

23  second person or has your memory faded as to that person?

24  A.   I don't remember their name.  I believe they were

25  arriving from the Middle East.  Whether it was a Islamic or

1    Muslim country, I couldn't tell you.

2    Q.   They were arriving from the Middle East?

3    A.   Yes, sir.

4    Q.   Did you go through their luggage?

5    A.   Yes, sir.

6    Q.   Did you go through their computers?

7    A.   Yes, sir.

8    Q.   How long did that take you?

9    A.   I believe we spent roughly three hours working on that.

10   Q.   Three hours.  Do you remember the name of that person?

11   A.   I do not.

12   Q.   Did you record it someplace?

13   A.   It would be, yes, sir.

14   Q.   Where is that recorded?

15   A.   In the TECS computer system that we discussed earlier.

16   Q.   So you stopped another person coming from the Middle

17   East, and on their computer did you see any ISIS flags?

18   A.   I did not.

19   Q.   Did you see any -- any items that suggested that the

20   person was connected to Hamas or Hezbollah?

21   A.   I did not.

22   Q.   Did you see any items which suggested that the person

23   was connected to Al Qaeda?

24   A.   I did not.

25   Q.   And this individual, you said it was a male?

```
 1   A.  I believe it was, yes, sir.
 2   Q.  Had this person committed some sort of import violations
 3   or were they illegally suspected of bringing something
 4   illegally into the United States?
 5   A.  No, sir.
 6   Q.  Were they on a watch list?
 7   A.  Yes, sir.
 8   Q.  A terrorist watch list?
 9   A.  Yes, sir.
10   Q.  Was this -- and you detained this person for three
11   hours?
12   A.  Roughly.
13   Q.  He was not free to leave?
14   A.  He was not free to leave until our inspection was
15   complete.
16   Q.  And you determine when your inspection was completed?
17   A.  I do not determine when the inspection is complete.
18   Q.  You or your fellow officer or somebody makes that
19   determination; is that correct?
20   A.  There is a phone call that we have to make to the
21   National Targeting Center.  The watch commander at the
22   National Targeting Center determines when we are done.
23   Q.  And until that inspection was completed, that individual
24   was not free to leave; is that right?
25   A.  That's correct.
```

1  Q.  And was he eventually released?

2  A.  Yes, sir, he was.

3  Q.  And he was released by somebody -- your office's

4  authority; is that right?

5  A.  He was released by somebody above our office inside the

6  Department of Homeland Security outside of my port of entry.

7  Q.  All right.  But he needed authorization -- you received

8  authorization to release that individual from your custody;

9  is that right?

10  A.  I did.

11  Q.  On August 15th you received -- you were in your office I

12  take it?

13  A.  We were at the North terminal.

14  Q.  And you received a call asking for your assistance in

15  the investigation or interrogation of a man whose bags had

16  contained metal plates; is that right?

17  A.  We don't do interrogations, sir.

18  Q.  You call it what you like.  You received --

19  A.  I did not.  Officer Schmeltz did.

20  Q.  Did you get a call to come down and interview someone?

21  A.  Officer Schmeltz took the phone call.  I did not.

22  Q.  Did Officer Schmeltz ask you to come go with him?

23  A.  We asked the people who called us to bring Mr. Ramadan

24  downstairs.

25  Q.  Who called you?

1    A.   Umm --

2    Q.   Or called Schmeltz?

3    A.   I wasn't in on the phone call.  I believe it was

4    Officer Robinson.

5    Q.   And Officer Robinson does what?

6    A.   He's part of the Antiterrorism Contraband Enforcement

7    Team.

8    Q.   Okay.  So somebody from the antiterrorism unit called

9    you regarding Mr. Ramadan; is that right?

10   A.   Yes, sir.

11   Q.   You are also connected in some fashion to another

12   antiterrorism or terrorism unit; is that right?

13   A.   That's correct.

14   Q.   So when did you and Schmeltz get this call?

15   A.   I believe it was sometime around -- I don't have the

16   report in front of me.

17   Q.   Do you need something to refresh your recollection?

18   A.   That would be most helpful.  Thank you, sir.

19   Q.   You are welcome.  Does that refresh your recollection at

20   all?

21   A.   I don't see a time on here.

22   Q.   Is that military -- 15:50, is that military time?

23   A.   This would be probably written the following day.

24   Q.   The following day?

25   A.   August 16th.

1   Q.  I'm sorry.  So you don't remember what time you got the

2   call from -- that Schmeltz got this call?

3   A.  I could give you a rough estimate.

4   Q.  Go right ahead.

5   A.  Somewhere between 8:15 and 8:30 p.m.

6   Q.  And --

7   A.  It could be 8:00, somewhere between 8:00 and 8:30.

8   Q.  Once you get the call, what do you and Schmeltz do?

9   A.  I didn't do anything.  I waited for Mr. Ramadan to come

10  downstairs.

11  Q.  All right.  So was downstairs in your office?

12  A.  Yes, sir.  It is the diagram that was presented earlier.

13  Q.  Your office is downstairs -- your office --

14  A.  The federal --

15  Q.  -- in one of those buildings -- one of those rooms in

16  the diagram that we saw earlier?

17  A.  Those are just interview rooms, that's not our office.

18  Our actual office is in the other terminal, the McNamara.  We

19  happened to be onsite that night for the interview we had

20  done leading up to --

21  Q.  Pardon me.

22  A.  We happened to be at the North terminal that night for

23  the inspection you were asking me about earlier, the other

24  person I had interviewed.

25  Q.  The other Middle Eastern gentleman?

```
 1   A.   Well --
 2   Q.   What?
 3   A.   I said, yes, he was arriving from the Middle East.
 4   Q.   Okay.  And so you happened to be onsite, Ramadan is
 5   brought to your area?
 6   A.   Yes, sir.
 7   Q.   And not only Mr. Ramadan but Mr. Ramadan, his wife, and
 8   his children --
 9   A.   Yes, sir.
10   Q.   -- is that right?
11   A.   That is correct.
12   Q.   And who brings them into the lobby area?
13   A.   I believe it was Officer Robinson and Officer Haeck.
14   Q.   Robinson and Haeck?
15   A.   Yes, sir.
16   Q.   Is Mr. Ramadan handcuffed at this point?
17   A.   Absolutely not.
18   Q.   What happens when the Ramadan family enters the lobby
19   area?
20   A.   We asked the wife and children to wait in the lobby, and
21   we go into the interview room to talk in private.
22   Q.   You immediately take Mr. Ramadan into an interview room
23   and separate him from his wife and children?  Do you
24   immediately take Mr. -- separate Mr. Ramadan from his wife
25   and children?
```

1   A.  Yes, sir.

2   Q.  So they are seated in the lobby area, you and Schmeltz

3   take control of Ramadan, and you walk them into the interview

4   room?

5   A.  We do not physically control him, no.

6   Q.  Pardon me?

7   A.  We do not physically control him.

8   Q.  I didn't ask you if you physically controlled him.

9        MR. WATERSTREET:  Your Honor, we are getting back

10  to the same area we have gone over already with counsel and

11  it was objectionable before.

12       MR. DENSEMO:  I don't understand what he's

13  objecting to.

14       MR. WATERSTREET:  Asked and answered.

15       THE COURT:  Sustained.

16  BY MR. DENSEMO:

17  Q.  So you and Schmeltz are now in the interview room with

18  Mr. Ramadan and the door closes automatically; is that right?

19  A.  Yes, sir.

20  Q.  And Mr. Ramadan is seated at the table; is that right?

21  A.  Yes, sir.

22  Q.  Are you seated?

23  A.  I am.

24  Q.  Is Schmeltz seated?

25  A.  Yes, sir.

Case 2:17-cr-20595-VAR-EAS ECF No. 41 filed 02/26/18 PageID.551 Page 147 of 250
*Evidentiary Hearing • January 30, 2018*

**147**

1  Q.  Are you on the same side of the table as Mr. Ramadan or

2  the opposite side?

3  A.  I'm on the end of the table.

4  Q.  And you introduce yourself to Mr. Robinson --

5  Mr. Ramadan; is that right?

6  A.  Yes, sir.

7  Q.  And Officer Schmeltz introduces himself?

8  A.  Yes, sir.

9  Q.  And you both tell him that you are with Customs and

10  Border Protection?

11  A.  I don't work for Customs and Border Protection, no, sir.

12  Q.  I'm sorry.  You both tell them -- who did you tell him

13  you worked for?

14  A.  I don't believe we told him.

15  Q.  You didn't tell him who you worked for?

16  A.  No, sir.

17  Q.  You didn't tell him you were with a terrorism unit?

18  A.  No, sir.

19  Q.  What is the first question you ask Mr. Ramadan?

20  A.  Where are you going?

21  Q.  What's the next question you ask?

22  A.  How long are you going to be there?  And I'm not asking

23  the questions, Officer Schmeltz is.

24  Q.  Oh, so you are taking notes?

25  A.  Yes, sir.

1  Q.  So Schmeltz asked him where are you going, how long are
2  you going to be there?
3  A.  Yes, sir.
4  Q.  Mr. Ramadan told you he was going to Palestine; is that
5  right?
6  A.  Yes, sir.
7  Q.  And he said that it was indefinite; is that right?
8  A.  Yes, sir.
9  Q.  What did Schmeltz ask him next?
10  A.  I think we asked how much currency are you carrying.
11  Q.  Did you or Schmeltz ask the questions?
12  A.  Off the top of my head I couldn't tell you.  It is such
13  a common question that it was just a natural part of the
14  questioning process, that's what we ask next.
15  Q.  What was that that you asked next?
16  A.  How much currency Mr. Ramadan was transporting.
17  Q.  Did he answer that question?
18  A.  Yes, he did.
19  Q.  Did he have his carry-on bag with him at that point?
20  A.  I know he had a fanny pack.  I couldn't verify a
21  carry-on piece of luggage.
22  Q.  Okay.  What did ask you him about -- after you asked the
23  question about how much money he had, he showed you; is that
24  right?
25  A.  Yes, sir.

```
 1   Q.   What's your next question that you asked?
 2   A.   I believe Officer Schmeltz started asking about the body
 3   armor.
 4   Q.   And Mr. Ramadan gave you some answers about the body
 5   armor; is that right?
 6   A.   Yes, sir.
 7   Q.   Mr. Ramadan told you that the body armor was for his
 8   protection?
 9   A.   Yes, sir.
10   Q.   And was there anything about that statement that was
11   suspicious, that body armor was going to be used for
12   protection?  Isn't the purpose of body armor --
13            MR. WATERSTREET:  Can he answer the question first?
14            MR. DENSEMO:  I'm going to ask a different
15   question.
16            MR. WATERSTREET:  Okay.
17   BY MR. DENSEMO:
18   Q.   Isn't the purpose of body armor to protect an
19   individual?
20   A.   The purpose of body armor is to protect the wearer, yes,
21   sir.
22   Q.   Okay.  And Mr. Ramadan told you that he had the body
23   armor for protection; is that right?
24   A.   That is correct.
25   Q.   So his statement to you was consistent with the intended
```

1   purpose of body armor; is that right?

2           MR. WATERSTREET:  Objection; speculation.

3           THE COURT:  Overruled.  You said his statement to

4   him?

5           MR. DENSEMO:  His statement.

6           THE COURT:  Yes.

7   BY MR. DENSEMO:

8   Q.  His statement to you that he had it for protection was

9   consistent with the purpose of body armor; is that right?

10  A.  Yes, sir.

11  Q.  Did you ask him any other questions about the body

12  armor?

13  A.  I believe the line of questioning asked, if you need

14  body armor, why are you taking your children?

15  Q.  Okay.  And you asked this question because it is unusual

16  to have a body armor?

17  A.  I don't normally take my children anyplace where I feel

18  like I need body armor, no, sir.

19  Q.  Okay.  Do you know if police officers in the

20  United States use body armor?

21  A.  Every day I'm in my uniform I wear it.

22  Q.  All right.  Have you ever taken your kids to Michigan?

23  A.  In my uniform if I intend to do work, I do not take my

24  children with me.

25  Q.  Do they have body armor in Michigan, Officer Armentrout?

```
 1              THE COURT:  Counsel, let's move along, please.
 2   BY MR. DENSEMO:
 3   Q.  Officer Armentrout, you would agree with me, wouldn't
 4   you, that body armor is --
 5              THE COURT:  We know what body armor is.  Let's go
 6   on.
 7              MR. DENSEMO:  Okay.
 8   BY MR. DENSEMO:
 9   Q.  So your question about why would you take your children
10   to someplace that you need body armor, what was the point of
11   that question?
12   A.  Generally speaking, if --
13   Q.  What was the point of the question, what point were you
14   trying to make?
15   A.  I was asking a question, sir.
16   Q.  What was the point of the question?
17   A.  To get an answer.
18   Q.  What kind of answer were you trying to elicit from
19   Mr. Ramadan regarding what kind of place is it that requires
20   body armor?
21   A.  Whatever Mr. Ramadan wanted to answer.
22   Q.  And he gave you an answer; is that right?
23   A.  Yes, sir, he did.
24   Q.  And you thought that that answer was deceptive, correct?
25   A.  His answer was that his children would stay in the
```

 1   house.

 2   Q.  And you considered that -- you considered that to be a

 3   deceptive answer; is that right?

 4   A.  For school-aged children --

 5   Q.  Yes or no, did you consider that to be a deceptive

 6   answer?

 7          MR. WATERSTREET:  Your Honor --

 8          THE COURT:  Sustained.  Let him answer the question

 9   if you are going to ask it.

10          MR. WATERSTREET:  Thank you.

11          THE COURT:  Okay.

12   BY MR. DENSEMO:

13   Q.  Did you consider the statement my kids would be in the

14   house or remain in the house, did you consider that to be

15   deception, yes or no?

16   A.  I believed his children would absolutely stay in the

17   house.

18   Q.  So you believe that his answer was truthful, yes or no?

19   A.  Could I answer the first question you asked me or the

20   second?

21   Q.  You already answered that one.  You said you believed

22   his kids would stay in the house just as he indicated.  Now I

23   asked you, did you consider that to be deceptive?

24   A.  Yes, sir, I did.

25   Q.  Did you say that you believed him when he said that his

1   answer was my kids would stay in the house and that you

2   believed his kids would stay in the house?

3   A.  Yes, sir.

4   Q.  But you think that that's being deceptive?

5   A.  Yes, sir.

6   Q.  Explain how a statement that's consistent with what

7   Mr. Ramadan's saying is deceptive.

8   A.  Well, sir, to use your own analogy, here in the State of

9   Michigan my children walk to and from school, they go outside

10  and play football, soccer, they play baseball outside of the

11  house, they generally visit their friends outside of my home.

12  Q.  From all of that, you took it that Mr. Ramadan was

13  telling you that his kids was going to stay -- was going to

14  stay in their home forever and that they would never go

15  outside and visit family, friends, go to the mosque or do

16  anything.  From all of that you made a determination that

17  Mr. Ramadan was saying my kids were going to stay in this

18  house for the rest of their lives?

19  A.  Rest of their lives, no, sir, that's a little bit

20  ridiculous.

21  Q.  Don't you believe that your assumption is a little bit

22  ridiculous?

23          MR. WATERSTREET:  Objection, Your Honor;

24  argumentative.

25          THE COURT:  Sustained.

Case 2:17-cr-20595-VAR-EAS  ECF No. 41  filed 02/26/18  PageID.558  Page 154 of 250
*Evidentiary Hearing • January 30, 2018*

154

1  BY MR. DENSEMO:

2  Q.  Officer Armentrout, what was the next -- so now you are

3  asking Mr. Ramadan about why he had the body armor, and he

4  told you for his safety?

5  A.  Yes, sir.

6  Q.  And then you asked -- then you suggested to him that

7  the -- where he's going wasn't safe because he was taking his

8  children someplace that needed body armor?

9        THE COURT:  All right.  I think we have covered

10  this.  We are going to break now for the pleas.  You may step

11  down, sir.

12        Counsel, I would suggest we will be about a half

13  hour so we will break until 3:05.

14        THE LAW CLERK:  All rise.  Court is in recess.

15        (Court recessed at 2:35 p.m.)

16                    —   —   —

17        (At 3:18 p.m. Court reconvenes, Court, counsel and

18        all parties present.)

19        THE LAW CLERK:  All rise.  Court is again in

20  session.

21        THE COURT:  You may take the stand.  You may be

22  seated.  All right.  We will continue.  Sorry for the delay.

23        MR. DENSEMO:  Thank you, Judge.

24  BY MR. DENSEMO:

25  Q.  Officer Armentrout, I was talking with you -- we were

1   talking about your interrogation of Mr. Ramadan.  One of the

2   questions you asked Mr. Ramadan was you asked about his

3   employment; is that right?

4   A.   Are you asking about our interview?

5   Q.   Yes, talking about the interview.

6   A.   Because we did not interrogate him, and Officer Schmeltz

7   asked most of the questions.  Mr. Ramadan was probably asked

8   about his employment, yes, sir.

9   Q.   So Officer Schmeltz asked him about his employment, and

10  you wrote down what -- some of the questions Officer Schmeltz

11  was asking and you wrote down some of Mr. Ramadan's answers;

12  is that right?

13  A.   No, sir, that's incorrect.  I would have written down

14  the answer.

15  Q.   Pardon me?

16  A.   I would have only written the answer.

17  Q.   You only wrote the answer?

18  A.   Yes, sir.

19  Q.   Okay.  So you heard what Officer Schmeltz was asking and

20  then you wrote down Mr. Ramadan's answers, that's what you're

21  saying?

22  A.   I would have written some of the answers down, yes, sir.

23  Q.   And one of the answers that he gave you was that he was

24  a photographer or photojournalist; is that right?

25  A.   Journalist, yes, sir.

1    Q.   He also -- did Officer Schmeltz ever ask Mr. Ramadan

2    what he had done for work while he was living in the United

3    States?

4    A.   Yes, sir.

5    Q.   And Mr. Ramadan told him that he had -- that he had

6    worked in construction and in security; is that right?

7    A.   When I was present the only employment that was

8    mentioned was construction.

9    Q.   Okay.  So he had -- so you heard him say construction?

10   A.   Yes, sir.

11   Q.   And during your interrogation or interview or however

12   you choose to phrase it, the only question -- the only answer

13   he gave regarding employment here in the U.S. was to

14   construction?

15   A.   Yes, sir.

16   Q.   And did he explain to Schmeltz that as a

17   photojournalist -- I'm sorry, let me back up.

18          And during the review of his property, his luggage,

19   you found a vest with the word PRESS on it; is that right?

20   A.   I didn't do the review of the baggage, sir, the other

21   team did.  It is noted in the photographs that I did see it

22   that night, yes, sir.

23   Q.   Pardon me?  You have to keep your voice up.

24   A.   I speak somewhat softly.  I apologize.

25          I said I didn't inspect the luggage.  It was

1   admitted in the pictures.  I did see one of the load-bearing

2   vests with the word PRESS on it, yes, sir.

3   Q.   Okay.  And do you recall Mr. Ramadan telling you that he

4   wanted to cover the conflict in Palestine, is that one of the

5   answers he gave you?

6   A.   Yes, sir.

7   Q.   And based upon the information that you have, which you

8   consider to be the West Bank -- or has the West Bank been

9   characterized as a dangerous part of the world?

10  A.   I believe our media characterizes it as such, yes, sir.

11  Q.   And you have heard stories where people detonate smoke

12  bombs in that area?

13  A.   Smoke bombs or IEDs.

14  Q.   Smoke bombs and IEDs.

15  A.   IEDs, yes.  I have not heard any reports of smoke bombs.

16  Q.   Have you heard of the Israeli army firing missiles in

17  that area, in the West Bank?

18  A.   Are you asking me my opinion?

19  Q.   No.  Based upon your knowledge of that part of the

20  world, the Israeli army has fired missiles in the West Bank,

21  haven't they?

22  A.   The reason I asked is because earlier you said I wasn't

23  an expert and I just wanted to verify that my --

24  Q.   I'm not asking for your expert opinion.

25            THE COURT:  One at a time.

```
 1                    MR. DENSEMO:  I'm sorry, Judge.
 2    BY MR. DENSEMO:
 3    Q.   It is true --
 4    A.   Oh, absolutely.
 5    Q.   -- that the Israeli army has fired missiles in that
 6    area?
 7    A.   Missiles, absolutely.
 8    Q.   And according to what the reports that you and I and
 9    others have heard, there is often gunfire in that area?
10    A.   Absolutely true.
11    Q.   And would you say that a gas mask would help protect
12    somebody from gas fumes?
13    A.   Certainly it would.  That's what it is designed for.
14    Q.   And if somebody doesn't have a gas mask or scarf or a
15    ski mask, the mask would offer some sort of protection?
16    A.   A ski mask?
17    Q.   If somebody didn't have a mask of some kind, a gas mask
18    would offer some kind of protection from gases and fumes?
19    A.   Oh, absolutely.
20    Q.   And body armor would protect somebody from stray
21    bullets, would it not?
22    A.   Absolutely true.
23    Q.   And Mr. Ramadan told you that he had packed the body
24    armor for self protection, didn't he?
25    A.   That is correct.
```

```
 1   Q.  He explained that he thought his wife could use the
 2   pepper spray to protect herself; is that right?
 3   A.  I was not present for the part of the interview.
 4   Q.  You weren't present for that response?
 5   A.  No, sir.
 6   Q.  Do you recall Mr. Ramadan saying that the pepper spray
 7   was for his wife's protection?
 8   A.  No, sir.  I was not present for that part of the
 9   interview.
10   Q.  Did you ever talk to Mr. Ramadan's wife?
11   A.  No, sir, I did not.
12   Q.  So you don't know if she had confirmed that Mr. Ramadan
13   worked in construction here in the U.S.?
14   A.  I did not speak to Mr. Ramadan's wife.
15   Q.  At some point you asked Mr. Ramadan for his passcodes to
16   access the digital devices, is that right, or
17   Officer Schmeltz asked him?
18   A.  Yes, we did ask for access to his cellular telephone.
19   Q.  And he refused; is that right?
20   A.  That is true.
21   Q.  And he said he did not want to give you the passcodes on
22   multiple occasions; is that right?
23   A.  That is correct.
24   Q.  And Mr. Ramadan asked for a contract stating that he
25   would not be prosecuted for material on the device in
```

1    exchange for the passcodes; is that right?

2    A.   Yes, sir.

3    Q.   Did you tell him that he watches too many movies?

4    A.   No, sir, I did not.

5    Q.   Did Officer Schmeltz say that to him?

6    A.   He may have.  I can't recall the exact content of all of

7    Officer Schmeltz's comments that evening.

8    Q.   You didn't let Mr. Ramadan contact an attorney, did you?

9    A.   No, sir.

10   Q.   You didn't advise him of any Miranda Rights either, did

11   you?

12   A.   No, sir.

13   Q.   At some point Mr. Ramadan was handcuffed; is that right?

14   A.   That's correct.

15   Q.   And Mr. Ramadan could see into the room where he was

16   seated?

17   A.   Who could see?

18   Q.   Mr. Ramadan's family?

19   A.   Oh, yes.

20   Q.   They could see in the room where he's -- where you all

21   were?

22   A.   Yes, sir.  The diagram that was provided, the dashed

23   line is a picture window.

24   Q.   And they presumably could see you put handcuffs on him?

25   A.   Yes, sir.

1    Q.  You let Mr. Ramadan out of the room at some point; is

2    that right?

3    A.  Yes, sir.

4    Q.  He was not free to leave, was he?

5    A.  No, sir.

6    Q.  When your interview with Mr. Ramadan was concluded,

7    he -- was he placed in another interview room or was he taken

8    back to the lobby?

9    A.  When my portion of the interview of Mr. Ramadan was

10   concluded, he was still seated in the interviewed room when

11   Officer Schmeltz and I departed.

12   Q.  Now, some of the items that were found were not export

13   controlled; is that right?

14   A.  That is correct.

15   Q.  The Taser was export controlled?

16   A.  It is.

17   Q.  The body -- the metal plates --

18   A.  Level III body armor is export controlled.

19   Q.  You keep saying level three.  What is a Level I body

20   armor?

21   A.  I have no idea what Level I is.  Level II is soft body

22   armor police officers wear.  It is designed to stop handgun

23   rounds.

24   Q.  Right.

25   A.  Level III is thicker steel designed to stop something up

1    to a Kalashnikov round.

2              THE COURT:  Wait a minute.  I'm not getting this.

3              MR. DENSEMO:  Kalashnikov, it is a machine gun.

4              THE COURT:  Oh, Kalashnikov.  Thank you.

5    BY MR. DENSEMO:

6    Q.  Is there a Level IV?

7    A.  I have no idea.

8    Q.  So you are aware of II or III?

9    A.  I was going to say, steel that will take an AK round I

10   kind of stopped research there.

11   Q.  So the body armor here is a Level III body armor?

12   A.  Yes, sir.

13   Q.  All right.  The interrogation of Mr. Ramadan began

14   August 15th and concluded -- and he wasn't released until the

15   early morning hours of August 16th; is that right?

16   A.  The interview of him started on the 15th, and then we

17   ended on the 16th in the early morning hours.

18   Q.  You were one of the first agents to question

19   Mr. Ramadan; is that right?

20   A.  Officer Schmeltz did the bulk of the questioning.  I may

21   have asked a question or two as my experience led me to

22   interject into Officer Schmeltz's interview.

23   Q.  From your knowledge, Mr. Ramadan was removed from his

24   plane before it was scheduled to take off; is that right?

25   A.  According to --

1    Q.   From your knowledge.

2    A.   From my knowledge he voluntarily departed the aircraft.

3    Q.   Were there two agents with him at the time that he

4    departed the aircraft?

5    A.   I wasn't up at the jetway,, it would be speculative for

6    me to guess.  They did come downstairs with him.

7    Q.   But you weren't on the airplane at the time he was taken

8    off of the plane?

9    A.   I was not at the aircraft when he left the airplane, no,

10   sir.

11   Q.   Not only he was taken off the plane, but his wife and

12   children were also taken off the plane; is that right?

13          MR. WATERSTREET:  Your Honor, he's already said he

14   wasn't there.

15          THE COURT:  Sustained.

16   BY MR. DENSEMO:

17   Q.   Okay.  How much time would you say that you spent with

18   Mr. Ramadan?

19   A.   Between 40 and 45 minutes.

20   Q.   That's all, 40 and 45 minutes?

21   A.   Yes, sir.

22   Q.   During the time that you spent with Mr. Ramadan was he

23   given anything to eat?

24   A.   He didn't ask for anything, we offered.

25   Q.   The question was --

Case 2:17-cr-20595-VAR-EAS   ECF No. 41   filed 02/26/18   PageID.568   Page 164 of 250
*Evidentiary Hearing • January 30, 2018*

164

1    A.   We offered --

2    Q.   Let me ask you a simple question.  Did you see him

3    eating anything during the 40 to 45 minutes that you were

4    with him?

5    A.   No, sir.

6    Q.   Let's talk a minute about the circumstances that lead to

7    you handcuffing Mr. Ramadan.  You asked Mr. Ramadan some

8    questions about the -- his passcodes?

9    A.   I did not handcuff Mr. Ramadan, sir.

10   Q.   Okay.  Officer Schmeltz handcuffed --

11   A.   Yes, sir.

12   Q.   -- Mr. Ramadan?  Pardon me?

13   A.   Yes, sir, he did.

14   Q.   All right.  So there was presumably an exchange between

15   Officer Schmeltz and Ramadan that lead Officer Schmeltz to

16   handcuff him?

17   A.   Yes, sir.

18   Q.   And since he was not free to leave in any event,

19   Officer Schmeltz decided to handcuff him, right?

20   A.   Officer Schmeltz decided to handcuff him for his safety

21   and ours, yes, sir.

22   Q.   Okay.  And he handcuffed Mr. Ramadan for 15 minutes?

23   A.   Less than 15 minutes.

24   Q.   I thought you said about 15 minutes before.

25   A.   Approximately, not more than.

1  Q.  All right.  And for that 15 minutes that he was

2  handcuffed he was not free to leave?

3  A.  That is correct.

4  Q.  Do you know that during the 40 to 45 minutes that you

5  were dealing with Ramadan, Mr. Ramadan and his family, did

6  you ever see his wife and children eating anything?

7  A.  No, sir.  I was with Mr. Ramadan.

8  Q.  Okay.  But you said you could see into the lobby,

9  couldn't you?

10  A.  You can, yes.

11  Q.  From where you were?  You say that there is a --

12  A.  Picture window.

13  Q.  Pardon me?

14  A.  A window.

15  Q.  A window so you can see the family?

16  A.  Yes, sir.  I would add I would be remiss from doing my

17  duties if my attention was on his family and not the person

18  that we were interviewing.

19  Q.  So you were focused on taking notes and making sure that

20  Mr. Ramadan was secured?

21  A.  I don't know about secured.

22      MR. WATERSTREET:  Your Honor, what question does he

23  want him to ask, whether he was focused on taking notes or

24  securing him?  He asked two questions.

25      THE COURT:  Separate your question, Counsel.

Case 2:17-cr-20595-VAR-EAS  ECF No. 41  filed 02/26/18  PageID.570  Page 166 of 250
*Evidentiary Hearing • January 30, 2018*

166

```
 1   BY MR. DENSEMO:
 2   Q.  All right.  You were focused on taking notes?
 3   A.  I was focused on the question, the answer, and jotting
 4   down notes, yes, sir.
 5   Q.  All right.  But you didn't take down the question, you
 6   just took down the answer?
 7   A.  Correct.
 8   Q.  And you were also concerned, being a law enforcement
 9   officer, you were also concerned with your safety; is that
10   right?
11   A.  I was concerned for all three of us, yes, sir.
12   Q.  Okay.  So you were concerned for everybody's safety?
13   A.  That's absolutely true.
14   Q.  So you were watching Mr. Ramadan to make sure that he
15   doesn't do anything of an aggressive nature; is that right?
16   A.  That is correct.
17   Q.  Now, Mr. Ramadan's demeanor during the initial stages of
18   the interview or interrogation, you said that initially he
19   was cooperative?
20   A.  Yes, sir.
21   Q.  And he had answered your questions?
22   A.  He did.
23   Q.  And what triggered the handcuffing, if you know?
24   A.  When the questioning about the telephone became more
25   intensive, his --
```

Case 2:17-cr-20595-VAR-EAS   ECF No. 41   filed 02/26/18   PageID.571   Page 167 of 250
*Evidentiary Hearing • January 30, 2018*

167

1   Q.   How did it become intensive, could you describe what you

2   mean by got more intensive?

3   A.   When we asked Mr. Ramadan for his phone and then the

4   passcode, his demeanor changed.  As soon as we wanted to

5   review digital media, the demeanor went from maybe not as

6   truth telling as we know it but to demonstratively aggressive

7   in terms of balled fist, leaning forward in the chair.  There

8   was a change in his demeanor that led us in our experience to

9   believe that he could make a bad choice at that point in

10  time.

11  Q.   Did you ever tell Mr. Ramadan that you were of German

12  extraction?

13  A.   I did.

14  Q.   And did you ever say to Mr. Ramadan you don't

15  particularly like Jews either?

16  A.   In the course of an interview when we are attempting to

17  extract information, many times we will tell the person we

18  are discussing something with something in an attempt to gain

19  their confidence.

20  Q.   I got you.  So you did tell him you don't like Jews?

21  A.   I did.

22  Q.   And you also told him that I wouldn't mind killing them

23  either?

24  A.   I did not say that.

25  Q.   Okay.  What did you say about killing Jews?

1   A.  I didn't say anything about killing Jews.

2   Q.  So you told Mr. Ramadan, look, I'm from Germany, we

3   don't like Jews either, right, right?  That's what you just

4   said, right?

5   A.  What I said was that I will lead people to believe

6   something.

7   Q.  Right.  And you lead him to believe it by saying I'm

8   from Germany, we don't like Jews either?

9   A.  I did not say I don't like Jews.

10  Q.  Did you say we don't like Jews?

11  A.  The exact --

12  Q.  Tell me what you said.  Let's stop this dance.  Tell me

13  what you said about Jews.

14  A.  Six months ago I couldn't tell you what I said.

15  Q.  You just said that you used the ploy to try to gain his

16  confidence by saying something derogatory about Jews

17  believing that he didn't like Jews, right?

18  A.  That's absolutely true.

19  Q.  And Mr. Ramadan told you stop right there, I have

20  nothing against Jewish people, isn't that what he told you?

21  A.  He may have.

22  Q.  Did you write that down in the notes that had been

23  shredded?

24  A.  I'm sorry, sir.  I didn't shred any notes.

25  Q.  Did you write that down in the answers that you were

1   taking?

2   A.   I very well could have, yes, sir.

3   Q.   And didn't he also tell you I have nothing against

4   Jewish people, that I've worked with Jewish people, I have

5   had attorneys that are Jewish people, I have nothing against

6   Jews whatsoever, didn't he tell you that?

7   A.   Certainly.

8   Q.   Didn't he also tell you that he hated Hamas?

9   A.   I believe I have already covered the exact vernacular

10  for Hamas.

11  Q.   And did he tell you that he did not believe in violent

12  means used by ISIS?  Was that a question that

13  Officer Schmeltz asked him and is that a response that he

14  gave?

15  A.   The response to that question for me would be hearsay.

16  I heard it after the fact.  I was not part of that interview.

17  Officer Schmeltz told me that that was the response, yes, but

18  I was not present.

19  Q.   So Officer Schmeltz told you that Mr. Ramadan told him

20  that he did not believe in ISIS's violent methods,

21  Officer Schmeltz told you that?

22  A.   Officer Schmeltz told me that Mr. Ramadan believed in

23  the caliphate but not the violence associated with it.

24  Q.   So when you are interviewing Mr. Ramadan, you know that

25  he's -- he says he hates Hamas, correct?

Case 2:17-cr-20595-VAR-EAS  ECF No. 41  filed 02/26/18  PageID.574  Page 170 of 250
*Evidentiary Hearing • January 30, 2018*

170

1    A.  Yes, sir.

2    Q.  Did you ever ask him about the pictures that have been

3    displayed this morning, these photos, these violent photos,

4    did you ever ask Mr. Ramadan about those photos?

5    A.  Did I personally ask him?

6    Q.  Yes.

7    A.  No, sir, I did not.

8    Q.  Did you hear Officer Schmeltz ask him about those?

9    A.  I did not hear Officer Schmeltz ask him.  The room on

10   the diagram has a closed door, and I didn't leave the room

11   again to come interview Mr. Ramadan that night when I went

12   in.

13   Q.  I'm asking you about the time that you and

14   Officer Schmeltz were in the room with Mr. Ramadan, no

15   question was ever asked about those photos, nobody ever asked

16   Mr. Ramadan about those photos, did they?

17   A.  I hadn't seen those photos, no, sir.

18   Q.  You hadn't seen them?

19   A.  No, sir.

20   Q.  But you had seen other photos or information -- had you

21   seen photos about Mr. Ramadan holding a rifle, had you seen

22   that when you were talking to him?

23   A.  No, sir.

24   Q.  You hadn't seen any photos at all at the time that you

25   spoke with Mr. Ramadan?

1   A.  I had not reviewed any digital media while I was

2   speaking with Mr. Ramadan.

3               MR. DENSEMO:  Give me one second, Your Honor.

4               (An off-the-record discussion was held at

5               3:37 p.m.)

6   BY MR. DENSEMO:

7   Q.  Did you see a report that was generated by

8   Officer Schmeltz on August 16th regarding you and him

9   interviewing Mr. Ramadan, have you seen that report?

10  A.  Officer Schmeltz's interview covers multiple times

11  interviewing --

12  Q.  Pardon me?

13  A.  Officer Schmeltz's interview for Mr. Ramadan extended

14  beyond the time where I was physically present.  I have seen

15  the report, yes, sir.

16  Q.  Are you with TRT?

17  A.  No, sir.

18  Q.  TTRT?

19  A.  Yes, sir, I am.

20  Q.  Okay.  Are you familiar with a statement made by

21  Officer Schmeltz that due to Mr. Ramadan being unable to

22  answer simple questions, TTRT decided to conduct a media

23  exam, and when asked to unlock his phones, Mr. Ramadan

24  refused and stated that he did not want to answer any

25  questions?

1   A.   Yes, sir.

2   Q.   Do you recall that Officer Schmeltz saying that although

3   TTRT could not examine the phones or the laptops without a

4   passcode --

5            THE COURT:  Slow down.

6            MR. DENSEMO:  I'm sorry.

7   BY MR. DENSEMO:

8   Q.   Although TTRT could not examine the phones or the

9   laptops without a password, we were able to review the

10   external hard drives and thumb drives?

11   A.   That was at the point where I had left the interview and

12   gone to conduct the electronic media exam.

13   Q.   So you are saying that you went and conducted an

14   electronic media exam, right?

15   A.   Yes, sir.

16   Q.   But you never returned to interviewed Mr. Ramadan?

17   A.   No, sir, I did not.

18   Q.   And so you never went back to talk to Mr. Ramadan about

19   the photos?

20   A.   No, sir.

21   Q.   All right.  So you didn't have -- so these photos didn't

22   form a basis for you to detaining Mr. Ramadan or questioning

23   Mr. Ramadan, they could not have because you hadn't seen

24   anything?

25            MR. WATERSTREET:  Your Honor, objection.

1   A.   That is correct.

2           MR. WATERSTREET:  Objection.  Whether he asked

3   Mr. Ramadan about it, those photos certainly could --

4           THE COURT:  I'm not sure --

5           MR. WATERSTREET:  -- could be reviewed by other

6   agents and --

7           MR. DENSEMO:  I asked him about him, Judge.

8           THE COURT:  Right, he asked him about him, and he

9   hadn't seen them.

10          MR. DENSEMO:  Right.

11          MR. WATERSTREET:  Your Honor, I believe the

12  testimony has been after the interview was completed, he went

13  and did the media search, and in the process he came across

14  all of these photographs.  Other things may have been going

15  on with other agents at that time, but he was not part of any

16  other interview of Mr. Ramadan.

17          MR. DENSEMO:  That's not my question.  I asked him

18  specifically about these photos and whether these photos had

19  formed the basis for his detention of questioning of

20  Mr. Ramadan, and clearly they could not have because he

21  hadn't seen them.

22          MR. WATERSTREET:  Okay.  Then we have the answer.

23          MR. DENSEMO:  Well, he needs to answer the

24  question, not me.

25          THE COURT:  I thought your objection was going to

1  be asked and answered because he said it several times.

2      MR. WATERSTREET:  Right, exactly.

3      THE COURT:  So I will sustain my own objection.  Go

4  on, ask another question.

5      MR. DENSEMO:  So the Court is finding that -- I'm

6  sorry, Judge.

7      THE COURT:  He couldn't have -- he didn't see the

8  photos.

9      MR. DENSEMO:  Okay.

10  BY MR. DENSEMO:

11  Q.  And so Mr. Ramadan was being interrogated by you not

12  based on any photos but because of the plates that had been

13  found in his luggage; is that right?

14  A.  He was being interviewed for an export violation and the

15  reason for the body armor being in his luggage, yes, sir.

16  Q.  All right.  At that point you just had your suspicions

17  about Mr. Ramadan being involved in terrorism; is that right?

18  You hadn't seen any photos, any ISIS materials, right?

19  A.  That's correct, I did not see any ISIS materials at that

20  point in time.

21  Q.  So you just had some suspicion maybe because he was from

22  the Middle East and he was Palestinian and he had this body

23  armor that we need to talk to him about terrorism; is that

24  right?

25  A.  We had to discern why he was travelling with Level III

1  body armor.

2  Q.  All right.  You are from the terrorism unit --

3  A.  I was --

4  Q.  -- right?

5  A.  -- there that night, yes, sir.

6  Q.  You talked to him about terrorism; is that right?

7  A.  We did discuss that, yes, sir, but that was not the

8  basis for why we made contact with him.

9  Q.  I know why you made contact with him but I'm saying --

10 but what I'm trying to get at is your conversations with him.

11 A.  We did include that as part of the conversation, yes,

12 sir.

13 Q.  All right.  And that was based upon the information that

14 you had at that time, you delved into terrorism?

15 A.  Yes, sir.  We've covered already the record for possibly

16 being associated with Hamas, that we were able to --

17 Q.  When he told you I don't care for Hamas --

18            THE COURT:  Okay.  I have heard all of this.

19            MR. DENSEMO:  Okay.  I know.

20            THE COURT:  Let's move along.

21            MR. DENSEMO:  All right.

22 BY MR. DENSEMO:

23 Q.  Did you see any -- did you see any of Mr. Ramadan's

24 children while you were doing your work, did you see any of

25 his children crying?

1   A.   I did not.

2   Q.   Did you hear any children crying?

3   A.   I probably did, yes, sir.  It was late and they were

4   small.

5   Q.   Did Mr. Ramadan say anything to you about his children

6   and their emotional or physical state?

7   A.   I don't believe so, no, sir.

8   Q.   Is it your position that Mr. Ramadan never -- he never

9   asked for an attorney, is that right, that's what you are

10  saying?

11  A.   Yes, sir.

12  Q.   And is it your position that he wasn't entitled -- did

13  you ever tell him you are not entitled to an attorney?

14  A.   I did not, no.

15  Q.   Pardon me?

16  A.   I did not tell him that, no.

17  Q.   Did you ever tell him that he was at an international

18  border?

19  A.   Yes, because he was.

20  Q.   Did you ever tell him that he did not have any rights at

21  an international border?

22  A.   No, sir, I did not.  I would say that the

23  Fourth Amendment has been relaxed to allow Customs and Border

24  Protection, Border Patrol and HSI to use border search

25  authority.

1   Q.  Did you say that to Mr. Ramadan or did you say it in a

2   different way?

3   A.  I would have paraphrased that.

4   Q.  You would have paraphrased?  Pardon me?

5   A.  Yes, sir, that's what I said.  I would have probably

6   said Customs has the right to search people, their things and

7   their conveyance when they enter or exit the United States.

8   Q.  Okay.  But you paraphrased what you actually said to

9   him?

10  A.  What I just said is probably what I told him.

11  Q.  All right.  Did you tell Mr. Ramadan that he did not

12  have a right to an attorney at an international border?

13  A.  I did not tell him that, no.

14  Q.  But you did tell him that the Fourth Amendment --

15  A.  Allowed us to search people, their conveyance and all of

16  their things.

17  Q.  All right.  And that he -- did you tell him he could not

18  refuse?

19  A.  I'm sorry, I don't understand your question.

20  Q.  Did you tell him you cannot refuse?

21  A.  Refuse what?

22  Q.  To answer our questions?

23  A.  No, I never told him that.

24  Q.  Did you tell him that he could not refuse to submit to a

25  search?

1    A.   At the border, we are --

2    Q.   Did you tell him that, Agent Armentrout?

3    A.   I'm not an agent, sir, I'm an officer.

4    Q.   I'm sorry.  Officer, Agent --

5    A.   The reason why I make the difference is because special

6    agents and agents are criminal investigators.

7    Q.   I don't care, Officer Armentrout.  Did you ask the

8    question?

9          MR. WATERSTREET:  Your Honor, may I impose an

10   objection?  He keeps cutting the witness off.  Can he let the

11   witness please answer the question.

12         THE COURT:  All right.

13   BY MR. DENSEMO:

14   Q.   Officer Armentrout, did you say to Mr. Ramadan that this

15   is an international border, you cannot refuse to submit to

16   having your luggage inspected?

17   A.   I don't believe I would have said those words.  I would

18   have said subject of every -- everything you have with you is

19   subject to inspection.

20   Q.   Pardon me?

21   A.   I would have said everything that you're carrying, all

22   of your goods, your conveyance and your person are subject to

23   inspection.

24   Q.   Did you tell Mr. Ramadan that since he wasn't -- since

25   he was at an international border, he had to talk to you?

Case 2:17-cr-20595-VAR-EAS  ECF No. 41  filed 02/26/18  PageID.583  Page 179 of 250
*Evidentiary Hearing • January 30, 2018*

179

1      MR. WATERSTREET:  Your Honor, this has been asked

2  and answered.

3      THE COURT:  Sustained.

4  BY MR. DENSEMO:

5  Q.   What was his answer?

6      MR. WATERSTREET:  Your Honor --

7      MR. DENSEMO:  I don't remember his answer.

8      MR. WATERSTREET:  Well --

9      THE COURT:  No, let's go on please.

10  BY MR. DENSEMO:

11  Q.   After the handcuffs were taken off of Mr. Ramadan, did

12  he answer any more of your questions?

13  A.   I wasn't present for any more questioning, no.

14  Q.   Pardon me?

15  A.   I wasn't present for any more questioning.

16  Q.   I said after the handcuffs were taken off.  You said the

17  handcuffs were only on for 15 minutes but the interview

18  lasted 40 to 45 minutes?

19  A.   Yes, sir.

20  Q.   Yes, sir what?

21  A.   At the end of the interview he was handcuffed.

22  Q.   At the end of the interview he was handcuffed for

23  15 minutes?

24  A.   Yes, sir.

25  Q.   And following that no -- you did not -- the

Case 2:17-cr-20595-VAR-EAS  ECF No. 41  filed 02/26/18  PageID.584  Page 180 of 250
*Evidentiary Hearing • January 30, 2018*

180

1    interrogation ceased?

2    A.   I've never interrogated him, sir.  I interviewed him.

3    Q.   Officer Schmeltz's interrogation ceased?

4    A.   No, sir, Officer Schmeltz was interviewing him.

5    Q.   Officer Schmeltz was still interviewing him after he

6    took the handcuffs off of him?

7    A.   Officer Schmeltz would be physically present for an

8    interview with Mr. Ramadan to include FBI, JTTF and HSI.

9    Q.   I'm talking about when you and he were partnered up.

10   A.   I couldn't testify for what Officer Schmeltz did.  I

11   wasn't physically present.  I went to the command center and

12   was reviewing the media at that point in time.

13           THE COURT:  Did you leave when he was handcuffed?

14           MR. DENSEMO:  Thank you, Judge.

15   A.   Yes, ma'am, I did.

16           THE COURT:  So you weren't there when the handcuffs

17   were taken off?

18   A.   No.

19           THE COURT:  All right.  Let's move on.

20           MR. DENSEMO:  Thank you, Judge.

21   BY MR. DENSEMO:

22   Q.   So if you weren't there, you don't know how long the

23   handcuffs were on; is that right?

24   A.   That would be a fair statement, yes.

25   Q.   A fair statement that it was 15 minutes was inaccurate?

1    A.   It would be --

2    Q.   Because you don't know?

3    A.   Is that a statement or question, sir?

4    Q.   That is a question.

5    A.   Okay.

6    Q.   Since you weren't there -- let me -- since you weren't

7    there to see the handcuffs come off, you don't know how long

8    they were on him; is that right?

9    A.   I may have gone to the bathroom and come back and seen

10   him out of the handcuffs.  I wasn't keeping a timeline of

11   going to the bathroom or -- but I was in the command center

12   and did not participate in any more questioning that evening.

13   Q.   Did you move -- did you and Officer Schmeltz move

14   Mr. Ramadan from one room to another, from one interview room

15   to a different interview room?

16   A.   Did I do it?  No, sir.

17   Q.   Did you and Officer Schmeltz do it yourself?

18   A.   I did not.

19   Q.   Did you see any other agents or officers move

20   Mr. Ramadan from one interview room or interrogation room to

21   another room?

22   A.   He may have gone from one to the other.  The command

23   center where I was is dark and there's a wall and a door.

24   After I went in, unless I went out to use the restroom, I

25   didn't see anything else that happened.

*Evidentiary Hearing • January 30, 2018*

1  Q.   I don't want to keep asking the same questions --

2  A.   Okay.

3  Q.   -- Officer.  Did you see -- did you see -- could you see

4  any other agents or officers moving Mr. Ramadan from one room

5  to another room?

6  A.   No, sir.

7  Q.   Did you ever see Mr. Ramadan in a different room other

8  than the lobby, any other -- any of the other interrogation

9  rooms at that facility?

10  A.   No, sir, I did not.

11  Q.   During the time that you and Officer Schmeltz were with

12  Mr. Ramadan, did he go -- did he go to the bathroom or did he

13  ask to go to the bathroom?

14  A.   No, sir.

15  Q.   I'm going to ask you two questions again, let me

16  separate it.  Did he ever ask to go to the bathroom?  You

17  don't recall?

18  A.   I don't recall.

19  Q.   Were there any other members of the public in this area?

20  A.   No, sir.

21  Q.   So the only people who were in the area when you were

22  with Mr. Ramadan were you, Officer Schmeltz, Mr. Ramadan, his

23  wife and children; is that right?

24  A.   There may have been other CBP employees but not

25  traveling public.

```
 1   Q.   Okay.  And was the traveling public allowed in this
 2   area?
 3   A.   Absolutely not.
 4   Q.   This area was restricted?
 5   A.   Yes, sir, it is.
 6   Q.   To CBP employees or federal employees?
 7   A.   Slide the badge holders have access to it, airport ID,
 8   so people that push the Smart Carts, airline employees,
 9   certain TSA inspectors, CBP.
10   Q.   And could the public -- could the public gain access to
11   this area if they wanted to?
12   A.   No, sir.
13   Q.   Why not?
14   A.   Wayne County has set up a system where you need a swipe
15   badge to get into to the area.
16   Q.   So it was a secure area?
17   A.   Yes, sir.
18   Q.   You can't get into the area without a swipe?
19          THE COURT:  Is there an allegation the public came
20   in?
21          MR. DENSEMO:  No, Your Honor.  I just wanted to
22   establish that the area -- what kind of area this was, that
23   there wasn't -- it wasn't open to the public and that it was
24   a secure area.  I think the officer has testified that it was
25   as to all of those things.
```

1    BY MR. DENSEMO:

2    Q.   Is that right, Officer Armentrout?

3    A.   That is correct.

4    Q.   And in order to leave that area, could you just walk

5    out?

6    A.   Could --

7    Q.   Could anyone just walk out of the area, just turn the

8    knob and walk out?

9    A.   There is no knob to turn.

10   Q.   How do you get out?

11   A.   How do I get out?

12   Q.   How did you get out of the area?

13   A.   I swipe and go out on the tarmac and leave.

14   Q.   So you need a swipe card?

15   A.   No.  You asked how I get out.  How does the traveling

16   public get out is a different question.

17   Q.   Let me ask --

18   A.   There is a magnetic door that opens and you can walk

19   right out.  There is a seeing eye on it you walk up to, it

20   slides open, you walk out.

21   Q.   If you are inside of the secured area --

22   A.   Yes, sir.

23   Q.   -- you can just push the door and walk out if you want?

24   A.   Yes, sir.

25   Q.   During the time that --

1  A.  But you don't have to push it.  You walk up to it and it

2  opens like the Star Trek doors.

3  Q.  So you need a card to get in but you don't need one to

4  get out?

5  A.  That's correct.

6  Q.  And during the time that the Ramadan family was there,

7  were they allowed to leave?

8  A.  No, sir.

9      MR. DENSEMO:  Give me one second, Judge, I think

10  I'm almost done.

11      (An off-the-record discussion was held at

12      3:52 p.m.)

13      MR. DENSEMO:  I just have a few more questions,

14  Judge, it won't take that long.

15  BY MR. DENSEMO:

16  Q.  Officer Armentrout, could you tell me if your office has

17  a policy about preserving the notes that you take during

18  these interviews or interrogations?

19  A.  A policy, sir?

20  Q.  A policy, yes, about preservation of notes.

21  A.  No, sir, we don't.

22  Q.  All right.  But the notes that you did take, you did not

23  retain them or keep them in a personal file that you opened

24  for Mr. Ramadan; is that right?

25  A.  That's correct, sir.  I'm not a criminal investigator.

1    I don't keep notes that I take when I interview people.

2    Q.  But you did keep your memorialized notes, you did give

3    those to Officer Schmeltz; is that correct?

4    A.  Sir, I'm not certain what a memorialized note is.

5    Q.  Written down.

6    A.  Yes, sir.  I provided Officer Schmeltz my notes to help

7    him write the report that I think you have a copy of.

8    Q.  Okay.  Is that a practice that you have engaged in in

9    the past, making notes and then giving them to Schmeltz?  Is

10   Schmeltz your supervisor?

11   A.  No, sir, he's my partner.

12   Q.  He's your partner?

13   A.  Based on scheduling and who is there that day, we work

14   on the same team together.

15   Q.  Can you tell me why you gave your notes to Schmeltz

16   instead of retaining them yourself?

17   A.  Because he was going to write the report because he was

18   in the entirety of the interview where I was only in a

19   portion of it and then left.

20   Q.  All right.  That makes sense.

21        Now, did you ask Mr. Ramadan a question about the

22   caliphate?

23   A.  I don't believe I did, no, sir.

24   Q.  You didn't talk to him about the caliphate at all?

25   A.  I do not believe --

Case 2:17-cr-20595-VAR-EAS ECF No. 41 filed 02/26/18 PageID.591 Page 187 of 250
*Evidentiary Hearing • January 30, 2018*

187

1    Q.   Do you know what a caliphate is?

2    A.   Yes, sir, I do.  I believe I have already testified

3    using the caliphate name today.

4    Q.   Pardon me, Judge -- I mean, pardon me, Officer.

5    A.   I believe I even used the word caliphate today in my

6    testimony.

7    Q.   And you never talked to the caliphate -- talked to

8    Mr. Ramadan about the caliphate?

9    A.   I wish I could talk to the caliphate, but I did not ask

10   Mr. Ramadan about it.  That would have been questioning

11   during Officer Schmeltz's time, not mine.

12   Q.   Okay.  Okay.  And the questions that you said were

13   simple questions had to do with why he was going to

14   Palestine.  You said that he -- there was simple questions he

15   could not answer.

16   A.   That's in Officer Schmeltz report.

17   Q.   Okay.

18   A.   I didn't say anything.  What I will say is that when he

19   asked him the question, when you asked for a follow-up

20   question, there didn't seem to be any depth to the answer.

21   Q.   He seemed what now?

22   A.   There was no depth to the answer.

23   Q.   Depth, what do you mean by depth?

24        MR. WATERSTREET:  Your Honor, we are going over the

25   same material over and over again.  Asked and answered.

1    Objection.

2              THE COURT:  I don't think we went into how deep his

3    answers were.

4              MR. WATERSTREET:  Okay.

5    A.   The follow-up question would be who do you know that you

6    can either sell your items to or who is going to help you

7    publish your documentation, and there wasn't any depth to the

8    answer.

9    BY MR. DENSEMO:

10   Q.   Were those questions that were asked by Schmeltz?

11   A.   Yes, sir, they are.

12   Q.   And didn't -- doesn't Schmeltz in his report indicate

13   that Mr. Ramadan answered those questions that he was a

14   freelance and he was going to try to sell them on the

15   Internet or post them on the Internet, wasn't that an answer

16   that he gave you?

17   A.   Although that is the answer he gave us --

18   Q.   And you weren't satisfied with that answer?

19   A.   We were not satisfied with that answer, that's correct.

20             MR. DENSEMO:  I don't think I have anything else.

21             THE COURT:  Redirect?

22             MR. WATERSTREET:  Very few.

23                        REDIRECT EXAMINATION

24   BY MR. WATERSTREET:

25   Q.   On direct examination when we were talking about the

1    interview room --

2    A.  Yes, sir.

3    Q.  -- you said the door was open.  On cross you said it was

4    closed.  Can you explain how a door can be open and closed at

5    the --

6    A.  It is on a spring.  It gets hot so we will open it and

7    close it periodically.  If I get too warm or if I feel

8    claustrophobic, if it is not too loud, we will just open up

9    the door up.  There is a stanchion like with a rope that you

10   will stand in at the bank that we use to prop that door open.

11   Q.  So during that 45-minute interview that you were

12   involved in, the door was closed at one point and propped

13   open at a different point?

14   A.  Yes, sir.

15   Q.  Okay.  Did he ever ask for an attorney?

16   A.  No, sir.

17   Q.  Okay.  After he was cuffed, were you involved in any

18   interviewing of Mr. Ramadan?

19   A.  No, sir.

20   Q.  And the cuffing was at the end when he became aggressive

21   during that interview?

22          MR. DENSEMO:  Objection; asked and answered.

23          MR. WATERSTREET:  Well, Your Honor, I think

24   counsel --

25          THE COURT:  I will allow it only because you went

1    over it so much in cross.

2              MR. DENSEMO:  All right.

3    A.   It was at the end of the 40- to 45-minute interview

4    portion I was present for, yes, sir.

5    BY MR. WATERSTREET:

6    Q.   Okay.  And that was because he became aggressive?

7    A.   Because he became aggressive and we want to -- well, for

8    whatever else we got going on, he had his little kids with

9    him and I did not want any sort of mistake from being

10   agitated to make it harder than it had to be.

11   Q.   Okay.

12             THE COURT:  Anything else?

13   BY MR. WATERSTREET:

14   Q.   And you were told -- he was told he was not under arrest

15   at that time, just as soon as you cool down --

16   A.   Not under arrest.  For your safety and ours, calm down

17   and we will take the handcuffs off, which is exactly what

18   happened.

19   Q.   On cross-examination you were asked about export

20   controlled items.  The rifle scope is also an export

21   controlled item, isn't it?

22   A.   That's correct.

23   Q.   And the two-part question was if the defendant asked to

24   go to the bathroom, what would have happened?

25   A.   He would have been allowed to use the restroom.

1   Q.   Okay.

2   A.   I'm sorry, I guess I didn't understand it was a

3   two-part.  I thought it was did he ask and would you let him.

4   Obviously.

5   Q.   Okay.  All right.  Thank you.

6              THE COURT:  All right.  You may step down, sir.

7              (Witness excused at 3:59 p.m.)

8              THE COURT:  Your next witness?

9              MR. WATERSTREET:  Your Honor, the next witness is

10  going to be Officer Robinson.  We are going to go back a

11  little bit in time.  These are the people who first had

12  contact with him while he was on the jetway, and they were

13  the ones who were asked to bring Mr. Ramadan down and also

14  asked to bring the family down.

15             THE COURT:  Okay.

16             MR. WATERSTREET:  It was a timing thing, so rather

17  than sit here and wait for him, we decided to go with

18  Officer Armentrout first.

19             THE COURT:  We are going to 4:30.  How many

20  witnesses do you have after that?

21             MR. WATERSTREET:  Three more, Your Honor.

22             THE COURT:  Three?

23             MR. WATERSTREET:  Yes.  Well, again, we are at a

24  little bit of a disadvantage.  We have yet to be told when

25  this so-called assault took place, so we have to bring in

Case 2:17-cr-20595-VAR-EAS ECF No. 41 filed 02/26/18 PageID.596 Page 192 of 250
*Evidentiary Hearing • January 30, 2018*

192

1    witnesses --

2              THE COURT:  All right.  I just want to know how

3    many.  You don't have to explain.  Defense?

4              MR. DENSEMO:  Just one.

5              THE COURT:  So we probably need another day?

6              MR. DENSEMO:  Yes, ma'am.

7              MR. WATERSTREET:  Yes, ma'am.

8              Please step forward.

9              THE CASE MANAGER:  Would you please raise your

10   right hand.

11             Do you solemnly swear or affirm that the testimony

12   you are about to give this Court will be the truth, the whole

13   truth, and nothing but the truth, so help you God?

14             OFFICER ROBINSON:  I do.

15                      OFFICER MATTHEW ROBINSON,

16   called at about 4:00 p.m., was examined and testified on his

17   oath as follows:

18                       DIRECT EXAMINATION

19   BY MR. WATERSTREET:

20   Q.  Turn your seat to face the microphone and direct your

21   comments to the Judge.

22   A.  Okay.

23   Q.  For the benefit of the Court and court reporter, can you

24   please state your name and spell your name, please?

25   A.  Matthew Robinson, M-A-T-T-H-E-W, R-O-B-I-N-S-O-N.

1   Q.   And where are you employed sir?

2   A.   Customs and Border Protection at Detroit Metro Airport.

3   Q.   How long have you been so employed?

4   A.   A little over 11 years now.

5   Q.   Okay.  And did you have any other prior experience with

6   the federal government prior to that?

7   A.   I worked with TSA for about four years prior.

8   Q.   And generally at this point in your career, what is your

9   role at the -- first of all, are you at the Detroit

10   Metropolitan Airport?

11   A.   Yes.

12   Q.   What is a your role there at Detroit Metropolitan

13   Airport?

14   A.   I'm a part of the ATCET team.

15   Q.   What is that?

16   A.   Antiterrorism Contraband Enforcement Team.  I'm

17   currently serving as the team lead for the team.

18   Q.   Okay.  And what does the is the -- you have to give that

19   acronym again.

20   A.   The easiest way is the CET team, the CET team.

21   Q.   What does the CET team do?

22   A.   We look for -- well, there is quite a big variety in

23   stuff we do.  We look for goods that are coming into the U.S.

24   and out of the U.S. as far as cargo shipments go.  We examine

25   passengers that are traveling in and out of the U.S. looking

Case 2:17-cr-20595-VAR-EAS   ECF No. 41   filed 02/26/18   PageID.598   Page 194 of 250
*Evidentiary Hearing • January 30, 2018*

194

1    for different types of contraband, currency, narcotics,

2    people traveling for nefarious purposes.

3    Q.   Okay.  So I want to take you back to August 15th, 2017.

4    Were you working that day?

5    A.   Yes.

6    Q.   And were you working any particular area in the late

7    evening at the North terminal?

8    A.   Yeah.  We were -- one of the flights we generally look

9    at is the Royal Jordanian flight, and that usually flies two

10   days a week, so that would have been the flight in the

11   evening that we would have worked that day.

12   Q.   And what is it that you were looking at particularly --

13   what was your particular concern at that time?

14   A.   For that flight mainly we are looking for any kind of

15   stuff that might be related to terrorism and currency.  The

16   agency's first mission is antiterrorism, so -- but we also --

17   that flight does have a lot of currency that travels out of

18   the U.S., so we are looking for enforcement compliance with

19   the laws for currency reporting.

20   Q.   What do you do to make sure that that compliance is

21   adhered too?

22   A.   We generally talk to passengers, kind of advise them of

23   the laws for the currency reporting.  We will do random exams

24   sometimes on them depending on how they answer.  We will, you

25   know, sometimes search through their luggage.  Sometimes just

1  talking to the passengers is enough and, you know, we release

2  them.

3  Q.  Okay.  And you are required to fill out some form if you

4  are taking in excess of $10,000 U.S. currency?

5  A.  Right.  The -- the reporting requirement is, you know,

6  if you are causing the transportation of over $10,000

7  monetary instrument, so it is not just currency, then there

8  is a form that is required to be filed and that's the FinCEN

9  105.

10  Q.  Now, it's perfectly appropriate to take $30,000, you

11  just have to fill out the paperwork?

12  A.  Correct.

13  Q.  Do you tell that to people?

14  A.  That's part of the advisement, yes.

15  Q.  Okay.  Were you teamed up with anybody that evening?

16  A.  There were a few officers on duty that night with us.

17  Officer Haeck, Officer Banach were two of the officers I

18  recall offhand, but Haeck was the one that was kind of

19  working next to me.

20  Q.  Were you in uniform?

21  A.  Yes, sir.

22  Q.  Similar to what you are wearing today?

23  A.  Rough duty uniform, so not as nice looking.

24  Q.  Okay.  Now, did there come a point in time that you came

25  in contact with a person named Yousef Ramadan?

```
 1   A.   Yes.
 2   Q.   Okay.  Can you explain the very first time you came into
 3   contact with him?
 4   A.   When they first encountered him I was working at the
 5   jetway door, so after the airline scans the boarding pass
 6   they come through the jetway door and we are the first people
 7   they see, so --
 8   Q.   This is the jetway door between the -- where the ticket
 9   is scanned and where they actually enter the plane?
10   A.   Correct.  It is the first door that kind of separates
11   the boarding area from the jetway -- from the airplane
12   basically.
13   Q.   And this is a time that it's basically they're confirmed
14   that they are going to be leaving the United States, they
15   have swiped their ticket saying I'm going to be leaving the
16   United States?
17   A.   Yeah.  That's pretty much their last point I guess you
18   could say before they change their mind or, you know, decide
19   not to fly.
20   Q.   Okay.  You said you first had contact with Mr. Ramadan
21   when he came to the door?
22   A.   Yes.
23   Q.   Okay.  Under what circumstances?
24   A.   It was as the passengers come through, generally we have
25   somebody that works at the door just to kind of check
```

1    passports, see who you are talking to, you know, whether they

2    are a diplomat or somewhere along those lines, get a quick

3    story, quick background story, and then make a determination

4    whether or not you want to talk to them or let them go, and

5    maybe another officer after hearing the story wants to talk

6    to them.

7    Q.   Okay.  Now, was there anything that seemed a little

8    different to you when Mr. Ramadan came through?

9    A.   Well, he -- from what I recall, he -- he was getting --

10   he was getting on the plane alone, but he had like an

11   excessive amount of carry-on bags.  Normally the airline

12   allows -- they are very strict about what they allow, but he

13   had quite a few carry-on bags, you know, and so that is kind

14   of what first was, you know, tipped -- like why do you have

15   so many bags?  What are you --

16   Q.   Okay.  And so did you ask him?

17   A.   Yeah, I asked him about the bags, and he said his wife

18   and children were traveling with him but they had gone ahead

19   of him.

20   Q.   Okay.  Did you ask him where he was going?

21   A.   Real quick, yeah, where he was going and how much money

22   he was traveling with, how long he would be gone.

23   Q.   Do you remember the answers to those questions?

24   A.   He said he was going back to Palestine.  He wasn't sure

25   when he was coming back, I believe is what he said.  And as

Case 2:17-cr-20595-VAR-EAS   ECF No. 41   filed 02/26/18   PageID.602   Page 198 of 250
*Evidentiary Hearing • January 30, 2018*

198

1    far as currency, I think he said about $3,000.

2    Q.   And in your mind did that seem out of the ordinary or

3    anything seem strange to you about that?

4    A.   Normally when citizens travel they intend to come back.

5    And then like I said, all the carry-ons he had with him was

6    kind of odd, but --

7    Q.   All right.  Well, I mean, his kids could have gone on

8    and wife?

9    A.   Yeah, that was a plausible thing, I'm carrying all the

10   carry-ons for the family.

11   Q.   I mean, you didn't immediately jump to a conclusion that

12   something is wrong here or anything like that?

13   A.   No.

14   Q.   Okay.  Did the amount of money, saying $3,000 and moving

15   his family to Palestine seem --

16            MR. DENSEMO:  Objection, Your Honor; it is a

17   mischaracterization of the witness.  The witness never said

18   Mr. Ramadan was moving his family to Palestine.

19            THE COURT:  Sustained.  Rephrase your question.

20   BY MR. WATERSTREET:

21   Q.   When he said he didn't know when he was going to be

22   coming back, did the -- with -- and his family had already

23   boarded the plane, did the amount of money seem odd to you at

24   all?

25   A.   I guess for the time -- the amount of time he was -- not

1    having an ending to your trip, you know, it seemed like a low

2    amount, you know, because if you are on a one-way ticket,

3    you've got to pay for a ticket to come back and those kinds

4    of things.

5    Q.   So -- but other than that, no problems, allowed him to

6    board the plane?

7    A.   Correct.

8    Q.   Okay.  Did there come a point in time you were contacted

9    by somebody over your radio or by phone?

10   A.   Yeah, by cellular phone.

11   Q.   Okay.  And who did you get a call from?

12   A.   It was I believe Supervisor Stiggerwalt.

13   Q.   Who is Supervisor Stiggerwalt?

14   A.   He's the supervisor for -- he's within the chain of

15   command.  He's a supervisor for the TTRT team, which is kind

16   of a partner team with us.

17   Q.   Okay.  And why did he call you?

18   A.   We had been advised that a passenger with a family name

19   of Ramadan had some possible OFAC items in his checked

20   luggage.

21   Q.   What do you mean by OFAC items?

22   A.   Certain items you are required to have a license to

23   export out of the United States.

24   Q.   Now, you had run into Mr. Ramadan earlier?

25   A.   Correct.

1  Q.  So you kind of had an idea that he was, in fact, on the

2  plane?

3  A.  Yes.

4  Q.  What did you do then -- let me back up.

5       What did -- what else did Supervisor Stiggerwalt

6  tell you about other than there is some OFAC items?

7  A.  Yeah.  He kind of specified that, you know, they were --

8  there was body armor and that it was being held with TSA and

9  that -- that we had an officer down there kind of verifying

10  that it was, in fact, body armor.  So that's kind of -- that

11  gave me a heads up that, okay, this could be a restricted

12  item.

13  Q.  Okay.  Waiting to hear back as to what to do next?

14  A.  From Supervisor Stiggerwalt?

15  Q.  Yes.

16  A.  Yeah.

17  Q.  Did there come a point in time that you were asked to

18  approach the aircraft and talk to some of their -- the flight

19  crew?

20  A.  Yeah.  With that airline we generally don't -- they

21  normally have marshals on that plane so we generally just

22  don't go on there.  If I remember right, that's a -- the

23  government of Jordan owns that airline, so their air marshals

24  get a little antsy sometimes when we come on the plane.  So

25  typical practice is we will let the ticket agents know, we

Case 2:17-cr-20595-VAR-EAS  ECF No. 41  filed 02/26/18  PageID.605  Page 201 of 250
*Evidentiary Hearing • January 30, 2018*

201

1    will ask if this person has boarded, what seat they are in,

2    and let them know that we want to talk to the passenger if

3    they have already boarded the plane.

4    Q.  And did you talk to one of the employees about

5    Mr. Ramadan?

6    A.  I did.

7    Q.  And did you ask -- what, if anything, did you ask of the

8    employee?

9    A.  Initially what seat they were in and that we needed to

10   have them come off the plane so we could ask a few questions.

11   Q.  Okay.  Did there appear to be some confusion as to what

12   you requested and what eventually happened with Mr. Ramadan,

13   you talking to just Mr. Ramadan?

14   A.  I don't think so.  The -- not that I recall.

15   Q.  Well --

16   A.  I mean, the agents, you know, the ticket agents for the

17   airline said he was kind of difficult at check-in but, you

18   know, that --

19   Q.  Did Mr. Ramadan come to the door of the aircraft?

20   A.  So -- yeah, so when we asked to have him brought up to

21   the front of the aircraft so we could just ask him about the

22   luggage, what was in it, see what he would tell us about it,

23   you know, if he knew about the items that were in it.

24   Q.  Okay.  Where was his family at this time?

25   A.  His family was still on the plane.

1   Q.   Okay.  And where did you -- what happened next?

2   A.   So we were waiting at the -- on the jetway where the jet

3   bridge actually connects to the plane where the people can

4   pass through, we were kind of waiting there for him to come

5   up to the front.  The airlines brought him up to the front

6   and we just pulled him off.

7   Q.   When you say pulled him off, did you physically grab him

8   and pull him off?

9   A.   No, no, he stepped off.  We just said we have some

10  questions we wanted to ask you, and he stepped off the plane

11  to the jet bridge, you know, freely.

12  Q.   I mean, did you -- were other people still boarding the

13  plane, you had to step to the side or were there people going

14  back and forth?

15  A.   We were to the side.  I don't recall -- I don't think

16  the flight was completely done yet so there might have been

17  some people in the jetway.  I don't recall exactly.

18  Q.   And when you engage in these kind of conversations with

19  passengers and travelers, do you try to keep it as low key as

20  possible, do you want to have other passengers know what's

21  going on, things of that nature?

22  A.   The way the area is set up, you know, there is kind of a

23  limited amount of privacy we could provide.  If somebody has

24  something hidden on their body that they need to get off, we

25  have an area -- a small area for that, but it is not where we

 1   normally would talk to people, you know.  There's no cameras

 2   in that area so --

 3   Q.   Okay.  Did you ask him about his luggage?

 4   A.   I did ask him about his luggage, yes.

 5   Q.   What, if anything, did he say?

 6   A.   So just through normal conversation, how many pieces of

 7   luggage do you have and what kind of items do you have in it.

 8   You know, he was just basically saying it was clothing and

 9   general household goods.  So then I specifically asked him if

10   he had body armor in there.

11   Q.   What did he say?

12   A.   He said he did have body armor in there.

13   Q.   Did you ask him if he had anything else in there?

14   A.   I don't recall asking him if he had anything else, no,

15   just if there was any money or anything like that.

16   Q.   Did you ask him whether his wife knew about this or

17   anything?

18   A.   I did ask if his wife knew about any of the stuff in the

19   luggage and he said no, she didn't know anything about any of

20   the stuff in the luggage.

21   Q.   Did you ask him if he had any paperwork to allow him to

22   take the body armor outside of the United States?

23   A.   I asked -- yeah, I asked him if he had -- if he had a

24   license for it for export.

25   Q.   What did he say?

Case 2:17-cr-20595-VAR-EAS  ECF No. 41  filed 02/26/18  PageID.608  Page 204 of 250
*Evidentiary Hearing • January 30, 2018*

204

1   A.   He said no, he didn't know anything about it.

2   Q.   Did you ask him, well, why would you need body armor?

3   A.   I did ask him about the body armor, what the -- why he

4   was taking it to Palestine, and I believe his response was he

5   was going to film the -- I don't want to say war but the

6   disputes going on between the Israelis and Palestinians.

7   Q.   Now, if everything he had said up to this point that his

8   wife doesn't know, there is no reason for the children and --

9              MR. DENSEMO:  Objection, Your Honor; it is leading.

10             THE COURT:  Sustained.  Rephrase.

11  BY MR. WATERSTREET:

12  Q.   What did you think about having the wife and the

13  children come off the plane at this point in time?

14  A.   Initially, given the number of kids, I initially thought

15  it was probably best to let them go, especially if she didn't

16  know anything about what was in the luggage at the time.

17  Q.   So if what he said was true, then there is really no

18  reason to bring them off?

19  A.   Correct.

20             THE COURT:  You said number of kids.  What number

21  are you talking about?

22  A.   I believe he had three kids.

23  BY MR. WATERSTREET:

24  Q.   Now, what did you -- did you talk to him more about what

25  needed to happen next concerning the body armor?

1   A.   Yes.  So I told him that, you know, the body armor you

2   had might require a license for export and that he would have

3   to come downstairs to do -- so we could do paperwork on it,

4   whether we could verify with State Department if it was an

5   item that was allowed to go.  At that time of night, you

6   know, they are not there, you know, late at night.  So it

7   would -- the items would need to be seized or detained and he

8   would be given paperwork to appeal to get the items back.

9   Q.   Okay.  And did you tell him it was likely that he was

10   going to miss that flight?

11   A.   Yes.

12   Q.   Let me just stop concerning Mr. Ramadan.

13          Have things like this happened in the past

14   throughout your career with talking to people, they are going

15   to miss their flight because you have to resolve an issue?

16   A.   Yeah, at least once a week, you know.

17   Q.   So this is a common -- somewhat of a common occurrence

18   with you?

19   A.   Yes, sir.

20   Q.   What is your general practice when you know a person is

21   going to miss their flight, what is it that your agency does

22   to try to, I guess, ease the pain a little bit, so to speak?

23          MR. DENSEMO:  Your Honor, I object to that.  He can

24   testify as to what he did -- if he did anything particular in

25   Mr. Ramadan's case, I will have no objection, but as a

1    general matter, I don't think it is relevant.

2            MR. WATERSTREET:  Defense counsel has gone to great

3    lengths how this is out of the ordinary and how different it

4    is.

5            THE COURT:  Overruled.  You may ask.

6            MR. WATERSTREET:  Thank you.

7    BY MR. WATERSTREET:

8    Q.  Go ahead.

9    A.  I'm sorry.

10   Q.  What -- what do you typically do in a situation where

11   you know because of the amount of time it is going to take to

12   talk to somebody that they are going to miss their flight,

13   what does your agency do to try to, as I say, ease the pain?

14   A.  We try to get everything done as quickly as possible.

15   So we advise them, we advise the airline so they can remove

16   the luggage from the plane, bring the person downstairs.  We

17   will do the -- a lot of times we do the search of all the

18   bags, we do patdown searches of the people.  Since they are

19   coming into a federal area, we need to make sure that there

20   is nothing hidden or that they haven't hidden anything on

21   their bodies.

22   Q.  Okay.

23   A.  Process the paperwork, and then we usually help them

24   reconnect with the airline to try to get a flight rebooked.

25   Q.  So you tell them early on that we will help you try to

1   get -- we will help you get your next flight out?

2   A.   Yeah.  I mean, in the case of that Royal Jordanian

3   flight out of Detroit, it is only twice a week generally, so

4   if you miss one, in all likelihood the next one you are going

5   to get on is a few days later.  You know, they can reroute

6   people through other states and cities, of course, but the

7   airline normally is going to charge a fee for anything like

8   that.

9   Q.   And when you have the rest of the bags removed, are you

10  just talking about the carry-on bags or are you talking about

11  the bags that are now in the belly of the airplane?

12  A.   The aircraft -- the checked luggage that was under the

13  aircraft.  You know, we wanted to make sure if he had

14  anything that he needed out of there, any medication or

15  anything like that, that he had that because I knew that he

16  most likely wasn't going to be flying out at the earliest til

17  the next day, so if there is something he needed, like I

18  said, especially medication, I wanted to make sure that he

19  has that.

20  Q.   You also wanted to look through the rest of the items as

21  well?

22  A.   The checked luggage, correct.

23  Q.   Now, is that something that happens instantaneous, that

24  you say, okay, bring the stuff off and it magically appears?

25  A.   No.  We -- we -- depending on the airline, we get

 1    varying success how quickly it comes off.  That flight the

 2    bags are just -- the way they sort them, sometimes they can

 3    get them off within a half hour, sometimes it is several

 4    hours.  We have had them come back days later sometimes so --

 5    Q.  Are you familiar with the way they pack the airplane so

 6    that it may take a long period of time before you get

 7    actually all of the luggage off the plane that is -- all the

 8    luggage that has been checked?

 9    A.  Yeah.  Generally I think the airlines try to put the

10    luggage in a fashion that if Amman, Jordan is the final

11    destination, then bags that are staying in Amman are in one

12    part of the plane and bags that have connecting flights would

13    be in a separate part of the plane.

14    Q.  Do they put them in these cargo containers and then put

15    the cargo containers in the plane and put different cargo

16    containers inside the plane?

17    A.  Yeah.  The cargo containers, generally they carry -- it

18    is only passenger luggage.  The actual physical cargo that

19    you would ship between companies and stuff, that's in a

20    different part of the plane.

21    Q.  Okay.  Now, you were really lucky all the luggage ended

22    in the last cargo container that went onto the plane?

23    A.  The last container and all in one container together.

24    Q.  Right.  If you are unlucky, what happens?

25    A.  It is typically spread out.

Case 2:17-cr-20595-VAR-EAS  ECF No. 41  filed 02/26/18  PageID.613  Page 209 of 250
*Evidentiary Hearing • January 30, 2018*

209

1  Q.  Okay.

2  A.  Yep.

3  Q.  And so they have to unload all of the cargo containers,

4  go through all of the containers and try to find each item

5  that has been checked by --

6          MS. FITZHARRIS:  Objection; leading.

7          THE COURT:  Rephrase your question, Counsel.

8  BY MR. WATERSTREET:

9  Q.  Can you explain -- to make sure that every single bag is

10  off of the plane -- I apologize, Judge.  I'm trying to move

11  this along.

12          Every single bag that's on the plane is, in fact --

13  that Mr. Ramadan put on the plane is removed from the plane,

14  what process would they have to go through in the worst case

15  scenario?

16  A.  So we normally would try to get the receipts that are

17  given to him at check-in for all the luggage from the

18  passenger.  Sometimes they can't find those.  The airline

19  will do their best to locate the bags based on their

20  passenger record, and then they inevitably have to pull all

21  of those cans off, search through all the cans to try and

22  produce all of the luggage that was requested.

23  Q.  Okay.  That can take -- you can get lucky or unlucky?

24  A.  Yeah.  Sometimes there's two guys trying to do it and

25  sometimes they have a dozen down there.

Case 2:17-cr-20595-VAR-EAS ECF No. 41 filed 02/26/18 PageID.614 Page 210 of 250
*Evidentiary Hearing • January 30, 2018*

210

1  Q.  Now, during this time that you have asked Mr. Ramadan to

2  step off the plane to talk to him about his luggage, do you

3  get another phone call from somebody?

4  A.  Yeah.  I -- that was supervisor -- that was

5  Officer Schmeltz.

6  Q.  Okay.  And what did Officer Schmeltz talk to you about?

7  A.  Kind of just went over, you know, what's -- what Ramadan

8  and I had talked about, what he said about the luggage.  And

9  we talked a little bit about -- there was a prior record for

10  Mr. Ramadan, I think it was from an ICE tip line for possible

11  recruitment or marriage fraud, something along those lines.

12  Q.  Okay.

13  A.  I didn't have access to that record at the time, I was

14  upstairs.

15  Q.  Okay.  So did -- what was the decision at that point?

16  A.  So at that point I think we decided that we've got all

17  the luggage coming off, that we should have the entire family

18  come off as well.

19  Q.  Okay.  And so what happened at that point?

20  A.  We went back to the airline and let them know that we

21  were going to pull the entire family because the airline has

22  to transmit the names for passengers that are on the flights,

23  so they don't -- you know, they don't want to transmit

24  somebody being on the flight that's not on the flight, so

25  they had to update their records that the passengers were

 1   actually taken off the plane.

 2   Q.   Historically, this Royal Jordanian flight, is this a

 3   flight that leaves 100 percent on time pushback from the

 4   gate?

 5   A.   No, they are notoriously late on arrival and late to

 6   depart.

 7   Q.   And is it because of your conduct or ICE's conduct or

 8   CBP's conduct or just the way they run?

 9           MS. FITZHARRIS:  Objection; relevance.  We need to

10   know what happened on August 15th and whether there was a

11   delay of that flight, not generally what happens.

12           THE COURT:  What's the relevance of this, Counsel?

13   BY MR. WATERSTREET:

14   Q.   Was there any exception on August 15th to their lack of

15   on-time arrival and departure?

16   A.   No, it was pretty standard.

17   Q.   Okay.  And my question was, was this something that is a

18   result of the airline's actions or CBP's actions?

19   A.   I think it is just the process as a whole for that

20   airline.  You know, just a lot of the workers are contracted.

21   I don't think they -- you know -- I don't know.  I can't say

22   they don't care.  You know, they are not employed by the

23   company, they are contracted.  There are a lot of people that

24   generally fly and there's a lot of luggage that people take

25   with them, so it's just a long process, you know, boarding

1    issues, you know.

2    Q.   Where did you have Mr. Ramadan and his family go?

3    A.   So once the family was all back together up in the

4    jetway where we initially do our exams, the family was back

5    together there, we headed downstairs to the Federal

6    Inspection Station, which is the FIS.

7    Q.   That's the -- we heard testimony about secondary area?

8    A.   Yeah.  That's where everyone when they are entering the

9    U.S., that's where they will come through.  They have, you

10   know, their immigration check done, customs checks,

11   agriculture checks.  It is kind of a big area altogether.

12        Mr. Ramadan went with Officer Schmeltz, and then

13   the family was also with -- they were initially with him.

14   They later came out due to some childcare issues.

15   Q.   Okay.  And there is an image right here in front of you

16   that has been marked as Government's Exhibit X.  Is that

17   roughly the area in which Mr. Ramadan and his family were

18   asked to wait until Officers Schmeltz and Armentrout could

19   talk to them?

20   A.   Are you talking about the conference room or --

21   Q.   That whole general area.

22   A.   Oh, yeah, I'm sorry.  Yes, this is a small scale of it.

23   Q.   Yes, it is very small scale.  The area that say lobby,

24   what is that?

25   A.   The lobby area would be -- from the drawing here it

1    looks like possibly where the passengers line up for

2    immigration checks.

3    Q.   Okay.  So when the -- Mr. Ramadan -- did -- were you

4    present when Mr. Ramadan went into any interview rooms?

5    A.   Not when he went in there.  We were -- I was moving back

6    and forth to make copies of things, so I did know that he was

7    in an interview room at one point.

8    Q.   What happens when you make it down to the lobby area

9    with Mr. Ramadan and his wife and family, who takes over at

10   that point?

11   A.   That would have been Officer Schmeltz and

12   Officer Armentrout were on duty.

13   Q.   I'm going to ask you some questions here, and I

14   apologize for asking these, but did you beat him up or

15   assault Mr. Ramadan at any point from the time that you first

16   met him as he entered the jetway until he appeared in the

17   lobby area?

18   A.   No.

19   Q.   Did you witness any other agent, officer, government

20   employee assault or beat up Mr. Ramadan?

21   A.   No.

22   Q.   At any time during any of the time that you had any

23   contact with Mr. Ramadan, did he ever ask for a lawyer?

24   A.   No, not that I'm aware of in my contact with him.

25   Q.   Anytime that you --

1   A.   No.

2   Q.   -- were in contact with him?

3   A.   No.

4   Q.   At any time that you were in contact with him, did he

5   ask for the meeting to be recorded?

6   A.   No.

7   Q.   At any time that you had any contact with Mr. Ramadan or

8   any of his goods, did you steal any money, jewelry or gold?

9   A.   No.

10  Q.   Now, did that end your involvement in this situation or

11  was there some other acts that you were asked to do as part

12  of this CET team?

13  A.   So while they were talking to Mr. Ramadan, we were

14  locating his luggage in the - off of the luggage carousel so

15  we could search through it.

16  Q.   And do you remember approximately how many bags there

17  were that were brought by the airline to that area -- how is

18  it that they make -- the bags make their way from the belly

19  of the plane to where you are?

20  A.   So typically once they are pulled off, the airline uses

21  a vehicle of sorts to bring them over to our area, and if it

22  is a few bags, sometimes they will just bring them in by hand

23  through the doors.  Other times they will put them on a

24  luggage belt that brings them into the round carousels that

25  people are used to seeing in the airports.

1   Q.   Okay.  And was this a small amount or large amount?

2   A.   Oh, it was a large amount.  I think he had 15 bags if I

3   remember right.

4   Q.   Okay.  And so after waiting for all of these bags to

5   come off, then you -- were you one of the people that had to

6   go through the bags?

7   A.   Yes.

8   Q.   Okay.  I'm going to show you I-1 through 27.  I would

9   like you to take a look at that and see if you recognize any

10  of the items depicted in I-1 through 27.

11  A.   Yeah.  I think I took all of these photos.

12  Q.   Okay.

13  A.   The majority of them.  Like I said, we took everything

14  out of the bags so --

15  Q.   Who made a determination -- well, let me ask you this.

16  Were there some interesting ways in which some of the items

17  that you found of interest were packed within those bags?

18  A.   Yeah.  I mean, some of the stuff, the way it was packed,

19  you know, would -- you want to shield it from maybe damage or

20  whatever.  He had -- or someone had packed -- you can see by

21  some of these photos there was mace, for a better term, you

22  know, spray, and that stuff was wrapped into like socks and

23  stuffed inside of tennis shoes.  You know, like I said, we

24  took a lot of these pictures.  The stuff, it wasn't all

25  necessarily contained in like one bag, it was spread out

 1   through a lot of bags.

 2   Q.  And some of the items that you look for in this

 3   situation as part of your inspection is if there is any media

 4   or things of that nature, correct, like phones, hard drives?

 5   A.  Oh, yeah, phones, computers.

 6   Q.  SD cards?

 7   A.  Portable drives.  That's all stuff that we look for, you

 8   know, that, depending on the circumstances, may or may not be

 9   reviewed.

10   Q.  Okay.  And some as small as some of these little tiny

11   micro SD cards and things of that nature?

12   A.  Correct.

13   Q.  So this is not something that you can unzip a bag, look

14   in, and say, oh, it is good to go?

15   A.  Correct.

16   Q.  You have to actually go through all of the items?

17   A.  Correct.

18   Q.  Look to see if something is rolled up in a sock, things

19   of that nature?

20   A.  Correct.  Like I said, at that point all I knew for sure

21   was there were body plates, so we wanted to look through --

22   or body armor, and we want to look through everything to see

23   if there is anything else in there.

24   Q.  And do you remember some -- and then -- what was your

25   team's responsibility while the two other officers were

1    talking to Mr. Ramadan, what was your responsibility?

2    A.   So we were tasked with searching through the luggage

3    trying to find items that we believe to be OFAC violations

4    and kind of just categorize different things that looked --

5    you know, not something normally that you would travel with I

6    suppose.

7    Q.   And did you find a number of items?

8    A.   There were the body plates, the armor, there was a Taser

9    brand stun gun, electronic control device, whatever you want

10   to call it, the OC mace spray, but you can transport that.

11   There is a limit, I think TSA has a limit on how much you can

12   transport, four ounces.  That's -- you know, the tactical

13   gear and all of that stuff but that's not necessarily

14   restricted.

15   Q.   But there were rifle scopes?

16   A.   Yeah.

17          MR. DENSEMO:  Objection, Your Honor; testifying

18   again.

19          MR. WATERSTREET:  Excuse me?

20          MR. DENSEMO:  I said you are testifying again.

21          MR. WATERSTREET:  Oh, no.

22   BY MR. WATERSTREET:

23   Q.   Why don't we look through the photos.

24   A.   Okay.

25   Q.   We will take that time to do that and see if there were

1  any other export controlled items that were of a concern for

2  you?

3  A.  So, well, the press badge on the armor, the body

4  carrier.

5  Q.  Why was that a concern?

6  A.  Well, I didn't know for sure at that point, but I don't

7  think he was a member of the press, he would have had

8  credentials or something.

9  Q.  Did you find any credentials among that stuff?

10  A.  He had some IDs that are on the back page here, his

11  family IDs.

12  Q.  But no press credentials?

13  A.  I didn't see any press credentials.

14  Q.  Any paperwork indicating that he worked for a particular

15  journalistic organization?

16  A.  No.

17  Q.  Anything that said that he graduated from a journal -- a

18  school in journalism or that he had taken any classes or

19  anything of that nature?

20  A.  Not that I'm aware of, no.

21  Q.  All right.

22  A.  Body armor, I mean, knives, he had some kind of gas mask

23  of some sort here.  I took a lot of pictures of the OC spray.

24  Q.  Yes.

25  A.  And some of this stuff was, you know, just kind of set

1    in a group and photographed as a group.

2    Q.  I understand.

3    A.  The range here -- there was just so much stuff to kind

4    of sort through.  We are getting photos of a lot of it, you

5    know.

6    Q.  And I just wanted you to focus on some export control

7    items that you thought were of interest.

8    A.  So that would have been the body armor, the body plates

9    for the armor, the Taser itself and the scopes.

10   Q.  Okay.

11            THE COURT:  Counsel, we are going to have to break.

12            MR. WATERSTREET:  Your Honor, I think --

13            THE COURT:  Are you almost done?

14            MR. WATERSTREET:  -- I am almost done.

15   BY MR. WATERSTREET:

16   Q.  Did you also find some computers, external hard drives,

17   things of that nature as well?

18   A.  There were several storage devices for computers, you

19   know, the memory cards.  I believe he had some cellphones.

20   There was an actual personal computer like a desktop, and I

21   think he had maybe some tablets, an iPad or something along

22   those lines.

23   Q.  Did he also have some external hard drives?

24   A.  There was some external hard drives, several.

25   Q.  Did you bring those to the attention of

1     Officers Schmeltz and Armentrout?

2     A.   I did.

3     Q.   And you provided those materials to them for them to do

4     whatever they needed to do?

5     A.   Correct.

6     Q.   Okay.

7     A.   I didn't review the drives.   We don't have the

8     capability there to review them.   They have a special

9     computer for that that they use.

10    Q.   So you did not look through any of the media at all?

11    A.   No.

12    Q.   And did you -- once you finished talking to Mr. Ramadan

13    up on the jetway, did you have any more conversations with

14    Mr. Ramadan?

15    A.   I think the -- one other -- one other conversation I

16    think I recall he had was it was about the airline refunding

17    baggage fees or something like that.

18    Q.   Okay.

19    A.   And how the airline was going to get the money back to

20    him for that, but I think the wife handled that.

21    Q.   Was that on the walk down to the --

22    A.   No, no, that was toward -- well, before I left, let's

23    put it that way.

24    Q.   And his wife was going to take care of that?

25    A.   Somehow.

```
 1              MR. WATERSTREET:  All right.  I have no further
 2    questions, Your Honor.
 3              THE COURT:  How long would your cross-examination
 4    be?
 5              MR. DENSEMO:  It shouldn't be too long, maybe 15,
 6    20 minutes at the most.  I don't have that much to ask this
 7    officer.
 8              THE COURT:  Go ahead.
 9              MR. DENSEMO:  You want to go ahead?
10              THE COURT:  I will give you 15 minutes.
11              MR. DENSEMO:  Thank you.
12                         CROSS-EXAMINATION
13    BY MR. DENSEMO:
14    Q.   Is it Officer Robins?
15    A.   Robinson.
16    Q.   Officer Robinson, did you prepare a written report
17    regarding your interaction with Mr. Ramadan?
18    A.   I prepared a seizure report for the items that CBP
19    detained which was then turned over to HSI.
20    Q.   So your seizure report was turned over to HSI?
21    A.   The seizure report that I did?
22    Q.   Yes.
23    A.   Was -- they ended up cancelling that into a detention,
24    HSI did a detention on it.
25    Q.   Is your report still around?
```

1   A.   It's cancelled but it is probably still in the system.

2   Q.   Where would I find it or where would these guys find if

3   they wanted to?

4   A.   I would suppose I would have to look it up and print it

5   out for them.

6   Q.   So you could do that?

7   A.   Sure.

8   Q.   Okay.  So you get a call from Stiggerwalt saying get

9   Ramadan, go talk to Ramadan?

10  A.   Go talk to him regarding, you know, the items that TSA

11  saw through the X-ray.

12  Q.   We found some plates, we want you to talk to him and see

13  what is up with him?

14  A.   Right.

15  Q.   So you contact the Royal Jordanian Airline officials so

16  that they can intervene because you don't want to go on the

17  plane?

18  A.   It is not that I don't want to go on, the airline

19  doesn't care for us to go on, the air marshals for Royal

20  Jordanian.

21  Q.   You are trying to keep down any conflict?

22  A.   Correct.

23  Q.   So your testimony is you don't physically go onto the

24  plane, you and a partner?

25  A.   Can we go on the plane?

1   Q.   Do you walk through the jetway doors --

2   A.   Onto the aircraft?

3   Q.   -- down the aisle to Mr. Ramadan's seat?

4   A.   I don't recall going down to his seat.

5   Q.   You don't recall.  Could you have done that and not

6   recall it?

7   A.   No.  I don't -- I didn't go on the plane down to his

8   seat.

9   Q.   So you did not get on the plane and walk down to his

10  seat?

11  A.   The jetway and maybe the galley area but not down to the

12  seat.

13  Q.   All right.  And you are saying that somebody brought --

14  somebody connected to the airline brought Mr. Ramadan to you?

15  A.   The airline was notified, and they went and told him to

16  come up, that we needed to talk to him.

17  Q.   So did somebody connected with the airline bring

18  Mr. Ramadan to you?

19  A.   He was walking on his own.  They weren't, you know --

20  the airline was the one that asked him to come off the

21  aircraft.

22  Q.   Okay.

23  A.   Or to step forward.

24  Q.   Let me make it a very simple question.  Did you see

25  anyone that you knew or believed to be connected to the

1   airline escorting Mr. Ramadan to you?

2   A.   It would have been one of the Royal Jordanian flight

3   attendants or ticket agent.

4   Q.   So a ticket agent or flight attendant may have gotten

5   Mr. Ramadan and say somebody from the airport wants to talk

6   to you, come with us?

7   A.   Yeah.  I don't know what was said to him.

8   Q.   And Mr. Ramadan gets to where you are, correct?

9   A.   Correct.

10  Q.   And he steps into -- do you step into the jetway area?

11  A.   We -- yeah, we are right where the jet bridge meets up

12  with the aircraft, right in that area.

13  Q.   You tell him what the situation is regarding the body

14  plates, the body armor?

15  A.   I want to just generally ask him and see what he would

16  provide, what information he would provide about what was in

17  the luggage.

18  Q.   All right.

19  A.   And then when he didn't, then I asked him if he had body

20  armor in his luggage.

21  Q.   Again, you already knew Mr. Ramadan because you had had

22  this conversation with him about the baggage and all of this

23  other stuff and where he was going?

24  A.   I recalled him from the name.

25  Q.   From earlier?

 1   A.   Right.  It was only -- it wasn't too awful long from

 2   when I was contacted after having spoke with him briefly at

 3   the door.

 4   Q.   All right.  So you were simply -- you went and got

 5   Mr. Ramadan because you were told to do so?

 6   A.   Because of the armor.

 7   Q.   Right.  But it wasn't your own decision, somebody called

 8   you and said, Robinson, go get this guy Ramadan off the plane

 9   and talk to him, right?

10   A.   Right.  Well, once I'm told that he's got something in

11   there that is possible OFAC violation, we are going to talk

12   to him regardless.

13   Q.   All right.  And you did what you needed to do to get him

14   out of his seat and to where you were, right?

15   A.   Right.

16   Q.   And then you talked to him briefly about the body armor,

17   right?

18   A.   Correct.

19   Q.   And who made the determination to get his wife and

20   children off of the plane?

21   A.   I think that was Officer Schmeltz and I when we talked.

22   Q.   Who made the decision, you or Schmeltz, or was it -- who

23   suggested that they come off of the plane?

24   A.   That would have been Officer Schmeltz.

25   Q.   So Schmeltz suggested get them all off the plane,

1   correct?

2   A.   Correct.

3   Q.   And you did that.  How did you do that?  Did you contact

4   the Royal Jordanian folks again and say we want everybody

5   off?

6   A.   Yeah.  I contacted the ticket agents for the airline

7   again and said we need to pull the rest of the family off the

8   plane.

9   Q.   All right.  Now, while you are waiting for the rest of

10  the family to come off the plane, you are still talking to

11  Mr. Ramadan?

12  A.   I believe we were just chatting about what was going to

13  happen, about rebooking the flights, things like that.

14  Q.   All right.  Did Mr. Ramadan have all of his -- when

15  Mr. Ramadan came to you, did he have all of his -- all of the

16  bags that he walked onto the plane with, did he walk back to

17  you from his seat with all of these bags?

18  A.   He didn't bring any of his luggage initially when he

19  came up.

20  Q.   Okay.  How did he -- did you allow him to go back and

21  get that carry-on luggage?

22  A.   Yeah.  Well, I asked him about medication and stuff,

23  again, you know, and if he needed anything out of his

24  carry-on bags.

25  Q.   Okay.  Did you walk with him back to get his carry-on

1   bags?

2   A.   I did not.

3   Q.   Did any -- did you have a partner with you or were you

4   by yourself during all of this?

5   A.   No, I had Officer Haeck with me.

6   Q.   Haeck?

7   A.   Officer Haeck.

8   Q.   Okay.  Was Haeck with you in the jetway talking to

9   Ramadan -- Mr. Ramadan?

10   A.   He was.

11   Q.   Did Haeck go -- when you allowed Mr. Ramadan to go back

12   and get his carry-on, did Haeck go with him?

13   A.   I believe he stepped onto the aircraft with him.

14   Q.   Pardon me.

15   A.   I believe he stepped onto the aircraft with him.

16   Q.   But could you see him?

17   A.   Not the whole time.

18   Q.   Okay.  So you saw Haeck and Mr. Ramadan disappear into

19   the airport (sic), you couldn't see them?

20   A.   Down, you know, a short -- yeah, they were onto the

21   aircraft.  I couldn't see them because I was still on the

22   jetway on the phone, yes.

23   Q.   You could not see them?

24   A.   Could not see them.

25   Q.   So you don't know what Haeck and Mr. Ramadan did?

1    A.   I do not.

2    Q.   All right.  But you do know that they eventually

3    returned to you, Haeck and Mr. Ramadan returned to you, and

4    did Mr. Ramadan have all of these bags with him again?

5    A.   Not at that point.

6    Q.   When did he go get all of those -- let me stop you.  So

7    you had allowed Mr. Ramadan to go with Officer Haeck to get

8    his carry-on bags, right?

9    A.   Yeah, if there was anything that he needed out of them,

10   again, any kind of medication or anything important.

11   Q.   So Officer Haeck and Mr. Ramadan come back to where you

12   are and Mr. Ramadan still does not have a bags, right?

13   A.   I don't recall him bringing any luggage, no.

14   Q.   Okay.  So do you then send him back in to go get his

15   carry-on bags?

16   A.   I don't recall doing that, no.

17   Q.   How did his carry-on bags get out of the airplane?

18   A.   So when the decision was made to pull the entire family

19   off, all the luggage had to come off with them including the

20   carry-on bags.

21   Q.   How did the carry-on bags come off of the airplane?

22   A.   I believe the airline helped to get them off because

23   there was so many of them.

24   Q.   I'm talking about the --

25   A.   They loaded them on a little luggage trolley.

1 Q. I'm talking about the bags that were inside the plane in

2 the cabin.

3 A. Correct.

4 Q. Okay.  Did you see those bags being brought to where you

5 were by the airlines?

6 A. Yes.  They brought them up to the initial inspection

7 area.

8 Q. Not Mr. Ramadan?

9 A. I don't believe he had them with him, no.

10 Q. You don't believe or you know?

11 A. Well, at that point the whole family was coming off

12 so --

13 Q. And none of the family members had any of the bags slung

14 over their shoulders?

15 A. I don't recall that.

16 Q. No backpack was with Mrs. Ramadan?

17 A. I don't know if it was on her back or on this cart, I do

18 not know that.

19 Q. So you don't know if Officer Haeck had -- you don't know

20 what transpired between Mr. Ramadan and Mrs. Ramadan and the

21 kids while Officer Haeck was inside the plane, do you?

22 A. I do not.

23 Q. And you got the call -- and your unit is also a

24 terrorism unit?

25 A. Antiterrorism.

Case 2:17-cr-20595-VAR-EAS   ECF No. 41   filed 02/26/18   PageID.634   Page 230 of 250
*Evidentiary Hearing • January 30, 2018*

230

1  Q.   I'm sorry.  Antiterrorism unit?

2  A.   Yes, sir.

3  Q.   And is that your general responsibility to patrol, for

4  lack of a better phrase, the Royal Jordanian Airline?

5  A.   We select different airlines, not just Royal Jordanian,

6  but the bulk of them is Delta because that's their main hub

7  in Detroit.

8  Q.   Whose main hub, Delta's?

9  A.   Yeah.  If you are flying out of Detroit, chances are you

10  are on a Delta flight.

11  Q.   Was there another group of agents or officers in your

12  office that could have dealt with this situation, or is that

13  strictly your area, body plates, unregistered items, items

14  that haven't been --

15  A.   There is an officer that handles -- the exodus officer

16  who handles license verifications and things like that, but

17  it is kind of a Monday through Friday, 9:00 to 5:00.

18  Q.   Do you know why the determination was made to have the

19  antiterrorism officer go handle this if this was just body

20  plates, metal plates?

21  A.   Okay.  I see what you are saying.  I'm sorry.  We work

22  with that team that handles that stuff.  We generally are

23  responsible for cargo coming inbound, cargo going outbound,

24  and passengers that are traveling outbound.

25  Q.   All right.  And who made the determination to continue

Case 2:17-cr-20595-VAR-EAS  ECF No. 41  filed 02/26/18  PageID.635  Page 231 of 250
*Evidentiary Hearing • January 30, 2018*

231

1  the antiterrorism unit investigation of Mr. Ramadan?

2  A.  As far as what?

3  Q.  As far as taking him down to secondary inspection to

4  question him.

5  A.  Well, I mean, once it was determined he had some items

6  that were possibly OFAC, it was my decision to pull him off

7  and, you know, let the supervisor know, hey, we are going to

8  bring him down to do the paperwork.  I think at that point,

9  once there is a violation, the supervisor knows about it, you

10  know, we don't really have any discretion I think with OFAC

11  stuff.

12  Q.  OFAC stuff is?

13  A.  Office For Asset Controls.

14  Q.  And those are items that should have been declared but

15  weren't?

16  A.  That you have to have a license to export.

17  Q.  And that's not necessarily terrorist connected, is it?

18  A.  No, but it is contraband connected.

19  Q.  Okay.  But again, if it is currency, there is nothing

20  immediate about that that would suggest that that had

21  something to do with -- people try to sneak money out of the

22  U.S. or sneak money in the U.S. all the time, don't they?

23  A.  Correct.

24  Q.  And typically that doesn't have anything to do with

25  terrorism, that's just people trying to avoid the tariff

1   laws, right?

2   A.   They are just not reporting it for whatever reason; I

3   can't say why.

4   Q.   Right.  But you have investigated currency -- people

5   declaring money or not declaring money, right?

6   A.   I determine if there is a violation of the law.

7   Q.   What I'm trying to get at, Officer Robinson, is why was

8   the determination made that this was worthy -- if you are

9   just investigating these metal plates, that the antiterrorism

10  unit should continue this investigation?

11  A.   We would be the ones responsible for detaining or

12  seizing the items.

13  Q.   And the individual connected to those items?

14  A.   He would have to come off to do the paperwork.

15  Q.   Would have to?

16  A.   Yep.

17  Q.   And if you believe there was something additional, then

18  that would subject that person to further detention and

19  interrogation?

20  A.   Other than the routine questioning and paperwork that we

21  do, if there was something else there.

22  Q.   Okay.  Typically if you had a violation like this and it

23  was just a matter of person not declaring, how long would

24  that process take for the person to go out and fill out the

25  paperwork to --

1    A.   Well, to search through 15 bags --

2    Q.   No, no.

3    A.   Not everyone carries 15 bags.

4    Q.   You misunderstand me.

5         Let's just say that we have one bag with an item

6    that should have been declared.

7    A.   Okay.

8    Q.   All things else being equal --

9         MR. WATERSTREET:  Your Honor, I was objected to for

10   giving hypotheticals.

11        THE COURT:  Sustained.  Let's talk about these

12   bags.

13        MR. DENSEMO:  All right.

14   BY MR. DENSEMO:

15   Q.   Do you know how long it took -- how long did it take you

16   to take the photos in this case of -- the photos that you

17   have there in front of you of all the items that were found

18   in the --

19   A.   I can't say how long that took.

20   Q.   When did you give those -- when did you send those

21   photos to Armentrout and Schmeltz, what time was it?

22   A.   Oh, I can't give you that time.  It was after we took

23   the photos, you know, the items were still there because HSI

24   and the FBI --

25   Q.   Do you remember --

```
 1              MR. WATERSTREET:  Your Honor --
 2   BY MR. DENSEMO:
 3   Q.  -- when you took the photos and sent them?
 4   A.  I don't know the time.
 5              MR. WATERSTREET:  Excuse me.
 6              MR. DENSEMO:  He's answered the question.  He said
 7   he doesn't remember.
 8              MR. WATERSTREET:  Whoa, whoa.  Could he please be
 9   given the opportunity to finish his answer before he's asked
10   the next question.
11              THE COURT:  Mr. Densemo, be careful, please.
12              THE COURT REPORTER:  Mr. Densemo, I need your
13   question again.
14   BY MR. DENSEMO:
15   Q.  Your answer is you don't remember when you took the
16   photos; is that correct?
17   A.  It would have been after the stuff was -- after all the
18   bags were emptied out.
19   Q.  I'm saying time.
20   A.  Time I do not recall, no.
21   Q.  8:45, 9:00, you do not know?
22   A.  Do not know.
23   Q.  And you don't remember when you sent the photos that you
24   took of these items, you don't remember when you sent those
25   to Schmeltz and Armentrout?
```

Case 2:17-cr-20595-VAR-EAS   ECF No. 41   filed 02/26/18   PageID.639   Page 235 of 250
*Evidentiary Hearing • January 30, 2018*

235

1    A.   The time that they were sent, I do not.

2    Q.   How did you send these photos to Schmeltz and

3    Armentrout?

4    A.   Through the government e-mail.

5    Q.   So there's an e-mail which could tell us when these

6    photos were taken; is that right?

7    A.   Correct.  There is a timestamp on the photos themselves.

8    Q.   Is that e-mail still around?

9    A.   I don't know if I have it or not.  I don't know.

10   Q.   If you have that e-mail, can you send that to assistant

11   U.S. Attorney?

12   A.   I could.

13          MR. DENSEMO:  Give me one second.

14          (An off-the-record discussion was held at

15          4:55 p.m.)

16          THE COURT:  Wait a minute.  What's going on here?

17          MS. FITZHARRIS:  We were continuing the

18   cross-examination but I was --

19          MR. DENSEMO:  My colleague has a couple questions

20   and it is quicker if she just asks them instead of trying to

21   relay the information to me.  It is along the same lines we

22   have been asking.

23          MR. WATERSTREET:  Well, if it is as long --

24          THE COURT:  No, we only -- wait a minute.  You just

25   cross-examined him.

1          MS. FITZHARRIS:  I could either tell him the
2    questions that I want to ask.
3          MR. DENSEMO:  I will ask the question.
4          THE COURT:  You will.  We can't have two people
5    cross-examining one witness.
6    BY MR. DENSEMO:
7    Q.   Officer -- Officer Robinson --
8          (An off-the-record discussion was held at
9          4:57 p.m.)
10   BY MR. DENSEMO:
11   Q.   Officer Robinson, did Mr. Ramadan have a camera with him
12   at the time he was taken off of the plane?
13   A.   I don't know.
14   Q.   Do you recall you -- either yourself or Officer -- is it
15   Haeck?
16   A.   Haeck was with me, yes.
17   Q.   Do you recall either yourself or Haeck telling
18   Mr. Ramadan to turn the recording device off on his phone --
19   on his camera, that he could not record what was taking
20   place?
21   A.   I don't recall that.
22   Q.   So it could have happened but you don't remember?
23   A.   Correct.  I didn't say it, let's put it that way.  I
24   don't know if somebody else said it or not.
25   Q.   But it could have taken place?

1    A.   It could have.

2    Q.   Did you ever see any money being taken from Mr. Ramadan?

3    A.   No.

4    Q.   Did you ever see Mr. Ramadan with any money?

5    A.   No.  When I asked him upstairs about it, I didn't look

6    at it or verify it.

7    Q.   Did you take any notes at all at the time that you were

8    talking to Mr. Ramadan or did Officer Haeck take any notes at

9    all?

10   A.   I wouldn't call them notes; maybe times that, you know,

11   we talked to him for the seizure report.

12   Q.   Okay.

13   A.   But what time -- you know, what time we maybe brought

14   him downstairs, things like that.

15   Q.   Are those written down?

16   A.   In the seizure report.

17   Q.   And that's the same seizure report you talked about

18   earlier?

19   A.   Correct.

20   Q.   Were any -- you said -- how many e-mails do you think

21   were generated as a result of your contact or investigation

22   of Mr. Ramadan from yourself to somebody else or somebody

23   else to you?

24   A.   There is a limit on the size of the files we can send,

25   so the number of photographs I took had to be divided up into

1  multiple e-mails.

2  Q.  All right.  And you send those to?

3  A.  Officer Schmeltz.

4  Q.  Schmeltz?

5  A.  Uh-huh.  Yes, sorry.

6  Q.  Do you recall the time that that flight was scheduled to

7  leave?

8  A.  Not off the top of my head.  That would be part of the

9  seizure report also.

10  Q.  I have a couple more questions, Judge, and I will be

11  done.

12       Do you recall how long it took you to unload

13  Mr. Ramadan's luggage, just a rough approximation, if you

14  can?

15  A.  I don't -- to unpack all of it or for the airline to

16  deliver it?

17  Q.  For you to unpack it, unload it.

18  A.  To unpack everything, it probably took 90 minutes I

19  would guess.

20  Q.  To unpack.  So it took you about 90 minutes to unpack

21  it --

22  A.  Rough.

23  Q.  -- and then photograph everything, or were you taking

24  photographs as you were unpacking?

25  A.  Things were -- yeah -- well, some things were

Case 2:17-cr-20595-VAR-EAS  ECF No. 41  filed 02/26/18  PageID.643  Page 239 of 250
*Evidentiary Hearing • January 30, 2018*

239

1    photographed as they came out, other things we tried to group

2    together and take photographs of, and then -- yeah, so like I

3    said, I don't know for sure how long it took.

4    Q.   Okay.  When did your shift end that night?

5    A.   That night I was off at 21:00.

6    Q.   21:00, what is that in nonmilitary?

7    A.   9:00 p.m.

8    Q.   So by 9:00 p.m. you were done?

9    A.   No.

10   Q.   You said your shift ended at 9:00 p.m.?

11   A.   Right, but I still had paperwork to do.

12   Q.   Okay.  What time do you begin doing your paperwork, do

13   you remember?

14   A.   Once everything was unpacked, the items that we thought

15   were of interest for OFAC, we would have started -- I would

16   have started the paperwork on that as soon as practically

17   possible.  I can't give you an exact time.

18   Q.   Do you know what time you left work that evening?

19   A.   Maybe 2:00 a.m. the next morning, 1:00 a.m. possibly.

20   Q.   Were you working on any cases other than Mr. Ramadan

21   during that period of time?

22   A.   At that time it was just waiting to process the

23   paperwork for this OFAC stuff.

24   Q.   Waiting to process the paperwork, what does that mean?

25   A.   Waiting -- while we were waiting to make sure that there

1  was nothing else in there in the bags, in the carry-ons and

2  the checked luggage.  So once we had everything out, had all

3  the photographs taken, people started showing up to talk to

4  Mr. Ramadan, his family, you know, at that point is when I

5  started processing some of the paperwork for it.

6  Q.  Did you mention there had been some childcare issues

7  regarding the Ramadan children?

8  A.  Yeah.  His Mrs. I believe asked for a change of clothes,

9  one of the kids had to go to the bathroom or whatever.

10  Q.  One of the kids had soiled themselves?

11  A.  That's what I was told.

12  Q.  While they were in the waiting room area?

13  A.  Yeah.

14         MR. DENSEMO:  I think I'm almost done, Judge.

15         (An off-the-record discussion was held at

16         5:02 p.m.)

17         THE COURT:  All right.  We have to conclude this.

18  I'm sorry.

19         MR. DENSEMO:  Judge, can we have -- we have some

20  additional questions.  Can he just be brought back tomorrow,

21  Judge?

22         THE COURT:  No, no.

23         MS. FITZHARRIS:  May I just ask them?

24         THE COURT:  No.  Do you have questions you have

25  too?

```
 1              MR. WATERSTREET:  Just a few questions.
 2                       REDIRECT EXAMINATION
 3    BY MR. WATERSTREET:
 4    Q.   The length of time you spoke to Mr. Ramadan on the
 5    jetway, between the first time you talked to him -- I mean,
 6    grand total?
 7    A.   Grand total that I spoke with him, maybe five, ten
 8    minutes total.
 9    Q.   Thank you.  You were asked to go see Mr. Ramadan and
10    asked for him to come off the plane because you were already
11    there, right?
12    A.   We -- yeah, we were working the outbound section of that
13    flight or portion of that flight.
14    Q.   So it wasn't some special terrorism thing that was going
15    on, it just happened that you were there?
16    A.   Yeah, we were already up there.
17    Q.   Okay.  And when you -- as part of your job, you don't
18    just do terrorism-related things, you do all outbound --
19              MR. DENSEMO:  Objection, Your Honor; leading.
20              THE COURT:  Sustained.
21              MR. WATERSTREET:  I'm trying to move this as fast
22    as I can, Judge.
23              THE COURT:  We don't need this information.
24              MR. WATERSTREET:  All right.
25              THE COURT:  We have had it already.
```

1  BY MR. WATERSTREET:

2  Q.  The items that were laid out, did both of the officers,

3  either Armentrout and/or Schmeltz, come out and look at the

4  items?

5  A.  He did.  I don't recall if Armentrout did but

6  Officer Schmeltz did --

7  Q.  Okay.

8  A.  -- at one point.

9  Q.  They came out and saw the items, so they didn't have to

10  wait until these photos were taken --

11  A.  Correct.

12  Q.  -- sent to them by e-mail?

13  A.  Correct, they saw them in person.

14          MR. WATERSTREET:  Okay.  Thank you.

15          THE COURT:  All right.  Ms. Fitzharris, would you

16  tell me the nature of your questions?

17          MR. DENSEMO:  Yes, Your Honor.  I will read you the

18  questions, the four questions that we have, and you can tell

19  me if we can ask.

20          THE COURT:  You can just ask them, please.

21          MR. DENSEMO:  Thank you.

22          THE COURT:  Let's not fool around.

23                       RECROSS-EXAMINATION

24  BY MR. DENSEMO:

25  Q.  How late was the flight delayed, how long was the flight

1    delayed on August 15th?

2         THE COURT:  Does that make a difference?

3    A.  Inbound, outbound?

4         THE COURT:  Wait a second.  I'm sorry, I'm getting

5    a little testy here.

6         MR. DENSEMO:  I understand.

7         THE COURT:  But what difference does it make how

8    long the flight was delayed?  If you would tell me that, I

9    would be happy.

10        MR. DENSEMO:  Your Honor, we are -- I don't know.

11   My colleague knows -- she knows why she wants to --

12        THE COURT:  What difference does it make?

13        MS. FITZHARRIS:  We are trying to establish a

14   timeline.  Mr. Waterstreet asked a lot of questions about

15   what generally happens with this flight, so we are trying to

16   figure out exactly what time Mr. Ramadan went into CBP

17   custody, how long.  And the reasonableness of the detention,

18   right, that's a huge issue in this case, and so we kind of

19   need to know the timeline.

20        THE COURT:  I don't see the time the plane was

21   delayed.

22        MR. DENSEMO:  If he knows.  Your Honor, again, I --

23        THE COURT:  Wait a minute.  You have the times that

24   these individuals went on to take him off the plane, you have

25   the time -- the testimony of the officers.

Case 2:17-cr-20595-VAR-EAS  ECF No. 41  filed 02/26/18  PageID.648  Page 244 of 250
*Evidentiary Hearing • January 30, 2018*

244

1    MR. WATERSTREET:  Correct.

2    THE COURT:  So what is your next question?

3  BY MR. DENSEMO:

4  Q.  Did you take notes of the conversation with Mr. Ramadan

5  when he was getting on the plane?

6    MR. WATERSTREET:  Asked and answered, Your Honor.

7    MR. DENSEMO:  I don't --

8    THE COURT:  I don't remember that.  When he was

9  getting on the plane?

10 BY MR. DENSEMO:

11 Q.  When you escorted him on the plane or either

12 conversation when he -- there was a conversation when he was

13 getting on the plane, then you have additional conversation

14 when he was getting off the plane, did you take any notes

15 regarding those conversations?

16 A.  No.

17   MR. DENSEMO:  I can't read your writing.  Just one

18 more question, and I appreciate the Court's indulgence.

19   (An off-the-record discussion was held at

20   5:07 p.m.)

21 BY MR. DENSEMO:

22 Q.  Officer Robinson, did Mr. Ramadan's statements about his

23 travel plans end up in any report?

24 A.  That he was -- I'm trying to think.  The report I wrote,

25 I probably put it in there that he stated that he was moving

1    back to Palestine.

2    Q.  So that was in a report?

3    A.  I believe it would have been put in my seizure

4    narrative.

5    Q.  And what did you do to prepare for your testimony today,

6    what did you review?

7    A.  Nothing.

8    Q.  Just your memory?

9    A.  Just trying to go from memory.

10   Q.  Okay.

11   A.  Yep.

12        MR. DENSEMO:  Judge, we appreciate it.  Thank you

13   for your patience.

14        THE COURT:  Okay.  You may step down, sir.

15   A.  Thank you.

16        (Witness excused at 5:07 p.m.)

17        THE COURT:  Now, Counsel, we have to determine when

18   we are going to conclude this.  As it has gone today, it

19   appears it is going to take longer than any of you have

20   imagined, at least that I have imagined.  So I can give you

21   time on Friday, and other than that, we go to March.  I am

22   absolutely booked up and also out of town in a case.

23        MR. WATERSTREET:  I understand, Your Honor.

24        THE COURT:  I hate to do this but --

25        MR. WATERSTREET:  So nothing tomorrow or Thursday,

 1   Friday is the first time?  What time is --

 2           THE COURT:  We can do a couple of hours tomorrow.

 3           MR. DENSEMO:  That would be fine, Judge, if we can

 4   just have a couple hours tomorrow and maybe finish up on

 5   Friday.

 6           MR. WATERSTREET:  That's fine with me, Your Honor.

 7           THE COURT:  Okay.  Let me just check this one more

 8   time.

 9           MR. DENSEMO:  Your Honor, I'm sorry, Judge.  I've

10   spoken to Mr. Ramadan.  He indicates that he wants to be able

11   to fully explore all of the issues here, and if we have to --

12   if the Court's schedule take us into March, that's fine with

13   him.

14           THE COURT:  Well --

15           MR. DENSEMO:  Given what we heard, Judge, there may

16   be good reason to do so.  If Mr. Ramadan doesn't mind, then

17   maybe March is a good date, and we can get some of these

18   notes.

19           THE COURT:  He knows he has a right to a speedy

20   trial and --

21           MR. DENSEMO:  He's aware of that, Judge, but I

22   think while these motions are pending, the speedy trial

23   stops.

24           THE COURT:  No, I agree it stops, and it is not a

25   problem, but I want him to know --

```
 1            MR. DENSEMO:  He knows, he knows, he knows, Your
 2   Honor.
 3            MR. WATERSTREET:  Your Honor, can I just ask the
 4   Court to inquire of him so he understands that -- can I ask
 5   the Court to inquire of Mr. Ramadan so he understands what
 6   rights he's giving up by asking this --
 7            THE COURT:  Yes.  You have a right to a speedy
 8   trial, sir, and that is generally 70 days, take out time for
 9   motions, so these motion times doesn't really count, but I
10   want you to know that you are giving up your right to be
11   tried a little bit earlier because if we delay this to March,
12   it would take me a little bit longer to do this.
13            THE DEFENDANT:  It is okay.
14            THE COURT:  That's okay with you?
15            THE DEFENDANT:  Yep.
16            THE COURT:  All right.
17            THE DEFENDANT:  Thank you.
18            THE COURT:  Let's take a look then at March.
19            THE DEFENDANT:  Thank you so much.
20            THE COURT:  I'm going to give you March 6th.  I'm
21   going to cancel everything so you will have all day.  I will
22   give you March 7th, we will cancel everything.  So I'm hoping
23   in two days the testimony should be done.
24            MR. DENSEMO:  It will, Judge, guaranteed.
25            THE COURT:  You know I like you.
```

 1          MR. DENSEMO:  I know that.

 2          MR. WATERSTREET:  I hope you like me too, Judge.

 3          THE COURT:  I do.

 4          MR. WATERSTREET:  Okay.

 5          THE COURT:  All right.  Let's put it for March 6th

 6   and 7th, and we will start on March 6th at 9:30 a.m. and

 7   March 7th we will start the same time.

 8          MR. WATERSTREET:  Thank you very much, Your Honor.

 9          THE COURT:  And also, Counsel, you had indicated to

10   me that you want to -- you didn't know about this burden of

11   proof or you wanted to bring something up on the burden of

12   proof.  If you are going to file a brief, I will allow you to

13   do that.

14          MS. FITZHARRIS:  Thank you, Your Honor.

15          THE COURT:  And if you would do it within a couple

16   weeks so I can have that, and then if you need to reply to

17   it, you can reply in a week, and then we will have everything

18   by the time we come back.

19          MR. WATERSTREET:  Okay.  That's fine.  Thank you,

20   Your Honor.

21          THE COURT:  Anything else?

22          MR. WATERSTREET:  Not at this time.

23          THE COURT:  We are not doing tomorrow at all.

24          MR. WATERSTREET:  Not doing tomorrow, we are not

25   doing Thursday or Friday, that is my understanding.

Evidentiary Hearing • January 30, 2018

1       THE COURT:  Right.

2       MR. WATERSTREET:  Okay.

3       THE COURT:  Okay.

4       MR. DENSEMO:  Thanks, Judge.

5       MR. WATERSTREET:  Thank you, Your Honor.

6       THE COURT:  Thank you.

7       THE LAW CLERK:  All rise.

8       (Proceedings concluded at 5:12 p.m.)

9                   —   —   —

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*CERTIFICATION*

I, Robert L. Smith, Official Court Reporter of the United States District Court, Eastern District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing pages comprise a full, true and correct transcript taken in the matter of UNITED STATES OF AMERICA vs. YOUSEF RAMADAN, Case No. 17-20595, on Tuesday, January 30, 2018.

*s/Robert L. Smith*
Robert L. Smith, RPR, CSR 5098
Federal Official Court Reporter
United States District Court
Eastern District of Michigan

Date:  02/26/2018
Detroit, Michigan