```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION
 3                           —   —   —

     UNITED STATES OF AMERICA,
 4
                  Plaintiff,
 5
       vs.                              Case No. 17-20595
 6
     YOUSEF RAMADAN,                     Hon. Marianne O. Battani
 7
                  Defendant.
 8     _____/

 9                      EVIDENTIARY HEARING

10          BEFORE THE HONORABLE MARIANNE O. BATTANI
                   United States District Judge
11          Theodore Levin United States Courthouse
                    231 West Lafayette Boulevard
12                       Detroit, Michigan
                      Tuesday, March 6, 2018
13

14   APPEARANCES:

15    For the Plaintiff:      RONALD W. WATERSTREET
                              MICHAEL M. MARTIN
16                            U.S. Attorney's Office
                              211 W. Fort Street, Suite 2001
17                            Detroit, MI 48226
                              (313) 226-9100
18
      For the Defendant:      ANDREW DENSEMO
19                            COLLEEN P. FITZHARRIS
                              Federal Defender Office
20                            613 Abbott, 5th Floor
                              Detroit, MI 48226
21                            (313) 967-5555

22

23

24      To obtain a copy of this official transcript, contact:
              Robert L. Smith, Official Court Reporter
25            (313) 234-2612 • rob_smith@mied.uscourts.gov
```

*Evidentiary Hearing • March 6, 2018*

1                    TABLE OF CONTENTS

2  WITNESSES:                                          PAGE

3  OFFICER SCHMELTZ
      Direct Examination by Mr. Waterstreet............ 15
4     Cross-Examination by Ms. Fitzharris.............. 39
      Redirect Examination by Mr. Waterstreet.......... 78
5     Recross-Examination by Ms. Fitzharris............ 79

6  SPECIAL AGENT PATRICK KELLEY
      Direct Examination by Mr. Waterstreet............ 80
7     Cross-Examination by Mr. Densemo................. 97
      Redirect Examination by Mr. Waterstreet..........136
8     Recross-Examination by Mr. Densemo...............140

9  SPECIAL AGENT DAVID BANACH
      Direct Examination by Mr. Martin.................145
10    Cross-Examination by Mr. Densemo.................154
      Redirect Examination by Mr. Martin...............158
11    Recross-Examination by Mr. Densemo...............159

12

13 EXHIBITS:                                       RECEIVED

14 Government's P..................................152
   Government's Q..................................154
15 Government's R.................................. 86
   Government's S..................................147
16 Government's T..................................147

17

18

19

20

21

22

23

24

25

```
 1 │  Detroit, Michigan
 2 │  Tuesday, March 6, 2018
 3 │  at about 9:39 a.m.
 4 │                        —   —   —
 5 │          (Court, Counsel and Defendant present.)
 6 │          THE LAW CLERK:  Please rise.
 7 │          The United States District Court for the Eastern
 8 │  District of Michigan is now in session, the Honorable
 9 │  Marianne O. Battani presiding.
10 │          You may be seated.
11 │          The Court calls Case No. 17-20595, United States
12 │  vs. Yousef Ramadan.
13 │          THE COURT:  All right.  May I have your
14 │  appearances, please.
15 │          MR. MARTIN:  Good morning, Your Honor.
16 │  Michael Martin and Ronald Waterstreet for the government.
17 │  And with us today is Darlene Secord, a paralegal from our
18 │  office, and FBI Special Agent David Banach.
19 │          MR. DENSEMO:  Good morning, Your Honor.
20 │  Andrew Densemo on behalf of Yousef Ramadan.
21 │          THE COURT:  Okay.
22 │          MS. FITZHARRIS:  And Colleen Fitzharris also on
23 │  behalf of Yousef Ramadan.
24 │          THE COURT:  All right.
25 │          MR. DENSEMO:  Before we get started, could we ask
```

1   the Court if Mr. Ramadan's hands could be unshackled so he

2   can --

3            THE COURT:  Yes.

4            MR. DENSEMO:  Thank you very much.  And I do have

5   one matter I would like to bring to the Court's attention

6   before we get started, Your Honor.

7            THE COURT:  Okay.

8            MR. DENSEMO:  I spoke with Mr. Ramadan before

9   coming into court this morning, and he advised me that once

10  he was returned to the federal correction institution in the

11  special housing unit, he was -- a member of the FBI or

12  someone claiming to be from the FBI attempted to question

13  him.  He believes the FBI agent name was Cisnarski or

14  something like that, something along these lines.

15  Mr. Ramadan asked the agent for his card.  The agent refused

16  to give Mr. Ramadan his card.  Mr. Ramadan indicated to the

17  agent that he was represented by counsel and that the agent

18  shouldn't be speaking with him, and apparently the agent told

19  him that it was okay that he could speak with him.  Obviously

20  it wasn't okay.  The FBI agent, whoever is he, should not

21  have been attempting to question Mr. Ramadan.

22           So we would like -- I would like to know who this

23  agent was and under whose authority he attempted to

24  interrogate Mr. Ramadan.

25           In addition, Mr. Ramadan says that immediately

1    after that members of SIS I believe it may have been, it is

2    the security detail or security associated with the federal

3    prison, came into his room and took pictures of all of his

4    legal work and they took pictures of the cell where he was

5    being detained.

6            And lastly, he indicates that towards the end of

7    this whole process one of the COs flipped him off -- excuse

8    me, Judge -- flipped him off, gave him the bird, and called

9    him a sand nigger.

10           That -- all of these things are particularly

11   troubling to me given that I still consider this to be a gun

12   case.

13           THE COURT:  To be what?

14           MR. DENSEMO:  A gun case.  It's a case involving a

15   gun with an obliterated serial number, but it is -- this case

16   feels like something else, and I'm concerned that -- that

17   perhaps this something else that I'm feeling may be -- may be

18   seeping into or eroding constitutional rights that this young

19   man has that perhaps aren't being respected for some reason

20   or another.

21           Again, we wanted to put the Court on notice because

22   we know that if the Court is aware of it, perhaps that will

23   put an end to it.  We have no objections to legitimate

24   investigation, obviously we cannot object to a legitimate

25   investigation, but seeking to question an individual during

1    the middle of a federal prosecution where it's clearly

2    established that he has counsel I think is an attempt to

3    subvert the constitutional rights of Mr. Ramadan.  It is

4    clearly wrong.  It is illegal.  It can't be done.  And these

5    other -- this other conduct that he's been subjected to is

6    clearly -- it's uncalled for.

7              THE COURT:  Okay.  Let me hear from the government.

8    I would like to know what you know about this.

9              MR. MARTIN:  The short answer, Your Honor, is I

10   don't know anything about it.

11             THE COURT:  When did you hear about it?

12             MR. MARTIN:  Just now when Mr. Densemo alleged it

13   to you.  So I have no knowledge that any of these incidents

14   actually took place.  I know that one of the themes of

15   Mr. Ramadan's defense to the motion to suppress has been, you

16   know, bias against him because of his nationality and

17   religion and those sorts of things, so this fits with his

18   defense to the motion to suppress.  I don't know whether they

19   are true or not true.

20             All I can say to you now is we will look into it

21   and report back as to what we will find out, but that's all I

22   can say now because I know nothing about any of this.

23             THE COURT:  Okay.  You will look into it.  I guess

24   you could look at -- the jail must have some something

25   written about who comes in, right, so you will have a note of

1   some kind?

2          MR. MARTIN:  We will see if we can track down if

3   any FBI agents had any contact with him at the jail.

4          THE COURT:  Let me ask Mr. Banach, do you know

5   anything about it?

6          AGENT BANACH:  I do not, ma'am.

7          THE COURT:  Thank you.

8          MR. MARTIN:  If Mr. Densemo has any details that he

9   would like to share with me like dates and times of when

10  these alleged incidents occurred, that might help us --

11         MR. DENSEMO:  We will.

12         MR. MARTIN:  -- try to find out more about it.

13         THE COURT:  Okay.

14         MR. MARTIN:  So on that topic I can't offer

15  anything more, Your Honor.

16         THE COURT:  All right.

17         MR. MARTIN:  I did have some opening comments I

18  would like to make.

19         THE COURT:  Wait a minute.  Before we begin, I do

20  want you, Mr. Densemo, to give to Mr. Martin the specifics --

21         MR. DENSEMO:  I will.

22         THE COURT:  -- as to date, time.  Obviously you

23  don't have a name, but as best of a name you can come up

24  with.

25         MR. MARTIN:  Or even what the individual looked

1    like.

2            MR. DENSEMO:  We will give you all the details that

3    we can.

4            THE COURT:  Okay.  Thank you.

5            MR. DENSEMO:  We appreciate it, Your Honor.  Thank

6    you.

7            THE COURT:  Okay.

8            MR. MARTIN:  Your Honor, I just want to make a few

9    opening remarks today before we begin the testimony.

10           THE COURT:  Okay.

11           MR. MARTIN:  First, I wanted to kind of recap where

12   we are and fill you in on some events that transpired since

13   the last hearing.  There were three recent filings by the

14   defense: there was a motion for Rule 17 subpoenas that was

15   filed Friday evening at 5:00; there was a motion to strike

16   one of our witness's testimony, a witness who testified back

17   in January, that was filed yesterday; and then there was

18   supplemental brief that was filed by the defense yesterday as

19   well, yesterday afternoon.

20           We would like to respond to these in writing.  I

21   don't think you will be surprised to hear that we disagree

22   with the defense's interpretation of the law on these issues,

23   so we would like an opportunity to respond to those in

24   writing and then perhaps have another hearing date for those.

25           THE COURT:  Yes.  I am not aware of the motion to

 1    strike.

 2              MR. MARTIN:  Okay.

 3              THE COURT:  I saw a supplemental brief, I'm not

 4    sure it was the one just filed, and I did see the Rule 17

 5    subpoena.  But I will wait on all of those until -- I did

 6    check today and you hadn't responded yet, which is no

 7    surprise, I'm not saying that, but I want to wait until I

 8    have a response from you to rule on it, so we will see if we

 9    need to set another date.

10              MR. MARTIN:  Okay.  Thank you.

11              And then in terms of where we are in the testimony,

12    today we are going to be calling two witnesses and we are

13    going to show you some exhibits and then some video.  And

14    today's testimony and exhibits are really not going to

15    pertain to the lawfulness of the search of the computer hard

16    drive and the bags that was the subject of one their motions

17    to suppress under the Fourth Amendment.  The testimony

18    related to that is largely in, and as you know from last

19    time, the government's position is because it is a border

20    search, and that fact really isn't in dispute, it is a legal

21    issue that can be decided based on our legal arguments that

22    we made last time.

23              I would reiterate that position today, and I would

24    just point out to the Court that resolving that

25    Fourth Amendment motion on the legal issue I think could moot

```
 1    some of the discovery-related motions they have -- the
 2    defense has recently filed because some of what they are
 3    seeking they say they need to show that the agents didn't
 4    have probable cause to search, which our point is the law
 5    doesn't require probable cause or reasonable suspicion
 6    because it is a border search, so resolving that issue might
 7    actually narrow done some of the issues for later litigation
 8    and discussion.
 9              Two points I want to make with respect to the
10    testimony today.  The testimony today, as I said, is not
11    going to be necessarily related to the issues of the
12    searching the bags and the electronic media; it is going to
13    be about the interviews of the defendant that took place at
14    the border.
15              And the defense has filed two motions to
16    suppress -- or I should say a motion to suppress under two
17    different legal theories; one is that the defendant didn't
18    receive Miranda warning under the Fifth Amendment, and the
19    other is that his statements were coerced in violation of due
20    process under the Fourteenth Amendment.
21              And the reason I'm raising this now is there are
22    two separate analyses under these two different doctrines.
23    Under the Miranda cases you are to look at what a reasonable
24    person would understand in terms of whether or not he was
25    under arrest or in custody, not whether this particular
```

1   defendant did.  It's an objective inquiry.

2        The due process violation under the Fourteenth

3   Amendment is not an objective inquiry at the end of day.

4   There is an objective component to it.  The first is that the

5   plea or the law enforcement actually engaged in a coercive

6   type conduct, but the second issue is that that conduct, in

7   fact, overborne this defendant's will.  And so looking at

8   that and in analyzing that, the cases say you have to look at

9   the totality of the circumstances, including who this

10  defendant is, his background, his education, his experience,

11  as well as the conduct of the police.  And so some of the

12  exhibits and information today that we are going to present

13  is not going to be necessarily related to the events at the

14  airport.  It is going to include things like the defendant's

15  criminal history, his experience crossing the borders, his

16  experience dealing with police officers on other occasions,

17  things like that.  And that goes to whether or not is this

18  the type of person that would be coerced and his will would

19  be overborne by the police conduct that occurred here.  So

20  that's kind of an outline or a map, if you will, of where we

21  are going with the testimony today.

22        THE COURT:  Okay.  Your first witness?

23        MR. DENSEMO:  Your Honor, before the witness

24  testifies, we would just let the Court know that we object to

25  the U.S. Attorney using what we believe to be videos of

1    Mr. Ramadan -- family videos from Mr. -- that were taken from

2    Mr. Ramadan's hard drives in an effort to try to paint some

3    picture of Mr. Ramadan as this seasoned criminal veteran who,

4    because he is a seasoned -- according to the government, has

5    some background with law enforcement, somehow cannot have his

6    will overborne by governmental conduct or the circumstances

7    that surrounded this particular seizure, interrogation,

8    detention and arrest of Mr. Ramadan.  So we object to all of

9    the videos that we anticipate the government is going to show

10   which have absolutely nothing to do with the particular

11   circumstances that took place on the date and time that the

12   Ramadan family was taken off of that plane and interrogated

13   for hours in -- by Customs and Border Protection and the FBI.

14        We do not believe that showing some video of

15   Mr. Ramadan talking to his daughter or saying that he was

16   arrested or investigated by Chula Vista Police in 2010 has

17   anything to do with whether or not his will was overborne,

18   whether or not the government created an environment which

19   was necessarily -- which was, in and of itself, created an

20   environment of involuntariness.  And that is what the Court

21   needs to hear in our opinion as to what were the conditions

22   that were present on the date that Ramadan family was taken

23   off of the plane interrogated.

24        So, again, we believe that this is just another

25   attempt by the government to somehow sway the Court against

1    Mr. Ramadan by saying, look, Judge, look what he's talking

2    about, look what he's discussing.  It has absolutely nothing

3    to do with the circumstances that took place on the date that

4    he was interrogated by all of the agents in this case.

5         THE COURT:  Do you disagree with what the argument

6    is about coercion, looking at the totality of the

7    circumstances?

8         MR. DENSEMO:  You can look at the totality of the

9    circumstances that took place during the events.  We have no

10   objections to Mr. -- the government saying that Mr. Ramadan

11   has been arrested for misdemeanors before.  I think that

12   that -- his knowledge of the justice system may be relevant

13   in this case and I think that it probably goes to our benefit

14   because Mr. Ramadan will testify that he knew that he had a

15   right to an attorney and he asked for an attorney.  He did

16   know his rights.  So we don't object to that.  I think that

17   that is relevant.

18        But any videos of him talking to his daughter or

19   talking to his son or having some interaction with his wife,

20   I don't see how that that assists the Court in making the

21   determination.  Well, what happened on the date that he was

22   arrested?  What were those conditions?  Were those conditions

23   in and of themselves so compelling that even someone who had

24   been arrested before would have felt compelled to provide a

25   statement?  And ultimately that is what the Court is going to

```
 1    have to decide about, what were the conditions taking place
 2    with Mr. Ramadan on that date.
 3              MR. MARTIN:  Your Honor, I don't mean to interrupt
 4    Mr. Densemo, but in our presentation and in our case in chief
 5    we are not going to show videos of him talking to his
 6    daughter or his wife or his son.  We are going to show two
 7    videos of him, essentially videos that he took of himself
 8    being pulled over by police officers in 2017, the year that
 9    the border search took place, and you will see his
10    interaction with the police officers.  And the purpose of
11    that is to show that he -- now, mind you, this is a Terry
12    stop so he's not free to leave, and in his interaction with
13    the police officer he's very capable of standing up for
14    himself and talking back to those police officers, and that's
15    directly relevant as to the totality of the circumstances
16    because it goes to the type of person.
17              THE COURT:  All right.  Okay.  Let's begin.
18              MR. WATERSTREET:  Thank you.  I would like to call
19    Officer Schmeltz to the stand, Your Honor.  Please step
20    forward and be sworn.
21              THE COURT REPORTER:  Would you please raise your
22    right hand.
23              Do you solemnly swear or affirm that the testimony
24    you are about to give this Court will be the truth, the whole
25    truth, and nothing but the truth, so help you God?
```

1          OFFICER SCHMELTZ:  I do.

2          MR. WATERSTREET:  May I proceed, Your Honor?

3          THE COURT:  You may.

4          MR. WATERSTREET:  Thank you.

5                    OFFICER SCHMELTZ,

6    called at about 10:00 a.m., was examined and testified on his

7    oath as follows:

8                    DIRECT EXAMINATION

9    BY MR. WATERSTREET:

10   Q.   Sir, can you turn toward Her Honor and introduce

11   yourself to the court, please.

12   A.   My name is Officer Schmeltz.  I'm with Customs and

13   Border Protection, ma'am.

14   Q.   And how long have you been with Customs and Border

15   Protection?

16   A.   About ten years.

17   Q.   And what have been some of your jobs there at Customs

18   and Border Protection?

19   A.   I have been on the contraband team, I've been on the

20   counterterrorism team, I've been on the antiterrorism team,

21   and I'm currently a member of the tactical terrorism team.

22   Q.   Okay.  And have you been in uniform before?

23   A.   In other roles, yes.

24   Q.   Are you currently in uniform now as part of your role?

25   A.   No, sir.

```
 1   Q.   Were you in your uniform or plainclothes back in August

 2   of this past year, 2017?

 3   A.   Plainclothes.

 4   Q.   Plainclothes.  Okay.  And where exactly do you work?

 5   A.   Detroit Metro Airport.

 6   Q.   And any particular terminal?

 7   A.   Both terminals.

 8   Q.   Okay.  And I want to focus in on the North Terminal, and

 9   I also want to focus in on August 15th, 2017.  Were you

10   working plainclothes that day?

11   A.   Yes, I was.

12   Q.   And when you work plainclothes, do you also have a

13   firearm and handcuffs available to you?

14   A.   Yes, but it's concealed.

15   Q.   All right.  Now, that day did talk to an individual who

16   you later learned to know that his name was Yousef Mohammed

17   Ramadan?

18   A.   Yes.

19   Q.   Is he in the courtroom today?

20   A.   He is.

21   Q.   Can you point him out please?

22   A.   Right there in the middle (indicating).

23            MR. WATERSTREET:  Your Honor, may the record

24   reflect that he's identified the defendant?

25            THE COURT:  All right.
```

*Evidentiary Hearing • March 6, 2018*

**17**

```
 1              MR. WATERSTREET:  Thank you.
 2    BY MR. WATERSTREET:
 3    Q.   Where is it that you first came in contact with
 4    Mr. Ramadan on August 15th, 2017?
 5    A.   In secondary.  He was brought down to us in secondary.
 6    Q.   What is -- can you tell where generally the secondary is
 7    located and what terminal it is located?
 8    A.   It is in the North -- well, that one in particular we
 9    are talking about is in the North Terminal, and that is kind
10    of a separate area from where the booths are and everything,
11    where you bring them in and whatever needs to be secondary
12    for there.
13    Q.   I'm going to show you what has been previously used as
14    an exhibit in this matter, Exhibit X.  That's a rough outline
15    of the secondary area in which you first met Mr. Ramadan?
16    A.   Yes.  We first met him in what you have here as the
17    lobby area.
18    Q.   All right.  Did you bring him into the lobby area or did
19    somebody else do that?
20    A.   Somebody dropped him off to us.  I believe AT Set
21    (phonetic) dropped him off, and then we took him from there
22    to the interview room, sat his family down in the lobby and
23    let them stay in the lobby.
24    Q.   And what information did you have prior to the time that
25    you sat down to speak with Mr. Ramadan?
```

1   A.   All we had at that point was we had body armor leaving

2   the United States at this point.

3   Q.   That had been found in his luggage?

4   A.   Yes.

5   Q.   All right.  Let me ask you a little about the interview.

6   You've done this kind of interview in the past?

7   A.   Yes.

8   Q.   This particular interview, was this a friendly, cordial

9   interview, or was it a --

10          MR. DENSEMO:  Objection, Your Honor; it is a

11  subjective determination by this officer.

12          THE COURT:  He can describe the nature of the

13  interview.  Overruled.

14  BY MR. WATERSTREET:

15  Q.   Or was it a hostile interview?

16  A.   No.  It -- like any interview, you try to keep it

17  friendly, just see what's going on.  At that point we didn't

18  know anything other than he had body armor, and it was just

19  like, hey, have a seat.  Where are you going?  You know, you

20  start with some questioning.

21  Q.   And when you asked him where are you going, what answer

22  did you get?

23  A.   He said he was leaving the country.  He was moving to

24  Palestine.  We're talking and kind of asked him about the

25  body armor.  He said he was with the press.  I asked him with

1   who?  And then he said he worked for himself.  I said have
2   you ever done anything before like that?  Do you have
3   credentials?  Because I'm trying to figure out, you know, why
4   he has the body armor.  The story just kind of fell apart
5   from there.  Then he said he worked construction.  We asked
6   him where.  He couldn't really answer that.  We kind of went
7   round and round on what he did and how he did it at that
8   point.
9   Q.   As part of your discussion did the issue of money come
10  up?
11  A.   The issue of money didn't come up.  We asked him how
12  much money he was travelling with to see if it matched his
13  travel.  He said just under $10,000.  He showed it to us.  We
14  told him to put it back.  That was the end of the money.
15  Q.   And did you focus in on why the bulletproof vest?
16  A.   Why the vest, he said it was basically for his
17  protection, and he said it was dangerous.  We kind of talked
18  a little bit about that, why it is dangerous there, and why
19  would you bring your kids there if it was dangerous.  He said
20  they are going to stay in the house.  The story for us --
21  we've -- I've encountered people before with body armor that
22  were press, you know, that has credentials, they have a
23  reason to take it or not come into OFAC violation.
24  Q.   Okay.  And when you say OFAC violation, what's an OFAC
25  violation?

1    A.   OFAC violation is basically there's certain things that

2    cannot go in and out of the country, there are laws against

3    it as far as body armor.  There's a whole list of stuff you

4    cannot take to certain countries or take out of the U.S.

5    Q.   The body armor is one?

6    A.   Yes, a certain type of body armor is, yes.

7    Q.   And in this particular case, that was one that could not

8    go out of the United States?

9    A.   Correct.

10   Q.   Unless certain paper had been approved or licensing had

11   been approved --

12   A.   Correct.

13   Q.   -- by a particular agency.  Okay.

14          When you were not getting -- did you feel that the

15   answers to your questions were satisfactory for you to say

16   everything's good to go?

17   A.   No.  Basically we went round and round.  When you say

18   you work for a construction company and you can't tell me

19   where, when, you know, that's a red flag for you.  You say

20   you are press but you have never done it, you have no

21   credentials.  We were pretty much getting nowhere, so at this

22   point we decided to do a media exam, something we commonly do

23   if we are not -- you know, if we don't feel like we were

24   getting truthful answers.

25   Q.   Now, during this process did you also have access to a

1   computer system within -- that's used by CBP?

2   A.   Yes, yes.

3   Q.   What system was that?

4   A.   That was TECS, the Treasury enforcement tools.

5   Q.   And did you have access to that in the room which you

6   were talking with Mr. Ramadan?

7   A.   We did, yes.

8   Q.   Now, when Mr. Ramadan first walked into the room, did

9   you tell him he was under arrest?

10  A.   No.

11  Q.   Did you handcuff him when he walked into the room?

12  A.   No.

13  Q.   Did you tell him that you can't leave?

14  A.   No, I just said have a seat.

15  Q.   Okay.  Did you hit him, strike him?

16  A.   No.

17  Q.   Anything like that?

18  A.   No.

19  Q.   All right.  What, if anything, did you find when you

20  looked through the TECS system?

21  A.   The TECS system, he did have a TECS record, it was an

22  older one that we looked at.  I don't know it verbatim in the

23  top of my head right now, but it was something along the

24  lines someone called in and said he might have been a member

25  of Hamas or something along those lines.  I don't remember it

*Evidentiary Hearing • March 6, 2018*

**22**

 1   verbatim.

 2   Q.   Okay.  And did you then bring up the subject of Hamas?

 3   A.   We did.  We addressed it with him.  We asked him how he

 4   felt about Hamas.  He -- I guess I could say it.  He said

 5   fuck Hamas, which we were like oh, okay.  From there, like,

 6   so we didn't get anywhere with that.  That didn't mean a lot

 7   to us at the time, and so we just kept going around and

 8   around, and it was time to go to his media eventually.

 9   Q.   When you say go to his media, what do you consider his

10   media?

11   A.   Phones, anything that's electronic that we could look at

12   to maybe get a clear picture of what was really going on,

13   what the story is.

14         THE COURT:  I have a question.

15   A.   Yes, ma'am.

16         THE COURT:  As a border agent, when you are going

17   to look at the media, you do not have a search warrant; is

18   that correct?

19   A.   No, ma'am.

20         THE COURT:  Under what authority?

21   A.   Border search authority.

22         THE COURT:  Pardon me?

23   A.   Border search authority.

24         THE COURT:  And what's your understanding of a

25   border search authority?

1   A.   Border search authority, for instance, if you would like

2   to pat someone down, all you need is one articulable fact.

3   If you want to look through someone's media, you need mere to

4   no suspicion at all.  There are certain -- at the border

5   there's no -- the Fourth Amendment is kind of different for

6   us at the border.

7            THE COURT:  Does it make any difference to you if

8   somebody is coming in or going out of the country?

9   A.   No, ma'am, it is the same.  Inbound or outbound --

10  coming into or leaving the country, it is the same.

11           THE COURT:  Thank you.

12  A.   Yes, ma'am.

13           MR. WATERSTREET:  May I proceed then, Your Honor?

14           THE COURT:  Yes.

15  BY MR. WATERSTREET:

16  Q.   Okay.  And you said that you were going to turn to his

17  media?

18  A.   Yes.

19  Q.   And this maybe can help answer some of the Judge's

20  questions as well.  In turning to the media, did you also

21  give Mr. Ramadan some paperwork that's typically handed out

22  with the -- when the whole issue of electronics and media

23  come up?

24  A.   Yes.

25           MS. FITZHARRIS:  Mr. Waterstreet, can we have a

1  copy of what you --

2          MR. WATERSTREET:  Yeah, I sent one to you.

3          MS. FITZHARRIS:  I understand.  I just want to see

4  what you are giving him.

5  A.   When you look at someone's media, it is -- you always

6  give them this sheet, it is an electronic tear sheet.

7  Basically what this says, it breaks down our authority,

8  USC 15, you know, 13.  This basically let's them -- gives

9  them an understanding of why we can do it and --

10          THE COURT:  Okay.  But before we take this, do you

11  want to mark it if this is going to be in evidence?

12          MR. WATERSTREET:  Yes.  Government's Proposed

13  Exhibit R, Your Honor.  R as in Robert.

14  BY MR. WATERSTREET:

15  Q.   After you felt you were getting nowhere and you wanted

16  to look at his media, did you mention to him that, well, we

17  want to take a look at your phone or words to this effect?

18  A.   We did.  We asked to look at his phone.  He started

19  going into -- like he wanted to negotiate it; like if we

20  found anything, he wanted immunity for anything we found on

21  the phone, which kind of made us think, okay.  We told him we

22  couldn't, you know, there is no such thing here.  We went for

23  a good amount of time, I don't know how long, back and forth,

24  we showed him this sheet, this is what we do, we will look at

25  it, see if it matches your story.  And we got to a certain

 1  point --
 2  Q.   Let me stop you there.  In this process where people
 3  have put codes in to lock their phones, did you ask him for
 4  the code?
 5  A.   Yes.
 6  Q.   And did he willingly give you the code?
 7  A.   No, he did not.
 8  Q.   Okay.
 9  A.   We went in to negotiate a little bit more, and then he
10  just like a light switch, fuck you, balled up a little bit,
11  and we put him in restraints at that time.
12  Q.   Okay.  When he used those words -- you said you put him
13  in restraints.  Why did you put him in restraints at that
14  time?
15  A.   Anytime -- well, when he's leaning forward, clenching
16  his fists, he's physically showing us he's really getting
17  agitated, and his kids are there, it is late at night, for
18  our safety and his, we just want to calm him down right then
19  and there.  I put handcuffs on him, I told him he's not under
20  arrest, have a seat, and I told him to calm down and we will
21  take them off.  That happens often sometimes, people calm
22  down and they will just be fine.
23  Q.   All right.  And at any time up to this point have you
24  had a problem with him?
25  A.   No, no.  Like I said, it was like a light switch, he was

1   fine up to that point.

2   Q.   And when you were going directly to something he didn't

3   want to have happen, you looking at his media?

4   A.   Right.

5          MR. DENSEMO:   Objection, Your Honor; he's leading

6   the witness again.

7          THE COURT:   Rephrase your question.

8   BY MR. WATERSTREET:

9   Q.   Was there a different reaction when you went to the

10  situation where he didn't want you to do something --

11         MR. DENSEMO:   Objection; he's still leading the

12  witness.

13         THE COURT:   I don't know what the question is.

14  BY MR. WATERSTREET:

15  Q.   Was the reaction any different --

16         THE COURT:   What?

17  BY MR. WATERSTREET:

18  Q.   -- when he was being asked to do something that clearly

19  he didn't want to have happen?

20         MR. DENSEMO:   Objection; he's leading.

21         THE COURT:   Overruled.

22  A.   Yes.   It was definitely a difference.   When I asked him

23  any question, he would answer it and just kind of be cordial,

24  but when we started going to the phone, it just changed.

25  BY MR. WATERSTREET:

*Evidentiary Hearing • March 6, 2018*

**27**

1    Q.   And at any time during the interview up to this point,

2    did you ask him what his religion was?

3    A.   No.

4    Q.   Did you ask him to remove any of his clothing?

5    A.   No.

6    Q.   Did you have him remove his belt?

7    A.   No.

8    Q.   Shoelaces from his shoes if he had shoelaces in his

9    shoes?

10   A.   No.

11   Q.   Did you do a body search of him?

12   A.   No.

13   Q.   Did you ever do a strip search of him?

14   A.   No.

15   Q.   This was just a conversation you were having --

16          MR. DENSEMO:  Objection; that's leading, it

17   suggests the answer.

18          THE COURT:  Sustained.

19   BY MR. WATERSTREET:

20   Q.   Was this -- what was the purpose of you talking to

21   Mr. Ramadan?

22   A.   The purpose of us talking to Mr. Ramadan was at that

23   point we are trying to figure out why he has body armor that

24   he's taking overseas and what his purpose of his travel is.

25   Q.   Okay.

1    A.    And the restraints were just to calm him down.

2    Q.    Okay.  And how long did it take for Mr. Ramadan to

3    finally calm down that you ended up taking the restraints

4    off?

5    A.    Anywhere from five to ten minutes, I mean, it wasn't

6    long.

7    Q.    Okay.  Did you have an opportunity to go out and take a

8    look at the items that had been retrieved from his luggage?

9    A.    I did.

10   Q.    And did you find -- what items did you find that were of

11   an interest to you in your questions -- in your following up

12   on this body armor that Mr. Ramadan had?  I'm showing you

13   what has been marked as Government's Exhibits I-1 through 27.

14   A.    Okay.

15        MS. FITZHARRIS:  Mr. Waterstreet, could you please

16   let us know -- so it's Exhibit I, the ones previously

17   reviewed?

18        MR. WATERSTREET:  Yes.

19   BY MR. WATERSTREET:

20   Q.    Did you have an opportunity to review those?

21   A.    Yes, sir.

22   Q.    Were those images of some of the items that you saw out

23   there that evening?

24   A.    Yes, sir.

25   Q.    And through your experience are some of those items --

1    in addition to the body armor, were there some other items

2    that were export controlled?

3    A.   When I walked out there and seen all the items, pretty

4    much that was an eye opener for me personally, and that

5    didn't really match his story as far as we were concerned

6    after we looked at the items.

7    Q.   Some of other items that were export controlled were

8    what?

9    A.   I think it was the scope and maybe the Taser.  Off the

10   top of my head I couldn't tell you now.

11   Q.   But there were knives, masks, gas masks, things of that

12   nature, gun holsters?

13   A.   Holsters, forward assist for an AR.

14   Q.   What is a forward assist for an AR?

15   A.   It is a handle that goes in front of an AR-15 that is --

16   it is tactical.

17   Q.   Let me ask you this, have you had prior military

18   experience?

19   A.   Yes, sir.

20   Q.   And what branch?

21   A.   Served ten years in the Marine Corps.

22   Q.   Have you seen these types of items before?

23   A.   Yes, sir.

24   Q.   Okay.  As a CPC officer and a former marine of ten

25   years, did you have some additional concerns that you wanted

1    to follow up as a result of seeing these?

2    A.   Yeah.  He packed like a fighter, that's what a fighter

3    would take with him.  That's what I would have took.

4    Q.   Let me ask you a little bit about -- you said that the

5    handcuffs were on maybe five to ten minutes before the

6    defendant calmed down.  Did you -- did you remove those?

7    A.   Yes, sir.

8    Q.   Okay.  Where were you when you removed those?

9    A.   I believe in the same interview room.

10   Q.   Okay.  And was there any problems with him directly

11   after that?

12   A.   No, no.

13   Q.   Did you say, you know, anything to him particular about

14   it?

15   A.   No, no.

16   Q.   As part of your protocol, what is the next step in light

17   of the items that you just saw out in his luggage, what was

18   the next protocol for you as an officer with CPC?

19   A.   Well, after that, keep in mind, we had his media that

20   Officer Armentrout was reviewing on the inside.  We contacted

21   the agencies that -- our investigative branch basically,

22   which would be HSI --

23          THE COURT:  Could you slow down and speak up a

24   little bit.

25   A.   I'm sorry.  HSI Kelley.

1   BY MR. WATERSTREET:

2   Q.   You are being --

3            THE COURT:  He can look at you, that's fine.  I

4   just need him to slow down and speak up.  If you push that

5   microphone a little closer.

6   A.   Yes, ma'am.

7            THE COURT:  Thank you.

8   A.   So we contacted HSI, JTTF which is Joint Terrorism Task

9   Force, and the FBI.

10  BY MR. WATERSTREET:

11  Q.   Okay.  And who responded from those agencies, do you

12  recall?

13  A.   Yes.  That would be JTTF Officer Jim Brown, FBI Special

14  Agent Michael Thomas, and HSI Special Agent Kelley.

15  Q.   While Officer Armentrout was looking at media, did you

16  have an opportunity to go and look at some of the media as

17  well?

18  A.   I did.

19  Q.   As a result of looking at some of the items that he had

20  packed, the holsters, gun magazines, holders, things of that

21  nature, load-bearing vests, did you have any additional

22  questions that you wanted to talk to Mr. Ramadan about?

23  A.   We did.  During some of the videos he had a lot of

24  firearms and weapons and things like that, ISIS propaganda.

25  Went back in and kind of asked him about the weapons.  He

1   said, you know -- I said where's all your weapons basically?

2   He said they are in a storage locker.  We asked him about the

3   ISIS propaganda, and that's -- he really didn't have good

4   answers for that other than he believes in the caliphate, I

5   mean, so --

6   Q.   You said he believed in the caliphate.  Did he also say

7   what he thought about their violence?

8   A.   Yeah.  He said he likes ISIS, anything about them except

9   the violent part, at the end he would always throw that in

10  because it was kind of shocking that he supported the

11  caliphate.

12  Q.   Now, let me ask you this.  ISIS is a declared foreign

13  terrorism organization by the United States?

14  A.   Yes, sir.

15  Q.   Do you know any other organizations that are considered

16  terrorist organizations as defined by the United States?

17  A.   Hamas, Hezbollah.  There's quite a few on the list.

18  Q.   Okay.  And do you know whether it is a crime for

19  somebody to materially support any of those organizations?

20  A.   Yes, it is.

21  Q.   So when you said we went back in and asked questions,

22  where was Officer Armentrout when you were asking these

23  questions?

24  A.   He was looking through the media.  There was a lot of

25  media for him to look through.

```
 1    Q.   Okay.  And so who was the we that went back in there
 2    with you?
 3    A.   It will be myself and Brown, Officer Brown.
 4    Q.   The JTTF officer?
 5    A.   Yes, sir.  Keep in mind, at that point we are just
 6    popping in asking a question or two.  It's not like we are
 7    just sitting there talking to him.
 8    Q.   The first discussion you had with you and
 9    Officer Armentrout, approximately how long from the time
10    Mr. Ramadan sat down in that interview room until the time
11    that you went out to go search the media and look at the
12    other things, approximately how long did that take?
13    A.   40, 45 minutes tops.
14    Q.   You say that you popped in and out.  How long did these
15    popping in and out with you and Officer --
16    A.   Maybe a minute or two just to ask a question, if
17    something arises.  He really wasn't much on talking to us
18    much after that.
19    Q.   Now, did there come a point in time that HSI, FBI and
20    JTTF wanted to talk to Mr. Ramadan themself?
21    A.   Yes.
22    Q.   And did that take place in the same interview room?
23    A.   No.
24    Q.   Referring to Exhibit X, where, if any --
25    A.   As for your exhibit, that would have took place in the
```

1    conference room basically on the left here.  It is just a

2    bigger room because there was more of us.  He wanted to talk

3    to them, so we went in there, and I was just basically

4    witness to that.

5    Q.   Okay.  When he was brought in there, was he cuffed?

6    A.   No.

7    Q.   Was he told he was under arrest?

8    A.   No.

9    Q.   During that interview did he make mention of the

10   firearms being in a storage locker again?

11   A.   Yes.

12   Q.   Did he say anything about where they were located or

13   anything of that nature?

14   A.   He said they were in a storage locker.  We asked him

15   where.  He said he doesn't know the name of it, he can just

16   drive there, he didn't know the name of the storage locker,

17   where it was, somewhere, you know.

18   Q.   Did he offer to show you where it was?

19   A.   He did, he did.

20   Q.   Did you try to take him up on that offer?

21   A.   I tried to take him up on that offer that night.

22   Q.   Before we get into that, did you try to take him up on

23   that offer?

24   A.   Yes.

25   Q.   Okay.  After you finished up the interview in the

1    conference room, where was Mr. Ramadan asked to be seated?

2    A.    Brought back to the lobby on your chart.

3    Q.    Okay.  At that time had Mrs. Ramadan, his wife, and the

4    children left the area?

5    A.    They left before that, yes.

6    Q.    Okay.  So he would be the only one in that lobby area?

7    A.    Yes.

8    Q.    At the end of night after everything had been kind of

9    ended and you were ready to go, did you and the rest of the

10   officers go back to Mr. Ramadan to ask him about him showing

11   you where this locker was?

12   A.    Yeah.  I was -- him and Mike Thomas had a conversation

13   about it, and I could -- I was sitting right there, and Mike

14   was, well, let's go, do you have your key?  And he said what

15   key, the key to the locker?  And then he said, okay, I lied,

16   I don't have a locker.  Then he's like where's it at?  He

17   said it's at my friend's house.  Like who is your friend?  He

18   was asked who was your friend?  And, again, like a light

19   switch, fuck you, I'm not talking to you anymore, and he got

20   all balled up.  So at that time I put him in restraints again

21   and basically told him the same thing, if you calm down I

22   will take them off.

23          THE COURT REPORTER:  Slow down and repeat that.

24   A.    Sorry about that.  He got all balled up, so I put him in

25   handcuffs again, told him if he calmed down I would take them

 1   off, and that's pretty much what I did.  Probably less than

 2   five minutes he was in handcuffs there.

 3   BY MR. WATERSTREET:

 4   Q.   And how long was he in those handcuffs before he calmed

 5   the down?

 6   A.   Probably five minutes, I would say, a guesstimate.

 7   Q.   Did you remove them again?

 8   A.   Yes.

 9   Q.   Where were they removed?

10   A.   In the lobby.

11   Q.   In the lobby area.  Other than you cuffing him, did you

12   assault him in any way?

13   A.   No.

14   Q.   And you put that cuffing in your report, correct?

15   A.   Yes.

16   Q.   Did he ever ask for a lawyer and you ignored his

17   request?

18   A.   No.

19   Q.   If that had happened, what would you have done?

20   A.   I would have wrote it in the report.

21        MR. DENSEMO:  Pardon me?

22   A.   I would have wrote it in the report.

23        MR. DENSEMO:  You would have done what with the

24   report?

25   A.   I would have wrote it in the report.

```
 1   BY MR. WATERSTREET:
 2   Q.   You would have mentioned it in the report?
 3   A.   Yes.
 4   Q.   Okay.  Did he ever ask to have the meeting recorded?
 5   A.   No.
 6   Q.   If he would have asked, would that have been in the
 7   report?
 8   A.   Maybe, I would have just told him no.
 9   Q.   Did you steal any money from him?
10   A.   No.
11   Q.   Any jewelry, any gold?
12   A.   No.
13   Q.   Any gold bars?
14   A.   No.
15   Q.   What happened with that money that he said that he had
16   when he was in the interview room initially?
17   A.   He gave that to his wife, and she left.
18   Q.   And when did that take place?
19   A.   Approximately around midnight we let her go, because we
20   wanted to get her out of there, she had the kids with her.
21   Q.   Did you witness him handing her the money?
22   A.   I can't remember if he handed it to her or if he handed
23   it to me and I handed it to her, it was in the doorway, but I
24   did witness her take the money.
25   Q.   Okay.  Now, we've talked about a report.  When you write
```

1    a report, did you write it as a court transcript taking word

2    for word, second for second?

3    A.    No, no, it's basically an overlay of what transpired and

4    kind of try to keep it in order, you know.  You are not going

5    to have every little word in there.

6    Q.    Okay.  And in the preparation of this report did -- were

7    you given any paperwork by Officer Armentrout?

8    A.    Yeah.  He gave me some notes that he took in the initial

9    interview.

10   Q.    Okay.  What did he -- did you incorporate any of his

11   notes into your report?

12   A.    Yeah.  His notes were pretty much like basic information

13   so I put that in the report.

14   Q.    And what -- what did you do with the notes themselves

15   once you incorporated the information from his notes into the

16   report?

17   A.    Just put them in the shredder.  All of the copies that

18   we didn't need anymore we just shred at the end of the night.

19   Q.    Okay.  Then I guess the last area I want to talk about

20   is I asked you if you assaulted or hurt Mr. Ramadan in any

21   way, shape or form.  Did you see anybody else mistreat

22   Mr. Ramadan in any way, shape or form?

23   A.    No.

24            MR. WATERSTREET:  Thank you.

25            THE COURT:  Cross-examination?

```
 1                        CROSS-EXAMINATION
 2   BY MS. FITZHARRIS:
 3   Q.   Good morning, Officer Schmeltz.
 4   A.   Good morning.
 5   Q.   Thank you for being here today.
 6            THE COURT:   Okay.  I can't hear you either so --
 7   BY MS. FITZHARRIS:
 8   Q.   I said thank you for being here today.
 9            You mentioned the report you wrote.  Did you write
10   any other reports about your interview of Mr. Ramadan?
11   A.   No.
12   Q.   Did you write any follow-up reports after the interview
13   with special agent -- with the FBI agent?
14   A.   No.
15   Q.   Did you write any other reports since Mr. Ramadan --
16   since your interaction with Mr. Ramadan on the 16th and 17th?
17   A.   No.
18   Q.   Or 15th and 16th?
19   A.   No.
20   Q.   Did you write any e-mails about your interview with
21   Mr. Ramadan?
22   A.   If I sent an e-mail, they asked me that at work and I
23   searched, but the only thing I would have sent was he -- like
24   to the watch commander that he has left the building at this
25   time.
```

```
 1   Q.   Okay.  Did you send any text messages about the
 2   interview?
 3   A.   No.
 4   Q.   I have to ask this nowadays.  Did you post anything
 5   about this on social media?
 6   A.   No.
 7   Q.   Okay.  So everything you have that you wrote about the
 8   interview with Mr. Ramadan you've provided to the government?
 9   A.   Yes.
10   Q.   Okay.  Now, that report that you wrote, you wrote it on
11   August 17th, right?
12   A.   I wrote that at 5:00 in the morning, so if it was
13   August 15th we started, I would have wrote that around 5:00
14   in the morning that night.
15   Q.   But somebody reviewed it on the 17th?
16   A.   Right.
17   Q.   And that was your supervising officer,
18   Officer Steigerwalt?
19   A.   Yes.
20   Q.   And he made an edit to your report, right?
21   A.   Yes.
22   Q.   And he added something to the report?
23   A.   Yeah, that's normal.
24   Q.   Was Officer Steigerwalt present for the interrogation?
25   A.   There was never an interrogation.
```

1  Q.   Was he present for the interview?

2  A.   He was in the building, he was in the command center.

3  He wasn't there in the room during the interview but he was

4  in and out.

5  Q.   So what did he use when he made the edit and added

6  information to the report?

7  A.   I haven't seen the edit so I don't know.

8  Q.   You have not seen the edit?

9  A.   No.

10  Q.   Have you looked at your report before testifying today?

11  A.   My own version that I printed out.

12  Q.   Your own version, but you did not read the approval

13  remarks at the end of the report?

14  A.   No.

15  Q.   Okay.  Officer Schmeltz, you said that you have been a

16  member of CBP, right, for ten years?

17  A.   Yes.

18  Q.   And you've gone to a number of trainings?

19  A.   Yes.

20  Q.   And you are currently a member of TTRT?

21  A.   Correct.

22  Q.   And TTRT is the Tactical Terrorism Response Team?

23  A.   Yes.

24  Q.   And TTRT members they have special training in D.C.,

25  right?

1  A.  They have training in D.C., yes.

2  Q.  And the training focuses on issues of terrorism?

3  A.  Yes.

4  Q.  And Middle East?

5  A.  No.

6  Q.  No?

7  A.  Just terrorism.

8  Q.  Just terrorism.  So you talked about various terrorist

9  groups?

10  A.  Yes.

11  Q.  Like ISIS?

12  A.  Yes.

13  Q.  Hezbollah?

14  A.  Sure.

15  Q.  Hamas?

16  A.  Sure.

17  Q.  So you know that Hamas is in the Gaza Strip, right?

18  A.  Yes.

19  Q.  And --

20  A.  It is actually more in the West Bank.

21  Q.  You are saying that Hamas has a presence in the

22  West Bank?

23  A.  And Gaza, yes.

24  Q.  And you know that ISIS doesn't have a presence in the

25  West Bank?

1    A.   I don't know where ISIS is or where they are not.

2    Q.   And you know that Hezbollah mostly has the influence

3    over the West Bank?

4    A.   Hezbollah is a Shia and they wouldn't have any influence

5    over there.

6    Q.   Okay.  But you know -- and you know that Bethlehem is in

7    the West Bank?

8    A.   Yes.

9    Q.   And so you probably also talked -- you mentioned the

10   caliphate earlier?

11   A.   Yes.

12   Q.   And so you probably talked about and got some training

13   on what the caliphate means?

14   A.   Yes.

15   Q.   And caliphate means a lot of different things to

16   different people, right?

17   A.   As for ISIS, what the caliphate means?

18   Q.   Well, I'm saying in general the caliphate means

19   different things to different people?

20   A.   I guess it could but we were talking about ISIS.

21   Q.   I am saying that based on your training, you know that

22   the caliphate means different things to different people?

23   A.   Okay.

24   Q.   Is that a yes?

25   A.   Yes.

1  Q.  And it is generally a state established on Islamic

2  principles?

3  A.  Okay.

4  Q.  Yes?

5  A.  Yes.

6  Q.  And in contrast to one that is not set up on Sharia law?

7  A.  Okay.  Yes.

8  Q.  And the Koran has examples of benevolent caliphates?

9  A.  Okay.

10  Q.  Yes?

11  A.  Yes.

12  Q.  And then there are some that are violent, yes?

13  A.  Yes.

14  Q.  Did you ask Mr. Ramadan what his -- like what kind of

15  caliphate he supported?

16  A.  Yeah.  He wanted -- he supported ISIS in the caliphate.

17  Q.  But he said he didn't support the violence?

18  A.  Right, as part of the violence.  I didn't ask him that

19  question.  I was in that interview with him with other

20  people.

21  Q.  But a caliphate could be like - like Israel, right, an

22  Islamic state, Israel is a Jewish state, the caliphate could

23  be an Islamic state?

24  A.  Yes.

25  Q.  Okay.  Now, in your training with CPB and TTRT, you

1    talked -- you mentioned Fourth Amendment stuff, right?

2    A.   Correct.

3    Q.   And you received training on Fourth Amendment?

4    A.   Yes.

5    Q.   And you received training on Miranda?

6    A.   Yes.

7    Q.   And you know the difference between probable cause and

8    reasonable suspicion?

9    A.   Yes.

10   Q.   And you know that at the border, even though there is

11   relaxed authority, you can't search somebody's alimentary

12   canal without reasonable suspicion?

13   A.   Search someone's what?

14   Q.   Alimentary canal, so you can't detain somebody while

15   they pass drugs for a lengthy period of time without

16   reasonable suspicion?

17   A.   Drugs, yes.

18   Q.   So people smuggle drugs in their bodies, right?

19   A.   Yes.

20   Q.   And in order to detain them for lengthy periods of time,

21   you know through training that you need to --

22            MR. WATERSTREET:  Your Honor, if I may, what's the

23   relevancy?

24            THE COURT:  Yeah.  What is the relevance of that

25   type of body search?

1    MS. FITZHARRIS:  We are talking about good faith

2  and their general training and what he knows, and there are

3  some limits to what can be done at the border.

4    THE COURT:  Yeah, but we don't -- I sustain that

5  objection.  We don't need to go into those kind of body

6  searches unless there is something here that I haven't heard.

7    MS. FITZHARRIS:  There is no body search but, Your

8  Honor, we have argued --

9    MR. WATERSTREET:  Then what is the relevance of it?

10    MS. FITZHARRIS:  I am talking about the relevance.

11    THE COURT:  Let her finish her statement.

12    MS. FITZHARRIS:  We have talked about how much

13  sensitive material is on a computer, digital devices, we have

14  compared that to a search of a body cavity, and we have

15  talked about constraints on border patrol's ability to

16  conduct searches of persons and property.  So I'm just

17  probing into that training and trying to figure out what he

18  did in good faith and what he did not.

19    THE COURT:  Well, we can limit it to what he did in

20  this case.

21    MS. FITZHARRIS:  All right.

22    THE COURT:  Okay.

23    MR. WATERSTREET:  Thank you, Your Honor.

24  BY MS. FITZHARRIS:

25  Q.   Now, you mentioned the general border search earlier and

```
 1   you talked about the tear sheet, the inspection of devices?
 2   A.   Yes.
 3   Q.   So you know on that tear sheet there is a statement
 4   about authority to search persons and property?
 5   A.   Yes.
 6   Q.   And there are reasons given for why CBP searches people?
 7   A.   Those are just like it could be one of these reasons.  I
 8   think it is more of an educational pamphlet.  I don't need
 9   any reason to look it up.  It's electronic media.
10   Q.   But the document you give people, it says that you do
11   this to determine the identity of -- and citizenship of all
12   persons seeking entry into the United States?
13   A.   Okay.  Yes, it does say that.
14   Q.   It says that you try to determine the admissibility into
15   the United States of foreign nationals?
16   A.   Yes.
17   Q.   And it is to deter entry of terrorists, yes?
18   A.   True, yes.
19   Q.   This tear sheet does not talk about people leaving the
20   country?
21   A.   Okay.
22   Q.   Yes?
23   A.   Yes.
24        MR. WATERSTREET:  Your Honor, actually it does --
25   A.   It is inbound and outbound.
```

```
 1              THE COURT:  Wait a second.  What's your objection?
 2              MR. WATERSTREET:  The document -- she is
 3    misspeaking when she says the document doesn't --
 4              THE COURT:  Well, you can cross-examine -- you can
 5    re-examine when she is done.
 6    BY MS. FITZHARRIS:
 7    Q.  What I mean is when talking about the reasons for the
 8    searches, the document states it has to do with entering into
 9    the United States?
10    A.  If makes no difference if you're exiting the
11    United States or entering the United States as far as border
12    search authority.
13    Q.  Right.  But I'm talking about the document that you give
14    to people when you are searching their devices.
15              MR. WATERSTREET:  Your Honor, the document speaks
16    for itself; objection.
17              THE COURT:  Sustained.
18    BY MS. FITZHARRIS:
19    Q.  So after -- when you wrote your report you looked at
20    Officer Armentrout's notes?
21    A.  Yes.
22    Q.  And did you take notes?
23    A.  No.
24    Q.  You did not take any notes at all during the interview?
25    A.  No.
```

1  Q.   When you are in the room with the FBI agent, was he
2  taking notes?
3  A.   I don't recall if he was or not.
4  Q.   Okay.  Do you remember if the person from the Joint
5  Terrorism Task Force was taking notes?
6  A.   I don't not remember either way.  I'm not saying they
7  did, I'm not saying that they weren't.
8  Q.   But did you review those notes before writing a report?
9  A.   I didn't get anybody's notes other than
10  Officer Armentrout's.
11  Q.   And that report, you said that it summarizes the events,
12  right?
13  A.   Yes.
14  Q.   It does not include everything that was said or
15  discussed during the interview?
16  A.   It would be impossible to have every the and in, you
17  would have to write it as you talked, so no.
18  Q.   Sure.  But there are topics that you did not include in
19  the report?
20  A.   I'm sure.
21  Q.   You exercised some judgment about what you wanted to
22  include in the report?
23  A.   Sure, I guess.
24  Q.   All right.  So you said the conversation with
25  Mr. Ramadan began by asking about his travel plans?

*Evidentiary Hearing • March 6, 2018*

**50**

```
1    A.   Uh-huh.

2    Q.   Yes?

3    A.   Yes.  Sorry.

4    Q.   At some point Officer Armentrout mentioned that he has

5    German background, right?

6    A.   Yes.

7    Q.   And he suggested to Mr. Ramadan that he does not like

8    Jews?

9    A.   No.  I think he said his ancestors or something like

10   that.

11   Q.   Okay.  But he said that he would understand if somebody

12   doesn't like Jews?

13   A.   Okay.  Yes.

14   Q.   Yes.  And Mr. Ramadan responded?

15   A.   I don't know what he responded.

16   Q.   You don't remember him responding?

17   A.   No.  I think he just kind of laughed.  I don't remember

18   his response.  It's been a long time.

19   Q.   So you don't remember what his response was?

20   A.   No.

21   Q.   So you don't remember if his response was stop --

22            MR. WATERSTREET:  Well, objection, Your Honor.  He

23   says he doesn't remember, and now she's going to suggest some

24   different things.  If he doesn't remember, he doesn't

25   remember.
```

1          THE COURT:  Counsel?

2          MS. FITZHARRIS:  I'm just trying to clarify what he

3    remembers and, you know, where there's going to be

4    conflicting testimony, where there's a memory and when

5    there's not a memory.

6          THE COURT:  All right.  Overruled.  You may ask the

7    question.

8    BY MS. FITZHARRIS?

9    Q.  So you don't remember that he said stop, I don't hate

10   Jews?

11   A.  No.

12   Q.  You don't remember him saying I have friends who are

13   Jews?

14   A.  No.

15   Q.  Okay.  And you didn't include anything about this

16   conversation about disliking Jews in your report?

17   A.  No.

18   Q.  You didn't include anything about Mr. Ramadan's negative

19   views about Hamas in your report either?

20   A.  No.

21   Q.  Because you didn't think it was necessary to put that in

22   the report?

23          MR. WATERSTREET:  Objection, Your Honor.  The

24   witness is answering all of the questions, and he's told the

25   Court already that he doesn't write down verbatim everything

 1    that's told.  Obviously he's willing to answer the questions

 2    because he's given that answer beyond what's in the report.

 3              THE COURT:  This is cross-examination.  Overruled.

 4    Go ahead.

 5    BY MS. FITZHARRIS:

 6    Q.  You didn't think it was necessary to include that

 7    response in the report?

 8    A.  Fuck Hamas?

 9    Q.  Yes.

10    A.  No.

11    Q.  You talked to Mr. Ramadan about his travel plans?

12    A.  Yes.

13    Q.  He said he was going back to Palestine --

14    A.  Yes.

15    Q.  -- where he was born?

16    A.  Yes.

17    Q.  To Bethlehem?

18    A.  Yes.

19    Q.  And he mentioned that his parents lived there?

20    A.  Yes.

21    Q.  And there was an apartment there for him and his family

22    to live in?

23    A.  That I don't remember.

24    Q.  Okay.  Did he mention to you that his father is elderly

25    and needed help at home?

1    A.   No.

2    Q.   No.  Mr. Ramadan's first language is not English, right?

3    A.   I believe he speaks English fine.  I don't know.  I

4    didn't speak to him in any other language.

5    Q.   Okay.  You didn't speak to him in Arabic?

6    A.   No.

7    Q.   Officer Armentrout didn't speak to him in Arabic?

8    A.   No.

9    Q.   But he speaks with an accent?

10   A.   Okay.  If you say so.

11   Q.   You do not have any memory of whether he speaks with an

12   accent?

13   A.   I don't think he has a bad accent.  I interview a lot of

14   people with accents so I don't know.

15   Q.   Just asking if --

16   A.   He speak English.

17   Q.   He spoke English?

18   A.   Uh-huh.

19   Q.   Okay.  But nobody offered to get him a translator?

20   A.   I don't think so.

21   Q.   At some point in the evening you learned that

22   Mr. Ramadan had -- has a closed head injury?

23   A.   I don't recall that.

24   Q.   You don't recall that.  Okay.  Do you always shred notes

25   after writing your reports?

1   A.   Yes.

2   Q.   Do you rely on a policy to do that?

3   A.   No.

4   Q.   A CBP policy?

5   A.   There is no policy.  We don't keep anything that has PI

6   information.  For instance, mostly Armentrout's notes were

7   like driver's license number, name, just where he lived, it

8   wasn't nothing you would keep.  After I put it in the report,

9   I just shred it.

10  Q.   That doesn't change if the FBI becomes involved?

11  A.   No, that's all in the report.

12  Q.   Even though it is a criminal investigation?

13  A.   It wasn't at that time.

14  Q.   So even though the FBI was involved, you are saying it

15  was not a criminal investigation?

16  A.   The FBI comes there daily for our exams, that's nothing

17  new.

18  Q.   Mr Ramadan said that when he was in the U.S., he worked

19  construction, right?

20  A.   Yes.

21  Q.   He said that he planned to be a photojournalist in

22  Palestine?

23  A.   Yes.

24  Q.   Based -- through any of your CBP training, are you

25  informed about the requirements or credentials needed to be a

1    photojournalist?

2    A.   No, but I have talked to people before that have

3    credentials and things they pack.  The story has to make

4    sense.  By no means am I an expert on every single person

5    that flies, but if you say, for instance, you are a doctor

6    and you are going to Africa to help something, you would

7    probably have things in your bag that would be a doctor and

8    you would answer questions and I would say oh -- like, if you

9    asked me -- if I told you I was a doctor, how many questions

10   would it take you to figure out that I am not, you know, kind

11   of game that you have to play at the border.

12   Q.   But there's nothing in your training that tells you what

13   journalists are required to have?

14   A.   Not specifically.

15   Q.   Okay.  And you talked about your experience but, you

16   know, things are changing, right?  You have heard of YouTube?

17   A.   Yes.

18   Q.   And, in fact, when Mr. Ramadan mentioned

19   photojournalism, he mentioned that he planned to put his

20   videos on YouTube?

21   A.   He said he was a journalist.

22   Q.   Okay.  But you don't remember -- you don't dispute that

23   he might have said something like I plan to put my videos on

24   YouTube?

25   A.   No, he didn't say that.

```
 1   Q.   So you are saying that he did not say that?
 2   A.   Not to me.
 3   Q.   Okay.  But, you know, did you do any Google search to
 4   figure out if there are a lot of freelance journalists,
 5   photojournalists out there?
 6   A.   No.  We just asked him questions, and basically he said
 7   he was a journalist.  I asked who do you work for?  I work
 8   for myself.  Have you ever done anything like that before?
 9   He said no.  Basically he couldn't really answer any
10   questions of what he was going to shoot or what he was doing.
11   I mean, it was just basically his --
12   Q.   Sir --
13   A.   What's that?
14   Q.   You had an opportunity to talk about that.  I just want
15   to follow up on a couple things.  He did say he wanted to
16   film or photograph the conflict in the West Bank, right?
17   A.   I was getting to that, yes.
18   Q.   Okay.  And -- but all I'm trying to say is there is
19   nothing that you -- you did not Google to find out if this
20   kind of freelance journalism is common?
21   A.   No, I did not Google it that evening or any other
22   evening.
23   Q.   So you don't have anything that would -- to dispute the
24   fact that over 60 percent of photojournalists are freelance
25   journalists?
```

```
1              MR. WATERSTREET:  Objection, Your Honor.
2              THE COURT:  Let's move on please.  Sustained.
3   BY MS. FITZHARRIS:
4   Q.   You don't review somebody's digital devices during every
5   Customs inspection, right?
6   A.   No.
7   Q.   And when you wrote your report you said the reason you
8   searched the digital devices is because you didn't think
9   Mr. Ramadan's story was -- about what he planned to do was
10  credible?
11  A.   Correct.
12  Q.   You did not mention the TECS system?
13  A.   No.
14  Q.   That TECS system it includes things from Homeland
15  Security investigations called Tip Reports, right?
16  A.   Yes.
17  Q.   And Tip Reports are a way for people to just call in and
18  report something that they think might be suspicious?
19  A.   That's why I didn't care about it.
20  Q.   So you didn't care about that because it could be like a
21  disgruntled neighbor who --
22  A.   When we see that, it is like a two-line thing, that's
23  all it says what we are looking at, we don't get to see the
24  actual whole thing.
25  Q.   So you never know if it turned out to be a false claim
```

*Evidentiary Hearing • March 6, 2018*

**58**

1    or anything like that --

2    A.   Right.

3    Q.   -- based on the system?

4         So you kind of ignore it?

5    A.   Not ignore it, just keep it in the back of your head.

6    Okay.  If you find something during your exam -- if you find

7    something along those lines -- like if he had a TECS record

8    for apples, I would look for apples, you would look during

9    your exam.

10   Q.   But you can't put too much stock in it?

11   A.   Well, you don't put no less or no more than you would

12   anything else that you get, you just do your due diligence.

13   Q.   Because somebody could have been vindicated and it

14   wouldn't show up in the system?

15   A.   That I can't answer.  I don't know.

16   Q.   You don't know.  But let's say that you have some

17   questions about it, you might do something like call the

18   agency that received the tip line in California or something?

19   A.   Depends, probably not at 3:00 in the morning.

20   Q.   Well, it would have been earlier in California.

21   A.   True.

22   Q.   Let's talk a little bit about the room were you took

23   Mr. Ramadan.  To enter the room there is a door, right?

24   A.   Yes.

25   Q.   And we are just going to break it down.  Okay.  And it

1   says authorized personnel only or something like that?

2   A.   Okay.  Something.

3   Q.   There is a big red circle with a line through it?

4   A.   I go through the door every day and I couldn't tell you

5   a sign on it.

6   Q.   But general public cannot open this door?

7   A.   There is no lock on the door, anybody could open it.

8   Q.   Well, there is a pass code?

9   A.   Oh, you are talking about when you get into the lobby?

10  Q.   Yes.

11  A.   Yes.  I thought you were talking about the room.

12  Q.   I'm sorry.  The inspection -- the interview room area?

13  A.   Yeah, there is a passcode on it.

14  Q.   Passcode or you swipe a badge or something?

15  A.   Passcode.

16  Q.   Okay.  And you walk in and to your left there is a

17  waiting area?

18  A.   Yes.

19  Q.   Like with your back to the door, I'm just kind of

20  visualizing it.  And there are a number of chairs lined up?

21  A.   Yeah, yes.

22  Q.   10, 15 chairs, something like that?

23  A.   I don't know the exact amount of chairs.

24  Q.   But it looks kind of like a DMV, right?

25  A.   Kind of.

1   Q.   Okay.  And in the upper left-hand corner there is a

2   videocamera?

3   A.   Okay.  I don't know.

4   Q.   You don't know.  But there is a videocamera in the

5   waiting room?

6   A.   If there is I have never noticed it, but go ahead.

7   Q.   To the right of the waiting room there is the control

8   center?

9   A.   The command center.

10  Q.   The command center.

11  A.   To the left, if you are coming in that door.  Depending

12  on what door you came in, but go ahead.

13  Q.   Okay.  There is a command center and it has dark glass?

14  A.   Yes.

15  Q.   So it is hard to see in the command center?

16  A.   Yes.

17  Q.   But people on the inside can see out?

18  A.   Yes.

19  Q.   And then straight ahead as you are entering through

20  the -- walking through the waiting room, there are two

21  interview rooms, right?

22  A.   Yes.

23  Q.   And the interview --

24  A.   One on the left and on the right.

25  Q.   One on the left and the right.  And there is a wall that

| | |
|---|---|
| 1 | divides them, and that wall has a window between it? |
| 2 | A.  Yes. |
| 3 | Q.  And the doors are pretty heavy? |
| 4 | A.  They are doors. |
| 5 | Q.  Well, they close automatically? |
| 6 | A.  Sure. |
| 7 | Q.  Yes or no? |
| 8 | A.  I don't know if they are heavy, but they open and close. |
| 9 | Yes, the door opens and closes. |
| 10 | Q.  But if you were to open the door and not put anything in |
| 11 | front of it, it would close automatically? |
| 12 | A.  Yes. |
| 13 | Q.  And if you entered these interview rooms, there is a |
| 14 | wall that's blank? |
| 15 | A.  Yes. |
| 16 | Q.  The wall with the window into the other interview room? |
| 17 | A.  Yes. |
| 18 | Q.  And then on the left wall there is a plaque? |
| 19 | A.  Yes. |
| 20 | Q.  And the plaque has the seal of the Department of |
| 21 | Homeland Security on it? |
| 22 | A.  Okay.  Yes. |
| 23 | Q.  And it has a statement about authority to search and |
| 24 | seize -- search property? |
| 25 | A.  Oh, I'm not sure exactly verbatim what statements are |

1  up.  There are a couple different ones around there that has

2  different things so --

3  Q.  But there is something about CBP authority on that?

4  A.  Okay.  Sure.

5  Q.  And below it there is a statute?

6  A.  Okay.

7        MR. DENSEMO:  Your Honor, excuse me.  Could the

8  witness answer yes or no --

9        MR. WATERSTREET:  Your Honor --

10       MR. DENSEMO:  -- instead of saying okay?

11       MR. WATERSTREET:  Could we have the attorney who's

12  doing the cross-examination please make the objections rather

13  than the other attorney?

14       THE COURT:  All right.  But let's clarify it.  If

15  it calls for yes or no, please say so.

16  A.  Yes, ma'am.  Sorry.

17  BY MS. FITZHARRIS:

18  Q.  And underneath the statement on this plaque there is a

19  statute written?

20  A.  I don't know what's written there but there are words

21  written there.  I have never paid attention to it, but go

22  ahead.

23  Q.  But it is resisting a federal officer or interfering

24  with a federal officer statute, right?

25       THE COURT:  Wait a minute.  He just said he didn't

```
 1   pay attention.
 2   A.   I don't --
 3   BY MS. FITZHARRIS:
 4   Q.   You don't remember but you don't disagree that's what it
 5   says?
 6   A.   I don't know what it says.
 7            MR. WATERSTREET:  Your Honor, perhaps she would
 8   like to be the witness.  He's already answered he doesn't
 9   recall.
10            THE COURT:  Sustained.
11            MR. DENSEMO:  Excuse me one second.  Your Honor,
12   may I?
13            (An off-the-record discussion was held at
14            10:52 a.m.)
15            MS. FITZHARRIS:  Your Honor, the reason I'm getting
16   into this is we asked the government to see the interview
17   rooms and go in.  We were told that only counsel of record
18   could go and see the rooms, and that we could not bring an
19   investigator.  Obviously we cannot call ourselves as
20   witnesses.  And we were told that if we were not able to get
21   what we needed from the witnesses, that we would be
22   allowed -- we might be allowed back so we could get an
23   investigator and perfect the impeachment, so at this time I'm
24   making that request.
25            THE COURT:  Government?
```

```
 1              MR. WATERSTREET:  Your Honor --
 2              THE COURT:  I guess this is a request to go see the
 3   interview room.
 4              MR. WATERSTREET:  They have already been granted
 5   that opportunity.
 6              THE COURT:  They what?
 7              MR. WATERSTREET:  Excuse me, Your Honor.  They have
 8   already been granted that opportunity.  They were taken there
 9   this past Friday, both counsel were taken, and they had full
10   opportunity to review the location.  We --
11              THE COURT:  You already went?
12              MS. FITZHARRIS:  We were not allowed to bring an
13   investigator, and so we cannot call ourselves as witnesses,
14   and Mr. Waterstreet said that -- when we asked to bring an
15   investigator, he said that if need arises --
16              MR. WATERSTREET:  Please let me speak for myself.
17   What I told them, Your Honor, is if the need arises and we
18   can't resolve it, we will figure out.  Perhaps we can agree
19   to certain facts.  If there is a particular issue that he
20   cannot answer because he does not recall, have them write
21   them down, perhaps we can stipulate to those things.
22              THE COURT:  Well, okay, wait a minute.  I think we
23   are going a little far afield here in the sense that you are
24   talking about what's on a wall.  You saw what was on the wall
25   because you were there.  Why can't we take a picture and
```

```
 1    present it instead of going through all of these witnesses
 2    just to say what the plaque says.
 3              MS. FITZHARRIS:  We would be happy with that.  We
 4    were told we could not take photographs of the room.
 5              THE COURT:  Well, maybe you can't but the
 6    government can bring in a picture of what's on the wall.
 7              MR. WATERSTREET:  Your Honor --
 8              THE COURT:  You've read it so you will know if it
 9    is correct.
10              MR. WATERSTREET:  That's fine.
11              THE COURT:  Okay.  So we don't need another witness
12    on that.  Okay.  Go ahead.
13    BY MS. FITZHARRIS:
14    Q.  Officer Schmeltz, each of the rooms have a videocamera
15    in it?
16    A.  Yes.
17    Q.  The videocamera is in the upper right-hand corner?
18    A.  It is in the corners, I'm not sure where.
19    Q.  But it faces out towards the lobby or the waiting area?
20    A.  It is facing down.
21    Q.  Right in -- also in the ceiling there's a microphone?
22    A.  Okay.  I wasn't aware of that but okay.
23    Q.  And both -- they are both operational?
24    A.  I have no idea.
25    Q.  You have no idea?
```

```
 1   A.   None at all.

 2   Q.   You have no knowledge of video recording equipment?

 3   A.   I have nothing to do with the video recordings.  The

 4   officers there have no control over that.  We don't review

 5   it.  We don't get to see it.  We don't have anything to do

 6   with that.

 7   Q.   You've never asked for a copy of the video recording

 8   equipment?

 9   A.   Same answer; we have never touched it not in my ten

10   years.  It is not something officers are going to have any

11   interaction with.

12   Q.   All right.  But just in general the room has video

13   equipment?

14   A.   I see it.  I don't have anything to do with it.

15   Q.   And there are tables in the room?

16   A.   Yes.

17   Q.   And the tables have computers on them?

18   A.   Yes.

19   Q.   And the computer screen faces the back blank wall,

20   right?

21   A.   Yes.

22   Q.   During the interview with Mr. Ramadan you sat facing the

23   computer screen?

24   A.   Yes.

25   Q.   So facing the direction towards the waiting room?
```

1    A.   Yes.

2    Q.   And Officer Armentrout sat next to you?

3    A.   Yes.

4    Q.   And Mr. Ramadan sat with his back to the door?

5    A.   To the window, yes.

6    Q.   To the window.  Okay.  The door was closed during --

7    A.   I don't recall.  It was probably opened and closed a few

8    times during the interview.

9    Q.   But if Mr. Ramadan had opened the door himself, you

10   wouldn't have allowed it?

11   A.   I don't understand your questions.

12   Q.   If Mr. Ramadan said I'm going to open the door and walk

13   out, he was not free to do so?

14   A.   Well, depends on walk out of -- you are getting way --

15   like just leave the FIS, no.

16   Q.   He was not free to leave the interview room?

17   A.   No.

18   Q.   You mentioned that on that day you had handcuffs on your

19   waist?

20   A.   Yes.

21   Q.   And you had a service weapon?

22   A.   Yes.

23   Q.   And I know you said that you think it is not visible but

24   sometimes this might show through?

25   A.   No, it's concealed.

1    Q.   No.  How can you know that?

2    A.   How can you not?

3    Q.   Where do you keep it?

4    A.   High on my hip.

5    Q.   Okay.  So were you wearing a suit jacket?

6    A.   No, just a long shirt, real long.

7    Q.   Okay.  We talked a little bit about the interview rooms.

8    There were some other parts of this interview area, but you

9    would agree with me that there are cameras in other parts of

10   this interview area?

11   A.   I have no idea where the cameras are.  I see cameras

12   that I think might be cameras -- you see things, you see the

13   camera on the wall, but I don't know what they are pointing

14   at or not pointing at.

15   Q.   Did you have a baton with you on that day?

16   A.   No.

17   Q.   Officer Armentrout also had a firearm?

18   A.   I'm assuming he did, yes.

19   Q.   And on that day Officer Armentrout also had handcuffs?

20   A.   I'm assuming he did.

21   Q.   Okay.

22   A.   I didn't take inventory of his gear.

23   Q.   During the interview you did not tell Mr. Ramadan that

24   he had a right to remain silent?

25   A.   No.

```
1    Q.   You told him that he had to answer your questions?
2    A.   No, he just answered them.
3    Q.   You didn't tell him that he had a right to an attorney?
4    A.   No.
5    Q.   And you don't think he had a right to an attorney?
6    A.   He never asked for one.
7    Q.   If he had asked for one would you have provided one?
8    A.   No.
9         MR. DENSEMO:  Excuse me.
10        (An off-the-record discussion was held at
11        10:58 a.m.)
12   BY MS. FITZHARRIS:
13   Q.   So you did not think that Mr. Ramadan had a right to an
14   attorney when you were talking to him?
15   A.   I don't know if he had a right or not.  I just know that
16   when you are at the border, we don't do that.
17   Q.   You do not think that he had a right to an attorney?
18   A.   I don't know if he has one or not.
19        MR. WATERSTREET:  Asked and answered.
20        MS. FITZHARRIS:  He has not answered what he
21   believes.
22        THE COURT:  He said he doesn't know.  You want to
23   know what he believes even though he doesn't know?  Is that
24   your question?
25   A.   I believe everybody has a right an attorney, that's my
```

```
 1    personal belief.  Is that what you are asking for, my
 2    personal belief?
 3    BY MS. FITZHARRIS:
 4    Q.   Again, if he would have asked for one, you would not
 5    have allowed him to talk to one?
 6    A.   Not until we were finished with our exam.
 7    Q.   When you put Mr. -- handcuffs on Mr. Ramadan, you
 8    decided when they came off?
 9    A.   No, I let him decide.  As soon as he calmed down, I took
10    them off, and I told him that.
11    Q.   But if he had said I want you to take them off now, you
12    wouldn't have done that?
13    A.   If he was not safe, no.
14    Q.   So you decided when to take them off?
15    A.   Yes.
16    Q.   In Mr. Ramadan's checked luggage he had cameras?
17    A.   Yes.
18    Q.   Digital cameras?
19    A.   Maybe a digital cameras, I don't remember exactly how
20    many cameras he had.
21    Q.   But he had cameras?
22    A.   Yes.
23    Q.   He had a vest that had the word press written across it?
24    A.   Yes.
25    Q.   Based on your training on the West Bank, you know that
```

1    the West Bank is dangerous?

2    A.    Yes.

3    Q.    There are sometimes smoke bombs set off?

4    A.    Yes.

5    Q.    And a gas mask might help with that; prevent inhaling

6    smoke bombs?

7    A.    Yes.

8    Q.    He had some hunting knives?

9    A.    He had tactical knives, they weren't hunting.

10   Q.    It is not illegal to often tactical knife?

11   A.    No.

12   Q.    It is not illegal to own body armor?

13   A.    Depends but, no, in general, no.

14   Q.    In general, no.  It is not illegal to own a gas mask?

15   A.    No.

16   Q.    Sometimes people don't realize they have to check --

17   they have to declare things for Customs, right?

18   A.    Yes.

19   Q.    It happens pretty often?

20   A.    Yes.

21   Q.    So sometimes people say whoops, I'm really sorry, and

22   could even say leave it here, I don't care, right?

23   A.    Depends.

24   Q.    Depends.  But it is not uncommon for somebody to not

25   realize that, right?

1    A.   Depends on the item.  I mean, you are right, though it

2   is not common for people to not know what they are allowed or

3   not allowed to take.

4    Q.   Mr. Ramadan said he didn't know that he had to declare

5   the body armor?

6    A.   Correct.

7    Q.   During the interview you asked Mr. Ramadan for his

8   passcodes to his digital devices?

9    A.   Yes.

10   Q.   And he did not want to give them?

11   A.   No.

12   Q.   And you didn't think he had a right to refuse to give

13   them?

14   A.   He could refuse it all he wants.  I mean, there is

15   nothing -- we are not going -- there is nothing you can do to

16   get it from him.  We just obtained the media.

17   Q.   But it was after you asked for the passcodes that you

18   put him in handcuffs?

19   A.    No.  After he basically balled up on me and said fuck

20   you is when I put him in handcuffs.

21   Q.   Okay.  But that was around the time that you were asking

22   for the passcodes?

23   A.   No, the passcodes took a while.  It was past that

24   because he was negotiating.  He wanted immunity for anything

25   we found on his phone.

1              THE COURT REPORTER:  Slow down.

2    A.   Sorry.  I'm so sorry, sir.

3              It was past asking for the passcodes.  It was after

4    the negotiation of him trying to negotiate whatever we found

5    on his phone he would have immunity from.

6    BY MR. FITZHARRIS:

7    Q.   He wanted some kind of legal document?

8    A.   What?

9    Q.   He wanted a legal document?

10   A.   He wanted something.  We didn't know what he wanted.  He

11   just said I want something in writing no matter what you find

12   on my phone I won't be prosecuted for it.  We told him, no,

13   we don't do that.

14   Q.   It sounded like either he wanted to --

15             MR. WATERSTREET:  Objection to what it sounded

16   like.  The answer speaks for itself.

17             THE COURT:  Sustained.  Question.

18   BY MS. FITZHARRIS:

19   Q.   Non-prosecution agreements are kind of legal documents?

20   A.   I don't know.  I have never dealt with it.

21   Q.   You never -- okay.  But he didn't want to answer that

22   question?

23             THE COURT:  That's been asked and answered.

24   A.   What question?

25             THE COURT:  Let's go on.

*Evidentiary Hearing • March 6, 2018*

**74**

```
 1   BY MS. FITZHARRIS:
 2   Q.   At some point the FBI got involved?
 3   A.   Yes.
 4   Q.   And you said that Mr. Ramadan was taken to the
 5   conference room?
 6   A.   Yes.
 7   Q.   And in the conference room there were -- how many
 8   federal agents were there?
 9   A.   It was Mr. Brown, Mr. Thomas, Mr. Kelley and myself, I
10   believe.
11   Q.   And at no point was Mr. Ramadan provided an interpreter?
12   A.   No.
13   Q.   There is a videocamera in that room?
14   A.   I have no idea.  It's not a room that I go into.
15   Q.   You had some contact with Mrs. Ramadan and the children,
16   right?
17   A.   I did.
18   Q.   Are you aware that at some point one of Mr. Ramadan's
19   children wet herself?
20   A.   I heard about it.  I wasn't involved with it.  Somebody
21   took over luggage so she could change the child.
22   Q.   Were the kids crying?
23   A.   I have no idea.  I was in another room.
24        MS. FITZHARRIS:  One minute, Your Honor.
25             (An off-the-record discussion was held at
```

```
 1              11:04 a.m.)
 2   BY MS. FITZHARRIS:
 3   Q.   Officer Schmeltz, was Officer Armentrout wearing a suit
 4   or uniform?
 5   A.   Just plainclothes.
 6   Q.   What time did you leave the building on August 16th?
 7   A.   Probably sometime after 5:00 a.m.
 8   Q.   You released Mr. Ramadan around 2:00 in the morning?
 9   A.   I don't know the exact time.  I have to look -- it is in
10   my report.  I just don't know off the top of my head right
11   now.
12   Q.   But he was allowed to go home?
13   A.   Yes.
14   Q.   When you put the handcuffs on Mr. Ramadan, did
15   Officer Armentrout help you put them on?
16   A.   No.
17   Q.   Did you put them on with his hands in front of him?
18            MR. WATERSTREET:  Your Honor, can we clarify as to
19   what time she is talking about because he was cuffed -- made
20   mention in the report he was cuffed two different times.
21            THE COURT:  Right.
22   BY MS. FITZHARRIS:
23   Q.   All right.  The first time you put handcuffs on him, did
24   Officer Armentrout help you put them on?
25   A.   No.
```

```
 1   Q.  Did you -- that first time you put handcuffs on him, did
 2   you cuff him in front?
 3   A.  No, the back.
 4   Q.  In the back.  Did Mr. Ramadan ever complain that the
 5   handcuffs were too tight?
 6   A.  No.
 7   Q.  Did he complain that you -- that he was -- it hurt him?
 8   A.  No.
 9   Q.  The second time you put handcuffs on Mr. Ramadan, that
10   was in the conference room?
11   A.  That was in the lobby.
12   Q.  In the lobby.
13   A.  According to your chart.
14   Q.  And did you put handcuffs on him yourself?
15   A.  Yes.
16   Q.  And did you cuff him in the front?
17   A.  In the back.
18   Q.  And you decided the second time you put handcuffs on him
19   you decided when --
20   A.  Yes.
21   Q.  -- to take them off?
22          Okay.  Now, you said that Mr. Ramadan's answers to
23   your questions about his travel plans were not satisfactory?
24   A.  No.
25   Q.  They didn't make sense to you?
```

```
 1    A.   They didn't make sense to you.
 2    Q.   What could he have said that would have made sense to
 3    you?
 4              MR. WATERSTREET:  Objection, Your Honor.
 5              THE COURT:  Sustained.
 6    A.   It depends.
 7    BY MS. FITZHARRIS:
 8    Q.   Okay.  So if he had said that he wanted to go live with
 9    his parents overseas to take care of them --
10              THE COURT:  Counsel, counsel, he didn't say.  Let's
11    stick to what he said.  Okay.
12              MS. FITZHARRIS:  Well, there is some dispute about
13    that.
14              THE COURT:  I'm sorry.  If there is other things
15    that you want to ask that you say that he said or that he
16    said that he said, you may do that.  I just don't want you to
17    go through a whole scenario of various things that are not in
18    evidence.
19              MS. FITZHARRIS:  No further questions at this time.
20              THE COURT:  Okay.  Redirect?
21              MR. WATERSTREET:  Two quick areas, if I may, Your
22    Honor?
23                        REDIRECT EXAMINATION
24    BY MR. WATERSTREET:
25    Q.   You were asked about a translator, whether he needed a
```

1    translator?

2    A.   Yes.

3    Q.   Did you have any difficulty communicating back and

4    forth?

5    A.   No.

6    Q.   Did you have a problem understanding what he was saying?

7    A.   No.

8    Q.   Did he ever complain that he didn't understand what you

9    were saying?

10   A.   No.

11   Q.   Had -- did he even ask for a translator?

12   A.   No.

13   Q.   Had he asked for a translator, would you have gotten a

14   translator?

15   A.   Yes.

16   Q.   The other area is deciding to take off the handcuffs.

17   What was one of the deciding factors for you to decide when

18   those cuffs came off?

19   A.   When Mr. Ramadan was calm and he was to longer a safety

20   issue, I would take them off of him.  And as an officer you

21   just have to make that call every time that you do that.

22   Q.   And at the end of day he went home?

23   A.   He went home.

24            MR. WATERSTREET:  Thank you.

25            THE COURT:  Thank you.  You may step down.

1        MR. DENSEMO:  We have one question regarding the

2   question that he just asked, Your Honor.

3        THE COURT:  All right.

4                  RECROSS-EXAMINATION

5   BY MS. FITZHARRIS:

6   Q.  As a CBP officer, do you have the authority to handcuff

7   any person whenever you think -- whenever you think it is

8   necessary?

9   A.  Explain your question a little more to me.  I'm just not

10  walking around cuffing people, if that's what you are asking.

11  Q.  No, but even if somebody is not under arrest, you can

12  put handcuffs on a person?

13  A.  Absolutely.

14        MR. DENSEMO:  No further questions.

15        THE COURT:  Your next witness?

16        MR. WATERSTREET:  Agent Kelley, Your Honor.

17        THE COURT:  Do we know if Agent Kelley is here?

18        MR. WATERSTREET:  Yes, he's here.  I saw him

19  earlier, Your Honor.

20        MS. FITZHARRIS:  Your Honor, just while we have

21  this second, we are requesting photographs of every -- of

22  every one of the CBP plaques that are in that interview area.

23  There were many on every wall.  In every room there was one,

24  so we just want to make sure that our request is very clear.

25  We don't want just the ones in the interview rooms, we want

```
 1  photographs of all of them.
 2          THE COURT:  Of every room that he was in?
 3          MS. FITZHARRIS:  Yes.
 4          THE COURT:  Okay.
 5          MR. WATERSTREET:  Okay.  Agent Kelley.
 6          THE COURT REPORTER:  Would you please raise your
 7  right hand.
 8          Do you solemnly swear or affirm that the testimony
 9  you are about to give this Court will be the truth, the whole
10  truth, and nothing but the truth, so help you God?
11          SPECIAL AGENT KELLEY:  I do.
12                  SPECIAL AGENT PATRICK KELLEY,
13  called at about 11:12 a.m., was examined and testified on his
14  oath as follows:
15                      DIRECT EXAMINATION
16  BY MR. WATERSTREET:
17  Q.  Can you introduce yourself to Her Honor.
18  A.  My name is Patrick Kelley, K-E-L-L-E-Y.
19  Q.  For the benefit of the court reporter, can you spell
20  your first and last name.
21  A.  Patrick, P-A-T-R-I-C-K, Kelley, K-E-L-L-E-Y.
22  Q.  And where do you work, sir?
23  A.  Special Agent, Homeland Security Investigations,
24  Detroit.
25  Q.  How long have you been so employed?
```

1    A.    Since December of 2002.

2    Q.    And have you always been a special agent?

3    A.    Previous to special agent hired in January of 2002, I

4    was a Customs inspector with United States Customs Service.

5    Q.    And that's the old --

6    A.    Previous to Homeland Security it was Customs Service

7    under the Department of Treasury, correct.

8    Q.    And in the past 15 years as a special agent with

9    Homeland Security, what different roles have you played and

10   what different types of investigation have you done?

11   A.    Financial investigations, long-term document fraud

12   investigations.

13          THE COURT:  Okay.  I'm going to ask you to slow

14   down and speak into the microphone.

15   A.    Okay.

16          THE COURT:  Okay.

17          MR. WATERSTREET:  I know maybe the Court is having

18   the same problem.  The defendant is speaking quite loud and

19   it is very difficult to hear.

20          THE COURT:  Yeah.  Let's wait until he's done.

21   BY MR. WATERSTREET:

22   Q.    You were telling us about some of the different

23   investigations you've done or --

24   A.    Correct.  I was assigned to the airport during this

25   time, previous to that a long -- several years document --

```
 1            THE COURT:  Pardon me?
 2            MR. WATERSTREET:  I don't know if I introduced that
 3  as a demonstrative aid.
 4            THE COURT:  X?
 5            MR. WATERSTREET:  X.
 6            THE COURT:  I thought we did that last time.  If
 7  not --
 8            MR. WATERSTREET:  If --
 9            THE COURT:  If not, any objections to it?
10            MR. DENSEMO:  I think it was admitted, Your Honor.
11  We have no objections.
12            THE COURT:  Okay.
13            MR. WATERSTREET:  Thank you very much, Your Honor.
14  I appreciate that.
15  BY MR. WATERSTREET:
16  Q.  Does that help you at all in the -- in describing the
17  secondary area that you went to?
18  A.  Yes.
19  Q.  Okay.  There is four different rooms that are marked;
20  one is conference room, command center, lobby, interview
21  room.  Are you familiar with generally what this diagram is
22  trying to depict?
23  A.  Generally, yes.
24  Q.  Okay.  And what information did you have prior to
25  arriving -- before you arrived at the secondary inspection
```

1    area?

2    A.    In the phone call the supervisor for CBP stated that

3    they had a passenger who was departing on a flight overseas,

4    and in the inspection of the luggage of the passenger and his

5    family, certain items, military and tactical items, were

6    found to include bulletproof vests, tactical vest, Taser, gas

7    mask and other assorted military items.

8    Q.    Okay.  How long did it take you approximately to get to

9    the airport from your home?

10   A.    Approximately an hour.

11   Q.    Okay.  And when you arrived there, did you have an

12   opportunity to look over some of the items that you were told

13   were found in the luggage belonging to a particular

14   passenger?

15   A.    Yes.

16   Q.    I'm going to show you Government's Exhibit I-1 through

17   27.  If you can look through that quickly --

18   A.    Yes.

19   Q.    -- please.  And tell me, are these photographs of some

20   of the items that were laid out for you to view?

21   A.    Yes, they are.

22   Q.    Okay.  And when you arrived there, did you eventually

23   meet up with some other law enforcement agents?

24   A.    Yes.

25   Q.    And who were they?

1   A.   CBP Officer James Brown and FBI Agent Mike Thomas.

2   Q.   Okay.  And were you part of a group of agents that

3   interviewed a woman named Jeanine Ramadan?

4   A.   Yes, I was.

5   Q.   I don't need for you to go into that, but in the timing

6   of that, when did that take place after you arrived

7   timing-wise?

8   A.   Approximately 15 minutes, 20 minutes after I arrived.

9   Q.   Okay.  So --

10          MS. FITZHARRIS:  I'm sorry, Mr. Waterstreet.  If I

11  may, Your Honor, is it possible to take a quick break so

12  people can use the restroom?

13          THE COURT:  Yes.  We will take --

14          MS. FITZHARRIS:  I apologize.

15          THE COURT:  -- a ten-minute break as soon as the

16  defendant can get down and up, I guess.  Okay.

17          MS. FITZHARRIS:  Thank you, Your Honor.  I

18  apologize.

19          THE LAW CLERK:  All rise.  Court is in recess.

20          (Court recessed at 11:19 a.m.)

21                  —   —   —

22          (Court reconvened at 11:40 a.m.; Court, Counsel and

23          all parties present.)

24          THE LAW CLERK:  All rise.  You may be seated.

25  Court is back in session.

1           THE COURT:  You may continue.  You may take the

2    stand, sir.

3           MR. WATERSTREET:  Thank you, Your Honor.  During

4    the break I realized that I did not move for the admission of

5    Government's Proposed Exhibit R, that was that tear sheet.

6    Move for its admission.

7           THE COURT:  Yes, any objections?

8           MR. DENSEMO:  Which sheet was that, Your Honor?

9    I'm sorry.

10          MS. FITZHARRIS:  This one.

11          MR. DENSEMO:  We don't of any objections.

12          THE COURT:  It may be received.

13          MR. WATERSTREET:  Thank you Your Honor.

14          (Government's Exhibit R received into evidence.)

15   BY MR. WATERSTREET:

16   Q.   I think we left off that you arrived before the

17   interview of Jeanine Ramadan, and you were there about

18   15 minutes before that took place?

19   A.   Correct.

20   Q.   Did you take part of that -- in that interview?

21   A.   Yes.

22   Q.   I'm not going to ask you any questions about what she

23   said, but approximately how long did that interview take?

24   A.   Approximately 30 minutes.

25   Q.   Okay.  And after that interview, did there come a point

1  in time that there was an interview of Mr. Ramadan?

2  A.  Yes.

3  Q.  Okay.  And when is it that you first came in contact or

4  saw Mr. Ramadan?

5  A.  He was walked in with CBP officers into the conference

6  that I was in.

7  Q.  Okay.  And you are referring to Exhibit X when you are

8  referring to the conference room?

9  A.  Correct, yes.

10  Q.  Okay.  Is that individual who was walked in by the CBP

11  officers in the courtroom today?

12  A.  Yes.

13  Q.  Can you identify him, please?

14  A.  He's wearing the red jumpsuit with the eyeglasses.

15       MR. WATERSTREET:  Your Honor, may the record

16  reflect that he's identified the defendant?

17       THE COURT:  Yes.

18       MR. WATERSTREET:  Thank you.

19  BY MR. WATERSTREET:

20  Q.  And when he was brought in, what other officers were

21  present in that room?

22  A.  Once again, FBI Agent Mike Thomas, CBP Officer

23  James Brown and CBP Officer Charles Schmeltz.

24  Q.  When the defendant was brought in, was he in handcuffs?

25  A.  No.

1    Q.    Was he told he was under arrest when he was brought in?

2    A.    No, he was not.

3    Q.    During the entire time -- and we will get to what

4    happened in the conference room, but during the entire time

5    that you were present in the conference room did you ever see

6    him mistreated?

7    A.    No.

8    Q.    Did you ever see him threatened?

9    A.    No.

10   Q.    During the conversation, did the defendant ever request

11   for a lawyer?

12   A.    No.

13   Q.    Did he ever make a request for the interview to be

14   recorded?

15   A.    No.

16   Q.    Now, you talked about a number of subjects, and I'm not

17   going to go into all of the details of the subjects that you

18   talked with him, but did the subject of firearms come up in

19   the conversation with Mr. Ramadan?

20   A.    Yes.

21   Q.    And you don't have to go into the nitty-gritty details

22   of it, but can you give us a flavor of what -- how that

23   conversation took place and what was going on at the time?

24   A.    He spoke about some firearms that he owned, he owned two

25   rifles and a Glock handgun he stated.  We asked where they

1    were, where they were stored.  He told us in a storage

2    facility, a storage unit.  He could not recall the location

3    of the storage unit, the address.  He couldn't recall the

4    storage unit number.  Other details about where the weapons

5    were stored he couldn't recall.

6    Q.   Okay.  And did you indicate whether he knew how to get

7    there or not how to get there?

8    A.   He stated he could get there.

9    Q.   Okay.  And was there a conversation about him -- his

10   willingness to show you the whereabouts of the storage

11   locker?

12   A.   Yes, there was.  At the -- he agreed at the conclusion

13   of interview to travel with us to the location of the storage

14   locker where they were located.

15   Q.   Okay.  Now, at any time during that interview was

16   Mr. Ramadan -- get upset and --

17   A.   Yes.

18   Q.   During that particular interview in the conference room?

19   A.   In the conference room, no.

20   Q.   Okay.

21   A.   No.

22   Q.   Okay.  Did -- if you could characterize the mood of the

23   room, was it a hostile, cordial, friendly environment?

24   A.   It was cordial.  It was conversational.  He was

25   answering our questions back and forth, conversation.

1  Q.  Any yelling?

2  A.  No yelling.

3  Q.  At any time did he ever indicate his un -- inability to

4  understand any of your questions?

5  A.  Not that I recall.

6  Q.  Was there any communication difficulties when he was

7  speaking that lead you to believe that you needed the

8  services of a translator or anything of that nature?

9  A.  No.

10  Q.  After the interview took place, where was Mr. Ramadan

11  taken?

12  A.  The initial interview in the conference room, across the

13  terminal to the lobby area on the map.

14  Q.  Okay.

15  A.  And there is a waiting -- a seating area in the lobby

16  that he was seated in.

17  Q.  At that point in time, was he placed in cuffs when he

18  was being moved from the conference room to the lobby?

19  A.  No, he was not.

20  Q.  And during the interim when this interview was taking

21  place, did Mrs. Ramadan and the children -- were they allowed

22  free to go?

23  A.  At that time they were in the public terminal area

24  outside of the inspection area.

25  Q.  Okay.  From -- as best as you can estimate, from the

```
 1   time that Mr. Ramadan came into the conference until you

 2   finished up the conversation in the conference room,

 3   approximately how much time passed?

 4   A.   Approximately an hour.

 5   Q.   One hour?

 6   A.   One hour, yeah.

 7   Q.   When he was in the lobby area -- when he was initially

 8   brought to the lobby area he was not cuffed?

 9   A.   No.

10   Q.   Did anybody ever tell him that he was under arrest?

11   A.   No, I did not.

12   Q.   Did you ever see anybody mistreat him?

13   A.   No.

14   Q.   Anybody threaten him?

15   A.   No.

16   Q.   Now, did there come a point in time that you had an

17   opportunity to view some of the media images and videos that

18   were being reviewed by Officer Armentrout?

19   A.   Yes.

20   Q.   Okay.  And approximately how long of a period did that

21   take place?

22   A.   Approximately 30 minutes.

23   Q.   Okay.  And during that 30-minute time period, did you

24   find -- observe ISIS propaganda?

25   A.   Yes.
```

1   Q.   Guns?

2   A.   Yes.

3   Q.   Defendant with guns?

4   A.   Again, to specifically say that I saw a photo with him

5   with a gun, but I know other agents speaking of that they saw

6   him with a gun in the photos, yes.

7   Q.   So you had opportunity to talk amongst yourselves during

8   this half hour?

9   A.   Right.

10  Q.   And was there a photograph of a pipe bomb?

11  A.   What appeared to be, yes, a pipe bomb in the photo.

12  Q.   As an HSI investigator, are you aware of the laws

13  concerning material support with a foreign terrorist

14  organization?

15  A.   Yes.

16  Q.   Do you know is ISIS identified as one of those

17  organizations?

18  A.   Yes.

19  Q.   Hezbollah, Hamas?

20  A.   Yes.

21  Q.   Did there come a point in time that things were winding

22  down and you were going to ask Mr. Ramadan to show you where

23  that storage locker was?

24  A.   Yes, correct.

25  Q.   Can you explain where this took place and how that

1   conversation came about?

2   A.   In the same lobby area that he was brought to with the

3   seating.  We said that if he was willing to show us we would

4   travel with him to the storage locker that he said the guns

5   were stored at.

6   Q.   Okay.  And what was his response at that time?

7   A.   At that time he seemed hesitant, and then he said that

8   he had lied about where the guns were stored.

9   Q.   What story did he go with at this time?

10  A.   He changed his story and said that the guns were stored

11  with a friend.

12  Q.   Did you do follow-up questions?

13  A.   Yes, we did.

14  Q.   What kind of questions were asked, and what kind of

15  answers were given?

16  A.   We asked who the friend was, where did the friend live,

17  how were the guns stored with the friend.  And he said he did

18  not want to get the friend involved with law enforcement, so

19  he would not tell us the name of the friend.

20  Q.   Was there a concern whether his friend was a felon and

21  could lawfully possess those firearms?

22         MR. DENSEMO:  Objection; leading, suggests the

23  answer.

24         THE COURT:  Could you restate that question.  You

25  are talking about his friend was a felon?

1          MR. WATERSTREET:  Right.

2    BY MR. WATERSTREET:

3    Q.  Did you have concerns about whether his friend --

4          MR. DENSEMO:  Objection.  I have no objection to

5    the first part of the question.  The second part of the

6    question, which he suggests the answer, I do have an

7    objection to.

8          THE COURT:  Well, I have to hear the question.  Do

9    you have concerns --

10   BY MR. WATERSTREET:

11   Q.  About whether his friend -- the story he was giving, his

12   friend could lawfully even possess those firearms if his

13   story was true?

14   A.  Yes.

15   Q.  Okay.  And what were some of your concerns?

16   A.  Whether the friend was a felon, what his criminal

17   history may have been, other facts like that.

18   Q.  Did you challenge Mr. Ramadan about that?

19   A.  Yes.

20   Q.  Did he claim -- did he indicate whether his friend was

21   or was not a felon?

22   A.  He stated that his friend was not a felon.

23   Q.  Did you ask about the guns themselves; how they were

24   obtained, things of that nature?

25   A.  Yes, we did.

1    Q.   What answer did he give?

2    A.   He stated that they were legally purchased.

3    Q.   As you began to delve more and more on his new story,

4    did Mr. Ramadan's demeanor change in any way?

5    A.   Yes.

6    Q.   In what respect?

7    A.   Seemed to become agitated.  At one point rose up, stood

8    out of his chair, took an aggressive stance/posture towards

9    us, raised his voice, yelling.

10   Q.   What happened then?

11   A.   CBP Officer James Brown obviously told him to calm down,

12   and placed him in handcuffs at that time for officer safety

13   reasons.

14   Q.   Did there come a point in time that he calmed down?

15   A.   Yes.

16   Q.   Were those cuffs removed?

17   A.   He was placed in an interview room.  I didn't see the

18   cuffs removed but --

19   Q.   But there came a point in time that eventually he was

20   released at the end of the day?

21   A.   Correct, yes.

22   Q.   Defendant claims in his motion that he was assaulted.

23   Did you see him, other than the -- other than him being

24   cuffed, was there any other times that the agents you saw put

25   their hands on him?

```
1   A.   No.
2   Q.   He claims that he asked for a lawyer and you ignored his
3   request.
4   A.   No.
5   Q.   Did he -- first of all, did he ask for a lawyer?
6   A.   When I was present I didn't hear him ask for a lawyer,
7   no.
8   Q.   He's claimed in his motion that he asked that the
9   meeting be recorded, whatever meeting he had.  Did he do that
10  in your presence?
11  A.   No.
12  Q.   He also made a claim that money and jewelry and gold was
13  stolen from him.  Do you know anything about that?
14  A.   I do not.
15  Q.   Were you involved in that at all?
16  A.   I was not.
17  Q.   Did it take place?
18  A.   It did not take place, no.
19           MR. WATERSTREET:  One moment, Your Honor.
20           (An off-the-record discussion was held at
21           11:54 a.m.)
22           MR. WATERSTREET:  I have nothing further at this
23  time, Your Honor.
24           THE COURT:  Okay.  Cross-examination?
25
```

*Evidentiary Hearing • March 6, 2018*

**97**

```
 1                        CROSS-EXAMINATION
 2   BY MR. DENSEMO:
 3   Q.   Good morning still, Special Agent Kelley.  How are you?
 4   A.   Good morning.
 5   Q.   Agent Kelley, how long have you been in law enforcement?
 6   A.   16 years approximately.
 7   Q.   Where did you start out?
 8   A.   I was a Customs inspector in Detroit, Michigan.
 9   Q.   Okay.  How long did you do that?
10   A.   Approximately one year.
11   Q.   And after that you went to Homeland Security?
12   A.   At the time it was still called U.S. Customs Service,
13   but I was hired as a special agent with the U.S. Customs
14   Service.
15   Q.   Okay.  I take it you have investigated hundreds of
16   cases, thousands?
17   A.   Approximately hundreds you could say, yes.
18   Q.   Okay.  Those investigations take place at the airport,
19   Detroit Metro Airport?
20   A.   All of the investigations or --
21   Q.   Some of them?
22   A.   I was assigned to the airport for approximately six
23   months.  That was during -- this event occurred during that
24   time period.
25   Q.   Okay.  But that ordinarily wasn't your -- where -- your
```

1    stomping grounds?

2    A.   I was assigned there in March of that year -- of last

3    year.

4    Q.   Before that, you just moved all over Detroit metro area?

5    A.   I was assigned to the downtown Detroit office before

6    that.

7    Q.   How many interviews or interrogations or investigations

8    have you conducted in that secured area at the airport?  How

9    many people do you think you have interrogated or

10   interviewed?

11   A.   In the specific area or this specific room?

12   Q.   In that specific area.  You know what I'm talking about,

13   that secured area, the secondary inspection?

14   A.   Right.

15   Q.   Have you been there before?

16   A.   Yes.

17   Q.   How many times had you been there before?

18   A.   I couldn't answer how many times.

19   Q.   Several?

20   A.   There is another terminal airport, I've conducted

21   interviews over there also.

22   Q.   All right.

23   A.   As far as how many times in that terminal, in that area,

24   I couldn't answer.

25   Q.   More than four, five?

1    A.   I couldn't say in that specific area.

2    Q.   Why not, why can't you say, you don't know?

3    A.   Not very many.  I can't say the number.

4    Q.   Okay.  One or two?

5    A.   Possibly, approximately, yeah.

6    Q.   So you are not that familiar with the area such that

7    you --

8    A.   I've been through that, I work -- at the time I worked

9    at that terminal and the other terminal.

10   Q.   So you are at home, you are the duty officer on

11   August 15th, right?

12   A.   Correct.

13   Q.   And you are at home taking it easy, and you get a call

14   from Steigerwalt?

15   A.   I believe the officer's name was Salinas.

16   Q.   Salinas calls you?

17   A.   Correct.

18   Q.   And he says, Kelley, we need you to come to the airport?

19   A.   He doesn't word it like that, but he tells me what's

20   going on at the time with the inspection with what they have.

21   Q.   All right.

22   A.   And he gives me information.

23   Q.   And he says we've got -- we pulled a guy off of a plane

24   and we found some tactical equipment in his luggage, right?

25   A.   The main focus for me and when he told me what the --

1    what they had at the airport was the items in the luggage,

2    the tactical items.

3    Q.   Why was that of importance to you?

4    A.   Our agency investigates export violations, that's one of

5    the things we do involving the border, involving shipping

6    items out of the country, items coming into the country,

7    cargo.

8    Q.   Okay.  I apologize.  So the only information that you

9    had at that time about -- did you know his name?  Did they

10   tell you the passenger's name?

11   A.   I don't recall.

12   Q.   Did you record that phone call at all?

13   A.   No.

14   Q.   Do you know if the phone call was recorded by the person

15   on the other end?

16   A.   I do not.

17   Q.   Is that a policy to record calls between agents

18   regarding investigations?

19   A.   It is not policy.

20   Q.   Did -- so -- was the only information that you had at

21   that time was regarding export violations?

22   A.   He was travelling with his family.  I had a little more

23   information than just specific items.

24   Q.   What other information did you have?

25   A.   Traveling with his family outbound on a flight outbound

1    of the country.

2    Q.    Royal Jordanian Airlines?

3    A.    I'm not sure if he mentioned the flight.

4    Q.    Did they mention anything about media devices or

5    multiple media devices being confiscated?

6    A.    I don't recall at that time.

7    Q.    You don't recall.  So they could have?

8    A.    On that phone call I remember talking about the law

9    enforcement military items that he had in his luggage.

10   Q.    All right.  So it takes you an hour to drive from where

11   you are to the airport; is that right?

12   A.    Approximately.

13   Q.    Okay.  Do you know what time you got the call?

14   A.    Approximately 9:30.

15   Q.    9:30 p.m.?

16   A.    Yes.

17   Q.    And do you know how long the person had been detained,

18   did you ask that?

19   A.    No.

20   Q.    So 9:30 you get a call about an individual who is being

21   detained at the airport -- at about 9:30 p.m. you get a call

22   about an individual who is being detained at the airport

23   regarding tactical equipment found in their luggage; is that

24   right?

25   A.    I received a call, yes.  I don't remember if he used the

1    words detained.  We had someone in secondary inspection area

2    that was leaving the country.

3    Q.   Okay.  And when someone is being -- what word would you

4    use when you take somebody off of an airport [sic] and they

5    are taken to secondary inspection and they are not allowed to

6    leave, what word would you say -- what word --

7    A.   They are undergoing secondary inspecting.

8    Q.   Pardon me?

9    A.   They are undergoing secondary inspection at that time.

10   Q.   Okay.  And are you familiar with secondary inspection?

11   A.   Yes.

12   Q.   And what is the nature of secondary inspections?

13   A.   Referring to?

14   Q.   Referring to why, what gives you the authority -- what

15   gives -- what makes someone subject of a secondary

16   inspection?

17   A.   People that depart or are returning to the United

18   States, going to foreign, are subject to screening by

19   Customs, by Immigration.

20   Q.   At secondary inspection?

21   A.   There is an initial inspection.

22   Q.   Okay.

23   A.   And determines -- determined upon what happens during

24   that initial encounter, initial inspection, it is determined

25   whether the person is given entrance to the country or exit,

1    and then if there's further things that need to be

2    investigated, further facts that occur during that initial

3    screening secondary is where those things are looked into.

4    Q.   How does an individual get to secondary inspection?  Do

5    you go there -- are you given directions to go down to --

6    A.   It depends on where the situation is; the airport, the

7    border, land border.

8    Q.   Okay.  We are talking about the airport here.  An

9    individual at the airport there has been a determination made

10   that they are subject to secondary inspection, how do they

11   get -- how do you physically get to secondary inspection; are

12   you told to go there on your own or are you taken there by

13   agents?

14   A.   They are walked --

15           MR. WATERSTREET:  Your Honor, this is beyond the

16   scope of direct.

17           MR. DENSEMO:  This is cross-examination.

18           MR. WATERSTREET:  I understand it is

19   cross-examination, but we have been over this.

20           MR. DENSEMO:  We have not been over this.

21           MR. WATERSTREET:  Excuse me.

22           THE COURT:  Let him -- overruled.  Let him say what

23   he will say about how he got there.

24   BY MR. DENSEMO:

25   Q.   So the agents take you to secondary inspection; is that

1    right?

2    A.    I'm a HSI special agent.  The CBP officers determine the

3    best way -- the best route for a passenger to be taken from a

4    jet way to the secondary area from the inspection area.

5    Q.    So a CBP officer takes a passenger off of a plane to go

6    to secondary inspection, is that right, in this circumstance?

7          When a CBP officer -- do you have some problem --

8    if I'm saying something that's not right, Agent Kelley, just

9    tell me.  Let's --

10   A.    No, I'm --

11         THE COURT:  Counsel, let's move along.

12   A.    I'm listening.

13   BY MR. DENSEMO:

14   Q.    The CBP officer takes an individual off of a plane,

15   right, subject to secondary inspection.  Are you with me?

16   A.    Depends on the situation whether they need to be removed

17   from a plane or --

18   Q.    Let's say they have been -- their situation has dictated

19   that your officers believe they should be taken off of the

20   plane.  That's what we are talking about, right?

21         MR. WATERSTREET:  Your Honor, this witness did not

22   testify anything about --

23         MR. DENSEMO:  He --

24         MR. WATERSTREET:  -- being brought off of the plane

25   and coming down be to secondary.

1      THE COURT:  Sustained.

2   BY MR. DENSEMO:

3   Q.   Agent Kelley, in order to get into secondary inspection,

4   you need to be escorted by a CBP officer?

5      MR. WATERSTREET:  Objection, Your Honor; it is the

6   same question and area that the Court just sustained.

7      MR. DENSEMO:  It is not the same question, Your

8   Honor.  The prosecution doesn't want me to get into it

9   because it shows --

10      MR. WATERSTREET:  No, no.

11      MR. DENSEMO:  -- that this person --

12      MR. WATERSTREET:  No.

13      MR. DENSEMO:  Excuse me, Mr. Waterstreet, I wasn't

14   done.

15      THE COURT:  Hey, listen, stop.  Come on.  Stop.

16      MR. WATERSTREET:  Your Honor --

17      THE COURT:  I know exactly what you are going to.

18   Okay.  Your objection is?

19      MR. WATERSTREET:  I objected because the Court

20   sustained the very line of questioning previously.  It is

21   not -- it is not part of the direct of this witness, this

22   witness was not a witness to that of those events.  We have

23   already brought those witnesses to come before the Court, and

24   now Mr. Densemo is --

25      THE COURT:  Okay.  I sustain it in that this

1   witness did not see this.  You may lay a foundation as to

2   does he see it other times.  I mean, how does he know what

3   he's talking about here?

4          MR. DENSEMO:  Thank you, Your Honor.

5          THE COURT:  He hasn't said he escorts from the

6   plane.

7          MR. DENSEMO:  All right.  Thank you, Your Honor.

8   BY MR. DENSEMO:

9   Q.   Agent Kelley, you said that you are a Customs and Border

10  Patrol officer for ten years; is that right?

11  A.   I was a Customs inspector for approximately one year.

12  Q.   For about one year.  And did you say that you worked for

13  Customs and Border Patrol in some other capacity?

14  A.   At the time it was called U.S. Customs Service and I was

15  an inspector, which is basically the same position as a CBP

16  officer.

17  Q.   All right.  Did you ever have occasion to take

18  individuals off a plane or escort people off a plane?

19  A.   When I was assigned to that position I worked at the

20  land border.  I did not work at airport at the time.

21  Q.   So your answer is you've never taken anyone off of a

22  plane?

23  A.   In that position as CBP officer?

24  Q.   The question is, have you ever taken an individual off

25  of a plane as a U.S. agent?

```
1    A.   I can't recall.  I may have.  I don't know.

2    Q.   You may have?

3    A.   It has been 16 years.  I have taken -- I have had a lot

4    of situations occur.

5    Q.   Have you taken a lot of people off planes, is that what

6    you were about to say?

7    A.   No.  I have not take a lot of people off planes.

8    Q.   Some people off planes?

9              MR. WATERSTREET:  Your Honor --

10             THE COURT:  Yeah, let's move along, let's move

11   along.  Sustained.

12   BY MR. DENSEMO:

13   Q.   Agent Kelley, how did you get into the conference room?

14   A.   I walked into the conference room.

15   Q.   Did somebody open the door for you?

16   A.   I walked into the conference room.  I don't recall.

17   Q.   How did you get into the area leading into the

18   conference room; how did you get into the secured area?

19   A.   There's an access door for employees.

20   Q.   For employees.  And what did you use in order to open

21   that door?

22   A.   I have an ID, an airport ID badge that I use to go into

23   certain areas.

24   Q.   I'm sorry.

25   A.   To go into certain areas I use a badge at the time.
```

1   Q.   And that badge was necessary in order to open that door;

2   is that right?

3   A.   For me to get in the door, yes.  For that door that I

4   walked into, yes.

5   Q.   And once you got into the area, you walked -- you

6   walked -- did you walk directly into the lobby or did you go

7   into the conference room?

8   A.   The area outside of both of those areas.  There was some

9   counters set up, and I was in that area.

10  Q.   Pardon me?

11  A.   There are some counters set up in the area between the

12  lobby and the conference room, that's where I was initially

13  when I first arrived.

14  Q.   The counters where the computers are?

15  A.   No.  Across from the conference room there's an

16  inspection area.

17  Q.   And did you immediately approach Mrs. Ramadan and her

18  children?

19  A.   No.

20  Q.   What was the first thing that you did once you entered

21  the conference room area, the restricted area?

22  A.   I met with an FBI agent, I met with a CBP officer,

23  amongst other CBP officers that were in the area.

24  Q.   And did they tell you that they had examined

25  Mr. Ramadan's media?

1   A.   At that time I was looking at the luggage that was in

2   the area.

3   Q.   My question was:  Did the officers who were there, did

4   they ever indicate to you that we've looked at Mr. Ramadan's

5   media and there are some things on there that we are troubled

6   by?

7   A.   At that time I don't recall them telling me about the

8   media.

9   Q.   So you go in and you look at the luggage and the items

10  in the luggage; is that right?

11  A.   Initially, yes.

12  Q.   How long does that take?

13  A.   Approximately 10 to 15 minutes.

14  Q.   What do you do after you examine the items in the

15  luggage?

16  A.   I went to the conference room.

17  Q.   You went to the conference room?

18  A.   Yes.

19  Q.   Who was in the conference room?

20  A.   I walked into the conference room with FBI Agent Thomas

21  and CBP Officer Brown.

22  Q.   Had Brown and Thomas also been examining the contents of

23  the luggage?

24  A.   Yes.

25  Q.   With you?

1  A.   Yes.

2  Q.   And you all walked into the conference room together?

3  A.   It may have been a little apart, but for the most part,

4  yes.

5  Q.   Did you have any conversation while you were in the

6  conference room before Mr. Ramadan arrived?

7  A.   We were in there a very short time together before he

8  was in the room.  I don't recall conversations we had, no.

9  Q.   When you -- did you see Mr. Ramadan in another room as

10 you were going to the conference room?

11 A.   No.

12 Q.   Who brought Mr. Ramadan to the conference room where you

13 and the other agents were?

14 A.   He walked in with CBP officers into the conference room.

15 Q.   Would that have been Schmeltz and Armentrout?

16 A.   I don't know.

17 Q.   You don't know who they are, their names?

18 A.   I don't remember what officers walked in the room with

19 him, no.

20 Q.   What does Mr. Ramadan do once he gets to the conference

21 room where you are?

22 A.   Sit down at the table in the conference room.

23 Q.   So it was Mr. Ramadan -- were you seated at the desk or

24 was one of the -- was it Agent Brown?  Was Brown seated, you

25 seated or Thomas seated?

```
 1   A.   The three of us was seated along with CBP
 2   Officer Schmeltz.
 3   Q.   So there were four agents in the room, right?
 4   A.   Correct.
 5   Q.   And Mr. Ramadan enters.  He enters the room being
 6   escorted by two other agents; is that right?
 7   A.   CBP officers, uniformed officers.
 8   Q.   All right.  So you have Mr. Ramadan take a seat?
 9   A.   He took a seat, yes.
10   Q.   Were you armed at that time?
11   A.   Yes.
12   Q.   To your knowledge, do you know if the others officer
13   were armed as well?
14   A.   As part of their duty they would be armed.
15   Q.   Okay.
16   A.   I didn't see -- I can't say that I saw weapons or -- saw
17   their weapons.  I don't know.
18   Q.   Did you have handcuffs on you?
19   A.   I did, yes.
20   Q.   What other gear; did you have any batons or anything
21   like that?
22   A.   No.
23   Q.   Just your firearm and your handcuffs?
24   A.   And a badge on a chain.  It may have been under my
25   shirt.
```

1  Q.  Did you have any pepper spray or any other --

2  A.  I did not.

3  Q.  Nothing like that?

4  A.  I did not.

5  Q.  All right.  So Mr. Ramadan enters the room, and do you

6  introduce yourself?  Do you tell him who you are?

7  A.  Yes.

8  Q.  Do you introduce the other people in the room?

9  A.  Everyone introduced themselves.

10  Q.  Was there somebody that took the lead in the

11  interrogation of Mr. Ramadan?

12  A.  During the questioning we all had specific questions.

13  Did certain agents ask more questions than others, yes.

14  Q.  All right.  And you had specific -- you had specific

15  areas of interest based upon your role as the Homeland

16  Security officer; is that a fair statement?

17  A.  Yes.

18  Q.  And the FBI agents had specific areas of interest based

19  upon their area of interest as FBI agents?

20  A.  Yes.

21  Q.  And so it was with the other officers and agents in the

22  room; is that right?

23  A.  Yes.  We all have certain categories of investigations

24  that we do, yes.

25  Q.  Okay.  And you start off by asking Mr. Ramadan basic

1    questions about who he was, family -- his wife and children;

2    is that right?

3    A.   In that interview -- they may have been asked

4    previously.  I don't --

5    Q.   I'm saying your interview, did you?

6    A.   About a -- there could have been some questions about

7    the family, yeah, yeah.

8    Q.   All right.  Do you recall Mr. Ramadan indicating to you

9    that he was unemployed and had been so for several months?

10   A.   Yes, so that he was unemployed, yes.

11   Q.   Do you recall Mr. Ramadan answering the question stating

12   that he had previously been employed in various construction

13   jobs in the surrounding Metro Detroit area?

14   A.   Yes.

15   Q.   Do you recall Mr. Ramadan stating that his father sends

16   him money to help support his family?

17   A.   Yes.

18   Q.   Do you recall Mr. Ramadan telling you that he received

19   an insurance settlement from a motorcycle accident?

20   A.   Yes.

21   Q.   Do you recall him telling you that he doesn't take -- he

22   does not take any medication and he doesn't suffer from any

23   mental health issues?

24   A.   Yes.

25   Q.   Do you recall Mr. Ramadan being questioned about the

1    various pieces of tactical equipment in his luggage?

2    A.   Yes.

3    Q.   Did you ask those questions or did some other officers

4    ask those questions?

5    A.   I was involved in the questions.

6    Q.   That would have been your area of expertise, right?

7    A.   Expertise, I --

8    Q.   Well, your area of investigation.

9    A.   Sure.

10   Q.   And that's why you had been called, right?  You had

11   gotten a call about tactic equipment in a passenger's

12   luggage?

13   A.   Yes.

14   Q.   Export violations, correct?

15   A.   Possibly, yes.

16   Q.   Was that why you were there, or were you there for some

17   other reason?

18   A.   That's why I responded to the call, yes.

19   Q.   Okay.  For the export violations?

20   A.   Correct.

21   Q.   And do you recall the questions that you asked him about

22   these export violations?

23   A.   Yes.

24   Q.   What was the -- one of the questions that you asked

25   regarding the export violations?

*Evidentiary Hearing • March 6, 2018*

**115**

```
 1  A.   Was he aware that -- if he could take these items out of
 2  the country.
 3  Q.   Did he respond that he was unaware of that; is that
 4  correct?
 5  A.   Correct.
 6  Q.   And did you have another question following that?
 7  A.   I would have to lock at the report if you want to go
 8  question by question.
 9          MR. DENSEMO:  May I, Your Honor?
10          THE COURT:  You may.
11  BY MR. DENSEMO:
12  Q.   That is all I have on that.
13  A.   Okay.
14  Q.   Again, I'm just speaking about the export violations.
15  Do you recall the questions that you -- the series of
16  questions that you asked him about the export violations?
17  A.   Yes.
18  Q.   All right.  Do you recall the next question that you
19  asked Mr. Ramadan about the export violations, why he had the
20  items that he had?
21  A.   Yes.
22  Q.   Do you recall what he said?
23  A.   He was going to be a photojournalist overseas, and he
24  wanted to bring these items with him while he was carrying
25  out that activity.
```

1  Q.  All right.  And did you ask him any other -- did you ask

2  him a follow-up question to that once he told you that he

3  wanted to be a photojournalist?

4  A.  We had a discussion about, you know, why he was taking

5  the items out of the country, yes.

6  Q.  Why he was taking the items out of the country?

7  A.  Yes.

8  Q.  And he told you -- and what was his response to that?

9  A.  The same, that he was going to be a photojournalist

10  overseas.

11  Q.  Okay.

12  A.  That's why he brought the items.

13  Q.  How long did your questioning of Mr. Ramadan take, your

14  personal questioning of Mr. Ramadan?

15  A.  I was involved in the questioning the entire time.

16  Q.  All right.

17  A.  So --

18  Q.  When did the questioning turn from the export violations

19  to other subjects?

20  A.  During the interview.  I don't know specifically when

21  time-wise, I don't know.

22  Q.  But the first thing that you ask about was the reason

23  why you were called, the export violations; is that right?

24  Was that the first subject that was discussed?

25  A.  We went over the items first, yes.

```
 1   Q.   Okay.  So, yes, that was the first thing that was
 2   discussed, the export violations; is that right?
 3   A.   Right.
 4   Q.   And according to the report that I have, there was --
 5   questioning began about ISIS propaganda and soldier videos
 6   and pictures on his electronic media.  Do you recall those
 7   questions being directed toward Mr. Ramadan?
 8   A.   Yes.
 9   Q.   Do you know who's asking those questions?
10   A.   I was involved in those questions, FBI Agent Thomas
11   asked those questions as well.
12   Q.   All right.  So apparently FBI Agent Thomas had reviewed
13   electronic media in order to ask that question about
14   electronic -- about these propaganda videos and pictures --
15        MR. WATERSTREET:  Objection; speculation.
16   BY MR. DENSEMO:
17   Q.   -- being dis --
18        THE COURT:  Sustained.
19   BY MR. DENSEMO:
20   Q.   Agent Thomas asked Mr. Ramadan about ISIS propaganda and
21   soldier videos and pictures on his electronic media, correct?
22   A.   Yes.
23   Q.   Mr. Ramadan indicated in -- do you recall Agent Thomas
24   asking him why do you have this on your electronic media?
25   A.   Yes.
```

1    Q.   And do you recall Mr. Ramadan's statements, his answers?

2    A.   Yes.

3    Q.   What were his answers?

4    A.   He stated that he enjoyed watching the footage, combat

5    footage.

6    Q.   Okay.  And did you recall him saying it was also part of

7    his research as a photojournalist?

8    A.   Yes.

9    Q.   Do you recall him saying he also enjoyed watching

10   American military combat footage?

11   A.   Yes.

12   Q.   Do you recall Mr. Ramadan being asked if he supported

13   ISIS?

14   A.   Yes.

15   Q.   Do you recall Mr. Ramadan saying that he does support

16   their goal of establishing a caliphate and an Islamic state

17   but does not support their method of violence to achieve that

18   goal.  Do you recall that question and that answer?

19   A.   Yes, correct.

20   Q.   Do you recall Mr. Ramadan stating that he prefers and

21   supports a peaceful approach to converting nonbelievers into

22   the Muslim religion and/or forming an Islamic state?  Do you

23   recall him making that statement?

24   A.   Yes.

25   Q.   Do you recall either yourself or one of the other agents

1  telling Mr. Ramadan that the videos that he was watching, the

2  ISIS videos, were violent in nature?

3  A.   Yes.

4  Q.   And do you recall one of the agents asking how can you

5  support a peaceful -- how could you support -- I will just

6  read it.

7  A.   Uh-huh.

8       MR. WATERSTREET:  Your Honor, if counsel wants to

9  introduce the report, I have no objection.

10      MR. DENSEMO:  No, Your Honor.  I'm satisfied with

11  what I'm doing.

12      THE COURT:  All right.

13  BY MR. DENSEMO:

14  Q.   Do you recall the interviewing agents telling

15  Mr. Ramadan the video and images that he's watching

16  downloaded from the Internet were all violent and not

17  peaceful?

18  A.   Yes.

19  Q.   Do you recall Mr. Ramadan responding that he doesn't

20  support that aspect of ISIS?

21  A.   Yes.

22  Q.   Do you recall the agents, either yourself or one of the

23  other agents in the room, telling Mr. Ramadan that are

24  concerned about him viewing the ISIS -- viewing the ISIS

25  violent videos which could possibly lead to violence on his

1  part?

2  A.  Yes.

3  Q.  Do you recall Mr. Ramadan saying that he -- that he --

4  if he ever wanted to commit an attack, he certainly wouldn't

5  have to travel overseas to do it?

6  A.  Yes.

7  Q.  How long would you say that the questioning regarding

8  Mr. Ramadan's viewing of ISIS videos and this potential for

9  violence, how long would you say that those -- that

10  questioning lasted?

11  A.  I can't say specifically as the interview lasted

12  approximately an hour, that part of the interview, it was

13  part of that hour.

14  Q.  Okay.  And that part of the interview did not have

15  anything -- did not have anything to do -- was not directly

16  connected to the export violations; is that right?  Why do

17  you have these things?

18  A.  It could be connected, yes.

19  Q.  All right.  So the export violation dovetailed into an

20  investigation related to the material support for terrorism,

21  is that right, or was connected to?  Yes?  Was it?  Didn't

22  you just say they were?

23      MR. WATERSTREET:  Your Honor, can he just let him

24  answer the question?

25      THE COURT:  Let him answer the question.

*Evidentiary Hearing • March 6, 2018*

**121**

```
1    BY MR. DENSEMO:
2    Q.   Was it or wasn't it?
3    A.   The combination --
4              MR. WATERSTREET:  Go ahead.
5    A.   The combination of departing the country or attempting
6    to depart the country with these items and the media that
7    Mr. Ramadan had on his devices were of a concern both
8    together -- separately and together.
9    BY MR. DENSEMO:
10   Q.   So there was an investigation into the export violations
11   and to whether he may be guilty of materially supporting a
12   terrorist organization; is that correct?  There were two
13   investigations going on?
14   A.   As investigators we always run into lots of different
15   fact situations.  These were the facts that we were presented
16   at time, and so we questioned him according to what we had
17   discovered and learned before/during the interview.
18   Q.   So is the answer to my question yes, there were multiple
19   investigations going on?
20   A.   At the time there was an interview going on.
21   Q.   There was an interview --
22   A.   We were interviewing the -- Mr. Ramadan at the time.
23   Q.   And?
24   A.   And we were learning what he was telling us, we were
25   learning during the interview of what he was telling us.
```

1    Q.   And had Mr. Ramadan said I believe in ISIS, and I have

2    supplied money to ISIS, and I intend to assist ISIS in

3    whatever way I could during this course of this interview,

4    then you --

5              MR. WATERSTREET:  Objection.

6    BY MR. DENSEMO:

7    A.   -- would have had evidence that he was guilty of

8    material -- a material support to a terrorist organization,

9    is that right, if he had made those statements during that

10   interview?

11             MR. WATERSTREET:  Objection, Your Honor;

12   speculation.

13             MR. DENSEMO:  Your Honor, that's not speculation.

14   He can say.  I asked him a very specific question about that

15   interview.

16             THE COURT:  I don't think it is speculation, but he

17   didn't say that so where are we going with this?

18             MR. DENSEMO:  I'm trying to establish, Your Honor,

19   that, one, this was a multiple violation, not just for export

20   violations.

21             THE COURT:  It was an interview.  He said this all

22   came up in the interview.  So you are asking him what he

23   would do if, and that if never occurred, so it doesn't make

24   any difference.  It's not relevant.

25             MR. WATERSTREET:  Right.

```
 1            MR. DENSEMO:  I think that it is, Judge --
 2            MR. WATERSTREET:  Thank you, Your Honor.
 3            MR. DENSEMO:  -- because if he makes statement that
 4   he is guilty of a crime, then all types of constitutional
 5   safeguards are triggered, and that's what we are talking
 6   about, Judge.
 7            THE COURT:  But he did not say that he made a
 8   statement that he was guilty of a crime.
 9            MR. DENSEMO:  It is not the statement, Your Honor,
10   it is the context.  It is the environment within which that
11   statement could -- was made or could have been made --
12            THE COURT:  No.
13            MR. DENSEMO:  -- and what would have been the
14   result of that statement.
15            THE COURT:  The could have been made and the result
16   I will not allow.  Go ahead.
17   BY MR. DENSEMO:
18   Q.  But, Agent Kelley, the fact of the matter is that there
19   were four different agencies represented in that
20   interrogation room -- in that interview room; is that right?
21   A.  I don't think four is correct.
22   Q.  Homeland Security, FBI, Customs and Border Inspection.
23   Were there two Customs agents?
24   A.  It was CBP and FBI and HSI, which is Homeland Security,
25   my agency, so the three of us.
```

```
 1   Q.   All right.  After the conversation about ISIS, you
 2   recall questions being asked -- do you recall Mr. Ramadan
 3   being presented with a photograph obtained from his
 4   electronic media which depicted what appeared to be a crystal
 5   or glass colored floor tile or countertop, do you recall
 6   that?
 7   A.   Yes.
 8   Q.   Do you recall him being asked if he knew what the
 9   material was and where the photo was taken?
10   A.   Yes.
11   Q.   Do you recall him saying the items in the picture were
12   broken glass pieces piled up on the tile floor at his
13   residence in Israel?
14   A.   I just remember his residence.
15            MR. DENSEMO:  May I, Your Honor?
16            THE COURT:  Go ahead.
17   A.   Yes, Israel.
18   BY MR. DENSEMO:
19   Q.   Do you recall Mr. Ramadan then being shown a picture of
20   what appeared on an IED grenade made of a metal elbow joint
21   capped at both ends with a fuse extending from out of it?
22   A.   Yes.
23   Q.   Do you recall Mr. Ramadan being questioned about this
24   IED device?
25   A.   Yes.
```

*Evidentiary Hearing • March 6, 2018*

**125**

1   Q.   Do you recall Mr. Ramadan giving answers about this IED

2   device?

3   A.   Yes.

4   Q.   If that IED device is -- if you know, is such a device

5   illegal to possess?

6   A.   It depends on -- that specifically, I don't know.

7   Q.   Let me ask you this:  Is a pipe bomb illegal to possess

8   by U.S. citizens?

9   A.   I don't know.

10  Q.   You don't know if a pipe bomb is illegal?

11  A.   To have a bomb in your possession, yes, it's illegal,

12  yes.

13  Q.   And Mr. Ramadan was questioned about his possession of

14  this illegal device pictured on his electronic media; is that

15  right?

16  A.   Yes.

17  Q.   How long did the questioning about the IED or pipe bomb

18  last?

19  A.   Approximately 10 to 15 minutes.

20  Q.   Then you moved on to questions about firearms?  You and

21  your officers began asking Mr. Ramadan questions about

22  firearms; is that right?

23  A.   The specific order is that -- that's not true in a

24  specific order, but, yes, we asked questions about the

25  firearm.

```
1   Q.   Well, give me the specific order; what came first?

2   A.   Firearms were discussed at different points during the

3   interview; the beginning, the end.

4   Q.   Did Mr. Ramadan indicate to you that he legally had

5   purchased firearms?

6   A.   Yes.

7   Q.   Did you do any kind of check to see if that were true to

8   see if he had been lawfully issued a firearms permit by the

9   State of California?

10  A.   I did not, no.

11  Q.   How difficult would that have been to do since you had a

12  computer right in front of you and you were a

13  Homeland Security officer?

14  A.   How difficult?

15  Q.   Yes.

16  A.   I didn't have the computer that I could get access to in

17  this area.

18  Q.   Did you have a computer in front of you?

19  A.   At what time did I have a computer in front of me?

20  Q.   Pardon me?

21  A.   When did I have a computer in front of me?

22  Q.   Yes.  There is a computer in the conference room or the

23  interrogation or interview room where you interrogated

24  Mr. Ramadan, there's a computer right on the desk, isn't it?

25  A.   Okay.  Not on the table that I was seated at there was
```

```
 1    not a computer.
 2    Q.   Pardon me?
 3    A.   There was no computer at the desk I was sitting at.
 4    Q.   You were in the -- there was two interview rooms --
 5              MR. WATERSTREET:  Your Honor, I think counsel may
 6    be confused.  The interview was taken place in the conference
 7    room.
 8              THE COURT:  He may be.
 9              MR. DENSEMO:  Maybe.
10              THE COURT:  All right.  We are in the conference
11    room right now, not in the interview room.
12              MR. DENSEMO:  Thank you, Judge.
13    BY MR. DENSEMO:
14    Q.   So you're saying in the conference room where you were
15    there was no computer?
16    A.   In the entire room I'm not sure if there was a computer,
17    but at the table I was seated at there was no computer.
18    Q.   Okay, Agent Kelley.  So there may have been a computer
19    in the conference room?
20    A.   There may have been.
21    Q.   All right.  It would not have been to far away; the room
22    is not that big, is it?
23    A.   No.
24    Q.   So the computer -- the computer was accessible to you
25    and to the other agents in the room?
```

1    A.   Not to me.  It is a CBP computer, and I would not have

2    access to get on that computer.

3    Q.   And as a Homeland Security officer, you don't believe

4    that you would have had -- you would have been granted access

5    to the computer had you asked?

6    A.   There are computers that I can use in the various

7    terminals, not in that specific room.

8    Q.   So had you asked do you believe that they would have

9    denied you access to the computer?

10             MR. WATERSTREET:  Objection, Your Honor.

11             THE COURT:  Sustained.

12             MR. WATERSTREET:  Thank you.

13   BY MR. DENSEMO:

14   Q.   The conversation about firearms, how long did the

15   conversation about firearms last?

16   A.   As I said before, it was brought up at different times.

17   I can't say an exact time that we discussed firearms.

18   Q.   So you discussed firearms throughout the interview

19   interrogation?

20   A.   Well, we were supposed to leave near the end of the

21   interview, that came up then also, so different times in the

22   interview firearms came up, yes.

23   Q.   And is it your understanding that at the border

24   Mr. Ramadan does not have a right to an attorney when

25   questioned by agents like yourself; is that your

1    understanding?

2    A.   He needs to --

3    Q.   Is that your understanding, Agent Kelley?  It is a very

4    simple question.  Is it your understanding that Mr. Ramadan

5    doesn't have a right to an attorney when questioned at an

6    international border by agents like yourself?

7    A.   Yes.

8    Q.   And Mr. Ramadan was not free to leave that interview

9    until you and your officers were satisfied that he was free

10   to leave; is that right?

11   A.   Anyone entering the U.S. needs to -- is required to

12   complete inspection.

13   Q.   I'm not talking about generally, Agent Kelley.

14   A.   We need to complete the inspection.

15   Q.   I'm not -- pardon me.

16   A.   The inspection needed to be completed.

17   Q.   Must be completed?

18   A.   Correct.

19   Q.   And the person is not free to leave until you are

20   satisfied that your inspection has been completed; is that

21   right?

22   A.   The inspection needs to be completed.

23   Q.   Please answer my question, Agent Kelley.  I'm not

24   playing any games with you.

25             MR. WATERSTREET:  Your Honor, he has answered the

1    question.

2            MR. DENSEMO:  It is a simple yes or no question.

3    BY MR. DENSEMO:

4    Q.  The person isn't free to leave until you and your agents

5    come to the conclusion that your inspection has been

6    completed; is that right?  Yes?  Yes?

7    A.  Yes.

8    Q.  And you say it was Agent Brown who put handcuffs on

9    Mr. -- that you saw put handcuffs on Mr. Ramadan?

10   A.  Officer Brown.

11   Q.  Officer Brown?

12   A.  Correct.

13   Q.  You saw that?

14   A.  Yes.

15   Q.  And that was because Officer Brown felt that he had the

16   right to handcuff Mr. Ramadan for his safety and the safety

17   of the other officers?

18   A.  I can't speak for Officer Brown.

19   Q.  But Officer Brown put -- you saw Officer Brown put

20   handcuffs on Mr. Ramadan?

21   A.  Yes.

22   Q.  And you don't know when those handcuffs were taken off

23   because you didn't see it; is that right?

24   A.  Yes.

25   Q.  Do you know if Mr. Ramadan was handcuffed in the back or

1    the front?

2    A.   The back.

3    Q.   Were his arms raised high or were they kept in a

4    position near his hips?

5    A.   Everything I saw he was handcuffed with proper

6    procedures.

7    Q.   Did Mr. Ramadan complain about how the handcuffs were

8    placed on him?

9    A.   I did not hear Mr. Ramadan complain.

10   Q.   Did Mr. Ramadan ever ask you where his wife and children

11   were, or did you hear Mr. Ramadan ask where his wife and

12   children had been taken?

13   A.   I don't remember.

14   Q.   You don't remember or you don't know?

15   A.   I don't remember him asking that question.

16   Q.   Did you or any agents -- did you ever tell Mr. Ramadan

17   where his wife and children had been taken?

18   A.   I believe he was aware they were --

19   Q.   No, Agent Kelley.

20   A.   They were outside.

21   Q.   Did you tell him -- Agent Kelley, did you tell

22   Mr. Ramadan where his wife and children had been taken?

23   A.   I don't remember.

24   Q.   Do you recall hearing any other officers tell

25   Mr. Ramadan where his wife and children had been taken?

```
 1   A.   No.
 2   Q.   Did Mr. Ramadan ever express any concern to you about
 3   the welfare of his children?
 4   A.   I don't remember.
 5   Q.   So he may have but you don't recall?
 6   A.   Yes.
 7   Q.   Did you ever tell Mr. Ramadan that you had questioned
 8   his wife?
 9   A.   Yes.
10   Q.   Did Mr. Ramadan ask you how his wife was doing?
11   A.   I don't remember.
12   Q.   Did Mr. Ramadan ever ask you if his wife was upset or
13   afraid?
14   A.   I don't remember.
15   Q.   Did Mr. Ramadan ever ask you if his children appeared to
16   be upset or afraid?
17   A.   I don't remember.
18   Q.   Did you ever ask Mr. Ramadan for the passcodes to his
19   electronic devices?
20   A.   No.
21   Q.   Did any of the other agents in the room with you ever
22   ask Mr. Ramadan for the passcodes to his electronic devices?
23   A.   Yes.
24   Q.   What was Mr. Ramadan's response?
25   A.   He did not want to give the passcodes to the devices.
```

*Evidentiary Hearing • March 6, 2018*

133

```
 1   Q.   And what did the agents say when Mr. Ramadan said he did
 2   not want to give them the passcodes?  Did you or -- what did
 3   you say or what did you hear the other agents say in response
 4   to Mr. Ramadan's refusal to provide the passcodes?
 5   A.   I explained to him that as part of an inspection that
 6   all media, all of your luggage needs to be inspected upon
 7   entry and upon exit of the country.
 8   Q.   Did Mr. Ramadan indicate to you that he wanted some
 9   assurances that he would not be prosecuted if you found
10   anything on his electronic devices that shouldn't be there?
11   A.   It wasn't prosecuted, it was that a document stating
12   that what we found wouldn't be used against him.
13   Q.   And you are saying that Mr. Ramadan, during this whole
14   process with you, never indicated that he wanted to speak to
15   an attorney?
16   A.   No.
17   Q.   Did he ever say should I have an attorney?
18   A.   I don't recall.
19   Q.   So he may have but you don't remember?
20   A.   He never requested an attorney.
21   Q.   I didn't say requested an attorney.  I said spoke about
22   an attorney or he said should I have an attorney?
23   A.   I don't recall.
24   Q.   So he may have said something along those lines but you
25   don't recall; is that fair?
```

1   A.   Yes.

2   Q.   Did you or any other agents ever tell Mr. Ramadan that

3   this is an international border and you are not entitled to

4   an attorney?

5   A.   I don't recall saying that statement.

6   Q.   So you may have said it but you don't remember?

7   A.   I did not say that.

8   Q.   Do you recall other agents telling Mr. Ramadan that he

9   was at an international border and that he was not entitled

10  to an attorney?

11  A.   Not when I was present, no.

12  Q.   Do you recall you or any other agent saying to

13  Mr. Ramadan that since this is an international border, he

14  doesn't have any Fourth Amendment rights?

15  A.   No.

16  Q.   Did you ever hear any agent tell Mr. Ramadan that he

17  would be taken to Guantanamo Bay -- Guantanamo?

18  A.   No.

19  Q.   And you and the other agents were in the conference room

20  with Mr. Ramadan for approximately how long?

21  A.   Approximately an hour.

22  Q.   And he was in the lobby for -- where he has handcuffed,

23  how long was he in that area, if you know?

24  A.   Approximately 30 minutes.

25  Q.   Do you know when Mr. Ramadan was finally released?

```
 1    A.   I read that he was released at 4:00 a.m.
 2              MR. DENSEMO:  Give me one second, Your Honor.
 3              (An off-the-record discussion was held at
 4         12:40 p.m.)
 5              MR. DENSEMO:  I have just a couple questions,
 6    Judge, and I should be done.
 7    BY MR. DENSEMO:
 8    Q.   I just want to make clear, Agent Kelley, that when the
 9    CBP officers escorted Mr. Ramadan or brought Mr. Ramadan into
10    the conference room, these CBP officers were in full CBP
11    uniform; is that right?
12    A.   Yes.
13    Q.   And --
14    A.   There was -- there are some officers there that are not
15    in uniform, some CBP officers, that were in the area that
16    were present.
17    Q.   Was there also a uniformed presence in the lobby when
18    you got there?  Was there an officer in uniform who was
19    monitoring the lobby?
20    A.   Yes.
21    Q.   And you never gave Mr. Ramadan any Miranda warnings, did
22    you?
23    A.   No.
24    Q.   And you never saw or heard any other officers give
25    Mr. Ramadan for the entire time that he was with you folks?
```

```
 1   A.   When I was present, no.

 2             MR. DENSEMO:  I think we are done.

 3             THE COURT:  Redirect?

 4             MR. WATERSTREET:  Two quick areas.

 5                         REDIRECT EXAMINATION

 6   BY MR. WATERSTREET:

 7   Q.   So I'm clear here, after all the interviews were done,

 8   Mr. Ramadan was asked to show you where he had his firearms

 9   stored, correct?

10   A.   Yes.

11   Q.   And he told you he lied, and he said that his friend had

12   it?

13             MR. DENSEMO:  Objection, Your Honor; this line --

14             MR. WATERSTREET:  I'm just trying to get the timing

15   correct here.

16             THE COURT:  I think we have the timing.  Let's move

17   along.

18             MR. WATERSTREET:  Okay.

19   BY MR. WATERSTREET:

20   Q.   And then he became upset and had to be handcuffed --

21             MR. DENSEMO:  Objection, Your Honor; we have gone

22   over this.

23             THE COURT:  Sustained.

24             MR. WATERSTREET:  I'm setting the time frame.

25             THE COURT:  The time frame for what?
```

1          MR. WATERSTREET:  For my next question, Your Honor.

2  BY MR. WATERSTREET:

3  Q.  After he was cuffed, at that particular time was he

4  questioned any further?

5  A.  When I was present, no.

6  Q.  Okay.  Thank you.  We came a long way to get there,

7  Judge, my apologies.

8          THE COURT:  Quiet, please.

9  BY MR. WATERSTREET:

10  Q.  During cross-examination defense counsel was asking you

11  about some of the things the defendant specifically said;

12  that the agents were concerned because he had violent videos

13  that he may engage in violence as well?

14  A.  Correct.

15  Q.  Do you recall?

16  A.  Correct.

17  Q.  And that he said if he ever wanted to commit an attack

18  he certainly would not have to travel overseas to do it?

19  A.  Correct.

20  Q.  Okay.  And then he said he would do an attack in the

21  United States, and he said it would be easier to do an attack

22  here in the United States --

23          MR. DENSEMO:  Your Honor, that's a mischaracterize.

24  He didn't say he would do an attack in the United States.

25  The important question is if I were to.  He never said I

1   would do an attack.

2        MR. WATERSTREET:  I will give the report to him,

3   Your Honor.

4        THE COURT:  All right.

5   BY MR. WATERSTREET:

6   Q.  I will let you find that area in your report that we are

7   talking about.

8        MR. DENSEMO:  One, he hasn't asked him if his

9   memory needs to be refreshed before he showed him that, so

10  he's improperly refreshing the recollection of the witness

11  who hasn't said that he needed --

12       THE COURT:  What's the question on the floor?

13  What's the question?

14       MR. WATERSTREET:  The question is -- there was an

15  objection about the precise wording, and I was giving him the

16  report to get precise wording, Your Honor.

17  BY MR. WATERSTREET:

18  Q.  Did he indicate that it would be easier to do an attack

19  here in the United States than it would be to do an attack

20  overseas?

21  A.  Yes.

22  Q.  He said if the weapons were confiscated, he could simply

23  purchase more off the street here to use?

24  A.  Yes.

25  Q.  And, again, he said it would be easier to do it in the

1    U.S. than overseas?

2    A.   Yes.

3    Q.   And an attack in the U.S. would be viewed and praised as

4    a huge victory --

5              MR. DENSEMO:  Objection; is there a question?

6              THE COURT:  Pardon me?

7    BY MR. WATERSTREET:

8    Q.   -- for ISIS; is that what he said?

9              THE COURT:  Just a minute.

10             THE COURT REPORTER:  One at a time.

11   BY MR. WATERSTREET:

12   Q.   Did he also say an attack in the U.S. would be viewed

13   and praised as a huge victory by ISIS?

14   A.   Yes.

15   Q.   Did he also claim that the reason he would not do it in

16   Israel is because they retaliate against every member of his

17   family?

18   A.   Correct, yes.

19   Q.   But after all of that, he was still released at the end

20   of the day?

21   A.   Yes.

22             THE COURT:  Okay.  Anything else?

23             MR. MARTIN:  Your Honor, we have -- oh, I'm sorry.

24   Go ahead.

25             THE COURT:  Do not repeat.

1           MR. DENSEMO:  Okay.

2                    RECROSS-EXAMINATION

3   BY MR. DENSEMO:

4   Q.   Do you recall Mr. Ramadan telling you the reasons why he

5   had refused to give CBP officers his unlocked codes for his

6   phone was because --

7           MR. WATERSTREET:  Beyond the scope of redirect,

8   Your Honor.

9           MR. DENSEMO:  No.  I think he definitely went into

10  all of this, Your Honor.

11          MR. WATERSTREET:  No, I didn't.

12          THE COURT:  Wait a minute.

13          MR. WATERSTREET:  There are two areas I went into;

14  any statement he made after he was handcuffed.

15          THE COURT:  Right.

16          MR. WATERSTREET:  And the statements he made in

17  response to defense counsel's question about he was doing an

18  attack overseas.  I never talked anything about any

19  cellphones.  This is beyond the scope.  Thank you.

20          THE COURT:  Sustained.

21  BY MR. DENSEMO:

22  Q.   After Mr. Ramadan had been handcuffed for the second

23  time and you guys asked him why he refused to cooperate with

24  the CBP officers, do you recall him telling you because he

25  didn't like the way he had been treated by the CBP officers?

```
1   A.   Yes.
2   Q.   And these statements that Mr. Ramadan made about attacks
3   in the United States, would you agree with me that
4   Mr. Ramadan is saying to the officers in response that had I
5   wanted to commit an act in the United States -- had I wanted
6   to commit a terrorist act, it would have been easier for me
7   to do so here in the U.S. than overseas; isn't that the gist
8   of what he was saying?
9   A.   Yes.
10  Q.   Okay.  Thanks, Agent Kelley.  I appreciate it.
11  A.   Yes.  Thank you.
12          THE COURT:  All right.  Thank you.  You may step
13  down.
14          (Witness excused at 12:47 p.m.)
15          THE COURT:  Do you have another witness?
16          MR. MARTIN:  No more witnesses, Your Honor.  We do
17  have a couple documents we would like to introduce, and then
18  to play two videos.
19          THE COURT:  How long are the videos?
20          MR. DENSEMO:  I'm going to object to any videos
21  unless there is a witness that accompanies it.  They just
22  can't play a video.
23          MR. MARTIN:  Yes, we can.  The Rules of Evidence
24  don't apply in a suppression hearing.
25          THE COURT:  How long are the videos?
```

```
 1              MR. MARTIN:  Five minutes each maybe.
 2              MR. DENSEMO:  Your Honor, the Rules of Evidence may
 3   not apply insofar as hearsay is concerned, but you still need
 4   somebody to authenticate these videos.  You still need
 5   somebody to get the videos in.  Some kind -- I've never --
 6   the Rules of Evidence demand that there be some form of
 7   authentication in this case.
 8              THE COURT:  Well, I don't know how they are going
 9   to come in.  We will see.
10              MR. DENSEMO:  Well, they said they are just going
11   to play the video.  They need --
12              MR. MARTIN:  Right.  I was going to proffer the
13   videos.
14              THE COURT:  Just a minute.
15              MR. DENSEMO:  I'm sorry.  They need a witness at
16   the very least to say we extracted the video from this
17   device.  They just can't play a video.
18              THE COURT:  All right.
19              MR. MARTIN:  Your Honor, I can lay the foundation
20   with a proffer, and hearsay is allowed in a suppression
21   hearing.  I can have Agent Banach come up and say the videos
22   came from his electronic devices, his storage device that was
23   searched at the airport.  The videos speak for themselves.  I
24   mean, the defendant is in the video talking to the police
25   officer.  Okay.
```

```
1         THE COURT:  So I'm to going allow the videos.  You
2   may have a witness -- you may have the agent come up -- you
3   may have the agent come up and testify where they came from.
4   We have to have something to show where they came from.  We
5   will resume at ten minutes of 2:00.  We will go until 3:30
6   today, and then I have a sentencing, so we will have to break
7   until tomorrow.
8         MR. MARTIN:  Okay.
9         MR. WATERSTREET:  Thank you, Your Honor.
10         THE COURT REPORTER:  All rise.  Court is in recess.
11         (Court recessed at 12:51 p.m.)
12                    -   -   -
13         (Court reconvened at 1:55 p.m.; Court, Counsel and
14         all parties present.)
15         THE COURT:  All right.  The videos.
16         MR. MARTIN:  We are going to call Agent Banach to
17   the stand, Your Honor.
18         THE COURT:  Okay.
19         MS. FITZHARRIS:  Your Honor, before we proceed with
20   the videos, now that we understand what these videos are with
21   a little more specificity, I want to make our objection very
22   clear on the record.  Okay.  So I want to state our
23   objection.
24         THE COURT:  Why don't you come to the podium.
25         MS. FITZHARRIS:  Okay.  As far as we understand,
```

1    Your Honor, the videos the government hopes to introduce are

2    videos of traffic encounters with Mr. Ramadan that

3    Mr. Ramadan supposedly took himself on his personal

4    cellphone.  We object on the grounds of relevance.  We do not

5    think that these videos of traffic encounters are relevant at

6    all to decide whether this was -- the August 15th and 16th

7    environment was inherently coercive.  It is some very

8    different circumstances in a traffic encounter between a

9    room -- an interrogation room with multiple officers for

10   many, many hours.  These were brief encounters so we just

11   don't think they are probative at all of the issues this

12   Court needs to consider.

13        THE COURT:  All right.  The Court is allowing them,

14   so you may proceed with your witness.

15        MR. MARTIN:  Okay.  The government calls FBI

16   Special Agent David Banach.

17        THE COURT REPORTER:  Would you please raise your

18   right hand.

19        Do you solemnly swear or affirm that the testimony

20   you are about to give this Court will be the truth, the whole

21   truth, and nothing but the truth, so help you God?

22        SPECIAL AGENT BANACH:  I do.

23             SPECIAL AGENT DAVID BANACH,

24   called at about 1:57 p.m., was examined and testified on his

25   oath as follows:

```
1                        DIRECT EXAMINATION
2    BY MR. MARTIN:
3    Q.   Good afternoon, Agent Banach.
4    A.   Good afternoon.
5    Q.   Could you tell the Court where you work?
6    A.   For the FBI.
7    Q.   What is your title there?
8    A.   I'm a special agent.
9    Q.   And how long have you been a special agent?
10   A.   For approximately 13 years.
11   Q.   And are you assigned to the investigation of this case?
12   A.   Yes, I am.
13   Q.   And during the course of your investigation did you
14   become familiar with the two videos we have been talking
15   about?
16   A.   Yes, I did.
17   Q.   How did you become aware of those two videos?
18   A.   As part of the evidence review of Mr. Ramadan's media I
19   viewed a number of different photos and videos, and I came
20   across these two particular videos.
21   Q.   Do you recall which media the videos were on?
22   A.   Yes, it was a five-terabyte external hard drive.
23   Q.   And when you reviewed the videos, just generally what
24   did they show?
25   A.   They showed Mr. Ramadan in two different encounters with
```

1     local law enforcement agency during traffic stops.

2     Q.  And do you know when these videos were taken?

3     A.  Yes.  One was in May of 2017.  The other was in August

4     of 2017.

5     Q.  And did you obtain any records that would verify that

6     Mr. Ramadan had, in fact, traffic stops at that those?

7     A.  Yes.  I obtained the actual ticket citations from the

8     local law enforcement agency that corresponded with those

9     traffic stops.

10           MR. MARTIN:  Okay.  I'm going to refer to

11     Government's Exhibit S as the earlier of the two videos.

12     And, Your Honor, before we play Government's Exhibit S, I

13     think it might help the Court if I could either turn down or

14     dim the lights --

15           THE COURT:  Yes, we can do that.

16           MR. MARTIN:  -- that's just over the screen.  That

17     might be great.  So, Your Honor, at this time I move to admit

18     Government's Exhibit S, excuse me, and the other video I'm

19     going to mark as Government's Exhibit T.

20           THE COURT:  S is the May video?

21           MR. MARTIN:  I'm sorry, Your Honor.

22           THE COURT:  S is the May video?

23           MR. MARTIN:  Correct.

24           THE COURT:  Okay.  The Court will accept it, and

25     the objection is noted on the record.

```
1            MR. DENSEMO:  Thank you, Your Honor.
2            (Government's Exhibits S and T received into
3            evidence.)
4            MR. MARTIN:  Excuse me, Your Honor.  This is a
5   traffic stop so it begins as a normal encounter would with a
6   police officer coming to the vehicle, then it goes back to
7   his car, there is a long period of time -- I don't want to
8   say, but a significant period of time where it is just
9   Mr. Ramadan sitting in the vehicle waiting for the officer to
10  return.  The defense has indicated that they would like the
11  entire video played.  We were just going play the portion
12  where he interacts with the officer, but they would like the
13  entire thing played.
14           THE COURT:  Correct?
15           MR. DENSEMO:  That's correct, Your Honor.  If we
16  are going to play this thing, I would like the Court to see
17  the whole thing.
18           THE COURT:  Okay.
19           MR. MARTIN:  It does brighten up, Your Honor.  Can
20  Your Honor hear the audio?
21           THE COURT:  Yes.
22           (Exhibit S played for the Court.)
23  BY MR. MARTIN:
24  Q.  Agent Banach, do you see and recognize the defendant in
25  this video?
```

1  A.  Yes, I do.

2  Q.  Is he the one driving the vehicle?

3  A.  Yes, he is.

4       MR. MARTIN:  Your Honor, this video is in two

5  parts.  The file ends there, so now we are going to pick up

6  with the next file.

7       (Exhibit S played for the Court.)

8       MR. MARTIN:  All right.  Your Honor, we are going

9  to play Government's Exhibit T, which is the second video

10  from the second encounter.

11       THE COURT:  All right.

12       (Exhibit T played for the Court.)

13  BY MR. MARTIN:

14  Q.  Agent Banach, I'm going to show you what I have marked

15  as Government's Exhibit P and --

16       THE COURT:  Would you turn the lights back on,

17  please.

18  BY MR. MARTIN:

19  Q.  And do you recognize this document?

20  A.  Yes, I do.

21  Q.  What is it?

22  A.  This is a -- the booking history of -- from three

23  arrests associated with Mr. Ramadan between the years 2009

24  and 2015.

25  Q.  Did you obtain this document from another law

1      enforcement agency?

2      A.   Yes, I did.

3      Q.   Which one was that?

4      A.   The San Diego Police Department.

5               MR. MARTIN:  Your Honor, I move to admit

6      Government's Exhibit P.

7               MR. DENSEMO:  Objection, Your Honor; it is

8      irrelevant.

9               THE COURT:  What's the relevance?

10              MR. MARTIN:  Your Honor, one of the things you have

11     to look at under the voluntariness analysis is the totality

12     of the circumstances including his criminal history.  Is he a

13     person who is just -- this border interview was the first

14     time he has interacted with law enforcement officers, or is

15     he rather experienced?  And what this document will show is

16     not only has he been arrested, he certainly knows what

17     custody is because he's been in custody for several --

18              THE COURT:  The Court will overrule the objection

19     and take it.

20              MR. MARTIN:  Can he bring up Government's

21     Exhibit P?

22     BY MR. MARTIN:

23     Q.   Okay.  Let me just show you the top of Government's

24     Exhibit P, and on the left side of this document is what, the

25     left side under personal?

1    A.   It lists his last name, first name, middle name, date of

2    birth, age.

3    Q.   Biographical information?

4    A.   Biographical information, yes.

5    Q.   On the right side is what?

6    A.   The detail of the arrest, the arresting agency, the time

7    and date that he was arrested.

8    Q.   So in this instance he was arrested when?

9    A.   On October 22nd, 2015.

10   Q.   And he was booked at what time?

11   A.   Book time is 15:13 and 13 seconds.

12   Q.   And the field for jail is blank in this entry?

13   A.   Yes.

14   Q.   At the bottom it says release type?

15        MS. FITZHARRIS:  Objection, Your Honor; the

16   document speaks for itself and has been admitted.

17        MR. MARTIN:  I'm publishing the document.

18        THE COURT:  Yes, the document does speak for

19   itself, but I will allow you to do it because I can't read

20   that.

21        MR. MARTIN:  Well, I can give you a copy, Your

22   Honor, but it is very small print too.

23        THE COURT:  You may continue.

24        MR. MARTIN:  If you prefer to look at it on your

25   own, I am happy to move along.

1          THE COURT:  Well, it will be a document later, so

2    go ahead.

3          MR. MARTIN:  Okay.  Can we pan back out and just go

4    to the second entry?

5    BY MR. MARTIN:

6    Q.   So this has the same personal information on the left

7    side; is that correct?

8    A.   Yes.

9    Q.   And then on the right side when it details information

10   related to this arrest, what is the arrest date?

11   A.   January 16th, 2014.

12   Q.   And what is the booking time?

13   A.   8:48 and 19 seconds.

14   Q.   And how many days in custody does it indicate the

15   defendant was in custody for?

16   A.   A little over one day.

17   Q.   And then it says custody days, colon.  Do you see that?

18         MR. DENSEMO:  Objection; asked and answered.

19   A.   Custody -- I'm sorry.  Custody days, two.

20         MR. DENSEMO:  Objection.

21         THE COURT:  What?

22         MR. DENSEMO:  Objection, the question is asked and

23   answered, he said one day.  And as my colleague indicated,

24   the document speaks for itself.

25         MR. WATERSTREET:  Who is doing the objection?

 1            THE COURT:  Does the document say one day, Counsel,

 2   Mr. Martin?

 3            MR. MARTIN:  It says two days.

 4   A.   Two days.

 5            THE COURT:  All right.  Then it may be received.

 6            (Government's Exhibit P received into evidence.)

 7            MR. MARTIN:  Then if we could pan back out to the

 8   third entry.

 9   BY MR. MARTIN:

10   Q.   This arrest took place when?

11   A.   October 17th, 2009.

12   Q.   And it has a booking time indicating that he was booked?

13   A.   16:27 and 27 seconds.

14   Q.   How many custody days did he serve for this?

15   A.   Three.

16            MR. MARTIN:  Thank you.  Nothing more on

17   Government's Exhibit P.

18            THE COURT:  Anything else with this witness?

19            MR. MARTIN:  I have one more document, Your Honor.

20            THE COURT:  Okay.

21   BY MR. MARTIN:

22   Q.   I'm showing you what I have marked as Government's

23   Exhibit Q.  What is Government's Exhibit Q?

24   A.   This is a TECS report of Mr. Ramadan's travel history.

25   Q.   And what is a TECS report?

*Evidentiary Hearing • March 6, 2018*

1    A.   It is a query run through the TECS database, Treasury

2    Enforcement Communication System, and it lists the travel

3    history for Mr. Ramadan.

4    Q.   Travel history meaning his --

5    A.   Travel in and out.

6    Q.   -- travel in and out of the country?

7    A.   In and out of the country, yes.

8    Q.   Does it include entry and exit both on vehicle, on foot,

9    and by air?

10   A.   Yes, it does.

11   Q.   And where did you obtain this record?

12   A.   Through the TECS system.  We had an FBI analyst who has

13   access to the TECS database run this query.

14   Q.   These are the results?

15   A.   These are the results, yes.

16         MR. MARTIN:  I move to admit Government's Q, Your

17   Honor?

18         MR. DENSEMO:  Same objection, Your Honor; they are

19   not relevant.

20         THE COURT:  Overruled.  The Court will accept it.

21         (Government's Exhibit Q received into evidence.)

22         MR. MARTIN:  If we could bring up Government's

23   Exhibit Q, it also has very small print on.  I'm not going to

24   go through all of these entries.

25   BY MR. MARTIN:

*Evidentiary Hearing • March 6, 2018*

**154**

```
 1    Q.   But do you have a sense of how many times Mr. Ramadan
 2    has entered and exited the country according to this report?
 3    A.   Approximately 20 or so border crossings through a
 4    vehicle, and approximately five travel -- international
 5    travels through flights.
 6    Q.   And these records cover a period from 2009 to 2017; is
 7    that correct?
 8    A.   Yes.
 9              MR. MARTIN:  Nothing further on that, Your Honor.
10              THE COURT:  Okay.  Cross-examination?
11              MR. DENSEMO:  Thank you.
12                        CROSS-EXAMINATION
13    BY MR. DENSEMO:
14    Q.   Agent Banach, those records indicate Mr. Ramadan has had
15    police contacts in the past?
16    A.   Yes.
17    Q.   You have been an FBI agent for how long?
18    A.   A little over 13 years.
19    Q.   Okay.  Even if you have -- let's say you are questioning
20    an individual who has a criminal record, would that prevent
21    you from giving that person Miranda warnings where you
22    thought that Miranda warnings should have been given?
23              Does the fact that somebody has a criminal record
24    obviate the need, in your mind, to give Miranda warnings
25    where the situation calls for it?
```

1    MR. MARTIN:  Your Honor, I'm going to object

2  because this witness didn't have any dealings with the

3  interview at the border.  He's just --

4    THE COURT:  Overruled.  I will allow him to answer

5  the question.

6  BY MR. DENSEMO:

7  Q.  Agent Banach --

8  A.  Can you repeat it one more time?

9  Q.  In your experience as an FBI agent --

10  A.  Yes.

11  Q.  -- even if you have an individual with a criminal

12  record, would that obviate the need to give Miranda warnings

13  where you believed Miranda warnings should be given?

14  A.  No.

15  Q.  So the fact of a criminal record does not suspend

16  Miranda warnings, does it?

17  A.  No.

18  Q.  Does the fact that somebody has crossed the border

19  frequently, would you, in your opinion, does that suspend

20  Miranda or the Fourth Amendment?

21  A.  No.

22  Q.  And just so the record is clear, in the videos that we

23  just saw, there were -- when the -- the first stop for --

24  A.  Yes.

25  Q.  -- Mr. Ramadan, there was a period between the time that

1    the officer first came to his window and reappeared at

2    Mr. Ramadan's window?

3    A.   Yes.

4    Q.   The dead time.

5    A.   Yes.

6    Q.   Would you agree during that period of time Mr. Ramadan

7    pretty much sat in his car patiently waiting for the officer

8    to return?

9    A.   Yes.

10   Q.   And in the second video, would you agree that during the

11   dead time it showed Mr. Ramadan sitting in his car waiting

12   for the officer to return?

13   A.   Yes.

14   Q.   And the video shows Mr. Ramadan, in both videos,

15   becoming upset upon the officer's return and not getting the

16   responses from the officers that he wanted?

17   A.   Yes.

18   Q.   In fact, he was ticketed and didn't believe he should be

19   ticketed?

20   A.   Yes.

21   Q.   And that's when he became vulgar and -- or used vulgar

22   language toward the officers; is that your view of what you

23   saw in the video?

24   A.   Yes.

25   Q.   All right.  And when did you see these videos?

1    A.   I can't say specifically the first time, it has been

2    within the last number of months.

3    Q.   When was this case first given to you, Special

4    Agent Banach?

5    A.   On August 16th, the day after.

6    Q.   The day after --

7    A.   Yeah.

8    Q.   -- Mr. Ramadan was questioned?

9    A.   Uh-huh.  That's when I was made aware of the situation,

10   and I was assigned to this matter.

11   Q.   And you have been the case agent every since?

12   A.   I have been one of the case agents, yes.

13   Q.   All right.  Thank you, Agent.  Pleasure.  Appreciate it.

14        Oh, wait a minute, Judge.  I'm sorry.

15        (An off-the-record discussion was held at

16        2:32 p.m.)

17   BY MR. DENSEMO:

18   Q.   Agent Banach, were you aware that Mr. Ramadan had been

19   interviewed on August 15th?

20   A.   Yes.

21   Q.   Okay.  Did you make a request for a videotape of that

22   interview if one existed?

23   A.   No.

24   Q.   Okay.  Can you tell me why not?

25   A.   I did not know that the video was recorded.

1    Q.   Okay.  And no one ever made -- none of the other agents

2    or any member of the airport ever advised you of any

3    recording of that video?

4    A.   Not until months later did we know that it was -- they

5    do record, and that the retention period was only seven days.

6    Q.   And by that time, it was too late to obtain a copy of it

7    and give it to defense?

8    A.   Yes.

9         MR. DENSEMO:  All right.  Thanks, Agent Banach.

10                        REDIRECT EXAMINATION

11   BY MR. MARTIN:

12   Q.   Agent Banach, when you are referring to they record, you

13   are referring to the Wayne County Airport Authority --

14   A.   That's correct.

15   Q.   -- is that correct?

16   A.   Yeah, that's correct.

17   Q.   Not the Customs and Border Protection?

18   A.   That's correct.

19        MR. MARTIN:  Thank you.  Nothing further, Your

20   Honor.

21                        RECROSS-EXAMINATION

22   BY MR. DENSEMO:

23   Q.   Agent Banach, the recording equipment is in the

24   interview area where Mr. Ramadan was; is that right?

25   A.   It is in the room but -- the cameras are in the room

*Evidentiary Hearing • March 6, 2018*

1    but --

2    Q.   I'm sorry.  Go ahead, Agent Banach.

3    A.   But my understanding is it is controlled by the Wayne

4    County Airport Authority.

5    Q.   Okay.  But the cameras are in the

6    interview/interrogation rooms where the secondary inspections

7    are conducted?

8    A.   Yes.

9    Q.   You never spoke to any of the agents about the recording

10   equipment at all?

11   A.   Not until after the request was made several months

12   later to see if there was a recording.

13          MR. DENSEMO:  All right.  Thank you, sir.

14          (An off-the-record discussion was held at

15          2:34 p.m.)

16          THE COURT:  Do you know if that recording records

17   continuously so do you know that there was a recording of

18   this before it was erased?

19   A.   At the time I did not know that they recorded any.  My

20   understanding is that it is a continuous recording for a

21   period of seven days.

22          MR. MARTIN:  Your Honor, we supplied an affidavit

23   from the Wayne County Airport Authority describing the

24   recording policies and procedures, and that was attached to

25   our response to their motion to dismiss the indictment for

1       failure to preserve the recorded video.

2               THE COURT:  Thank you.

3               MR. DENSEMO:  Just one second, Your Honor.  I'm

4       having my colleague write down the specific questions that

5       she wants me to ask the agent so we can be clear about what

6       we want.

7               Judge, you have a sentencing at 3:30?

8               THE COURT:  It is actually 3:00, but I'm going to

9       try to let you go on unless you can complete it.

10              MR. DENSEMO:  I think we are about done with this

11      witness.

12              THE COURT:  Okay.

13      BY MR. DENSEMO:

14      Q.   Agent Banach, did you use the statements made by

15      Mr. Ramadan during the interview in your request for a

16      warrant?

17      A.   I did not request the warrant.

18      Q.   Do you know if Ramadan's statements were included in

19      that warrant?

20      A.   Part of his statements --

21      Q.   Some of his statements?

22      A.   -- were included, yes.

23      Q.   Who prepared the warrant in this case, if you know?

24      A.   One warrant was -- Jonathan Brand was the --

25      Q.   And would it be fair to say that that warrant was

1    prepared --

2    A.   I'm sorry.  The first warrant was Ryan -- Agent Ryan

3    Schanberger.

4    Q.   And was Schanberger's warrant -- request for warrant

5    prepared within seven days of the --

6    A.   It was sworn out on August 23rd.

7    Q.   Okay.  And, again, you used statements -- some of the

8    statements from the Ramadan interview in the warrant; is that

9    correct?

10   A.   Some of his statements, yes.

11   Q.   And your office thought that this might be a terrorism

12   case?

13   A.   Yes.

14   Q.   But no one thought to ask for video of the interview of

15   Mr. Ramadan?

16   A.   No.

17            MR. DENSEMO:  I don't think we have anything

18   further, Your Honor.

19            MR. MARTIN:  Nothing, Your Honor.

20            THE COURT:  All right.  You may step down, agent.

21            (Witness excused at 2:37 p.m.)

22            THE COURT:  Does the government have anything else?

23            MR. MARTIN:  We have no other witnesses, documents,

24   or evidence.

25            MR. DENSEMO:  Your Honor, we thought that the

1    government was going to make available FBI Agent Thomas and

2    CBP Officer Brown.  We would like to have both of those

3    officers available for questioning tomorrow -- tomorrow

4    morning.

5         We do anticipate calling Mr. Ramadan as well.  We

6    have not had an opportunity to go over his direct testimony

7    for tomorrow.  We attempted to do so last Thursday but

8    unfortunately the facilities wasn't available to

9    Ms. Fitzharris and myself so we were turned away.  We asked

10   that he be brought to Dickerson so we could see him

11   yesterday, on Monday.  Unfortunately, the marshals weren't

12   able to accommodate that as well.  We do anticipate being

13   able to see him this evening and being able to go forward

14   with his direct testimony tomorrow midday hopefully.

15        But we would like to have Special Agent Thomas and

16   CBP Officer Brown brought to court tomorrow so we can

17   question them.

18        MR. MARTIN:  We object, Your Honor.  This is the

19   first time the defense has ever requested specific witnesses

20   to be here, so they are not prepared to be here.  I don't

21   even know what they are doing tomorrow.  I don't know where

22   they are right now.

23        Second of all, if they wanted to call government

24   witnesses, they know there is a process they have to follow

25   in order to do that, and then the agencies get to weigh in on

1     whether that request should be denied.

2          And frankly, you know, we've had a lot of testimony

3     so far.  There has been no testimony from any witness about

4     assaults or beatings or any of the types of things that they

5     alleged, or stealing money, or stealing gold bars, whatever

6     it was, that they have alleged in their motion.  This is

7     just -- at this point it is a fishing expedition by them to

8     drag this out.

9          If Mr. Ramadan, if they have evidence of coercion,

10    Mr. Ramadan is the -- can present it by testifying.  That's

11    what I would suggest we move to.  The government has

12    presented its witnesses, they have cross-examined those

13    witnesses.  None of the type of coercive conduct that they

14    were alleging has come out, and now it is time to finish this

15    evidentiary hearing rather than to wait at the last minute

16    and say we want this government witness and this person and

17    this person.

18          MR. DENSEMO:  Your Honor, contrary to what the

19    government believes coercion is, coercion does not have to be

20    a punch in the face.  Coercion does not have to be sticking

21    someone's head in that bucket of water.  There are other

22    forms of coercion that human beings are just as susceptible

23    to.  And not everybody who was in the room with Mr. Ramadan

24    has testified.  We know --

25          THE COURT:  Okay.  Well, this hearing was adjourned

 1   for over a month.  I mean, why are we just now tonight

 2   getting this request for these witnesses?

 3         MR. DENSEMO:  We were under the impression that all

 4   the witnesses who were involved in the interview and

 5   interrogation of Mr. Ramadan would be called as witnesses.

 6   That's what we were led to believe in this case.  We were --

 7         THE COURT:  Did they tell you they were calling all

 8   of the witnesses or did you just assume this?

 9         MR. DENSEMO:  We were told that all of the

10   witnesses that were involved in the interrogation with

11   Mr. Ramadan would be called as witnesses.

12         THE COURT:  Well, I think that you made a big

13   mistake.  I think you made a big mistake because you need --

14   I mean, I would like to see these witnesses here because I

15   would like this to be complete and not come back for the

16   witnesses not being here, but how does the government know at

17   this point if the witnesses are available?  I'm not

18   adjourning this again.

19         MR. DENSEMO:  The government has picked the

20   specific witnesses they wanted to call.

21         THE COURT:  As they can, that's part of the trial

22   process.

23         MR. DENSEMO:  But we were led to believe that all

24   of the people who were involved in the interrogation of

25   Mr. Ramadan would be called as witnesses, Your Honor.  We

```
 1     were told at least five agents would be called to testify in
 2     this case.  Three have testified -- three or four.  Is it
 3     three?
 4               MR. WATERSTREET:  Your Honor, I never told defense
 5     counsel that every single witness involved would be
 6     testifying in this case.
 7               THE COURT:  You have told him that?
 8               MR. WATERSTREET:  I have not.  I did not tell him
 9     that.
10               MR. DENSEMO:  Your Honor --
11               MR. WATERSTREET:  I did not tell him that every
12     single witness involved in this matter would testify in this
13     case.
14               MR. DENSEMO:  No, not every witness, because there
15     are like 20 people involved in this investigation, so the
16     government never said that everyone who ever looked at the
17     suitcase, anyone who helped get the suitcase out of the
18     airplane would be testifying.
19               THE COURT:  Well, okay.
20               MR. DENSEMO:  But what we -- we were led to believe
21     that everyone in that room -- every agent who questioned
22     Mr. Ramadan who had the potentiality of coercing Mr. Ramadan,
23     putting their hands on Mr. Ramadan would be called to testify
24     in this case.  And we demand our ability to cross-examine or
25     direct examine --
```

1   THE COURT:  I don't want to hear any more.  I

2   understand where you are going.  And I am going --

3   MR. WATERSTREET:  Your Honor --

4   THE COURT:  No.  I'm going to ask you to get these

5   witnesses in tomorrow morning, if you can.  I know it is

6   late.  There may be a reason why they can't testify, and I

7   will hear it, but I want you to try and get them in so we can

8   conclude this matter.

9   MR. WATERSTREET:  I understand that, Your Honor.

10  We will contact their agencies.  I know that there are

11  certain provisions that defense has to follow in order for

12  them to be subpoenaed to be here.  As the Court mentioned, we

13  had a month to do that.  I don't know why --

14  THE COURT:  I understand that.  But what I'm trying

15  to do is get to the bottom line and have all the witnesses,

16  so whatever, it is on the record for purposes of the decision

17  I make and for purposes of appeal by either side.

18  Okay.  We will resume -- let me just take a look at

19  tomorrow's schedule -- at 9:30 tomorrow morning.

20  MR. DENSEMO:  Thank you, Your Honor.

21  THE COURT:  Thank you.

22  MS. FITZHARRIS:  One last thing, Your Honor.

23  Mr. Ramadan has requested the assistance of an interpreter

24  for his testimony tomorrow.

25  THE COURT:  Why?  He seemed to understand

*Evidentiary Hearing • March 6, 2018*

**167**

1   everything in the video.

2         MS. FITZHARRIS:  It is very different to testify in

3   court.

4         THE COURT:  So you are asking today?  Now we have

5   to get an interpreter.  I mean, what is going on with the

6   defense here?  This is last minute.

7         MR. DENSEMO:  Your Honor, we will contact an

8   interpreter, a private interpreter and have them here, if the

9   Court -- if the Court is unavailable to supply one.

10        THE COURT:  You can't do that.  No, you can't do

11  that.  We have to have a court interpreter if you are

12  requiring an interpreter.

13        MR. DENSEMO:  We will contact Court Services and

14  see if we can't have an Arabic interpreter here tomorrow.

15        THE COURT:  Thank you.

16        THE LAW CLERK:  All rise.  Court is adjourned.

17        (Proceedings concluded at 2:45 p.m.)

18                        _   _   _

19

20

21

22

23

24

25

*CERTIFICATION*

      I, Robert L. Smith, Official Court Reporter of the United States District Court, Eastern District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing pages comprise a full, true and correct transcript taken in the matter of U.S.A. vs. Ramadan, Case No. 17-20595, on Tuesday, March 6, 2018.


                                          _____
                                          Robert L. Smith, RPR, CSR 5098
                                          Federal Official Court Reporter
                                          United States District Court
                                          Eastern District of Michigan



Date:  04/09/2018

Detroit, Michigan