```
 1                 IN THE UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3    UNITED STATES OF AMERICA,      )
                                     )
 4    -vs-                           )      Criminal Case No.
                                     )
 5    YOUSEF MOHAMMAD RAMADAN,       )      2:17-cr-20595-MOB-EAS
                                     )
 6                 Defendant.        )
      _____

 7

 8                            MOTION HEARINGS
                 BEFORE THE HONORABLE MARIANNE O. BATTANI
 9                   UNITED STATES DISTRICT JUDGE
             Detroit, Michigan - Wednesday, April 18, 2018
10

11    APPEARANCES:

12    FOR THE GOVERNMENT:     RONALD W. WATERSTREET, ESQ. and
                              MICHAEL M. MARTIN, ESQ.
13                            United States Attorney's Office
                              211 W. Fort Street, Suite 2001
14                            Detroit, Michigan 48226
                              (313) 226-9100
15
      FOR THE DEFENDANT:      ANDREW DENSEMO, ESQ. and
16                            COLLEEN P. FITZHARRIS, ESQ.
                              Federal Defender Office
17                            613 Abbott, 5th Floor
                              Detroit, Michigan 48226
18                            (313) 967-5555

19    ALSO PRESENT    :       SEREEN KISHMISH,
                              Arabic Intepreter
20

21    REPORTED BY:            Darlene May, CSR, RPR, CRR, RMR
                              231 W. Lafayette Boulevard
22                            Detroit, Michigan 48226
                              (313) 234-2605
23

24    (Proceedings reported by mechanical stenography.  Transcript
       produced by computer.)
25
```

# TABLE OF CONTENTS

PROCEEDINGS:                                              PAGE:

  Appearances                                              3

  Preliminary Matters before Hearing                       4

  Hearing

    Argument by Ms. Fitzharris                           9

    Response by Mr. Martin                              27

    Reply by Ms. Fitzharris                             49

    Response by Mr. Martin                              62

  Court's Findings                                         67

  Court Reporter's Certificate                            75


EXHIBITS:

    (None offered)

1          Wednesday, April 18, 2018

2          2:10 p.m.

3                    -- --- --

4          THE CLERK OF THE COURT:  Please rise.

5          The United States District Court for the Eastern

6    District of Michigan is now in session.  The Honorable Marianne

7    O. Battani presiding.

8          You may be seated.

9          Calling case number 17-20595, the United States *v.*

10   Yousef Ramadan.

11         THE COURT:  Okay.  Counsel, may I have your

12   appearances, please.

13         MR. MARTIN:  Good afternoon, Your Honor.  Michael

14   Martin and Ronald Waterstreet on behalf of the government.  And

15   with us today is the case agent, FBI Special Agent David

16   Banach.

17         THE COURT:  Thank you.

18         MS. FITZHARRIS:  Good afternoon.  Colleen Fitzharris

19   and Andrew Densemo on behalf of Yousef Ramadan, who is being

20   assisted by an Arabic speaking interpreter.

21         THE COURT:  Okay.  Would you swear in the interpreter,

22   please.

23         THE CLERK OF THE COURT:  Do you solemnly swear that

24   you will interpret accurately and completely from the Arabic

25   language to the English language and English to Arabic using

4

1  your best skill and judgment?

2          THE INTERPRETER:  I do.

3          THE COURT:  All right.  We have a number of motions

4  here.  Do you want them in any particular order, counsel?

5          MS. FITZHARRIS:  Unless Your Honor has a preference of

6  what we would like to address first, I ...

7          THE COURT:  No.  We don't care.

8          Mr. Waterstreet?

9          MR. MARTIN:  Your Honor, I was going to suggest a

10 particular order, because I think it would help narrow down

11 what needs to be decided.  I did prepare a document that -- in

12 which the order that I would propose them to be heard in.  If I

13 could just pass that up to the Court?

14          THE COURT:  Okay.

15      (Document passed.)

16          MR. MARTIN:  And what I have done is I've labeled each

17 of the five motions that you requested a hearing on today, one,

18 two, three, four and five.  And then underneath one and two I

19 have actually listed the discovery that the defendant is

20 requesting with respect to that particular motion.

21          THE COURT:  All right.

22          MR. MARTIN:  And then at the bottom of the page I've

23 indicated that -- there's two motions that aren't on the list

24 for today that ultimately must be decided by this Court at some

25 point.  And I think resolution of the first two become moot, if

1   the bottom two are decided.  And I've italicized the defense

2   motion to dismiss for destruction of video evidence.  And then

3   I've italicized what evidence would become moot at that point.

4   And then I have underlined the defense motion to suppress

5   evidence in violation of the Fourth Amendment.

6           That -- deciding that would then moot several others

7   as well.  So most of one and two will become moot if the

8   decision on those bottom two motions is ruled in favor of the

9   government.

10           I know we've had oral argument.

11           THE COURT:  We've already done this.

12           MR. MARTIN:  We've had oral argument on the Fourth

13   Amendment issue already.  We have not had argument on the

14   motion to dismiss for destruction of video evidence.

15           So when we first began the suppression hearing in

16   January, at that time I asked the Court to rule on the Fourth

17   Amendment issue because the undisputed facts were that the

18   search took place at the border and as a legal matter, no

19   warrant was required.  We went ahead with the evidentiary

20   hearing on that issue because we already had the witnesses

21   there and Your Honor said, you know, they're here.  I've got

22   time.  Let's just go ahead and do it.

23           And that made a lot of sense.  But now the parties are

24   litigating discovery related to whether the agents had probable

25   cause or reasonable suspicion.

1          THE COURT:  Okay.

2          MR. MARTIN:  And I think resolving that motion could

3    save us a lot of time.

4          MS. FITZHARRIS:  We would disagree with the government

5    that now is the appropriate time to resolve those issues.  The

6    issue is the Fourth Amendment and what level of suspicion is

7    required to search digital devices, if any, is a hot topic.

8    And I think Mr. Ramadan has a right to develop the record on

9    what facts the government had before it chose to search his

10   digital devices so that the record is complete when this Court

11   is confronted with that legal question and for the court of

12   appeals.

13          I mean, because, hopefully, we don't have to go back

14   and forth between here and the court of appeals if the Supreme

15   Court or Sixth Circuit ultimately decides that some level of

16   suspicion is required.

17          I think Mr. Ramadan should be entitled to have a

18   complete hearing on the circumstances leading to the search of

19   his devices.  So we object to that at this time.

20          THE COURT:  The Court is not going to rule on that at

21   this time but will do it in a written opinion at the time we

22   make ruling on all the other issues in this case so that

23   everything that is done -- that goes to the court of appeals,

24   goes to the court of appeals.

25          MS. FITZHARRIS:  Okay.

1    THE COURT:  But the motion to dismiss for destruction

2  of video evidence, that's kind of -- you have that also in your

3  other motions somewhere.

4    MS. FITZHARRIS:  Yes.  So this is still -- you know,

5  frankly, a lot of things are going on in this case.  It's kind

6  of been a moving target as we learn new information,

7  particularly information about evidence that has been

8  destroyed.  And so we have supplemented our briefing as we

9  learn new evidence, as we learn about nondisclosures and as

10 we've learn about additional destruction.

11   There is the affidavit of Ms. Steed (ph).  I think --

12 in my most recent filing, I do think that there is sufficient

13 evidence to show that the federal government had control over

14 the video recording commitment -- equipment in the rooms where

15 Mr. Ramadan was interrogated.

16   You know, this is government property.  In order to

17 access it, you need to get permission from CBP, not from the

18 Wayne County Port Authority.  There are indications of federal

19 government authority all over the room.

20   As Agent Kelly testified, even to get on the computer

21 you have to have a specific federal government ID.  And so I

22 think to say the government had no responsibility to preserve

23 this evidence, particularly when Mr. Ramadan's statements were

24 included in the application for a search warrant of the storage

25 unit it is a little -- it doesn't make sense.  Particularly,

```
1    when the federal government had so much control and access over

2    the room where the interrogation took place.

3           The issues related to the destruction of Officer

4    Armentrout's notes, those -- those we have to discuss as well.

5    And there was some testimony by Officer Schmeltz that he

6    usually destroys -- shreds notes after he writes a report.

7           We -- that is why we have requested the evidence

8    retention policies for CBP and also --

9           THE COURT:  Why don't we stop there.  Because you're

10   going into all of these, and I'll take them in order.

11          MS. FITZHARRIS:  Sure.

12          THE COURT:  I'll take them in the that they're on

13   here.  So, 50, first.

14          MS. FITZHARRIS:  Well, I actually had a slightly

15   different approach I was going to take.  I was just going to

16   identify the evidence that we are seeking and explain to the

17   Court why we think it is relevant and material, which is pretty

18   much the same question.  So even if it's not taking it motion

19   by motion, I just wanted to get all of that out at the

20   beginning.

21          THE COURT:  All right.

22          MS. FITZHARRIS:  And at the outset it's worth noting

23   that this is all relevant to determine whether the evidence,

24   the firearms and Mr. Ramadan's statements are admissible at

25   trial; whether they were seized lawfully.  So it goes to the
```

1    quantity of proof that the government will have.  And it,

2    obviously, will be very determinative of whether Mr. Ramadan --

3    whether it can prove that Mr. Ramadan committed the violations

4    stated in the indictment.

5         To that end, we have requested identification of the

6    federal officers who were involved in the investigation,

7    interrogation at the airport.  We have also asked for

8    identification of which federal agencies those officers work

9    for.

10        And the reason we have asked for this is because,

11   during the first day of the evidentiary hearing, there was,

12   frankly, some names that came up that we were not familiar

13   with.  And we have become concerned over time as we've learned

14   more about the government's views about its disclosure

15   obligations that we haven't received reports, E-mails or

16   statements or a number of other evidence relevant to find out

17   exactly what happened on this night.

18        THE COURT:  What other reports do you feel you have

19   not received?

20        MS. FITZHARRIS:  We don't know.  And the reason we

21   have asked for this is so we can make specific requests and

22   get --

23        THE COURT:  Who are you asking for it?  Where were

24   these officers that you're asking about?

25        MS. FITZHARRIS:  So these are the TSA officers.  There

1   is an --

2          THE COURT:  Stop.  Slow down.  Okay.

3          All right.  TSA officers who were there when they

4   interrogated them or just any TSA officer that was at the

5   airport?

6          MS. FITZHARRIS:  So to answer some of these questions,

7   I'm going to refer you to the letter that I -- we sent the

8   government on shortly -- following up on some discovery.  And

9   those were exhibits to the 17C subpoena motion.

10          THE COURT:  The what?

11          MS. FITZHARRIS:  The 17C -- motion for a 17C subpoena.

12          THE COURT:  Okay.

13          MS. FITZHARRIS:  All right.  So I have attached ...

14          THE COURT:  Which exhibit?

15          MS. FITZHARRIS:  So there are three exhibits.  There

16   is Exhibit A, which is page ID number 668.

17          THE COURT:  I've got it.

18          MS. FITZHARRIS:  All right.  That was the first E-mail

19   sent requesting information.  And this was before we had the

20   transcripts.

21          And once we received the transcripts, if you turn to

22   page ID 673 to 674.  It specifically identified the names of

23   officers who were in -- who were mentioned during the

24   evidentiary hearing.  So that is Ahmad Rammel, Jesse Nagy,

25   Officer Haeck, Officer Schmeltz, Supervisor Stiggerwalt and --

1    you know, we don't have any reports from Officer Vasher who,

2    obviously, testified.

3           Some of these names were new to us.  Which is -- and

4    we specifically requested their writings once we learned their

5    names.

6           We have asked for identification of those officers and

7    which agencies they work for because we don't know what we

8    don't know.  And we want to make sure that our record is

9    complete and that we have been provided any contemporaneous

10   reportings or statements taken during that investigation.

11           THE COURT:  Okay.

12           MS. FITZHARRIS:  All right.

13           The second -- those things are kind of together.

14           The second thing is this unredacted 2010 tip reports.

15   The government brought this up during the direct examination of

16   Officer Armentrout and went into some of the details of that

17   report back in 2010.

18           As I mentioned in motion and also at the previous

19   hearing, the last three pages of that report are heavily

20   redacted.  We do not know what those redactions cover.

21           Officer Armentrout told the Court that he did not have

22   access to information about any follow-up investigation.  It's

23   very difficult for us to know whether that's true when we can't

24   see the full report.

25           THE COURT:  Well, wait a minute.  If you didn't have

```
 1   access, why do you have to see the full report?
 2           MS. FITZHARRIS:  Well, he mentioned it.  He referenced
 3   it.  So Mr. Waterstreet marked that exhibit, I believe it's
 4   Exhibit I, and then asked specific details drawn from that
 5   report.  All right.
 6           So it was my understanding during the hearing that the
 7   report -- either Officer Armentrout looked at the report before
 8   the hearing or it would be used to refresh recollection.  And
 9   if we don't know what is in that report, it's very difficult
10   to -- if not impossible, to cross-examine Officer Armentrout or
11   any other officer.
12           THE COURT:  But what you need to know is what he knew
13   at that time, right?  Because he didn't have a copy of the
14   report at that time.
15           MS. FITZHARRIS:  Well, you know, what's in the tip?
16   What's in that tip?  What do they see?  We actually don't
17   know.
18           THE COURT:  I don't know.  Did you ask what they see?
19           MS. FITZHARRIS:  You know, they said not very much.
20   They said -- you know, Officer Schmeltz says he doesn't give it
21   a lot of attention because it could be inaccurate.
22           But it was something the government thought was
23   important to bring -- at least to mark as an exhibit and to
24   bring to the Court's attention and we have never been provided
25   any reason about why we are not permitted access to this report
```

1    that the government thinks is important.

2              THE COURT:  Okay.

3              MS. FITZHARRIS:  The third -- you know, I would say

4    this is also relevant to the question about reasonable

5    suspicion, probable cause.

6         The next category of materials have to do with

7    counter-terrorism training materials.  We asked for this

8    information because a number of these officers are part of

9    various counter-terrorism units; the Joint Terrorism Task

10   Force, the Tactical Terrorism Response Team and any number.

11   There are a lot.

12             THE COURT:  Why do you need these?

13             MS. FITZHARRIS:  These were mentioned as part of their

14   training.

15             THE COURT:  Right.

16             MS. FITZHARRIS:  And a lot of this has been -- this

17   goes to the question, again, what level of suspicion, what

18   reasons they had other than stereotypes or, you know, gut

19   feelings about Yousef Ramadan that caused them to search the

20   computer.  And so that is why we've asked for them.

21        The next category of information is the evidence

22   retention policies for the various agencies involved.  That

23   would be FBI, HSI, CBP, the Joint Terrorism Task Force and the

24   TTRT and, frankly, any of the federal agencies involved.

25        This has to do with the fact that pretty significant

1   evidence has been destroyed in this case; the video, Officer

2   Armentrout's notes.  We don't know if there were other notes

3   taken and have been destroyed.  And one of the issues this

4   Court has to decide in the motion to dismiss the indictment or

5   some other sanction for the destruction of critical evidence is

6   the good or bad faith of the government.

7           There was some suggestion that Officer Schmeltz

8   shredded Officer Armentrout's notes because that's his usual

9   practice.  We'd like to see what the usual practice is.  We

10  would like to see what the practice is about seeking out video

11  and when agents from the FBI or HSI are told it is important to

12  report interviews.  So we think that is directly relevant to

13  the motion to dismiss.  But, frankly, also to the question

14  surrounding voluntariness of Mr. Ramadan's statements.  I think

15  it's undisputed he did not receive Miranda warnings.  And,

16  frankly, also to the question of whether he was in custody,

17  which I know is being litigated.

18          Then there's the -- we are also seeking *Giglio*

19  material.

20          THE COURT:  Pardon?

21          MS. FITZHARRIS:  The *Giglio* materials.  And those are

22  for Special Agent Michael Thomas, CBP Officer James Brown,

23  Officer Matthew Robinson, Officer Vasher, Officer Schmeltz,

24  Officer Armentrout and Officer Kelly.

25          The first two names I have mentioned are the two

1    witnesses we have subpoenaed to testify at the next evidentiary

2    hearing over some protests.  We were, as you know, very

3    surprised when the government did not call them as witnesses.

4         The others are agents who have already testified.  And

5    the reason we have asked for that material after learning that

6    the government has *Giglio* materials, at least with respect to

7    Agent Thomas, is that --

8         THE COURT:  What *Giglio* materials does the government

9    have?  What are you talking about after learning that they have

10   them?

11        MS. FITZHARRIS:  Agent Thomas was apparently involved

12   in the *Koubriti* case and he ...

13        Would you like me to continue?

14        THE COURT:  No.  Not unless you have -- I mean, I know

15   about that.  But anything else you have about these officers?

16        MS. FITZHARRIS:  No.  But we have no guarantees that

17   they have either done *Giglio* checks or have turned over

18   anything that they may have found.  In fact, the government's

19   position is that we are not entitled to *Giglio* materials of any

20   kind at a suppression hearing.

21        We have asked for those out of an abundance of

22   caution.  And, frankly, if the government is willing to

23   represent to the Court that it has conducted *Giglio* checks with

24   respect to the officers who have already testified and that

25   they have not found anything, then we are satisfied with that.

1   There's no need for the Court to order the disclosure of those

2   materials.

3          THE COURT:  But you're saying if they agree that they

4   have already done a check and found nothing?

5          MS. FITZHARRIS:  Correct.

6          THE COURT:  Well, then there's no materials to give.

7          MS. FITZHARRIS:  But we don't have those

8   representations.  And we're asking -- all we're asking for is a

9   representation to the Court that the government has followed

10  its *Giglio* check procedures with respect to those agents.

11         And the same with respect to Officer Brown.  If the

12  government has conducted a *Giglio* check and has not discovered

13  anything that would come back, we don't need to argue much

14  about that further.  What we know, however, is that there are

15  *Giglio* materials about Agent Thomas.

16         You know, the final issue is what sanction is

17  appropriate for the government's failure to turn over Officer

18  Robinson's statements after he testified on direct examination

19  and after we specifically requested those materials in time for

20  use.

21         THE COURT:  Okay.

22         MS. FITZHARRIS:  All right.  So in terms of what

23  authority, we think -- why Mr. Ramadan is entitled to these

24  materials.  I'm going to begin with *Giglio* and *Brady*, the due

25  process clause, which requires that the government --

1          THE COURT:  Tell me which number.  I can look that up.

2     Is it 50?  55?

3          MS. FITZHARRIS:  Yes.  So that is going to be 55.  The

4     government's response is 66 and our reply is at 67.

5          Due process clause requires the proceedings be fair.

6     So the holding or misrepresentation of the Court -- of events

7     in any criminal proceeding is not fair without disclosure.  The

8     government wants to limit its disclosure obligations to trial,

9     but the case law, and the reasons behind the due process laws

10    and the *Giglio* and *Brady* line of cases don't back that up.

11         And their reply brief went into some comparison

12    between the *Brady* line of cases and ineffective assistance of

13    counsel cases, which are both ultimately concerned that

14    process, the criminal proceedings, are fundamentally fair.

15         And the Supreme Court has said that even if a motion

16    to suppress doesn't have much to do with the guilt or innocence

17    of the defendant, if an attorney performs deficiently at a

18    pretrial motion stage and misses a meritorious Fourth Amendment

19    motion, that results in fundamental unfairness and requires

20    reversal.  The prejudice inquiry is tailored to the specific

21    proceeding at issue, which is the pretrial proceeding.

22         And I think that same logic applies in full force at a

23    suppression hearing.  That it is incumbent on everybody

24    involved in the criminal process that the suppression hearing,

25    which is, you know, a very important, critical stage of the

proceeding, be fair.  And that the Court have the information

necessary to turn it over.  But it's a lopsided -- but where we

are right now is very lopsided.  The government has information

that Yousef Ramadan does not have and cannot get.

And Agent Thomas's credibility is important in this

case.  He was one of the authors of the two reports that we

received.  It's the only 302 that we have seen at all.  If you

compare the warrant application to the 302, you'll see the

language is very similar.  Agent Thomas's description of the

interrogation and what Mr. Ramadan said and everything found

and how supposedly voluntary it was, and all of that was drawn

and put into the warrant.  So his credibility is pretty

fundamental in this case.

And Mr. Ramadan, defense counsel, we have no desire to

relitigate *Koubriti*.  But we think it is very important to

learn exactly what happened.

THE COURT:  We're not going into *Koubriti*.  I'm

telling you that right now.  There's no need to do that in this

suppression hearing.

MS. FITZHARRIS:  But we think that it is relevant to

know about Agent Thomas's credibility.

THE COURT:  But you know about this.  Is there

something else?  Some other case or something?  I mean, you

know about *Koubriti*.  This is public.

MS. FITZHARRIS:  Very much of it is and very much of

1     it is not.  The criminal case is under seal.  It's not

2     accessible on PACER.  I will tell you, Your Honor, I was in

3     high school in Seattle Washington when *Koubriti* was going on.

4     I do not know about Koubriti.

5          I -- Mr. Densemo was not the counsel of record and

6     it -- the government's accusations to the contrary, we take

7     very personally and we think are unnecessary.  But that's kind

8     of beside the point.  The point is that there is information

9     about Agent Thomas's integrity, his willingness to

10    potentially -- we don't know.  His potential willingness to

11    testify under oath at trial and lie.  His willingness to

12    destroy evidence and withhold it from the defense.

13         These are really important questions in a case where

14    we have destruction of evidence that we believe is beneficial

15    to Mr. Ramadan.  And we have withholding of material until the

16    last minute and where the credibility of the agents involved in

17    the interrogation is pitted against Mr. Ramadan's credibility.

18         We're not talking about a lengthy cross-examination,

19    but we think that whether he was sanctioned -- and, you know,

20    it's frankly also relevant to the question of good faith.  You

21    know, voluntariness inquiry has some subjective component to it

22    that includes the agent's conduct.  And the government has

23    asserted a very broad reading of the good faith exception to

24    encompass something other than a warrant or a written down law.

25         So we are entitled, Mr. Ramadan is entitled, to

1   examine and interrogate whether the agents involved in this

2   case acted in good faith.  And I think this is very relevant.

3   We are also -- we do not know if Agent Thomas has been involved

4   in any other misconduct.  We do know not know if he was

5   sanctioned.  We do not know if he was required to attend

6   additional training about how to behave and how to preserve

7   evidence.  All of this is in the FBI personnel files and not in

8   the public record.

9          The cases that the government cites are not to the

10  contrary.  They have cited to -- you know, talked mostly about

11  Supreme Court case law.  The Sixth Circuit has never addressed

12  the question of whether *Giglio* and *Brady* line of cases require

13  disclosure for -- in time for use in the suppression hearing.

14         The Ninth Circuit has said that it is required.  The

15  D.C. Court of Appeals -- which is like the D.C. Supreme Court.

16  So all federal law is the same.  They have also reached that

17  conclusion.  As has the Fifth Circuit.

18         There is -- and the cases that they have cited are

19  this case called *Raddatz* and *Ruiz*.  *Raddatz* is about the

20  constitutionality of delegating authority to magistrate judges

21  to conduct suppression hearings and whether it's constitutional

22  for the district judge reviewing a report and recommendation

23  not to conduct an additional de novo evidentiary hearing.

24         What the court did is it looked at the -- in that

25  case, it looked at the *Matthew v. Eldridge* factors and looked

1    up the rights of interest and what protections were in place

2    and the harm it would cause to require some other procedure.

3    And what the court said is that, well, you have de novo review

4    by a district court. Yes, a cold record is not as good as a

5    live record, but with de novo review by an Article III judge,

6    the interest, the Fourth and Fifth Amendment interest of a

7    defendant are adequately protected at a suppression hearing.

8         In *Ruiz*, the question was about whether there is a

9    need to disclose *Giglio* materials before someone enters into a

10    fast track plea agreement with the government. Again, the

11    Court looked at the *Matthew v. Eldridge* factors and looked at

12    the interest at stake, the harm it might cause and what

13    procedural protections were in place and said, well, we have

14    Rule 11, which has a lot of protections baked into it that

15    require the courts to go through the rights that the person is

16    giving up.

17         And those plea agreements actually had a specific

18    provision that said that the government would turn over

19    evidence that was relevant, exculpatory evidence. So there

20    were these procedures in place to ensure that the rights of

21    people -- that people were waiving, were adequately protected.

22         With respect to a pretrial suppression hearing and

23    access to critical impeachment evidence and *Brady* material,

24    there are no such protections in place. We have what we can do

25    with public records and we have investigators, but we don't

1   have access to a lot of what the government might know.

2          And I think there would be nothing without the *Brady*

3   or *Giglio* requirements to prevent the government from

4   maneuvering and intentionally suppressing exculpatory evidence

5   that is critical to determination of a pretrial motion

6   beforehand.  There are no other mechanisms or safeguards in

7   place.  The rights at issue, Mr. Ramadan's rights, his right to

8   be free from unreasonable seizures and not to have compelled

9   testimony used against him, those are vitally important.  And

10  the Supreme Court's case law on Fourth Amendment and Fifth

11  Amendment exclusionary ruling all bear this out.

12          THE COURT:  Okay.

13          MS. FITZHARRIS:  And it's already DOJ policy to

14  require this disclosure.  So it's hard to see why this is so

15  burdensome on the government.

16          The other thing, I'm going to talk about is Rule 16.

17  We believe Rule 16(e) -- 16 -- what is it?

18          16(e)(1), romanette one, also requires disclosure of

19  the things we'd asked for because these are materials,

20  documents, books that are material to preparing the defense.

21  Part of the defense is litigating what evidence is admissible

22  at trial and whether it was lawfully obtained.

23          And so we believe that Rule 16 requires, upon request,

24  disclosure of certain issues that will help flush out those

25  issues.

1          Now, with respect to Officer Armentrout's notes and

2    the video recording.  Rule 16(b)(2) requires the government to

3    disclose and make available any portion, written or recorded,

4    record containing the substance of an oral statement made by

5    the defendant before or after arrest, if the statement is made

6    in response to interrogation by a person the defendant knew was

7    a government agent.

8          I think it's very clear that Mr. Ramadan knew that he

9    was speaking to government agents when he was at the airport.

10   It was -- you know, we're quibbling about whether he was under

11   arrest.  We think he was under arrest.  The government

12   disagrees.  But for Rule 16(b) that doesn't matter.

13         So the government's response that he wasn't in

14   custody, this wasn't a custodial interrogation is really beside

15   the point.  That's not what Rule 16 requires.  And I think

16   there's ample evidence in this record to show that Mr. Ramadan

17   was in custody that I don't need to dive into now.  It's in the

18   briefing.  But, I think handcuffs, he wasn't free to leave,

19   nine hours, these are all facts that show this was a custodial

20   interrogation.

21         But those notes, they have been shredded.  That video

22   gone.  Even though these are documents that are covered by Rule

23   16(b)(2).

24         Then there's the Court's inherent authority to manage

25   discovery.  I think Your Honor has an interest in resolving

```
 1   these issues accurately.  We -- there have been a lot of
 2   surprises in the litigation of this motion, these multiple
 3   motions.  And I think it is in Mr. Ramadan's interest, as in
 4   all of our interest, to ensure that we don't have any
 5   additional delays because of the fact that we have learned for
 6   the first time that we have not received evidence, and critical
 7   evidence, that bear on the questions related to these motions.
 8           Which is why we think that there needs to be some
 9   sanction for the government's failure to disclose Officer
10   Robinson's report and E-mails.  After he testified on direct
11   examination we learned for the first time that he wrote a
12   report on cross-examination.  Mr. Densemo asked him to provide
13   that report.  Later in cross-examination we learned that he
14   sent E-mails that included the photos of -- and would have time
15   stamps of when he took the photos of Mr. Ramadan's luggage.
16           The time line is somewhat important.  There's been
17   some dispute in the record about when exactly everything took
18   place, how long.  You know, who was talking to Mr. Ramadan for
19   how long, things like that.
20           So we want -- we think those E-mails provide very
21   critical information about when the information about the items
22   in the luggage was communicated to other officers.  We didn't
23   have it in time to question Mr. -- Officer Robinson about that.
24   We didn't have the ability to explore why he didn't put things
25   in the report that he was testifying to in the report.  And
```

```
 1   this is not news to the government that this kind of practice
 2   is common in a criminal case.  This is how impeachment works.
 3   This is how we try to get to the bottom of things is through
 4   the crux of cross-examination and adversarial testing.  But we
 5   were deprived of the ability to do that.  And so we think some
 6   sanctions -- you know, the Rule 26.2(e) says that the testimony
 7   shall be stricken.  And so that is a remedy that is available
 8   to the Court.
 9              THE COURT:  Okay.  Are there other questions you want
10   to ask Officer Robinson now that you have this information?
11              MS. FITZHARRIS:  I think we -- you know, we don't want
12   to delay things more.  We would -- I think it is --
13              THE COURT:  Yes or no?
14              MS. FITZHARRIS:  Yes.  There are things that we want
15   to ask him.
16              THE COURT:  Okay.  We can end this one.  You can bring
17   him back in and you can ask questions now that you have the
18   information.  We don't need further argument.
19              MS. FITZHARRIS:  But I think it is part and parcel of
20   what has been going on in this case where we have not been
21   provided information to which Mr. Ramadan is --
22              THE COURT:  All right.  Go on with your argument.
23   You've already argued that, counsel.
24              MS. FITZHARRIS:  Okay.  So there are a lot of various
25   forms of relief that we have requested.  We have requested
```

1    production of requested materials that I outlined at the

2    beginning.  That's to strike Robinson's testimony.  One remedy

3    for the destruction of Mr. Ramadan's notes is to strike Officer

4    Armentrout's testimony about Mr. Ramadan's statements.  There

5    is suppression of Mr. Ramadan's statements for the Rule

6    16(b)(2) violation.  That is a remedy available that we have

7    requested.  We've also requested an adverse credibility

8    inference related to government witnesses' testimony for the

9    destruction of the video.

10         We also think one might be appropriate for the

11   destruction of Officer Armentrout's notes.  We've also asked

12   for a dismissal of the indictment.

13         Before I finish up, this case has gotten very

14   personal.  The government has made a lot of attacks on

15   Mr. Densemo's integrity and my integrity that are unwarranted

16   and unfounded.  As I mentioned before, I was far away and quite

17   young during the *Koubriti* case.

18         It has never been our intention for bringing Agent

19   Thomas on for the sole purpose of impeaching him.  We are

20   asking for the agent's *Giglio* materials because Mr. Ramadan is

21   entitled to them and the government's accusations to the

22   contrary are completely unnecessary.

23         But it really speaks more to the way the government

24   has treated Mr. Ramadan from the beginning.  It's decided on

25   who he was and it's been unwilling to reconsider anything about

```
 1    who he is from the beginning even when he provided reasonable
 2    explanations.
 3            And so we think some sanction is in order and
 4    certainly Mr. Ramadan is entitled to access the information
 5    we've requested.  Unless the Court has any other questions, I
 6    think I'm done.
 7            THE COURT:  Thank you.
 8            Response?
 9            MR. MARTIN:  Your Honor, I'd like to start with some
10    basic legal principles about discovery because that's what all
11    these disputes are about, discovery disputes.  And they all are
12    discovery disputes about the defendant's ability to litigate a
13    motion to suppress.
14            We're not here on discovery disputes about whether the
15    defendant is guilty of the crime charged which, as you know, is
16    the possession of two firearms in a storage locker a week after
17    the events at the airport, and those firearms had obliterated
18    serial numbers.  That's the crime.  And very little, if any
19    of -- none of what they actually seek in their discovery
20    request goes to the guilt.  Goes to the question of whether or
21    not he's guilty of that offense or innocent.
22            It goes to their effort to litigate a suppression
23    issue.  Did the agents have probable cause to search the
24    electronic devices?  Did they need a warrant?  All of those are
25    separate from questions of guilt.  Did the agents coerce
```

1   statements out of him?  Did they Mirandize him?  Were they

2   required to Mirandize him?  All those questions are suppression

3   questions and important and have to be resolved by the Court,

4   but they don't go to guilt.

5         And all of the discovery obligations the government

6   has vis-a-vis *Brady* and vis-a-vis these Rule 16 provisions that

7   the defense has cited, go to questions of guilt.

8         I want to start with *Brady* and the due process clause.

9   *Brady* and *Giglio* are based on the Fifth and Fourteenth

10  Amendment, the due process clause which protects life and

11  liberty.  And when applied to the criminal context, the Supreme

12  Court said in *Brady* that evidence must be turned over under the

13  due process clause if it's related to material -- excuse me.

14  It's material either to guilt or punishment.

15        And *Brady* was decided in 1963.  And in a decade since,

16  case after case after case all the way up to the present, the

17  most recent one I found was 2017.  It's cited in our brief.

18  The Supreme Court has always described the *Brady* obligation as

19  evidence that pertains to guilt or punishment.

20        The overriding concern -- that's a quote -- is with

21  the justice of the finding of guilt.  That's *United States v.*

22  *Agurs*, a 1976 Supreme Court case.

23        The due process clause requires the government to

24  produce discovery when it, quote, might affect the outcome of

25  the trial, end quote.  That's *United States v. Bagley*, another

1    Supreme Court case from 1985.

2         *United States v. Ruiz*, a 2002 decision described the

3    *Brady* right to evidence as, quote, a trial related right, end

4    quote.

5         Time and again, it's focused on trials.  It's not

6    focused on pretrial litigation.  And that is the *Ruiz* case that

7    defense counsel mentioned.  It's one of, I think, the most

8    illustrative cases we have because it involved a situation

9    where a defendant wanted *Giglio* information, impeachment

10   information, before trial before the defendant decided to plead

11   guilty or not.  And the argument was, well, getting impeachment

12   information is very important to a defendant before they

13   testify so they can know and make an informed decision -- or

14   excuse me.  Before they pled guilty, whether the information is

15   important so that they can make an informed and full decision

16   about whether or not to plead guilty or not.

17        That was the argument that they made to the court and

18   the Supreme Court rejected that.

19        THE COURT:  But in this case, is it not -- I'm

20   assuming what they're trying to show with this evidence is that

21   these individuals are not credible and therefore, for

22   instance -- I'm going to give you an example.  Because we have

23   not heard from the defendant.

24        I think the allegation was he was assaulted or beat up

25   or something to that effect.

1           MR. MARTIN:  That is his allegation, yes.

2           THE COURT:  So if the officers say, "No, he was fine.

3    Nobody touched him" and he says, "No, I was beat up," then

4    there's a question of who is telling the truth.  Because what

5    is important is what comes out; that is, that statement -- I'm

6    not even sure yet.

7           But some statement about where the guns are or he had

8    guns or where the guns might be.

9           MR. MARTIN:  Right.

10          THE COURT:  Right?  Isn't that the scenario?

11          MR. MARTIN:  Yes.  Yes.

12          THE COURT:  So the credibility of the witnesses is

13   important?

14          MR. MARTIN:  It is.

15          THE COURT:  In this case?

16          MR. MARTIN:  It is.

17          THE COURT:  And isn't this information important to

18   the credibility issue?

19          MR. MARTIN:  The answer is no on both counts.

20          Credibility is important in this case.  But there's a

21   much, much -- there's a bigger question for you to answer.  And

22   that is, does the Constitution of the United States require

23   disclosure of, say, *Giglio* information in a suppression hearing

24   when the defense calls the witnesses?

25          THE COURT:  Has there been a case that was a

1    suppression hearing where this issue came up?

2         MR. MARTIN:  Not with respect to *Giglio*.  But there

3    has been Supreme Court cases that have looked at the balance of

4    due process in the suppression hearing context and said the due

5    process clause does not require disclosure in a suppression

6    hearing because the due process clause is concerned with guilt

7    at trial and suppression hearings do not carry with the same

8    type of due process protections that one would have at a trial.

9    That is the *United States v. Raddatz* case, a 1980 Supreme Court

10   case.

11        And here's what it said, quote, of course the

12   resolution of a suppression motion can and often does determine

13   the outcome of the case.  This may be true of various pretrial

14   motions, end quote.

15        However, the Supreme Court went on to say, quote, the

16   suppression hearings, quote, have nothing whatever to do with

17   improving the reliability of jury verdicts and, quote, they do

18   not coincide with the criminal law objective of determining

19   guilt or innocence.

20        And the Supreme Court said that is why, for example,

21   we allow hearsay at a suppression hearing but we would never

22   allow that for trial.  Or sometimes in a trial the government

23   must disclose the identity of the confidential informant so the

24   defense can present their defense at trial, but a confidential

25   informant's identity is never required to be disclosed at a

32

1    suppression hearing.

2        There's different standards that apply at a

3    suppression hearing. And why is that? Well, it's because the

4    interests at steak are different. At a suppression hearing

5    you're trying to figure out, yes, you are making factual

6    determinations and credibility is important. But ultimately

7    what you're deciding are legal issues. Does the Fourth

8    Amendment apply? Should the person be Mirandized or not?

9        You're not deciding the ultimate question of guilt or

10   innocence. And so the due process concerns are not as strong

11   in a suppression hearing as they are in a trial scenario. And

12   the due process clause is primarily focused on trial. That is

13   what it's trying to protect, the fairness of the trial. And

14   the Supreme Court says that over and over again.

15       Imagine if the due process clause applied to all

16   aspects of a pretrial hearing where a credibility or a witness

17   might testify. And also think, Your Honor, that if that is the

18   case, that means all state courts, all state prosecutors must

19   follow that as well.

20       It's not designed to do that. It would be a radical

21   departure for this Court to say the United States Constitution

22   requires disclosure under the due process clause in this

23   scenario. And that decision would apply not only to our office

24   but every county in this district, every local prosecutor.

25       The due process clause sets a bear minimum of

1    fairness, but allows for experimentation at other levels of a

2    criminal proceeding that don't involve that ultimate question

3    of guilt or innocence.  And so the defense can cite to you no

4    case that has said that the due process clause applies to a

5    suppression hearing with the exception of a couple of circuits.

6    And those circuits, the rationale underlying those, is directly

7    at odds with our circuit.

8           Our circuit has towed very strictly to the line of the

9    Supreme Court saying that the due process clause applies to

10   trials and to evidence that goes to guilt or innocence, and not

11   just anything that might help a defendant in a pretrial

12   litigation or even something that might help the defendant at a

13   trial.

14          And the case that I think -- I thought of -- that

15   first came to my mind when I was preparing for today was a case

16   I had before Your Honor many years ago now.  It was the case of

17   the *United States v. Dawn Hanna*.  It was an export control

18   case, export control violation case.  The defendant was

19   convicted.  After trial she moved for a new trial before the

20   court saying, "I have now discovered new evidence and the

21   government had possession of this evidence and has committed a

22   *Brady* violation.  I was entitled to this under the due process

23   clause.  And the evidence was that my co-conspirator worked for

24   the CIA and the government had all these files about how my

25   co-conspirator worked for the CIA and I was entitled to that."

1          When we litigated that before Your Honor, it was very

2    similar to this case in that the defense's position was that

3    materiality under *Brady* and under due process applied not just

4    to the questions of guilt or innocence, but to anything that

5    might have helped them in trial.

6          You denied that motion.  Finding that, no, this new

7    alleged evidence did not negate any of the elements that the

8    defendant was convicted of and, therefore, did not implicate

9    *Brady*.  She appealed.  That case went to the Sixth Circuit in

10   2011 and the Sixth Circuit affirmed the conviction and

11   addressed this specific issue.  She raised the same issue about

12   her co-conspirator that was raised before Your Honor.

13         The Sixth Circuit affirmed the conviction and affirmed

14   your decision.  And it did so because it adhered to that strict

15   line that due process and *Brady* applies to guilt.

16         And here's what they say:  Quote, there's no

17   constitutional duty of a prosecutor to disclose everything that

18   might influence a jury.  The mere possibility of an item of

19   undisclosed information might have helped the defense or might

20   have effected the outcome of the trial, does not establish

21   materiality in the constitutional sense.  Instead, the evidence

22   must be material either to guilt or punishment.

23         They were saying, as you said before, and as I am

24   arguing all these line of cases, *Brady* is interested in the

25   fairness of your guilt.  Not the fairness of your detention

1   hearing or your suppression hearing or your discovery motions

2   and things like that.

3          So the Constitution has a very limited application

4   here and I do not believe any of these materials are

5   discoverable as a constitutional matter.

6          As to Rule 16, there is one rule that the defendants

7   cite as a basis for requiring disclosure.  Actually, there's

8   two rules.  One with respect to Officer Armentrout.  I'll talk

9   about that in a minute.

10         But the other rule is with respect to the documents

11  they want.  The CBP tip, the evidence retention policies, the

12  counter-terrorism policies.  And that's rule 16(a)(1)(E) which

13  requires the government to disclose documents that are, quote,

14  material to preparing the defense.

15         There is a Supreme Court case on this particular rule

16  that defines what "the defense" means.  And "the defense,"

17  according to *U.S. v. Armstrong*, which is a Supreme Court case,

18  means claims that -- or any evidence -- that negates the

19  government's case in chief.  Case in chief, at trial,

20  obviously.

21         And I want to illustrate how narrow that is.  And I'm

22  going to actually use a case that the defense cites.  It's a

23  Sixth Circuit case, *United States v. Lichen*s 428 Federal

24  Appendix 621.  It's a 2011 case.  And it was -- I'm just going

25  to illustrate this with some facts.  It was a felon in

possession of a firearm case.  The case went to trial.  The
government proved its case.  When the defense put on their
case, the defendant testified and said, "I don't possess guns.
I don't have anything to do with guns.  I certainly didn't
possess the one you charged me with."

In the government rebuttal case they introduced a
photograph of the defendant holding a rifle.  Not the firearm
he was charged with, but just some other rifle to rebut his
testimony that "I don't have anything to do with guns.  I never
possessed guns."

The government had not provided that photograph in
discovery.  The first time the defense saw it was when it was
shown in rebuttal.  And they said, "Whoa, Rule 16 violation.
This was material to preparing my defense."

And the Sixth Circuit in *Lichen* said, no, it's not.
Because under this *Armstrong*, the Supreme Court *Armstrong*
opinion, "the defense" under Rule 16 means your rebuttal to the
government's case in chief.  Not anything the government might
use in its rebuttal case.

That's how narrow the Sixth Circuit has read "the
defense" under Rule 16.

So taking that and applying it to our case, these
suppression issues have nothing to do with rebutting the
government's case in chief, meaning his guilt or innocence of
possessing the firearms in the storage locker.

1   So for that reason, that Rule 16 does not apply.  That

2   part of Rule 16 does not apply.  And there was -- I litigated

3   this exact question before Judge Cox in 2014 in the case *United*

4   *States v. Hermes*.  I only have the Westlaw cite, which I'll

5   read into the record.  It's 2014 WL 3440323.

6   And the question was:  Does Rule 16, this particular

7   rule in Rule 16, apply to suppression hearings?  Does the

8   government have to give over anything that might help the

9   defense in a suppression hearing?  And Judge Cox for the

10   reasons I just articulated says, no, it does not.  That rule in

11   Rule 16 does not apply to suppression hearings.  Because it is

12   not responding to the government's, quote, case in chief.

13   The other Rule 16 that the defendants point to has to

14   do with Officer Armentrout's notes.  Just by way of background,

15   Officer Armentrout was the officer who testified he was the one

16   who participated in an interview of the defendant with Officer

17   Schmeltz and then after several minutes he left the interview

18   and began reviewing the defendant's electronic media in a

19   separate room.  So he participated in an interview for a short

20   period of time and then he leaves and he goes and conducts the

21   examination of the electronic devices.

22   During the short period of time he was in the

23   interview, he testified that he took notes.  That he gave his

24   notes to Officer Schmeltz.  Officer Schmeltz testified that he

25   looked at the notes, he incorporated what limited information

1   there was in those notes into his report, being Officer

2   Schmeltz's report, and then he destroyed the notes.

3         So the defense argument is that the notes that Officer

4   Armentrout took were discoverable under Rule 16, specifically,

5   Rule 16(a)(1)(B) which requires that any record of a

6   defendant's oral statement that was made, quote, in response to

7   interrogation, end quote, must be turned over.

8         So the two parties are in dispute as to what that

9   phrase means in response to interrogation.  It's not defined in

10  Rule 16, but the Sixth Circuit has said that they're going to

11  import the standard for determining whether a statement was

12  made in response to an interrogation from a Supreme Court case

13  called *Rhode Island v. Innis*, 446 U.S. 291 (1980).

14        And the Sixth Circuit case that said they were

15  importing was *Smith v. United States*.  And that's at 285

16  Fed.Appx. 209.  It's a 2008 case.

17        So the Sixth Circuit says, Rule 16 doesn't define what

18  interrogation means so we're going to use this definition given

19  by the Supreme Court in *Rhode Island v. Innis.*  And *Rhode*

20  *Island v. Innis* was a Miranda case where the defendant was

21  arrested.  He was in custody.

22        And in that case, it says that, quote, Miranda

23  safeguards come into play whenever a person in custody is

24  subject to either express questioning or its functional

25  equivalent.

1    We all know that the word "interrogation" is a term of

2  art in our business.  It's a term that has special meaning.

3  It's not just anytime somebody is asked questions by law

4  enforcement, but it's when you're in custody and you're being

5  asked either express questions or the functional equivalent of

6  expressed questions.

7    The *Innis* court, the Supreme Court in *Innis* said that

8  Miranda safeguards were designed to invest a suspect in custody

9  with a added measure against police practices and that's why

10  they require Miranda because you're in police custody and

11  you're being questioned.

12    So if that standard applies here, then Officer

13  Armentrout's notes were not discoverable under the Rule because

14  Mr. Ramadan was not being interrogated, as that term of art is

15  used, because he was not in custody.  We're litigating that

16  issue with respect to the defendant's motion to suppress for a

17  violation of not giving him Miranda warnings.  So that issue is

18  going to come up for you again of whether or not he was in

19  custody or not.

20    But there's a Sixth Circuit case right on point,

21  *United States v. Galloway*, 316 F.3d 624.  It's a 2003 case.

22  And it says, quote, a secondary Customs inspection is a routine

23  noncustodial detention.

24    When a Customs officer detains someone to look in

25  their bags or ask them questions about where they're going or

1    what they're doing or what their plans are or what they've

2    brought into the country, that person is not in custody for the

3    purposes of Miranda.   And the Sixth Circuit has so held.   And

4    if they're not in custody, then they're not being interrogated

5    under that Supreme Court *Innis* case and, therefore, Rule 16

6    doesn't apply.

7         But let me just say this:   Even if Rule 16 did apply,

8    and even if whenever a Customs officer asked somebody questions

9    they have to make sure they keep their notes in case a week

10   later a defendant commits a crime and there's a federal

11   prosecution, which is the situation we have here, even if Rule

12   16 applies, you still have the harmless error standard under

13   Federal Rule of Criminal Procedure 52, which says that

14   violations of Rule 16, if they're harmless, should have no

15   impact on the case and should not result in any kind of

16   sanction for the government.

17        So what is considered harmless?   Well, in applying

18   rule in -- excuse me, Your Honor.

19        Any error in complying with Rule 16 is considered

20   harmless unless the error has a constitutional significance.

21   Meaning, that it effects the verdict.   And that's a case,

22   *United States v. Brinson*, which we've cited, a Sixth Circuit

23   case from 2006.

24        The focus of Rule 16 is on accurately determining

25   guilt or innocence.   And the rule was not meant to extend to

1    issues that don't impact the defendant's culpability.

2          So now we're kind of coming full circle to where I

3    started which is where the due process clause comes into play

4    and Rule 16 sort of tracks each other in this regard.   How

5    would Officer Armentrout's notes change the verdict in this

6    case when Officer Armentrout has no information or knowledge

7    about the possession of obliterated guns with obliterated

8    serial numbers in a storage locker a week after the events?

9    They?  Didn't ask him any questions about obliterated firearms.

10   They didn't know at the time he had obliterated firearms.

11   There's no indication about obliterated firearms.   So it's

12   really farfetched.   So any error that might have occurred with

13   respect to his notes would be harmless.

14         Now that I have gone over this law let me go back over

15   the specific items that the defense has requested.   The list of

16   CBP government officers, they want a list of every government

17   agent who was involved, they say.   That's their word, involved,

18   with Mr. Ramadan at the airport.   The defense cites no case or

19   rule of discovery that would allow them access to that list.

20         There are cases directly to the contrary.   *United*

21   *States v. Perkin*, a Sixth Circuit case from 1993 says, quote,

22   defendant is not entitled to a list of the names of the

23   government's witness.

24         That rule is, in my experience, traditionally followed

25   in our courthouse.   Even for trial purposes.   Usually it's done

1   for convenience, you know, a week or two weeks or something

2   before the trial, but certainly not for a suppression.  I've

3   never heard of a defendant saying, "I want a list of anybody

4   that was in any way involved in this case."

5          They have no legal support for that whatsoever.  No

6   case requiring that and it being granted.  I did cite two

7   recent cases from our district which have adhered to the rule

8   that courts uniformly held that *Brady*, the Jencks Act or Rule

9   16 do not require the government to produce a witness list in

10  advance of trial.

11         And they're doing that.  They want that

12  list because -- and they're explicit about it.  They want that

13  list because they want to start filing more discovery requests

14  to further litigate discovery in the suppression context.

15         The Customs and Border tip that they want, the

16  government provided them a redacted copy.  They are now asking

17  for an unredacted copy because they believe the portions that

18  the government redacted contained information about how the

19  government investigated the tip and the tip was not true.

20  That's not what is in the redacted portions.  The redacted

21  portions are personal, identifying information, addresses,

22  phone numbers, Social Security numbers, dates of birth of

23  different people and things of that nature.  The redacted

24  portions of the tip do not contain any information that would

25  show the government investigated a tip and the tip was false.

1    That's not --

2           THE COURT:  What information did the officer have when

3    he looked at the tip?  What comes up on the tip?

4           MR. MARTIN:  I think the testimony in the hearing was

5    just a few lines.  Like an introductory sentence or two.

6           THE COURT:  So how does one get the whole tip?

7           MR. MARTIN:  I don't know how the officer at the time

8    would get the whole tip.  But I do know his testimony was he

9    didn't see the whole tip.  And there was a back and forth

10   between the Court and the officer.  And I think you asked him

11   directly, "Did you see the whole tip and do you know if it's

12   true or not?"

13          And he said, "I don't know if it's true.  I just read

14   the first few lines.  And here's what they were."  That was the

15   extent of it.

16          So he didn't see the redacted portions anyways.  So

17   whether the tip is true or not -- and again, whether the tip is

18   true or not is a question that gets into whether they had

19   probable cause and reasonable suspicion to search the

20   electronic devices.  Which is why I said at the beginning, if

21   no warrant is required and no reasonable suspicion is required,

22   then what difference does the tip make at all?  So that's why I

23   said resolving that legal question on the Fourth Amendment is

24   so important.

25          The training materials for terrorism training, this is

in the same boat as the tip in that it goes to whether or not the agents were searching his -- if I understand the argument correctly, I believe it's whether or not the agents were searching his electronic devices because they had biases against Muslim people and things of that nature and therefore they have to get information about what kind of terrorism training these officers had.

I have a couple of responses to that.  The first is a practical response.  And that is, the defense -- if the officer's training was so important to the defense, why didn't they ask the officers questions about their training when they testified?  Officer Armentrout, who looked at the electronic device, testified for a lengthy period of time in this courtroom.  The defense asked him many, many questions.  Not one -- I have gone back through the transcript.  They never asked him one question about what his training was for terrorism.  Not one.

And as a result, they have laid no foundation for what type of training materials they would want.  What training materials has he seen?  We don't know because they didn't ask him.  And yet they offer to the Court that this is somehow so critical to determine whether he had probable cause or whether he was, essentially, a racist or not.

Well, he testified.  They can ask him questions about his biases and all that.  And they did ask him questions about

1   that, but this training material has nothing to do with whether

2   or not he could under the law search those computers.  Because

3   now we're back to the border search question, which is a legal

4   question.  But more importantly, the defense, when they had the

5   opportunity to conduct the cross-examination, didn't even

6   bother.  So now they want the government to search its files

7   for training materials that they didn't even bother to bring

8   out on cross.

9        The evidence retention materials that they want, this

10  is primarily about this video.  And I want to give the Court

11  some background because this is the first time I have addressed

12  the Court about the video.  We -- the defense filed a motion to

13  dismiss the indictment because the government allegedly

14  destroyed video from inside the airport that they say is

15  exculpatory.

16       That was docket number 32.  That was their motion to

17  dismiss.

18       We filed a response and that response we attached an

19  affidavit from the Director of Security at the Wayne County

20  Airport Authority, which is an independent state agency that

21  runs the airport.  All of the video cameras -- and there's

22  hundreds, if not over a thousand video cameras in the Detroit

23  Metropolitan Airport.

24       Those are all operated and controlled and run by the

25  Wayne County Airport Authority, including the video cameras in

1    the secondary Customs inspection area.  The Wayne County

2    Airport Authority records that video and retains it and then,

3    pursuant to their internal policy, destroys the video after

4    seven days.  And you can understand that if they have over a

5    thousand cameras in that airport, why they can't just hold on

6    to that video indefinitely, just the sheer volume of it.

7         None of those facts are contested.  The defense would

8    have you believe that it is the government's responsibility to

9    possess and retain video evidence that is in the possession of

10   a third-party.  And there is no law that requires that or holds

11   to that effect.

12        There is a series of cases and a legal doctrine that

13   is developed around the destruction of evidence.  The primary

14   case on that is a Supreme Court case called *California v.*

15   *Trombetta.*  It's from 1984.  And it says that the due process

16   clause does require the government to preserve evidence if it

17   has a standard of constitutional materiality.

18        And to have this standard of constitutional

19   materiality, the evidence has to meet three requirements.  And

20   the first is that it's exculpatory, exculpatory to guilt.

21        So let's back up.  The video evidence of

22   Mr. Ramadan -- and there is only video.  There's no audio

23   that's attested to in the affidavit.  It's just video of what

24   is going on in the secondary inspection area.  There's nothing

25   that is going to be on that video that tells you whether or not

1    Mr. Ramadan possessed firearms in a storage locker a week

2    later.  There's no picture or image captured in that video that

3    tells you whether he is or isn't guilty of the crime charged.

4    So it doesn't even meet the first requirement.

5            Second, the second requirement is that the exculpatory

6    nature of the evidence has to have been apparent before the

7    evidence was destroyed.  Well, Mr. Ramadan didn't commit the

8    crime.  The guns that he's charged with were not found for a

9    week after the event at the airport.  So how would the officers

10   know at the time that the video of him just moving about the

11   secondary inspection area, just walking around or going here or

12   going there or sitting in a conference room talking to agents

13   would be exculpatory to guns that he possessed a week later in

14   a storage locker in Ann Arbor.  It doesn't meet that

15   requirement.

16           And then the third requirement is that the defendant

17   is unable to obtain comparable evidence by other reasonably

18   available means.  And there are numerous cases which we cite in

19   our brief that point out, well, maybe this evidence is

20   exculpatory, but the defendant already knows about it and he

21   can testify to it.  So, therefore, it's available to him by

22   other means or maybe the defendant could call another witness

23   like his wife who was present and can tell the Court about how

24   he moved around the secondary inspection area, if that's

25   important, or the defense can cross-examine government

1    witnesses about what happened in the secondary inspection area.

2    And because he has that ability, due process does not require

3    the government to hand over -- or to preserve that evidence.

4         But all of these cases assume that the evidence is

5    actually in the government's possession to begin with.  And

6    here we don't even have that because it's the Wayne County

7    Airport Authority that possessed the video and then destroyed

8    it on their own.  And the affidavit says very clearly that no

9    one from the government instructed Wayne County Airport

10   Authority to destroy the video.

11        And at the last hearing we had on the suppression

12   hearing, Agent Banach, who is in court today, testified.  And

13   Mr. Densemo asked him on cross-examination about, you know,

14   when he first learned about the video.  And I believe Agent

15   Banach's response was, "When you first requested it months

16   later."

17        The FBI wasn't out there trying to destroy this video.

18   So under the law that does exist, the video is not even

19   discoverable.  So why the government should then provide the

20   defense with retention policies of evidence when the video is

21   not even discoverable in the first place is a little far

22   afield.

23        Lastly, I want to talk about Officer Robinson.  I

24   think the Court already said -- indicated that we would just

25   call him back and they can ask him whatever questions.

1    He will be available.  We'll have him at the next

2   evidentiary hearing.  I would just point out, we have provided

3   the Court with a copy of his report and there's really no

4   material difference between that.  Your Honor can look at it if

5   you want.

6        The defense never even asked in their motion.  If they

7   wanted to ask additional questions, we'll be happy to have him

8   back here.

9        THE COURT:  Okay.

10       MR. MARTIN:  Does the Court have any further questions

11  for me?

12       THE COURT:  No.  Thank you.

13       MR. MARTIN:  Okay.

14       THE COURT:  Reply?

15       MS. FITZHARRIS:  Yes.  The government will very likely

16  introduce Mr. Ramadan's statements they gave at the airport at

17  the case in chief because they are statements about the

18  location of the storage unit.  The government would not know

19  about the storage unit, would not know about guns, would not

20  know even where to go but for Mr. Ramadan's statements at the

21  airport.

22       So to say that these motions and this video evidence

23  and everything that we're asking for is not connected to the

24  government's case in chief, is just incorrect.  Again, they

25  will undoubtedly introduce them to prove knowledge.

1      The guns themselves are integral to the government's

2 case in chief.  And so whether those guns were obtained

3 lawfully is squarely -- is a huge part of this case.

4      THE COURT:  But if you have a video without audio, how

5 are you going to -- I mean, it's only going to show people

6 moving around.

7      MS. FITZHARRIS:  Well, that goes to the question of

8 how long he was -- there are issues of how long he was

9 handcuffed, whether he was assaulted, the circumstances

10 surrounding everything.

11      The other thing I will tell you is that Mr. Densemo

12 and I went to those rooms.  There are microphones in those

13 rooms.  There are video recording devices in every room and

14 microphones.

15      THE COURT:  But it wasn't recorded.  There's no

16 evidence that it was recorded.  Video, I mean.  Or audio

17 recorded, right?

18      MS. FITZHARRIS:  Um ...

19      MR. MARTIN:  Correct.

20      MS. FITZHARRIS:  Other than the government's

21 representations, I don't understand how we're supposed to

22 verify that.  As far as --

23      THE COURT:  Well, maybe you can't.  But we can't

24 assume that this was recorded.  I mean, normally, the FBI

25 generally doesn't record their statements.  This has been a

```
 1    subject of discussion many times.  So, you know, to say we have
 2    to assume because there was recording equipment it was
 3    recorded, doesn't --
 4              MS. FITZHARRIS:  So HSI, actually, is required to
 5    record as a CBP.  Particularly, if a recording is requested.
 6              THE COURT:  If a recording is requested?
 7              MS. FITZHARRIS:  Yes, by the interrogee.
 8              THE COURT:  Okay.  But that didn't happen, right?
 9              MS. FITZHARRIS:  Mr. Ramadan did request it be
10    recorded.
11              THE COURT:  Oh, he requested it was recorded.  That's
12    the first time I heard that.  Interesting.
13              Okay.  Go ahead.
14              MS. FITZHARRIS:  So with respect to how relevant it is
15    to the ultimate questions of whether Mr. Ramadan will be
16    punished or convicted, the things we are seeking are integral
17    to those questions.
18              The government also will -- you know, to begin, the
19    government wants to limit its Giglio and Brady obligations to
20    trial.  That is not the language of Brady -- of Bagley.  And
21    the actual materiality standard of Bagley is whether the result
22    of the proceeding would have been different.  And that's at
23    473 U.S. 667 at page 682.  That is exactly the same -- and that
24    is the case where that adopted the Strickland standard, which
25    also looks at the result of the proceeding and the effect of
```

1  the evidence -- withheld evidence on the proceeding.

2       Mr. Martin, I believe, misspoke when he said that no

3  Supreme Court case actually said that *Giglio* is required for a

4  suppression hearing.

5       That is just not true.  The Supreme Court has never,

6  ever addressed the question of whether the government must

7  disclose *Brady* and *Giglio* evidence relevant to motions to

8  suppress.

9       Like I said before, *Raddatz* was entirely about the

10 constitutionality of a magistrate judge's acting and whether

11 it's constitutional to have a non-Article III judge decide

12 something without an evidentiary hearing.

13      The Sixth Circuit -- the government has said that the

14 Sixth Circuit agrees that it only has to do with the fairness

15 of trial.  Again, that is not true.  That is not what the Sixth

16 Circuit has actually said.  The cases the government has cited

17 are -- the first one is, frankly, about the *Franks* case.

18 Whether the government is required to -- when presenting an

19 affidavit to a magistrate judge, disclose *Giglio* information to

20 the magistrate judge.  That's *Maize v. City of Dayton*.

21      The *United States v. Presser*, the question is about

22 whether *Giglio* requires production of Jencks Act materials

23 before the person testifies, and the Sixth Circuit said no.

24      *Snow v. Nelson* was a civil rights suit that had to do

25 with someone seeking damages after charges were dismissed when

1    the prosecutor disclosed exculpatory evidence that had been

2    withheld from the grand jury.  Again, this person never went to

3    trial.  There was never a suppression issue.

4          *United States v. Uwazurike*, that's an unpublished

5    opinion.  That one's U-w-a-z-u-r-i-k-e.

6          That was about whether it was -- the exculpatory

7    evidence was disclosed too late in the middle of trial.

8          And then *Lorraine v. Kohl* (ph), is an EDCA case that

9    has to do with Ohio discovery rules and was subject to EDCA

10   deference.  So the government's cases do not support its

11   assertion that the Sixth Circuit does not require disclosure of

12   *Giglio* or *Brady* materials to be used relevant to deciding a

13   Fourth Amendment or Fifth Amendment issue.

14         And their arguments with respect to the requirements

15   of Rule 16 are similarly problematic.  The definition of

16   interrogation is drawn from the Miranda line of cases.  But

17   that means the express questioning or the functional equivalent

18   likely to produce an incriminating response.  That's an

19   interrogation.

20         The rule -- as I have said, the text of the rule says

21   before or after arrest, the custodial component is not in Rule

22   16(b).  At all.

23         So the government's arguments about the nature of this

24   interview is kind of irrelevant.  And *Galloway* actually

25   supports that conclusion that ordinarily a secondary Customs

inspection is not a custodial interrogation because you're not

talking about incriminating subjects.

But this interview with Mr. Ramadan went well beyond

ordinary Customs inspections.  I mean, they were asking about

his views on ISIS.  They asked him if he supported Hamas.  They

asked him about his feelings about Jews.  These are not

ordinary Customs questions.

And, particularly, when they started asking him about

terrorism-related issues and the guns or what they thought was

a pipe bomb, these are questions that are likely, very likely,

targeted at incriminating and producing incriminating

responses.  So I think they are squarely within the rule --

within the ambient of Rule 16.

With respect to *Armstrong* and the applicability of

Rule 16 discovery requests to pretrial motions, *Armstrong* dealt

with a very, very particular type of discovery.  That was about

access to the prosecution's files in order to file a selective

prosecution motion.  It was a very, very unique type of

pretrial motion.

And the Court said that this type of defense, which

isn't about, you know, things like admissibility of evidence,

is too far afield from the ultimate question of the

government's case in chief.  It's what's a sword claim saying

that we're attacking the government's conduct versus saying,

"Hey, this evidence that the government wants to introduce,

1    it's not admissible."

2         Now, that is a defensive claim.  So if we're drawing a

3    distinction between sword claim and shield claims, a motion to

4    suppress evidence, any claim that's evidence the government

5    wants to use against the defendant at trial is a shield claim

6    and, therefore, *Armstrong* is inapplicable.  And the Sixth

7    Circuit does not hold otherwise.

8         The cases the government cites, I fully go into those

9    in the brief.  But in all but one, *Armstrong* is not even

10   mentioned in those cases.

11        Mr. Martin and I have a different memory of

12   Armentrout's -- the length of time he was involved in the

13   interview with Mr. Ramadan.  I mean, he -- my impression, my

14   reading of that transcript, is not that it was short.  It went

15   on for some time and how long is a little unclear.  But he,

16   specifically said that he was writing down Mr. Ramadan's

17   answers to questions.  I know that on the second day of

18   testimony Officer Schmeltz said there wasn't much there.

19        But Officer Armentrout, the author of the notes, said

20   he was writing down Mr. Ramadan's answers to questions.  I

21   think that is more credible than Officer Schmeltz's testimony

22   after this exhibit became an issue.

23        Whether -- you know, Mr. Martin was talking about the

24   crime, the interrogation and the crime were a week apart.  But

25   the case agent was assigned to investigate Mr. Ramadan the day

1    after he was pulled from the airplane.  You know, hours after

2    he was released from the airport.  So they were looking into

3    Mr. Ramadan and they were looking into his statements.  They

4    were looking for that storage unit long before the tape was

5    recorded over.

6         And in terms of whether this is -- you know, the

7    government had possession of those materials, there is a very

8    limited amount of case law that has to do with -- the

9    government's responsible to preserve evidence that is in its

10   custody or control.  And so that's what I was talking about,

11   the control the government had over that particular area and

12   the relationship between the federal government and the Wayne

13   County Port Authority.

14        The Third Circuit case, *United States v. Risha*,

15   R-i-s-h-a, at 445 F.3rd 298, is the leading -- it's pretty much

16   the leading case on the question of cooperation between federal

17   government agencies and some other state actor.   Admittedly,

18   this, as Judge Kozinski pointed out in a recent descent having

19   to do with prosecutorial misconduct, this is kind of an

20   unsettled area.

21        But what the Third Circuit and the Fifth Circuit do is

22   they look at a variety of factors.  About the knowledge or the

23   information is acting on behalf of or is in control.

24        So I think Ms. Steeds or -- I'm pronouncing her name

25   wrong.

1            Her affidavit suggests an ongoing relationship between

2    Customs and Border Control and the Wayne County Port Authority

3    that had existed for many years.  You know, if you need to have

4    a government ID to get into this area, the federal  government

5    has complete control over everything surrounding that camera.

6            So it's hard to believe that it has no ability or

7    control over what happens to the footage if they need it.  And

8    I think it's pretty clear the fact that the case agent was

9    assigned the day Mr. Ramadan was released that what happened in

10   that room meant something to the government.

11           The other thing is that if the two agencies, the state

12   and federal agency, are part of a team that are participating

13   in a joint investigation or sharing resources, I think that's

14   undoubtedly true with respect to Wayne County Port Authority

15   and the federal government's control over the secondary

16   inspection area.  They are definitely part of the same team.

17   It's all about security at the airport, what goes on at the

18   airport, everything having to do with the border and planes

19   going in and out and who is on them.

20           The third factor is whether the entity charged with

21   constructive possession has ready access to the evidence.

22   Again, this is something where it's quite clear that the Port

23   Authority did have ready access to the video recordings that

24   were in the rooms where Mr. Ramadan was kept.  We believe,

25   based on the testimony, that Mr. Ramadan was put into -- that

1   there were only two interview rooms.  We think he was in both

2   and then there's a conference room.  Based on our visit to the

3   airport, both of those rooms have cameras in them.  We did not

4   go into the conference room.

5          But, the point is, there was ready access to this

6   information.  There was nothing preventing anyone from getting

7   control of it.  And, particularly, because the federal

8   government was -- the FBI was, apparently, interested in

9   Mr. Ramadan, it's incredible that they wouldn't want to look at

10  what happened or try to access the recording of that

11  conversation.

12         So I think the government's contention that this isn't

13  even discoverable, it just doesn't work out that way.  You're

14  part of a team.  The government had ready access to this

15  information and it's very critical.

16         With respect to harmless error.  Harmless error is a

17  standard of review.  The case the government cites is no

18  surprise that the Sixth Circuit reviewing what the district

19  court did with respect to a discovery motion applies harmless

20  error review.  So the fact it quotes that standard is pretty

21  obvious.  When it's in the district court, the standard is very

22  different.  And it's actually kind of backwards to say, "Well,

23  this may be discoverable and you haven't been providing it, but

24  the government doesn't need to provide it because I don't think

25  it's relevant at this time even though you don't have it."

1        That just doesn't work that way.  The Bank of Nova
2   Scotia, the Supreme Court case that the government cites in its
3   brief, has to do with when a district judge dismisses an
4   indictment after a grand jury proceeding.  So the district
5   judge was conducting a review procedure and decided there had
6   been prosecutorial misconduct and dismissed on those grounds.
7   And harmless error review was the standard appropriate for that
8   kind of review proceeding where the district court is acting
9   kind of like the court of appeals.  That's not the position
10  Your Honor is in right now.  So Rule 52 really has no bearing
11  on this thought whatsoever.

12       We do believe that the training, Officer Armentrout,
13  Officer Schmeltz, Officer Brown's training and Agent Thomas's
14  training about counter-terrorism is all relevant.  I asked
15  Officer Schmeltz about his counter-terrorism training when he
16  testified.  It was, frankly, not until Officer Armentrout
17  testified that he had that training and he started to explain
18  what he thought was suspicious about Mr. Ramadan's answers.
19  That's when it became clear that this was relevant to our line
20  of questioning.  So I don't think it's surprising that given
21  new evidence and new information that the request came when it
22  did.

23       Finally, credibility is really important.  And there
24  are two cases that came out of this district in the past less
25  than a week that show how important credibility is.

1          Judge Goldsmith on Friday granted a motion to suppress

2  after finding that the officers were not credible.  On Monday

3  Judge Edmunds also suppressed evidence finding that the

4  officer's testimony was not credible.  Credibility is of the

5  utmost importance when we're talking about Fourth Amendment

6  violations.

7          THE COURT:  Were these in suppression hearings or

8  trials?

9          MS. FITZHARRIS:  Those were in suppression hearings.

10         THE COURT:  Did they have information in the discovery

11  like you are requesting?

12         MS. FITZHARRIS:  There wasn't this sort of litigation

13  about it.

14         But I bring those up just to bring up the point just

15  how important credibility is in suppression hearings and why

16  access to impeachment information in time to be used as a

17  suppression hearing is important.

18         And I think that the language of that, when it talks

19  about the outcome of the proceeding, shows that it is not --

20  the government's *Giglio* and *Brady* obligations are not as

21  limited as it's reading it.

22         Finally, in respect to the concerns raised about how

23  problematic it might be if this Court orders disclosure of

24  exculpatory -- of information relevant to -- that is helpful to

25  the defense in its suppression hearing or, you know, about

1   credibility about testifying officers in a suppression hearing,

2   that -- it's really hard to understand why that is so

3   groundbreaking or shocking when the DOJ's current policy is

4   that they're supposed to provide *Giglio* materials *for*

5   testifying agents at suppression hearings.

6            THE COURT:  Well, what would be your benefit to having

7   the tip, the full tip document?

8            MS. FITZHARRIS:  Honestly, if the document had been

9   produced to us where it was clear, the things like date of

10  birth, names, personal identifying information, and then that

11  information had been redacted out, I don't think we would be in

12  this position.  The way that it was produced to us it had just

13  a huge block of redacted information.

14           THE COURT:  Now, what would be your benefit no matter

15  what it said?  As long as you knew what the officer testified

16  to.

17           MS. FITZHARRIS:  Well, we would have been able to ask

18  him more about that and, you know ...

19           THE COURT:  Like what?

20           MS. FITZHARRIS:  Like what -- if it said, you know,

21  follow-up investigation revealed that the tip came from

22  Mr. Ramadan's mother-in-law who has been civilly committed, you

23  know, that's pretty relevant information that we would have

24  liked to be able to inquire into with agent -- with Officer

25  Armentrout if we had had it in advance.

1          At this point, perhaps, if the government just changes

2   its redactions and produces the tip so it's clear that they're

3   just protecting PSI, that's fine.

4          THE COURT:  If the government did what?

5          MS. FITZHARRIS:  You know, instead of like a huge

6   block redaction the way it is now, if it redacts out things

7   like date of birth or Social Security numbers so it's clear

8   that that's the information that's been redacted, that's fine

9   with us.

10          It's a compromised position.  I -- we are just --

11   today is the first day when we have even been told what is

12   behind those redactions.

13          So we're not here to be unreasonable, but we don't

14   know what we don't know.  And we went through -- the more we

15   learn about what we don't know, the more troubled we are about

16   what has been withheld.  So unless the Court has any other

17   questions ...

18          THE COURT:  Not right this minute.

19          Mr. Martin, I have a question for you.  There was a

20   some discussion about whether you actually looked for *Giglio*

21   materials for agents other than Thomas?

22          MR. MARTIN:  Yes, Your Honor.  And I wanted to address

23   that.

24          The answer is, yes.  For the government -- the

25   witnesses the government called, the government did check and

```
 1    there's no material to produce.

 2              THE COURT:  Okay.

 3              MS. FITZHARRIS:  Your Honor, we would like a

 4    representation about Officer Brown as well.

 5              MR. MARTIN:  Well, we didn't call Officer Brown and so

 6    he and Mr. Thomas are in a different boat.

 7              And that's the second point I wanted to make and that

 8    is that I argued -- I spent most of my time arguing that due

 9    process clause Brady and Giglio do not apply at suppression

10    hearings.

11              Let's just assume for the sake of argument that they

12    do.  We have to keep in mind the posture we're in here.  The

13    government rested its evidence with respect to the suppression

14    hearing.  We are not calling anymore witnesses.  We are not

15    asking you to rely on the testimony of any more witnesses in

16    order for the government to defeat the defense's motion to

17    suppress.

18              The defense now it's time to present their case.  And

19    they are calling Thomas, Brown and they say their client.

20    Three witnesses in the defense case.  There is no case that

21    says that the government is required under Brady and Giglio to

22    provide impeachment information for a defense witness.  Even in

23    a trial there are many cases to the contrary.  I cite them in

24    our brief.  We have cited six.  I'll just give you a flavor of

25    one.
```

1          It's the most recent from the Court of appeals I

2     found, *United States v. Snell* 676.  It's a Federal Appendix

3     144.  It's actually a Fourth Circuit case from 2017.  And it

4     states, quote, the government had no obligation under *Brady* or

5     otherwise to disclose evidence that was only relevant to the

6     potential impeachment of a defense witness, end quote.

7          And there's many, many more.  Because it's never

8     helpful material to the defense under the meaning of the

9     constitutional standard under due process to impeach their own

10    witness.

11         You know, Thomas or Brown are going to come up and

12    testify and they're either going to say they beat up

13    Mr. Ramadan or they didn't.  If they say they beat up

14    Mr. Ramadan, then how does impeaching them help the defense?

15    If they get out of these witnesses what they want, how does

16    them turning around and, basically, drawing out evidence and

17    telling you, "Well, you shouldn't believe these two agents

18    because they're liars and cheaters and all that," that doesn't

19    help them.  So it's not material and the cases are clear that

20    the government is under no obligation to turn over impeachment

21    evidence.

22         THE COURT:  Well, I'm assuming they're going to say

23    they didn't beat him up and they're going to show that they're

24    lying.

25         MR. MARTIN:  That they're lying about that, right.

1    So, but does that -- so ...

2            THE COURT:  That's their witness?

3            MR. MARTIN:  It's their witness.  So then the question

4    becomes why are they calling him?  I mean, the reality here is

5    they know Thomas and Brown are not going to testify that they

6    beat a confession out of him.  So then the question comes into

7    play, "Why are they calling them?"

8            And that's why the government alleged that, well, they

9    must be calling them because they knew that they couldn't

10   impeach Thomas so thoroughly.  And it was the Federal

11   Defender's Officer that represented *Koubriti.*  So it would make

12   sense that they would know about the background on Thomas.

13           MR. DENSEMO:  Well, we didn't know.  Well, I didn't

14   know.

15           MR. MARTIN:  Let me also just --

16           MR. DENSEMO:  You're wrong.

17           THE COURT:  Just a minute.  Are you on the record?  Do

18   you want to say something?

19           MR. DENSEMO:  Yes, Your Honor.  The representation

20   from the U.S. Attorney's Office, once again, I think is

21   disparaged me and my office because their assumption is

22   completely wrong.  I had no idea that Michael Thomas was

23   involved in the *Koubriti* case.  We had no intention of even

24   talking about Michael Thomas or *Koubriti* until the U.S.

25   Attorney's Office told us about Michael Thomas and his

1 connection to *Koubriti.*

2          So all of this talk about *Koubriti*, that was brought

3 on by the U.S. Attorney's Office.  Not by me.  Not by the

4 Federal Defender's Office.  We had no intention of talking

5 about it, one, because we hadn't been given any *Giglio* material

6 that they had for eight months.

7          So the idea that Andrew Densemo is laying in the weeds

8 to ambush the U.S. Attorney's Office, wrong.  The idea that the

9 Federal Defender's Office laid in the weeds and tried to ambush

10 the U.S. Attorney's Office is wrong.  We were doing this

11 straight up.  We were going to cross-examine Thomas like any

12 other witness.  Like we had cross-examined Armentrout,

13 Schmeltz, Robinson, all the other witnesses.

14          We didn't try to disparage any of those witnesses'

15 character or integrity.  We didn't get into any of those things

16 because we trusted that the U.S. Attorney's Office had provided

17 us with *Giglio* materials and *Brady* materials.  I trusted the

18 U.S. Attorney's Office had done their job.  I did not know

19 about Michael Thomas and *Koubriti* and *Giglio* until I had got

20 the motion from the U.S. Attorney's Office saying, "Hey, Judge

21 Battani, don't let them talk about it."

22          MR. MARTIN:  I take Mr. Densemo at his words.  He

23 didn't know about Michael Thomas, I take him at his word.  But

24 then we're back to the question of why they want to call a

25 witness that's not going to provide them favorable evidence and

1    is there a case?  Is there a legal requirement for the

2    government to provide the defense with impeachment information

3    about their own witnesses?  And there is not.

4         There is also a practical consideration I want to

5    bring up to Your Honor.  There is a lot of material related to

6    the *Koubriti* case.  Myself and Mr. Waterstreet have not

7    reviewed it all.  If the Court were to order the government to

8    conduct a *Giglio* review of that, we're talking about a major

9    effort that would take a considerable amount of time and I want

10   the Court to be aware of that.

11        THE COURT:  I would think the only thing important

12   about that is if there was some discipline or something that he

13   had or the ultimate resolution that was negative.  Or even

14   positive.  I guess they should know.

15        That's all they want to know.  We're not going to go

16   into, as I said before, all the detail that some of us might

17   remember who were involved in that case.  That's not necessary.

18        MR. MARTIN:  Right.  I agree.

19        THE COURT:  So I wouldn't do that.  But I do think

20   that, given all of this discussion, that they should be given

21   not his FBI personnel file, but sanctions against him should be

22   turned over to them so they would know what they are.

23        MR. MARTIN:  Well, that could be a major effort to

24   uncover that.  That information may not be as readily available

25   as you would think.  And I'm kind of quite confident that I can

1  represent that to the Court.

2          And how much time the government would need to obtain

3  that information, I don't know.

4          THE COURT:  Well, I know.  I don't think it's going to

5  be that time consuming.  All you need to get them is a final

6  resolution of what happened.  He was -- I don't even remember.

7  He was fired because he failed to disclose information.  He was

8  fired because he lied.

9          I mean, I think that's enough.

10         MR. MARTIN:  So any kind of official discipline?

11         THE COURT:  Pardon me?

12         MR. MARTIN:  I'm sorry, Your Honor.  Any kind of

13  official discipline; is that what you're referring to?

14         THE COURT:  Yes, official discipline.  Yeah.  I don't

15  think we need to make a bigger deal out of this.

16         MS. FITZHARRIS:  You know, and findings.  You know, if

17  there was discipline or anything.  You know, there was clearly

18  an investigation and there was conduct, we would like to know

19  what the findings were.

20         MR. MARTIN:  See, that ...

21         THE COURT:  Well, that's a big grant.  I think you

22  can -- it's enough to know that he was -- I don't know what.

23  Discharged for lying.  Whatever it is.  That's all.

24         We're not going into the facts of the case.  I don't

25  think that's necessary.  Because it doesn't make any

1    difference.  If he lied in this case, you can argue he lied --

2    or if he lied in that case, he lied in this case.  Or if he

3    failed to turn over something in that case, maybe he failed to

4    turn it over in this case.  I don't know if that would be your

5    argument.

6                And I would order that you give them that information.

7                MR. MARTIN:  We will, Your Honor.  If it's something

8    that will take a long of time, we'll alert the Court.

9                THE COURT:  Let me know.

10               And how about Brown?

11               MR. MARTIN:  Brown, we have done a check on and we are

12   confident we met our obligations by not providing anything.

13               MS. FITZHARRIS:  Meaning, Your Honor, they did not

14   find anything that would be considered *Giglio* material?

15               THE COURT:  Correct.

16               MR. MARTIN:  Correct.

17               THE COURT:  Okay.  All right.  In terms of the

18   information you want on the officers who were there and their

19   agencies, this is like a witness list, which is not required in

20   our court in trial.  So I don't think it would be required in a

21   suppression hearing.  You did have the opportunity, I know, to

22   ask some of the officers who else was there and, therefore, you

23   have that information.  And if you want to know if you -- if

24   you don't know and you want to know which agencies those

25   individuals were with, I would allow you to -- or order the

 1   government to give you that information.

 2        Okay.  Government, do you understand what I said?  If

 3   she asks you, she or he, asks you for an agency that somebody

 4   was in, you're to turn that over, but other than that you don't

 5   have to give them any other listing.

 6        MR. MARTIN:  Yes, Your Honor.

 7        THE COURT:  And in terms of the unredacted tip report,

 8   the only testimony we have had is that the whole report was not

 9   seen by the officer; that he only saw the -- I think he said

10   several lines or something, information there.  There is

11   indication that this is a false -- that the report may have

12   had ...

13        I think this is what the defense is saying is may have

14   had information that it was checked out.  And it was merely

15   reported by an incompetent relative.  And if that's in the

16   report, you can look in the report.  If there is anything in

17   the pages that have been redacted regarding the mother-in-law

18   or mother, then that part should be turned over.  Not

19   addresses.  Just if the mother-in-law reported it and it was

20   found not to be relied upon.

21        MR. MARTIN:  Yeah.  I have looked at it, Your Honor.

22   I can tell you there's nothing in the redacted portions that

23   are about whether the information is reliable or not or was

24   investigated or was found to be not credible.  There's nothing

25   like that in there.  I've looked at that.

1          THE COURT:  I'll take your word for it.  That's fine.

2     So I'm not going to order that turned over.

3          The training material:  The training material, the

4  Court finds does not need to be turned over because it doesn't

5  appear that the training material would have any relevance from

6  the testimony that's come in so far to the actual statement and

7  the subsequent finding of the guns.

8          The retention policies, that goes to whether the video

9  or notes were destroyed and the Court finds the government had

10  no responsibility for the video given the affidavit of the

11  Airport Authority as to who controlled the videos.

12          Nobody asked -- I understand now that Mr. Ramadan

13  asked for an audio, but nobody asked the government to preserve

14  this.  And at that point how would the government even know to

15  preserve a video with no audio because there was no allegation

16  by the officers who testified.

17          And, in fact, on the contrary, they said he wasn't

18  beaten up.  He said he was.  But it would be nice to have the

19  video for that.  But if they did not control it and it was in

20  the hands of the third-party and the retention policy is seven

21  days, the Court is not going to -- well, it's not going to

22  sanction the government.  And there is no video to turn over

23  and the Court is not going to sanction the government on

24  that.

25          Also, the notes, the officers testified about the

1    officer taking the notes and then giving them to this

2    Armentrout.

3              Well, who did the notes?

4              MR. MARTIN:  Officer Armentrout did the notes and then

5    he provided them to Schmeltz to do the report.

6              THE COURT:  Officer Schmeltz to do the report.  The

7    officer testified he incorporated them into the report and then

8    destroyed the notes.

9              The question there would be is there some policy?  I

10   think that's probably what the defense is asking for.  Is there

11   some policy that says the notes should not be destroyed?  If

12   there is such a policy or a policy on note retention, I want

13   that turned over to the defendant.

14             As to the *Giglio* information, I think we've already

15   covered all of that.  I don't think there's anything left on

16   that.

17             As to Robinson's notes, the Court has already ordered

18   that that's -- his E-mails are to be turned over and if there's

19   any existing report to be turned over -- I understand the

20   photos that were in the E-mails were part of what we saw at the

21   last hearing, but the time lines may become important to the

22   defense.  So, therefore, the E-mails are to be turned over.

23             MR. MARTIN:  We've done that already, Your Honor.

24             THE COURT:  Okay.  And the Court is not going to

25   strike Robinson's testimony so far or Armentrout's.

1          Did I miss any of these?

2          MR. MARTIN:  I think you got them all.

3          MS. FITZHARRIS:  I agree, Your Honor.

4          THE COURT:  Okay.  Is there anything else?  Any other

5   motion that we haven't covered here today?

6          Defense?

7          MS. FITZHARRIS:  No, Your Honor.

8          THE COURT:  Government?

9          MR. MARTIN:  We haven't directly addressed the

10  government's motion in limine to limit the impeachment of

11  Mr. Thomas once he does take the stand.  I think given the

12  Court's ruling, we can see how it plays out during the course

13  of the hearing.

14         THE COURT:  I think we will see how it plays out

15  during the course of the hearing after you turn over the

16  information.

17         All right.  Thank you.  The hearing is set for May ...

18         MR. DENSEMO:  May 23rd, Your Honor.

19         THE COURT:  Thank you.  May 23rd.

20         I think we gave -- let me just look at the time we

21  gave because I want to make sure it's going to be sufficient.

22         MR. WATERSTREET:  Your Honor, I have a 10 o'clock in

23  the morning starting on the 23rd and you also set aside the

24  24th, if we need additional time.

25         Of course, I'm getting old and my memory's going.

```
 1                THE COURT:  No.  You're right.  I know it was the 23rd
 2    and we did.  We have given it the whole day, 10:00 to 5:00.
 3                MR. WATERSTREET:  Okay.
 4                THE COURT:  And the 24th we have given it the morning
 5    up until two o'clock.
 6                All right.  We'll see you then.  Thank you.
 7                MR. WATERSTREET:  Thank you.
 8                THE CLERK OF THE COURT:  All rise.
 9                This Court is adjourned.
10          (At 4:15 p.m., matter concluded.)
11                              -   -   -
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    C  E  R  T  I  F  I  C  A  T  E

2

3          I, Darlene K. May, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.  I further certify that the transcript

6    fees and format comply with those prescribed by the Court and

7    the Judicial Conference of the United States.

8

9    May 4, 2018                  /s/ Darlene K. May
     Date                         Darlene K. May, CSR, RPR, CRR, RMR
10                                Federal Official Court Reporter
                                  Michigan License No. 6479
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25