```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION
                             —  —  —
 3
    UNITED STATES OF AMERICA,
 4
                  Plaintiff,
 5
      vs.                             Case No. 17-20595
 6
    YOUSEF M. RAMADAN,                 Hon. Marianne O. Battani
 7
                  Defendant.
 8   _____/

 9                    EVIDENTIARY HEARING

10          BEFORE THE HONORABLE MARIANNE O. BATTANI
                  United States District Judge
11          Theodore Levin United States Courthouse
                  231 West Lafayette Boulevard
12                     Detroit, Michigan
                  Wednesday, May 23, 2018
13
    APPEARANCES:
14
    For the Plaintiff:    RONALD W. WATERSTREET
15                        MICHAEL M. MARTIN
                          HANK MOON
16                        U.S. Attorney's Office
                          211 W. Fort Street, Suite 2001
17                        Detroit, MI  48226
                          (313) 226-9100
18
    For the Defendant:    ANDREW DENSEMO
19                        COLLEEN P. FITZHARRIS
                          Federal Defender Office
20                        613 Abbott, 5th Floor
                          Detroit, MI  48226
21                        (313) 967-5555

22
    Also Present:         Tania Ghanem, Court Interpreter
23

24
          To obtain a copy of this official transcript, contact:
25               Robert L. Smith, Official Court Reporter
                 (313) 234-2612 • rob_smith@mied.uscourts.gov
```

1                              TABLE OF CONTENTS

2

3      WITNESSES                                                      PAGE

       OFFICER MATTHEW ROBINSON
4          Direct Examination by Ms. Fitzharris.............. 21
           Cross-Examination by Mr. Waterstreet............. 30
5          Redirect Examination by Ms. Fitzharris........... 32

6      AGENT MICHAEL THOMAS
           Direct Examination by Mr. Densemo................ 34
7
       ASMA RAMADAN
8          Direct Examination by Mr. Densemo................ 73
           Cross-Examination by Mr. Waterstreet............. 75
9          Redirect Examination by Mr. Densemo.............. 85

10     AGENT JAMES BROWN
           Direct Examination by Ms. Fitzharris.............. 87
11         Cross-Examination by Mr. Waterstreet.............132
           Redirect Examination by Ms. Fitzharris...........143
12
       YOUSEF RAMADAN
13         Direct Examination by Ms. Fitzharrs.............151

14

15     EXHIBITS                                                   RECEIVED

16     Government's Exhibits E-1, E-2 and E-3............. 86
       Government's Exhibit L-1...........................135
17     Government's Exhibit L-3...........................137

18     Defendant's Exhibit B............................. 28
       Defendant's Exhibit C.............................108

19

20

21

22

23

24

25

```
 1  Detroit, Michigan
 2  Wednesday, May 23, 2018
 3  at about 10:31 a.m.
 4                      —   —   —
 5            (Court, Counsel and Defendant present.)
 6            THE LAW CLERK:  All rise.
 7            The United States District Court for the Eastern
 8  District of Michigan is now in session, the Honorable
 9  Marianne O. Battani presiding.
10            You may be seated.
11            Calling Case No. 17-20595, United States vs.
12  Ramadan.
13            MR. WATERSTREET:  Good morning.
14            MR. DENSEMO:  Good morning, Your Honor.
15            MR. WATERSTREET:  Good morning.
16            THE COURT:  Just one minute.  All right.  I think
17  from what I understand, the courtroom is set up.  Let me have
18  your appearances, please, counsel.
19            MR. MARTIN:  Good morning, Your Honor.
20  Michael Martin, Ronald Waterstreet and Hank Moon for the
21  government.  With us today is paralegal Darlene Secord and
22  FBI Special Agent David Banach.
23            THE COURT:  All right.
24            MS. FITZHARRIS:  Good morning, Your Honor.
25  Colleen Fitzharris on behalf of Yousef Ramadan.
```

*Evidentiary Hearing • May 23, 2018*

4

```
 1            MR. DENSEMO:  Andrew Densemo on behalf of
 2   Mr. Ramadan as well, Your Honor, who is also present and
 3   being assisted today with an interpreter.
 4            THE COURT:  All right.  Would you swear the
 5   interpreter in, please.
 6            THE CASE MANAGER:  Do you solemnly swear that you
 7   interpret accurate and completely from the Arabic language to
 8   the English language and English into Arabic using your best
 9   skill and judgment?
10            THE INTERPRETER:  I do.
11            MR. DENSEMO:  Would the Court mind having
12   Mr. Ramadan's wrists unshackled so he can take notes during
13   the hearing?
14            THE COURT:  No, they may be unshackled.
15            MR. DENSEMO:  Thank you, Judge.
16            THE COURT:  Okay.  All right.  We have a number of
17   motions to deal with, the first being the request -- well, it
18   has to do with the order to dismiss.
19            MR. DENSEMO:  Your Honor, at the hearing on
20   April 18th of this year I believe, the Court ordered the
21   government to provide the defense with certain discovery
22   items.  Most importantly, the Court ordered the government to
23   turn over Giglio materials regarding Special Agent
24   Michael Thomas.  We waited for the government to turn those
25   materials over.  They did not.  I sent a letter, which I
```

*Evidentiary Hearing • May 23, 2018*

5

1   attached to my motion, to the government asking that they

2   comply with the Court's order.  The government did not

3   provide the information, especially the Giglio materials that

4   we had requested and that the Court had ordered.  The

5   government did not provide us in a timely fashion even the

6   simplest of information regarding the agencies that the named

7   officers worked for.  They did eventually supply that

8   information about I think the middle of last week.  They

9   still have not provided any information -- any Giglio

10  materials regarding Special Agent Thomas.

11          The Court also ordered the government to respond to

12  our motion to dismiss, and the Court ordered them to file a

13  response by August 14th.  The government disregarded the

14  Court's order in terms of filing a response as to why it had

15  not complied with the Court's order, why the motions -- why

16  defense's motions should not be granted.

17          So the government -- the only thing the government

18  has done is supplied us with a short letter saying that --

19  about three -- telling us what agencies certain officers work

20  for.  They sent us a one-line sentence saying that they don't

21  have any information regarding the CBP retention policies for

22  agent's notes and things of that nature.

23          The government, Your Honor, has at every available

24  opportunity it seems drug its feet in providing even the

25  simplest of discovery.

1    The government then files a motion for a protective

2  order.  The U.S. Attorney calls and asked me if I will

3  stipulate to the protective order.  I indicate I have no idea

4  why you need a protective order so, no, I do not agree to a

5  protective order.  I don't see the necessity in a protective

6  order if, in fact, we are asking for public information about

7  a public employee during -- undergoing his public duties, but

8  that's another issue we will deal with.

9    But at this point, Your Honor, I think the case

10  should be dismissed with prejudice not only because the

11  government failed to comply -- failed to provide discovery as

12  ordered, but the government disregarded this Court's order to

13  file a response to our motion.  That's inexplicable.  I can

14  see the government saying to me, Andrew Densemo, we can --

15  you are not going to do anything, you don't have any power if

16  we seek to not do anything or not give you what you are

17  entitled to.  But for this Court to -- for the

18  U.S. Attorney's Office to not even file a response as ordered

19  by the Court explaining why our motion should not be granted

20  is inexcusable.

21    I don't know what the Court's response would be to

22  that, but I -- I can't imagine a situation where a federal

23  judge tells the U.S. Attorney's Office to respond to the

24  defendant's motion and respond to it by a certain date, and

25  the Court said the prosecution shall file a response.  The

```
1   Court didn't say if you feel like it file a response,
2   U.S. Attorney.  The Court told the U.S. Attorney's Office to
3   file a response to this motion and do it by August [sic]
4   14th, they didn't do it, still haven't filed anything.  And I
5   think at this point, Your Honor, the Court should dismiss
6   this case with prejudice given everything that the Court has
7   seen, all the motions that have been filed.  I think this is
8   just more of the same for the U.S. Attorney's Office, and I
9   think the Court should put an end to it.
10          THE COURT:  Mr. Martin?
11          MR. MARTIN:  Your Honor, by way of background, at
12  the last hearing the Court ordered the government to provide
13  the defense with three items.  The first was the Court
14  ordered that the government look in to see if the Custom and
15  Border Protection had a written policy on retention of notes
16  during a secondary customs inspection.  You asked for the
17  government to provide the defense the agency that certain
18  federal law enforcement employees work for that the defense
19  would identify for the government, and then you asked us to
20  provide the defense with the official discipline for FBI
21  Special Agent Michael Thomas.
22          And at the time of that hearing I indicated to the
23  Court that particularly finding Special Agent Michael Thomas'
24  discipline record might take some time because we wanted to
25  be very thorough in that, and it is not simply a case of just
```

1   contacting the local FBI office.  We wanted to do a broad

2   search, and so it did take some time, but we did compile the

3   materials that the Court requested.  There was no written

4   policy by the Customs and Border Protection regarding

5   retention of notes.

6           The defense did provide us with a list of names of

7   individuals that they wanted to know which agency they worked

8   for.  Incidentally, all of those individuals either testified

9   in the government's case in chief at the suppression hearing

10  or were identified during the testimony, so why they needed

11  to learn again what agency these people worked for when it

12  was already known to them is not clear to me, but that was

13  the list of names they provided us, and so we sent them a

14  letter that said there is no CBP policy, and here are the

15  agencies that these individuals work for.  And then we said

16  we have the official discipline for Special Agent Thomas but

17  we would like you to agree to a protective order, which

18  generally is our office's practice when it comes to

19  discipline matters regarding agents, we accompany that

20  disclosure with a protective order.  And the protective order

21  is not particularly onerous on the defense, it essentially

22  asked them to treat the information as confidential.  They

23  are allowed to share with members of their staff, other

24  attorneys working on the case, you know, anybody who has a

25  need to know about it in their office in order for them to

*Evidentiary Hearing • May 23, 2018*

**9**

```
 1   work on the case.  It asks them not to disclose it beyond
 2   that, so people not involved in the case or members of the
 3   public or what have you, and then it asks for when the case
 4   is concluded to return the disciplinary record information
 5   back to the government.  They can refer did it in court, they
 6   can question the witness about it.  It is not like a gag
 7   order or something like that.  So it is a rather narrow
 8   protective order.  I have seen much more thorough protective
 9   orders.
10           The defense wouldn't agree to that, so we filed a
11   motion with Your Honor requesting that protective order, so
12   that motion is pending before you, and we have not given over
13   yet pending the resolution of protective order the
14   disciplinary information about Special Agent Michael Thomas.
15   I can tell you the disclosure we have prepared is very brief,
16   so --
17           THE COURT:  May I see your disclosure, please?
18           MR. MARTIN:  Yes, Your Honor.
19           THE COURT:  Okay.  Thank you.
20           MR. MARTIN:  Do you want me to retrieve that, Your
21   Honor?
22           THE COURT:  Yes.  Do you in every case have a
23   protective order with personnel issues like this?
24           MR. MARTIN:  That's my practice, yes, yes.  I can't
25   speak for every assistant United States Attorney in our
```

1    office but, yes, generally that is our practice.

2            THE COURT:  But this will be gone over in open

3    court so it does become a public record.

4            MR. MARTIN:  Yes, it does, and so we are trying to

5    walk a fine line in that we want to provide protection for

6    the employee because the information, you know, is -- goes to

7    their personnel record.  On the other hand, we have to have

8    open court proceedings, and we don't want to close a

9    courtroom, that's a high standard to meet, and we don't think

10   that would be appropriate in this case, so we are trying to

11   strike a balance and that's what the protective order is

12   intended to do.

13           THE COURT:  All right.

14           MR. MARTIN:  I do want to respond to Mr. Densemo's

15   allegation that the government deliberately did not respond

16   to the Court's order.

17           The -- I think Mr. Densemo is confused.  The order

18   from the Court that he's alleging was an order for the

19   government to respond to their motion to dismiss was, in

20   fact, not that; it was an order from the Court for the

21   defense to respond to the government's motion for protective

22   order.  Then last week on Monday a docket entry appeared

23   ordering the government to respond to the defendant's motion

24   to dismiss that same day.  So at 3:00 there was an order

25   entered by the Court requiring the government to respond to

```
 1   their motion to dismiss that day.  Both Mr. Waterstreet and
 2   I, because we learned about it at different times, contacted
 3   the Court's staff, and we were told that was entered in
 4   error.
 5            So when you go back and look at the first order of
 6   the Court that Mr. Densemo is referring to, the entry on ECF
 7   is very clear, it directs the defense to respond to the
 8   government's motion for protective order and it identifies
 9   the protective order document number.  And then when you
10   click on the actual order from the Court, the order itself,
11   there was a slight typographical error in the order because
12   the order itself says that the government should respond to
13   motion for protective order document number what have you,
14   and I can't remember it off the top of my head, by
15   August 14th.
16            THE COURT:  Meaning the government should respond
17   to its own order?
18            MR. MARTIN:  Correct, but the actual entry on ECF
19   was clear, and so Mr. Waterstreet and I just interpreted that
20   as the Court's ordering the defense to respond to the motion
21   for protective order.  And I've practiced before Your Honor a
22   long time, and I have never seen you enter an order requiring
23   a response -- enter an order at 3:00 requiring a response at
24   5:00 that same day, so that's why we called chambers and
25   received that information.  So it was not a deliberate
```

1    attempt by the government to ignore court orders.

2           THE COURT:  Okay.  Response?  One thing I can say

3    is I can guarantee you is I did not enter an order to be

4    responded to in two hours deliberately.  I'm not saying there

5    isn't an error, it certainly can happen.  Okay.  Mr. Densemo.

6           MR. DENSEMO:  Your Honor, I looked at the order

7    that was issued prior to August 14th.  There was some --

8    there was a difference in the language of the order.  The

9    order directed the government to respond to Mr. Ramadan's

10   motion, but it said the motion was the protective order.

11   Clearly the government knew the Court wasn't ordering it to

12   respond to its own protective order.  The Court was ordering

13   the government to respond to the defense's motion to dismiss.

14          THE COURT:  Okay.  Let me end this because it is

15   all I think rather sample.  First of all, there was the order

16   for the discovery so we know that the written -- you got a

17   letter which responded to the written policy; is that

18   correct?

19          MR. DENSEMO:  We got --

20          THE COURT:  That there is no written policy.

21          MR. DENSEMO:  That's correct, Your Honor.

22          THE COURT:  And you got a -- you received in a

23   letter also the agencies that the individuals work for; is

24   that correct?

25          MR. DENSEMO:  That's correct.

 1          THE COURT:  All right.  And what you did not

 2    receive was the discipline of Special Agent Michael Thomas;

 3    is that correct?

 4          MR. DENSEMO:  That's correct.

 5          THE COURT:  And that brings in the protective

 6    order, so -- right?

 7          MR. DENSEMO:  Pardon?

 8          THE COURT:  The government is saying we would give

 9    it to you if you sign this protective order?

10          MR. DENSEMO:  They never said that to me, never.

11    They called me and said will you sign a protective order.

12    They never said we will give it to you if you sign a

13    protective order.

14          THE COURT:  Well, isn't that ridiculous?  Why would

15    you sign a protective order -- I mean, that's the nature of

16    it.  You sign a protective order and you get what you agree

17    to protect.

18          MR. DENSEMO:  They didn't identify what the nature

19    of the protective order was about.  Judge, here is the most

20    important thing --

21          THE COURT:  What is that?

22          MR. DENSEMO:  They had the information eight months

23    ago.  They knew that -- if they were going to seek a

24    protective order, they could have contacted me eight months

25    ago with this information and I would have said yes at that

```
 1    time.  If they had fully disclosed this information to me, if
 2    they had disclosed it to Mr. Ramadan eight months when they
 3    knew all of this, and they said -- if they had come to me and
 4    said, Andrew, we have some information -- some Giglio
 5    material regarding Special Agent Thomas, we want a protective
 6    order filed under these conditions, at that time I would have
 7    said yes --
 8              THE COURT:  Okay.
 9              MR. DENSEMO:  -- because I had a history with both
10    Ron Waterstreet and Michael Martin.  This is -- the way that
11    this case has played out and withholding information for
12    eight months when I -- we should have been given that
13    information eight months ago, the government's call to me or
14    e-mail to me was will you sign a protective order?  Regarding
15    what?  About what?  Why?  None of that was explained.
16              THE COURT:  What was eight months ago?  I'm sorry.
17    I don't recall.
18              MR. DENSEMO:  They -- the government --
19    Michael Thomas has been a part of this investigation since
20    August 15th.  Michael -- the information about Michael Thomas
21    has been in the possession of the government for about a year
22    now.  They have known all of this for a year.  They have
23    known that he was involved in the Koubriti case.  They knew
24    about his history with the Koubriti case.  They knew about
25    his history of any disciplinary proceedings that had taken
```

```
 1    place regarding Michael Thomas.  The government knew all of
 2    this a year ago, Your Honor, and they did not -- and you are
 3    just dealing with this one year into this case when this
 4    should have been dealt with.  The government knew it had a
 5    Giglio obligation a year ago, but it took them a year for all
 6    of this to come to light for this Court to have to deal with
 7    this.  This should have been an issue we were dealing with a
 8    year ago.
 9             THE COURT:  Okay.  Thank you.  Response?
10             MR. MARTIN:  I think this is a slightly different
11    argument now.  So this gets back to Mr. Densemo's, I guess,
12    claim that the government has a Giglio obligation to provide
13    him with impeachment material.
14             THE COURT:  When does Giglio come into play?
15             MR. MARTIN:  Not until trial, Your Honor, which
16    is -- we have --
17             THE COURT:  That was my understanding.  Are there
18    exceptions to that?
19             MR. MARTIN:  No, no.  We have briefed this now
20    extensively to the Court, we had an argument about it last
21    time.  It is the government's position that Giglio is a
22    constitutional requirement for the government to provide the
23    defense with impeachment evidence that can be used in the
24    guilt phase of the proceedings at the trial.  It does not
25    apply to suppression hearings, and it certainly does not
```

```
 1    apply to witnesses that are either not called or witnesses
 2    called by the defense.  And eight months ago, before he even
 3    filed his motion to suppress, how would we know what
 4    witnesses were going to be called at a suppression hearing or
 5    trial?  I mean, it's --
 6         THE COURT:  All right.  All right.  I'm ready to
 7    rule on this.  The Court finds that the government has
 8    responded to two of the three issues that the Court ordered.
 9    The third has to do with Special Agent Michael Thomas.  The
10    Court has reviewed the protective order.  At this point I
11    will enter the protective order, and you may return the
12    document which you showed the Court.
13         Let me ask you this question though to be sure.  Is
14    this the only item that you have as to this agent?
15         MR. MARTIN:  Yes, Your Honor, yes.
16         THE COURT:  All right.  Thank you.  I am going to
17    order it turned over, although, again, my understanding of
18    Giglio is it does not need to be done at this point, but
19    there does not seem to be any reason not to do it to clarify
20    this matter and so that we may proceed.  The motion to
21    dismiss is denied.
22         MR. MARTIN:  Thank you, Your Honor.  Just for the
23    record, I'm now handing that letter to Ms. Fitzharris.
24         THE COURT:  All right.  We will proceed now with
25    the evidentiary hearing.
```

 1              MR. MARTIN:  Yes, if I may discuss that for a

 2     moment.

 3              THE COURT:  Yes.

 4              MR. MARTIN:  So to remind the Court where we are

 5     at, the government has rested its presentation, we don't

 6     intend to call any further witnesses.  The defense had

 7     indicated they would like Special Agent Thomas and

 8     Officer Brown to testify in their case in chief.

 9              THE COURT:  Correct.

10              MR. MARTIN:  Both are here.  We also have

11     CBP Officer Matthew Robinson, and as you made recall,

12     Officer Robinson testified I believe back in January,

13     completed his testimony, but during the course of his

14     testimony said that he had written a report.  The defense

15     asked for that report.  We provided it shortly after the

16     hearing.  They moved to strike his entire testimony.  You

17     denied that, but said as a remedy we will have

18     Officer Robinson come back.  I'm raising that now --

19              THE COURT:  I allowed them the opportunity if they

20     wished to.

21              MR. MARTIN:  Correct.  In my view,

22     Officer Robinson's now cross-examination should be relatively

23     short.  It's not an opportunity to redo the entire

24     cross-examination that took place.  We are now here because

25     they want an opportunity to supposedly impeach him with his

```
 1    report.  It should be fairly limited testimony.  And I just
 2    want to flag for the Court because I don't want to see that
 3    turn -- this turn into, you know, a redoing the testimony of
 4    a witness that was on the stand for a good chunk of time back
 5    in January.
 6             THE COURT:  All right.  As I understand it, and
 7    Mr. Densemo or Ms. Fitzharris, you are going to examine him
 8    as to the document that you have -- the notes you have now
 9    received; is that correct?
10             MS. FITZHARRIS:  That's correct, and the e-mails
11    that were also not provided until after he testified.
12             I have a couple things, very quick things for the
13    Court for the record.  Very briefly, back on the issue of
14    disclosure, particularly the agencies, they were not
15    disclosed until the middle of the week last week.
16             THE COURT:  Wait a minute.  No, no.
17             MS. FITZHARRIS:  May I just please put this on the
18    record?
19             THE COURT:  Stop.  Let me just say this.  We
20    already have had it all on the record, the dates, when they
21    were disclosed, which you didn't have.  I don't think we need
22    to go into it again.  If you want to make a special record I
23    will allow you to do that after we take our witnesses so we
24    don't keep people here longer.  But you can make a special
25    record --
```

1          MS. FITZHARRIS:  Okay.

2          THE COURT:  I mean, you may do it on anything you

3     like but it would be after we finish our witnesses.

4          MS. FITZHARRIS:  Okay.  Thank you.  Fine.

5          On the other -- the other issue is, you know,

6     Mr. Martin mentions they are -- Agent Thomas and Officer

7     Brown are our witnesses, and this is the result of, as you

8     know, a lot of maneuvering.

9          We are asking the Court to allow us to treat them

10    as adverse witnesses under Rule of Evidence 11 -- 6.11(c)(2);

11    a hostile witness includes a witness identified with an

12    adverse party.  The United States government is an adverse

13    party to Mr. Ramadan.  The Customs and Border Patrol agents,

14    the Federal Bureau of Investigations, these are all law

15    enforcement bodies of the United States government, and their

16    interest because they are involved in the investigation of

17    Mr. Ramadan are aligned with the prosecution and not with

18    Mr. Ramadan.

19          THE COURT:  Okay.

20          MS. FITZHARRIS:  So we ask for the ability to

21    cross-examine both of them.

22          THE COURT:  You may.

23          MS. FITZHARRIS:  The final issue is, you know, this

24    case -- these motions have been pending for some time.  I

25    filed my first brief in October of 2017.  Since then, there's

```
 1    been a lot of activity in other courts of appeals on the
 2    issue of searches of digital devices at the border.  A
 3    handful of courts of appeals have weighed in as has a number
 4    of district courts, and so I just ask the Court to think
 5    about how you would like to proceed.  I suggest that -- I
 6    know there has been a lot of briefing in this case, but I
 7    suggest that supplemental briefing may be in order to kind of
 8    get the Court up to date on all the developments in the law
 9    that has happened since October.
10              THE COURT:  My law clerk has advised me of various
11    cases on this particular issue, so I will allow you to
12    supplement it but we will do it all at end because I'm going
13    to do one opinion on this.
14              MS. FITZHARRIS:  I understand.  I just wanted to
15    raise it for the Court.
16              THE COURT:  Yes.  Thank you.  All right.  Your
17    witness.
18              MS. FITZHARRIS:  Officer Robinson,
19    Matthew Robinson.
20              THE COURT:  Officer Robinson.
21              MR. MARTIN:  He's in a room right outside of the
22    courtroom, Your Honor.
23              THE COURT:  All right.
24              MR. MARTIN:  So we are getting him.
25              THE COURT REPORTER:  Would you please raise your
```

```
 1   right hand.
 2           Do you solemnly swear or affirm that the testimony
 3   you are about to give this Court will be the truth, the whole
 4   truth, and nothing but the truth, so help you God?
 5           OFFICER ROBINSON:  I do.
 6           THE COURT:  Officer, if you would pull that
 7   microphone towards you.  Thank you.  I'm not quite sure how
 8   it works in this courtroom because I haven't used it before.
 9           OFFICER ROBINSON:  All right.
10           THE COURT:  So we will see.
11                   OFFICER MATTHEW ROBINSON,
12   called at about 10:59 a.m., was examined and testified on his
13   oath as follows:
14                   DIRECT EXAMINATION
15   BY MS. FITZHARRIS:
16   Q.   Good morning, Officer Robinson.
17   A.   Good morning.
18   Q.   After you -- after you interacted with Mr. Ramadan at
19   the airport, you wrote a report, right?
20   A.   Correct.
21   Q.   And you wrote it on August 15th?
22   A.   It was while I was there overnight, past midnight, so
23   the report was started on the 15th and I think wasn't
24   completed technically.
25   Q.   Okay.  So you finished on August 16th?
```

```
 1   A.   Yeah -- well, the report was never completely finished.
 2   I went on days off -- after the 15th I was off for some days,
 3   so it was never finished.
 4   Q.   Did you add to it after August 16th?
 5   A.   No.  When I came back from my days off the report I had
 6   found out was canceled, they changed the seizure into a
 7   detention.
 8   Q.   Okay.  But you wrote it shortly after you interacted --
 9   you interacted with Mr. Ramadan?
10   A.   Correct.
11   Q.   And as part of your training, you are trained on how to
12   write reports?
13   A.   They go over some stuff with us.
14   Q.   And you are supposed to be detailed?
15   A.   Yeah, depending on what we were writing.
16   Q.   And sometimes your reports are used in future
17   prosecutions?
18   A.   I suppose they might be.
19   Q.   So you want to be accurate?
20   A.   As much as possible.
21   Q.   And thorough?
22   A.   True.
23   Q.   And you want to include information that might be
24   relevant for future prosecutions?
25   A.   Well, I generally include information that is relevant
```

```
 1   to what was going on at the time.
 2   Q.   Okay.  But sometimes -- like you said, sometimes it's
 3   used in future prosecutions so if you think it is relevant
 4   for a future prosecution you would include it, right?
 5   A.   I suppose.
 6   Q.   All right.  Last time you were here you talked about a
 7   conversation that you had with Mr. Ramadan right before he
 8   entered the plane; is that correct?  Do you remember that?
 9   A.   I spoke with him twice, if I recall.
10   Q.   Right, but one time before he entered the jetway?
11   A.   Right at the door of the jetway and then once right
12   outside of the plane.
13   Q.   And that's when you checked his passport?
14   A.   I checked his passport at the door to the jetway.
15   Q.   And last time -- and last time you were here you said
16   that you thought that there was some things that struck you
17   about Mr. Ramadan as unusual?
18   A.   Yeah, it was the number of carryon bags that he had.
19   Q.   You also mentioned the amount of money that he said that
20   he had?
21   A.   He, I believe, said he had $3,000.
22   Q.   But that you said was unusual last time you were here?
23   A.   Well, it is unusual if you are moving to another country
24   or going for an extended period of time with, you know,
25   family.
```

1   Q.   My question is last time you were here you thought the

2   amount of money was unusual?

3   A.   Well, given the circumstances.

4   Q.   When you said -- I'm just asking about what you said

5   last time.   Okay.   Last time you were here that's what you

6   said?

7   A.   That $3,000 is unusual?

8   Q.   Yes.

9   A.   Okay.   I suppose.

10  Q.   Did you go over your testimony from the last time you

11  were here before you came back today?

12  A.   I did review it, yes.

13  Q.   Okay.   So you don't have any reason to disagree with me

14  that you said the amount of currency was unusual?

15  A.   Okay.

16  Q.   Okay.   And you also said that you thought it was unusual

17  that he did not plan to return to the United States?

18  A.   Well, he said he was moving to Palestine so --

19  Q.   Okay.   But last time you were here you said that was

20  unusual?

21  A.   To only have $3,000 if you are moving away.

22  Q.   The last time you were here you said that you thought it

23  was unusual that he planned an indefinite trip to Palestine?

24  Yes or no.

25  A.   I don't believe I said that.

```
1   Q.   You don't believe you said that.  Okay.  You thought --
2   on page 602 of the transcript you said that you thought it
3   was --
4            MR. WATERSTREET:  Can we show him first, Your
5   Honor?  I think proper impeachment is to show it to them, ask
6   them if they remember that, it refreshes their memory, and
7   then perhaps then question them.
8            THE COURT:  You may ask him the question but show
9   him the transcript.
10           MS. FITZHARRIS:  Okay.
11           THE COURT:  If he has a copy so we don't have to go
12  back and forth.
13  BY MS. FITZHARRIS:
14  Q.   But in your report you did not mention the amount of
15  money Mr. Ramadan said he had?
16  A.   I don't believe so.
17  Q.   In your report you did not mention that you thought it
18  was unusual that he did not plan to return to the
19  United States?
20  A.   For the report as it was written for the OFAC items
21  those wouldn't be relevant.
22  Q.   The report that -- you wrote a report, yes?
23  A.   Yes.
24  Q.   And you did not include any statement about the amount
25  of currency being unusual?
```

1    A.    No.

2    Q.    Last time you testified you also mentioned a 2010 HSI

3    tip.

4    A.    Yes, there was some sort of record.

5    Q.    And at the time you testified, you thought it had to do

6    with marriage fraud?

7    A.    I believe I said it was recruitment or marriage fraud of

8    some sort.

9    Q.    Okay.  But when you wrote your report you did not

10   mention the 2010 tip?

11   A.    No.

12   Q.    All right.  Last time you testified you were asked about

13   what time you took the photos of Mr. Ramadan's luggage, and

14   at that time you couldn't remember.  Do you remember now what

15   time you took those photos?

16   A.    No.  It would have been after we brought him downstairs

17   to the federal inspection area.

18   Q.    Is there anything that would help refresh your

19   recollection about what time you sent the photos of those

20   luggage items to Officer Schmeltz?

21   A.    The photos were sent I believe around 10:00 or

22   11:00 p.m.

23         MS. FITZHARRIS:  Okay.  I am -- Your Honor,

24   permission to approach, Your Honor?

25         THE COURT:  Pardon me?

1    MS. FITZHARRIS:  Permission to approach the

2    witness, Your Honor?

3    THE COURT:  You don't have to ask for permission.

4    If you have something to show him, just show it to him.

5    MS. FITZHARRIS:  Okay.

6    BY MS. FITZHARRIS:

7    Q.  Officer Robinson, I have handed you what has been marked

8    as Defendant's Exhibit B.  Do you recognize the -- those

9    documents?

10   A.  It looks like it is just an e-mail header from the

11   cellphone for the e-mails that were sent to Officer Schmeltz.

12   Q.  Okay.  And were those -- those e-mails had attachments

13   to them at the time?

14   A.  They did.

15   Q.  And on those e-mails there are time stamps?

16   A.  There is, correct.

17   Q.  And you were sending the e-mails?

18   A.  I believe I sent them or another officer may have taken

19   the phone and sent them.

20   Q.  Okay.  And they were sent to Officer Schmeltz?

21   A.  Correct.

22   MS. FITZHARRIS:  Your Honor, at this point I move

23   to admit Exhibit B -- Defendant's Exhibit B.

24   THE COURT:  Any objection?

25   MR. WATERSTREET:  No objection.

```
 1              THE COURT:  It may be received.
 2              (Defendant's Exhibit B received into evidence.)
 3  BY MS. FITZHARRIS:
 4  Q.   And the first photo that someone sent to
 5  Officer Schmeltz was sent at 10:51 p.m.?
 6  A.   The first e-mail was sent at 10:51.
 7  Q.   And that e-mail had a photograph attached to it?
 8  A.   I believe it did, yes.
 9  Q.   And the last e-mail with an attachment was sent at
10  11:07 p.m.?
11  A.   Yes, according to this.
12              MS. FITZHARRIS:  No further questions.
13              THE COURT:  All right.
14              MR. DENSEMO:  One second, Your Honor.
15              (An off-the-record discussion was held at
16              11:07 a.m.)
17              MS. FITZHARRIS:  Sorry.  Very quickly.  Sorry.  I'm
18  going to point out page 602.
19  BY MS. FITZHARRIS:
20  Q.   Officer Robinson, I have handed you a copy of the
21  transcript of your testimony last time.  And you said earlier
22  that you couldn't remember what you said about things being
23  unusual, right?
24  A.   Yeah, I guess.
25  Q.   Okay.  So if you take a moment would looking through
```

*Evidentiary Hearing • May 23, 2018*

1    your prior testimony help refresh your recollection of what

2    you said before?

3    A.   I can look at it, yeah.

4    Q.   Okay.  For ease I suggest you look at pages 600 to 602.

5    A.   We are looking at the page ID at the top, right?

6    Q.   Yeah, it is at the top, the top runner, yep.

7    A.   You want me to review this now?

8    Q.   Just let me know when your memory is refreshed about

9    what you said last time.

10   A.   Okay.

11   Q.   Okay.  So last time you said that you thought there was

12   some unusual things about Mr. Ramadan, right?

13   A.   Correct.

14   Q.   They were that he had excessive bags?

15   A.   Yes.

16   Q.   That you thought it was unusual that he didn't have

17   plans to return to the United States?

18   A.   That he was on a one-way ticket, yes.

19   Q.   And that you thought the amount of money that he said he

20   had seemed small for the length of his travel?

21   A.   Correct.

22   Q.   And you did not mention those three things in your

23   report?

24   A.   No.

25        MS. FITZHARRIS:  No further questions.

1          THE COURT:  Thank you,

2    A.   I believe in my report I did mention that he said that

3    he was moving to Palenstine.

4    BY MS. FITZHARRIS:

5    Q.   But you did not say that you thought it was unusual?

6    A.   No.

7          MS. FITZHARRIS:  Thank you.

8          THE COURT:  Mr. Waterstreet?

9          MR. WATERSTREET:  One quick line of questioning.

10   Thank you.

11                        CROSS-EXAMINATION

12   BY MR. WATERSTREET:

13   Q.   Officer Robinson, what is a seizure report?

14   A.   It is a report that we do for any type of items that are

15   seized that would be sent down to the fines, penalties and

16   forfeiture office to give the subject or the person an

17   opportunity to petition of government for relief for those

18   items.

19   Q.   So what items were being seized for fine or forfeiture?

20   A.   That would have been the OFAC items.

21   Q.   And the OFAC items were the items that it would be

22   illegal to take out of the United States without proper

23   documentation?

24   A.   Without proper licensing, yes.

25   Q.   That included the body armor?

1   A.   The body armor and the taser.

2   Q.   The taser and the gun scope?

3   A.   Yes, the scopes as well, yes.

4   Q.   And so the fact that he is going out of the country is

5   important, correct?

6   A.   Correct.

7   Q.   And you put that in your report?

8   A.   Yes.

9   Q.   But how much money he had, how is that important to

10  whether he had a license for a body armor?

11  A.   It wouldn't be.

12  Q.   Okay.  And so you said -- you're particular as to what

13  reports you are writing for, and you were writing for fines,

14  penalties or forfeitures of the OFAC items.

15  A.   Correct.

16  Q.   This is not a report of the interview of --

17          MS. FITZHARRIS:  Objection; leading.

18          MR. WATERSTREET:  Yes, it is, it is their witness.

19          THE COURT:  Cross.  Overruled.

20  BY MR. WATERSTREET:

21  Q.   This is not a report that was written by you as a

22  memorization of every dealing you had with Mr. Ramadan, was

23  it?

24  A.   Correct.

25  Q.   This was just a seizure report?

1    A.   Right.  It would be just the items that were being

2    seized, to report on those items.

3    Q.   Okay.  And you said eventually that report was canceled.

4    Why was that?

5    A.   I believe the evidence was turned over to HSI.  They did

6    a detention on the items.  The items, when they are seized,

7    other than currency or narcotics, has to have a tariff number

8    assigned to it.  As I said I was off for those days, so they

9    were waiting to get the tariff numbers.  Seizures can only

10   stay at the port for a certain amount of time before they

11   have to be sent down to the downtown office here to be

12   processed.  So in that period of time I think the local

13   managers or my supervisor or somebody determined we can just

14   switch it over to detention rather than waiting, and turn the

15   items over to HSI for their further investigation.

16   Q.   And somebody else decided to cancel your report then?

17   A.   Correct.

18            MR. WATERSTREET:  Okay.  Thank you.

19                    REDIRECT EXAMINATION

20   BY MS. FITZHARRIS:

21   Q.   The report you wrote included some information about the

22   results of media scan, right?

23   A.   Yes.

24   Q.   And that didn't have anything to do with the OFAC

25   controlled items?

1    A.    No.

2    Q.    One last thing.  You turned Mr. Ramadan over to

3    Officer Schmeltz and Armentrout at 9:00 p.m. on August 15th?

4    A.    Approximately.  It was -- essentially once we got down

5    to the federal area --

6    Q.    Uh-huh.

7    A.    -- we separate the luggage -- we kind of separate.  Him

8    and his family went in to talk to Officers Schmeltz and

9    Officer Armentrout, and we began working on locating the bags

10   and searching through the bags.

11   Q.    And that was around 9:00 p.m.?

12   A.    Around 9:00 p.m.

13        THE COURT:  All right.  Thank you.  You may step

14   down, sir.

15   A.    Thank you.

16        (Witness excused at 11:15 a.m.)

17        THE COURT:  Your next witness?

18        MR. DENSEMO:  Michael Thomas.

19        THE COURT REPORTER:  Would you please raise your

20   right hand.

21        Do you solemnly swear or affirm that the testimony

22   you are about to give this Court will be the truth, the whole

23   truth, and nothing but the truth, so help you God?

24        AGENT THOMAS:  I do.

25

```
 1                    AGENT MICHAEL THOMAS,
 2    called at about 11:16 a.m., was examined and testified on his
 3    oath as follows:
 4                      DIRECT EXAMINATION
 5    BY MR. DENSEMO:
 6    Q.   Good morning, Agent Thomas.  How are you?
 7    A.   Fine, sir.  Thank you.
 8    Q.   State your full name for the record, please.
 9    A.   Michael J. Thomas.
10    Q.   And how are you employed, Agent Thomas?
11    A.   Sir, currently employed as a special agent with the
12    Federal Bureau of Investigations.
13    Q.   How long have you been an FBI agent?
14    A.   Approximately 21 years.
15    Q.   Did you do -- were you a law enforcement officer before
16    you were an FBI agent?
17    A.   I was a military officer, and I had served as a military
18    police officer prior to that.
19    Q.   Okay.  How long were you a military police officer?
20    A.   For two years, sir.
21    Q.   So you have been in law enforcement probably the
22    majority of -- probably all of your adult life?
23    A.   With the exception of being an ordinance military
24    officer, yes, sir.  I was an ordinance military officer for
25    seven years.
```

1    Q.    Okay.  And you began with the FBI in what year?

2    A.    June of 1997.

3    Q.    And August 15th, 2017, what were your duties with the

4    FBI?

5    A.    I was assigned to JTFF, Joint Terrorism Task Force, with

6    the airport as the airport liaison FBI agent.

7    Q.    JTFF, airport.  And how long have you been with the

8    Joint Terrorism Task Force?

9    A.    Approximately eight, nine years.

10   Q.    On August 15th, 2017, were you working with -- you still

11   working in that capacity with the Joint Terrorism Task Force?

12   A.    Yes, sir.

13   Q.    And on August 15th, 2017, did you receive a call with

14   some information about a Yousef Ramadan?

15   A.    Yes, sir.

16   Q.    Who contacted you about Mr. Ramadan?

17   A.    CBP, sir.  I'm not sure exactly which officer.  It might

18   have been Supervisor Stiggerwalt.  I'm not sure exactly who

19   -- somebody from CBP contacted me.

20   Q.    So it could have been Stiggerwalt?

21   A.    That's possible yes, sir.

22   Q.    What did Stiggerwalt tell you?

23   A.    Again, I'm not sure it was Stiggerwalt.

24   Q.    What did the CBP officer want, why was he contacting

25   you?

```
 1   A.   That they had -- TSA had contacted them and they -- that
 2   they found some -- TSA had found some bulletproof vests on an
 3   X-ray, I believe, and that they contacted CBP.  /CBP
 4   responded and then recovered some luggage, and during the
 5   course of the inspection of luggage they found some export
 6   violations and also some military -- dual-use military
 7   equipment that they had concerned with.
 8   Q.   What kind of concerns?  Concerns that involved your
 9   expertise?
10   A.   Correct.
11   Q.   As a counterterrorism task force agent?
12   A.   Well, they just -- they felt I should be aware of what
13   was going on.
14   Q.   Okay.  You were an FBI agent assigned to the Joint
15   Terrorism Task Force?
16   A.   That is correct.
17   Q.   And they contacted you?
18   A.   Yes, sir.  They routinely do with all matters like that.
19   Q.   Okay.  And they weren't contacting you for a traffic
20   violation or anything like that, were they?
21   A.   No, sir.
22   Q.   They contacted you because you were working in a certain
23   capacity?
24   A.   As the airport liaison with the FBI, yes, sir.
25   Q.   With the Joint Terrorism Task Force?
```

1    A.   That's correct, sir.

2    Q.   Alright.   And they had some concerns that this -- what

3    they were looking at may involve your area of expertise,

4    that's why they contacted you; is that correct?

5    A.   They weren't sure.   They -- just like I said, they just

6    wanted me to come out and take a look at it.

7    Q.   They have some concerns so they asked you to come and

8    take a look; is that correct?

9    A.   That's correct, yes, sir.

10   Q.   And were you given any information about Mr. Ramadan --

11   or what information were you given about Mr. Ramadan?

12   A.    Initially I believe that they had advised that he was

13   traveling with his family, and that was really about it.

14   Q.   Were you contacted by CBP Agent James Brown?

15   A.   Yes.

16   Q.   Did he call you or did he send you a text message?

17   A.   I believe I called him after receiving a text message

18   from him.

19   Q.   Okay.

20   A.   Or he may have called me, but either way I did remember

21   speaking with him telephonically.

22          MR. DENSEMO:   May I, Your Honor?

23   BY MR. DENSEMO:

24   Q.   Is it fair to say you are having some difficulty

25   remembering who called who first or who texted who first?

1  A.   I just don't recall.

2  Q.   Okay.  Take a look at this text message and see if that

3  refreshes your recollection as to when you exchanged text

4  messages between yourself and CBP Officer James Brown.  Do

5  you recall?

6  A.   I don't recall this specific text but I see it.  It has

7  got my name on it, yes.

8  Q.   You said -- so you don't recall when -- exactly when you

9  received this text message from --

10  A.   I don't recall receiving that text message but I can see

11  that it came to my phone at 9:17 but I do not recall that.

12  Q.   It came in at what time?

13  A.   I believe it said 9:17 there.

14  Q.   Alright.

15  A.   9:17 p.m.

16  Q.   9:17 p.m. you received a text message from CBP Officer

17  James Brown; is that right?

18  A.   That's correct.

19  Q.   And in that text message either you or Officer Brown

20  says I will call Dave; is that right?

21  A.   That's him texting me.  I did not -- that's correct.

22  Q.   Okay.  And had you had a phone call with Officer Brown

23  prior to this text message?

24  A.   Honestly I don't recall.

25  Q.   Do you know who the Dave is he was referring to?

1   A.   When I initially saw that I saw it at the prosecutor's

2   office when we reviewed, and I thought it was possibly

3   Dave Lera (phonetic) who is another JTFF member.

4   Q.   Okay.  And you responded, did you run his name?

5   A.   I didn't respond to that, no, sir.  I think that he -- I

6   think that he sent that to me as well.

7   Q.   All right.  And did you send him a response?

8   A.   No, I did not.  I don't believe I did because I --

9   Q.   CBP Officer Brown send you a text message, did you run

10  his name?  I will call NCIC and check and let me know.  Do

11  you recall receiving that text message from CBP

12  Officer Brown?

13  A.   I do not recall receiving that text message, no, sir.

14  Q.   Are you saying that you never received it or you don't

15  recall receiving it?

16  A.   I don't recall receiving it.  Obviously I received it,

17  you have it right there.

18  Q.   Clearly you received it because it's in your phone?

19  A.   That is correct.

20  Q.   Alright.  And were there text messages that you sent in

21  response to CBP Officer Brown?

22  A.   I don't believe so.  I believe I spoke with him on the

23  phone.

24  Q.   Okay.  Did you check your phone to see if you sent text

25  messages to CBP Officer Brown?

1   A.   I did, sir.

2   Q.   And were there text messages -- returned messages that

3   you sent to Brown?

4   A.   I did not find any.  I typically as a routine practice

5   delete my text messages after I read them.

6   Q.   So you could have deleted your responses?

7   A.   It is possible, but I don't recall responding.  It would

8   be -- if I would have responded I assume it would be in that

9   string of responses.

10  Q.   So let me get this straight, you received two text

11  message from CBP Officer Brown and you responded to neither?

12  A.   I do not recall responding to either one of them.

13  Q.   What does that mean; that you could have but you don't

14  remember?

15  A.   I don't believe I responded, sir.  I believe I spoken

16  with him telephonically.  I think I got them, and I was

17  either possibly driving in my vehicle.  I did not respond, I

18  remember speaking to him telephonically.

19  Q.   Agent Thomas, you've been disciplined in the past for

20  neglecting in your preparing and reviewing documentation

21  during an investigation; is that correct?

22  A.   That is correct, sir.

23  Q.   And you were suspended as a result of your neglect?

24  A.   I received a one-day suspension, that's correct, sir.

25  Q.   And in this case, is it -- are you saying that you could

1   have failed to preserve communications from you to another

2   agent regarding a possible terrorist investigation?

3   A.   That's not what I'm saying at all, sir.  I'm just saying

4   I don't recall receiving that text message that you just

5   showed me.

6   Q.   Okay.  But you may have received it and deleted it?

7   A.   That's correct.

8   Q.   Do you remember how long you and Agent Brown

9   communicated about Mr. Ramadan?

10  A.   My recollection, the telephone call would have been very

11  briefly because I was en route to the airport.

12  Q.   Why were you en route to the airport?

13  A.   To go -- because CBP called me to respond to the

14  airport.

15  Q.   And you responded immediately?

16  A.   Well, if I received the call probably within 15 minutes

17  after receiving the call I would have responded, correct.

18  Q.   So your text message from CBP Officer Brown was at 9:17

19  so you should have gotten a -- you probably got a call from

20  Stiggerwalt or somebody from CBP at about 9:00; is that

21  right?

22  A.   I don't recall exactly what time it was.

23  Q.   I want you to approximate given what you just said.

24  A.   I was say approximately, sir.

25  Q.   9:00, around 9:00?

1    A.    Yes, sir.

2    Q.    8:59, something like that?

3    A.    Somewhere in that time frame, I can't be certain.

4    Q.    Okay.

5    A.    I did receive a call that evening, I can't be specific

6    exactly what time.

7    Q.    So you got a call from someone at CBP, possibly

8    Stiggerwalt, correct?

9    A.    Correct.

10   Q.    And then you get two text messages around 9:17 from CBP

11   Officer James Brown; is that correct?

12   A.    That's correct.

13   Q.    Asking you to come to the airport, right?

14   A.    No, I don't think he was asking me to come to the

15   airport.

16   Q.    You got a call regarding --

17   A.    I told him I was en route to the airport, and I believe

18   he was already there.

19   Q.    I'm sorry.  You got a call -- you weren't already on

20   your way to the airport that evening; is that right?  Where

21   were you when you got the call from possibly Striggerwalt?

22   A.    I was at my residence.

23   Q.    You were at home.  You get a call from Stiggerwalt or

24   someone from CBP, right?

25   A.    Correct.

1   Q.   They tell you about we got this guy, Ramadan, at the

2   airport, we want you to come by and check him out?

3   A.   Correct.

4   Q.   9:17 you get an couple text messages from CBP

5   Officer Brown; is that right?

6   A.   According to what you showed me, yes.

7   Q.   You don't have any recollection of having contact with

8   Brown that evening?

9   A.   I have recollection of speaking with him telephonically.

10  Q.   Okay.  All right.  And we have a record from your phone

11  that you -- you contacted him about -- he contacted you about

12  9:17 on your way to the airport, right?  Is that right?

13  A.   Again, I'm not sure if I was en route to the airport.

14  He sent me a text at 9:17.  I don't recall seeing it.  I

15  don't recall replying to it.  So it is possible when I saw it

16  I telephonically called him.

17  Q.   All right.  How long -- did you do you anything --

18  between the time that you got your call and the time that you

19  saw Mr. Ramadan, did you make any other phone calls?  Did you

20  contact anybody else?

21  A.   I probably contacted my supervisor to -- what I

22  routinely do is to let him know I'm responding to the

23  airport.

24  Q.   A supervisor with whom -- with who?

25  A.   When the FBI, it would have been Nick Zamback at the

1    time.

2    Q.   Is he with Joint Terrorism Task Force as well?

3    A.   He would have the supervisor at the JTFF.

4    Q.   You informed him why you were going to the airport?

5    A.   Yes, sir.

6    Q.   Did you contact anybody else?

7    A.   Not that I recall, no, sir.

8    Q.   Did you receive any information from anybody else?

9    A.   Not that I recall, sir.

10   Q.   And your assigned duties on August 15th, 2017 were what

11   as an FBI, what were your duties that evening?

12   A.   That evening the same as they are every evening, as the

13   airport liaison officer with the FBI to CBP, to other

14   airlines.  Anybody who needs FBI assistance --

15   Q.   You investigate what, what do you do?

16   A.   I investigate all federal violations that occur at the

17   airport.

18   Q.   Including terrorism?

19   A.   Including terrorism, that would be correct.

20   Q.   And was your participation in the interrogation of

21   Mr. Ramadan on August 15th, 2017 consistent with your

22   assigned duties as a terrorism investigator?

23   A.   I never interrogated Mr. Ramadan.

24   Q.   Did you question Mr. Ramadan?

25   A.   I did.  I interviewed him, yes.

1   Q.   Alright.  And you make a distinction between questioning

2   and interrogation; is that right?

3   A.   Yes, I do.

4   Q.   Please tell me the difference between questioning

5   somebody and interrogating somebody?

6   A.   I think an interrogation involves when somebody is in

7   custody and you are questioning them about a crime they are

8   being charged with, that to me would be an interrogation.

9   Q.   Okay.  Define custody.

10  A.   Custody, they are under arrest, they are not free to

11  leave, they have been advised of their Miranda Rights.  That

12  would be a custodial.

13  Q.   All right.  How long did it take you to get to the

14  airport?

15  A.   30, 35 minutes, 30.

16  Q.   What did you do once you arrived at airport?

17  A.   Once I got to the airport, I went into the north

18  terminal, and I was met by CBP officers who gave me a general

19  thumbnail sketch of what they had.

20  Q.   What did they tell you that they had.

21  A.   Again, as I stayed earlier, that they had received a

22  call from TSA.  They had the bags, they had all the bags, the

23  contents of the bags laid out, and they were reviewing I

24  believe some media at that time that they had found.

25  Q.   Did they tell you what was on the media?

1   A.   ISIS related videos and propaganda.

2   Q.   Do you investigate ISIS -- individuals connected with

3   ISIS?

4   A.   If it happens at the airport, yes, sir.

5   Q.   So this would have been consistent with your duties as

6   an FBI agent?

7   A.   Yes, sir.

8   Q.   Did you consult with any other agents -- you just

9   answered that.

10        So how -- do you recall which agents you talked to

11  go about Mr. Ramadan?

12  A.   No, sir, I do not.

13  Q.   And so you had -- did you look at the media yourself

14  before talking to Mr. Ramadan?

15  A.   I did.  I went into the command center and saw what they

16  had had at that time, not all of it.  Like I said, they were

17  reviewing it so not all -- everything but I did say some.

18  Q.   There was a lot of stuff on that hard drive, a lot of

19  information, a lot of data?

20  A.   I am assuming so, yes, sir.

21  Q.   But you were able to -- what time did you arrive at the

22  airport, do you remember?  It took you about 30 minutes or so

23  it took you to get there?

24  A.   I arrived between 10:00 and 10:15.

25  Q.   And so you looked at the -- you talked to the agents,

```
 1   they told you well, we found some ISIS videos and some other
 2   stuff, and then you looked at it yourself?
 3   A.   I looked at all the equipment that laid out on the
 4   belts.
 5   Q.   Did you have any concerns seeing that?
 6   A.   I did.
 7   Q.   What were those concerns?
 8   A.   Just to me it didn't appear like normal stuff that
 9   normal travelers travel with.
10   Q.   Suggesting what?
11   A.   Not suggesting anything.  It's just -- it wasn't
12   consistent with normal travel and packing.  Somebody who was
13   either involved with the military or possibly --
14   Q.   Possibly what?  What?
15   A.   Hunting.  I don't know.  It just was not consistent with
16   equipment that I've seen -- or not consistent with normal
17   travel stuff.
18   Q.   All right.  So why didn't you turn around and go home if
19   you thought it was nothing, if it was just something unusual?
20   A.   I felt that --
21   Q.   You didn't turned around and go home, did you?
22   A.   No, sir, I did not.
23   Q.   You continued your investigation?
24   A.   Correct.
25   Q.   Where was Mr. Ramadan located when you first saw him?
```

1    A.   He was in the reception area of the CBP secondary

2    inspection area.

3    Q.   Did you see his wife and children with him -- or people

4    who appeared to be his wife and children?

5    A.   Yes.

6    Q.   Did you lead or summon Mr. Ramadan into a small

7    interrogation room?

8    A.   Excuse me.

9    Q.   Did you lead or summon Mr. Ramadan into a small

10   interrogation room?

11   A.   No, sir, I did not.

12   Q.   Did you go into a smaller room?  Let me make this easy

13   for you.  You see Mr. Ramadan in the reception area; is that

14   right?

15   A.   Yes.

16   Q.   Did you walk up to him and start questioning him?

17   A.   No, sir, I do not.

18   Q.   Once you get to the reception area, where do you go?

19   A.   I went into the command center.

20   Q.   Okay.  What do you do in the command center?

21   A.   Again, that's where I was -- where the CBP officers were

22   reviewing some of stuff they had found, and I looked at some

23   of that stuff.

24   Q.   How long did it take you to review that?

25   A.   Not very long, maybe five to seven minutes.

```
 1   Q.   What did you did after reviewing that information?  What
 2   did you do or where did you go?
 3   A.   I went to the -- there's a break room across the CPC
 4   area.
 5   Q.   What did you do there?
 6   A.   That's where I wanted to interview Mr. Ramadan.
 7   Q.   Was this a room with a desk and chairs and a computer?
 8   A.   Yes, and a big round table.
 9   Q.   Were people already in that room?
10   A.   I don't recall if there were people already in that room
11   when I got inside the room.
12   Q.   So you walk inside the room.  What happens next?
13   A.   I -- I'm joined by CBP Officer Schmeltz, HSI
14   Officer Kelley and Task Force Officer James Brown.
15   Q.   Was Agent Armentrout there?
16   A.   No, sir, I don't believe so.
17   Q.   Do you know Armentrout?
18   A.   I do, sir.
19   Q.   And you don't believe he was in the room?
20   A.   I do not believe he was in the room.
21   Q.   So it was you, Schmeltz, Kelley and Brown inside the
22   room?
23   A.   I'm trying to think if Schmeltz was there when I
24   initially --
25   Q.   You said he was?
```

1    A.   I stand corrected.  I don't believe Schmeltz was in

2    there when I was -- when we initially interviewed

3    Mrs. Ramadan.

4    Q.   Mrs. Ramadan or Mr. Ramadan?

5    A.   Mrs. Ramadan.  I interviewed her first, sir.

6    Q.   You interviewed Mrs. Ramadan first?

7    A.   Yes, sir.

8    Q.   Did you ask Mrs. Ramadan questions about Mr. Ramadan?

9    A.   I did.

10   Q.   Did you ask Mrs. Ramadan why Mr. Ramadan had ISIS -- why

11   he was looking at ISIS videos?

12   A.   I did.

13   Q.   Did you ask Mrs. Ramadan whether your husband -- about

14   your husband's political beliefs?

15   A.   Political beliefs?

16   Q.   Yes, sir.

17   A.   No, sir, I don't believe so.

18   Q.   Did you ask Mrs. Ramadan if your husband was connected

19   to ISIS, Hamas, Hesballah?

20   A.   No.

21   Q.   Did you ask Mrs. Ramadan if her husband was a private

22   person?

23   A.   I believe she told me he was a private person.

24   Q.   In response to a question or she just blurted it out?

25   A.   It was possibly in respond to a question but I --

1    Q.   Did you ask Mrs. Ramadan other questions about her

2    husband?

3    A.   I asked him if he had any firearms.  I asked her why he

4    would have -- or, you know, why he has these ISIS videos.

5    Q.   Your question related to the ISIS videos, that wasn't in

6    relationship to any kind of export violation, was it?

7    A.   No, sir.

8    Q.   That was -- you asked those questions because you are

9    suppose to ask those questions as a Joint Terrorism Task

10   Force officer; is that right?

11   A.   I would agree with that, yes, sir.

12   Q.   You would agree with that?

13   A.   Yes, sir.

14   Q.   And the point of that question was to determine if

15   Yousef Ramadan was connected to -- if if she knew or was

16   willing to provide you information about Yousef Ramadan's

17   connection to any terrorist organizations?

18   A.   My question was --

19   Q.   I said the point of your question.

20   A.   I'm sorry.  Could you repeat the question.

21   Q.   I said by asking that question -- you asking

22   Mrs. Ramadan questions about these ISIS videos because you

23   wanted to find out if she knew or was prepared to tell you if

24   her husband was connected to any terrorist organizations?

25   A.   Yes, sir.

1  Q.   How long did you talk to Mrs. Ramadan?

2  A.   Maybe 30 minutes.

3  Q.   And would you say that your questioning of Mrs. Ramadan

4  was to determine if she and her husband, specifically her

5  husband, posed some sort of terroristic threats to the U.S.,

6  its allies or others?

7  A.   Yes, sir.

8  Q.   After you were done questioning Mrs. Ramadan, what did

9  you do next?

10  A.   I went out in the hallway and I talked to Mrs. Ramadan's

11  sister who was out there.

12  Q.   Her sister?

13  A.   There was a sister out there, yeah.

14  Q.   Really?

15  A.   Yes.

16  Q.   Okay.

17  A.   And asked her --

18  Q.   You talked to her sister?

19  A.   Yes.

20  Q.   Do you remember her sister's name?

21  A.   I don't remember the sister's name.

22  Q.   Okay.  You left the secondary inspection area?

23  A.   Correct.

24  Q.   That's that secured area, right, or at least that's --

25  A.   That's correct.

```
 1   Q.   So you left out of there and you walked outside?
 2   A.   Right outside of that area, yes, sir.
 3   Q.   Why did you do that?  Did someone call you and tell you
 4   that Mrs. Ramadan's sister is here asking about her?
 5   A.   Mrs. Ramadan's sister said -- excuse me.  Mrs. Ramadan
 6   said she was staying with the sister.
 7   Q.   Okay.
 8   A.   And I wanted to confirm that information.
 9   Q.   So her sister was outside waiting for you?
10   A.   She was waiting for them, I believe.
11   Q.   Okay.  So you walked outside and you talked to her?
12   A.   Yes.
13   Q.   And did you confirm the information with her sister that
14   they were staying with her?
15   A.   Yes.
16   Q.   And what else did you guys talk about?
17   A.   I believe that was it.  Then I went back inside and went
18   to -- went back up into the command center to see if there
19   was any additional information, and then I went -- returned
20   back to the interview room and then wanted to interview
21   Mr. Ramadan again -- or wanted to interview Mr. Ramadan at
22   that point.
23   Q.   Was Schmeltz in the interview room by this time?
24   A.   He was present for that interview, yes, sir.
25   Q.   So did somebody go and get Mr. Ramadan and bring him to
```

 1  you?

 2  A.   Somebody brought Mr. Ramadan to that room, yes, sir.

 3  Q.   Okay.  So at this time there is also Schmeltz, Kelley,

 4  you and Brown, right, in the room?

 5  A.   Myself, Officer Brown, Schmeltz, and Mr. Kelley, yes,

 6  sir.

 7  Q.   Were you all armed -- were you armed?

 8  A.   I was armed, yes, sir.

 9  Q.   Okay.  Did you -- was your sidearm visible?

10  A.   No, sir.

11  Q.   Did you have your jacket on?

12  A.   I had probably a shirt on covering my weapon.

13  Q.   Was your weapon sticking out or did you have one of

14  those really sneaking concealed weapons where you can't --

15  A.   No, sir.  My weapon was covered, sir.

16  Q.   What kind of weapon do you have?

17  A.   I have a Glock .22, sir.

18  Q.   Is that the big one or the small one?

19  A.   It is a Glock .22.  I'm not sure sure what you are

20  comparing it to.

21  Q.   Where was Mr. Ramadan seated inside the room?

22  A.   We were all sitting around a round time.  I think if I

23  was sitting here here, Mr. Ramadan would have been sitting

24  right here at that round table.

25  Q.   Okay.  So you were all seated?

```
 1   A.   Yes, sir.

 2   Q.   No one was standing?

 3   A.   No, sir.

 4   Q.   Why Mr. Ramadan wasn't free to leave that interview

 5   room, was he?

 6   A.   He could have left, I guess.

 7   Q.   What do you mean you guess?

 8   A.   I don't know where he would have went to.  He could have

 9   went to the restroom or something.

10   Q.   Was he free to leave the airport?

11   A.   No, sir, he was not free to leave the airport, not until

12   CBP has completed their inspection.

13   Q.   Okay.  During your question of Mr. Ramadan, did he ask

14   for an attorney?

15   A.   He did not, sir.

16   Q.   Did he ask that the questions be recorded?

17   A.   He did not, sir.

18   Q.   Did he ask if the questioning was being recorded?

19   A.   He did not, sir.

20   Q.   Are you aware that in 2014 then FBI director and

21   Attorney General Eric Holder initiated a policy that stated

22   that FBI interrogations or FBI interviews should be recorded?

23   Were you aware of that?  Were you of that policy?  You were

24   an agent when that policy was handed down, weren't you?

25   A.   I was, but that's not what the policy says, sir.
```

*Evidentiary Hearing • May 23, 2018*

```
 1   Q.   Why don't you tell me, was there a preference to record
 2   interrogation?  Isn't that what the policy says?
 3   A.   Under certain circumstance, yes, sir.  One of those
 4   conditions --
 5   Q.   You've answered my question.
 6   A.   I'm sorry.
 7   Q.   You've answered my question.
 8   A.   I just wanted to make sure I was clear.
 9   Q.   You were clear.
10   A.   Okay.
11   Q.   So you were the only FBI agent who was present, there
12   wasn't a second FBI present; is that right?
13   A.   I was the only one, sir.
14   Q.   Is there a FBI policy that counsels or directs that two
15   FBI agents be present during the questioning of suspects?
16   A.   Not necessarily two FBI agents but two agents assigned
17   to the same squad or something like that, and my number two
18   was Task Force Officer James Brown.
19   Q.   Did you question Mr. Ramadan in an effort to determine
20   if he posed a terrorism threat to the United States, its
21   allies or others?
22   A.   I did.
23   Q.   Did you question Mr. Ramadan in an effort to determine
24   if he had supposed or had aided terrorist organizations?
25   A.   I did.
```

1    Q.   Did you ask Mr. Ramadan if he believed in the caliphate?

2    A.   I don't know if I asked him that or if he stated that,

3    but he said that he did believe in the caliphate.

4    Q.   He just blurted that out?  He just said I believe in the

5    caliphate, or was it in response to a question?

6    A.   Sir, it was probably in response to a question.

7    Q.   Thank you, Officer.  Did you ask Mr. Ramadan if he was

8    going to carry out any acts of violence in the United States?

9    A.   I did not ask him that.  He made a statement that if he

10   was to carry out an act it would be much easier to carry an

11   act out into the states versus overseas.

12   Q.   Isn't what Mr. Ramadan said if I wanted to carry out a

13   terrorist act or an act of violence it would be easier

14   overseas?

15   A.   No, sir.  He said it would be easier to do here in the

16   United States.

17   Q.   I'm sorry.  He said but if I wanted to -- if I were of a

18   mind -- if I wanted to do something like that it would be

19   easier here in the U.S.?

20   A.   That's correct, sir.

21   Q.   He never said he was going to go do it, he said if I

22   wanted to?

23   A.   That's correct, sir, he never said that.

24   Q.   And did you ask Mr. Ramadan if he was going to carry out

25   any acts of violence in the United States?

1    A.   I don't believe I specifically asked him that.

2    Q.   Did Mr. Ramadan indicate to you that he had no intention

3    of carrying out any acts of violence in the U.S. or anyplace

4    else?

5    A.   Correct, he did say that.

6    Q.   Did you request Mr. Ramadan about his distrust of others

7    or did that come out?

8    A.   That came up, yes, sir.

9    Q.   Mr. Ramadan said he doesn't trust many people?

10   A.   Correct, including his wife.

11   Q.   Did you ask Mr. Ramadan why he needed the bulletproof

12   vest?

13   A.   I asked him why he had the vest, and said that he had

14   the vest because he used to be a security guard in

15   California, I believe

16   Q.   Did you see -- when you reviewed his media, did you see

17   a picture of Mr. Ramadan in his security guard uniform with

18   his bulletproof vest on?

19   A.   I don't recall any of that.

20   Q.   You don't recall seeing that on the videos that you

21   reviewed?

22   A.   No, sir, I did not

23   Q.   Did you question Mr. Ramadan about why he had the ISIS

24   videos?

25   A.   I did, sir.

1   Q.   Did you ask Mr. Ramadan about firearms?

2   A.   I did, sir.

3   Q.   Did you question Mr. Ramadan about having permission to

4   own firearms; whether or not he had a license to legally

5   carry firearms?

6   A.   I don't recall if I asked him if he had a license to

7   carry.

8   Q.   Did you ask Mr. Ramadan where firearms were located?

9   A.   I did, sir.

10   Q.   Did you have a discussion with Mr. Ramadan about the

11   ISIS videos radicalizing him and inspiring him to commit acts

12   against the United States?  Did you tell Mr. Ramadan that you

13   were concerned about the ISIS videos and that they may

14   radicalize him?

15   A.   I told him I had concerns with the totality of what he

16   was telling me, the ISIS videos, his paranoia that everybody

17   was watching him, his --

18   Q.   Stockpiling of firearms?

19   A.   No, I didn't say anything about stockpiling firearms.

20   Q.   Didn't you write a note where you circled stockpiling

21   firearms?

22   A.   I don't believe so, sir.

23   Q.   Give me one second.  Do you recall those notes that you

24   took during the interview of Mr. Ramadan?

25   A.   Yes, sir.

1    Q.   Do you recall writing stockpile?

2    A.   I do remember stockpiles.

3    Q.   So that's was one of the things that you were concerned

4    of --

5    A.   I wouldn't consider three weapon stockpiles.

6    Q.   But that's what you wrote on your notes?

7    A.   That's what is there, sir, but --

8    Q.   That's what you wrote, isn't it?

9    A.   That is correct.

10   Q.   You wrote stockpile, I didn't, right?

11   A.   That is correct, sir.

12   Q.   And then you wrote on your report ISIS/Hamas videos,

13   correct?

14   A.   I don't think I wrote on my report -- yes, sir.

15   Q.   You wrote on your report ISIS/Hamas videos, right?

16   A.   In my notes there, sir.

17   Q.   Then you wrote Gaza in your notes, right?

18   A.   Correct, sir.

19   Q.   Then you wrote Bethlehem; is that correct?

20   A.   That's correct.

21   Q.   You wrote issue Hamas -- ISIS/Hamas again, correct?

22   A.   Can I see it again, sir?  Correct, sir.

23   Q.   And you circled paranoia, correct?

24   A.   Yes, sir.  If I can explain that?

25   Q.   No, I don't need you to.  I want you to answer my

1    question.

2    A.    Yes, sir, I did circle that.

3    Q.    And then in really big circles you circled lone wolf; is

4    that right?  Yes or no.  Did you do that?

5    A.    Correct.

6    Q.    And lone wolf, in FBI terms, lone wolf is a single --

7    someone acting by themself as a terrorist; is that right?

8    A.    That would be -- a lone wolf would be somebody that acts

9    on their own, yes, sir.

10   Q.    Terrorist?

11   A.    It doesn't necessarily have to be terrorism.  It could

12   be --

13   Q.    It could be a terrorist?

14   A.    It could be, doesn't necessarily have to be.

15   Q.    That's what you were talking about, right, terrorist?

16   A.    When I wrote the lone wolf is Mr. Ramadan told me that

17   he was very private and acted alone, he was a lone, that's

18   why I wrote that.  I told him I had some concerns, and one of

19   them is because you told me yourself, sir, you were a lone

20   wolf.  Sir, you told me yourself --

21   Q.    You used the words himself I am a lone wolf?

22   A.    A loaner.

23   Q.    You wrote lone wolf; is that right?

24   A.    Correct, sir.

25   Q.    And lone wolf is used in FBI terminology sometimes to

1   describe a terrorist acting alone?

2   A.   That's correct, sir.

3   Q.   Did you or one of the other agents in the room

4   questioning Mr. Ramadan tell him that he would be or could be

5   taken to Guantanamo to be detained and interrogated further

6   if he refused to answer your questions?

7   A.   No, sir.

8   Q.   How long did your questioning of Mr. Ramadan last?

9   A.   My interview, I guess, would -- if I had to estimate, I

10  would say between an hour, hour and 15 minutes possibly.

11  Q.   Toward the end of questioning he told you he didn't want

12  to answer any more questions, didn't he?

13  A.   No, sir.  He answered all of the questions.  It wasn't

14  until we were ready to leave and he recanted -- he had told

15  us that his weapons were stored in a mini storage and that he

16  would take us there at the conclusion of the interview.  When

17  we all wrapped up that evening and we were ready to leave, we

18  were all ready to leave, and we said do you have the key for

19  it, he changed his story all of a sudden and told us a story

20  that he gave his weapons to his friend, and it was after that

21  exchange that he said -- he start getting irritated and he

22  said I'm done, but we were already done with the interview.

23  Q.   In the middle of the interview that you had with

24  Mr. Ramadan while you were still in the interview room, was

25  he handcuffed?

1    A.   No, sir, he was very cooperative.

2    Q.   He was very cooperative?

3    A.   He was cooperative.  He answered all the questions in

4    the room.

5    Q.   So if another agent described him as being uncooperative

6    then that agent didn't know what he was talking about; is

7    that right?

8    A.   He answered the questions I posed to him.  He was

9    cooperative when I interviewed him --

10   Q.   All right.

11   A.   -- right up the point before we got to leave, and then

12   he changed.

13   Q.   So Mr. Ramadan never told you during the interview that

14   he didn't want to ask any of your questions?

15   A.   He did not.

16   Q.   Did he ask you if it was voluntary?

17   A.   He did not.

18   Q.   Did any agent tell him that he had to answer your

19   questions?

20   A.   Not that I heard, not that I'm aware of.

21   Q.   Did any agent ever tell him that he was at an

22   international border and he was required to answer questions?

23   A.   Not during my interview, sir.

24   Q.   Did you ever advise Mr. Ramadan of his -- any Miranda

25   Rights?

1  A.   He was not under arrest or in custody.

2  Q.   You thought he was.  I asked you if you advised him of

3  his Miranda Rights?

4  A.   Sir, I would advise him of his Miranda Rights if he

5  was --

6  Q.   The question is no, I didn't advise him of any Miranda

7  Rights?

8          THE COURT:  Hold on.  Do you want to start that

9  over again?  Listen, sir, to the question.

10  A.   Yes, ma'am.

11  BY MR. DENSEMO:

12  Q.   Did you take out a card with Miranda warnings on it?

13  A.   I did not, sir.

14  Q.   At any time during the interview, did you read from a

15  card with Miranda warnings on it?

16  A.   I did not, sir.

17  Q.   At any time during the interview did you ever read

18  Miranda warnings out loud to Yousef Ramadan?

19  A.   I did not, sir.

20  Q.   Did you see Mr. Ramadan handcuffed at any point during

21  the evening?

22  A.   I don't recall seeing him handcuffed at any time while I

23  was there, sir.

24  Q.   Ever?

25  A.   Ever, sir, while I was there.

1    Q.   Even at the point in time where he was in the reception

2    area when you thought you were about to leave to go to

3    storage facility, you don't recall seeing him handcuffed then

4    either?

5    A.   I almost saw him handcuffed, sir, but he was not

6    handcuffed because the agent who went to cuff him didn't have

7    handcuffs on him and he sat him in the room, and shortly

8    thereafter I left.

9    Q.   So when you left.  When you left who was there -- who

10   was -- what agents were still there with Mr. Ramadan?

11   A.   Agents?  I was --

12   Q.   Officers, CBP officers, agents.

13   A.   I can't say who was still there, sir.

14   Q.   When you left out of the room, who did you see -- well,

15   Mr. Ramadan wasn't by himself, was he?

16   A.   There were some other CBP officers working, so I'm not

17   sure who they were.

18   Q.   Was Schmeltz still there?

19   A.   I believe he was still there, yes, sir.

20   Q.   Was Kelley still there?

21   A.   I can't say -- I don't know if you left with us or

22   slightly before us, but I can't say.

23   Q.   How about Brown, was Brown still there?

24   A.   I believe Brown and I walked out together, and Kelley

25   may have been with us when we walked out together, I just

1    don't recall.

2    Q.   You do not recall?

3    A.   I do not recall.

4    Q.   During the time that you interviewed Mr. Ramadan, was he

5    given any food or water?

6    A.   I believe he was given water.

7    Q.   You believe it.  Did you see it?

8    A.   Yes, there was water on the table.  He didn't ask for

9    any food or anything, but I believe he asked for a glass of

10   water and it was brought in.

11   Q.   At the time that you were interviewing Mr. Ramadan, was

12   his family still in the waiting area?

13   A.   I don't know, sir, if they had been released already.

14   Q.   But the time that you left was his family there?

15   A.   They were not there when I left, no, sir.

16   Q.   What time did you leave?

17   A.   I estimate I left probably between 3:00 and 3:30ish, I'm

18   not sure exact time, sir, a.m.

19   Q.   Did you see any -- did you see any agents punch

20   Mr. Ramadan?

21   A.   No, sir, I did not.

22   Q.   Did you see any agent raise Mr. Ramadan's arms high

23   behind his back -- his arms in this fashion (indicating)?

24   A.   No, sir, I did not.

25   Q.   Did you see any agent twist Mr. Ramadan's ear or squeeze

1    the back of his neck?

2    A.   No, sir, I did not.   The only time I saw anybody put

3    hands on Mr. Ramadan was Agent Brown when he told him to

4    turned him around, he put his hand on his shoulder and he

5    reached back to grab his handcuffs and he didn't have his

6    cuffs, then he sat Mr. Ramadan in the chair in the interview

7    room I believe.

8    Q.   Where did there take place?

9    A.   It took place in the CBP reception area.

10   Q.   Why was agent -- why was Officer Brown his hands on

11   Mr. Ramadan?

12   A.    Mr. Ramadan started getting boisterous and excited and

13   that's when he said I'm done, I'm done, and Agent Brown

14   wasn't comfortable with that.

15   Q.   Do you know the length of time that Mr. Ramadan was

16   detained in that secondary inspection area?

17   A.   I don't know the total amount of time, no, sir.

18   Q.   Did you ask Mr. Ramadan for pass codes to his cellphone

19   and laptop?

20   A.   I did ask him.

21   Q.   And what was his response?

22   A.    That he wasn't going to provide them or he did not

23   provide them, wouldn't provide them, because CBP wouldn't

24   give him some type of letter to say it wouldn't be used

25   against him.

1    Q.   You don't consider that being cooperative, do you,

2    refusing to -- was that being cooperative?

3    A.   Sir, you asked him me if he was cooperative with me.

4    Q.   When you asked him for the pass codes --

5    A.   I believe he unlocked his phone when I asked him.

6    Q.   All right.

7    A.   I think he unlocked his phone when I asked him to.  He

8    didn't provide the code, but he unlocked the phone.

9    Q.   And were you able to access his phone without the pass

10   codes?

11   A.   I didn't access his phone, sir.  I didn't touch his

12   phone, sir.

13   Q.   Were you aware that CBP officers had asked him for his

14   pass codes and the pin, and he refused to give it to him?

15   A.   I was aware of that, yes, sir.

16   Q.   There were no other members of the general public in the

17   secondary area when Mr. Ramadan was there, were there?

18   A.   Other than his wife and children, no, sir.

19   Q.   Do you know if there were cameras in the reception area

20   and the interview rooms?

21   A.   I'm not sure if there are cameras in the reception area,

22   but I do believe there's cameras in the interview rooms.  I

23   don't believe there were cameras where we talked.

24   Q.   Did you ask that some of Mr. Ramadan's property be

25   seized or detained for further inspection or investigation?

*Evidentiary Hearing • May 23, 2018*

 1   A.   No, sir, I did not.

 2   Q.   Were you aware that his property had been seized?

 3   A.   I was aware that his had seized, yes, sir.

 4   Q.   Were the agents in uniform or were they in plainclothes?

 5   A.   Both, sir.

 6   Q.   Were the firearms -- was any agent's firearm visible?

 7   A.   The agents in uniform their weapons would have been

 8   visible, yes, sir.

 9   Q.   Do you recall how many uniformed officers you remember

10   seeing?

11   A.   I don't recall, sir.

12   Q.   Did your office maintain surveillance of Mr. Ramadan

13   beginning August 16th, 2017?

14   A.   I'm not certain when they picked up surveillance of him,

15   sir.  I was not part of it.

16   Q.   But there was surveillance directed at Mr. Ramadan?

17   A.   There was, sir.

18   Q.   After August 15th, 2017?

19   A.   There was, sir.

20   Q.   You maintained an open terrorism investigation on

21   Mr. Ramadan, didn't you?

22   A.   I did not, sir.

23   Q.   Your office did?

24   A.   Our office did, correct.

25   Q.   Did Mr. Ramadan call you about missing gold and money?

1    A.    He did not contact me, no, sir.

2    Q.    He didn't call you twice and ask for your assistance in

3    returning some gold and missing money?

4    A.    Sir, I don't recall him calling me, and had he did call

5    me I certainly would have deferred me to either, A, the

6    airlines, or, B, CBP, but I don't have any recollection of

7    him calling me.

8    Q.    Did Mr. Ramadan ever asked for who you were or your

9    business card when you were talking to him?

10   A.    I would have identified myself and left him a business

11   card.

12   A.    And you don't recall any phones call from him at all?

13   A.    I'm sorry, sir, I don't.

14   Q.    You don't recall Mr. Ramadan contact -- giving him

15   contact information about who he should call at the airport

16   to get his property back, you don't remember that at all?

17   A.    Again, sir, I don't remember the conversation, but had

18   he called me I would have directed him to CBP or the

19   airlines, sir.

20   Q.    All right.  So is it -- I don't mean to keep going over

21   this but I want to make sure we are clear about this.  Are

22   you saying, Agent Thomas, that he never called you, or you

23   don't remember -- that he could have called you but you don't

24   remember?

25   A.    I don't recall, sir.  It is possible he may have called

1   and asked me that.  It is possible, I just don't recall.

2   Q.   Thank you.  At the time that you left was Mr. Ramadan

3   still being detained by the CBP officers?

4   A.   They were still finishing up whenever they were doing

5   so, yes.

6   Q.   He was?

7   A.   He was still there when I left, yes, sir.

8          MR. DENSEMO:  I think I'm done, Judge.  I will see

9   if my colleague has any additional questions.

10         (An off-the-record discussion was held at

11         12:04 p.m.)

12  BY MR. DENSEMO:

13  Q.   Special Agent Thomas, do the TSAs always contact FBI

14  agents or export violations?

15  A.   For export violations, TSA or CBP, sir.

16  Q.   TSAs.

17  A.   No, sir.

18         MR. DENSEMO:  Thank you.  I appreciate it.

19         THE COURT:  Cross-examination?

20         MR. WATERSTREET:  Your Honor, we have no questions.

21  Thank you.

22         THE COURT:  All right.  You may step down, sir.

23  A.   Thank you, ma'am.

24         (Witness excused at 12:05 p.m.)

25         THE COURT:  Your next witness?

```
 1              MS. FITZHARRIS:  Your Honor, if you wouldn't mind
 2   if we take a break before Officer James Brown testifies for
 3   the bathroom really quick?
 4              THE COURT:  No.  We will take our lunch break then.
 5              MS. FITZHARRIS:  Okay.
 6              THE COURT:  We will resume at 1:15.  All right.
 7   Thank you.
 8              THE LAW CLERK:  All rise.  Court is in recess.
 9              (Court recessed at 12:09 p.m.)
10                           —   —   —
11              (Court reconvened at 1:23 p.m.; Court, Counsel and
12              Defendant present.)
13              THE LAW CLERK:  All rise.  Court is again in
14   session.
15              Calling Case No. 17-20595, United States of America
16   vs. Yousef Ramadan.  Back on the record.  You may be seated.
17              THE COURT:  Your next witness?
18              MS. FITZHARRIS:  Good morning, Your Honor.  May
19   Mr. Ramadan be unhandcuffed for these proceedings?
20              THE COURT:  Yes.
21              MS. FITZHARRIS:  Thank you.
22              MR. DENSEMO:  Your Honor, we would like to call
23   Asma Ramadan.
24              MS. RAMADAN:  Asma Ramadan.
25              THE COURT REPORTER:  Please raise your right hand.
```

```
 1              Do you solemnly swear or affirm that the testimony
 2    you are about to give this Court will be the truth, the whole
 3    truth, and nothing but the truth, so help you God?
 4              MS. RAMADAN:  I do.
 5                           ASMA RAMADAN,
 6    called at about 1:25 p.m., was examined and testified on her
 7    oath as follows:
 8                        DIRECT EXAMINATION
 9    BY MR. DENSEMO:
10    Q.   Ms. Ramadan, state your full name.
11    A.   Asma Hamad (phonetic) Ramadan.
12    Q.   And are you related to Yousef Ramadan?
13    A.   I'm his sister.
14    Q.   And is Jeanine Ramadan your sister -- sister-in-law?
15    A.   Yes.
16    Q.   Were you at the airport on August 15th, 2017?
17    A.   Yes.
18    Q.   Did you speak with a Special Agent Michael --
19              MR. WATERSTREET:  Your Honor, can we ask to be
20    non-leading questions, please?
21              THE COURT:  Sustained.
22              MR. WATERSTREET:  Thank you.
23    BY MR. DENSEMO:
24    Q.   Did you speak to a someone who identified themself as --
25              MR. WATERSTREET:  Your Honor, just did you speak?
```

```
 1              THE COURT:  Yes.  No leading questions.
 2              MR. DENSEMO:  Okay.  Fine.
 3    BY MR. DENSEMO:
 4    Q.  Did you go some place airport?
 5    A.  I was downstairs where the package claim at, and a
 6    special agent, he was on the stand here earlier, came out and
 7    talked to Jeanine, and I went to him and I was like what's
 8    going on.  And he was like I don't want to talk to you, who
 9    are you, and I told him I'm Yousef's sister.  He is like I
10    can't talk to you.  He was only talking to Jeanine until
11    Jeanine told him Yousef wife -- until Yousef wife told him
12    that it's okay, you can talk in front of her.
13              MR. WATERSTREET:  Hearsay, Your Honor.
14              MR. DENSEMO:  This is a suppression hearing;
15    hearsay is admissible.
16              THE COURT:  Overruled.
17    BY MR. DENSEMO:
18    Q.  Go right ahead.
19    A.  Until he said --
20              THE COURT:  I'm going to ask you to slow down a
21    little bit, please.
22    A.  Okay.  Jeanine said it is okay for him it talk in front
23    of me.  And then he was like Yousef is going to stay here, if
24    he doesn't cooperate he's going to stay in custody.
25    Q.  Okay.
```

1    A.   She talked to him for a couple more minute, and then he

2    went in for like a half hour, and then he came back and he

3    had a photo on his phone.

4    Q.   A photo of what?

5    A.   It was like a little black thing.

6    Q.   It looked like a pipe bomb?

7    A.   Yes.

8    Q.   And he showed that to you and Jeanine?

9    A.   Yes.

10   Q.   What happened next?

11   A.   And then he's like I'm going -- he went back, and he

12   talked to Jeanine.  He was like I want to talk to Jeanine for

13   herself.  He talked to her for a few minute, and then he went

14   back.

15   Q.   Okay.  Thank you.  Hold on for a second in case the

16   government has any questions.

17            MR. WATERSTREET:  Yes, I have a few questions.

18                        CROSS-EXAMINATION

19   BY MR. WATERSTREET:

20   Q.   Ma'am, is this the first time you have come to this

21   courthouse today?  Have you been here for every single

22   proceeding?

23   A.   Yes.

24   Q.   Okay.  And you knew this information for how long?

25   Since I would say -- what is it, August 15th, 2017?

1    A.    Yeah.

2    Q.    Okay.  And you sat into the proceedings all of these

3    times as well listening to the testimony of the witnesses?

4    A.    Yes.

5    Q.    Okay.  And you understood there was a court order that

6    said any potential witnesses cannot sit in the courtroom and

7    listen to the testimony of other witnesses, right?

8          MR. DENSEMO:  Excuse me, Your Honor.

9    A.    No.

10         MR. DENSEMO:  Excuse me, Your Honor.  There was a

11    -- Mr. Waterstreet --

12         THE COURT:  There was a what?  I'm sorry.

13         MR. DENSEMO:  There was a sequestration order.  We

14    indicated -- we being the defense had indicated to

15    Ms. Ramadan that we had no intention of calling her as a

16    witness.  She only became a witness after Agent Thomas'

17    testimony, which the Court could see took me by surprise that

18    he had said that he had spoken with a Jeanine Ramadan.  We

19    had no information whatsoever from the United States -- from

20    the U.S. Attorney's Office that Agent Thomas had spoke into

21    Jeanine Ramadan, and this had never come up with any

22    conversation that we had with this particular witness, so we

23    had no reason to order her out of the courtroom.

24    Agent Thomas' testimony today is what triggered this

25    testimony.

1         THE COURT:  All right.  I will allow you to
2  continue, however.  Go ahead.
3         MR. WATERSTREET:  Thank you.
4  BY MR. WATERSTREET:
5  Q.   So you've sat in on all of the other proceedings,
6  correct?
7  A.   Yes, but --
8  Q.   Okay.  Is that correct?  Yes or no?
9  A.   I was here for all of the court --
10 Q.   Okay.  And all of these other times which you have had a
11 chance to talk to defense counsel -- you have talked to them
12 after every proceeding, have you not?
13 A.   Almost, yeah.
14 Q.   Okay.  And did you ever bring this up before to them?
15 A.   No, because --
16 Q.   A simple yes or no, ma'am.
17 A.   Let me finish, please.
18 Q.   Ma'am, it is a simple yes or no.
19 A.   Let me finish, please.
20        THE COURT:  Wait a minute.  Ma'am, you can only
21 answer the question asked, and your attorney will come up
22 later and ask you to explain.
23 A.   Okay.
24 BY MR. WATERSTREET:
25 Q.   And you never mentioned this at any time to any of those

1   attorneys, correct?

2   A.   No.

3   Q.   Okay.  And are you the -- do you go and visit your

4   brother often at the Milan County -- I mean the Milan federal

5   facility?

6   A.   Almost every week, yes.

7   Q.   And did you meet with him on February 22nd, 2008?

8            MR. DENSEMO:  Your Honor, we are going to object.

9   A.   I don't remember.

10           MR. DENSEMO:  Excuse me.  Your Honor, we are going

11  to object to this.  This goes far beyond the limited

12  questions that I asked on direct examination.

13           THE COURT:  Yes, but it is cross.  Overruled.  But

14  did you say 2008?

15           MR. WATERSTREET:  2018.  Excuse me, Your Honor.  My

16  apologies.

17  BY MR. WATERSTREET:

18  Q.   February 22, 2018.

19  A.   I can't remember.  I say almost every visit I go visit

20  him.

21  Q.   And did you make any notes of this conversation that you

22  had with -- that you overheard between the agent and your

23  sister-in-law?

24           MR. DENSEMO:  Excuse me, Your Honor.  That's a

25  mischaracterization.  Ms. Ramadan said that the agent had a

1    conversation with her.

2              THE COURT:  Rephrase your question.

3    BY MR. WATERSTREET:

4    Q.   Well, did you have your notes of any of this

5    conversation at all?

6    A.   What do you mean notes?

7    Q.   Did you write down any notes of what the conversation

8    was about?

9    A.   No.

10   Q.   Okay.  Did you write down any notes when you went to

11   visit your brother?

12   A.   You are not allowed to have anything with me when I go

13   visit him.

14   Q.   After you visit him, do you write down any notes of what

15   you discuss?

16   A.   No.

17   Q.   Okay.  And when your sister was released by CPB she was

18   given back all of the items, was she not?

19   A.   She is not my sister.

20   Q.   Sister-in-law.  My apologies.

21   A.   No, she is not.  She did not have everything back.

22   Q.   Well, did she have the holsters for the guns?

23   A.   Holsters?

24   Q.   The holsters --

25   A.   I don't know what they are.

1    Q.   Okay.  So where did she go after --

2            MR. DENSEMO:  Excuse me.  Judge, again, I object to

3    this line of questioning.  I don't see how this has anything

4    to do with the very limited questions I asked Ms. Ramadan

5    about the brief conversation that she had with Agent Thomas.

6            THE COURT:  Okay.  Is it a suppression hearing.

7    I'm going to be -- allow this testimony.  Go ahead, to a

8    limited fashion, Counsel.

9            MR. WATERSTREET:  I'm going to try to keep it short

10   and sweet as possible, Your Honor.

11   BY MR. WATERSTREET:

12   Q.   What did your sister-in-law do with all the items that

13   the CBP gave to her?

14   A.   I don't know.

15   Q.   Did she come home with you?

16   A.   She wasn't living with you.

17   Q.   She was not living with you?

18   A.   No.

19   Q.   You don't know where -- where was she living?

20   A.   No.  I know where she live at, at my other sister house.

21   Q.   Who is that?

22   A.   My sister.

23   Q.   Who is your sister, what's her name?

24   A.   Somya.

25   Q.   Okay.

```
 1              THE COURT:  What was it?
 2   A.   Somya.
 3              THE COURT:  How do you spell that, ma'am?
 4   A.   S-O-M-Y-A.
 5              THE COURT:  Thank you.
 6   A.   You are welcome.
 7   BY MR. WATERSTREET:
 8   Q.   Now, I assume that Yousef is your brother, correct?
 9   A.   Yes.
10   Q.   And do you share the same mother?
11   A.   Yes.
12   Q.   I'm going to show you a photograph --
13              MR. DENSEMO:  May we see what you are showing the
14   witness?
15              MR. WATERSTREET:  This is I.
16              MR. DENSEMO:  Are you kidding me?  Are you kidding
17   me?  Your Honor, we object.  I can't imagine what the purpose
18   of showing this witness a picture of a woman with firearms in
19   her hands has to do with what I asked on direct examination.
20   We object.
21              THE COURT:  Counsel, just a minute.  The Court has
22   already indicated it was allowing a broader
23   cross-examination.
24   BY MR. WATERSTREET:
25   Q.   Do you recognize the woman in E-1?
```

1    A.   Yes.

2            MR. DENSEMO:  One, is this the same photograph that

3    we have?

4            MR. WATERSTREET:  Yes, yes, it is.

5    BY MR. WATERSTREET:

6    Q.   You recognize that woman?

7    A.   Yes.

8    Q.   Who is that?

9    A.   My mom.

10   Q.   Okay.  Do you recognize the woman in E-2?

11           MR. DENSEMO:  We don't have E-2.

12           MS. FITZHARRIS:  We don't have E-2.

13   BY MR. WATERSTREET:

14   Q.   Do you recognize the woman in E-2?

15   A.   Yes.

16   Q.   Who is that?

17   A.   Jeanine.

18   Q.   That's your brother's wife?

19   A.   Yes.

20   Q.   Do you recognize the woman in E-3?

21   A.   Yes.

22   Q.   Have you seen any of those firearms that appear in E-1,

23   E-2 or E-3 before?

24           MR. DENSEMO:  Objection, Your Honor.

25           THE COURT:  Just a minute.  Who is E-3?  What did

1    you show?

2    BY MR. WATERSTREET:

3    Q.   Is that your sister-in-law Jeanine?

4    A.   Yes.

5         THE COURT:  So she is E-2 and E-3?

6         MR. WATERSTREET:  Yes, Your Honor.

7         THE COURT:  Now the objection.

8         MR. DENSEMO:  Judge --

9         MR. WATERSTREET:  Directing --

10        MR. DENSEMO:  -- even with latitude that question

11   has -- is irrelevant.  It has absolutely nothing to do with

12   this woman's testimony about a conversation with Special

13   Agent Thomas.

14        THE COURT:  Sustained.

15   BY MR. WATERSTREET:

16   Q.   Have you ever seen any of those firearms before?

17        THE COURT:  No, I sustained that objection.

18        MR. WATERSTREET:  Oh, I'm sorry.

19   BY MR. WATERSTREET:

20   Q.   Have you ever seen your brother with any firearms?

21        MR. DENSEMO:  Objection, Your Honor.  Same

22   objection.

23        THE COURT:  No, overruled.

24   BY MR. WATERSTREET:

25   Q.   Have you ever seen your brother before with any

1  firearms?

2  A.  He has guns that he has license to.

3  Q.  He has guns.  What kind of guns?

4  A.  I don't know.  I'm not an expert.

5  Q.  Okay.  Are they any of the guns that appear in any of

6  those photographs?

7          MR. DENSEMO:  Your Honor --

8  A.  I don't remember.

9  BY MR. WATERSTREET:

10  Q.  You don't remember?

11          THE COURT:  Just a minute.

12          MR. DENSEMO:  This has absolutely nothing to do

13  with a suppression issue whatsoever.

14          THE COURT:  She is asking about -- you are asking

15  about defendant's guns.

16          MR. WATERSTREET:  Right.

17          THE COURT:  Overruled.

18  BY MR. WATERSTREET:

19  Q.  Have you ever seen any of these guns that appear in E-1,

20  E-2 or E-3 in the possession of the your brother?

21  A.  I'm not a gun expert.  I don't know.  I don't remember.

22  Q.  Well, I'm not asking you to be an expert.  Have you ever

23  seen this type of weapon before?

24  A.  They all look like each other to me.

25  Q.  Every one of these look alike to you?

1    A.   To me, yeah.

2    Q.   The rifle with the scope --

3    A.   This one looks like this --

4    Q.   -- looks exactly like this one in E-2?

5            MR. DENSEMO:  Objection, Your Honor; he's arguing

6    with the witness.

7            THE COURT:  Sustained.

8            MR. WATERSTREET:  I have no further questions.

9    Thank you, Your Honor.

10           THE COURT:  Anything further?

11                     REDIRECT EXAMINATION

12   BY MR. DENSEMO:

13   Q.   Ms. Ramadan, the -- when you heard Agent Thomas testify

14   today, did that trigger in your mind the conversation that

15   you had?

16           MR. WATERSTREET:  Objection to the leading nature,

17   Your Honor.

18   A.   When I -- when I heard the --

19           THE COURT:  I did not hear -- did it trigger in

20   your mind --

21           MR. WATERSTREET:  Objection, leading.

22           THE COURT:  Are you asking what did it trigger in

23   her mind or were you going to say what it triggered in her --

24           MR. DENSEMO:  I'm asking her what.

25           THE COURT:  Okay.  Overruled.

```
 1   A.   When I heard him talk today and he swore to tell the
 2   truth, I remembered what he said.  I did not talk to him
 3   because I thought it wasn't important because I thought he
 4   was going to say the truth, but when he came here and he
 5   swore and he tell the truth, he did not tell everything.
 6   That's when I came up to the -- to Mr. Andrew, and I told him
 7   I remember what happened at the airport, and I told him
 8   everything.
 9             MR. DENSEMO:  Thank you, Ms. Ramadan.  Nothing
10   further.
11             MR. WATERSTREET:  Move for the admissions of E-1, 2
12   and 3, Your Honor.
13             MR. DENSEMO:  We object, Your Honor.  They are
14   irrelevant and immaterial.
15             THE COURT:  Okay.  The Court will allow them.
16             (Government's Exhibits E-1, E-2 and E-3 received
17             into evidence.)
18             THE COURT:  You may step down, ma'am.  Thank you.
19             (Witness excused at 1:37 p.m.)
20             THE COURT:  Your next witness?
21             MS. FITZHARRIS:  CBP Agent James Brown.
22             MR. WATERSTREET:  Sorry.  We have these
23   electronically, but we are not hooked up because defense has
24   theirs hooked up.
25             THE COURT:  Okay.
```

```
 1              THE COURT REPORTER:  Would you please raise your
 2    right hand.
 3              Do you solemnly swear or affirm that the testimony
 4    you are about to give this Court will be the truth, the whole
 5    truth, and nothing but the truth, so help you God?
 6              AGENT BROWN:  I do.
 7                       AGENT JAMES BROWN,
 8    called at about 1:38 p.m., was examined and testified on his
 9    oath as follows:
10                        DIRECT EXAMINATION
11    BY MS. FITZHARRIS:
12    Q.   Good afternoon, Officer Brown.
13    A.   Good morning.  How are you?
14    Q.   I'm all right.  How are you?
15    A.   Good.
16    Q.   Where do you work?
17    A.   Right now I'm a Joint Terrorism Task Force.  I'm CBPO
18    assigned to the Joint Terrorism Task Force
19    Q.   There are a lot of acronyms.  What does CPBO stand for?
20    A.   Customs and Border Protection officer.
21              THE COURT REPORTER:  Excuse me.  Can you slow down?
22              MS. FITZHARRIS:  Sure.
23    BY MS. FITZHARRIS:
24    Q.   How long have you worked for the Customs and Border
25    Protection Agency?
```

1    A.   I have worked for Customs and Border Protection for

2    22 years.

3    Q.   How long have you been on the Joint Terrorism Task

4    Force?

5    A.   About a year and-a-half.

6    Q.   Were you on the Joint Terrorism Task Force on

7    August 15th, 2017?

8    A.   Yes, ma'am.

9    Q.   And so do you remember meeting Yousef Ramadan on that

10   day?

11   A.   I do.

12   Q.   After you -- after you met with Mr. Ramadan, did you

13   write any reports?

14   A.   I personally did not, no.

15   Q.   Did you assist in writing any reports?

16   A.   I was a co-author on a report, yes.

17   Q.   Who was your co-author on that report?

18   A.   Special Agent Thomas.

19   Q.   Did you take any handwritten notes of your -- of the

20   interview?

21   A.   No, I did not.

22   Q.   Did you send any text messages to anyone about

23   Yousef Ramadan?

24   A.   Yes, I did.

25   Q.   Who did you send text messages to?

```
 1   A.   Special Agent Thomas.
 2   Q.   Have you ever turned over every text message you sent to
 3   Special Agent Thomas?
 4   A.   Yes.
 5   Q.   Did you post anything about Yousef Ramadan on any social
 6   media?
 7   A.   Oh, no.
 8   Q.   Did you write any e-mails about Yousef Ramadan?
 9   A.   Official e-mails or personal e-mails?
10   Q.   Either one.
11   A.   I don't recall -- I do not -- I can definitely tell you
12   no on any personal e-mails because I don't have any social
13   media myself, but probably e-mails back and forth to other
14   agents.
15          MS. FITZHARRIS:  Your Honor, if they were about
16   Mr. Ramadan we ask at this time that the government produce
17   the e-mails that Officer Brown wrote about Yousef Ramadan
18   under Rule 26.2.
19          MR. WATERSTREET:  Could we get the time limitation,
20   Your Honor, because we have handed over the reports that
21   relate to the night -- the night and early morning because
22   that's what they -- counsel swore this was the only subject
23   of cross-examination on, and we have handed over all of
24   those.  So if they want some prospective ones --
25          THE COURT:  Ask him --
```

```
 1            MS. FITZHARRIS:  But he's talking -- if they are

 2   e-mails about --

 3            THE COURT:  Just a minute, just a minute.  Ask him

 4   when he wrote these and the time.

 5   BY MS. FITZHARRIS:

 6   Q.   When you write these e-mails?

 7   A.   The e-mails that I remember are the e-mails that went

 8   back and forth to the agents after -- when they would ask me

 9   about different reports, I would send reports because that's

10   my job as liaison between Customs and Border Protection and

11   the FBI.

12   Q.   So they were e-mails about the interview of

13   Yousef Ramadan on August 15th and August 16th?

14   A.   There were all sorts of e-mails not just --

15   Q.   But there were some about the interview with

16   Yousef Ramadan?

17            THE COURT REPORTER:  Slow down.

18            MS. FITZHARRIS:  Yep.

19   BY MS. FITZHARRIS:

20   Q.   Were there some e-mails about the interview of

21   Yousef Ramadan on August 15th and August 16th?

22   A.   Yes, ma'am.

23            MS. FITZHARRIS:  Your Honor, I ask that those

24   e-mails that agent -- that Officer Brown wrote about the

25   interview of Yousef Ramadan on August 15th and August 16th be
```

1      turned over.

2                  THE COURT:  Okay.  You may have those.

3                  MR. WATERSTREET:  Your Honor, I have handed over

4      those.  We can maybe ask a question.  Were these e-mails

5      about what you saw and what you did that day?

6      A.   No.  They were e-mail requests for different reports and

7      back and forth.

8                  THE COURT:  Okay.  Do you --

9      A.   E-mails about that.  They were not e-mails about

10     specific -- anything that happened from me to write a report

11     on, no.

12     BY MS. FITZHARRIS:

13     Q.   All right.  The question was not about whether you were

14     ask to write report, it was about the subject of those.  Were

15     those e-mails about the interview of Mr. Yousef Ramadan on

16     August 15th and 16th?

17     A.   About the -- yes.

18     Q.   Were they e-mails about the search of his media devices

19     on August 15th and August 16th?

20     A.   They were e-mails, but they were turned over, yes,

21     ma'am.

22     Q.   How many e-mails did you write about the interview of

23     Yousef Ramadan and the search of his property?

24     A.   I do not recall how many, ma'am.

25                  MS. FITZHARRIS:  Your Honor, based on

```
 1   Officer Brown's testimony, it sounds like there are e-mails
 2   that exist that have not been provided to them [sic] so we
 3   are moving for production of those e-mails at this time.
 4           THE COURT:  All right.  I'm going to order that the
 5   e-mails be turned over.  They may already have been turned
 6   over.  They may be exactly the e-mails you are talking about.
 7   That will have to be clarified.  Okay.  Go ahead.
 8           MS. FITZHARRIS:  I will put on the record, Your
 9   Honor, the defense has not received any e-mails that
10   Agent Brown wrote -- or Officer Brown wrote.
11           THE COURT:  Okay.  So you have no e-mails?
12           MS. FITZHARRIS:  We have no e-mails that
13   Officer Brown authored.
14           THE COURT:  All right.  Thank you.
15   BY MS. FITZHARRIS:
16   Q.  When you joined the Joint Terrorism Task Force, did you
17   attend any special training?
18   A.  Yes, ma'am.
19   Q.  And it is training about counterterrorism measures?
20   A.  Yes, ma'am.
21   Q.  I assume at that training you learned about various
22   terrorist organizations?
23   A.  Yes, ma'am.
24   Q.  So you learned about ISIS?  You learned about ISIS?
25   A.  I've learned about ISIS, yes, ma'am.
```

1  Q.  And you've learned about Hamas?

2  A.  Yes, ma'am.

3  Q.  And you've learned about Hezbollah?

4  A.  Yes.

5  Q.  And I'm sure you learned that they are very different

6  groups?

7  A.  Yes, ma'am.

8  Q.  I am sure you also learned that Hamas has declared war

9  on -- or ISIS has declared on Hamas?

10  A.  Yes, ma'am.

11  Q.  So it is not likely that somebody who supports Hamas

12  also supports ISIS?

13       MR. WATERSTREET:  Objection to speculation.

14  A.  I'm sorry.  Could you repeat that?

15       THE COURT:  Overruled.  You may answer.

16  BY MS. FITZHARRIS:

17  Q.  Not not likely that somebody who supports Hamas also

18  supports ISIS?

19  A.  Well, I did agree with you.

20  Q.  Okay.  ISIS is killing people -- Hamas people?

21  A.  Yes, ma'am.

22  Q.  And Hamas people are killing ISIS people?

23  A.  Yes, ma'am.

24  Q.  So you disagree -- and you disagree that somebody could

25  support both?

```
1    A.   Well, no, ma'am.
2    Q.   So you agree; it is not likely that somebody supports
3    both?
4              Who are you looking at over here by the way?
5    A.   I'm just looking.  Am I not allowed to look?
6    Q.   You are but --
7    A.   I will look over here if you want it.
8    Q.   You keep turning your eyes so I'm just curious who you
9    are looking at.
10   A.   I'm just looking, ma'am.
11   Q.   So you agree with me, it is unlikely that someone would
12   support both Hamas and ISIS?
13   A.   Unlikely.
14   Q.   Okay.  I'm sure you also have heard about terms like
15   caliphate?
16   A.   I have.
17   Q.   And caliphate means a lot of different things to
18   different Muslims, right?
19   A.   I think it means one thing.
20   Q.   What do you think it means?
21   A.   I think it means to take Muslim state -- to create a
22   Muslim state.
23   Q.   But there are different forms of states, right?  We have
24   dictatorial states?
25   A.   I'm sorry.
```

```
 1   Q.   There are dictatorial states?

 2   A.   Dictatorial states meaning --

 3   Q.   There are republics?

 4   A.   Uh-huh.

 5   Q.   Yes?

 6   A.   Yes.

 7   Q.   There are democracies?

 8   A.   Yes.

 9        MR. WATERSTREET:  Your Honor --

10   BY MS. FITZHARRIS:

11   Q.   And an Islamic state could be one of those three?

12        MR. WATERSTREET:  -- I'm trying to find the

13   relevance that this has to do with the events of the 15th and

14   16th.

15        MS. FITZHARRIS:  Your Honor, Mr. Ramadan was

16   questioned about his views of the caliphate, and that was one

17   of the things that has been mentioned as being suspicious,

18   and so this line of questioning is along the lines of how

19   suspicious is it if somebody believe in the idea of a

20   caliphate.

21        THE COURT:  Overruled, overruled.  Go ahead.

22   BY MS. FITZHARRIS:

23   Q.   So a caliphate could be a democracy in someone's mind --

24   in a Muslim's mind?

25   A.   Yes, ma'am.
```

1    Q.   And a caliphate can be peaceful?

2    A.   Yes, ma'am.

3    Q.   And, in fact, Yousef Ramadan told you that he supported

4    a peaceful -- peaceful path to a caliphate?

5    A.   He did, he did.

6    Q.   As a member of the CBP, you have also been trained in

7    searches; how to conduct a proper search?

8    A.   Yes, ma'am.

9    Q.   And that includes searches of digital media?

10   A.   Yes, ma'am.

11   Q.   And are you -- are you familiar with the term advanced

12   search of digital media?

13   A.   Advance search of digital media, no, ma'am.

14   Q.   You are not.  Are you familiar with the policy on media

15   searches that was issued on January 4th, 2018?

16             MR. WATERSTREET:  Excuse me.  What was the date of

17   that?

18             MS. FITZHARRIS:  I said January 4th, 2018.

19             MR. WATERSTREET:  What does a -- what does a policy

20   after the events have to do with this matter, Your Honor?

21             MS. FITZHARRIS:  It has --

22             MR. WATERSTREET:  What's the relevancy?

23             MS. FITZHARRIS:  Is it those do with terminology.

24   So if CBP was using terms like -- this policy talks about

25   basic searches and advanced searches.  And if Your Honor

1   remembers in Cotterman and a variety of other cases, there's

2   a lot of talk about the difference between routine searches,

3   manual searches and forensic searches.

4           THE COURT:  Yes, but anything that happened, a rule

5   or a promulgation of something, as of January 4th, 2018 was

6   after the fact.

7           MS. FITZHARRIS:  Well, I'm exploring whether he

8   knew this.

9           THE COURT:  I sustain the objection.

10  BY MS. FITZHARRIS:

11  Q.   Before January 4th, 2018, had you heard of a term

12  advanced search?

13  A.   On social media?

14  Q.   Digital media, computers?

15  A.   I don't recall that, ma'am.

16  Q.   Okay.

17  A.   I don't recall that term.

18  Q.   And you would agree with me though there are different

19  types of searches of digital devices?

20  A.   Yes, ma'am.

21  Q.   There is turning one on?  You can turn one on?

22  A.   Yes, ma'am.

23  Q.   And you can just scroll through things on someone's

24  phone, for example?

25  A.   Yes, ma'am.

1    Q.   And sometimes you hook digital devices up to CBP

2    equipment, right?

3    A.   Yes, ma'am.

4    Q.   And you maybe connect a USB cord to the digital device?

5    A.   Say that again.

6    Q.   Sometimes you connect a USB cord or something like that

7    to a digital device?

8    A.   I don't know what or something like that means.

9    Q.   A USB cord -- sometimes you connect a digital device

10   with a USB cord to CBP equipment?

11   A.   Yes, ma'am.

12   Q.   And you have software that facilitates reviewing

13   materials on digital devices, yes?

14   A.   Some of this is classified.  Am I supposed to answer

15   this in court?

16        THE COURT:  You can answer that question.

17   A.   Okay.  Yes, ma'am.

18        THE COURT:  Don't give the details, just that you

19   have.

20   A.   Yes, ma'am.

21   BY MS. FITZHARRIS:

22   Q.   And there's -- is there software that allows you to use

23   search terms?

24   A.   Search terms, can you explain that to me, please?

25   Q.   Search terms like terrorist and you plug that in like

```
 1    Google and you see what comes up?
 2    A.   I'm not familiar with using anything like that, ma'am.
 3    Q.   Okay.  Do you conduct any searches of digital media?
 4    A.   In my 22 years I have never completed one with
 5    connecting a USB port to a --
 6    Q.   How do you usually conduct --
 7    A.   I physically go through --
 8              THE COURT:  Wait a minute.  Let him finish, but,
 9    sir, would you speak into the microphone?  I'm having trouble
10    hearing you.
11    A.   Yes, ma'am.  Would this be better?
12              THE COURT:  That's much better.
13    A.   Thank you.  Sorry.
14    BY MS. FITZHARRIS:
15    Q.   How do you usually review digital media?
16    A.   I usually go through it manually, ma'am.
17    Q.   Okay.  If you have a hard drive where you can't manually
18    search it, how do you go about searching a hard drive?
19    A.   I rely on one of my other officers to take care of that
20    for me.
21    Q.   Okay.  Have you seen one of the other officers conduct
22    that kind of search?
23    A.   I have seen them, yes, ma'am.
24    Q.   And describe to us, what does the officer do in order to
25    search a hard drive?
```

1   A.   They -- a hard drive?

2         MR. WATERSTREET:  What is the -- what's the

3   relevancy of how somebody else does a search?  We have

4   already had the testimony of Officer Armentrout and what they

5   did in this case.

6         THE COURT:  Sustained.  Just keep it to this case.

7         MS. FITZHARRIS:  Well --

8         THE COURT:  Keep it to this case here.

9   BY MS. FITZHARRIS:

10   Q.   Okay.  In Mr. Ramadan's case, how did CBP officers

11   review his hard drive?

12   A.   A standalone computer, ma'am.

13   Q.   And how did they connect his hard drive to the

14   standalone computer?

15   A.   I think with a USB port.

16   Q.   And how -- and that -- that review of the digital

17   devices started at what time?

18   A.   I can't recall the time it started, ma'am.

19   Q.   Was it after Mr. Ramadan was in the interrogation room?

20   A.   We don't have interrogation rooms, ma'am.

21   Q.   Was it after Mr. Ramadan was in the interview room?

22   A.   I believe, yes, after he was in an interview room.

23   Q.   How soon after he was in an interview room?

24   A.   I can't answer that.  I wasn't there at the time.

25   Q.   Where were you when Mr. Ramadan was placed in the

1   interview room?

2   A.   Which time, ma'am?

3   Q.   The first time.

4   A.   I was on the road.  I was on my way home.

5   Q.   Okay.  And why did you turn around and return to the

6   airport?

7   A.   I got a phone call.

8   Q.   Who called you?

9   A.   Officer Schmeltz.

10  Q.   What did Officer Schmeltz tell you?

11  A.   I'm sorry?

12  Q.   What did Officer Schmeltz say to you?

13  A.   Officer Schmeltz told me what was going on, told me that

14  they had a lot of stuff -- tactical stuff, said there's

15  possible HSI warrant -- or not a warrant but HSI possible

16  lookout, and at that point I turned around.

17  Q.   So when you say he told you what was going on, what

18  specifically had he told you had happened already?

19  A.   I believe that he was -- he went through TSA, TSA found

20  a large amount of tactical equipment in his bags and alerted

21  CBP.  CBP then went and looked at it, and made the judgment

22  to pull him off the plane.

23  Q.   You contacted Agent Michael Thomas -- you texted him at

24  9:17 p.m.?

25  A.   I don't recall exact the time.

1    Q.   Would anything refresh your recollection?

2    A.   If you had the text.

3    Q.   All right.  I just handed you a document.  Do you

4    recognize that?

5    A.   Yes.

6    Q.   What is it?

7    A.   That is -- the picture?  What do you want me to

8    describe?

9    Q.   What does the document show?

10   A.   The document shows a text message.

11   Q.   And it's a text message from you to Michael Thomas?

12   A.   Correct.

13   Q.   And it's a text message about Yousef Ramadan?

14   A.   It's about this tactical gear right here.

15   Q.   And that tactical gear was found in Yousef Ramadan's

16   checked bags?

17   A.   Yes.

18   Q.   And so it is a text about Yousef Ramadan?

19   A.   It's a text about this gear right here.

20   Q.   It says it right above it, have you are named his name

21   in NCIS?

22   A.   It's -- no, it says NCIC.

23   Q.   NCIC, that's what it says.  And who is he?

24   A.   I'm sorry.

25   Q.   Who is he, have you run his name?

1    A.   That would be Ramadan.

2    Q.   All right.  So at 9:17 you sent a text to Michael Thomas

3    about Yousef Ramadan?

4    A.   Correct.

5    Q.   So you had been contacted by Officer Schmeltz before

6    9:17 p.m.?

7    A.   Correct.

8    Q.   Where were you when you were contacted by

9    Officer Schmeltz?

10   A.   I was at Ford Road getting ready to go into

11   White Castle.

12   Q.   Okay.  And when you sent this text message to

13   Michael Thomas, where were you?

14   A.   I was at the airport.

15   Q.   So how long would it take you to get to the Ford Road

16   White Castle to the airport?

17   A.   It depends on traffic, but usually 15 or 20 minutes.

18   Q.   All right.  So that time of day that day, how long would

19   you say it took you to get from the White Castle to the

20   airport?

21   A.   I don't recall how much time it took me.

22   Q.   Was there much traffic on the road?

23   A.   I don't recall that either.

24   Q.   Is it fair to say it took perhaps 15 to 20 minutes?

25   A.   That's fair.

1    Q.   So is it fair to say that you received a call from

2    Officer Schmeltz right before 9:00 p.m.?

3    A.   I don't recall.

4    Q.   All right.  When you arrived at the airport, were CBP

5    agents already looking at officer -- Mr. Ramadan's hard

6    drive?

7    A.   I don't recall if they were already looking at his hard

8    drive.

9    Q.   When did you first look at the contents of his hard

10   drive?

11   A.   I don't recall that time either.

12   Q.   How soon after you arrived at the airport did you look

13   at contents of his hard drive?

14   A.   Hmm -- I think it would have to be -- this is

15   speculation.  I would -- because I don't walk around looking

16   at my watch so I don't know the time, but it would have to be

17   at least maybe 30 to 45 minutes.

18   Q.   Okay.  So when you arrived at the airport, what did you

19   do first?

20   A.   I went and talked with Officer Schmeltz.

21   Q.   And what did Officer Schmeltz tell you?

22   A.   That he has been interviewing with Mr. Ramadan, talking

23   to him, and that they found some type of materials on his

24   hard drive and, you know, that he -- Mr. Ramadan was placed

25   in handcuffs once already because Mr. Ramadan was being --

1   acting a little aggressively.  And that was about it I think.

2   Q.   Okay.  When you arrived was Mr. Ramadan in handcuffs?

3   A.   No.

4   Q.   Where was he?

5   A.   I don't recall.

6   Q.   After you talked to Officer Schmeltz, what did you do

7   next?

8   A.   Officer Schmeltz went -- we interviewed -- he started

9   talking with Mr. Ramadan again.  Since Officer Schmeltz was

10  by himself I stood with him, and that was about it.

11  Q.   So you went into a room with Officer Schmeltz and

12  Mr. Ramadan?

13  A.   Yes.

14  Q.   And you stood while Officer Schmeltz asked Mr. Ramadan

15  questions?

16  A.   More questions, yes.

17  Q.   And was this one of the interview rooms?

18  A.   At that point, yes.

19  Q.   And it is one of the rooms where there's a window -- a

20  window right next to the door?

21  A.   There is a window next to the door.

22  Q.   And there is a window between the two interview rooms?

23  A.   There is an window there.

24  Q.   And there is a table?

25  A.   Yep, there is a table.

*Evidentiary Hearing • May 23, 2018*

**106**

1  Q.  And a computer?

2  A.  Yep, and a computer, misdemeanor.

3  Q.  And there's a camera in the corner?

4  A.  Yes, ma'am.

5  Q.  And there is a microphone on the ceiling?

6  A.  No microphone that I know of.

7  Q.  Is it that you don't remember a microphone or there is

8  not a microphone?

9  A.  There is no microphone in that room.

10  Q.  And on the other wall across from where the window to

11  the other interview room, there is a plaque, like a bronze

12  plaque?

13  A.  I don't recall those.

14  Q.  Is there anything that would help refresh your

15  recollection?

16  A.  If you've got a picture.

17  Q.  I've just handed you a document.  What does that

18  document show?

19  A.  I'm sorry, ma'am.  Say that again, please.

20  Q.  What does the document I just handed you show?

21  A.  It shows 19 USC 1582.

22  Q.  Is it a photograph?

23  A.  All it is on this paper, yes, ma'am.

24  Q.  And is it a photograph of the brass plaque that appears

25  in -- on the walls in the CBP secondary inspection area?

*Evidentiary Hearing • May 23, 2018*

**107**

1   A.   Yes, ma'am, I guess so.

2   Q.   All right.  And that plaque has two statutes written on

3   it?

4   A.   Yes, ma'am.

5   Q.   And one of those statutes is a criminal statute for

6   resisting or impeding officers or employees?

7   A.   Assaulting or impeding, resisting, yes.

8   Q.   And that is in the interview rooms where

9   Officer Schmeltz questioned Mr. Ramadan?

10   A.   If they are in there I have never paid attention to

11   them, ma'am.

12   Q.   But you don't disagree that they are in there?

13   A.   I can't disagree or know.

14       MS. FITZHARRIS:  All right.  Your Honor, at this

15   moment I move to admit Exhibit C.

16       THE COURT:  What was your exhibit number?

17       MS. FITZHARRIS:  C, letter C like cat.

18       THE COURT:  Any objection?

19       MR. WATERSTREET:  Umm --

20       THE COURT:  It may be received.

21       MR. WATERSTREET:  Is that the document that was

22   just shown?

23       MS. FITZHARRIS:  Correct.

24       MR. WATERSTREET:  Defense C as in cat?

25       MS. FITZHARRIS:  As in cat, yes.

```
 1              MR. WATERSTREET:  All right.  No objection, Your
 2   Honor.
 3              THE COURT:  All right.
 4              (Defendant's Exhibit C received into evidence.)
 5   BY MS. FITZHARRIS:
 6   Q.   And when you -- what were you wearing on that night when
 7   you met Mr. Ramadan?
 8   A.   I really couldn't tell you, ma'am.
 9   Q.   Were you in plainclothes?
10   A.   Oh, yes, ma'am, I was in plainclothes.
11   Q.   And you had your service weapon?
12   A.   Yes, ma'am.
13   Q.   You had handcuffs?
14   A.   Not at that time.
15   Q.   No?  You went into the interview without handcuffs?
16   A.   Yes, I did.
17   Q.   Did you have handcuffs at any time?
18   A.   I did earlier that day.
19   Q.   That evening on August 15th or August 16th, did you have
20   handcuffs?
21   A.   What time?
22   Q.   At any time during the night?
23   A.   Well, yes, ma'am, I just told you that, during that day
24   I had handcuffs.
25   Q.   That night when you -- during the time between, let's
```

1  say, 9:30 p.m. and 4:00 in the morning, did at any point did

2  you have handcuffs?

3  A.  At that point I -- I found out I did not.

4  Q.  At any point between that time period did you have

5  handcuffs?

6  A.  No, ma'am.

7  Q.  At any time during that period did you use handcuffs?

8  A.  No, ma'am.

9  Q.  How many times was Mr. Ramadan handcuffed?

10 A.  I don't know.

11 Q.  How many times do you know Mr. Ramadan was handcuffed?

12 A.  One time.

13 Q.  And that was before you arrived?

14 A.  Yes, ma'am.

15 Q.  Is it that you don't recall that he was handcuffed any

16 other time or you only know that he has handcuffed one time?

17 A.  No, I don't -- I do not -- I know he was only handcuffed

18 one time, ma'am, while --

19 Q.  So if other people said that he has handcuffed more than

20 once, they would be mistaken?

21 A.  I can't answer for them, I can only answer for me, and I

22 only know of one time.

23 Q.  All right.  So you were in the room with

24 Officer Schmeltz when he was asking questions.  How long did

25 that questioning last?

1    A.   I don't recall the time frame, ma'am.

2    Q.   And during that time you asked Mr. Ramadan about -- you

3    asked about his travel plans or Officer Schmeltz asked about

4    his travel plans?

5    A.   I did not answer any questions, ma'am.

6    Q.   Officer Schmeltz asked about Mr. Ramadan's travel plans?

7    A.   I don't recall the questions that he answers -- or that

8    he asked.

9    Q.   You don't recall any questions that he answered.

10            During that time you were in with Officer Schmeltz,

11   Mr. Ramadan did not want to answer any questions?

12   A.   I believe he did not want to answer some questions at a

13   time.

14   Q.   He did not want to provide a pass code for his digital

15   devices?

16   A.   He did not for his phone, yes.

17   Q.   In your opinion, he was uncooperative?

18   A.   In my opinion?

19   Q.   Yes.

20   A.   He wasn't cooperative.

21   Q.   All right.  After you -- Officer Schmeltz finished

22   asking Mr. Ramadan questions in the interview room, what did

23   you do next?

24   A.   I'm sorry.  Repeat that, please.

25   Q.   After Officer Schmeltz finished asking Mr. Ramadan

*Evidentiary Hearing • May 23, 2018*

**111**

```
 1   questions in the first interview room, what did you do next?
 2   A.   I walked out and looked at the -- all the gear that was
 3   laying on the bag belts.
 4   Q.   Did you know what was in all of those bags before you
 5   walked out?
 6   A.   No, ma'am.
 7   Q.   Okay.  What time would you say it was that you walked
 8   out and looked at the gear on the bag belts?
 9   A.   Again, ma'am, I don't know the timeframes.
10   Q.   Say -- you know, can you guess from the time you arrived
11   how long -- how much time has passed?
12   A.   Do I have to guess?
13          MR. WATERSTREET:  Objection, Your Honor, because he
14   says I don't know and then she says just guess.
15          MS. FITZHARRIS:  If you can estimate --
16          THE COURT:  Don't guess, but if you can estimate
17   when it was you should do that.
18   A.   Which time?
19   BY MS. FITZHARRIS:
20   Q.   The first time you looked at the bags.
21   A.   Probably about 8:30, 8:45.
22   Q.   Then when did you go look at them again?
23   A.   I don't know the time.
24   Q.   So your guess is that you first looked at the bags -- so
25   you were already back at the airport at 8:30 p.m.?
```

1    A.   Its my guess.

2    Q.   All right.  And so was it after that you looked at those

3    bags that you texted Agent Thomas?

4    A.   Well, I have to look at bags first, ma'am, before I can

5    get this picture.

6    Q.   Okay.  So the answer is yes?

7    A.   Yes, ma'am.

8    Q.   Are you called for every Customs export violation?

9    A.   No, ma'am.

10   Q.   Is the Joint Terrorism Task Force called for every time

11   an OFAC item is found?

12   A.   No, ma'am.

13   Q.   When is it that the Joint Terrorism Task Force is

14   contacted when there is a Customs violation?

15   A.   If the Customs and Border Protection finds that there

16   might be -- might be a nexus to any type of terrorism I would

17   get a phone call.

18   Q.   And so because you were called CBP had already decided

19   that there might be a nexus to terrorism?

20   A.   They called me, yes.

21   Q.   And you only get called if they think there is nexus to

22   terrorism?

23   A.   There is a possible nexus to terrorism, yes

24   Q.   When you were in the room with Officer Schmeltz and

25   Mr. Ramadan, just the three of you, did you ever tell

*Evidentiary Hearing • May 23, 2018*

1   Mr. Ramadan that he had a right to remain silent?

2   A.   I did not even speak at that point.

3   Q.   Okay.  Officer Schmeltz did not tell Mr. Ramadan he had

4   a right to remain silent?

5   A.   CBP does not do that, ma'am.

6   Q.   Okay.  But my question is, did he do that?

7   A.   No.

8   Q.   Did he tell Mr. Ramadan that he had a right to a lawyer?

9   A.   No.

10  Q.   Did he --

11  A.   Not in my presence.

12  Q.   Not in my presence?  Okay.  Is that something that CBP

13  usually does?

14  A.   No.

15  Q.   But CBP does some training on interrogations, right?

16  A.   We do not interrogate, ma'am.

17  Q.   You've received training on Miranda?

18  A.   Not much training on Miranda.

19  Q.   But you know what Miranda is?

20  A.   Yes, ma'am.

21  Q.   And you have received training about when Miranda

22  warnings must be read?

23  A.   CPBO does not Mirandize.

24  Q.   Have you received any training about when Miranda

25  warnings should be read?

```
 1   A.   Years ago, maybe.
 2   Q.   But you have received it?
 3   A.   Yes, ma'am.
 4   Q.   And CPB does train its officers about when Miranda
 5   warnings should be read?
 6   A.   Yes, ma'am.  But, again, CBP does not Mirandize.
 7   Q.   So after you went and looked at the baggage a second
 8   time, what did you do next?
 9   A.   I think I looked at the stuff on the bag belt.
10   Q.   Uh-huh.
11   A.   That's about it.  Waited for Special Agent Thomas.
12   Q.   When Special Agent Thomas arrived, what did you two do?
13   A.   We went into the command center where the officers were
14   looking at some of the hard drives and media.
15   Q.   How many officers were looking at the hard drives?
16   A.   I believe it was just one.
17   Q.   Who was that?
18   A.   Officer Armentrout.
19   Q.   Did any other -- did you at any time personally look
20   through Mr. Ramadan's hard drive?
21   A.   I looked at what Officer Armentrout showed me, so I did
22   not personally go through his media, no.
23   Q.   But you are aware that there were thousands of files on
24   his hard drive?
25   A.   I am aware.
```

```
1    Q.   It was a five-terabyte hard drive?

2    A.   Yes.  I don't know what a terabyte is but yes.

3    Q.   Okay.  But it stores a lot of data, five terabytes, you

4    would agree?

5    A.   I really don't know.

6    Q.   Okay.  After you look at Mr. Ramadan's hard drive, what

7    did you do next?

8    A.   I just looked at pictures.  I did not look through his

9    hard drive.

10   Q.   After you looked at the photographs on his hard drive --

11   that were on his hard drive, what did you do next?

12   A.   We went and I believe we talked with Ramadan's wife.

13   Q.   And her name is Jeanine Ramadan?

14   A.   Yes, ma'am.

15   Q.   And who talked with Mrs. Ramadan with you?

16   A.   I believe it was myself, Special Agent Kelley and

17   Special Agent Thomas.

18   Q.   And where did you question Mrs. Ramadan?

19   A.   In a little conference room, what we -- where we eat

20   lunch.  It was a more relaxed setting.

21   Q.   And that conference room does not have any windows?

22   A.   No.

23   Q.   People who are in the CBP secondary inspection waiting

24   area could not see it?

25   A.   You could see in if you are standing right out in front
```

```
 1    of the door, yes.
 2    Q.   But you just said there's no - but if the door -- but
 3    only if the door is open, right?
 4    A.   Only if the door is open, right.
 5    Q.   And that room has a round table?
 6              MR. WATERSTREET:  Your Honor --
 7    A.   I believe it does.
 8              MR. WATERSTREET:  Can we wait a moment because the
 9    defendant is talking quite loud.  I can't hear the questions
10    and answers going back and forth.
11              THE COURT:  Okay.  Please be careful.  Write down
12    your questions.
13    BY MS. FITZHARRIS:
14    Q.   There's a round conference table in that room?
15    A.   Yes.
16    Q.   And how many chairs are in that room?
17    A.   I don't know.
18    Q.   How long did you interview Mrs. Ramadan for?
19    A.   Approximately a half hour.
20    Q.   After you finished interviewing Mrs. Ramadan, what did
21    you do next?
22    A.   I believe we went and helped her get her bags together,
23    and we helped -- went out and spoke with I think
24    Mr. Ramadan's sister to make sure that Jeanine had a ride and
25    to make sure that her children were taken care of.
```

1   Q.   And did you speak with Mrs. -- with Ms. Asma Ramadan,

2   Yousef's sister?

3   A.   I believe I might have been cordial, said hello, but

4   nothing -- I don't recall any -- my questioning of her, no.

5   Q.   Were you there when Agent Thomas spoke with

6   Asma Ramadan?

7   A.   I do, I was there.

8   Q.   Do you remember what he said?

9   A.   I believe he asked if they were living there, and she

10  said yes.

11  Q.   Was that the only time Agent Thomas spoke with

12  Asma Ramadan?

13  A.   I believe that's the only time we went out, yes.

14  Q.   After you -- how many bags did Mrs. Ramadan leave with?

15  A.   I can't answer that.  I don't know.  I know it was a

16  lot.

17  Q.   Did she leave with every bag that --

18  A.   A bag out of CDP, yes.

19  Q.   Yes.  After Mrs. Ramadan left, what did you do next?

20  A.   Went back into the conference -- or, excuse me, the

21  command center.

22  Q.   What did you do in the command center?

23  A.   To look at more pictures.

24  Q.   What pictures did you look at?

25  A.   There were pictures of Mr. Ramadan shooting weapons,

1    there were pictures of Mr. Ramadan - YouTube videos that he

2    had, different things like out in I believe Arizona or

3    California it looked like.  So it was, you know, basically

4    about shooting weapons, being -- shooting the weapon over the

5    seat, doing tactical maneuvers on his ATV, just stuff like

6    that.

7    Q.   And, you know, if he was allowed to possess a firearm

8    everything he was doing was legal?

9         THE COURT:  I didn't hear --

10   A.   Well, yes, ma'am --

11        THE COURT:  Just a minute.  I didn't hear that

12   question.  Would you repeat it?

13   BY MS. FITZHARRIS:

14   Q.   If he was allowed to -- if he was legally permitted to

15   possess firearms, everything he was doing in those videos is

16   legal?

17   A.   I have no evidence of anything illegal.

18   Q.   So after you looked at those photographs of firearms and

19   videos of tactical maneuvers, what did you do next?

20   A.   We weren't and -- well, we -- I went out and used the

21   restroom, I do remember that, because I had to go really bad,

22   and then went back into the conference -- if I remember to

23   the conference -- excuse me, to the command center, and asked

24   Armentrout to give me a call if anything else popped up that

25   was important.

1     We requested to speak with Mr. Ramadan at that
2  point, and requested that we take him to the conference
3  room -- what we call the conference room.
4  Q.  So you said that you requested to speak with
5  Mr. Ramadan?
6  A.  Uh-huh.
7  Q.  If he had said no, I don't want to talk, I want to go
8  home, you wouldn't have let him go, would you?
9  A.  In the role that I was in, I was there as JTTF, if he
10  would have said no, I don't want to talk to you, I would have
11  been done.
12  Q.  But he was not permitted to go?
13  A.  He was still in -- he was still with CBP until they
14  released him, no.
15  Q.  All right.  When you -- so this conference room, you
16  went into the conference room?
17  A.  I did go into the conference room.
18  Q.  And Agent Thomas went into the conference room?
19  A.  Yes.
20  Q.  And Agent -- Officer Schmeltz went into the conference
21  room?
22  A.  Yes.
23  Q.  And somebody brought Mr. Ramadan into the conference?
24  A.  Yes.
25  Q.  Is that Officer Armentrout who brought Mr. Ramadan into

*Evidentiary Hearing • May 23, 2018*

**120**

```
 1    the conference room?
 2    A.   That I do not recall.
 3    Q.   So there were -- oh, and Agent Kelley was in the
 4    conference room?
 5    A.   Kelley was also in the conference room.
 6    Q.   So there were at least four federal agents in the
 7    conference room?
 8    A.   Yes.
 9    Q.   When Mr. Ramadan was brought in, he sat with his back to
10    the door?
11    A.   Yes.
12    Q.   And Officer -- Agent Thomas sat across from him?
13    A.   Across, can you --
14    Q.   I know it's a round table --
15    A.   Yes.
16    Q.   -- but if you imagine just like a clock, so Mr. Ramadan
17    is at 6:00 and Agent Thomas was at about 12:00?
18    A.   Not to my knowledge, no.
19    Q.   Okay.  Where were you standing or sitting?
20    A.   I was sitting -- if Mr. Ramadan was at the 12:00
21    position, I was at the 7:00 position.
22    Q.   And where was Agent Thomas sitting?
23    A.   The 4:00 position.
24    Q.   And Agent Kelley?
25    A.   6:00.
```

1    Q.    And where was Officer Schmeltz?

2    A.    I believe he was off into the corner.

3    Q.    Did Officer Schmeltz have a service weapon with him?

4    A.    I would imagine, yes, but I -- he was wearing

5    plainclothes, I would hope he had his weapon with him.

6    Q.    Did he have handcuffs?

7    A.    Again, I can't tell you what he had on his body, I don't

8    know.

9    Q.    Did Agent Thomas had a service weapon with0 him?

10   A.    I -- I -- did -- I can't answer that question --

11   Q.    Okay.

12   A.    -- because I can't see if he has a weapon on or not.

13   Q.    Did Agent Kelley have a service weapon with him?

14   A.    Again, ma'am, everyone is wearing civilian clothes, I

15   can't tell if he has got a weapon under his shirt or not.

16   Q.    Is it that you don't remember or that you --

17          THE COURT:   He said he couldn't tell.  Let's move

18   along, please.

19   BY MS. FITZHARRIS:

20   Q.    In that room who was asking the questions?

21   A.    Agent Thomas.

22   Q.    And was he the only one asking questions?

23   A.    For the most part, yes, ma'am.

24   Q.    Did at any point you ask questions?

25   A.    Not a that point, no, ma'am.

1  Q.   What -- who else asked questions?

2  A.   I believe Mr. Kelley might have asked one but not much.

3  Agent Thomas handled most of it.

4  Q.   He asked Mr. Ramadan about -- about ISIS?

5  A.   He did.

6  Q.   He asked Mr. Ramadan about the videos on his hard

7  drive --

8  A.   He did.

9  Q.   -- that had some ISIS propaganda?

10  A.   Yes.

11  Q.   He asked Mr. Ramadan about Hamas?

12  A.   I believe so.  I'm not -- I don't know on that one.  I

13  can't recall.

14  Q.   He asked Mr. Ramadan if he believed in the caliphate?

15  A.   He did.

16  Q.   Mr. Ramadan said he believes in a caliphate but believes

17  in peacefulness?

18  A.   He stated he believes in the caliphate and believed in

19  what ISIS was doing, he just did not believe in the violence.

20  Q.   Okay.  And at any point did Agent Thomas tell

21  Mr. Ramadan that he was a lone wolf?

22  A.   I don't recall that.

23  Q.   In addition to questions about -- did Agent Thomas ask

24  Mr. Ramadan about the prophet Mohammad?

25  A.   I don't recall that.

*Evidentiary Hearing • May 23, 2018*

```
 1   Q.   Did Agent Thomas say how is it possible to have a
 2   caliphate without violence?
 3   A.   I don't recall that exact question, no.
 4   Q.   Do you recall what Mr. Ramadan said, how it's possible
 5   to have a caliphate without violence?
 6   A.   No.
 7   Q.   Do you -- Agent Thomas asked Mr. Ramadan about firearms
 8   in that conference room?
 9   A.   Yes.
10   Q.   And the firearms that you saw the photos of on the
11   digital devices?
12   A.   We asked if he had weapons.
13   Q.   And you asked Mr. Ramadan if he had a license for those
14   weapons?
15   A.   I don't recall asking about a license.
16   Q.   What do you recall asking about those weapons?
17   A.   If he legally owned those weapons.
18   Q.   Okay.  And did you ask -- you asked where they were
19   stored?
20   A.   We did.
21   Q.   And you asked -- did you ask if he had a felony
22   conviction?
23   A.   His criminal history was brought up, yes.
24   Q.   And you learned that he did not have a felony
25   conviction?
```

1    A.    I'm sorry, ma'am.

2    Q.    And you learned that he did not have a felony

3    conviction?

4    A.    Yes, ma'am.

5    Q.    You mentioned earlier this 2010 tip line?

6    A.    Yes, ma'am.

7    Q.    That's a call-in line that ICE runs?

8    A.    HSI, yes, ma'am.

9    Q.    HSI.  And what you learned it could be anyone calling

10   in?

11   A.    Yes, ma'am.

12   Q.    You don't know who is reporting it?

13   A.    I do not know anything about it, ma'am.

14   Q.    Okay.  So it is kind of like an anonymous tip?

15   A.    It is.

16   Q.    And did you ask Mr. Ramadan about that 2010 tip?

17   A.    I don't recall asking that question about that tip.

18   Q.    Did you ask anything about the 2010 -- anything having

19   to do with the 2010 incident?

20   A.    We asked him about the situations, why would somebody do

21   that, what was this about.  He stated that he trusts no one,

22   he had an incident with his wife at one point, and that was

23   it.

24   Q.    You also asked Mr. Ramadan about pipe bombs?

25   A.    Say it again.

1   Q.   You asked Mr. Ramadan about pipe bombs?

2   A.   In this conference room setting that you are still

3   talking about?

4   Q.   Yes.

5   A.   No, ma'am.

6   Q.   Okay.  About how long -- can you estimate how long were

7   you in that conference room?

8   A.   Maybe an hour and-a-half.

9   Q.   After the -- what happened after that interview ended;

10   what did you do?

11   A.   Well, the interview ended by us -- he stated he would

12   take us out to where his weapons were stored, so we went back

13   over to the lobby area, we were talking there.  That's --

14   Q.   Okay.  And did you tell Mr. Ramadan to sit down in one

15   of the chairs in front of the command center?

16   A.   Yes, ma'am, uh-huh, outside of the command center.

17   Q.   Outside of the command center.  And Agent Thomas was in

18   that waiting area outside of the command center?

19   A.   We were all there.

20   Q.   All of them, so Schmeltz, Kelley, Thomas?

21   A.   Myself, Kelley and Agent Thomas, yes.

22   Q.   And where was Officer Armentrout?

23   A.   He was still inside the command center.

24   Q.   And when you were in that waiting area, somebody asked

25   Mr. Ramanda about pipe bombs?

1    A.    That's when the picture came out of the command center

2    and shown to us, and we asked him about it, yes.

3    Q.    And you asked him how to make a pipe bomb -- how he made

4    the pipe bomb?

5    A.    I asked him --  because he said it was a picture.   I

6    asked him how long it took him to make that pipe bomb.   He

7    told me one hour, but he recanted that.

8    Q.    And at some point you told Mr. Ramadan to stand up?

9    A.    At the end of the night when --

10   Q.    And there was a point when you wanted to put handcuffs

11   on him again?

12   A.    Yes.   He was getting very aggressive.   I asked him to

13   stand up.

14   Q.    And you put your hands on him?

15   A.    I put my right hand on his should, reached back for my

16   handcuffs and realized I left them in the car.

17   Q.    Okay.   Did anybody hand you any handcuffs?

18   A.    Nope.   I escorted him into the other room and had him

19   sit down.

20   Q.    Did you grab him by the neck?

21   A.    No, sure did not.

22   Q.    Did you twist his ear?

23   A.    Did not.

24   Q.    Did you twist -- did you pull his hair?

25   A.    I'm sorry.

1    Q.    Did you pull his hair?

2    A.    No, ma'am.

3    Q.    Did you punch him in the stomach?

4    A.    No, ma'am.

5    Q.    And your testimony was that he was not wearing

6    handcuffs, you never put handcuffs on him?

7    A.    I'm sorry.  Repeat that.

8    Q.    Your testimony is that you did not put handcuffs on --

9    A.    I never put handcuffs on Mr. Ramadan.

10   Q.    You have been in that secondary inspection area a number

11   of times, right?

12   A.    A few.

13   Q.    So you are aware that there are cameras in the waiting

14   room?

15   A.    The waiting room.

16   Q.    Like outside of the command center.

17   A.    I don't know where the cameras are, ma'am, to be honest

18   with you.  I don't pay attention to that stuff.

19   Q.    But you know there are cameras?

20   A.    There are cameras.

21   Q.    And when you are investigating a potential terrorist

22   act, it would be important to -- if someone admits to a

23   terrorist activity, it would be important to find that

24   videotape, right?

25   A.    Yeah, but no one admitted to anything, ma'am.

1    Mr. Ramadan was not under arrest; he was released that night.

2    Q.   But, you know, when you are investigating terrorism

3    there are times when you would want video of what happened in

4    the interview rooms?

5    A.   Under -- if there was somebody being arrested, yes.

6    Q.   So you know how to make a request for that video?

7    A.   I ask my chief to get it.

8    Q.   And so if you decide that you want the video, you make a

9    request to your chief?

10   A.   I just ask somebody to get it.  I've never done it.

11   Q.   But if you wanted that video you knew how to get it?

12   A.   I would ask for that video.

13   Q.   Okay.

14        MR. WATERSTREET:  Your Honor, I object because the

15   Court has already denied that -- this discovery request, and

16   I don't know why we are going into it.

17        MS. FITZHARRIS:  Your Honor, we didn't think we had

18   an opportunity to fully develop this record.  This record is

19   now as complete as we want it to be.

20        THE COURT:  Wonderful.  Are you done?

21        MS. FITZHARRIS:  I am going to ask my colleague if

22   there is anything else, and then I'm done.

23        THE COURT:  Okay.

24        (An off-the-record discussion was held at

25        2:25 p.m.)

*Evidentiary Hearing • May 23, 2018*

**129**

1   BY MS. FITZHARRIS:

2   Q.   Officer Brown, you said that you helped write a report

3   after you interviewed Mr. Ramadan?

4   A.   I co-authored.

5   Q.   Okay.  And you read it over?

6   A.   I did.

7   Q.   You checked it for accuracy?

8   A.   I'm sorry.

9   Q.   And you checked it for accuracy?

10  A.   To the best of my ability, yes, ma'am.

11  Q.   Right, because you wouldn't want to put in something

12  there that is incorrect if you know it is incorrect?

13  A.   Correct.

14  Q.   And when you wrote that report it was closer in time to

15  the interview of Mr. Ramadan than now?

16  A.   I didn't write the report.

17  Q.   When that report was written it was closer in time to

18  the interview of Mr. Ramadan then now?

19  A.   Oh, definitely.

20          MR. WATERSTREET:  What's the question?

21          MS. FITZHARRIS:  Just a minute.

22  BY MS. FITZHARRIS:

23  Q.   I just handed you a copy -- a document.  Do you

24  recognize that document?

25          MR. WATERSTREET:  What document did you show him?

1          MS. FITZHARRIS:  It is Agent Thomas' report that he

2    co-authored.

3    A.  I didn't co-author these, ma'am.  These are written by

4    other officers.  I do not co-author these.  It says generated

5    by me because I printed it.

6    BY MS. FITZHARRIS:

7    Q.  Okay.  But did you read it?

8    A.  I went over them, yes.

9    Q.  Okay.

10   A.  But it is not my job --

11   Q.  And if you noticed --

12   A.  -- to approve

13          THE COURT REPORTER:  Hang on, hang on.

14          MR. WATERSTREET:  Your Honor --

15   A.  It is not my job to approve these.

16   BY MS. FITZHARRIS:

17   Q.  If you noticed --

18          MR. WATERSTREET:  If I may interrupt, please.  Your

19   Honor, he asked if this was his report.  He says it is not

20   his report, and now she is going to ask him questions about a

21   report that he was not an author of.

22          THE COURT:  I don't know what she is going to ask

23   him, so let me hear the question.

24          MR. WATERSTREET:  Okay.  Hopefully we will find out

25   together.

1    BY MS. FITZHARRIS:

2    Q.   You read over this report?

3    A.   I didn't raid over them fully, ma'am, because I didn't

4    generate these reports and I don't -- I do not approve these

5    reports.

6    Q.   Okay.  But if you noticed something that was wrong in

7    the report, would you say something?

8         MR. WATERSTREET:  Your Honor, now she is --

9         THE COURT:  Sustained.  Yeah, he already said he

10   just looked at it, didn't check it for accuracy.  Is there

11   another report that is his report that maybe you mean to give

12   him?

13        MR. DENSEMO:  Is there?

14        (An off-the-record discussion was held at

15        2:28 p.m.)

16   BY MS. FITZHARRIS:

17   Q.   Are you aware that another agent said that Mr. Ramadan

18   was placed in restraints again after he --

19        MR. WATERSTREET:  Your Honor --

20   BY MS. FITZHARRIS:

21   Q.   -- refused to provide the location of the storage unit?

22        MR. WATERSTREET:  Your Honor --

23   A.   No, ma'am.

24        MS. FITZHARRIS:  Okay.  Anything else?

25        THE COURT:  Cross --

```
1              MS. FITZHARRIS:  No further questions.
2              THE COURT:  Cross-examination?
3              MR. WATERSTREET:  Thank you very much, Your Honor.
4                        CROSS-EXAMINATION
5    BY MR. WATERSTREET:
6    Q.   Officer Brown --
7    A.   Yes, sir.
8    Q.   -- I want to ask you about the few times that you had
9    contact with Mr. Ramadan.  You said the first time you had
10   contact with Mr. Ramadan is when Officer Schmeltz went back
11   in to ask him a few questions.
12   A.   Yes, sir.
13   Q.   At that time was he handcuffed?
14   A.   No, sir.
15   Q.   Was he told that he was under arrest?
16   A.   No, sir.
17   Q.   Was he -- was he mistreated in any way by you or
18   Officer Schmeltz?
19   A.   No, sir.
20   Q.   At any of that time did he request for an attorney?
21   A.   No, sir.
22   Q.   Did he request for any of the proceedings to be
23   recorded?
24   A.   No, sir.
25   Q.   Now, the next time that you had any contact with him was
```

*Evidentiary Hearing • May 23, 2018*

133

```
 1    in this conference room interview?
 2    A.   Yes, sir.
 3    Q.   At that time was he handcuffed at any time?
 4    A.   No, sir.
 5    Q.   Did he ever -- was he ever told that he was under
 6    arrest?
 7    A.   No, sir.
 8    Q.   Did you ever see him mistreated in any way?
 9    A.   No.
10    Q.   Punched, hit, kicked, pulled, hair pulled, ear twisted,
11    anything like that?
12    A.   No, sir, not at all.
13    Q.   Okay.  Did he ever ask for the interview to be
14    recorded --
15    A.   Not to my knowledge, no, sir.
16    Q.   -- when you were there?
17    A.   No, sir.
18    Q.   Okay.  Did he ever ask for an attorney?
19    A.   No, sir.
20    Q.   The next time that you had contact with him was out in
21    the lobby area not long before he promised you that he would
22    take you to where he had his firearms stored?
23    A.   Yes, sir.
24    Q.   And in that interview back in the conference room, did
25    he tell you how many firearms that he had?
```

1    A.   Yes, sir.  He had I think a pistol and two rifles.

2    Q.   Okay.  And did he say where they were stored?

3    A.   Yes, sir.  He said that he had them in a storage

4    facility.

5    Q.   Okay.  And was he able to give you the address of that

6    storage facility?

7    A.   No, sir.

8    Q.   Well, did you ask him, well, can you take us and show us

9    where it is?

10   A.   Yes, sir.  He said he didn't know the address but he

11   knew how to get there.

12   Q.   And he was willing to take you there?

13   A.   Yes, sir.

14   Q.   And was it your plan then at the end of the night to go

15   ahead and have him show you where he said he was storing his

16   firearms?

17   A.   Yes, sir.

18   Q.   Now, prior to that did you have an opportunity to show

19   him two different photos that Officer Armentrout had found in

20   his media?

21   A.   Yes, sir.

22   Q.   I'm going to show you what has been marked as

23   Government's Exhibit L-1.  Have you seen L-1 before?

24   A.   Yes, sir.

25   Q.   What is L-1?

1    A.    L-1 is a broken glass or broken vase, glass, on a tile

2    floor.

3    Q.    Some broken glass on a tile floor?

4    A.    On a tile floor, yes, sir.

5    Q.    And this was an item that was taken off of Mr. Ramadan's

6    media and provided to you by Officer Armentrout?

7    A.    Yes, sir.

8              MR. WATERSTREET:  And move for the admission, Your

9    Honor.

10             THE COURT:  Any objection?

11             MS. FITZHARRIS:  Objection.  I don't understand the

12   relevance of it.

13             THE COURT:  Counsel, what's the relevance of the

14   glass?

15             MR. WATERSTREET:  Your Honor, this was part of the

16   things that precipitated the defendant's outburst and his

17   reaction to being questioned about things that he had in his

18   possession that indicated that perhaps he was more involved

19   than just a peaceful existence of the caliphate.

20             THE COURT:  Overruled.  You may -- it may be

21   received.

22             MR. WATERSTREET:  Thank you, Your Honor.

23             (Government's Exhibit L-1 received into evidence.)

24   BY MR. WATERSTREET:

25   Q.    And was this photograph first shown to Mr. Ramadan in

*Evidentiary Hearing • May 23, 2018*

**136**

1    the -- in this little lobby area?

2    A.   Yes, sir.

3    Q.   And how was that done?

4    A.   It was done by -- how was it shown to him?

5    Q.   Yeah, how was it shown to him.

6    A.   An officer took a picture.

7    Q.   Took a picture?

8    A.   Of the picture.

9    Q.   Of the screen?

10   A.   Of the screen, yes, sir.

11   Q.   And then showed it to him?

12   A.   Yes, sir.

13   Q.   And what did Mr. Ramadan say about where that broken

14   glass was?

15   A.   He said there was a broken glass on his house in

16   Bethlehem.

17   Q.   Bethlehem?

18   A.   Yes, yes.

19   Q.   Now you also had another photograph, Government's

20   Proposed Exhibit L-3.  Do you recognize Government's Exhibit

21   L-3?

22   A.   I do, sir.

23   Q.   And could you tell me what Government's Exhibit L-3 is?

24   A.   This --

25   Q.   Is that one of those other images that was taken off of

1    his media?

2    A.   This was also taken off the -- a picture off of the

3    screen shot, yes, sir.

4    Q.   Okay.  And this is -- this is a picture of the pipe

5    bomb?

6    A.   Yes, sir.

7              MR. WATERSTREET:  Okay.  Move for the admission of

8    L-3, Your Honor.

9              MS. FITZHARRIS:  Same objection; it is irrelevant.

10             THE COURT:  It may be received.

11             (Government's Exhibit L-3 received into evidence.)

12   BY MR. WATERSTREET:

13   Q.   This is the pipe bomb that you -- now Mr. Ramadan has

14   said the glass -- the broken glass on the floor is on a tile

15   floor of his place in Bethlehem, correct?

16   A.   Yes.

17             MS. FITZHARRIS:  Objection; lack of personal

18   knowledge.

19             MR. WATERSTREET:  Well, that's what Mr. Ramadan

20   said.

21             THE COURT:  Overruled.  Go ahead.

22   BY MR. WATERSTREET:

23   Q.   That's what Mr. Ramadan said, right?

24   A.   Yes, yes, sir.

25   Q.   Okay.  And then you showed him a picture of a pipe bomb

*Evidentiary Hearing • May 23, 2018*

**138**

```
1    that's on tile floor, the same terrazzo tile floor?
2    A.   Yes.
3             MS. FITZHARRIS:  Objection to the characterization
4    of it as the same floor.
5             THE COURT:  Sustained.
6    BY MR. WATERSTREET:
7    Q.   As  you looked at those photographs, did you believe
8    them to be from the same type of floor?
9    A.   I did, sir.
10   Q.   Okay.  And then what did Mr. Ramadan say when you showed
11   him this picture?  What did he say about the object that
12   appeared in L-3?
13   A.   About the object, sir?
14   Q.   Yes.
15   A.   He said that was a grenade, sir, that he made.
16   Q.   Okay.  And did he admit that -- did he -- did you ask
17   him how long it took him to make that bomb?
18   A.   I did, sir.
19   Q.   And what did he say?
20   A.   He said one hour.
21   Q.   Did he then try to backtrack after he acknowledged that
22   he built this bomb in one hour?
23   A.   He did, sir.
24   Q.   And what did he said?
25   A.   He said, well, if I had the components it would only
```

1   take me an hour.

2   Q.   Which begs the question, he has to know what kind of

3   components you need in order to build a bomb, correct?

4   A.   Correct, sir.

5   Q.   And did he say what kind of shrapnel they would -- he

6   would use or they would use?

7   A.   I asked him what type of shrapnel he used, and he said

8   bullets, sir.

9   Q.   Okay.  And then did he vehemently deny that this bomb --

10   this IED was made by him?

11   A.   He did at that point, he backtracked again, sir.

12   Q.   Okay.  But when pressed on his knowledge about making

13   bombs he acknowledged that he had made some in the past for

14   educational -- he called it educational purposes, correct?

15   A.   Yes, sir, also to throw at the troops overseas.

16   Q.   Okay.  And then after realizing that he made that

17   mistake, you asked --

18           MS. FITZHARRIS:  Objection to the characterization.

19           THE COURT:  Sustained.

20   BY MR. WATERSTREET:

21   Q.   After he realized that you now had a pipe bomb -- that

22   he acknowledged building pipe bombs, you then asked him

23   about, well, why don't you now show us where your firearms

24   are?

25   A.   Correct, sir.

1    Q.   And what did he say to you when he said -- well, let me

2    ask you this:  What did you say to him to suggest, okay, well

3    we are all ready to go?

4    A.   Agent Thomas asked him if he had his keys.

5    Q.   Okay.

6    A.   And he stated keys for what?  And he said for your

7    storage locker because we are going to go and take a look at

8    the guns.  And he was like, no, I lied about that, sir.

9    Q.   What did he say then?  Did you ask him questions about

10   that?

11   A.   We did.  We asked him, well, why would you lie about

12   that?  Then he stated that he's got the guns at his friend's

13   house.

14   Q.   Now, earlier in the -- in your discussion with

15   Mr. Ramadan he admitted that he was a loner?

16   A.   Yes, sir.

17   Q.   He didn't trust anybody?

18   A.   Correct, sir.

19   Q.   Didn't even trust his own wife?

20   A.   Yes, sir.

21   Q.   So now he's telling you that he has entrusted his

22   firearms to some person?

23   A.   Yes, sir.

24   Q.   Did he name that friend?

25   A.   No, sir.

```
 1    Q.   Did he name where that friend lived?

 2    A.   No, sir.

 3    Q.   Did he claim that the guns were all properly registered

 4    and purchased?

 5    A.   He did, sir.

 6    Q.   But now his story is there was some friend who he didn't

 7    give the name, didn't give the address?

 8    A.   Correct, sir.

 9    Q.   And as you started to press him on this new story --

10              MS. FITZHARRIS:  Objection, Your Honor.  This is

11    not a trial.  None of these questions Mr. Waterstreet are

12    asking about these firearms have anything to do with the

13    suppression issues, about the search of the digital devices,

14    or the voluntariness of Mr. Ramadan's statements.

15              MR. WATERSTREET:  I disagree vehemently, Your

16    Honor.  It has to do directly with his voluntariness to

17    explain why the defendant became very irritated at the

18    questioning of the agents and why they reacted the way they

19    had to.

20              THE COURT:  Overruled.

21    BY MR. WATERSTREET:

22    Q.   So as you began to press him -- challenge him on his

23    stories, the change in stories about the bomb and the guns

24    and the friends and the not friends --

25              MS. FITZHARRIS:  Objection to the characterization
```

Evidentiary Hearing • May 23, 2018

1    of all of this.

2              THE COURT:  Overruled.

3              MR. WATERSTREET:  May I proceed?

4              THE COURT:  You may.

5    BY MR. WATERSTREET:

6    Q.   So as you pressed him on the fact that he changed his

7    story from I'll take you to the locker, now it is with a

8    friend, I've got some guns but now my friend has them but I'm

9    not going to tell you the name of my friend, I made a bomb

10   but I didn't make a bomb but have made bombs, as you pressed

11   him more and more on this, did he demeanor change at all?

12   A.   Yes, sir.

13   Q.   And did you have to react as a result of Mr. Ramadan's

14   demeanor?

15   A.   He got aggressive, sir.

16   Q.   And what did you end up having to do?

17   A.   I was going to put him in handcuffs, sir, but when I

18   reached back embarrassingly I didn't have my handcuffs with

19   me, sir.

20   Q.   And was he questioned any more after that event by you

21   or any of the other agents in your presence?

22   A.   When I put him in the other room to sit down --

23   Q.   Yes.

24   A.   -- to cool off a little bit, to leave him alone?

25   Q.   Yes.

1    A.   I have no clue if anybody else talked to him.

2    Q.   You did not?

3    A.   No, sir, we did not.

4         MR. WATERSTREET:   Your Honor, did I admit L-1 and

5    3?

6         THE COURT:   Yes.

7         MR. WATERSTREET:   If I may have a moment, Your

8    Honor?

9         (An off-the-record discussion was held at

10        2:40 p.m.)

11        MR. WATERSTREET:   I have no further questions at

12   this time.   Thank you, Your Honor.

13        THE COURT:   Anything else?

14                    REDIRECT EXAMINATION

15   BY MS. FITZHARRIS:

16   Q.   So you just said that Mr. Ramadan backtracked on some

17   things, does that suggest that he was being cooperative?

18   A.   I'm sorry, ma'am.

19   Q.   You just said that Mr. Ramadan backtracked on some

20   things, does that suggest to you that he was being

21   cooperative?

22   A.   I don't know what -- explain cooperative at that point,

23   ma'am?

24   Q.   In your opinion, was Mr. Ramadan cooperative with you

25   when you started asking him about the pipe bomb?

1    A.    He wasn't belligerent at that point, no.

2    Q.    But was he cooperative?

3    A.    He would tell us an answer and then retract.

4    Q.    Okay.  When you said we want to go to the storage unit,

5    was he cooperative at that point?

6    A.    When we want to go to the storage unit?

7    Q.    Yes.

8    A.    When we asked him if he had the keys?

9    Q.    Yes.

10   A.    He became not cooperative at that point.

11   Q.    You just said that Mr. Ramadan said that he made IEDs to

12   throw at Israelis?

13   A.    If I said Israelis -- it was troops is what he said,

14   troops.

15   Q.    Your testimony today is that Mr. Ramadan told you that

16   he threw IEDs at troops?

17   A.    At troops, yes.

18   Q.    That's a pretty important detail.

19   A.    Yes, it is.

20   Q.    I'm handing you a document, this is this one --

21           MR. WATERSTREET:  What?  Can you like label this?

22           MS. FITZHARRIS:  I'm not admitting it as an

23   exhibit.

24           MR. WATERSTREET:  Okay.  Can I see it then?

25           MS. FITZHARRIS:  Page 4.

```
 1            MR. MARTIN:  What is the proposed exhibit number?
 2            MS. FITZHARRIS:  Proposed exhibit --
 3            MR. WATERSTREET:  Right.
 4            MS. FITZHARRIS:  This is, I guess, Proposed
 5   Exhibit D.
 6            MR. WATERSTREET:  Your Honor, I believe it is the
 7   302 that was authored by Agent Thomas.  Am I correct,
 8   Counsel?
 9            MS. FITZHARRIS:  Yes.
10            THE COURT:  It is exhibit what?
11            MS. FITZHARRIS:  It is Proposed Exhibit D.  I do
12   not plan to admit it as evidence.
13   BY MS. FITZHARRIS:
14   Q.   Do you recognize that document?
15   A.   I do.
16   Q.   What is it?
17   A.   It is a report that an agent writes.
18   Q.   And who wrote that report?
19   A.   Special Agent Mike Thomas.
20   Q.   And you helped him write that report?
21   A.   I co-authored that report means I looked over it after
22   he was done.
23   Q.   Okay.  And so if there were important details missing
24   you would have told him to add them?
25   A.   We would have talked about it, yes, ma'am.
```

```
 1    Q.   Okay.  Could you take a look at -- take a look through
 2    it and show me where Mr. Ramadan admitted to throwing IEDs at
 3    troops?
 4    A.   I'm a slow reader.
 5    Q.   Take your time.
 6    A.   Okay.  Right here where it says loud bang to detonate,
 7    and these items were sometimes used to throw at soldiers
 8    overseas.
 9    Q.   But you did not write that Mr. Ramadan said that he used
10    them to throw at soldiers overseas?
11    A.   Okay.   You are right, it doesn't say Mr. Ramadan said I
12    threw them, but he said that -- when he talked about the
13    explosives he said, yeah, it was just for a loud bang,
14    firework effects, and used to throw at soldiers overseas.
15    Q.   So generally some people throw IEDs at soldiers?
16    A.   Sure.
17              MR. WATERSTREET:  Your Honor, argumentative.
18    A.   Sure.
19              THE COURT:  Sustained.
20    BY MS. FITZHARRIS:
21    Q.   Was Officer Schmeltz in uniform that night?
22    A.   I believe we said no at that.
23    Q.   Okay.  And Armentrout, was he in uniform?
24    A.   I don't recall but probably not.
25    Q.   Okay.
```

```
 1              MR. DENSEMO:  One last question, Judge.
 2              (An off-the-record discussion was held at
 3              2:45 p.m.)
 4    BY MS. FITZHARRIS:
 5    Q.  When Mr. Waterstreet was asking you questions you
 6    said --
 7    A.  I'm sorry.  Say that again, please.
 8    Q.  When Mr. Waterstreet was asking you questions --
 9    A.  Yes.
10    Q.  -- you said that Mr. Ramadan said that he put bullets in
11    the IED?
12    A.  Yes.
13    Q.  Can you look at page 4 again and tell me where it says
14    that Mr. Ramadan admitted to putting bullets in an ied --
15    that IED?
16    A.  In this report?
17    Q.  Yes.
18    A.  Okay.  Okay.  In this report it says they.
19    Q.  Okay.  So did he not say that he put bullets in an
20    IED -- in that IED pictured, Mr. Ramadan did not say that?
21    A.  When I asked him what did you use for shrapnel,
22    Mr. Ramadan said I used bullets.
23    Q.  But in the report it says they?
24    A.  Then he retracted, no, that's what they use because he
25    gave me an answer and then he retracted that answer.
```

1  Q.  Okay.  But that report does not include any statement

2  that Mr. Ramadan said I used bullets?

3  A.  It does not.

4          MS. FITZHARRIS:  Okay.  No further questions.

5          THE COURT:  Okay.

6          MS. FITZHARRIS:  Oh, Your Honor, because we have

7  not been provided the e-mails that Officer Brown wrote about

8  this, we reserve the right to recall him once we have

9  obtained those e-mails.

10         THE COURT:  If they are of any import you may

11 recall him.

12         MS. FITZHARRIS:  Yes.

13         THE COURT:  But they have to mean something. All

14 right.  You may step down, sir.

15 A.  Thank you, ma'am.

16         (Witness excused at 2:47 p.m.)

17         THE COURT:  Your next witness?

18         MS. FITZHARRIS:  Your Honor, we call

19 Yousef Ramadan.

20         THE COURT:  Mr. Ramadan, please come forward.

21         THE COURT REPORTER:  Would you please raise your

22 right hand.

23         Do you solemnly swear or affirm that the testimony

24 you are about to give this Court will be the truth, the whole

25 truth, and nothing but the truth, so help you God?

1    MR. RAMADAN:  (In English) I do.

2    MS. FITZHARRIS:  Your Honor, before we begin, I

3  just want to, I guess, make a motion in limine and make clear

4  that Mr. Ramadan is testifying for the limited purpose of

5  these motions to suppress the evidence found on his hard

6  drives, digital devices and his statements.  It is not an

7  open free-range opportunity for the government to ask

8  Mr. Ramadan whether he possessed the firearms he's charged

9  with possessing or any other criminal activity.  It is a

10  limited hearing, and under Supreme Court case law he does not

11  have to forfeit his Fifth Amendment right to not incriminate

12  himself when he is asserting another right.

13    THE COURT:  Tell me what you are limiting it to

14  again?

15    MS. FITZHARRIS:  The suppression issues, the

16  voluntariness of his statements and the search of his digital

17  devices.

18    THE COURT:  Okay.

19    MR. WATERSTREET:  Your Honor, two issues, if I

20  might?  About the Court instructing the defendant he does not

21  have to take the stand and testify in these proceedings, that

22  it is his choice, he has a Fifth Amendment privilege, and

23  he's giving up that right by testifying at this hearing.

24    And as to the second issue, Your Honor, one of the

25  things the defendant must establish is standing to contest

1   the suppression of the items they seek to suppress in their

2   motion, so there will be some questions that can be asked of

3   him, but as counsel pointed out he does not have to give up

4   one right for the other.  So these questions -- answers to

5   these questions cannot be used directly against him at up

6   coming trial, I understand that completely.  So I'm not sure

7   as to what the motion in limine is trying to do other than

8   perhaps hamstrung the United States from being able to ask

9   probing questions about the defendant's standing and other

10  related issues.

11          MS. FITZHARRIS:  I think it is appropriate to ask

12  questions about his standing to assert privacy protections in

13  the storage units.  I do not think it is appropriate to ask

14  Mr. Ramadan if he possessed the firearms charged in the

15  indictment.

16          THE COURT:  Well, then why would he be taking the

17  stand?

18          MS. FITZHARRIS:  The search, the protected area

19  protected by the Fourth Amendment is --

20          THE COURT:  No.  The issue -- the issue raised is

21  one of standing.  What right does he have to --

22          MS. FITZHARRIS:  If he has a right to privacy in

23  the storage unit then he can assert a right to suppress the

24  evidence seized in that and have it used against him at

25  trial.

*Evidentiary Hearing • May 23, 2018*

**151**

```
 1              THE COURT:  Okay.  That's good.  Yeah.  Go ahead.
 2              Now, Mr. Ramadan, you understand you don't have to
 3    testify --
 4              MR. RAMADAN:  (In English) Yes.
 5              THE COURT:  -- at all, that you are giving up your
 6    Fifth Amendment rights if you do testify to some of these
 7    things?
 8              MR. RAMADAN:  (In English) Yes.
 9              THE INTERPRETER:  Yes.
10              THE COURT:  All right.
11                            YOUSEF RAMADAN,
12    called at about 2:38 p.m., was examined and testified on his
13    oath as follows:
14                         DIRECT EXAMINATION
15    BY MS. FITZHARRIS:
16    Q.  Good afternoon, Mr. Ramadan.
17              MR. RAMADAN:  (In English) Hi.
18              THE COURT:  Wait a minute.  One other question I
19    want to ask.
20              MS. FITZHARRIS:  Sure.
21              THE COURT:  Did you discuss this with your lawyers
22    about testifying?
23              MR. RAMADAN:  (In English) Yes.
24              THE COURT:  Okay.
25
```

*Evidentiary Hearing • May 23, 2018*

**152**

1   BY MS. FITZHARRIS:

2   Q.   What is your full name?

3   A.   Yousef Ramadan.

4   Q.   How old are you?

5   A.   29.

6   Q.   Where were you born?

7   A.   Bethlehem, Palestine.

8   Q.   What is your citizenship?

9   A.   I have dual citizenship, American and Palestine.

10  Q.   Do you remember where you were August 15th, 2017?

11  A.   At the airport.

12  Q.   Why were you at the airport?

13  A.   Did you say when, why?

14  Q.   Why?

15  A.   I was traveling to Palestine through Jordan.

16  Q.   What time did you arrive at the airport?

17  A.   Around 3:00.

18  Q.   Were you traveling with anyone?

19  A.   Yes.  With my wife and four -- my four kids.

20  Q.   What is your wife's name?

21  A.   Jeanine Ramadan.

22  Q.   What are your children's name?

23  A.   Mohammad, Nadine, Amjad, and Ipsisan (phonetic).

24  Q.   How old are your children?

25  A.   From seven to nine now, from seven to nine.

*Evidentiary Hearing • May 23, 2018*

**153**

```
 1    Q.   When you arrived at the airport approximately how many
 2    bags did you have with you?
 3    A.   15 big -- 15 big one, it was like dark color, black
 4    color, and six little one, and backpack, six.
 5         MR. WATERSTREET:  I'm sorry, I missed it.  There
 6    were 15 bags and how many -- I missed it.  I'm sorry.
 7    A.   And six carry-on.
 8    BY MS. FITZHARRIS:
 9    Q.   What did you do with the 15 big bags?
10    A.   After we bought the tickets and we did solve that issue,
11    I gave them to the airline people.
12    Q.   And so you checked those bags?
13    A.   Yes.
14    Q.   And what did you do -- after you checked your bags what
15    did you do next?
16    A.   After that I got the carry-on, six, and six backpacks,
17    and we went to the security checks after we said goodbye to
18    the family.
19    Q.   And when you went through security check, did you put
20    your checked bags through X-rays?
21    A.   Yeah.
22    Q.   What time did you arrive at the gate for your flight?
23    A.   Between 7:45 to 8:00.
24    Q.   What time was your flight scheduled to leave?
25    A.   I think around 8:00, but they did delay the flight
```

1   because there were like some passengers that were delayed.

2   Q.   What time did you board the flight?

3   A.   Between 8:00 and 8:15.

4   Q.   When you boarded the flight, do you remember talking to

5   any federal officers?

6   A.   Before we entered the plane there were like small room,

7   two agents talked to me.

8   Q.   What did those agents look like?

9   A.   One of them he was here, he gave his testimony.  The

10   other one is skinny, around six feet.  He was supposed to

11   come here to give his testimony but he did not.

12   Q.   Okay.  Did --

13   A.   Officer Haeck his name, I believe.

14   Q.   Did either of those officers ask you any questions?

15   A.   Yes.

16   Q.   What questions did they ask you?

17   A.   How much money I have on me, and where am I going.

18   Q.   What did you answer?

19   A.   I -- I asked him if it's only me or me and my wife.  I

20   told him around 10,000, and we have gold.  I told him that I

21   have around seven, and she has around three.

22           MR. WATERSTREET:  I'm sorry.  He has how much?

23           THE INTERPRETER:  Seven, I have around seven, and

24   she has around three.

25

1    BY MS. FITZHARRIS:

2    Q.   Thousand?

3    A.   Yes.

4    Q.   Where did you have the $7,000?

5    A.   My wife had it in her bra, and I had it in my backpack

6    with the gold.

7    Q.   And where was the gold necklace that you mentioned?

8    A.   With me in my backpack.  All the gold were together.

9    Q.   Officers spoke with Mr. -- with Officer Robinson, what

10   did you do next?

11   A.   So he told me you are good to go.  We entered the plane,

12   we sat down.  I put -- organized, like put the backpacks on,

13   and we put the kids in their seats.

14   Q.   Approximately what time was it by the time that everyone

15   was in their seats on the plane?

16   A.   Between 8:00 and 8:30.

17   Q.   Once you were seated, what happened next?

18   A.   After like 20 minutes two officers came inside the

19   plane, and he was asking the flight attendant where am I

20   sitting.  She pointed to me.  He asked me if I am

21   Yousef Ramadan.  I said yes.

22   Q.   Who were the officers that came on the plane?

23   A.   I think Robinson and Haeck.

24   Q.   After they said are you Yousef Ramadan, and you said

25   yes, what happened after that?

1   A.   He told me come with me, I need to talk with you for a

2   little bit.  He told me that he wanted to talk to me

3   regarding something that I have in my luggage.  I said go

4   ahead, and he told me that you have a bulletproof plate --

5   plate.

6   Q.   When he asked you about -- when he told you that there

7   were some bulletproof plates in your luggage where were you?

8   A.   Inside the plane next to the kitchen.  In front of

9   everybody he was asking me.  I was shy.

10   Q.   At that -- when he came on the plane and asked to speak

11   with you, how did you feel?

12   A.   When he asked me about the bulletproof plate, I was like

13   embarrassed and I was like worried about the kids, and I was

14   like also worried about how like the people are thinking

15   about me.

16   Q.   What did you say to officer -- when you were asked about

17   the plates?

18   A.   I did tell him yes, I do have it.  Like I did say, yes,

19   I do have it.  And he told me if I have a receipt.  I told

20   him, yes, I do have a receipt, I bought them on the internet.

21   And he said, no, no, I'm not asking about the receipt, I'm

22   asking if you have like papers or document or permission that

23   you can take it with you.  I told him I didn't know that I'm

24   supposed to have a permission, and I do not have a

25   permission.

1  Q.   After you told him that you didn't know that you had to

2  get permission, what happened next?

3  A.   He -- he -- he told me to follow him.  I didn't want to

4  follow him but, like, I felt like I have to.

5  Q.   Why did you feel like you had to follow him?

6  A.   Because I was planning to go to my country, and not

7  leave the kids alone, and to see my dad, who is sick, my mom

8  and my family.  So I just wanted to go and follow him because

9  I thought -- so I felt like I had to follow him just because

10  I figured, like, it is a matter of just doing a paper and

11  come back.  I didn't want it to tell the story like, you

12  know, bigger than what it is.

13  Q.   Did you -- at that point did you just follow the

14  officers somewhere?

15  A.   Until then so far, yes, on my own.

16  Q.   At some point did your family come with you?

17  A.   Right.  After we came out of the plane, and they did

18  escort me outside the plane, before we entered the secondary

19  area I remembered that I have the kids 'medications and the

20  passport, and I had like the paperwork for me to cross to the

21  other country.  So I did tell the CBP officer that I have to

22  give the medication, like the stuff to my kids.  And in his

23  testimony he said that he's the one who asked me about the

24  medication, but as a matter of fact I'm the one who asked

25  about the medication.

1    Q.   So once you remembered about the medications, what did
2    you do next?
3    A.   He took me back to the plane.
4    Q.   Who took you back to the plane?
5    A.   Haeck and Robinson.
6    Q.   What happened when you were back on the plane?
7    A.   Officer Haeck took me inside the plane, and
8    Officer Robinson was behind him.
9    Q.   Once you got back to where your family was seated, what
10   did you do?
11   A.   So just like how I said, I gave it -- I gave her the
12   medications, and the papers, and the money, and the papers
13   that would allow you to answer the second country.  And while
14   I was giving her the stuff, he saw like one of the backpacks'
15   pockets open and he asked me what's that, because I was
16   giving her the money and the stuff.  He told me what's that,
17   and he took the hard drive.
18   Q.   After Officer Haeck took the hard drive, what did he do?
19   A.   And he told me the whole family has to come out and
20   follow him.
21   Q.   And so did your whole family pick up and grab their
22   bags?
23   A.   Yes, that's right.  So our plan was not like that.  They
24   were like kind of forced to do that indirectly.  Okay.  So --
25   so if we don't do what they ask us to do they will bring the

1    police, so I was, like, kind of embarrassed, and I had a red

2    face, and I was liked concerned about the family.

3             MR. WATERSTREET:  Your Honor, I'm not sure I

4    understood what he said.  He said the police told him that if

5    they don't do what he says or --

6             MS. FITZHARRIS:  Your Honor, Mr. Waterstreet can

7    clarify.

8             MR. WATERSTREET:  Your Honor, I'm having a hard

9    time understanding the interpreter because the microphone --

10   she is talking to you and her voice isn't projecting this

11   way.

12            THE INTERPRETER:  I thought it was working.  You

13   cannot hear me?

14            MR. WATERSTREET:  No.  I'm having a hard time

15   hearing you.

16            THE COURT:  Why don't you ask the question again.

17   BY MS. FITZHARRIS:

18   Q.   After Officer Haeck grabs the hard drive, what did you

19   do next?

20   A.   He told us that the whole family has to follow him.  We

21   didn't want to leave the plane.  We were, like, forced to

22   leave the plane indirectly.  It wasn't like voluntarily, we

23   were, like, forced.

24   Q.   What did Officer Haeck or Officer Robinson say to you to

25   make you believe that you had to leave the plane?

1   A.   If I -- if I had the choice I could of, like, you know,

2   left them there and I went by myself with them, but the kids

3   they were, like, also scared.  That's why they didn't give us

4   the choice, and it wasn't voluntarily for us to go with them.

5   If they gave us the choice I could of, like, went with them

6   alone.

7   Q.   What was Officer Haeck wearing?

8   A.   A black --

9           THE INTERPRETER:  I'm sorry. It is interpreter's

10  fault.

11  A.   It is a dark blue suit.

12  BY MS. FITZHARRIS:

13  Q.   Did you notice whether he had any weapons?

14  A.   He had the duty belt, he had a gun, handcuffs, extra

15  storage --

16          MR. RAMADAN:  (In English) No, extra magazines.

17  A.   Extra magazines, and a baton, baton

18  BY MS. FITZHARRIS:

19  Q.   What was Officer Robinson wearing?

20  A.   I think the same thing.

21  Q.   After you gathered all of your family's luggage, where

22  did you go?

23  A.   After they forced us to leave the plane, we went to the

24  secondary area.  After we open the door, we went to an area

25  -- like isolated area away from people.

```
 1   Q.   At any time did you ask to record what was going on?
 2   A.   After like 20 feet I ask the officer that I wanted to be
 3   a recorder, and the camera recording that --
 4            MR. RAMADAN:  (In English) No.  The camera is
 5   already recording when I asked him that.
 6   A.   So the camera was already recording when I asked him
 7   that.  Officer Robinson said no.  He said, no, we couldn't
 8   because we cannot show, like, the federal offices and their
 9   face.  So I did -- I did listen to him and turned off the
10   camera.
11   Q.   Why did you want to record what was happening?
12   A.   Because, first, they took us unvoluntarily from the
13   plane.  I was, like, very scared about, you know, our lives
14   and my kids, and I had bad experience with the police, so for
15   my safe and for the police officers' safe.
16   Q.   How did your children appear when they were taken off of
17   the plane?
18   A.   They were really scared, and my youngest daughter she
19   was crying, and my wife was crying, and I was, like, very
20   scared too.  So we thought, like, you know, we were going to
21   be -- like, we thought that the -- we were going to miss the
22   plane and we were going to buy new tickets.
23   Q.   How did it make you feel to see your child and your wife
24   crying?
25   A.   I was shocked a lot, and I was very scared because I
```

1    don't want them to have, like, emotional problem because of

2    that and psychological problems because they are young and

3    this will stay in their brain.

4    Q.    After you left the plane, where did you go?

5    A.    After we went, like, a -- like, a dark tunnel, we start

6    at a door, so he did put his -- swiped his ID.  So we went to

7    an area where there were chairs.  So -- so once we entered

8    there were, like, chairs, and then he took from me the

9    backpack that has the gold, the money, five hard drives and

10   cameras.  Okay.  So he gave it -- and the hard drive that he

11   took from me before, he gave it to another room that has

12   tinted window.

13   Q.    And in this room were there any other people beside --

14   members of the public who are not your family?

15   A.    So we were in an area isolated.  It was just us where we

16   don't see, like, anybody outside doors or the whole area.  It

17   is meant to have interviews -- interrogations with people.

18   Q.    Once you were in this kind of secondary inspecting area,

19   where did you go?

20   A.    So after like around 15 minutes I heard them start

21   turning on those videos, watching it, and laughing at me and

22   making fun of my accent.

23   Q.    Where were you seated when you heard this?

24   A.    Where those chairs are in that interrogation area.

25   Q.    Okay.  Is that right in front of the command center?

1    A.   Yes.

2    Q.   How long were you sitting there hearing officers go over

3    your videos?

4    A.   Can I see the paper that has the command center?

5            MS. FITZHARRIS:  Your Honor, I'm going to ask

6    Mr. Ramadan if maybe he could draw the room, with your

7    permission?

8            THE COURT:  Okay.

9    BY MS. FITZHARRIS:

10   Q.   Mr. Ramadan, would you please draw to the best of your

11   memory the secondary inspection area.

12           THE COURT:  Isn't one of the exhibits --

13   Government's exhibit exactly the room?

14           MS. FITZHARRIS:  It is.

15   BY MS. FITZHARRIS:

16   Q.   All right.  I'm sorry, Mr. Ramadan.  Oh, great.  So on

17   the area -- on the picture that you have just drawn, can you

18   mark the area where your family was seated -- the waiting

19   area with the letters WA?

20   A.   My kids, my kids were here (indicating).

21   Q.   Okay.  And that's in the waiting area?

22   A.   It is like flipped, it is supposed to be like that.

23   Q.   So when you were sitting in the waiting area, you could

24   hear what was going on in the command center?

25   A.   We were here, like, around ten feet.

1   Q.   How long were you in the waiting area?

2   A.   Around 20 minutes.

3   Q.   So after 20 minutes what happened next?

4   A.   After that an agent came, I think his name was Armstrong

5   Q.   Armentrout?

6   A.   Armentrout, yes.  He pointed to me, and he said came

7   over here.

8   Q.   When he told you -- and where did he direct you to go?

9        MR. RAMADAN:  (In English) I would say that

10   interrogation room number -- the one on the right from my

11   view

12   BY MS. FITZHARRIS:

13   Q.   On Government's Exhibit X can you mark that room with

14   the letter I and the number 1.

15   A.   (Witness complies.)

16   Q.   When he told you to go to the -- into the interrogation

17   room, did you feel that you had to go?

18   A.    To start with, I just didn't want to go but I figured,

19   you know, it is a matter of -- because I don't want, like, my

20   family to stay for a longer period of time because my

21   daughter was crying and she did pee on herself, and they were

22   all scared, so I figured let me go and talk to them.

23   Q.   When you went into the room, who else was in the room

24   with you?

25   A.   Officer Smith.

1   Q.   Officer Schmeltz?

2   A.   Schmeltz.

3   Q.   Any other officers?

4   A.   They were like another one, there is a small office.  He

5   was right here.

6        MR. RAMADAN:  (In English) It is not an office.

7   A.   Desk, and he had like a higher rank.  He was like

8   watching the kids -- supervise the kids.

9   BY MS. FITZHARRIS:

10  Q.   When you were seated, where was the door in relation to

11  you?

12  A.   The door was here.  I was sitting next to the door --

13  next to the window exactly.

14  Q.   And could you mark -- could you write on that room the

15  letter R where you were -- approximately where you were

16  sitting?

17  A.   (Witness complies.)

18  Q.   Could you mark on there with a letter S where

19  Officer Schmeltz was sitting?

20  A.   (Witness complies.)

21  Q.   And were you the only two people in the room at that

22  point?

23  A.   Armentrout.

24  Q.   Could you mark on the diagram where Armen --

25  Officer Armentrout was sitting with a letter A?

1    A.    (Witness complies.)

2    Q.    During that time was the door open?

3    A.    They closed it.

4    Q.    You said that your back was to the window.  Could you

5    see your children?

6    A.    So every, like, you know, half a minute or so I would,

7    like, turn over and look at them and make sure that they are

8    safe, and just too comfort them, to tell them, like, in a way

9    like don't worry about me, I'm okay to.

10                 After that, Officer -- Officer Armentrout.

11   Q.    Armentrout?

12   A.    Armentrout, he told me stop looking over my shoulder.

13   He told me to move from that seat to behind -- like, right

14   behind the door.  He asked me to move my chair to behind the

15   door.

16   Q.    So when you first went into this interrogation with

17   Officers Armentrout and Schmeltz, what questions did they

18   start -- what were the first questions -- was the first

19   question they asked you?

20   A.    What's your name?  Where are you going?  How much money

21   do you have?  And I was, like, answering the question how

22   much money I have, gold.

23   Q.    And when they asked you where were you going, what did

24   you tell them?

25   A.    I told them that I was going to Palestine through

1    Jordan, and then he start asking other questions.

2    Q.   What other questions did he ask you?

3    A.   How many luggages do I have?  Where are you going?  Who

4    are you going to stay with there?  How many brother do I

5    have?  So if I'm, like, if I own the house or if I'm going to

6    rent?  How many years I'm going to stay there?  What am I

7    going to work there?

8    Q.   When they were asking you these sorts of questions, did

9    you -- how did you feel?

10   A.   So it was, like, you know, regular questions, and also

11   they ask about the bulletproof plate.

12   Q.   At any point in this conversation did the subject of the

13   questions change?

14   A.   Yes.

15   Q.   What subject did they start asking you about?

16   A.   After that he asked me if I'm going to go to Syria or

17   Iraq.

18   Q.   When they asked you if you were going to Syria or Iraq,

19   how did that make you feel?

20   A.   After he asked that question, it did -- like, I did pay

21   attention at why is he asking, like, that, about the exports

22   and imports --

23             MR. RAMADAN:  (In English) No.

24   A.   So when he asked that question I did pay attention why

25   is he asking that question, because after that question he

1   asked me if I have any relation with any terrorism.  I was

2   like very scared.  So the questions were changed from, like,

3   regular interrogations to, like, terrorism interrogations.

4   BY MS. FITZHARRIS:

5   Q.   When the officers started asking you about terrorism

6   questions did you do anything?

7   A.   Yes.   So I told him, like, what person who has a brain

8   would take his family and kids from a safe area to an area,

9   like, where it has war and there were, like, bombing all the

10  time, and it is unsafe.

11  Q.   When they started asking you about terrorism, did you

12  ask for a lawyer?

13  A.   So after he asked this question, and I paid attention,

14  so I did tell him right away that I want a lawyer and I want

15  an interpreter because I don't want, like -- the way to

16  express myself I don't want it to be changed because I have

17  problem with English speaking.

18  Q.   When you asked for -- was there anything in particular

19  that the officer said to you that made you ask for a lawyer?

20            THE INTERPRETER:  To ask for what?

21            MS. FITZHARRIS: A lawyer.

22  A.   Yes, yes.  He asked me if I belonged to any terrorism

23  party or if I'm going to go and join ISIS.

24  BY MS. FITZHARRIS:

25  Q.   When you asked for a lawyer what was the response?

1  A.   So he told me that this is international area, like, we

2  cannot have a lawyer here.  Even though if a lawyer is going

3  to come here so we have to have, like, a prior pass.  So even

4  if you -- you have no rights, and even if you are going to

5  have a prior pass for a lawyer they are not going to give it

6  to you.  You have to speak.

7  Q.   After they --

8  A.   It's better for you.

9  Q.   So just to clarify, they said it's better for you to

10 speak?

11 A.   Yes.

12 Q.   Did you understand that to be a suggestion?

13 A.   To start with, I didn't want to say something because

14 those questions are terrorism related, so after he starts

15 asking me questions I felt like I have to answer his

16 questions because he didn't give me the choice.

17 Q.   What specific questions about terrorism did

18 Officer Schmeltz ask you?

19 A.   Because, like, he knew that I was, like, going to -- he

20 thought that I was going to join ISIS in Syria.

21 Q.   What questions did he ask you?

22 A.   If I'm going to join them, or if I'm going to do any

23 terrorism act.

24 Q.   Did he ask you -- did Officer Armentrout ask you any

25 questions about terrorism?

```
 1    A.   After they forced me to answer -- to speak, they start
 2    asking me different questions.  So they told me, like, why am
 3    I going to go and join ISIS in Syria?  So I told him why am I
 4    going to go to Syria and join ISIS there?  If I was going to
 5    join them I could have, like, stayed there.  Why am I going
 6    to take my family there.  Or like take my family, put them in
 7    danger, and take them where the war is.
 8            So if, like, in that point of view it's better to
 9    do a terrorism act here in America, and it will show like --
10    it will be all over the news, and it will be, like, you know,
11    embarrassing for the American government.
12    Q.   And when you were saying this, you weren't saying that
13    you wanted to do this?
14            MR. WATERSTREET:  Objection, Your Honor; leading.
15    A.   I said if I was.
16    BY MS. FITZHARRIS:
17    Q.   Okay.  At any point did either Officer Schmeltz or
18    Officer Armentrout ask -- say anything about Guantanamo?
19    What did they say?  Who said it first?
20    A.   Armen --
21    Q.   Armentrout?
22    A.   Armentrout.
23    Q.   And what did he say?
24    A.   So I told him I do not want to talk to you, not before
25    you bring me a lawyer because after -- after he asked me
```

1    those questions about terrorism and if I'm going to join --

2    join them or do, like, any terrorism act.  If I stay quiet he

3    will send me to Guantanamo and I will not be cooperative.  He

4    told me I have to talk for your own good, for your own good.

5            So when I heard the word Guantanamo I was, like --

6    felt, like, my head is leaving my body, and I was like so

7    scared, and I know how -- how torture -- how they torture

8    people there, and being away from my family and being away

9    from the whole world.  And they torture people with dogs and

10   electric wires.

11           In the future they will take the American citizen

12   from me and go back to my country.

13   Q.   At any --

14   A.   And the period of staying in jail is a long period of

15   time.

16   Q.   At any point in that first interrogation room were you

17   asked questions about Islam?

18   A.   He asked me if I'm Muslim.  I said, of course, my name

19   says it, it will speak for itself, my name is Muslim.  And he

20   asked me about the caliphate.  I told him as a Muslim I like

21   to have the caliphate -- Islamic caliphate, not with -- not

22   like the ISIS caliphate.  So he told me how the caliphate is

23   going to be at your country.  Okay.  So I told him that I

24   like the caliphate to be not like the one that ISIS has, I

25   like it based on helping people.  So he told me how are you

1    going to have the caliphate and you have it based, like, on a

2    killing?  I told him I like it peaceful, and helping people,

3    and by numbers -- like -- and also like with numbers, the

4    people it becomes like caliphate -- Muslim -- Islamic

5    caliphate.

6    Q.   And, Mr. Ramadan, who was asking you about the

7    caliphate?

8    A.   I think it was Armstrong.

9    Q.   Armentrout?

10    A.   Armentrout.

11    Q.   When you were in that first interrogation room with

12    Officer Schmeltz and Robinson, at any point were you asked

13    about your views about Jews?

14    A.   Yes.  He told me if I like Jews or not.  I said yes, I

15    like Jews.  So I don't like Zions (phonetic) and before that

16    question he asked me -- he told me if I was in your place I

17    would not like Jews, and if I had the choice I would go kill

18    all the Jews; Schmeltz said that.

19         He told me that originally he's from Germany, and

20    his wish if, like, all the Jews will be, like, burned out.

21    So I did answer him.  I told him I like all kind of people,

22    all races, and I told him, like, if ISIS are -- you know,

23    they are terrorists, not necessary all Muslims a bad.  Or if

24    the KKK are terrorists, not -- it doesn't mean that all white

25    people they are terrorists.  So if, like, if the Zions are

1    terrorists, not necessarily all Jews are terrorists.  I told

2    him personally all of my lawyers from before, all of them are

3    Jews.  And all of my clients -- all of my clients in San

4    Diego, 70 percent, are Jews.  And I was like raised there,

5    and I never had any terrorism attack or did anything bad

6    against Jews.

7    Q.   So, Mr. Ramadan, at some point when you were in the

8    first interrogation room were you asked questions -- were you

9    asked about your digital devices?

10   A.   This question they asked me a lot about it, lots of

11   times.

12   Q.   What specifically did they ask you about your media?

13   A.   So they wanted the passwords for my own -- my cellular

14   phone.  Okay.  So they were, like, looking at my videos, and

15   I did not give them any permission to look at my -- at the

16   hard drive.

17   Q.   Mr. Ramadan, you mentioned that they asked for your pass

18   code.  Did you give them your pass code?

19   A.   No.

20   Q.   Why didn't you want to give them your pass code?

21   A.   So as a personal -- a personal Muslim person, I have my

22   wife's pictures on my phone, I have my kids, and the picture

23   of my identity, and I have my -- pictures of my social

24   securities and medical records about me and my family, and

25   about -- it has, like, my personal life -- information.  And

*Evidentiary Hearing • May 23, 2018*

**174**

1   my wife was, like, half naked in those pictures, so that's

2   why I don't want to give him my password. So it is against

3   the Muslim culture and my own belief and culture too. So if

4   somebody would ask me for the password I'm not going to give

5   it to them even if, like, somebody told me I'm going to kill

6   you, I would not give them my password. It is like my honor.

7   Q.   How did Officer Schmeltz and Officer Robinson react when

8   you refused to give your password?

9   A.   So they were, like, more aggressive and not comfortable,

10  and every time they would ask me about the password and about

11  terrorism, I would, like, ask for a lawyer.

12  Q.   What were -- what was Officer Armentrout wearing that

13  day?

14  A.   Regular clothes.

15  Q.   Were you aware of whether he had any weapons on him?

16  A.   He had a gun and handcuffs. I think his duty weapon was

17  a Sig -- a Sig.

18  Q.   And what was Officer Schmeltz wearing that night?

19  A.   A blue suit, dark, and they have the duty belt, has his

20  gun and magazine or handcuffs, or baton, and he was wearing

21  his bulletproof vest under his shirt.

22  Q.   Okay. So after you told him that you would not give

23  them the pass codes, was that the end of the conversation?

24  A.   No.

25  Q.   So what happens next?

1   A.   So after I told him that -- he told me that I have to

2   speak and give him the password, I said I'm not going to give

3   it to you.  I was like a little bit frowning when I said no,

4   I'm not going to give it to you.  And he told me stand up,

5   and turn around, and he did put the handcuffs on me.

6   Q.   When you were hand -- when Officer Schmeltz -- well, who

7   put the handcuffs on you?

8   A.   Armstrong.

9   Q.   You think it was Armentrout.  Okay.  And when he put the

10   handcuffs on you, where were your hands?

11   A.   Behind me like this (indicating).

12   Q.   And when he put the handcuffs on you, could your

13   children see you?

14   A.   Yes.  So I was, like, trying to show my wife that they

15   were putting the handcuffs on me so she would know what's

16   going on, and he told me come over here.  So I was, like,

17   next to the window, and he told me come here behind the doors

18   that is closed.  And he told me that he doesn't want to show

19   my family -- like, he doesn't want the family to see why he

20   is putting the handcuffs on me.  My wife did see the

21   handcuffs, and I felt, like, she's worried and she was

22   scared, and the kids they saw that too.

23   Q.   When they put the handcuffs on you, how tight were they?

24   A.   A lot, and I told him that it's too tight on me, and he

25   told me you'll be fine.

1    Q.   After --

2    A.   And when I left I took pictures of my hands how, like,

3    the marks were -- that did leave on my hands.

4    Q.   After you were handcuffed, were you asked any questions

5    in that first interrogation room?

6    A.   Yes.  Officer Armentrout he got, like, upset and he left

7    the room.   He went to the command center, I believe.  Maybe

8    he went to check out some videos for me -- about me because

9    when he came back he start asking me questions about the

10   videos and pictures that was on the hard drive.

11              THE COURT:  Okay.  We are going to break at this

12   point.

13              MS. FITZHARRIS:  Okay.

14              THE COURT:  We will resume tomorrow morning with --

15   at this point.  What other witnesses are you presenting,

16   Counsel?

17              MS. FITZHARRIS:  Mr. Ramadan is our last witness

18   that we expect to call, you know, but --

19              THE COURT:  But -- I'm sorry?

20              MS. FITZHARRIS:  Mr. Ramadan -- we expect

21   Mr. Ramadan will be our last witness.

22              THE COURT:  Okay.  All right.  We will begin

23   tomorrow morning, it will be about 10:30, and hopefully we

24   can conclude everything tomorrow, I'm hoping.  All right.

25   Thank you.

```
 1            THE LAW CLERK:  All rise.  Court is in recess.

 2            (Proceedings concluded at 4:01 p.m.)

 3                            _   _   _

 4                         CERTIFICATION

 5

 6            I, Robert L. Smith, Official Court Reporter of

 7     the United States District Court, Eastern District of

 8     Michigan, appointed pursuant to the provisions of Title 28,

 9     United States Code, Section 753, do hereby certify that the

10     foregoing pages comprise a full, true and correct transcript

11     taken in the matter of U.S.A. vs. Ramadan, Case No. 17-20595,

12     on Wednesday, May 23, 2018.

13

14

15                         _____

16                         Robert L. Smith, RPR, CSR 5098
                           Federal Official Court Reporter
                           United States District Court
17                         Eastern District of Michigan

18

19

20     Date:  06/08/2018
             _____

21     Detroit, Michigan

22

23

24

25
```