1        UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF MICHIGAN
2              SOUTHERN DIVISION

3                 —   —   —

    UNITED STATES OF AMERICA,
4
                Plaintiff,
5
      vs.                          Case No. 17-20595
6
    YOUSEF M. RAMADAN,             Hon. Marianne O. Battani
7
                Defendant.
8    _____/

9                  EVIDENTIARY HEARING

10       BEFORE THE HONORABLE MARIANNE O. BATTANI
               United States District Judge
11      Theodore Levin United States Courthouse
               231 West Lafayette Boulevard
12                 Detroit, Michigan
               Thursday, May 24, 2018
13
    APPEARANCES:
14
    For the Plaintiff:    RONALD W. WATERSTREET
15                        MICHAEL M. MARTIN
                          U.S. Attorney's Office
16                        211 W. Fort Street, Suite 2001
                          Detroit, MI  48226
17                        (313) 226-9100

18   For the Defendant:   ANDREW DENSEMO
                          COLLEEN P. FITZHARRIS
19                        Federal Defender Office
                          613 Abbott, 5th Floor
20                        Detroit, MI  48226
                          (313) 967-5555
21

22   Also Present:        Tania Ghanem, Court Interpreter

23

24
         *To obtain a copy of this official transcript, contact:*
25          *Robert L. Smith, Official Court Reporter*
            *(313) 234-2612 • rob_smith@mied.uscourts.gov*

*Evidentiary Hearing • May 24, 2018*

**2**

1                          TABLE OF CONTENTS

2

WITNESSES                                                    PAGE

3

4    YOUSEF RAMADAN
         Direct Examination (Continued) by Ms. Fitzharris...  7
5        Cross-Examination by Mr. Waterstreet...............  70
         Redirect Examination by Ms. Fitzharris.............147
6        Recross-Examination by Mr. Waterstreet............151

7

8

9

10   EXHIBITS                                              RECEIVED

11

     Government's Exhibits O-3, O-4, O-5, O-6, O-7,
12                          O-10, O-13 and O-14............132

13   Government's Exhibits U-1, U-2 and U-3..............  86

14   Defendant's Exhibits E & F..........................  70

15   Defendant's Exhibit G...............................  59

16

17

18

19

20

21

22

23

24

25

*Evidentiary Hearing • May 24, 2018*

```
 1 ║ Detroit, Michigan
 2 ║ Thursday, May 24, 2018
 3 ║ at about 10:28 a.m.
 4 ║                        —   —   —
 5 ║           (Court, Counsel and Defendant present.)
 6 ║           THE LAW CLERK:  Please rise.
 7 ║           The United States District Court for the Eastern
 8 ║ District of Michigan is now in session, the Honorable
 9 ║ Marianne O. Battani presiding.
10 ║           You may be seated.
11 ║           THE COURT:  Good morning.
12 ║           MR. DENSEMO:  Good morning.
13 ║           MS. FITZHARRIS:  Good morning, Your Honor.
14 ║           MR. WATERSTREET:  Good morning, Your Honor.
15 ║           THE CASE MANAGER:  Calling Case No. 17-20595,
16 ║ United States vs. Ramadan.
17 ║           THE COURT:  We are continuing our hearing.  You may
18 ║ be seated.
19 ║           Mr. Ramadan, you may take the stand.
20 ║           MR. DENSEMO:  Your Honor, would the Court mind if
21 ║ Mr. Ramadan's hands are unshackled?
22 ║           THE COURT:  Yes, the cufflinks may come off.
23 ║           MR. DENSEMO:  We appreciate it, Judge.
24 ║           MS. FITZHARRIS:  Good morning, Your Honor.
25 ║ Colleen Fitzharris for Mr. Ramadan.
```

1        Before we begin, I would like an update from the

2   government on where they are on the production of

3   Officer Brown's e-mails that were ordered produced yesterday.

4        MR. WATERSTREET:  Your Honor, we reviewed it.  We

5   have not come across anything that pertains to this time

6   period, so I will continue -- continue to look.  I don't know

7   what else I can say.

8        THE COURT:  Where do you look?  Do you have his

9   computer or do you --

10       MR. WATERSTREET:  I asked for him to provide all of

11  his e-mails to me.  I have gone through all of those e-mails

12  on more than one occasion.  I provided all of those to

13  defense counsel, any one that pertains to the time period in

14  question.

15       MS. FITZHARRIS:  The time period in question means

16  an interview or interrogation of Mr. Ramadan on August 15th

17  and 16th.  It does not matter if they were written before or

18  after or during the interrogation, it matters if they were

19  about that topic.

20       MR. WATERSTREET:  I understand that, Your Honor.

21       THE COURT:  And you found nothing that you haven't

22  already turned over?

23       MR. WATERSTREET:  I have not found anything I have

24  not already turned over.  I will look -- continue to look.

25  Maybe there will be some file somewhere that I misplaced or

1   something, but I have not come across a single thing that I

2   have not handed over.

3           THE COURT:  Okay.

4           MS. FITZHARRIS:  Again, defense counsel has not

5   received any e-mails whatsoever written by Officer Brown

6   pertaining to the interrogation of Yousef Ramadan.

7           THE COURT:  Okay.  Look, because he said he wrote

8   e-mails so --

9           MS. FITZHARRIS:  Right.

10          THE COURT:  -- there must be something.  It sounds

11  like they were maybe just even transferring photos or

12  something, but look again.

13          MR. WATERSTREET:  Okay.  Thank you.

14          THE COURT:  All right.

15          MS. FITZHARRIS:  All right.  We call

16  Yousef Ramadan.

17          THE COURT:  You are still under oath, sir, from

18  yesterday.

19          MR. DENSEMO:  Your Honor, I placed a chair for the

20  interpreter by Mr. Ramadan so that she can sit down.

21          THE COURT:  All right.  That's fine.

22          MS. FITZHARRIS:  Your Honor, I'm going to -- just

23  for the marshals, I'm going to return what has been marked as

24  Defense Exhibits E and F.  These are the -- E is the drawing

25  of the interrogation area that Mr. Ramadan drew yesterday,

 1    and F is Government's Exhibit X, which Mr. Ramadan wrote on

 2    yesterday.  I'm just going to hand that to him and a pen so

 3    that if he needs to write in the future.

 4            THE COURT:  All right.

 5            UNIDENTIFIED MARSHAL:  No, he can't have the pen.

 6            MS. FITZHARRIS:  Your Honor, may he --

 7            UNIDENTIFIED MARSHAL:  He cannot have this.

 8            MS. FITZHARRIS:  What kind of pen may he have?

 9            UNIDENTIFIED MARSHAL:  There is a pen in lockup

10    that we use.

11            THE COURT:  What?

12            UNIDENTIFIED MARSHAL:  I can call down and probably

13    possibly have someone bring one up, but he can't have that

14    one.

15            MS. FITZHARRIS:  He used this one yesterday.

16            UNIDENTIFIED MARSHAL:  He's not allowed to.  I

17    don't know who allowed him to do it but he's not allowed to

18    use that pen.

19            THE COURT:  Let's go on, and when he -- he can

20    point to whatever and you can write it in.

21            MS. FITZHARRIS:  Okay.  That works.

22            THE COURT:  Is it a felt pen that you are talking

23    about?

24            UNIDENTIFIED MARSHAL:  It is a special rubber --

25            THE COURT:  Okay.  We will do it with counsel.

*Evidentiary Hearing • May 24, 2018*

**7**

 1          MS. FITZHARRIS:  All right.  Thank you, Your Honor.

 2          THE COURT:  It will take us a little bit but --

 3                    YOUSEF RAMADAN,

 4  having been previously sworn, was examined and testified on

 5  his oath as follows:

 6               DIRECT EXAMINATION (Continued)

 7  BY MS. FITZHARRIS:

 8  Q.  Good morning, Mr. Ramadan.

 9          MR. RAMADAN:  (In English) Good morning.

10  BY MS. FITZHARRIS:

11  Q.  Yesterday we were talking but when we ended we were

12  talking about when you were interrogated first --

13          MR. RAMADAN:  (In English) Yes.

14  BY MS. FITZHARRIS:

15  Q.  -- by two CBP officers.  Do you remember that?

16          MR. RAMADAN:  (In English) Yes.

17  A.  Yes.

18  BY MS. FITZHARRIS:

19  Q.  Okay.  Based on the way you were talking yesterday it

20  seemed to me that you were having trouble with the names of

21  the officers; is that correct?

22  A.  Yes.

23  Q.  Okay.  So for clarity in the record, when I refer to the

24  tall officer I am talking about Officer Armentrout.  Okay.

25  A.  Okay.

*Evidentiary Hearing • May 24, 2018*

8

```
1    Q.   And when I talk about the short officer I'm talking

2    about Officer Schmeltz.

3    A.   Okay.

4    Q.   So with that in mind, who was the officer who told

5    you -- said something about Guantanamo?

6    A.   The short one.

7    Q.   Who was the officer who asked you about your feelings

8    about Jews?

9    A.   The tall.

10   Q.   Who was the officer who asked you about whether you plan

11   to go to Syria?

12          MR. RAMADAN:   (In English) The short, the FBI.

13   A.   The short, the FBI.

14          MR. RAMADAN:   (In English) The short and the FBI.

15   A.   The short one and the FBI.

16   BY MS. FITZHARRIS:

17   Q.   And when you say the FBI agent, you are talking about

18   Agent Thomas?

19   A.   Yes.

20   Q.   Who's the officer who put handcuffs on you in the first

21   interrogation room?

22   A.   The short.

23   Q.   All right.  When we left off yesterday we were talking a

24   little bit about the conversations about pass codes, okay, so

25   I'm going to pick up there.
```

*Evidentiary Hearing • May 24, 2018*

1          How long had you been talking to the officers

2     before they asked you for pass codes to your cellphones?

3     A.   Like around 40 minutes.

4     Q.   And when you refused to give them your pass code, what

5     did the officers do?

6     A.   First, he got upset, he didn't like it.  He told me what

7     did you hide in the phone that you don't want us to see.

8     Q.   Who is the person who said that?

9     A.   The short.

10    Q.   Okay.  And how did you respond when he asked you what

11    you were trying to hide?

12    A.   I told him I have nothing to hide in my phone.  But I

13    have pictures of my wife and my sisters, and I have the

14    picture of my Social Security cards and ID, and my kids

15    playing.

16    Q.   Did they tell -- did any -- either one of the officers

17    ask you -- tell you that you had to provide your pass codes?

18    A.   All of them, but mostly the short and the tall guy and

19    the short one too.

20    Q.   After they told you that you had to provide your pass

21    codes, how did you respond?

22    A.   I did like that.  I don't want to.

23    Q.   And when you say like that, you made a facial

24    expression?

25    A.   He stood up and asked me to turn around, and he put the

1  handcuffs.

2  Q.  At any point did you ask either officer for legal

3  protection before providing pass codes?

4  A.  Not only for the pass code but to any -- anything that

5  is electronic.

6  Q.  So what did you ask for, what legal protection?

7  A.  I told him to give me like a guarantee that -- like a

8  paper -- immunity that, you know, I will be protected and you

9  will not press charges against me or do anything, and then I

10  will open it for you.

11  Q.  Why did you ask for that?

12  A.  Because I have a previous experience in San Diego, and

13  when I gave them the security -- the pass code at the

14  security, they did pass -- they did erase -- erase it.  So

15  they told us -- they told me -- I'm sorry.  They told me

16  trust us, and if you give it to us we will erase any cameras

17  because -- and we are not going to --

18  Q.  Hold on, Mr. Ramadan, let me back up.  Okay.

19       You said that you had a previous experience with

20  law enforcement officers where they asked for your pass

21  codes?

22  A.  Yes.

23  Q.  When was that?

24       MR. RAMADAN:  (In English) In San Diego.

25  A.  In San Diego.

 1  BY MS. FITZHARRIS:

 2  Q.   What year?

 3           MR. RAMADAN:   (In English) I would say I think

 4  2015.

 5  A.   I would say I think in 2015.

 6  BY MS. FITZHARRIS:

 7  Q.   And they asked you to provide pass codes to your

 8  computers then?

 9  A.   The security camera and the phone.

10  Q.   So just to clarify, they asked you to provide the pass

11  codes for the security camera and for your phone?

12  A.   Yes.

13  Q.   And in 2015, after you gave them those pass codes, what

14  did the officers do?

15  A.   They told me, trust me -- trust us, and give us the pass

16  code.  I said no, I don't want to.  He did threaten me

17  because I had an a misdemeanor case, and I did sign a waiver

18  for my rights, I think Fourth or Fifth Amendment.

19  Q.   Okay.  So just to clarify again, they told you that you

20  had a misdemeanor conviction, and what did they say about

21  waiver of rights?

22  A.   So I was on probation for three years.  I did sign a

23  waiver regarding my rights, so they can come to my house and

24  search my house without any permission or warrants, so I

25  don't want that.

1    Q.   So after they told you that you had waived these rights,

2    what did you do?

3    A.   He did threaten me, and he told me that he would take

4    the devices with him.

5    Q.   And after he threatened you and said that he would take

6    the devices with him, what did you do?

7    A.   After he forced me I gave him the pass code.

8    Q.   And what did the officer do with the pass code?

9    A.   So he would start looking at my pictures on the phone,

10   and he erased the hard drives of the camera because on the

11   hard drive they were they came to my house, there is a video

12   that when they came, and they wanted to make sure -- they

13   thought that I have a felony when I went to buy the gun.

14   Q.   Mr. Ramadan, so what did the officers do after you gave

15   them the pass code?

16            MR. RAMADAN:   (In English) They erased.

17   A.   Erased.

18   BY MS. FITZHARRIS:

19   Q.   Okay.  When you were in the first interrogation room on

20   August 15th and you asked for legal protection, were you

21   thinking about that incident?

22   A.   That's the main reason, that's why I didn't trust them.

23   Q.   So when --

24   A.   One of the main reasons.

25   Q.   When you said that you wanted immunity, how did the CBP

1   officers respond?

2   A.   He starting to laugh, and he told me that I watch lots

3   of movies.

4   Q.   Who said that?

5          MR. RAMADAN:   (In English) The short.

6   A.   The short.

7   BY MS. FITZHARRIS:

8   Q.   And was that the end of the conversation about your pass

9   codes?

10  A.   No.

11  Q.   What happened next?

12  A.   He threatened me if I don't speak up he's going to take

13  a different -- he's going to do something else against me.

14  Q.   Who said that?

15         MR. RAMADAN:   (In English) The short.

16  A.   The short, after he put the handcuffs.

17  BY MS. FITZHARRIS:

18  Q.   So when he said this you were wearing handcuffs?

19  A.   Can you repeat the question?

20  Q.   When he said -- when he threatened -- he responded and

21  said that you were -- you watch too many movies and you have

22  to answer, were you wearing handcuffs?

23  A.   No, not yet.

24  Q.   Not yet.  So after -- after he said that, what happened

25  next?

1   A.   I told him that I don't want to.  He did not like it.

2   And I gave him that face and then stood up, and he put the

3   handcuffs on me.

4   Q.   Okay.

5   A.   And then he get out of the room.

6   Q.   And who left the room?

7   A.   The short.

8   Q.   So at this point were you the only person in the room?

9        MR. RAMADAN:   (In English) The tall agent stayed

10  there.

11  A.   The tall guy --

12       MR. RAMADAN:   (In English) Agent.

13  A.   Agent was there.

14  BY MS. FITZHARRIS:

15  Q.   How long were you alone with just the tall guy?

16  A.   For a short period of time, like 20 minutes, around

17  20 minutes.

18  Q.   And when you were alone with the tall officer, was he

19  asking you questions?

20  A.   Yes.

21  Q.   What sorts of questions did he ask you?

22  A.   He is trying to play the role of good cop/bad cop.

23  Q.   And when you say that what do you mean?

24  A.   He told me that I don't blame you for what happened to

25  you, and he starts asking me if I like Jews or not.

1    Q.   At some point did the short officer return to the first

2    interrogation room?

3    A.   Yes.

4    Q.   And what happened when he returned?

5    A.   He start asking me questions about the -- that was on

6    the hard drive.

7    Q.   What questions did he ask you about the contents of the

8    hard drive?

9    A.   Lots of pictures about armies and war.

10   Q.   And what did he ask you about the pictures of armies and

11   war?

12   A.   Mostly he asked like why do you look at those kinds, and

13   he insisted on ISIS.

14   Q.   How did you -- what did you say when asked about the

15   photos of -- ISIS photos?

16   A.   I told him that I take a look at all kind of videos, not

17   only ISIS, just to see what's going on around me and in the

18   world.  But he kept on insisting on ISIS even though there

19   were like other pictures about war and other armies.

20   Q.   Who was insisting on talking about ISIS?

21        MR. RAMADAN:   (In English) The short.

22   A.   The short.

23   BY MS. FITZHARRIS:

24   Q.   How long were -- when they were asking -- when the short

25   officer was asking you questions about ISIS, were you in

1  handcuffs?

2  A.  As far as I remember, maybe no.

3      THE INTERPRETER:  The interpreter, Your Honor, is

4  going to clarify on one word.

5      THE COURT:  Can you clarify?

6      MR. RAMADAN:  (In English) He took off.

7  A.  Because the tall guy he took off the handcuffs on me

8  meanwhile.

9      MR. WATERSTREET:  I believe the record should

10 reflect that the defendant said he took off the handcuffs,

11 and then said something else.

12     THE INTERPRETER:  I said took off.

13     MR. WATERSTREET:  Okay.  I thought you said remove.

14     THE INTERPRETER:  I did repeat in English what this

15 man said.

16     MR. WATERSTREET:  Okay.  Thank you.

17 BY MS. FITZHARRIS:

18 Q.  So when -- when were the -- so after the short officer

19 returned to the room, at what point were the handcuffs taken

20 off?

21 A.  Before he came in.

22 Q.  Okay.  And who decided whether to take the handcuffs

23 off?

24 A.  The tall guy.

25 Q.  Did either officer ask you about any other photos or

1    videos on the hard drives?

2    A.   Yes.

3    Q.   What photos did they ask you about in the first

4    interrogation room?

5    A.   Pictures of weapons.

6    Q.   What did they ask you about the photos of weapons?

7    A.   Pictures off of the internet, if I own it or not.

8    Q.   How did the first interrogation end?

9    A.   Every time they kept on asking about the password.

10   Q.   And how many times did they ask you to give them the

11   pass code?

12   A.   A lot.

13   Q.   During that first interrogation in that room with

14   Officers Armentrout and Schmeltz, how many times did you ask

15   for a lawyer?

16          THE INTERPRETER:   The interpreter didn't hear.  Did

17   you ask about what?

18   BY MS. FITZHARRIS:

19   Q.   How many times did you ask for a lawyer?

20   A.   At least four times.

21   Q.   When you are in the room, did you notice any cameras?

22   A.   Yes, it was toward the right side.

23   Q.   When you noticed the cameras, did you ask that the --

24   that the questioning be recorded?

25   A.   Yes, I did ask this question since the beginning of the

1    interrogation.

2    Q.   When you asked for a lawyer, how did the two CBP

3    officers respond?

4    A.   He told me that I do not have any rights, and a lawyer

5    cannot come over here.  If he's going to come over here we

6    have to have a pass, a Clear pass.  He told me that you are

7    in international board, and he told me that I do not have any

8    rights.

9    Q.   When you asked that the conversation be recorded, what

10   did the officers say?

11   A.   He told me that it is recorded.

12   Q.   When that first interrogation ended, where did the tall

13   officer go?

14   A.   Both of them they were, like, in and out, but always I

15   had someone with me.  They were, like, you know, in and out,

16   rotating.

17   Q.   When the first interrogation ended, where did you go, if

18   anywhere?

19   A.   I stayed in the room, and one time they gave me a

20   coloring book when the FBI agent came in so I can like color

21   with the kids.

22   Q.   When you -- so when you were coloring with the kids,

23   where were you?

24   A.   Seated area in the lobby.

25   Q.   Okay.  Was your wife with you when you were there with

1   the kids?

2   A.   No.

3   Q.   Where did your wife go?

4   A.   I think she was talking to the FBI agent.

5   Q.   When you were in the waiting area coloring with your

6   kids, how did your kids seem to you?

7   A.   They were, like, scared a lot, and I tried to calm them

8   down but they from feeling, like, something wrong is going

9   on.

10  Q.   How did you know that they were scared?

11  A.   They were crying, and when I came out and bringing the

12  coloring books this is when they start crying.  And then I

13  try to calm them down, and I told them don't be scared, just

14  shortly and we will all go together home.  They just wanted

15  to talk to me.  So I felt, like, their face, they changed,

16  it's not like the usual.

17  Q.   How long were you in the waiting room with your kids

18  with the coloring books?

19  A.   Like around 20 minutes.

20  Q.   And what changed after 20 minutes, what happened?

21  A.   They called me back and my wife came in.

22  Q.   Who called you back?

23         MR. RAMADAN:  (In English) The short.

24  A.   The short.

25  BY MS. FITZHARRIS:

```
 1    Q.   And where did he direct you to go?

 2    A.   He took me back to the same interrogation room.

 3    Q.   And when you were in that first interrogation room, who

 4    else was with you?

 5    A.   The tall officer.

 6              MR. RAMADAN:  (In English) Agent.

 7    A.   Agent.

 8    BY MS. FITZHARRIS:

 9    Q.   And when you were in the interrogation room with the

10    tall agent -- officer, did he ask you any questions?

11    A.   He came back to the same questions regarding the

12    pictures and terrorism and the password, and he told me that

13    I am hiding something big on my phone.  I told him that I am

14    not going to give it to you, and I don't want to talk to you.

15    He told me that all the government going to come and talk to

16    you --

17              MR. RAMADAN:  (In English) And basically you -- can

18    I say that?    It is a bad word?

19    BY MS. FITZHARRIS:

20    Q.   Go ahead.

21              MR. RAMADAN:  (In English) Basically you are

22    fucked.  Sorry.

23    BY MS. FITZHARRIS:

24    Q.   When you said that you didn't want to talk, what

25    happened next?
```

 1   A.   He asked me to stand up, put the handcuffs -- he told me

 2   to turn around, and put the handcuffs on me, and he was,

 3   like, really upset, and it was really tight.

 4   Q.   Who put the handcuffs on you this time?

 5   A.   The same guy, the short.

 6   Q.   Okay.  And after he put handcuffs on you, what happened

 7   next?

 8   A.   The same thing, he got out and he went to that command

 9   room I think so, so he can take a look at the photos on the

10   hard drive.

11   Q.   Did the short officer ever come back?

12   A.   Yes.

13   Q.   So when he left, were you in handcuffs?

14         THE INTERPRETER:  The interpreter is going to

15   clarify.  Did you say when you left or --

16   BY MS. FITZHARRIS:

17   Q.   When the short officer left the room, were you in

18   handcuffs?

19   A.   Yes.

20   Q.   And when he returned to the room -- when the short

21   officer returned to the room, were you in handcuffs?

22   A.   Yes, but when he left the tall officer told me it's

23   better for you to talk because we want to help you, give us

24   the password, like, it is not, like, worser to happen -- for

25   that to happen to you.  I told him that I do not want to give

 1    it to you.

 2    Q.   All right.  On August 15th and 16 were you only in that

 3    first interrogation room?

 4    A.   This one and another room.

 5    Q.   When were you taken to the other room?

 6    A.   Altogether there were like three rooms including the

 7    lobby it would be four.

 8    Q.   Okay.  So when you -- at one point did you go to the

 9    conference room?

10    A.   Yes.

11    Q.   What happened right before you went to the conference

12    room?

13    A.   After he threatened me that the government will be here,

14    the FBI agent came over with -- with three other

15    investigators.

16    Q.   And where was the FBI officer and the three other

17    investigators?

18    A.   I was still in the interrogation room, so he called my

19    wife to talk to her, and they left the kids alone.

20    Q.   How long was the FBI officer talking to your wife?

21    A.   Like around a half hour.

22    Q.   When he finished talking to your wife after 30 minutes,

23    what happened next?

24    A.   I stayed a little bit in the interrogation room, and I

25    told him that I need to talk to my wife, I need to see what

1   you are talking to her about.

2   Q.   When you asked him to talk to your wife, what did --

3   what was the response?

4   A.   He told me when we finish the investigation --

5           MR. RAMADAN:   (In English) Interrogation.

6   A.   Interrogation.

7   BY MS. FITZHARRIS:

8   Q.   Who told you that?

9           MR. RAMADAN:   (In English) The tall.

10  A.   The tall guy.

11  BY MS. FITZHARRIS:

12  Q.   Okay.   How did you get into the conference room?

13  A.   After my wife left like 15 minutes after.

14  Q.   And who brought you into the conference room?

15  A.   The short.

16  Q.   And when Officer Schmeltz brought you into the

17  conference room, were you in handcuffs?

18  A.   Yes.

19  Q.   Was there anyone else in the conference room when you

20  arrived?

21  A.   With me it will be six -- like five and me it will be

22  six.

23  Q.   But when you entered, how many people were in the room?

24  A.   Four.

25  Q.   Who was in the room?

1              MR. RAMADAN:  (In English) The tall agent.

2   A.   The tall agent.

3              MR. RAMADAN:  (In English) The FBI.

4   A.   The FBI.

5              MR. RAMADAN:  (In English) And James Brown.

6   A.   And James Brown.

7              MR. RAMADAN:  (In English) The guy with the beard

8   came in.

9   A.   And the guy with the beard, Kelley.

10  BY MS. FITZHARRIS:

11  Q.   So when you say the guy with the beard -- the agent with

12  the beard, you are talking about Special Agent Kelley?

13             MR. RAMADAN:  (In English) Kelley, yep.

14  BY MS. FITZHARRIS:

15  Q.   When you entered the room, when were the handcuffs

16  removed, if at all?

17  A.   They did not take them off.

18  Q.   So they did not take them off at any time when you were

19  in the conference room?

20  A.   No.

21             MS. FITZHARRIS:  All right.  At this point, Your

22  Honor, I'm going to ask to draw on the thing.

23  BY MS. FITZHARRIS:

24  Q.   What furniture was in the conference room?

25  A.   A round table.

1    Q.   I'm going draw a round table.

2    A.   Uh-huh.

3    Q.   Okay.  How many -- were there any chairs in the room?

4    A.   Yes.

5    Q.   How many chairs?

6    A.   I think more than six.

7    Q.   Okay.  When you were in the room, can you point to me

8    where you were sitting?

9             MR. RAMADAN:  (In English) X right here.

10   BY MS. FITZHARRIS:

11   Q.   I am marking where Mr. Ramadan was sitting with an R.

12            Where was the FBI Agent Thomas sitting?

13   A.   Across from me.

14   Q.   I'm marking where Agent Thomas was sitting with a T.

15            Where was HSI Agent Kelley, the man with the beard,

16   sitting?

17   A.   Next to Tom, the FBI.

18   Q.   I'm going to mark that with a K.

19            Where was the short officer, Officer Schmeltz?

20   A.   He was behind me.

21   Q.   So I'm going mark that with an S.

22            Was there anyone else in the room?

23            MR. RAMADAN:  (In English) The tall agent.

24   A.   The tall agent.

25

 1  BY MS. FITZHARRIS:

 2  Q.   That's Officer Armentrout?

 3  A.   Officer Armentrout.

 4  Q.   And where was he?

 5  A.   He was sitting here on a chair, and he had the yellow

 6  notes.

 7  Q.   Okay.  I'm going to mark where Officer Armentrout was

 8  sitting with an A.

 9  A.   There is one more I forgot.

10       MR. RAMADAN:  (In English) James Brown.

11  A.   James Brown.

12  BY MS. FITZHARRIS:

13  Q.   Okay.  Sorry.  Where was CBP officer James Brown?

14  A.   He wasn't sitting.

15  Q.   Okay.  But --

16       MR. RAMADAN:  (In English) He was standing here.

17  A.   He was standing here.

18  BY MS. FITZHARRIS:

19  Q.   I'm going to mark for where Officer Brown was standing

20  with a B.

21       When you entered the conference room, did the

22  officers identify themselves?

23  A.   No, I asked.

24  Q.   And who responded?

25  A.   I talked to the FBI agent.

1    Q.   And what did he say?

2    A.   He told me do you -- do you have to know?  The whole

3    government is going to talk to you.  I told him yes, I would

4    like to know who am I talking to.

5    Q.   And when you said that, what did Agent Thomas say?

6    A.   He didn't reduce [sic] himself, and he told me that I am

7    from the FBI.

8    Q.   Did he provide you with any identification?

9    A.   I asked him for the card.

10   Q.   And did he give it to you?

11   A.   I would like -- I told him that I want to know who am I

12   talking with because maybe you are not from the FBI.

13   Q.   When you asked for a card from Agent Thomas, did he give

14   one to you?

15   A.   Yes, and I still have it until now.

16   Q.   When you entered -- what were the first questions asked

17   when you were in the conference room?

18   A.   First, they asked like routine questions, my name, and

19   they asked me about the plate.

20   Q.   When they -- about how many questions did they ask you

21   about the plates?

22   A.   One only.

23   Q.   What was the question they asked you about the body

24   armor plates?

25   A.   Why do you need it?

1    Q.   What did you say?

2    A.   For my safety because I want to work as a photographer

3    when they do like a strike between -- sorry, demonstration

4    between the Israeli solders and the Palestinian, the whole

5    conflict.

6    Q.   And -- sorry, I'm just going to back up a quick second,

7    Mr. Ramadan.

8          Were you aware that these officers had weapons with

9    them?

10   A.   Yes.

11   Q.   Did this conference room have any windows?

12        THE INTERPRETER:   The interpreter didn't hear.  Did

13   you say windows?

14   BY MS. FITZHARRIS:

15   Q.   Did this conference room have any windows?

16   A.   No.

17   Q.   Was the door open?

18   A.   No, they closed it.

19   Q.   Did you notice any cameras in the conference room?

20   A.   No, but I requested for it to be recorded for my own

21   safety.

22   Q.   When you asked for the interrogation to be recorded,

23   what was the response?

24   A.   So they said we just going to ask you a few questions,

25   don't be scared.

1    Q.   Who said that?

2    A.   The FBI agent.

3    Q.   Going back, so after you told the FBI agent that you

4    wanted to be a photo journalist and cover the conflict, what

5    questions were asked next?

6    A.   He asked me why did I buy the tickets on the same day.

7    Q.   What did you say?

8    A.   I told him that my wife bought the tickets three months

9    ago and she did not confirm the e-mail that they sent us, so

10   we had an issue with the reservation, and at the end I end up

11   buying new tickets.  The FBI agent asked me why did I buy it

12   cash.  I told him that I bought it with Visa.  He told me why

13   did I buy it only one way.  I told him because I want to go

14   help my dad and cover those conflicts.

15   Q.   Okay.  When you were answering these questions, did you

16   feel that you had to answer them?

17   A.   Until then, yes, it is normal questions.

18   Q.   After you were asked about your travel plans, what were

19   the next questions asked?

20   A.   They asked me about my dad and how much property he has

21   and why am I going to go and help him.  I told them because

22   he's old and he's sick I want to go and help him and he will

23   always tell me come back, come back.

24        MR. RAMADAN:  (In English) And this is one of the

25   reason now obviously he's died.

```
 1    A.   And now he passed away, he died.  That's one of the
 2    reasons why he died because he's always thinking about me and
 3    I'm, like, in prison.
 4    BY MS. FITZHARRIS:
 5    Q.   When did he die?
 6              MR. RAMADAN:  (In English) April 20th.
 7    A.   April 20th.
 8    BY MS. FITZHARRIS:
 9    Q.   Of this year?
10    A.   Yes.  Not only him, only -- also my uncle, my wife's
11    grandpa, and her uncle, and my mom's brother.
12    Q.   I'm very sorry, Mr. Ramadan.
13    A.   Within like, you know, less than six months.
14    Q.   Okay.  I'm very, very sorry.  Okay.
15              Let's -- I'm going to direct your attention now
16    back to August 15th and 16th.  Okay.  When -- so after they
17    were asking you about the length of your trip, what were the
18    next questions?
19    A.   They told me why am I going to go to Jordan.  Why you
20    didn't make a reservation directly to Palestine.
21    Q.   And what did you say?
22    A.   I told them because I have a Palestinian identity, so I
23    cannot go to Israel -- to -- Israeli airport even though I
24    have the American passport but I still have the Palestinian
25    identity, so I have to make a reservation to Jordan and cross
```

 1    by car, that's the only country that will accept us because

 2    I'm Palestinian.

 3    Q.   When they were asking you about your travel plans, did

 4    you feel that you needed a lawyer?

 5    A.   No.

 6    Q.   So after they finished asking you about your travel

 7    plans, what did they ask you about next?

 8    A.   He told me you're lying now.

 9    Q.   What did he say that you were lying about?

10    A.   That I made the reservation to Jordan for me to go to

11    Syria or Iraq because it's like next door, and also Palestine

12    is next door, and always when I make a reservation I go to

13    Jordan.

14    Q.   When he said that you were lying about your travel

15    plans, how did that make you feel?

16    A.   I felt like no matter what I'm going -- no matter what

17    I'm going to say they're not going believe me.  So I -- I

18    felt like they're asking me those questions about terrorism,

19    they're trying to accuse me with this -- with the terrorism

20    case.

21    Q.   When you felt like you were being accused of terrorism,

22    how did you respond?

23    A.   When he asked me I said I want a lawyer, I'm not going

24    say anything.  I told him that if you're going to talk to me

25    regarding this subject I want an interpreter and I want a

1   lawyer.

2   Q.   What was the response when you asked for an interpreter

3   and a lawyer?

4   A.   He told me that people like you --

5             THE INTERPRETER:  Can the interpreter ask him to

6   repeat, please.

7   A.   He told me that you will never have a lawyer here, and

8   people like you if you're not going to talk you're going to

9   be going to Guantanamo.

10  BY MS. FITZHARRIS:

11  Q.   Guantanamo.  Who said that?

12  A.   The FBI agent.

13  Q.   So after he told you that you were lying, did he ask you

14  any more questions?

15  A.   Yes.

16  Q.   What did he ask you about?

17  A.   After he asked me and forced me and scared me, he told

18  me why you don't trust your wife.  He asked me why I don't

19  have friends.

20  Q.   And why did he ask you those questions -- or what -- did

21  he explain why he asked you those questions?

22  A.   I think -- I think he was, like, asking questions to my

23  wife.  My wife told him that he doesn't have friends, he's a

24  family guy.

25  Q.   Mr. Ramadan, I want to ask you about things that you saw

1  and heard.  Okay.  So, you know -- okay.  So when Mr. -- when

2  Agent Thomas asked you about --

3  A.   He asked me the same questions.

4  Q.   Okay.  And what questions did he ask you about friends?

5  A.   If I have -- if I have friends.  Where do I go?  So I go

6  to my family's houses.  And he told me do you trust your

7  wife?  I told him not only my wife, I don't trust anyone.

8  Q.   What did he say when you said that you don't trust

9  anyone, Agent Thomas, what did he say?

10  A.   He had a paper, so he had a paper and every time he

11  would ask a question, like, you don't have friends he would

12  make like a mark.  You don't trust anyone, he was like

13  writing things.  And he asked me if I have paranoia, and he

14  made like a circle around it, and he told me you're a lone

15  wolf -- a lone wolf, and he made a circle around it -- more

16  than one circle around it.

17  Q.   And I want the record to reflect that Mr. Ramadan is

18  imitating writing and then circling as if he were writing on

19  a paper.

20        When -- was this -- did Agent Thomas or anyone else

21  in the room ask you any other questions about terrorism?

22  A.   All of them, they were like -- they were, you know,

23  included in the interrogation but mostly it was the FBI guy

24  except James Brown, he did not say anything.  He was, like,

25  going back and forth, and he was doing like that, and giving

```
 1   me that look like a frown and making, like, breathing sounds.
 2   Q.   Just a second.  I want the record to reflect that
 3   Mr. Ramadan has crossed his arms and made a frowning face.
 4        THE COURT:  All right.
 5   A.   He was giving me that look like he had enough of me, so
 6   anything that I'm saying is a lie.
 7   BY MS. FITZHARRIS:
 8   Q.   Mr. Ramadan, what questions were you asked about
 9   terrorism?
10   A.   The same questions that the short guy asked me about the
11   caliphate, Islamic caliphate.
12   Q.   What did he ask you about the caliphate?
13   A.   If I support them, and I said no, of course not.  I told
14   him that as a Muslim I like to have a caliphate but not like
15   the one for ISIS.  How are you going to have a caliphate
16   without the blood shade [sic].
17   Q.   Hold on a second.
18   A.   How are you going to establish a caliphate without the
19   blood shade.
20   Q.   Hold on a second.  So was that a question posed to you,
21   how are you going to have a caliphate with out bloodshed?
22   A.   Yes.
23   Q.   Who asked you that question?
24   A.   The FBI.
25   Q.   Okay.  Were you asked if you support ISIS?
```

1   A.   Yes.

2   Q.   Were you asked whether you ever sent money to ISIS?

3   A.   Yes.  And he told me that Mohammed established caliphate

4   based on like blood, so how are you going to do something

5   like that?  I told him that you're wrong, first of all.  I

6   told him that Mohammed never had his caliphate based on

7   blood, it was very peaceful for tens of years.

8   Q.   When you said that Mohammed established a peaceful

9   caliphate, did the agent -- the FBI agent have any response

10   to that?

11   A.   He starting to laugh.

12   Q.   And did he ask you -- did anyone in that room ask you

13   about Hamas?

14   A.   Not -- they asked me but not in this room.

15   Q.   Okay.  Where did they ask you about Hamas?

16   A.   The tall guy.

17        MR. RAMADAN:  (In English) Agent.

18   A.   Agent.

19   BY MS. FITZHARRIS:

20   Q.   And where did he ask you?

21   A.   At the first interrogation room.

22   Q.   Okay.

23   A.   I told him that I don't like them.

24   Q.   When you were asked questions about ISIS, did you feel

25   that you had to respond?

1  A.   They had, like, their own system where, like, you know,

2  they all were wearing weapons on them and especially after

3  they threaten, you know, to go to Guantanamo, that's why,

4  like -- I was, like, cooperative and they, like, forced --

5  they forced me to talk to them.

6  Q.   Did they ask you questions about anything other than

7  terrorism when you were in the conference room?

8  A.   Until then I don't think so.

9  Q.   Did they ask you at all about firearms when you were in

10  the conference room?

11  A.   Not in the conference room.  When they send me from

12  there and went to the lobby.

13  Q.   Okay.  Hold on a second.  I'm going to collect my

14  thoughts.

15       When you were in the conference room, did they ask

16  you about any other topic other than your travel plans,

17  terrorism, and the items in your bags?

18       THE INTERPRETER:  Can you repeat the three things,

19  please.

20       MS. FITZHARRIS:  Terrorism, travel plans and items

21  in your bags.

22  A.   No.

23  BY MS. FITZHARRIS:

24  Q.   All right.  When you were in that conference room, did

25  you ask for a lawyer?

1    A.   Yes.

2    Q.   How many times did you ask for a lawyer in the

3    conference room?

4    A.   One time.

5    Q.   When the conversation in the conference room finished,

6    what happened next?

7    A.   First they took me to an interrogation room.

8         MR. RAMADAN:  (In English) I'm sorry.

9    A.   Oh, I'm sorry.  I -- when I was in a conference room

10   they also asked me about the password regarding the device.

11   BY MS. FITZHARRIS:

12   Q.   Okay.  Who asked you about the passwords to the devices?

13        MR. RAMADAN:  (In English) The FBI agent.

14   A.   The FBI agent.

15   BY MS. FITZHARRIS:

16   Q.   Did you give him pass codes to those devices?

17   A.   No.

18   Q.   What did you say when he asked for the pass codes?

19   A.   I told him that I'm not going give it to you, and do

20   whatever you want.  I'm not -- and I'm not going to give you

21   the password or the permission to give it to -- to take a

22   look at any of the device that I have.

23   Q.   You felt like you had to answer questions about

24   terrorism but you felt you could say no to giving pass codes.

25   Why did you feel like you could say no to giving pass codes

1    but you couldn't answer other questions?

2    A.   Because it has lots of personal stuff in it, and my --

3    and picture of my wife like half naked, and kids.

4          MR. RAMADAN:   (In English) Private life.

5    A.   My private life.

6    BY MS. FITZHARRIS:

7    Q.   Any point when you were talking to the FBI agents did

8    you mention a closed head injury?

9    A.   This was at the -- in the lobby.

10   Q.   What did you tell the officers about your closed head

11   injury?

12   A.   I did tell them that, yes, I was in a motorcycle

13   accident.

14   Q.   How does that closed head injury effect you and your

15   memory?

16   A.   So because of the injury I -- I forget names and numbers

17   but not the Arabic names, like more westernized -- English

18   names.

19   Q.   Did the officers respond at all after you told them

20   about this injury?

21   A.   He told me you're a liar, you're trying to get away from

22   the answers.

23   Q.   Who said that to you?

24         MR. RAMADAN:   (In English) FBI agent.

25   A.   The FBI agent.

1      MR. RAMADAN:  (In English) The short.

2  A.  And the short.

3  BY MS. FITZHARRIS:

4  Q.  When did the subject of your closed head injury come up?

5  A.  They asked me about the address, the store -- regarding

6  the storage.

7  Q.  Okay.  Where were you when they asked you about the

8  storage locker?

9  A.  In the lobby.

10  Q.  And who was in the lobby with you?

11  A.  All the people that were in the conference room.

12  Q.  Okay.  Were -- when you were in the lobby, were you in

13  handcuffs?

14  A.  In the beginning, no.

15  Q.  Okay.  So you said in that -- at first when you were in

16  the conference room you had handcuffs on.  At what point were

17  the handcuffs taken off?

18  A.  They moved me to the first interrogation room.  I sat

19  there, like, around 10 or 15 minutes.

20  Q.  And were the handcuffs removed in that interrogation

21  room?

22  A.  Once I entered the room they took off the handcuffs.

23  Q.  And who took off the handcuffs?

24      MR. RAMADAN:  (In English) The short.

25  A.  The short.

1   BY MS. FITZHARRIS:

2   Q.   Okay.  So Officer Schmeltz.

3   A.   Officer Schmeltz.

4   Q.   So how long were you in that -- after you were in the

5   conference room and you were put back in the first

6   interrogation room, how long were you in there?

7          MR. RAMADAN:  (In English) Can you repeat this,

8   please.

9   BY MS. FITZHARRIS:

10  Q.   So after you were in the conference room and moved into

11  the interrogation room, how long were you in that first

12  interrogation room?

13  A.   Around 15 minutes.

14  Q.   When you were in that room were you alone?

15  A.   I had the short guy with me.

16  Q.   And when you were in that interrogation room the second

17  time, did the short officer ask you questions?

18  A.   I think he asked me a few questions but I don't

19  remember.  So he was, like, playing with the phone and he

20  asked me about the passwords again.

21  Q.   At what point were you taken into the waiting area?

22  A.   After that they moved to the lobby and they moved me

23  with them.

24  Q.   And who moved you into the lobby?

25          MR. RAMADAN:  (In English) The short --

1   A.   The short --

2            MR. RAMADAN:  (In English) -- agent.

3   A.   -- agent.

4   BY MS. FITZHARRIS:

5   Q.   When you were in the lobby and when he moved you were

6   you wearing handcuffs?

7   A.   No.

8   Q.   What happened when you arrived back in the lobby?

9   A.   They were -- they were already there, the agents.

10  Q.   And where did you go?

11  A.   They made me sit on a chair in the lobby.

12  Q.   When you were sitting in the chair in the lobby, did

13  they ask you any questions?

14  A.   Yes.

15  Q.   What questions did they ask you?

16  A.   They asked me about pictures that they saw on the hard

17  drive.

18  Q.   What pictures on the hard drive?

19  A.   Other videos.

20  Q.   What did those videos show?

21  A.   Video about the person using drugs.

22           THE COURT:  Wait a minute.  I'm having trouble

23  hearing you again.  A video of what?

24           THE INTERPRETER:  Video about a guy using drugs.

25           THE COURT:  Thank you.

```
 1                  THE INTERPRETER:  You're welcome.
 2    BY MS. FITZHARRIS:
 3    Q.   Did they ask you about any other videos?
 4    A.   And the picture about broken glass and picture about a
 5    pipe bomb.
 6    Q.   When you were in the waiting area, did they ask you
 7    about firearms?
 8    A.   Yes.
 9    Q.   What did they ask you about firearms?
10    A.   He told me -- he asked me if I have weapons.  I said I
11    do.
12    Q.   Who asked you if you had weapons?
13    A.   The FBI.
14    Q.   And what -- did he ask you any other questions about
15    firearms?
16    A.   He asked me where do I have them.
17    Q.   What did you say?
18    A.   I said in a storage.
19    Q.   Did you tell him where the storage unit was?
20    A.   I told him that I -- I don't remember the address.  And
21    he said how come you don't remember the address?  You always
22    go there.  How come you don't have the address?  I told him
23    that I had a motorcycle accident and I have an injury, I
24    cannot remember numbers and names.
25    Q.   Okay.
```

1   A.   But I told him that I can show it to you on the computer

2   or I can take you there.

3   Q.   When you were answering questions about the location of

4   your firearms, did you feel like you had to answer?

5   A.   Yes, after threatening me, like, when he told -- you

6   know, threatening me about Guantanamo, and I was, like,

7   concerned that they will take me away from my family.  And he

8   told me that if you're not going to talk you will be staying

9   with us, so it is better for you to talk.

10           MR. RAMADAN:   (In English) You have to talk.

11   A.   You have to talk.

12   BY MS. FITZHARRIS:

13   Q.   When you were in this waiting area, was your family

14   there with you?

15   A.   No.

16   Q.   Did you know where your family was?

17   A.   I asked about them.  He told me that they left.  I asked

18   for a phone so I can call them make and sure that they are

19   okay.  He told me that I cannot talk to them.

20   Q.   Did the FBI agent ask you any other questions about

21   firearms?

22   A.   How many firearms I have.

23   Q.   Did he ask you whether you purchased them legally?

24   A.   Yes.  I told him that I buy it under my name legally.

25   Q.   You mentioned a pipe bomb.  Were you asked any questions

1   about a pipe bomb?

2   A.   So, first, he brought the picture of a broken glass, and

3   he asked me where is that picture taken.  I told him that it

4   is at my house in Bethlehem.

5   Q.   What did you -- what happened after you explained the

6   broken glass photo in your house in Bethlehem?

7   A.   He went and came back, and then a picture appeared to

8   me, a pipe bomb.

9   Q.   When he showed you -- and who showed you the photo of a

10  pipe bomb?

11  A.   The FBI agent.

12  Q.   Did he ask you any questions about the photo of a pipe

13  bomb?

14  A.   He told me where was that picture taken.  I told him off

15  of the internet.  And he told me you are a liar, this picture

16  is at your house.

17  Q.   Who said that you were a liar?

18  A.   The FBI agent.

19  Q.   After the FBI agent said that you were lying about the

20  pipe bomb, what happened next?

21  A.   And he brought both pictures and he told me that it is

22  the same tile.  I told him that it is a different tile; one

23  is like reddish color -- toward reddish color, and the other

24  one is more like white, and the square that is in it is

25  different.

1    Q.   Did he -- sorry.

2    A.   So he asked me is this picture in America or your

3    country.

4    Q.   What did you say when he asked you if this photo was in

5    America or in Palestine?

6    A.   I told him that it's -- it's in my country because they

7    do that there.

8    Q.   And when you say my country, do you mean Palestine?

9    A.   Yes.

10   Q.   Did Agent Thomas ask you if you made the pipe bomb?

11   A.   He asked me if I know how to make one.  I told him

12   personally I don't know how to make one and I never tried to,

13   but one time I saw on TV on the History Channel how they make

14   one.  It was, like, an FBI agent was, like, showing how you

15   make one.  So they can, you know, check how -- how it will

16   effect, so it was like for security and education purpose.

17   Q.   Did he ask you any other questions about how pipe bombs

18   are made?

19   A.   And he asked me what do they put in it.  I said I don't

20   know.  So he asked me if you are going to get all of the

21   supplies to make one how long it will take you to make one.

22   Q.   What did you say in response?

23   A.   I told him I don't know but I never done -- make one,

24   but based on what I watch on TV it will take one hour maybe

25   around.

1   Q.  After Agent Thomas was finished asking you about -- when

2   you were answering questions about pipe bomb, did you feel

3   that you had to answer?

4   A.  Yes, because, you know, there was, like, all around me

5   and showing me pictures and they all had guns.

6   Q.  All right.  I'm going to approach again and do some more

7   of the writing.

8            THE COURT:  All right.

9   BY MS. FITZHARRIS:

10   Q.  Okay.  In this area where there is a lobby, can you

11   point to me where you were sitting?

12            I'm marking in the lobby with an R where

13   Yousef Ramadan was sitting.

14            Where was Agent Thomas?

15   A.  He was here in front of me back and forth, he was going

16   back and forth.

17   Q.  I'm marking on the area in the lobby with a T where

18   Agent Thomas was walking back and forth.

19            Where was Officer Brown?

20   A.  Officer Brown, he was behind him going back and forth.

21   Q.  I'm marking --

22   A.  He would, like, be walking.

23   Q.  Okay.  I'm marking where Agent Brown was walking back

24   and forth with the letter B.

25            Where was the tall officer, Officer Armentrout?

```
1    A.   He was here (indicating.)

2    Q.   I'm marking on the diagram in the lobby with an A where

3    Officer Armentrout was.

4              Where was Officer Schmeltz, the short officer?

5    A.   He was next to me.

6    Q.   I'm marking with an S where Officer Schmeltz was.

7              And --

8    A.   They were like all of them going back and forth, like,

9    changing their spots.

10   Q.   Okay.  And for identification purposes I'm marking these

11   on Defendant's Proposed Exhibit F as in Frank.

12   A.   And you forgot the guy with the beard.

13   Q.   Where was the man with the beard, Agent Kelley?

14   A.   He was standing up here.  He was, like, standing up here

15   but he would be, like, talking to the FBI guy.

16   Q.   Okay.  I'm marking on Defendant's Proposed Exhibit F, as

17   in Frank, with the letter K for where Agent Kelley was

18   walking.

19   A.   He will go to the command room, but all of them they

20   would be, like, going to that computer room.

21   Q.   Okay.  How did the interview in the lobby end?

22   A.   After they asked me the question, and I changed my story

23   where the -- about the storage -- about the weapons that

24   was -- if they were in a storage area or someplace else.

25   Q.   So after you changed your story, what was their
```

1  response?

2  A.   They told me you're playing with us.

3  Q.   Who said that?

4  A.   Tom.

5  Q.   The -- Thomas, the FBI agent?

6  A.   Yes.

7  Q.   After Thomas said you are playing with us, what happened

8  next?

9  A.   He asked me where -- where do you have them.  I said at

10  my friend's.  He asked me give me -- give us his name to make

11  sure that he does not have a felony.  I said don't worry, he

12  did not have a felony.  He has weapons.

13  Q.   After you said that your friend -- you gave them to a

14  friend who does not have a felony, what happened next?

15  A.   All of a sudden James Brown get upset.

16        MR. RAMADAN:   (In English) He got mad.

17  A.   He got mad.

18  BY MS. FITZHARRIS:

19  Q.   When you said he got mad, what did he do?

20  A.   He yelled at me, he told me stand up, turn, and he took

21  off his handcuffs and put them on me.  And he lifted -- and

22  he put his arm between my --  both my arms and lifted up, and

23  he hit me two punches on my stomach.

24        MR. RAMADAN:   (In English) Who do you think you

25  are, you sand nigger.

1    A.   He told me what do you think you are, you son of nigger.

2            MR. RAMADAN:   (In English) No, sand nigger.

3    A.   Sand nigger.  Are you going to keep on lying?  I don't

4    like your story since the minute I saw you, and then he

5    twisted my ear and he pulled my hair.  And FBI guy was there

6    and all of them they were there, and then he put my hands

7    down and he told me to sit down.  He told me right now you

8    are going to take us where are the weapons, otherwise I'm

9    going to keep on hitting you all night.  I told him no matter

10   what you do I'm not going to say anything, and I want a

11   lawyer to tell them what's going on.

12   BY MS. FITZHARRIS:

13   Q.   Mr. Ramadan, if the marshals don't mind, Mr. Ramadan,

14   can you stand up.  Where did agent -- where did Officer Brown

15   punch you, can you show us?

16   A.   This area (indicating).

17   Q.   Your left side or the right side or the center?

18   A.   I think toward the right.

19   Q.   Okay.  And which ear did Agent Brown twist?

20   A.   (Indicating.)

21   Q.   Is this your left ear or right ear?

22   A.   Right ear.

23   Q.   And if you show the Judge, where did Officer Brown pull

24   your hair?

25   A.   The right side.

1    Q.   Is that right behind your ear?

2    A.   Yes.

3    Q.   Thank you.  You can sit down.

4         Did Officer Brown put handcuffs on you?

5    A.   Yes.

6    Q.   When he handcuffed you, did he handcuff you with your

7    hands in front or in back?

8    A.   Can I stand up to show you?

9    Q.   Yes, you may.

10   A.   He asked me to stand up, turn your back, give me your

11   hands to the back.  I did do what asked, and he put the

12   handcuffs on, and then he lifted my arms up and he put his

13   hand in between my both arms.

14        MR. RAMADAN:  (In English) Can she stand so --

15        UNIDENTIFIED MARSHAL:  No.

16   A.   He put his arm in between my both arms and lifted up,

17   and then he hit me.

18   BY MS. FITZHARRIS:

19   Q.   Okay.  After Officer Brown put handcuffs on you, what

20   happened next?

21   A.   He hit me.

22   Q.   Sorry.  And after he hit you and twisted your ear and

23   pulled your hair, what happened next?

24   A.   He told me that you're going to take us where you have

25   the weapons, otherwise I'm going to keep on hitting you all

```
 1   night.  You have to take us.  No one is going to help you
 2   here.
 3              I said I need the lawyer right now and I want to
 4   call my family, and I'm not going to talk to you no matter
 5   what you ask me and what you do.
 6   Q.   And did they stop asking you questions then?
 7   A.   Yeah, after that they left.  They asked the -- they
 8   pulled the FBI agent --
 9              MR. RAMADAN:  (In English) No, he pulled him.
10   A.   He pulled him, and they made me sit on a seat, and they
11   wanted to talk to each other.
12   BY MS. FITZHARRIS:
13   Q.   And where were you seated?
14   A.   At the same place, in the lobby until then.
15   Q.   Okay.  And when you were sitting in the lobby, were you
16   handcuffed?
17   A.   Yes.
18   Q.   At some point were you allowed to go home?
19   A.   No.  I asked them if I can go home.  He said no, I have
20   to -- we have to finish up the interrogation.  If you will be
21   cooperative, you can go after.
22   Q.   At any point during this time when you were in the
23   secondary inspection area, did anyone tell you that you had
24   the right to remain silent?
25   A.   No one told me about my rights.
```

1   Q.   At any time when you were -- so you were not told that
2   you had the right to remain silent?
3   A.   No.
4   Q.   At any time when you were in the secondary inspection
5   area, were you told that you had the right to a lawyer?
6   A.   No.
7   Q.   At any point when you were in the secondary inspection
8   area, were you told that if you could not afford a lawyer one
9   would be appointed for you?
10  A.   No.
11  Q.   On August 16th did you eventually go back home?
12  A.   Yes.  Then after they took me to the second
13  interrogation room they kept me there, I don't know for how
14  long exactly, maybe 40 minutes.
15  Q.   Umm --
16          MR. RAMADAN:  (In English) They let me go.
17  A.   And then they let me go, they escort me too.
18  BY MS. FITZHARRIS:
19  Q.   So I'm going to again write on the drawing.  When you
20  said you were taken to the second interrogation room, can you
21  point on exhibit -- Defendant's Proposed Exhibit F where it
22  is?
23  A.   (Indicating.)
24  Q.   I'm going to mark that with the letter I and a dash and
25  the number 2.  Who brought you into the second interrogation

1  room?

2  A.   As far as I remember, I think the tall agent.

3  Q.   Okay.  Who escorted you outside of the airport when you

4  were finished?

5       MR. RAMADAN:  (In English) The short.

6  A.   The short.

7  BY MS. FITZHARRIS:

8  Q.   So Officer Schmeltz.

9       What time was it when you were escorted out of the

10  airport?

11       THE DEFENDANT:  Around -- between 5:00 and 6:00 in

12  the morning, I believe.

13  A.   Between 5:00 and 6:00 in the morning I believe.

14  BY MS. FITZHARRIS:

15  Q.   Who picked you up from the airport?

16       MR. RAMADAN:  (In English) My sister.

17  A.   My sister.

18  BY MS. FITZHARRIS:

19  Q.   And what is your sister's name?

20       MR. RAMADAN:  (In English) Asma.

21  A.   Asma.

22  BY MS. FITZHARRIS:

23  Q.   Where did you go after you left the airport?

24       MR. RAMADAN:  (In English) To my sister -- my other

25  sister's house.

1    A.   To my other sister's house.

2    BY MS. FITZHARRIS:

3    Q.   When you got to your other sister's house, was your

4    family there?

5    A.   Yes.

6    Q.   What -- and when you got home, what did you do when you

7    first got home?

8    A.   I made sure that the kids were okay, my wife was okay,

9    and I was like very tired.  After I made sure that everything

10   was okay I went to sleep.

11   Q.   At any point did you look -- check your bags?  When did

12   you check your bags?

13   A.   So on that morning after I slept for a few hours I woke

14   up, I want to see, like, what did they take, what did they do

15   in the suitcases.

16   Q.   And when you checked your suitcases, was everything

17   there?

18   A.   No.

19   Q.   What was missing?

20   A.   So what's important was like the backpacks, so I wanted

21   to make sure that the money was there and the gold.

22   Q.   Was the money and gold in the backpack?

23   A.   No.

24   Q.   How much money was missing?

25   A.   The whole amount of money.

```
 1    Q.   After you noticed the money and gold was missing, what
 2    did you do?
 3              MR. RAMADAN:   (In English) The money and the
 4    gold --
 5    A.   I right away I asked my wife, and she told me this is
 6    how they gave it to me, still the same.
 7    BY MS. FITZHARRIS:
 8    Q.   Did you do anything else after you spoke with your wife
 9    about the gold and the money?
10    A.   So it was, like, around after noon I called the FBI
11    agent.
12    Q.   On what date was that, August 16th?
13    A.   I think so, 16th.
14    Q.   How many times did you call Agent Thomas?
15    A.   Two times.
16    Q.   What days were those, if you can remember?
17    A.   I know that on the 16th I called him.  I think the
18    second time was on the 17th, and it's recorded those calls.
19    Q.   You mentioned earlier that you had had an experience
20    with the police in 2015 that kind of caused you some concern;
21    is that right?
22    A.   Yes.
23    Q.   What exactly happened that day?
24    A.   I was sleeping.  I heard like people knocking at the
25    door, and they said -- and they said U.S. Marshal, open the
```

1   door.  I was like, you know -- you know, I was about to get

2   up, and -- so I just woke up, and was, like, shocked somebody

3   knocking hard on the door, and U.S. Marshal and the police,

4   and they were like, you know, loudly saying open the door,

5   open the door.

6           So I was like scared to open the door or get

7   confused, and then I opened the door, and they asked me to

8   put my hands up.  And I told them that I was sleeping, I was

9   sleeping.  So they asked me open the door.  I open the door,

10  and then he pulled my left arm, I think so, and he slammed me

11  on the floor, and they were, like, all attacking me.  He saw

12  my wife taking a video on her phone.

13  Q.   What was your wife taking a video with?

14          MR. RAMADAN:  (In English) Cellphone.

15  A.   Cellular phone.

16  BY MS. FITZHARRIS:

17  Q.   When the officer saw your wife taking a video, what did

18  they do?

19  A.   They entered the house toward her and they had the

20  weapons towards her.

21          MR. RAMADAN:  (In English) Pointing at her.

22  A.   Pointing at her.  And then they took the phone from her,

23  and they pulled her arm like that.  They pulled her arm, and

24  then the phone fell from her.

25  BY MS. FITZHARRIS:

1    Q.   And is this the same time when the -- when you felt like

2    you had to give the officers your pass codes and they erased

3    videos?

4    A.   I was, like, forced to.

5    Q.   Right, but is this that same time when you gave them

6    pass codes and they erased it?

7            MR. RAMADAN:   (In English) That's the only time.

8    A.   That's the only time.

9    BY MS. FITZHARRIS:

10   Q.   Okay.  Did they erase all videos of this incident?

11   A.   For my own luck that she was taking -- she taping with

12   her own phone.  So they asked me where is my phone, I told

13   them here it is, I gave it to them.

14   Q.   So --

15   A.   And they asked me about the password.

16   Q.   So this video that your wife took, what happened to it?

17   A.   The police officer turned off the recorder and -- turned

18   off the phone.

19   Q.   Do you still --

20           MR. RAMADAN:   (In English) Locked.

21   A.   Locked the phone.

22   BY MS. FITZHARRIS:

23   Q.   Mr. Ramadan, do you still have a copy of the video that

24   your wife took?

25   A.   Yes.

1   Q.   Where do you keep a copy of that video?

2   A.   On the hard drive.

3   Q.   And what is the brand name of that hard drive?

4        MR. RAMADAN:  (In English) Five terabyte.  I don't

5   know the name.  It starts with S.

6   A.   It starts with an S.  I forgot the name.

7   BY MS. FITZHARRIS:

8   Q.   Seagate maybe?

9        MR. RAMADAN:  (In English) Yes.

10  BY MS. FITZHARRIS:

11  Q.   Is that the same hard drive that the officers were

12  looking at in the airport?

13  A.   So it was on a different hard drive, but every year I

14  get, like, better hard drive, so I did switch it to because I

15  take lots of -- I have lots of cameras and I take lots of

16  pictures.

17  Q.   Okay.  But the video that your wife took when the FBI

18  came to your house in 2015, is that video on the hard drive

19  that we are looking at in the airport?

20  A.   Yes.

21  BY MS. FITZHARRIS:

22  Q.   I've asked Ms. Whittaker (phonetic) to select the photo

23  labeled IMG_3064.mp4.  Do you mind opening it and pausing it?

24        All right.  I know we have only seen a little bit,

25  Mr. Ramadan.  Do you recognize this video?

 1   A.   Yes.  This is where I was in this video.

 2   Q.   Okay.

 3              MR. RAMADAN:  (In English) If you repeat --

 4   A.   Can you rewind it and put the volume up so they can

 5   hear, please.

 6              MS. FITZHARRIS:  Yes.  So for identification

 7   purposes this is going to be Defense Exhibit G at this point,

 8   Your Honor, we move to admit Exhibit G.

 9              THE COURT:  Okay.

10              MR. WATERSTREET:  No objection, Your Honor.

11              THE COURT:  It may be received.

12              (Defendant's Exhibit G received into evidence.)

13              MS. FITZHARRIS:  Do you mind starting from the

14   beginning.

15              (Defendant's Exhibit G played.)

16   BY MS. FITZHARRIS:

17   Q.   How did that 2015 incident impact the way that you were

18   feeling on August 15th and 16th, 2017?

19   A.   A lot.  So that's a proof that the police they hit when

20   they put me on the floor, even though I had my arms up, and I

21   was cooperative, and I did open the door for them, he just --

22   not just liked asked me to turn around and put the handcuffs

23   on me, he just, like, pushed me on the floor.

24              MR. RAMADAN:  (In English) He slammed.

25   A.   He slammed me on the floor, and they jumped on me all of

1  them, and he put his knee on my neck, and he was saying,

2  like, stop resisting, stop resisting, and I wasn't even

3  resistant.  And they start hitting me, and I said, like, I'm

4  not resistant, why are you hitting me?  And I was, like,

5  laying down on the floor.  How am I going to resist you?  And

6  I had the handcuffs on my arms.

7  BY MS. FITZHARRIS:

8  Q.  So on August 15th when you were in the secondary

9  inspection area, were you thinking about this 2015 incident?

10  A.  Yes.  This is one of main reasons, and that's why -- and

11  also I have another proof to -- that's another proof to tell

12  the truth about them.

13         MR. RAMADAN:  (In English) To say I want --

14         THE INTERPRETER:  Your Honor, can the interpreter

15  check one word?

16         THE COURT:  Yes.

17         THE INTERPRETER:  I have to go to my phone.  Is

18  that okay?

19         THE COURT:  Counsel, how much more do you have on

20  your examination?

21         MS. FITZHARRIS:  I hesitate to give an estimate.  I

22  have four other topics I would like to ask questions about.

23         THE COURT:  How long?  Do you have any idea how

24  long that might be?

25         MS. FITZHARRIS:  You know, each topic is maybe 10

```
 1   minutes, so 40 minutes.
 2           MR. DENSEMO:  Judge, could we take a break at about
 3   2:00 if at all possible?  I have a presentence
 4   investigation --
 5           THE COURT:  I'm sorry.  I can't hear you.
 6           MR. DENSEMO:  Is it possible to take a break at
 7   2:00?  I have a presentence investigation interview at 2:00.
 8   If that's not feasible, don't worry about it, but if the
 9   Court is going to take a break --
10           THE COURT:  I'm going to take a break very shortly
11   for lunch.  It is already a quarter to 1:00.
12           MS. FITZHARRIS:  So why don't we finish up -- I can
13   finish with this topic, this is pretty much the end of it,
14   and then we will resume.
15           THE COURT:  All right.  And then you have to be
16   somewhere else at 2:00?
17           MR. DENSEMO:  I can find somebody else to cover it.
18           THE COURT:  I hate to delay it because I would like
19   to get done today.
20           MR. DENSEMO:  That's fine.  I will find somebody to
21   cover it for me.
22   BY MS. FITZHARRIS:
23   Q.  Okay.  So --
24   A.  So this thing will like disclose or unmask them.
25   Q.  Okay --
```

```
 1    A.   Because I had security cameras at my house in each room
 2    for my own safety.
 3    Q.   Is this why you asked that the interrogation be
 4    recorded?
 5    A.   Yes.
 6             MS. FITZHARRIS:  I'm finished with this topic.
 7    A.   So they asked me for the passwords.
 8             MR. WATERSTREET:  Your Honor, I don't think there
 9    is a question pending.  She said she was done and now --
10             THE COURT:  Right, sustained.  We are talking about
11    passwords for his house?
12             MS. FITZHARRIS:  Okay.  So I don't -- at this time
13    I don't have questions, but when we come back.
14    A.   All right.  Okay.
15             THE COURT:  All right.  We will break for lunch now
16    to resume at ten minutes of 2:00.
17             THE LAW CLERK:  All rise.  Court is in recess.
18             (Court recessed at 12:44 p.m.)
19                        -   -   -
20             (Court reconvened at 2:03 p.m.; Court, Counsel and
21             all parties present.)
22             THE LAW CLERK:  All rise.  Calling Case No.
23    17-20595, United States vs. Yousef Ramadan.  Back on the
24    record.
25             You may be seated.
```

```
 1              THE COURT:  All right.  You may continue.
 2   BY MS. FITZHARRIS:
 3   Q.   Mr. Ramadan, except for this case, have you been
 4   arrested before?
 5   A.   Yes.
 6   Q.   Where were you arrested?
 7   A.   In California.
 8   Q.   When you were arrested in California, explain to me what
 9   the officers who arrested you did?
10   A.   They took me in a police car to jail with the handcuffs
11   on, and they did interrogation with me.
12   Q.   And when --
13   A.   And they took me to isolated area.
14   Q.   So when you were asked questions when you were arrested,
15   were you alone in a room with an officer?
16   A.   Yes.
17              MR. WATERSTREET:  Can we ask him what happened
18   rather than leading, please, Your Honor?
19              THE COURT:  Pardon me?
20              MR. WATERSTREET:  These are leading questions.  She
21   is suggesting what happened.  Ask him what happened.
22              THE COURT:  All right.  Restate your question,
23   Counsel.
24   BY MS. FITZHARRIS:
25   Q.   When you were taken to the station, where did the
```

 1   officers put you?

 2           MR. RAMADAN:   (In English) In a room.

 3   A.   In a room.

 4   BY MS. FITZHARRIS:

 5   Q.   Who else was in the room with you?

 6   A.   Just me.

 7   Q.   At any point were there police officers in the room?

 8   A.   Yes, he was talking to me.

 9   Q.   And when you were in the room, were you wearing

10   handcuffs?

11   A.   Yes.

12   Q.   When you were at the airport on August 15th and 16th,

13   2007, did you think that you were under arrest?

14           MR. RAMADAN:   (In English) Can you repeat the

15   question?

16   A.   Can you repeat the question?

17   BY MS. FITZHARRIS:

18   Q.   When you were at the airport in secondary inspection

19   area on August 15th and 16th, 2017, did you think that you

20   were under arrest?

21   A.   Yes.

22   Q.   Why did you think you were under arrest?

23   A.   First of all, it was the same kind of what happened with

24   me in California.  They put the handcuffs on me, and they

25   took me out of the plane, and they led me to a separate

1    area --

2              MR. RAMADAN:  (In English) Took me to the separate

3    area.

4    A.   Took me to a separate area, and, of course, they put the

5    handcuffs on me, and they interrogated with me, and they told

6    me that I have to talk, and I wasn't free to go home.

7    BY MS. FITZHARRIS:

8    Q.   Have you ever been asked to go to the second -- when you

9    have crossed -- have you crossed the border before?

10   A.   Yes.

11   Q.   And at any point when you've crossed the border before

12   have you been asked to go to a secondary inspection area?

13   A.   Yes.

14   Q.   Where were you when you were asked to go to a secondary

15   inspection area before?

16   A.   Where I was going or what city?

17   Q.   What city.

18   A.   One time when I was in a plane and they stopped me in

19   Georgia, so this is where I was like the ticket I was

20   supposed to stop there.  And the other one is in Santa --

21             MR. RAMADAN:  (In English) San Ysidro, California.

22   A.   San Ysidro, California.

23   BY MS. FITZHARRIS:

24   Q.   When you were taken to secondary inspection before when

25   you were in California, what did that area look like?

```
 1   A.   So we were in a car and it was like -- and there were,
 2   like, lots of people next to us so we did not get out of the
 3   car.   The police asked us just -- the four -- the border
 4   patrol asked us just a few questions.
 5   Q.   What questions did they ask you?
 6   A.   Where was I in Mexico, and what do I have -- what did I
 7   bring with me, that's all.
 8   Q.   When you were taken to the secondary inspection area in
 9   Georgia, what did that area look like?
10   A.   It was a room that has lots of people, big room, so it
11   wasn't isolated area, so you see people, like, walking at the
12   airport.   So what was the question?
13   Q.   I was just asking what it looked like.
14         THE COURT:   When was this?
15   BY MS. FITZHARRIS:
16   Q.   When were you in secondary inspection in Atlanta?
17   A.   Maybe 2011.
18   Q.   And when you are in -- when were you in secondary
19   inspection in California?
20   A.   You know, a few times where I have been stopped because
21   that is a border there to cross.
22   Q.   When you were in Atlanta or the Georgia secondary
23   inspection area, what questions were you asked?
24   A.   Where are you going?   How much money do you have?
25   That's it.
```

```
1    Q.   Were you asked about terrorism?

2    A.   No.

3    Q.   Were you put -- when you were at the secondary

4    inspection area in Georgia, were you ever put in handcuffs?

5    A.   No.

6    Q.   Okay.

7              THE COURT:  Counsel, would you relate it to this

8    case, please.  I mean --

9              MS. FITZHARRIS:  The government when it brought up

10   Mr. Ramadan's border crossings to suggest that it has to deal

11   with his subjective understanding, which goes to the

12   voluntariness question, so I'm expanding on that, and it has

13   to deal with whether he felt in secondary inspection that he

14   was under arrest or whether he was truly in secondary

15   inspection and whether his -- and that goes to the

16   voluntariness question and also to the Miranda questions.

17             THE COURT:  Were there other reasons why they

18   stopped him?  Was there anything like we have here in terms

19   of things that he did not have licenses for?

20             MS. FITZHARRIS:  Well, the government has argued

21   that there was no need to give Miranda warnings at all in the

22   secondary inspection because this was a routine secondary

23   inspection, it had nothing to do with investigations or law

24   enforcement purposes, and that's why they were authorized to

25   search his digital devices and ask him questions without
```

1    Miranda warnings.

2              THE COURT:  I know, but in these other situations

3    did he have anything like that like he had here?  You know,

4    did they find it in his luggage?  I want to know, was there

5    some reason he was stopped outside of --

6    BY MS. FITZHARRIS:

7    Q.   When you were in the secondary inspection area in

8    Atlanta, do you know why you were stopped or sent to

9    secondary inspection?

10   A.   I don't know why.

11   Q.   And when you were put in secondary inspection in

12   California, do you know why you were put in secondary

13   inspection?

14   A.   I think they just, like, you know, randomly one day

15   think about the car they will stop it and ask questions.

16   Q.   Okay.  Mr. Ramadan, I'm going to ask you about the

17   storage unit in this case.  Did you have -- did you use a

18   storage unit in the State of Michigan?

19   A.   Yes.

20   Q.   And that was in August of 2017?

21   A.   August 2017.

22   Q.   Did you have access to a storage unit in August of 2017?

23   A.   Yes.

24   Q.   Where that was storage unit?

25   A.   In Ann Arbor.

```
 1    Q.   Did you -- was you -- did you sign a lease for that
 2    storage unit?
 3    A.   Not me, my wife.
 4    Q.   Okay.  Did you have a key to that storage unit?
 5    A.   Yes.
 6    Q.   Did you store personal property in that storage unit?
 7    A.   Yes.
 8    Q.   Okay.  I'm going to take you back to the airport very
 9    quickly.  Okay.  When you were in the conference room talking
10    to Agent Thomas, did the subject of being a confidential
11    informant come up?
12    A.   Yes.
13    Q.   Who brought up that subject?
14         MR. RAMADAN:  (In English) The FBI agent.
15    A.   The FBI agent.
16    BY MS. FITZHARRIS:
17    Q.   What did he say about becoming a confidential informant?
18    A.   He gave me the choice to work with them.
19    Q.   When he said you could work with him, what did you
20    understand that to mean?
21    A.   To work with them as an informer, maybe they will put me
22    in mosque or something like that.
23    Q.   How did you respond when they asked you to work with
24    them?
25    A.   I told them that I do not want to.  And he told me you
```

1  don't want to help the American government.  I said I will

2  help this government and I like this country --

3         MR. RAMADAN:  (In English) I love this country.

4  A.   I love this country, and I'm willing to fight and be in

5  the first rows, but --

6         MR. RAMADAN:  (In English) For this country.

7  A.   -- for this country, but I do not want to work as an

8  informer.

9         MS. FITZHARRIS:  All right.  At this time, Your

10  Honor, I move to admit Exhibits E and F, which are the two

11  drawings.

12         THE COURT:  All right.  Any objections?

13         MR. WATERSTREET:  No, Your Honor.

14         THE COURT:  They may be received.

15         (Defendant's Exhibits E and F received into

16         evidence.)

17         MS. FITZHARRIS:  If it would be possible to make

18  copies of these before we leave to give to the government.

19         THE COURT:  We don't have a copier here.

20         MS. FITZHARRIS:  No?  Okay.

21         THE COURT:  We can do them upstairs later.

22         MS. FITZHARRIS:  That's fine.  No further

23  questions, Your Honor.

24         THE COURT:  All right.  Cross-examination?

25         MR. WATERSTREET:  Yes, Your Honor.  May I have a

1   moment to get everything set up here, please?

2           THE COURT:  Yes.

3           MR. WATERSTREET:  May I proceed, Your Honor?

4           THE COURT:  Yes.

5                         CROSS-EXAMINATION

6   BY MR. WATERSTREET:

7   Q.   Mr. Ramadan, good afternoon.

8   A.   Good afternoon.

9   Q.   Why don't we try this:  Why don't you listen to me in

10  English, if you have any problems with any of my words you

11  can refer to the interpreter.  How about we try that?

12          MR. DENSEMO:  I object, Your Honor.

13          THE COURT:  Pardon me?

14          MR. DENSEMO:  I object to that.  The purpose of the

15  interpreter is for the interpreter to interpret what is being

16  said and then what -- Mr. Ramadan is to say to the

17  interpreter what his response is and give that response to

18  the government.

19          THE COURT:  All right.  No, I think that we should

20  have the interpreter to be sure he understands the questions

21  asked.

22          MR. WATERSTREET:  Quite all right, Your Honor.  I

23  just -- defense counsel assured the Court earlier and --

24          THE COURT:  I understand.

25          MR. WATERSTREET:  Okay.

```
 1   BY MR. WATERSTREET:
 2   Q.   I'm going to ask you some questions about yourself,
 3   about your contact with the agents, and why you are here
 4   today.  Okay.
 5   A.   Okay.
 6           MS. FITZHARRIS:  Your Honor, before we begin, if
 7   he's going to ask why he's here today if it relates to
 8   criminal activities, I am going to object to those questions.
 9   We are here to talk about the suppression issues, the
10   voluntariness of his statements, and whether they had
11   reasonable suspicious to search his devices, and whether the
12   gold and money should be returned to him.  Those are the
13   issues here today, not why he's charged with these crimes.
14           MR. WATERSTREET:  May I proceed, Your Honor?
15           THE COURT:  You may.
16           MR. WATERSTREET:  Thank you.
17           THE COURT:  Thank you.
18   BY MR. WATERSTREET:
19   Q.   You understand the reason we are here today is for the
20   Judge to determine what happened?
21           MR. RAMADAN:  (In English) Yes.
22   A.   Yes.
23   BY MR. WATERSTREET:
24   Q.   Okay.  And to determine who is telling the truth?
25           MR. RAMADAN:  (In English) Yes.
```

1    A.   Yes.

2    BY MR. WATERSTREET:

3    Q.   And who is being honest?

4          MR. RAMADAN:   (In English) Yes.

5    A.   Yes.

6    BY MR. WATERSTREET:

7    Q.   You have taken an oath to tell the truth, the whole

8    truth and nothing but the truth, correct?

9    A.   Yes.

10   Q.   Okay.  And you have taken a similar type of oath like

11   that in the past, have you not?

12   A.   Yes.

13   Q.   Okay.

14         MS. FITZHARRIS:  Your Honor, at this point I'm

15   going to object because --

16         THE COURT:  To what?

17         MS. FITZHARRIS:  It seems to me that

18   Mr. Waterstreet is intending to ask Mr. Ramadan about his

19   naturalization application, and that has significant impact

20   on his future ability to stay in this country, and it is

21   completely beyond the scope of this, and I think, you know,

22   if that is the subject of his line of questioning we put an

23   objection and we would advise Mr. Ramadan to take the Fifth.

24         They have threatened to supersede and charge him

25   with this offense, and so it is an improper line of

1    questioning in this case.

2            THE COURT:  Okay.

3            MS. FITZHARRIS:  In this hearing.

4            THE COURT:  Mr. Waterstreet.

5            MR. WATERSTREET:  Your Honor, Rule 609 allows me to

6    go into false statements and other findings of falsity in the

7    past.  That maybe an area, but that's not where I'm going

8    right now, Judge.  May I proceed?

9            THE COURT:  Let me hear the questions.  Yes, you

10   may proceed.

11   BY MR. WATERSTREET:

12   Q.   You have made -- you have been placed under oath in the

13   past, have you not?

14   A.   Yes.

15   Q.   Promised to tell the truth?

16   A.   Yes.

17   Q.   And you have lied?

18   A.   No.

19   Q.   Okay.  So let's make sure we are all on the same page.

20   You are a liar and a thief, are you not?

21            MS. FITZHARRIS:  Objection; argumentative.

22            THE COURT:  Its bordering.  Rephrase, Counsel.

23   BY MR. WATERSTREET:

24   Q.   Have you been convicted of theft and lying?

25   A.   Yes.

 1   Q.    Okay.  And that was a case that your attorney talked

 2   about back when you were arrested and you pled guilty to; is

 3   that not true?  Sir, it is a simple yes or no question.  Sir,

 4   it is a simple yes or no question.  Have you -- have you --

 5            MR. RAMADAN:   (In English) Can you repeat the

 6   question?

 7   BY MR. WATERSTREET:

 8   Q.    Have you been convicted and is that the crime that your

 9   attorney talked about before that you lied and got something

10   that you were not entitled to?  Simple yes or no.

11   A.    No.

12            THE COURT:   Counsel, when was this?

13            MR. WATERSTREET:   This was -- excuse me, Your

14   Honor.  This was in --

15   BY MR. WATERSTREET:

16   Q.    You pled guilty in June 11th, 2015?

17            MR. RAMADAN:   (In English) For theft, not lying.

18   BY MR. WATERSTREET:

19   Q.    Well, the allegations were that you obtained items to

20   which you were not entitled to by making false

21   representations and statements; is that not true?

22   A.    No, it was a misunderstanding.  And they did not charge

23   me by lying, only theft.

24   Q.    The theft was that you took items -- well, actually you

25   got money from the federal government for which you were not

1  entitled to by knowingly making false statements?

2  A.  No.

3      MS. FITZHARRIS:  Objection, Your Honor.

4  Mr. Waterstreet has received an answer to the question

5  whether he has been convicted of theft.  That is the extent

6  to which the rule -- you know, he's thoroughly impeached him

7  on this.  We don't need to go into the details and relitigate

8  his prior conviction.

9      MR. WATERSTREET:  I'm not seeking to relitigate it,

10  Judge.  I'm trying to get a straight answer from the man.

11      THE COURT:  Correct.  Overruled.

12  BY MR. WATERSTREET:

13  Q.  I'm going to show you what has been marked as

14  Government's Proposed Exhibit U-1.  Can you take a look at

15  that, please.  Do you recognize that document?  Do you

16  recognize that document?

17  A.  I don't remember it.

18  Q.  It says People of the State of California vs.

19  Yousef Mohammed Ramadan.  Is that you?

20  A.  Yes.

21  Q.  Okay.  And your date of birth is 10/19/88?

22  A.  Yes.

23  Q.  Okay.  And let me just back up a second.  You are not a

24  born citizen here in the United States, are you?

25      MS. FITZHARRIS:  Objection; this is now going into

1    questions about naturalization.

2              MR. WATERSTREET:  Judge, I'm not going into

3    naturalization.

4              THE COURT:  Overruled.

5    BY MR. WATERSTREET:

6    Q.   You are from Palestine originally, correct?

7    A.   Right.

8    Q.   And you're Palestinian, correct?

9    A.   I am American now.

10   Q.   But when you were born you grow up as a Palestinian,

11   correct?

12   A.   Right.

13   Q.   Okay.  Did you live in the Gaza Strip or the West Bank?

14   A.   The West Bank.

15   Q.   Are you WB.88, West Bank 88, is that what that stands

16   for?

17   A.   Yes.

18   Q.   Okay.  That's you?

19   A.   That's YouTube channel.

20   Q.   Okay.  And that's you?

21   A.   That's my channel, yes.

22   Q.   That's your channel?

23             MR. RAMADAN:  (In English) Yeah.

24   BY MR. WATERSTREET:

25   Q.   So you were charged with the allegations in that offense

```
 1   and you had a preliminary examination, did you not?  There
 2   was a hearing, people testified, laid out the facts of the
 3   case, your attorney had a chance to cross-examine them?
 4   A.  So this -- on that court?
 5   Q.  Yes.
 6            MR. RAMADAN:  (In English) This Court?
 7   BY MR. WATERSTREET:
 8   Q.  No, no, back in California, the Superior Court of
 9   California.
10   A.  They were, like, no witnesses.
11   Q.  You mean, your wife didn't testify at that hearing?
12   A.  I don't remember.
13   Q.  We will see if I can refresh your memory.
14            THE COURT:  Counsel, why are we going into what
15   happened at that hearing?
16            MR. WATERSTREET:  I'm just asking him if he
17   remember the events and if this can help refresh his memory
18   as to what the allegations were.
19   BY MR. WATERSTREET:
20   Q.  Go ahead and take a look at --
21            MS. FITZHARRIS:  Your Honor, these are allegations.
22   We continue to objection.  These are allegations, these are
23   not the elements that he plead guilty to, this is not his
24   plea agreement or any plea colloquy.  These are not facts
25   that he has admitted to committing.
```

1    MR. WATERSTREET:  I will get to the facts that he

2    admitted to in a moment.  I just want to make sure we are

3    still talking about the right case because he said first of

4    all he didn't remember this case, and then I have been able

5    to get him to acknowledge.

6    BY MR. WATERSTREET:

7    Q.  You were, in fact, charged with grand theft by making

8    false statements under oath, correct?

9    A.  What I understood from that case is that it was just

10   theft.

11   Q.  That you made false statements to Social Security

12   Administration in order to get money for your children

13   claiming that they were here in the United States when, in

14   fact, they were living overseas.  Isn't that --

15        MS. FITZHARRIS:  Objection, Your Honor.  The facts

16   of his prior conviction are irrelevant.  These are the

17   charges --

18        THE COURT:  The question --

19        MS. FITZHARRIS:  -- not the fact that he plead

20   guilty to.

21        THE COURT:  Yes, but the question of whether he

22   lied is relevant.  Overruled.

23        MR. WATERSTREET:  Correct.

24   A.  So what is the question?

25

1   BY MR. WATERSTREET:

2   Q.   The question is:  Isn't the charges that you made false

3   statements claiming that your children were living here in

4   the United States when, in fact, they were living overseas,

5   and you made statements under the penalty of perjury saying

6   they lived here and you collected money saying that they were

7   living here?

8   A.   They misunderstood the case.  I never lied.

9   Q.   Okay.  But you pled guilty to that offense, didn't you?

10  You plead --

11  A.   For theft.

12  Q.   -- guilty to the lesser included offense because of the

13  amount of money, they cut the amount of money that you owed,

14  but it was based upon the fact that you made false statements

15  claiming that your children were living in the United States

16  when, in fact, they were living overseas and you did so under

17  penalty of perjury, did you not?

18  A.   Can you repeat it one more time?

19  Q.   Sure.  The fact of the matter is you pled guilty to the

20  lesser included offense of making false statements under

21  penalty of perjury in order to collect money from the

22  United States claiming that your children were living here in

23  the United States when, in fact, they were living overseas;

24  isn't that what happened?

25  A.   I never pled guilty for lying.  I did plead guilty for

1    theft, and they were going to -- they -- they were going

2    to -- even drop the charges, everything, without a

3    misdemeanor.

4    Q.   The theft was because you were not entitled to the money

5    because you made false statements in order to obtain that

6    money?

7            MS. FITZHARRIS:  Objection; argumentative, asked

8    and answered.

9            THE COURT:  Sustained.  Let's move along.

10   BY MR. WATERSTREET:

11   Q.   Did you make a statement under penalty of perjury --

12           MS. FITZHARRIS:  Same objection.

13   BY MR. WATERSTREET:

14   Q.   -- to the allegations that between on or about

15   April 13th, 2011 and June 6th, 2013 you obtained money for

16   which you were not entitled to because you knowingly made

17   false statements?

18           MS. FITZHARRIS:  Objection; asked and answered.

19           MR. WATERSTREET:  That has not been asked, Your

20   Honor.

21           THE COURT:  I will take the answer.

22           MR. RAMADAN:  (In English) Can you repeat the

23   question?

24   A.   Can you repeat the question?

25

1    BY MR. WATERSTREET:

2    Q.   Isn't it true that you plead guilty to an offense that

3    occurred between April 13th, 2011 and June 6th, 2013 by

4    obtaining money for which you were not entitled to because

5    you knowingly made false statements?

6    A.   Guilty just for theft, not other things.

7    Q.   Well, let's go into that theft and other things.  You --

8    here is Government's Proposed Exhibit U-2.  Tell me if you

9    recognize this?  This is your plea agreement, is it not?

10            MR. RAMADAN:  (In English) Guilty charge in what?

11   Count 1, guilty Count 1, there's two counts.

12   A.   Guilty only in Count 1, not two counts.

13   BY MR. WATERSTREET:

14   Q.   I understand that.  Count 1 says that on or about

15   between April 13th, 2011 and June 6th, 2013, you unlawfully

16   obtained monies to which you were not entitled?

17            MS. FITZHARRIS:  Objection, that's actually not

18   what it says.

19            MR. WATERSTREET:  Okay.

20            THE COURT:  I'm reading it.  You can read it

21   directly from the charge.

22   BY MR. WATERSTREET:

23   Q.   Okay.  Take and steal money and personal property from

24   Social Security Administration?

25            MR. RAMADAN:  (In English) When?

1    A.   Where does it say that?

2    BY MR. WATERSTREET:

3    Q.   Go to the second page on U-1, go back to U-1, the other

4    document -- the first document I handed to you.  Go to the

5    second page.  Count 1.

6            MR. RAMADAN:  (In English) I wasn't guilty on this

7    paper, I was guilty after.

8    A.   So in this paper I wasn't guilty, it was after.  In this

9    paper here it has two felonies.

10   BY MR. WATERSTREET:

11   Q.   Correct, and you plead guilty to one of them -- you

12   plead guilty to one of the crimes?

13   A.   Guilty for misdemeanor, not felony.

14   Q.   I understand that.  You plead guilty to Count 1 and they

15   reduced it to let you plead guilty to a misdemeanor but the

16   crime is still the same; you took money for which you were

17   not entitled to because you made a false statement?

18           MS. FITZHARRIS:  Objection; this has been asked and

19   answered.

20           MR. WATERSTREET:  No, it has not been answered.

21           THE COURT:  It hasn't been answered but its gone

22   over enough.  I think it is clear what's on the papers

23   whether he admits it or not.

24           MS. FITZHARRIS:  Your Honor, the convictions speaks

25   for themselves.  If the government wants to move to admit

1    these exhibits --

2              THE COURT:  Okay.  Let's get one final yes or no.

3    Okay.  One final question.

4    A.  So I wasn't lying, it was a misunderstanding, and the

5    guilty for theft.

6    BY MR. WATERSTREET:

7    Q.  There is no misunderstanding, you.  Say I accept -- I

8    accepted Social Security funds when not entitled to them in

9    excess of $950?

10             MS. FITZHARRIS:  Objection, Your Honor.

11   Mr. Ramadan has admitted that he plead guilty to a

12   misdemeanor count as shown in U-2.

13   BY MR. WATERSTREET:

14   Q.  And you --

15             THE COURT:  What's the question?

16   BY MR. WATERSTREET:

17   Q.  And you swore this under oath to a judge, right?

18             MR. RAMADAN:  (In English) For theft.

19   A.  For theft.

20   Q.  Right, that I accepted Social Security --

21             MS. FITZHARRIS:  Objection, Your Honor; this has

22   been asked and answered.

23             THE COURT:  Sustained, sustained.

24             MR. WATERSTREET:  And since counsel agreed to allow

25   the government to move to introduce, I will move to introduce

1  U-1, U-2, and U-3, which is the reporter's transcript, and

2  U-4?

3          MS. FITZHARRIS:  I do not have U-3.

4          MR. WATERSTREET:  I will give it to you right now,

5  Counsel.

6          MS. FITZHARRIS:  I do not agree without seeing it,

7  I said I would agree to the admission of the guilty plea.

8          MR. WATERSTREET:  Well, U-3 is the guilty plea, it

9  is the transcript.

10          MS. FITZHARRIS:  U-2 is my understanding is the

11  plea of guilty.

12          MR. WATERSTREET:  That's the guilty plea agreement,

13  and U-3 is the actual transcript of the proceedings.

14          MS. FITZHARRIS:  Your Honor --

15          THE COURT:  What is U-8 then?  That's the

16  preliminary exam.  Are you moving for that?

17          MR. WATERSTREET:  Preliminary examination outlines

18  the substance of the charges in which he made false

19  statements, his children were living overseas, he went in --

20          MS. FITZHARRIS:  Objection to the narrative.  Okay.

21  Mr. Waterstreet wants to go into the details of these

22  charges.  It is completely improper.  All right.  We agree to

23  the admission of Mr. Ramadan's guilty plea.  The preliminary

24  examination, that are not proven charges, that are not facts,

25  we do not agree to the admission of that transcript that

1  Mr. Ramadan agreed to.  What we agreed to is his guilty plea.

2  THE COURT:  All right.  I will allow U-1, U-2, U-3,

3  but not U-8.

4  MR. WATERSTREET:  That would be U-4, I believe,

5  Your Honor.

6  THE COURT:  You put down here U-8.

7  MR. WATERSTREET:  My apologies, you are absolutely

8  right.  It is U-8.  My apologies.

9  MS. FITZHARRIS:  U-8 is preliminary transcript?

10  MR. WATERSTREET:  Yes, the preliminary examination

11  transcript.

12  MS. FITZHARRIS:  And that's not admitted?

13  THE COURT:  That's not admitted.

14  MR. WATERSTREET:  Okay.

15  (Government's Exhibits U-1, U-2, U-3 received into

16  evidence.)

17  BY MR. WATERSTREET:

18  Q.  Now, I want to go into -- and since you've acknowledged

19  that you lied in order to get those items, have you -- you

20  are now --

21  MS. FITZHARRIS:  Objection to the characterization;

22  argumentative.

23  MR. WATERSTREET:  May I proceed, Your Honor?

24  THE COURT:  You may proceed.

25

1  BY MR. WATERSTREET:

2  Q.  Are you a reformed liar?

3          MS. FITZHARRIS:  Objection; argumentative.

4          THE COURT:  It is argumentative, Counsel.  Move

5  along.

6  A.  So what is your question?

7  BY MR. WATERSTREET:

8  Q.  My question is, are you continuing to lie under oath or

9  are you telling the truth today?

10          MS. FITZHARRIS:  Objection; argumentative.

11          THE COURT:  He can answer that question if he's

12  telling the truth today.

13  A.  I never lied under oath.

14  BY MR. WATERSTREET:

15  Q.  Okay.  Now, I just want to get a few facts squared away,

16  if I may.  You testified on direct examination that the

17  16 bags that were searched by CBP, those belonged to you,

18  correct?

19  A.  15.

20  Q.  15.  I'm sorry.  15.  Those belonged to you, correct?

21  A.  Yes.

22  Q.  Okay.  And you and your family were all flying out of

23  the United States to fly to Jordan, correct?

24  A.  Right.

25  Q.  And you checked them knowing you were going on an

1   international flight, correct?

2   A.   Checked them to whom?

3   Q.   Checked them to the airlines, to Royal Jordanian

4   Airlines to put in the plane to take with you?

5   A.   Yes.

6   Q.   And that included your external hard drives, correct?

7   A.   No.

8   Q.   Okay.  Your external hard drives you kept with you with

9   your carry-on luggage?

10          MR. RAMADAN:   (In English) In my backpack.

11   A.   In my backpack.

12   BY MR. WATERSTREET:

13   Q.   And that was your external hard drive?

14   A.   Yes.

15   Q.   You testified earlier that you are the one that

16   downloaded information onto that external hard drive?

17   A.   Right.

18   Q.   Okay.  So as part of your direct examination you talked

19   about a number of things, and I want to go over those with

20   you for a moment here, if that's okay with you.

21   A.   Yes, that's fine.

22   Q.   Okay.  One of the things you testified to was the fact

23   that because you -- you knew the police officers had

24   firearms.  That mere fact -- the mere presence of those

25   firearms coerced you into answering their questions?

```
 1              MS. FITZHARRIS:  Objection; that's a
 2    mischaracterization of Mr. Ramadan's testimony.
 3              MR. WATERSTREET:  I'm asking him the question, Your
 4    Honor, to clarify it if I misunderstood.
 5              THE COURT:  All right.  I will allow him to answer
 6    that.
 7              MR. RAMADAN:  (In English) Can you repeat the
 8    question?
 9    BY MR. WATERSTREET:
10    Q.  You testified that you knew the police officers or the
11    agents had firearms, correct?
12    A.  Yes.
13    Q.  And the mere fact that they had those firearms with them
14    was coercive to you that forced you to answer the questions;
15    is that true?
16    A.  This is one of many reasons.
17    Q.  Okay.  The mere fact that they had firearms on their
18    person, whether visible or not visible, was coercive to you?
19              THE INTERPRETER:  Interpreter wants to ask you if
20    you can rephrase the word coercive, please.
21    BY MR. WATERSTREET:
22    Q.  You understand my question, Mr. Ramadan, don't you?
23              MR. RAMADAN:  (In English) No, I didn't understand
24    this question.
25
```

1   BY MR. WATERSTREET:

2   Q.   Okay.  The mere fact they had firearms, whether you can

3   see them or not, caused you to say things you didn't want to

4   say, you were scared?

5   A.   This is one of the reasons.

6   Q.   Well, I understand it is one of the reasons but that is

7   what you said, correct?

8           MS. FITZHARRIS:  Objection, asked and answered.

9           THE COURT:  Just a minute, just a minute.

10  A.   This is one of reasons.

11          THE COURT:  Just a minute.  He said it is one of

12  the reasons.  You said the mere fact, and that makes it like

13  an exclusive reason.

14          MR. WATERSTREET:  Well, all right.  I will see if I

15  can rephrase it.

16  BY MR. WATERSTREET:

17  Q.   One of the reasons was just because they happen to have

18  guns whether you could see them or not, you were scared and

19  it kind of forced you to say something you didn't want to

20  say?

21  A.   This is one of the reasons.

22  Q.   Okay.  Is that yes or no?

23  A.   Yes.

24  Q.   Okay.

25          MR. RAMADAN:  (In English) That's one of the

1   reason.

2   BY MR. WATERSTREET:

3   Q.   I understand --

4   A.   This is one of reason.

5   Q.   I understand that.

6   A.   And which is Guantanamo too.

7   Q.   I have listened to everything you have said.  I just

8   wanted to make sure I understood what you were saying.

9        MS. FITZHARRIS:  Objection; he's arguing with

10  Mr. Ramadan.

11       THE COURT:  Okay.  Listen, listen, this has to be

12  by question and answer.  So you ask your question, you answer

13  just the question he asks.  He's not asking about other

14  things, don't volunteer anything, just answer the question.

15  Okay.

16       MR. WATERSTREET:  Thank you, Your Honor.  I

17  appreciate that.

18  BY MR. WATERSTREET:

19  Q.   So I want to make sure I understand.  Just because

20  somebody had a gun nearby, whether you could see it or not,

21  was one of reasons why you felt you had to talk to the

22  police?

23  A.   I did see it.  Yes, that's -- that was one of the

24  reasons.  I did see it.

25  Q.   Okay.  You saw everybody's gun?

1          MR. RAMADAN:  (In English) Most of them.

2     A.   Most of them.

3     BY MR. WATERSTREET:

4     Q.   Okay.  What kind of gun did Agent Kelley have?

5     A.   Black gun.

6     Q.   A black gun.  What kind of gun?  You are very familiar

7     with guns, aren't you?

8          MS. FITZHARRIS:  Objection, argumentative.

9     A.   I don't know.

10    BY MR. WATERSTREET:

11    Q.   So did you see --

12         MR. RAMADAN:  (In English) It's been a long time.

13    A.   It's been a long time.

14    BY MR. WATERSTREET:

15    Q.   What kind of gun did Agent Thomas have?

16         MR. RAMADAN:  (In English) Same thing, it's been a

17    long time.

18    A.   Same thing, it's been a long time.

19    BY MR. WATERSTREET:

20    Q.   So your memory is fading a little bit now; your memory

21    is not as good.  You said you have memory problems.  Your

22    memory is not as good now?

23         MR. RAMADAN:  (In English) No.  Can you repeat the

24    question, please.

25    A.   Can you repeat the question, please.

1   BY MR. WATERSTREET:

2   Q.   My question was:  What kind of gun did Agent Thomas

3   have?  And your answer was it's been a long time.  And then I

4   asked you --

5         MS. FITZHARRIS:  Objection, Your Honor.  Allow

6   Mr. Ramadan to answer the question.

7         MR. WATERSTREET:  I'm giving him --

8         MR. RAMADAN:  (In English) I don't know.

9   A.   I don't know.

10        THE COURT:  Wait a minute.  You don't know what?

11        MR. RAMADAN:  (In English) What kind of gun.

12  A.   What kind of gun.

13        THE COURT:  All right.  Move along, please.

14  BY MR. WATERSTREET:

15  Q.   What kind of gun did Officer Brown have?

16        MR. RAMADAN:  (In English) Same thing.

17  A.   Same thing.

18  BY MR. WATERSTREET:

19  Q.   Same thing what --

20  A.   I don't know.

21  Q.   -- that it has been a long time or you don't know?

22  A.   I don't know.

23  Q.   Okay.  But you have grown up around guns, have you not?

24  A.   No.

25  Q.   And you've brought up your whole family around guns,

1    have you not?

2    A.   Recently when they grow up.

3    Q.   So you've had your kids grow up around guns, correct?

4    A.   Yes.

5    Q.   Okay.

6         MR. RAMADAN:  (In English) Supervised.

7    A.   Supervised.

8    BY MR. WATERSTREET:

9    Q.   Supervised.  Teach them how to load guns?

10   A.   No.

11   Q.   No?

12        MS. FITZHARRIS:  Objection.  What's the relevance

13   of this?

14   A.   Just to take pictures.

15        MR. WATERSTREET:  The relevance was brought up by

16   them, Your Honor.  They were suggesting by the mere presence

17   of guns the defendant's will somehow was overborne and he's

18   unable to make decisions on his own.

19        MS. FITZHARRIS:  We never argued that the mere

20   presence of guns is the reason why his will was overborne, it

21   was one of many factors and totality of circumstance.

22        THE COURT:  Okay.  Assuming it is one of many

23   factors.

24        MR. WATERSTREET:  I'm going through each factor.

25        THE COURT:  Overruled.

1    BY MR. WATERSTREET:

2    Q.   So my question was, you teach your children how to

3    handle guns and load guns, haven't you?

4    A.   Maybe one time or twice I showed it to them.

5    Q.   Right.  You and your wife actively encouraged your kids

6    in teaching them how to handle guns and load guns, haven't

7    you?

8            MS. FITZHARRIS:  Objection, Your Honor; questions

9    about the way --

10           THE COURT:  Sustained.

11           MS. FITZHARRIS:  Thank you.

12   BY MR. WATERSTREET:

13   Q.   Have you -- have you taught your children how to fire

14   guns?

15           MS. FITZHARRIS:  Same objection.

16           THE COURT:  Sustained.

17   BY MR. WATERSTREET:

18   Q.   Now, another question that I wanted to ask you about is

19   in several instances you said that the officers asked you for

20   your pass code for your phone on August 15th and August 16th,

21   2017?

22   A.   Yes.

23   Q.   And at every turn you said no?

24   A.   Yes.

25   Q.   You said no, I'm not going to give you my pass code for

1   my phone.

2   A.   Or permission to any digital device to see it.

3   Q.   Okay.  And one of the reasons I think you pointed out is

4   that as, Your Honor, as a Muslim you could never let them

5   look at your phone because of the photos of your wife, the

6   photos of your sister, the photos of your children, your

7   personal information, your Social Security card, you could

8   not -- you would rather die -- I think that was a quote --

9   you said you would rather die then let that happen, right?

10  A.   Yes.

11  Q.   But didn't you also testify that you would give that all

12  up, you would let them look at any picture they wanted as

13  long as they promised you they wouldn't use it against you?

14  A.   I will show him the picture.

15  Q.   Okay.  So you would --

16          MR. RAMADAN:   (In English) Not show him the

17  picture, I will make --

18  A.   That he will -- so I will bring like a lady and will use

19  the device in front of me.

20  BY MR. WATERSTREET:

21  Q.   Wait, wait, wait.  We never heard any testimony about

22  bringing a lady in or anything.  You said if you sign a paper

23  that says you give me immunity I will unlock it for you.

24  That's what you said on direct examination, is that true,

25  Mr. Ramadan?

1   A.   Right.

2   Q.   Okay.  Thank you.

3   A.   But I will show it to him.  Like he cannot enter the

4   pictures to see my wife and personal stuff.

5   Q.   When did you say that on direct examination?  Did you

6   say that on direct examination, sir?  Yes or no.  Sir, it is

7   a simple yes or no.  Did you say that on direct examination?

8          MS. FITZHARRIS:  Objection, Your Honor; allow him

9   to answer the question.

10          MR. WATERSTREET:  I'm asking him to answer the

11   question, Your Honor.  It's a simple question or no.

12   A.   No one asked me like this question --

13          THE COURT:  Just a minute.  Let's see what he says.

14   A.   -- the same way.

15   BY MR. WATERSTREET:

16   Q.   It's simple yes or no, sir.  Did you --

17   A.   No one asked me this way.

18   Q.   And you did not offer that when you were asked by your

19   attorney, that you said that as long as they gave you

20   immunity you would unlock the phone, you never said that?

21          MR. RAMADAN:  (In English) Yes, yes.

22   BY MR. WATERSTREET:

23   Q.   Okay.  Thank you.

24          MR. RAMADAN:  (In English) I would like to address

25   this with my attorney.

1   A.   I would like to address --

2   BY MR. WATERSTREET:

3   Q.   You can address it with your attorney when the time

4   comes.

5           MR. DENSEMO:  Excuse me, Your Honor.  May I ask

6   Mr. Ramadan if he's having difficulty with --

7           MR. WATERSTREET:  Your Honor --

8           MR. DENSEMO:  Excuse me, Mr. Waterstreet.

9           MR. WATERSTREET:  If I may, Your Honor?

10           THE COURT:  No.  Let me hear his objection.

11           MR. WATERSTREET:  Well, the attorney --

12           THE COURT:  Let me hear his statement.

13           MR. DENSEMO:  May I or Ms. Fitzharris talk to

14   Mr. Ramadan to see if he is -- if what he's expressing

15   through the interpreter is being accurately conveyed to the

16   Court?

17           THE COURT:  No, you may not speak with him at this

18   point.

19   BY MR. WATERSTREET:

20   Q.   I want to go over an item here.  And you explained from

21   Government's Exhibit L-1 that this was the last that the

22   agents asked you about when you were in the lobby area,

23   correct?

24   A.   Right.

25   Q.   Is that correct?

1   A.   It is right.

2   Q.   And on direct examination you testified that that

3   photograph was some broken glass from your home in Israel,

4   correct?

5   A.   Palestine.

6   Q.   Well, it is in the country of Israel but it is in the

7   West Bank?

8        MR. RAMADAN:  (In English) It is Palestine, West

9   Bank.

10  A.   It is in Palestine, West Bank.

11  BY MR. WATERSTREET:

12  Q.   My question was, was it in your home?

13       MR. RAMADAN:  (In English) Yes.

14  A.   Yes.

15  BY MR. WATERSTREET:

16  Q.   And where exactly is your home, what street is it on?

17  A.   El Maahad (phonetic) Street.

18  Q.   What?

19  A.   El Maahad Street.

20       MS. FITZHARRIS:  Objection; what's the relevance of

21  this?

22       MR. WATERSTREET:  I'm asking if he remembers

23  specifically at that house having that photo taken.

24       THE COURT:  Okay.  Overruled.

25       MS. FITZHARRIS:  How is this relevant to the

 1   suppression questions?

 2          THE COURT:  The photo is in, the Court is going to

 3   allow the answer.

 4          MR. WATERSTREET:  Thank you, Your Honor.

 5   BY MR. WATERSTREET:

 6   Q.  Did you take that photograph?

 7   A.  Yes.

 8   Q.  Okay.  Now, I'm going to show you L-3.  Was this the

 9   photo of the pipe bomb that was shown to you by the agents on

10   August 15th, August 16th, 2017?

11   A.  I think so.

12   Q.  What makes you think it is different?  That's the photo,

13   isn't it?

14   A.  Yes.

15   Q.  Okay.  And where did -- and you testified on direct

16   examination that you downloaded that picture from the

17   internet?

18   A.  That's right.

19   Q.  Okay.  And you downloaded that from the internet where?

20   What --

21          MS. FITZHARRIS:  Objection; relevance to the

22   suppression questions.

23          MR. WATERSTREET:  It goes to his credibility, Your

24   Honor.

25          THE COURT:  Overruled.

1    BY MR. WATERSTREET:

2    Q.   Where did you download that from?

3    A.   I forgot from where.

4    Q.   Was it the same time that you took -- have the picture

5    of the broken glass?

6    A.   Maybe.

7    Q.   Maybe.  Was it the same day?

8    A.   Could be.  I don't remember.

9    Q.   Okay.  And you downloaded it while you were overseas or

10   here in the United States?

11   A.   In Bethlehem, overseas.

12   Q.   At your home?

13   A.   I don't remember where I did the -- the download.

14   Q.   You sure about that?

15   A.   Yes.

16   Q.   You didn't do it here in the United States?

17   A.   No.

18   Q.   You didn't make this bomb?

19   A.   No.

20          MR. WATERSTREET:  May I have one moment, Your

21   Honor?

22          (An off-the-record discussion was held at

23          2:59 p.m.)

24   BY MR. WATERSTREET:

25   Q.   And then did you print that off or how did that get onto

```
 1    your hard drive?
 2              MS. FITZHARRIS:  Objection, Your Honor.  All of
 3    these questions about how he got this photo are irrelevant to
 4    the suppression questions.
 5              THE COURT:  Overruled.
 6              MR. WATERSTREET:  Thank you.
 7    BY MR. WATERSTREET:
 8    Q.  How did it get to your hard drive?
 9    A.  My brother uses -- uses my hard drive, but it is my hard
10    drive.
11    Q.  I thought earlier you testified that all the items that
12    were on that hard drive belonged to you.  Now you are saying
13    this is somebody else's?
14              THE COURT:  Wait a minute.  Let him answer the
15    question.  Okay.
16    A.  No, not for someone else, it's mine.
17    BY MR. WATERSTREET:
18    Q.  Okay.  So you just said your brother uses your hard
19    drive.  Did he download this photo?
20    A.  I did the download.
21    Q.  Okay.  How did you do that?
22    A.  On the internet.
23              MS. FITZHARRIS:  Objection; asked and answered, he
24    said he didn't remember.
25              THE COURT:  Overruled.
```

1    BY MR. WATERSTREET:

2    Q.   From the Internet.  How did you accomplish that?  Did

3    you bring your hard drive with you from the United States all

4    the way over to Bethlehem just to download a pipe bomb -- a

5    photo of a pipe bomb?

6    A.   I was there.

7    Q.   No, you're not answering my question.  Did you bring

8    your hard drive all the way over from the United States all

9    the way over to Bethlehem just to download a picture of a

10   pipe bomb?

11   A.   No.

12   Q.   Okay.  Then how did it get on to your hard drive?

13   A.   I did the download.  I did download it on my hard drive.

14   Q.   Where?

15   A.   In Bethlehem.

16   Q.   So you brought your hard drive with you from the

17   United States to Bethlehem?

18   A.   I had more than hard drive, yes.

19   Q.   Okay.  And so it was placed on the hard drive while you

20   were in Bethlehem, and you went on to the Internet,

21   downloaded a photo, and had it copied to your hard drive?

22            MS. FITZHARRIS:  Objection; asked and answered.

23            MR. RAMADAN:  (In English) It's not a photo, it is

24   a video.

25   A.   It's not a photo, it is a video.

```
1              THE COURT:  It has, Counsel.  Let's move along.
2    BY MR. WATERSTREET:
3    Q.  It's a video?
4              MR. RAMADAN:  (In English) Yes.  It is a not a
5    photo, it's a video.
6    A.  Yes, it's not a photo, it's a video.
7              THE COURT:  Wait a minute.  What's a video?
8    A.  This is a picture but it's taken from a video.
9    BY MR. WATERSTREET:
10   Q.  And it's a video that you watched in Bethlehem, and you
11   then brought your hard drive with you to Bethlehem and
12   downloaded --
13             MS. FITZHARRIS:  Objection; it has been asked and
14   answered.
15             MR. WATERSTREET:  I just want to make sure.
16             THE COURT:  No.  It has been asked and answered
17   several times.
18   BY MR. WATERSTREET:
19   Q.  Okay.  You did not use an Apple phone to make a picture
20   of that item?
21             MS. FITZHARRIS:  Same objection; asked and
22   answered.
23             MR. WATERSTREET:  Well, no.
24             THE COURT:  Overruled.  This is different.
25
```

1  BY MR. WATERSTREET:

2  Q.  You didn't take an Apple phone and take a video with an

3  Apple phone and create a video, did you?

4  A.  No.

5      MR. WATERSTREET:  Your Honor, may I come sidebar

6  please with counsel?

7          (Sidebar conference held on the record at 3:04 p.m.

8          as follows:

9          MR. WATERSTREET:  Your Honor, my fear is the

10  defendant has committed perjury as to this -- this area, and

11  I was going to -- about to impeach him with that.  This item

12  here, L-1, is a photo of the glass, this is the metadata that

13  I have shared with defense as part of the forensic analysis

14  that was provided to them.  This shows that this is a

15  photograph that was taken and the equipment that was used to

16  take that.  And that it -- and it also has the longitude and

17  latitude for that location.

18          This is the picture of the pipe bomb.  This is the

19  information concerning -- the metadata concerning that, and

20  it was taken a few days later using a model iPhone5, and that

21  it was the same longitude and latitude, the exact same

22  location of both the bomb and the broken glass, and that

23  comes back to the area in which he said that he lives in

24  Bethlehem, the longitude and latitude.

25          So my fear is that he has committed perjury by

1   claiming that this is not a pipe bomb that --

2           MR. DENSEMO:  He didn't say it was a pipe bomb.  We

3   were talking about the location.

4           MR. WATERSTREET:  The pipe bomb that was taken from

5   his place in Bethlehem.

6           MR. DENSEMO:  The question, Your Honor, was the

7   item downloaded or was the picture taken in Bethlehem.

8           MR. WATERSTREET:  It says in -- the metadata says

9   specifically the time stamp the and longitude and latitude.

10          THE COURT:  You can go ahead and impeach him.  We

11  are not doing anything with perjury at this point unless he

12  takes the Fifth.  Do you need to talk to him about that?

13          MR. DENSEMO:  Yes.

14          MR. WATERSTREET:  I might suggest that, that's why

15  I brought it to the Court's attention.

16          THE COURT:  We will let you talk to him right now.

17          MR. DENSEMO:  Thank you.

18          (Sidebar conference concluded at 3:06 p.m.)

19          (An off-the-record discussion was held at 3:11 p.m.

20          between defense counsel and defendant.)

21          THE COURT:  All right.  For the record, the Court

22  has allowed counsel to speak with Mr. Ramadan.  All right.

23  Mr. Densemo.

24          MR. DENSEMO:  Your Honor, at this point we can

25  continue with the questioning.  I anticipate Mr. Ramadan,

 1  after having spoken with counsel and reviewing the

 2  document --

 3          THE COURT:  I'm sorry, you are blocked out.

 4          MR. DENSEMO:  After having reviewed the documents

 5  and spoken to counsel, we have instructed Mr. Ramadan to

 6  answer the questions truthfully and if he doesn't recall

 7  certain information to indicate to the U.S. Attorney that he

 8  doesn't recall, but not to guess or speculate about what he

 9  knows or remembers.

10          THE COURT:  All right.  You may continue.

11          MR. WATERSTREET:  Okay.

12  BY MR. WATERSTREET:

13  Q.  Mr. Ramadan, I want to ask you a few other things here.

14  Now, the -- today -- the first day of your testimony was not

15  all completely accurate, correct?

16  A.  I tried --

17  Q.  It's a simple yes or no.

18  A.  I tried the best I can.

19          THE DEFENDANT:  Yes, it is true.

20  A.  Yes, it is true.

21  BY MR. WATERSTREET:

22  Q.  Okay.  So what was the reason to make the correction at

23  the beginning of the hearing today?

24  A.  Because that picture I don't remember if I did download

25  it or not, the video.

1    Q.   You may have taken that video?

2          MS. FITZHARRIS:  Objection, Your Honor.  It appears

3    Mr. Ramadan is not understanding the question.  Can

4    Mr. Waterstreet ask it again?

5          THE COURT:  Wait a minute.  Are you asking for him

6    to ask the question again?

7          MS. FITZHARRIS:  Yes.

8          MR. DENSEMO:  He's answering --

9          MS. FITZHARRIS:  His answer is nonresponsive to the

10   question.

11         THE COURT:  Well, that's the asker's objection.

12   Overruled.  Go ahead.

13   BY MR. WATERSTREET:

14   Q.   So you may have taken the video?

15   A.   I don't recall it.

16         MR. RAMADAN:  (In English) I don't remember.

17   A.   I don't remember.

18   BY MR. WATERSTREET:

19   Q.   And yesterday's testimony -- at the very beginning of

20   today's hearing your attorney went back and basically

21   clarified that the information you provided in the first day

22   of testimony was not accurate?

23         MS. FITZHARRIS:  Objection; mischaracterization of

24   what happened.

25

1   BY MR. WATERSTREET:

2   Q.   As to who did what, who said what, things of that

3   nature.

4              THE COURT:  Wait a minute.  Wait a second.  I'm not

5   understanding it.  What are you referring to?

6              MR. WATERSTREET:  Your Honor, at the beginning of

7   the proceedings this morning, defense counsel asked

8   Mr. Ramadan if everything he said was correct yesterday, and

9   then started going over --

10             THE COURT:  Specific items.

11             MR. WATERSTREET:  -- specific items.

12  A.   Yes.

13  BY MR. WATERSTREET:

14  Q.   Okay.  Is that a memory problem that you have?

15  A.   Yes, I have.

16  Q.   Does it come and go?

17             MS. FITZHARRIS:  Objection; argumentative.

18             MR. WATERSTREET:  No, it is --

19             THE COURT:  Overruled.

20  BY MR. WATERSTREET:

21  Q.   Does it come and go?

22  A.   No.

23  Q.   Okay.  So it's a constant problem that you have?

24  A.   It's been a while but now with names and numbers.

25  Q.   Okay.  I'm not sure I understand that answer.

1      MR. RAMADAN:  (In English) Is it the same question?

2  A.   Is it the same question.

3          MS. FITZHARRIS:  Is there a question?

4          MR. RAMADAN:  (In English) Is that a question?

5  A.   Is that a question?

6  BY MR. WATERSTREET:

7  Q.   I'm not sure I understand your answer, sir.  Do you have

8  a problem that comes and goes with your memory?

9  A.   It was little things like numbers.

10 Q.   Only numbers?

11 A.   Little things.

12 Q.   What little things?

13          THE COURT:  Counsel, please, it's so general.

14 Let's move along.

15          MR. WATERSTREET:  Thank you, Your Honor.

16 BY MR. WATERSTREET:

17 Q.   I wanted to talk to you about the claim you made of what

18 happened with Officer Brown in which you were handcuffed and

19 struck, your hair was pulled, and your ear was pulled.  I'm

20 taking you to that time -- time of that evening.  Okay.

21          MR. RAMADAN:  (In English) Okay.

22 BY MR. WATERSTREET:

23 Q.   They didn't ask you any more questions about where your

24 guns were or anything like that after that, did they?

25 A.   What questions, about the guns or what?

1  Q.   That's what I just said.  They didn't ask you any more

2  questions about where your guns were or anything after

3  Officer Brown purportedly did this?

4  A.   No.

5  Q.   Okay.  So let's talk about that storage locker.  You

6  mentioned that storage locker when you were with Armentrout

7  and Schmeltz when you were first interviewed, did you not?

8  That's where your guns were?

9  A.   Yes.

10 Q.   Okay.  And you also made that same statement when you

11 were in the conference room when you were with Agents Thomas,

12 Brown, Kelley and Schmeltz, correct?  They asked you about

13 the guns?

14 A.   Yes.

15 Q.   And then at the end of the night you changed your story

16 and said that they were not at the storage locker but instead

17 they were with a friend?

18 A.   Yes.

19 Q.   Okay.  Which one of those two are the lie?

20 A.   So for my own safety I lied and said that it -- said

21 that my friend's -- the second one.

22 Q.   Okay.  So the truth was they were, in fact, at the

23 storage locker the whole time you told them the truth about

24 that?

25 A.   Yes.

1   Q.   But then you lied at the very end?

2   A.   Yes.

3   Q.   And during the testimony defense counsel introduced

4   Defendant's Exhibit G, which is a video of you having a

5   search warrant executed at your home, correct?

6   A.   Yes.

7   Q.   And you said that you were thinking about that incident

8   at the time in which the police were talking to you on

9   August 15th and 16th, and that whole incident was in your

10  mind at that time.  Am I correct?

11  A.   Yes.

12  Q.   Okay.  And what was happening is -- you were living in

13  Chula Vista at the time, weren't you?

14  A.   Yes.

15  Q.   The Chula Vista Police Department were executing a

16  search warrant for a stolen AR15 that --

17  A.   Not in this video, no.

18  Q.   But they did execute a search warrant at your house for

19  an AR15, did they not, a stolen AR15?

20  A.   After that, after that.

21  Q.   And that stolen AR15, and a firearm of that nature is a

22  very dangerous weapon, is it not?

23  A.   Only --

24          MS. FITZHARRIS:  Your Honor, we object.

25  Mr. Ramadan said they were not looking for an AR15 at the

 1   time.

 2            THE COURT:  Yes.  I want to ask a question about

 3   that.  You said after that.  Were there two search warrants

 4   for your house, Mr. Ramadan?

 5            MR. RAMADAN:  (In English) No.

 6   A.   No.

 7            MR. RAMADAN:  (In English) Just one --

 8   A.   Just one time when I was like -- I was on probation, I

 9   wanted to buy a gun, so they thought that I was on -- I have

10   a felony, that's why they came to my house, not because of

11   the AR15.

12   BY MR. WATERSTREET:

13   Q.   You mean a judge did not issue a search warrant saying

14   that they believed that you were in possession of a stolen

15   AR15 for the execution of that search warrant, is that what

16   you are saying?

17   A.   Not -- not on -- in this video.

18   Q.   So you never had a search warrant executed at your home

19   searching for a stolen AR15?  Yes or no.

20   A.   They came to my house after this to search for AR15, but

21   I wasn't sure if they had a warrant to search.

22            THE COURT:  So they had two -- you had two searchs

23   of your house?

24   A.   Yes.

25

1    BY MR. WATERSTREET:

2    Q.   And what you were really thinking about that night is

3    the fact that you had that stolen AR15 --

4            MS. FITZHARRIS:  Objection; argumentative.

5    BY MR. WATERSTREET:

6    Q.   -- sitting in that storage locker and that is why you

7    told the officers that it was at your friend's house and not

8    in the storage locker; isn't that true?

9            THE COURT:  The objection is what?

10           MS. FITZHARRIS:  Argumentative.

11           MR. WATERSTREET:  No.

12           THE COURT:  Overruled.

13   BY MR. WATERSTREET:

14   Q.   Isn't that the reason why you told them no, it is at my

15   friend's house because you realize that the stolen AR15 that

16   the police were looking for out in Chula Vista were sitting

17   in your storage locker and you didn't want them to find it?

18   A.   No.  First of all, they did not find an AR15.

19           MR. RAMADAN:  (In English) They found parts.

20   A.   They found parts.

21           MS. FITZHARRIS:  Objection.  This is getting way

22   beyond the scope of -- this is getting into potential

23   criminal activities that the government has threatened to

24   charge Mr. Ramadan with, and it is also beyond the scope of

25   this suppression hearing.

1     MR. WATERSTREET:  No, it is not, Your Honor.  He

2  was explaining the whole purpose of changing his story

3  because of being overborne by the activity that the agents

4  were involved in.  His changing the story has to do with the

5  fact that he knew criminal evidence was sitting in his

6  storage locker that he did not want them to find.

7     MS. FITZHARRIS:  Whether his will was overborne is

8  a different question than why he changed his story.

9     MR. WATERSTREET:  That's for this Court to decide,

10  Your Honor.

11     THE COURT:  Overruled.  Go you ahead.

12  BY MR. WATERSTREET:

13  Q.  I'm going to show you what has been marked as

14  Government's Proposed Exhibit B-1.  Have you ever seen that

15  before?

16  A.  No.

17  Q.  You've never seen that before.

18     I'm going to show you what has been marked as

19  Government's Exhibit Proposed B-2.  Have you ever seen that

20  object before?

21     MS. FITZHARRIS:  Your Honor, can we see a copy of

22  the photos they are handing Mr. Ramadan?

23     THE COURT:  Yes.

24     MR. WATERSTREET:  I'm sorry.

25

1    BY MR. WATERSTREET:

2    Q.   Do you recognize B-2?

3    A.   Maybe the handle.

4    Q.   It is circled.  Okay.

5            And B-3, do you recognize that?

6    A.   Yes, I saw a picture close to it.  I saw a lot.

7    Q.   And this is the picture that the police were provided by

8    the owner of the gun?

9            MS. FITZHARRIS:  I'm going to object because lack

10   of personal knowledge.

11           MR. WATERSTREET:  Well, we can --

12           THE COURT:  Okay.  Your comment is what -- your

13   response?

14           MR. WATERSTREET:  He can answer the question

15   whether he knows or not, Judge.

16           THE COURT:  If he's seen the picture before.

17           MS. FITZHARRIS:  The question was this is the

18   picture the owner of the gun gave the government.

19           THE COURT:  Right, that would be struck at this

20   time, but whether he has seen it before he can answer.

21   BY MR. WATERSTREET:

22   Q.   Have you seen that picture before?

23   A.   Same picture, no.

24   Q.   Okay.  I'm going to show you B-4, the objects that was

25   seized from your storage locker.  Have you seen that before?

1   A.   Yes.

2   Q.   Here is a close up, B-5.  Have you seen that before?

3   A.   Yes.

4   Q.   Do me a favor, will you compare B-3 with B-5?

5        MS. FITZHARRIS:  Objection, Your.  Honor, this is

6   completely irrelevant to the suppression issue.  This is the

7   subject of the suppression.  They found this -- they found

8   these items in his storage locker, so the questions about

9   these are completely irrelevant if the evidence is

10  suppressed, and it is only going into potential criminal

11  activity the government is threatened to charge Mr. Ramadan

12  with.

13       MR. RAMADAN:  (In English) Are these different?

14  A.   These are different.

15       THE COURT:  Just a minute.  Your response?

16       MR. WATERSTREET:  Your Honor, this goes directly to

17  his credibility as to why he told the agents the different

18  story, and it had nothing to do with being overbroad.

19       THE COURT:  Overruled.

20       MS. FITZHARRIS:  This has nothing to do with what

21  Mr. Ramadan said at the airport.

22       THE COURT:  Overruled.  I will take it now.  Let's

23  go.

24       MR. RAMADAN:  (In English) So what's the question?

25  A.   So what is the question?

1   BY MR. WATERSTREET:

2   Q.   I'm looking at B-3 and 5.  Do those look the same to

3   you?

4   A.   A little bit.

5   Q.   A little bit?

6   A.   A little bit.

7   Q.   Let's take a look at each one here side by side.

8           MS. FITZHARRIS:  Objection, Your Honor.  You can

9   look at the photos yourself and decide if they look the same.

10          THE COURT:  Sustained.  He's already answered.

11          MR. WATERSTREET:  Move for the admission, Your

12  Honor, of --

13          MS. FITZHARRIS:  We object to the admission of

14  these photos for all the reasons stated.

15          THE COURT:  Based on your reasons stated, but the

16  Court will accept them, except I don't know what is B-1?

17          MR. WATERSTREET:  B-1 is a photograph of the weapon

18  that was produced by the owner of the firearm.

19          THE COURT:  Well, wait a second.  You can't put

20  that in --

21          MR. WATERSTREET:  I will -- if I need to, Your

22  Honor, I will bring an agent up here to testify to that.

23          MS. FITZHARRIS:  That would be --

24          THE COURT:  I mean, you just can't say that's what

25  it is.  You can't testify, so I'm not going to allow B-1.

1        MR. WATERSTREET:  Okay.  Your Honor, I will have an

2    agent --

3        MS. FITZHARRIS:  Again, objection; whether or not

4    the owner provided this photo is completely irrelevant to the

5    suppression issue.

6        THE COURT:  Overruled.

7    BY MR. WATERSTREET:

8    Q.  Have you seen B-9 before?

9    A.  I saw a lot like it.

10   Q.  Is this the part that was found in your storage locker?

11       MR. DENSEMO:  Your Honor, at this point we are

12   going to -- we are going to instruct Mr. Ramadan to take the

13   Fifth Amendment regarding the rest of these photos because,

14   again, the government has threatened to charge Mr. Ramadan

15   with these items, so we don't believe that any further

16   testimony would be in his interest.  So we are instructing

17   our client to take the Fifth with regard to any further

18   photos that the government wants to offer.

19       THE COURT:  All right.

20   BY MR. WATERSTREET:

21   Q.  I'm going to show you what has been marked B-26?

22       MR. RAMADAN:  (In English) I take my Fifth.

23   BY MR. WATERSTREET:

24   Q.  You take the Fifth on that?

25       THE COURT:  Okay.  We were on B-9.

```
 1              MR. WATERSTREET:  Yeah, I moved to B-26, Your
 2   Honor.
 3              THE COURT:  B-26?
 4              MR. WATERSTREET:  Yes, Your Honor.
 5   BY MR. WATERSTREET:
 6   Q.  Do you recognize this WB --
 7              MS. FITZHARRIS:  Objection, Your Honor; Mr. Ramadan
 8   has invoked the Fifth.
 9              THE COURT:  I didn't hear him if he -- I'm not
10   saying he didn't, I just didn't hear it.  He can answer it.
11   A.  I take the Fifth.
12              MR. WATERSTREET:  Can I ask the question first
13   before he takes the Fifth?
14              THE COURT:  Yes, you can ask the question first.
15   BY MR. WATERSTREET:
16   Q.  Do you see this WB1988 written on this --
17   A.  I take the Fifth.
18   Q.  And earlier you said that you are WB.88, are you not?
19              MS. FITZHARRIS:  Objection, Your Honor; asked and
20   answered.
21              THE COURT:  It was.
22   BY MR. WATERSTREET:
23   Q.  And you have a website WB.88, do you not?
24   A.  YouTube.
25   Q.  A YouTube.  What's on that YouTube channel?
```

1         MS. FITZHARRIS:  Objection, Your Honor; relevance.

2         THE COURT:  What is the relevance?

3         MR. WATERSTREET:  Your Honor, again, he's claimed

4    that his will was overborne by the mere presence of firearms,

5    yet he has a website devoted solely to firearms.

6         MS. FITZHARRIS:  That is a mischaracterization of

7    the argument, that the mere presence of firearms.

8         THE COURT:  Okay.  It is not mere presence, it was

9    one of the --

10        MS. FITZHARRIS:  Yes.

11        THE COURT:  -- items.

12        MR. WATERSTREET:  One of the items.

13        THE COURT:  All right.  But you may go into that.

14   Overruled.

15   BY MR. WATERSTREET:

16   Q.   I'm going to show you --

17        MS. FITZHARRIS:  If I could place a standing

18   objection to any discussion of this YouTube channel, any

19   videos of this YouTube channel and anything having to do with

20   this YouTube channel.

21        THE COURT:  All right.

22        MS. FITZHARRIS:  Okay.

23        THE COURT:  And, excuse me, but I have no idea what

24   a YouTube channel is.

25        MR. WATERSTREET:  I will ask him about it.

1   BY MR. WATERSTREET:

2   Q.   What is a YouTube channel, Mr. Ramadan?

3   A.   It is a channel on YouTube, you can download videos.

4   Q.   And to speed this up a little bit, this is something

5   that you put on YouTube, you can create your own channel and

6   try to get people to come and watch the videos that you post?

7   A.   Yeah.

8   Q.   And it is also a way for you to be able to make money

9   because sometimes they pay you for how many people come and

10  view your videos and things of that nature?

11  A.   Right.

12  Q.   Okay.  I'm going to show you what has been marked W-1.

13  This is a screen shot of your YouTube channel, WB.88.GUNS?

14  A.   Yes.

15  Q.   Is this your -- the screen shot of your YouTube video

16  WB.88.GUNS?

17  A.   Yes.

18  Q.   And on there does it have you target shooting with a

19  Mosin Nagant model 91130PU?

20        MS. FITZHARRIS:  Your Honor, if Mr. Waterstreet is

21  referring to something specifically on the website we would

22  ask that Mr. Ramadan see what he is referring to.

23        THE COURT:  All right.

24  BY MR. WATERSTREET:

25  Q.   It is the third picture in from the left-hand side where

1    it says uploads, number one, two, three, shooting target

2    Mosin Nagant model 91130PU.

3    A.   Yes.

4    Q.   Is this you in Government's Proposed Exhibit C-4 holding

5    that very same weapon?

6          MS. FITZHARRIS:  Can we see what C-4 is?

7          MR. WATERSTREET:  Yes.

8    A.   Yes.

9    BY MR. WATERSTREET:

10   Q.   And that's the same weapon that your mother is holding

11   in E-1?

12         MS. FITZHARRIS:  Objection, Your Honor, to anything

13   having to do with his mother; that's completely irrelevant.

14         THE COURT:  Well, the picture is in.

15         MS. FITZHARRIS:  I understand but my objection

16   is --

17         THE COURT:  All right.  I will take it.

18   BY MR. WATERSTREET:

19   Q.   Is it the same weapon?

20   A.   Yes.

21   Q.   Is that taken in the same location as the picture with

22   you?

23   A.   Yes.

24   Q.   Showing you what has been marked C-1, do you recognize

25   the person in C-1?

```
1    A.   Me.

2    Q.   Is that you?

3    A.   Uh-huh.

4    Q.   Is that a yes?

5    A.   Yes.

6    Q.   What gun is that?

7              MS. FITZHARRIS:  Objection; relevance.

8              THE COURT:  The relevance, Counsel?

9              MR. WATERSTREET:  Again, as to his concern for just

10   merely being around a firearm, Your Honor.

11             MS. FITZHARRIS:  How does the type of firearm

12   matter in this?

13             MR. WATERSTREET:  I don't know.  I don't know.

14             THE COURT:  Overruled.

15             MS. FITZHARRIS:  Well, you are the one saying that

16   it is relevant.  Why is the type of firearm in this photo

17   relevant, Mr. Waterstreet?

18             THE COURT:  Are you saying because this looks -- I

19   mean, it looks like a very powerful weapon, would be greater

20   than a weapon that the agents would have them on?  I don't

21   know.

22             MR. WATERSTREET:  His knowledge of firearms for him

23   to be able to explain whether he was fearful of a firearm,

24   not fearful of a firearm by the mere presence of a firearm --

25             MS. FITZHARRIS:  Objection --
```

1       THE COURT:  I will take it.

2       MS. FITZHARRIS:  -- to the characterization of the

3    mere presence of a firearm.  It was one of the factors.

4       THE COURT:  It is not mere presence.  We have gone

5    over that, and I understand it.  Okay.  Go ahead.  But I

6    think with this -- you should wrap up with this because we

7    have heard enough on the guns.

8       MR. WATERSTREET:  Move for the admission of --

9       MR. DENSEMO:  I don't think Mr. Waterstreet heard

10    the Court, Your Honor, the Court's last statement.

11       MR. WATERSTREET:  I'm moving on to another subject.

12       THE COURT:  Okay.

13       MR. WATERSTREET:  I'm moving for admission of those

14    items?

15       MS. FITZHARRIS:  Objection; irrelevant --

16       MR. WATERSTREET:  C-1.

17       MS. FITZHARRIS:  -- prejudicial.

18       MR. WATERSTREET:  C-4, W-1.

19       THE COURT:  Okay.  I don't know C-4, I didn't

20    write -- let me see.  Did I have C-4?

21       MR. WATERSTREET:  I'm sorry, Your Honor.  It is

22    right here.

23       THE COURT:  Hold on one minute.  What is C-4?

24    BY MR. WATERSTREET:

25    Q.   Your extending index finger in C-4, what does that --

```
 1              MR. DENSEMO:  Objection.
 2   BY MR. WATERSTREET:
 3   Q.   Why did you --
 4              MR. DENSEMO:  Your Honor, excuse me.
 5              MR. WATERSTREET:  Your Honor --
 6              MR. DENSEMO:  Look, look --
 7              MR. WATERSTREET:  -- if I may.
 8              MR. DENSEMO:  Your extended index finger in C-4?
 9   He was talking about guns, and now he's talking about an
10   extended index finger.
11              THE COURT:  Okay.  But only one of you can object
12   for this witness.
13              MS. FITZHARRIS:  I object to questions about the
14   extended finger in a photo.
15              THE COURT:  Okay.
16              MS. FITZHARRIS:  How is that relevant to the
17   suppression issue?
18              THE COURT:  I don't know.
19   BY MR. WATERSTREET:
20   Q.   So the question is, sir, what did you mean by --
21              THE COURT:  But, wait a minute.  The question is
22   you introduced a number of exhibits, they had objections
23   based on all of the objections they have stated as to the
24   relevance, and the Court allowed it, so she will allow all of
25   these, but I said we are done.  I don't know what you are
```

```
 1  doing.
 2              MR. WATERSTREET:  I understand.
 3  BY MR. WATERSTREET:
 4  Q.   Mr. Ramadan --
 5              MR. DENSEMO:  Your Honor --
 6  BY MR. WATERSTREET:
 7  Q.   -- the images that you're --
 8              MR. DENSEMO:  Your Honor, this has gone -- is about
 9  to sink into the muck at this point.  If the --
10              THE COURT:  I don't know what you are talking
11  about.
12              MR. DENSEMO:  The government has given us photos
13  that have -- that have absolutely nothing to do with the
14  suppression hearing whatsoever.
15              THE COURT:  Okay.  And I do think Ms. Fitzharris is
16  capable of raising the objection.
17              MS. FITZHARRIS:  Your Honor, the government has
18  handed us the same photos of ISIS photographs beheading,
19  things like that, that were already introduced as exhibits on
20  the first day of testimony.  This is about to go -- this
21  cross-examination has already devolved into an interrogation
22  of Mr. Ramadan's character, whether it is okay to download
23  these photos, whether it is okay to possess guns, and it
24  should stop.  It is irrelevant to the suppression questions.
25              MR. WATERSTREET:  It goes to exactly why they were
```

1  interviewing him in the first place, Your Honor.  Mr. Ramadan

2  is trying to suggest that by traveling with his family he was

3  improperly pulled off of a plane, that he was subjected to

4  questioning about the objects that he had in his possession,

5  and also questioned about the objects that they found on his

6  hard drive, and that it was totally improper, and that's what

7  they are suggesting.

8          MS. FITZHARRIS:  Your Honor --

9          MR. WATERSTREET:  I --

10         MS. FITZHARRIS:  -- I actually --

11         THE COURT:  Just wait until he's done.

12         MR. WATERSTREET:  May I finish, please.

13         MS. FITZHARRIS:  Okay.

14         MR. WATERSTREET:  And the reason that it's totally

15 proper for law enforcement to do this, they would be remiss

16 in their duties based upon the information they came across

17 not to ask Mr. Ramadan some questions about his possessions

18 and the items that he decided to download on his own.

19         MS. FITZHARRIS:  Your Honor, this is not a question

20 about whether it was proper to ask Mr. Ramadan to step off

21 the plane.  It is not a hearing about whether it's proper for

22 them to follow up on questions.  It is about whether the

23 government -- these government agents, who are asking

24 Mr. Ramadan about whether he was involved in terrorist

25 activity, should have given him Miranda warnings.  It is

 1   about whether -- at the moment they started searching his

 2   digital hard drive they had a reason to do so, that based on

 3   customs and border search reasons, not based on like

 4   freestanding investigative searches for criminal activity.

 5        This hearing is about whether Mr. Ramadan felt

 6   compelled to speak, so it is not about the propriety of these

 7   questions.  It is about whether they had to take certain

 8   measures and get certain protections to make sure that

 9   Mr. Ramadan's rights were protected.  That's what's going on

10   here.

11        THE COURT:  Well, it seems to me that there --

12   there are issues which go back to the first issue about

13   whether or not they had to advise him whether or not this is

14   a warrantless search, and there is something about the

15   reasonable suspicion, I believe.

16        MS. FITZHARRIS:  Your Honor, they did not know

17   about these photos until they went onto his hard drive.  So

18   if we look at the snapshot in time when they went onto his

19   hard drive, that is what's relevant.

20        THE COURT:  It is relevant when they went onto his

21   hard drive and they found these.  Now the question of should

22   they have gone onto his hard drive is one that you have

23   argued, but assuming -- assuming the Court finds it is a

24   border search and it is allowable and you find this

25   information, it is reasonable that they would go on with

1   questions.  Of course, there is the issue of should they then

2   have Mirandized him, and those are all issues that have to be

3   decided, but I think it is reasonable to go into this if this

4   is what they found, and I'm going allow it.

5           MR. WATERSTREET:  Thank you, Your Honor.

6   BY MR. WATERSTREET:

7   Q.   I'm going to start with O-2.  Is this one of the items

8   that was downloaded onto your hard drive?

9   A.   I don't remember.

10  Q.   You don't remember.  What about O-3?

11          THE COURT:  O-2 and O-3?

12          MR. WATERSTREET:  O-2 and then O-3, Your Honor.

13  A.   Those pictures it feels like I saw those but I don't

14  remember.  Maybe those are videos.

15  BY MR. WATERSTREET:

16  Q.   Did you download these onto your hard drive?

17  A.   I had, yes.

18  Q.   Okay.  O-4.  Did you -- is this from your hard drive?

19  A.   Yes.

20  Q.   Okay.  O-5, is this from your hard drive?

21  A.   Yes.

22  Q.   O-6, is this from your hard drive?

23  A.   Yes.

24  Q.   O-7, is this from your hard drive?

25  A.   Yes.

1  Q.  O-9, is this from your hard drive?

2  A.  I don't remember this one.

3  Q.  O-10, is that from your hard drive?

4  A.  I saw lots of video -- I saw lots of videos, not

5  pictures, like this one.

6  Q.  But these are the videos that you downloaded to your

7  hard drive?

8       O-13 --

9       THE COURT:  Wait a minute.  I didn't get an answer

10  to that.

11  BY MR. WATERSTREET:

12  Q.  Are these videos that you downloaded to your hard drive?

13  A.  Yes.

14  Q.  O-13, is this a video or a photo that you downloaded to

15  your hard drive?

16  A.  Yes.

17  Q.  O-14, is this a video that you downloaded or a photo

18  that you downloaded to your hard drive?

19  A.  Yeah.

20  Q.  O-15, are these -- this is a photo or video that you

21  downloaded to your hard drive?

22  A.  I'm not sure, it's been a long time.

23  Q.  Okay.  Did you download so many that you may not

24  remember that?

25       MS. FITZHARRIS:  Objection, Your Honor;

1    argumentative.

2            THE COURT:  Pardon me?

3            MR. WATERSTREET:  It is not argumentative.

4            MS. FITZHARRIS:  Argumentative.

5            THE COURT:  Overruled.

6    BY MR. WATERSTREET:

7    Q.  Did you download so many that you may not be able to

8    remember?

9    A.  Not a lot, a lot.

10   Q.  Would you say over a thousand would be a lot?

11   A.  Ten.

12   Q.  Ten?

13           MR. RAMADAN:  (In English) Maybe 20.

14   A.  Twenty.

15   BY MR. WATERSTREET:

16   Q.  Twenty.  You realize you are under oath.  Ten, 20,

17   that's all?

18           MR. RAMADAN:  (In English) I'm not hundred percent

19   sure, you know.

20   A.  I'm not hundred percent sure.

21   BY MR. WATERSTREET:

22   Q.  You have a five terabyte hard drive that's almost

23   completely full, and there is --

24   A.  It was like -- it has like also has my personal stuff,

25   and it has -- most of it, and it has a little bit about

1    American army, all kind of armies, not only ISIS.

2    Q.   So getting back to my question, these are ISIS videos,

3    right?

4    A.   Yes.

5    Q.   And they asked you about ISIS videos?

6            MS. FITZHARRIS:  Objection; who is he -- who is

7    they?

8    BY MR. WATERSTREET:

9    Q.   The agents.

10   A.   At the airport?

11   Q.   Yes.

12   A.   Yes.

13           MR. WATERSTREET:  I think the point has been made

14   Your Honor.  I will move, if they have not already been

15   introduced O-2, 3, 4, 5, 6, 7, 9, 10, 13 and 14?

16           THE COURT:  All right.  He indicated that he

17   doesn't remember O-2 and O-9, so the Court will allow the

18   others but not those two over the objection.

19           MS. FITZHARRIS:  But please note the objection.

20           THE COURT:  The standing objection of the defense.

21           (Government's Exhibits O-3, O-4, O-5, O-6, O-7,

22            O-10, O-13 and O-14 received into evidence.)

23   BY MR. WATERSTREET:

24   Q.   So you do not remember O-2?

25   A.   No.

1    Q.   Okay.

2    A.   I don't remember.

3          MR. WATERSTREET:  Your Honor, for the record, I

4    will proffer that O-2 is we are coming to kill you, oh,

5    Jews --

6          MS. FITZHARRIS:  Objection; we object to the

7    proffer.

8          THE COURT:  Just a minute.  It's not in so --

9          MR. WATERSTREET:  I understand.  I'm just making

10   a --

11         THE COURT:  A proffer?

12         MR. WATERSTREET:  A proffer.

13         MS. FITZHARRIS:  Objection to the proffer to an

14   exhibit that has not been admitted.

15         THE COURT:  Okay.  It may be submitted for purposes

16   of appeal, but I'm not going to look at it.

17         MR. WATERSTREET:  I understand that, Your Honor.

18         THE COURT:  Okay.

19   BY MR. WATERSTREET:

20   Q.   Mr. Ramadan, the last area that I want to go into is the

21   items that were provided by you placed in those bags at the

22   airport.  Were you the one that packed each and every one of

23   those bags?

24   A.   No.

25   Q.   Didn't you tell the law enforcement you didn't trust

1    your wife?

2    A.   Yes, but not about the -- he asked me about -- not

3    regarding the luggage.

4    Q.   Okay.  The luggage.  The luggage.  The bulletproof vest

5    and the plates, those belong to you?

6    A.   Yes.

7    Q.   The gas mask, that belongs to you?

8    A.   Yes.

9    Q.   The load bearing vest, that belongs to you, the one the

10   plates go into?

11   A.   Yes.

12   Q.   The gun holsters, those belong to you?

13          MR. RAMADAN:   (In English) The BB gun holsters.

14   A.   The BB gun holsters.

15   BY MR. WATERSTREET:

16   Q.   The BB gun holsters?

17          MR. RAMADAN:   (In English) Yep.

18   BY MR. WATERSTREET:

19   Q.   Okay.  And how many BB gun holsters did you pack?

20   A.   I don't remember but it was all of them for the BB gun.

21   Q.   And how many BB guns do you own?

22   A.   Maybe four.

23   Q.   And where did you keep those BB guns?

24   A.   It was in a storage.

25   Q.   The storage -- the storage locker that you have in

1   Ann Arbor?

2           MS. FITZHARRIS:  Objection; what's the relevance of

3   all of this?

4   A.   The other pictures that my wife was carrying, it was a

5   BB gun.

6           THE COURT:  Okay.  Counsel, wait a minute.  What's

7   the relevance of this?

8           MR. WATERSTREET:  Whether he has standing to

9   contest the --

10          THE COURT:  He what?

11          MR. WATERSTREET:  Standing, and is he --

12          MS. FITZHARRIS:  Mr. Ramadan has already

13   established standing.  He established that he had a right to

14   privacy in the storage locker.  Berg vs. United States

15   provides a really excellent explanation of what standing is.

16   I can talk about it after we finish evidence, if Your Honor

17   would like.

18          MR. WATERSTREET:  I'm talking about the items that

19   you packed.

20          MS. FITZHARRIS:  He does not have to have -- claim

21   personal possessory interest in the items that are -- that --

22   every item found in that storage locker to claim a reasonable

23   expectation of privacy or a possessory interest in the

24   storage locker.

25          MR. WATERSTREET:  I'm not talking about the storage

1   locker, Your Honor.  I'm talking about the items in the

2   bag -- the luggage.

3           THE COURT:  The items in the bag at the airport?

4           MR. WATERSTREET:  Yes.

5           THE COURT:  Overruled.

6   A.   So what is the question?

7   BY MR. WATERSTREET:

8   Q.   How many BB guns did you have in that storage locker was

9   the question because --

10          THE COURT:  You said storage locker.

11  BY MR. WATERSTREET:

12  Q.   I was following up on the question of you only had one

13  BB gun in that storage locker, correct?

14  A.   No.  As far as I remember more than one.

15  Q.   And each one of those holsters was for that BB gun?

16  A.   No.

17  Q.   There were magazine holders for magazines for AR15s,

18  correct?

19  A.   No, for the BB gun AR15.

20  Q.   And the Taser, did that Taser belong to you?

21          MR. RAMADAN:  (In English) It's mine.

22  A.   It's mine.

23  BY MR. WATERSTREET:

24  Q.   Okay.  And the rifle scope for the AR15, is that yours?

25  A.   First of all, it is not for the AR15.  So it's -- it's

1    the -- it's not meant to be for a strong weapon because it's

2    very cheap and the glass will shatter.

3            MR. RAMADAN:  (In English) It's only just for BB

4    gun.

5    A.   It's only just for BB gun.

6    BY MR. WATERSTREET:

7    Q.   But the mount for that scope was for an AR15, it was an

8    A500?

9    A.   I never tried it.  I don't know.

10   Q.   And the lower handle -- the lower handle for if the

11   AR15, did that belong to you?

12   A.   Yes, but it's not for the AR15.

13   Q.   So all of the -- remember seeing those photos all the

14   items laid out, did all of those items belong to you?

15   A.   Which, which --

16   Q.   That were introduced as exhibits before?

17   A.   Can I see them?

18   Q.   Sure.  These were I-1 --

19           MS. FITZHARRIS:  Mr. Waterstreet, can we please

20   have a copy?

21           MR. WATERSTREET:  Yes, I will get them to you.

22   These have been previously admitted, Your Honor, I-1 through

23   27.

24   BY MR. WATERSTREET:

25   Q.   Does number 1 belong to you?

1    A.   Yes.

2    Q.   Number 2?

3    A.   Yes.

4    Q.   Number 3?

5    A.   Yes.

6    Q.   Number 4?

7    A.   Yes.

8    Q.   Number 5?

9    A.   Yes.

10   Q.   Number 6?

11   A.   Yes.

12   Q.   Number 7?

13   A.   Yes.

14   Q.   Number 8?

15   A.   Yes.

16   Q.   These tactical knives, those belong to you?

17             MR. RAMADAN:   (In English) Pocket knife.

18   A.   Pocket knife.

19             MR. RAMADAN:   (In English) It's a pocket knife.

20   A.   These are pocket knives.

21   BY MR. WATERSTREET:

22   Q.   All of these knives belong to you?

23   A.   Yes.

24   Q.   Number 9, the gas mask belongs to you?

25   A.   Yes.

1   Q.   Number 10, the gun magazines, those belong to you?

2        MR. RAMADAN:  (In English) They are not gun

3   magazines.  They are BB gun magazines.

4   A.   These are BB gun magazines.

5   BY MR. WATERSTREET:

6   Q.   I-11, the law enforcement spray, OCS spray, that belongs

7   to you?

8   A.   Yes.

9   Q.   Number 13, the knives, the camera?

10       MR. RAMADAN:  (In English) I don't see knives.

11  BY MR. WATERSTREET:

12  Q.   The holster.

13       MR. RAMADAN:  (In English) I don't see knives.

14  A.   I don't see knives.

15  BY MR. WATERSTREET:

16  Q.   Okay.  What's in -- what's in the middle of that --

17  what's in the very middle there, Mr. Ramadan?

18       MR. RAMADAN:  (In English) It's not clear.  I can't

19  see -- I can see the gas mask.

20  BY MR. WATERSTREET:

21  Q.   I'm on 13 now.

22       MR. RAMADAN:  (In English) Oh, you're on 13.  I'm

23  talking about 12.

24  BY MR. WATERSTREET:

25  Q.   Yeah, I'm on 13.  Is that knives right there in the

1    middle?

2         MR. RAMADAN:  (In English) This is multiple tools.

3    A.   This is multiple tools.

4    BY MR. WATERSTREET:

5    Q.   Okay.

6         MR. RAMADAN:  (In English) And the pocket knife.

7    A.   And the pocket knife.

8    BY MR. WATERSTREET:

9    Q.   So there was knife?

10   A.   And light.

11   Q.   There are two holsters -- the top two black holsters?

12   A.   Yes.

13   Q.   And then to the right there is a -- it looks like an

14   under shoulder holster -- a leather under-the-shoulder

15   holster?

16   A.   Yes.

17   Q.   And then headphones, the ear protection, is that yours

18   as well?

19   A.   Yes.

20   Q.   Okay.  Are BB guns that loud that you need ear

21   protection?

22   A.   This one you don't use it for the BB gun.

23   Q.   That's for shooting handguns and rifles?

24        MR. RAMADAN:  (In English) You can use it for

25   construction too.

1  A.  You can use it for construct too.

2       MR. RAMADAN:  (In English) Heavy equipment.

3  A.  Heavy equipment.

4  BY MR. WATERSTREET:

5  Q.  I understand you can use it for that, but you use it for

6  handguns and rifles?

7  A.  You can use it for one -- for more than one reason.

8  Q.  I understand that, Mr. Ramadan.  Please just answer the

9  question.  You can use it for a rifle and --

10      MS. FITZHARRIS:  Objection; Mr. Ramadan has

11  answered the question.

12      MR. WATERSTREET:  No, he has not answered the

13  question.

14      MR. RAMADAN:  (In English) I answered.

15  A.  I answered.

16  BY MR. WATERSTREET:

17  Q.  Sir, it is a very simple question.  This is the headgear

18  that you can wear when using a handgun and a rifle?

19  A.  You can use it, but the whole purpose of it is to reduce

20  the loud noise.

21  Q.  And guns make loud noises, don't they?

22      MR. RAMADAN:  (In English) Sure, yes.

23  A.  Sure, yes.

24  BY MR. WATERSTREET:

25  Q.  I-15, that's a holster, a drop holster, that you hook up

1    to tactical vest?

2    A.    No.

3    Q.    What is it?

4    A.    That's a BB gun for the leg -- the holster for the leg.

5    Q.    For a BB gun?

6          MR. RAMADAN:  (In English) Yes.

7    A.    Yes.

8    BY MR. WATERSTREET:

9    Q.    I-19, you can skip ahead, I'm trying to go through these

10   very quickly.  That's your Taser?

11   A.    Yeah.

12   Q.    I-20, that's your scope for a rifle?

13         MR. RAMADAN:  (In English) No.

14   Q.    I-21, the AD-RECON X30, that is the scope?

15         THE COURT:  Wait a minute.  Go back -- excuse me.

16   Go back to I-20.  He said no?

17         MR. RAMADAN:  (In English) No -- yes.

18         MR. WATERSTREET:  He said yes to that, Your Honor.

19   That is your scope.  It may be the way I said it, Your Honor.

20   BY MR. WATERSTREET:

21   Q.    That is your scope?

22   A.    Yes.

23   Q.    I-21, the AD-RECON X30, that's the scope mount for the

24   firearm, correct?

25         MR. RAMADAN:  (In English) I think this is for the

 1   flashlight.

 2   A.   I think this is for the flashlight.

 3   BY MR. WATERSTREET:

 4   Q.   For the flashlight.  Is that what you use it for?

 5           MR. RAMADAN:  (In English) I believe so.

 6   A.   I believe so.

 7   BY MR. WATERSTREET:

 8   Q.   So when you were using a BB gun that needed a

 9   flashlight?

10           MR. RAMADAN:  (In English) Just to look --

11           MS. FITZHARRIS:  Objection; this is a

12   mischaracterization of testimony.

13   A.   Just to look --

14   BY MR. WATERSTREET:

15   Q.   I-22, the --

16           THE COURT:  Okay.  Wait a second, wait a second.

17   The objection is mischaracterization?

18           MS. FITZHARRIS:  Yes.

19           MR. WATERSTREET:  Okay.

20           THE COURT:  Go back to it and --

21   BY MR. WATERSTREET:

22   Q.   Okay.  What do you use this -- what do you use this

23   scope mount for?

24   A.   What picture?

25   Q.   I-21.

1   A.   What do I use it for?

2   Q.   Yes.

3            MS. FITZHARRIS:  Objection; relevance.

4            THE COURT:  Wait a minute.  We can't do it all

5   at -- yeah.  Go ahead.  Your objection is what?

6            MS. FITZHARRIS:  Relevance as to what he uses it

7   for.

8            THE COURT:  Well, it would help to explain what the

9   picture is -- the photo is.

10   BY MR. WATERSTREET:

11   Q.   What do you use it for?

12   A.   I don't remember exactly.

13   Q.   Did you buy this?

14   A.   Yes.

15   Q.   How much did you pay for it?

16            MS. FITZHARRIS:  Objection; relevance.

17   A.   I don't remember.

18            THE COURT:  Sustained.

19   BY MR. WATERSTREET:

20   Q.   I-22, what is that?

21            MR. RAMADAN:  (In English) Same thing that BB gun

22   is for, like, so you can look --

23   A.   Same thing --

24            MR. RAMADAN:  (In English) -- close, like, you

25   know --

1   A.   Close like -- so to hold the BB gun so it will look like

2   real one.

3   BY MR. WATERSTREET:

4   Q.   So it is a lower handle for a BB gun or an AR15?

5           MR. RAMADAN:   (In English) BB gun, yeah.

6   BY MR. WATERSTREET:

7   Q.   Only BB gun?

8           MR. RAMADAN:   (In English) BB gun, you can use it

9   for --

10  A.   BB gun, you can use it for different.

11  BY MR. WATERSTREET:

12  Q.   You can use it for a rifle, an AR15?

13          MS. FITZHARRIS:   Objection; relevance.

14          MR. RAMADAN:   (In English) I don't know if it's for

15  AR15.

16  A.   I dont know if you can use it for an ar 15.

17          MS. FITZHARRIS:   Objection.

18          THE COURT:   Yes, wait a minute.   Relevance is the

19  objection for --

20  BY MR. WATERSTREET:

21  Q.   This belongs to you, does it not?

22          THE COURT:   -- the AR15.

23          MS. FITZHARRIS:   The objection was to the -- what

24  do you use it for, there's a lot of questions about that.   If

25  it --

```
 1              THE COURT:  If it is self-explanatory like a
 2   weapon, AR15, you don't need to answer what you use it for.
 3              MR. WATERSTREET:  I understand that but it is a
 4   handle --
 5              MR. RAMADAN:  (In English) For BB gun.
 6   BY MR. WATERSTREET:
 7   Q.  You use it for a BB gun?
 8              MR. RAMADAN:  (In English) Yes.
 9   BY MR. WATERSTREET:
10   Q.  This is yours?
11              THE COURT:  Overruled.  I will allow him to explain
12   it is a handle for a BB gun, not what you use a BB gun for.
13   BY MR. WATERSTREET:
14   Q.  Is that yours?
15   A.  Yes.
16   Q.  I-23, what is I-23?
17   A.  Yes, for me.
18   Q.  That's yours.
19              And 25, 26 are additional photographs of the items,
20   correct, kind of at a slightly different view?
21   A.  Yeah.
22   Q.  And then 27, this is your wife's and your personal
23   identification information?
24   A.  Yes.
25   Q.  Including your identification for work when you used to
```

1   work for Star Carpet and Flooring in California?

2          MS. FITZHARRIS:  Objection; relevance,

3   self-explanatory, speaks for itself.

4          MR. WATERSTREET:  That's fine, if it speaks for

5   itself, that's fine.

6          THE COURT:  Okay.

7          MR. WATERSTREET:  I have no further questions at

8   this time, Your Honor.

9          THE COURT:  Redirect?

10  A.  Did you give a copy to my attorney?

11                    REDIRECT EXAMINATION

12  BY MS. FITZHARRIS:

13  Q.  Mr. Ramadan, do you remember what color Officer Brown's

14  gun was?

15  A.  As far as I think it's black.

16  Q.  Okay.  Did you need to see the firearms to know that

17  they had them?

18  A.  It was showing.

19  Q.  So how did you know the officers had firearms?

20  A.  Because I saw it, like, it was visible.

21  Q.  Okay.  When -- the -- when you were talking about the

22  pass codes and you asked for immunity, did you only ask for

23  immunity or did you ask for anything else?

24  A.  I also -- I asked -- I asked if I can show him the phone

25  if he gives me a paper that I will have my rights and not do

1  anything against me, like, I will show him what I want to

2  show him, like, not my wife's pictures or bring a female lady

3  to look at it.

4  Q.   Mr. Ramadan, are guns one of your hobbies?

5  A.   Yes.

6  Q.   Even though guns are your hobbies, are you still afraid

7  of guns and people using guns on you?

8        MR. RAMADAN:  (In English) Can you repeat?

9  A.   Can you repeat?

10  BY MS. FITZHARRIS:

11  Q.   Even though guns are your hobbies, are you still afraid

12  of --- if people use guns on you?

13  A.   Yes.  If you carry a weapon it's not the same as someone

14  who's carrying against you.

15        THE COURT:  Excuse me.  If you carry a weapon it is

16  not the same as --

17  A.   As someone's carrying it against you or in front of you.

18        MR. RAMADAN:  (In English) In front.

19  BY MS. FITZHARRIS:

20  Q.   And why is that?

21  A.   Because, first of all, I was in isolated area, and all

22  of them that were around me they had guns, and they can do

23  anything they want, they can kill me.

24  Q.   Mr. Ramadan, why is it that when you have a gun on you

25  that's -- that's not as terrifying for you as if somebody

1   else has a gun, why is that?

2   A.   Because I can -- because I can defend myself when I have

3   it on me.

4   Q.   How large is your hard drive?

5   A.   Five terabytes.

6         MR. RAMADAN:  (In English) That's one of them.

7   A.   That's one of them.

8   BY MS. FITZHARRIS:

9   Q.   Okay.  The hard drive that the agents searched at the

10  airport, how large is that hard drive?

11  A.   Five terabyte.

12  Q.   As an example, how many hours of video could fit on one?

13  Do you know how many hours of video can fit on one terabyte?

14        MR. RAMADAN:  (In English) A lot.

15  A.   A lot.

16  BY MS. FITZHARRIS:

17  Q.   Do you have a guess, how many files are on your

18  five-terabyte hard drive?

19  A.   A lot, a lot, thousands maybe.

20  Q.   You know, when we received a copy of the hard drive from

21  the government you, Mr. Densemo and I, we sat down and we

22  looked at the hard drive, right?  How did we go through those

23  files?

24  A.   The first time?

25  Q.   Total.

1   A.   A lot, two days.

2   Q.   How long -- how many hours were we looking at the files?

3   A.   I did not count it but it was lots of hours, maybe

4   14 hours in total.

5   Q.   Were we able to look at every single file in that hard

6   drive?

7   A.   No.

8   Q.   Are ISIS videos the majority of the files on your hard

9   drive?

10   A.   The minority; they were, like, only a few.

11   Q.   What are kind of -- most of the -- if you were to say,

12   what's the majority of the files on that hard drive?

13        MR. RAMADAN:   (In English) Family.

14   A.   Family and personal family, cousins, areas, like areas.

15   Mostly it was family and personal.

16   BY MS. FITZHARRIS:

17   Q.   On your hard drive, besides these ISIS videos that

18   Mr. Waterstreet talked about, are there other videos or

19   photos of armed conflicts?

20   A.   Lots of armies in the world.

21   Q.   And why do you watch those videos?

22   A.   Just to see what's going on in the world because, like,

23   CNN and other channels they don't bring videos like that.

24   And if I knew that it was illegal I could have -- if it was

25   illegal I could have not watched it.

1  Q.  When you -- the officers at the airport were asking you

2  about the ISIS videos, did you explain to them why you

3  watched the videos and looked at the photos?

4  A.  After they forced me, yes.

5  Q.  And -- and what did they ask you or what did you say to

6  them?

7  A.  The same answer kind of.

8      MS. FITZHARRIS:  No further questions, Your Honor.

9      THE COURT:  Any recross?

10                    RECROSS-EXAMINATION

11  BY MR. WATERSTREET:

12  Q.  Mr. Ramadan, none of those guns the agents were

13  carrying, if they were carrying them, were ever pointed at

14  you, were they?  It is a simple yes or no, sir.

15  A.  Where, at the airport --

16  Q.  At the airport.

17  A.  -- or when they came to my house?

18  Q.  At the airport.

19  A.  No one pointed to me.

20  Q.  Okay.  And when you say you defend yourself with a gun,

21  you tried to get a concealed weapons permit but you were

22  denied a concealed weapons permit, were you not?

23      MS. FITZHARRIS:  Objection; relevance.

24      MR. WATERSTREET:  You brought it up.

25      THE COURT:  Sustained.  We don't need it.

| | |
|---|---|
| 1 | MR. WATERSTREET:  Okay.  Thank you. |
| 2 | THE COURT:  You may step down, sir. |
| 3 | MR. RAMADAN:  (In English) Thanks so much. |
| 4 | (Witness excused at 4:14 p.m.) |
| 5 | THE COURT:  Any other witnesses for the defense? |
| 6 | MS. FITZHARRIS:  No, Your Honor. |
| 7 | THE COURT:  Any other rebuttal for plaintiff? |
| 8 | MS. FITZHARRIS:  Although I will say, again, |
| 9 | there's that outstanding issue of Officer Brown's e-mails. |
| 10 | THE COURT:  There is an outstanding issue of -- |
| 11 | MS. FITZHARRIS:  Officer Brown's e-mails, right. |
| 12 | Mr. Waterstreet said that his office is going to check some |
| 13 | more because Officer Brown said he had e-mails. |
| 14 | THE COURT:  Okay.  Any other witnesses, |
| 15 | Mr. Waterstreet, Mr. Martin? |
| 16 | MR. WATERSTREET:  I don't believe we have anything |
| 17 | more, Your Honor -- |
| 18 | THE COURT:  Okay. |
| 19 | MR. WATERSTREET:  -- at this time except for |
| 20 | argument. |
| 21 | THE COURT:  You are going to look for the e-mails? |
| 22 | MR. WATERSTREET:  Yes, Your Honor. |
| 23 | THE COURT:  Okay.  And we have argument, and you |
| 24 | want to present briefs -- I want you to present briefs, but |
| 25 | you want to update your briefs based on recent law.  Do you |

1    want to argue today or do you want to come back?

2            MR. MARTIN:  We are prepared to argue today, Your

3    Honor.

4            MS. FITZHARRIS:  We are prepared to argue today,

5    but there are still a few outstanding kind of

6    discovery-related issues that actually haven't been wrapped

7    up, and would -- I guess our --

8            MR. MARTIN:  I'm sorry to interrupt, but I don't

9    know what those are.

10           MS. FITZHARRIS:  There is the issue -- Your Honor

11   never actually finally ruled on whether there would be any

12   sanction for Officer Armentrout's notes being destroyed that

13   included Mr. Ramadan's statements, and, you know, there are

14   things like that that I want to supplement the record on with

15   respect to the disclosure of the evidence that was ordered

16   compelled.

17           We also would like to renew our motion for some

18   sort of sanction for the discovery -- for the destruction of

19   the video based on the supplemented testimony and evidence

20   presented in these past two days.  I --

21           MR. MARTIN:  It is my recollection those motions --

22   the ones she's referring to, the destruction of the notes and

23   the motion regarding the video, have been denied, so those

24   are not pending now before the Court.

25           MS. FITZHARRIS:  The destruction of notes has not

1    been decided because Your Honor ordered the production of any

2    policies, and that was an outstanding issue that needed to be

3    resolved, and so I think we should be given --

4            THE COURT:  Did you get a policy?

5            MS. FITZHARRIS:  No, there is no policy, but we

6    should be able to argue about what that means with respect to

7    whether there should be any sanctions for the destruction of

8    Mr. Ramadan's statement in those notes.

9            MR. MARTIN:  Their request for the policy, Your

10   Honor, was separate from their separate motion to dismiss the

11   indictment because of the destruction of notes or some kind

12   of sanction on the government.

13           MS. FITZHARRIS:  There is a --

14           MR. MARTIN:  Both of those have been decided now.

15           MS. FITZHARRIS:  Your Honor, the issue of Mr. -- of

16   Officer Armentrout's notes was not decided at the previous

17   hearing because of this issue of the policy, and --

18           THE COURT:  Well, there is no policy.

19           MS. FITZHARRIS:  Well, I believe -- I'm requesting

20   the opportunity to argue how that plays -- how that court --

21   how this Court should consider whether there is a policy

22   whether there should be some sort of sanction for the

23   destruction of the notes.  If there is a policy that they

24   should destroy the notes, and he followed it, then the

25   concerns about bad faith or selective destruction of

```
 1    defendant's statements is less problematic, but because there
 2    is no policy whatsoever, and Officer Schmeltz is making
 3    independent judgments about which defendant's statements to
 4    keep, which to shred, I think there needs so be some more
 5    care taken --
 6                  THE COURT:  Okay.
 7                  MS. FITZHARRIS:  -- particularly when they are
 8    investigating a criminal -- any criminal conduct.
 9                  THE COURT:  Okay.  Now, Officer Schmeltz didn't
10    write the final report, right?
11                  MR. MARTIN:  Officer Schmeltz wrote the report
12    based --
13                  THE COURT:  On his notes, I mean?
14                  MR. MARTIN:  Based in part on his own knowledge,
15    because he was present during the interview, and then
16    Officer Armentrout's notes.  So they filed a motion for
17    sanctions against the government because of
18    Officer Armentrout's notes.  We filed a response in which we
19    argued they weren't entitled to the notes to begin with, they
20    are not discoverable under Rule 16.  We had an entire
21    argument about this last time, and the Court denied their
22    motion but ordered the government to look into whether or not
23    there was a policy regarding note retention.  There is no
24    policy regarding note retention.  That motion has been
25    denied.  That issue is done.
```

```
 1            I'm concerned that the defense wants to just
 2    relitigate -- it is an endless series of litigation regarding
 3    this suppression hearing.  It has to end.
 4            MS. FITZHARRIS:  Your Honor, we are responding
 5    to -- learning information about just how much evidence has
 6    been destroyed and suppressed and withheld from the defense
 7    all along.  We still just yesterday learned of more
 8    statements by officers for the government who -- that have
 9    not been provided to the defense.  These are responsive
10    motions because the government has not obliged by its
11    obligations.
12            If Your Honor would like to check the transcript to
13    determine whether there was any sort of sanction for the
14    destruction of Officer Armentrout's notes, which included
15    Mr. Ramadan's statements, I welcome that because I do not
16    believe that was resolved.
17            I think we are entitled, less the government argue
18    for appeal, that we have waived any further challenge or
19    request for sanction for the destruction of the video.  We
20    are renewing that motion because the record is more complete
21    now.  All right.  And we just -- this is a consistent pattern
22    in this case where the government has --
23            THE COURT:  Don't argue, don't argue, please.  If
24    you want time to argue I will give you time to argue, but you
25    are not getting twice.
```

1      MS. FITZHARRIS:  Okay.

2      THE COURT:  And I think we have resolved most of

3  these issues.  I mean, if there is --

4      MR. MARTIN:  We have.  We went through each motion,

5  motion by motion by motion at the last hearing.  And at the

6  end the Court said I think we've covered them all, and I

7  stood up and I said I agree, and the defense stood up and

8  said I agree.  And now she is saying, no, you didn't actually

9  rule on that, we want another bite at the apple.

10      My point is that we started this suppression

11  hearing in January.  It is now late May and they want to

12  continue the litigation, so it has to end.

13      THE COURT:  The Court will review the transcript on

14  that to see whether or not I will allow you any more argument

15  on the issue.

16      MS. FITZHARRIS:  If Your Honor does not want to

17  hear any argument about the videotape, we are preserving that

18  issue for appeal, and I just request the Court's indulgence

19  to make sure that my record is complete.

20      THE COURT:  I can't imagine your record is not

21  complete.

22      MS. FITZHARRIS:  I understand.

23      THE COURT:  Is there something else you want to put

24  on the record?

25      MS. FITZHARRIS:  There was something else I wanted

 1    to put on the record with respect to the disclosure of the

 2    agencies that the various officers worked for and the

 3    disclosure of when the -- about the policy.

 4         That was disclosed to us last Wednesday while the

 5    Sixth Circuit conference was going on.  The government knew I

 6    was out of town and attending that conference because we

 7    discussed it on the record, which means that I was not in the

 8    office until this Monday and therefore could not do any

 9    follow-up investigation -- neither one of us could do

10    anything with the untimely information.

11         That is information that, unlike Agent Thomas'

12    Giglio materials, that the government has had for a long

13    time.  There is really no excuse for disclosing it late.  And

14    the reason we asked for it, as we explained, was because we

15    would like to -- we wanted the opportunity to make -- to

16    receive the information, make any appropriate -- take any

17    appropriate investigative steps like an FOIA request or

18    assign an investigator to do that.  Given the late disclosure

19    in this case, we were not able to do anything with that

20    information.

21         You know, it is -- we would be derelict in our

22    duties as defense lawyers if we just trusted the government's

23    word and did nothing, particularly it has been proven in this

24    case.  So we asked for that information based -- because we

25    wanted to do something with it.  It wasn't just busy work.

```
 1    It wasn't just to prolong this evidentiary hearing.
 2    Mr. Ramadan has been in custody.  We do not want to prolong
 3    this any longer.  But we are doing it because there have been
 4    so many instances where the government has withheld or
 5    destroyed evidence that we needed to do our due diligence.
 6    We were deprived of that opportunity to do any follow-up
 7    investigation because the government has waited until the
 8    last minute on absolutely everything to.
 9         THE COURT:  So else -- what do you want to do?  You
10    tell me what you want to do.
11         MS. FITZHARRIS:  We are asking this Court to
12    sanction the government for --
13         THE COURT:  I'm not sanctioning the government over
14    what I have heard so far, but if there is something else that
15    you need you tell me what it is.
16         MS. FITZHARRIS:  We -- you know, we -- I'm making
17    my record with respect to prejudice.  We were not able to
18    investigate.  If it comes to light --
19         THE COURT:  Okay.  But what is it that you are not
20    able to investigate?
21         MS. FITZHARRIS:  We are not able to submit FOIA
22    requests or any kind of follow-up or ask or investigators to
23    do any background research into the officers who we've asked
24    the government to identify, or to follow up on the
25    government's claim that they don't have any policies.
```

```
 1    That --
 2            THE COURT:  Well, you can follow up --
 3            MS. FITZHARRIS:  And with respect to
 4    Agent Thomas --
 5            THE COURT:  Wait a second.  If you want to follow
 6    up now, I will give you time to follow up.  You want to wait,
 7    we can wait for argument.  How much time do you need to
 8    follow up?
 9            MS. FITZHARRIS:  FOIA requests take forever, that's
10    the problem, Your Honor.
11            THE COURT:  So you want me to give you forever
12    while your client is in jail?
13            MS. FITZHARRIS:  No, we do not but this is --
14            MR. MARTIN:  Your Honor, this is about a customs --
15            THE COURT:  Just a minute.  Let her continue.
16            MR. MARTIN:  Very well.
17            THE COURT:  So we are not going with a FOIA
18    request?
19            MS. FITZHARRIS:  Not a this time, Your Honor.  We
20    think it is more important that this gets decided at this
21    time, but as I said my point is to make a record of
22    prejudice.
23            THE COURT:  Okay.
24            MS. FITZHARRIS:  And we -- as far as other
25    sanctions that we've asked for everything with everything
```

```
 1    else, we'd request an --

 2              THE COURT:  Okay.  Tell me about that --

 3              MS. FITZHARRIS:  -- adverse ability interests.

 4              THE COURT:  Tell me about the sanctions.  One is

 5    about the video, and we don't even know there is a video.

 6    Nobody has testified that they regularly do videos.

 7              MS. FITZHARRIS:  Actually Officer Brown testified

 8    about videos.  He testified that he knows how to --

 9              THE COURT:  Ask somebody to do --

10              MS. FITZHARRIS:  I would suggest --

11              THE COURT REPORTER:  Ms. Fitzharris --

12              THE COURT:  Wait a minute.  I'm talking.  I get to

13    talk because I'm judge.

14              He asks -- he said he could ask somebody, but he's

15    never ever done a video all the time he's worked at the

16    airport.  It isn't like it is a regular thing and they just

17    didn't do it for this case.

18              MS. FITZHARRIS:  He said that they do it sometimes.

19    Officer -- Mr. Ramadan also testified that when he asked that

20    it be recorded, one, either Officer Schmeltz or

21    Officer Armentrout said it was recording.

22              THE COURT:  Well, that's what he is saying, and

23    what we know is there is no video.  Your record is made so

24    the record is clear, but the Court is not sanctioning the

25    government for not turning over a video that does not appear
```

```
 1    to have been made.  Okay.  What other item?
 2              MS. FITZHARRIS:  Again, there's the outstanding
 3    issue of Officer Armentrout's notes, and our overall
 4    concern --
 5              THE COURT:  Okay.  Officer Armentrout --
 6              MS. FITZHARRIS:  Armentrout's notes that include
 7    Mr. Ramadan's statements.
 8              THE COURT:  And he was to give those to the other
 9    officer who did the final report?
10              MS. FITZHARRIS:  He gave them to Officer Schmeltz,
11    who did the final report, and then Officer Schmeltz shredded
12    them.
13              THE COURT:  Okay.  Again, the Court is not
14    sanctioning on that.  It's a procedure -- the testimony is
15    that's what they do.  There is no rule that they have to keep
16    the notes, and they regularly don't keep the notes.  So the
17    Court is not going to sanction them for not having the notes,
18    but the record is clear that they didn't keep them, and it is
19    there for purposes of the appeal.
20              MS. FITZHARRIS:  All right, Your Honor.  Again, the
21    issue about the disclosure of the evidence ordered compelled,
22    and we are saying it was not disclosed in a timely fashion.
23    Your Honor has already said you are not sanctioning the
24    government for that, but to make clear that's the basis for
25    our concern in this case.  It was not disclosed in a timely
```

1    manner.

2              THE COURT:  Okay.  I'm sorry.  What particularly

3    was not disclosed, the evidence?

4              MS. FITZHARRIS:  The Giglio materials, the identity

5    of the agencies where all of these officers would were

6    involved in the investigation of Mr. Ramadan at the airport,

7    which agencies they worked for, and whether there is a policy

8    about the retention of notes during extended interviews like

9    this.

10             THE COURT:  Okay.  But the testimony has been -- or

11   I think what you just argued is there is no policy.

12             MS. FITZHARRIS:  Yes.  It is about the timeliness

13   of the disclosure, how late it was, and that's the issue.  I

14   understand Your Honor is not going to order sanctions, but

15   the issue is that it was not disclosed in time for the

16   defense to make use of it and to conduct appropriate

17   follow-up investigation.

18             THE COURT:  Okay.  The Court's not doing it.  I

19   think the timeliness we have discussed that before.

20             MS. FITZHARRIS:  And with respect to --

21             THE COURT:  And as I said, if there is something

22   that you think really would make a difference here I'm more

23   than willing to give you the time to do it.

24             MS. FITZHARRIS:  You know, we are good on this.

25   I -- we are good.

 1          And then the outstanding issue, we have made a

 2   motion for Rule 26.2 materials that Officer Brown wrote.  I

 3   request the Court order a deadline for the government to

 4   comply with the order to produce those e-mails just so that

 5   it isn't lingering for a very long time.

 6          THE COURT:  Well, Mr. Waterstreet, I believe, said

 7   he had all of the e-mails.

 8          MR. WATERSTREET:  Your Honor, to be clear, I have

 9   complied.  I've looked through them, I have not found any.

10   Out of courtesy to this Court and to defense counsel, I

11   looked at them again, and out of courtesy to this Court and

12   defense counsel I will look a third time for documents and I

13   will report back if there is anything more than that I have

14   found, but I have already complied.  I don't know what else I

15   can say.  I have looked through the documents, and I have not

16   found any documents that apply.  I will look again with

17   counsel -- with co-counsel and see if there's anything else,

18   but there's -- I don't know what else I can say, Your Honor.

19          THE COURT:  Well, the officer testified to having

20   sent some -- something.

21          MR. WATERSTREET:  I understand that, and because --

22   I requested him to send me all of his e-mails and I have

23   reviewed those e-mails.  Now, he may be confused but I looked

24   those over.  And I'm hoping that I'm not confused, Judge,

25   because I stand here before the Court saying that I have

```
 1    complied, but I -- out of respect for this Court I will look
 2    again, and I told the Court that's what I would do.
 3              THE COURT:  Well, I wonder if the officer has more
 4    e-mails that he hasn't turned over to you.
 5              MR. WATERSTREET:  I will ask him.
 6              THE COURT:  Will you ask him about that?
 7              MR. WATERSTREET:  I will ask him again.
 8              THE COURT:  All right.  And there was another thing
 9    that you wanted to make a record of you said today, and I'm
10    sorry, but I have forgotten what that was.
11              MS. FITZHARRIS:  Yes.  So it was about the problems
12    with the disclosure, and in particular the fact that it was
13    disclosed with government counsel knew I was out of town.
14    And that -- that's why --
15              THE COURT:  That was which disclosure now, the
16    agencies and the officers?
17              MS. FITZHARRIS:  The agencies, the policy and
18    frankly the Giglio materials.  You know, I would like to put
19    an objection on the record again to the protective order.  I
20    know we opposed it.  I don't think there was a sufficient
21    factual finding to enter a protective order in this case.  I
22    understand the Court's ruling, I'm just making my record.
23              THE COURT:  Okay.  All right.  I can give you
24    another date to come in to argue, or you can do it in
25    writing.  Mr. Martin?
```

1       MR. MARTIN:  I'm happy to do either, Your Honor;

2   whatever the Court's preference is.  If you want more

3   briefing.  As I understand it, the issues outstanding -- the

4   issues outstanding are search and seizure under the

5   Fourth Amendment, they filed a motion with respect to that

6   that's still outstanding.  They then filed a motion alleging

7   statements should be suppressed based on failure to give

8   Miranda under the Fifth Amendment, and then violation of the

9   due-process clause.  So there are sort of three different

10  bases for suppression that are outstanding.

11       And I'm happy to brief those.  Now the Court has

12  received on all of those topics briefing from both parties,

13  and so as I look at the docket I see the briefing is

14  complete, but I would be happy to supplement that if the

15  Court wishes.

16       THE COURT:  Well, you don't have to subpoena it

17  unless you don't argue, and you want to do an argument in

18  writing.  That's --

19       MS. FITZHARRIS:  I would actually prefer a written

20  argument after we have ordered the transcripts and can look

21  them over, and particularly given the developments in the

22  case law.  Like I said, they are happening rapidly, and there

23  has been as far as I know at least seven new opinions have

24  come out in various courts since I filed my briefs in

25  October, and I think that the -- it is worth being able to

1    develop those arguments in writing.

2            MR. MARTIN:  I think --

3            THE COURT:  How much time do you think you need

4    after the transcripts?

5            MS. FITZHARRIS:  I need to check my calendar and

6    double-check what my other appellate and Supreme Court

7    deadlines are, Your Honor.  I believe I could finish it up in

8    three weeks.

9            MR. MARTIN:  Your Honor, just as we were talking,

10   you know, I almost think -- and obviously this is for the

11   Court to decide, but I almost think an oral argument would be

12   better because then you can ask questions and there can be

13   some give and take.  What you are going to get with

14   additional briefing about the record is they are going to

15   cite to all of Mr. Ramadan's testimony and say that's the

16   facts, and we are going cite to the testimony that came out

17   in our case in chief and we are going to say those are the

18   facts, and then there is not going to be -- you are just

19   going to get two summaries of different testimony.

20            I almost think an oral argument would be more

21   useful to the Court because then you could ask questions and

22   there could be some back and forth rather than just

23   additional briefing because, like I said, I think the law has

24   kind of been covered by the briefs.  Both parties' briefs

25   were pretty lengthy.

```
 1              MS. FITZHARRIS:  I disagree with the
 2   characterization of what would be done.  There is actually
 3   significant overlap and there would be -- I think there are
 4   facts in both the government's case and testimony other than
 5   Mr. Ramadan's that support Mr. Ramadan's motion, and so --
 6              THE COURT:  Okay.  Just one minute.
 7              (An off-the-record discussion was held at
 8              4:34 p.m.)
 9              THE COURT:  Okay.  What I'm going to do -- this is
10   the middle of May.  Let's give Rob some time to do the
11   transcript.  Assume the transcript is done by June 8th.  I'm
12   going to have you submit briefing, if you wish, you don't
13   have to do this, but there are the new cases which the Court
14   is aware of some of those, if you want to address those you
15   can do that, but I'm going to also allow you to do oral
16   argument.  I would like the briefs first, so let's say the
17   29th.  And then we will set oral argument for --
18              MS. FITZHARRIS:  June 29th?
19              THE COURT:  June 29th.
20              MS. FITZHARRIS:  Okay.
21              THE COURT:  I'm just looking for a date for oral
22   argument.  Do you have any vacations planned anybody here?
23              (No response.)
24              THE COURT:  Okay.  I see we have some time on
25   July 10th in the morning.  How's that?
```

```
 1              MS. FITZHARRIS:  I'm available, Your Honor.

 2              THE COURT:  Okay.  Let's do July 10th then at

 3    10:00.  And I'm going to give each of you no more than

 4    40 minutes.

 5              MS. FITZHARRIS:  Okay.  How many pages for the

 6    briefs?

 7              THE COURT:  How many pages to brief?

 8              MS. FITZHARRIS:  Yes.

 9              THE COURT:  Well, your brief can't be any more than

10    20, but you don't have to use that all, and you don't have to

11    repeat what you have already have, I do have it --

12              MS. FITZHARRIS:  I understand.

13              THE COURT:  -- but I understand that there's new

14    things.

15              MS. FITZHARRIS:  Okay.

16              THE COURT:  But you can use 20 pages to do whatever

17    you want, and then we will do the oral argument.  There's

18    going to be no response to the briefs; it is each your own

19    individual briefs.  Okay.

20              MS. FITZHARRIS:  Okay.

21              THE COURT:  So we --

22              MS. FITZHARRIS:  Thank you, Your Honor.

23              THE COURT:  So we have that down to June -- let me

24    make sure -- what did I say, the 29th?

25              THE LAW CLERK:  29th.
```

```
 1              THE COURT:  June 29th for briefs, and July 10th for
 2   oral argument.  Okay.  Anything else?
 3              MR. DENSEMO:  Yes, Your Honor.
 4              MR. WATERSTREET:  Your Honor, one of the things the
 5   Court asked the government to check into as a request of
 6   Mr. Densemo was the allegations about misconduct at the Milan
 7   facility where Mr. Ramadan made a claim that an FBI agent
 8   attempted to go interview him while he was in custody.  Does
 9   the Court wish to hear about the FBI's investigation
10   concerning that matter at this time?
11              THE COURT:  In just a minute.  Let me hear what --
12   Mr. Densemo, you also have something?
13              MR. DENSEMO:  Yes, Your Honor.  We were going to
14   move for bond at this time.  Mr. Ramadan had consented to
15   detention, and he wanted to withdraw that consent, and he
16   wanted to request bond at this point in time.  This is --
17   Mr. Ramadan is charged with offenses that do not carry a
18   presumption.  There is a presumption that he should be
19   released.  The Court has heard testimony that Mr. Ramadan has
20   one misdemeanor conviction of several years ago.
21              We would ask the Court at this point to allow us to
22   argue for bond for Mr. Ramadan.  He does still have family
23   here.  And his sister is here and she's prepared to provide a
24   residence for him for their remainder of these proceedings.
25   He has been in custody for going on a year now awaiting his
```

1    opportunity to have this hearing.  And at this point we

2    believe that he should be released especially given the fact

3    that he's charged with a nonviolent offense that carries a

4    presumption that he should be released.

5         THE COURT:  You may file a written motion and we'll

6    have the pretrial look at it, and I will hear it.

7         MR. DENSEMO:  We will, Your Honor.

8         THE COURT:  Okay.  What happened at Milan?

9         MR. WATERSTREET:  Your Honor, at the hearing on

10   March 6th Mr. Densemo brought up an incident in which he

11   claimed that Mr. Ramadan had been attempted -- an FBI agent

12   attempted to interview him after he returned to the Milan

13   detention center after the first suppression hearing that

14   took place on January 30th, 2018.

15        He claimed that the agent took some of his legal

16   documents, and --

17        MR. DENSEMO:  I don't think that's right, Judge.

18   He didn't claim that the agent took a legal documents.  He

19   said that the agent attempted to talk him, he said, you know,

20   I'm represented by an attorney, Mr. Ramadan refused to speak

21   with him.  He did not say that agent took anything from him.

22        THE COURT:  Okay.

23        MR. DENSEMO:  So I don't know where Mr. Waterstreet

24   got that, but if I said it I was mistaken because that's not

25   what happened.

  1          MR. WATERSTREET:  Okay.  All right.  So, Your

  2    Honor, what the United States did is we had the FBI check

  3    into this matter.  And to give the Court a little bit of

  4    information here, we confirmed that on January 19th, because

  5    Mr. Ramadan had been involved in an incident with another

  6    inmate, he had been placed in a special housing unit, and he

  7    was temporarily transferred from January 30th from the FDC in

  8    Milan to the marshals for the suppression hearing, and that

  9    Mr. Ramadan returned to Milan on February 20th, 2018.

 10          So what we ask the agent to check into is since he

 11    returned to Milan on February 20th, 2018 until March 2016

 12    when the allegation was made, we asked the agent to check to

 13    see if there was any FBI agent that went to Milan facility to

 14    interview Mr. Ramadan because that was all the information we

 15    had because at the time Mr. Densemo didn't have the specific

 16    date.  He had a name of an individual.

 17          Well, according to the investigation, within two

 18    days after Mr. Ramadan returned, Milan staff found some

 19    graffiti, which appeared to be Arabic writing on the walls

 20    and floors of the detention facility.  And they were provided

 21    photographs -- those photographs, and I will provide those to

 22    counsel and the Court at this time.

 23          So as a result of finding this graffiti that was

 24    written in his detention cell, there was an internal

 25    investigation being conducted by the Bureau of Prisons.

1    On February 23rd the investigator observed similar
2  type of graffiti on the walls of Mr. Ramadan's cell where he
3  was -- and determined that the graffiti matched the same
4  graffiti that had been on the detention cell the previous
5  day, February 22nd.  And they found on the floor underneath
6  his mattress a notepad with Arabic writing and the name of
7  another inmate with an accompanying signature.  And as a
8  result of that, they took a photograph of those items on the
9  notepad because they did not know because they could not read
10  Arabic why an inmate seems to have a signature place for
11  something that was written in Arabic.

12    So what the staff did is what was underneath his
13  mattress -- excuse me, his -- underneath his mattress this is
14  where the notepad was.  They did not look in any of the legal
15  files that were being maintained by Mr. Ramadan, but it was,
16  in fact, a notepad that was under his mattress.  And it talks
17  about -- we have had it translated, Your Honor.  One of the
18  images that was written by Mr. Ramadan was free Palestine.
19  The other one was Islamic caliphate.  And then there is a --
20  and I'm not -- I don't necessarily have to put this into the
21  record, but the Court has a copy of the translation from that
22  notepad where the signature page -- there is a line for the
23  signature for James Jackson, which is a fellow inmate.

24    Now, they know that -- the staff has reason to
25  believe that it was Mr. Ramadan who was the one who wrote the

1   Islamic caliphate and free Palestine as well as this document

2   for the signature of James Jackson because his roommate --

3   his name is Angel Rodriguez Rivera, and they have no reason

4   to believe that Mr. Rodriguez Rivera understands or has the

5   ability to write in the Islamic language.

6          So I believe that perhaps Mr. Ramadan's discussions

7   about the events that took place at the Milan facility had to

8   do with an investigation being conducted by the Milan staff

9   into his violation of Milan rules by writing graffiti on the

10  walls and floors, and it was that follow-up investigation.

11         But we didn't stop there.  We then went to the

12  sign-in logs and there are sign-in logs at the federal

13  detention center and the correction institution at Milan.

14  There are two different facilities, the detention facility

15  and the institution.  Oftentimes people who violate the

16  provisions of the Milan detention facility are put in the

17  special housing unit inside the institution, and so they are

18  moved from one building to another.  So we checked both of

19  those records to find out any legal -- any -- they -- and

20  they maintain logbooks for people who come and visit.  They

21  have the civilian logbook, and in the civilian logbook they

22  have who the person is and what inmate they are going to see,

23  and they have to write in the date, time, their name, the

24  signature, and who they are going to see.

25         What it comes to law enforcement --

1          MR. DENSEMO:  Did an FBI agent come to see

2    Mr. Ramadan or not?

3          MR. WATERSTREET:  No, the short answer --

4          MR. DENSEMO:  Okay.  Thank you.

5          MR. WATERSTREET:  The short --

6          MR. DENSEMO:  Thank you.

7          MR. WATERSTREET:  I want to make sure the Court

8    understands that we took this --

9          MR. DENSEMO:  You have complied sufficiently with

10   our request, Mr. Waterstreet.  If an FBI agent did not come

11   and see Mr. Ramadan in violation of his constitutional

12   rights, we appreciate you conducting the investigation.

13         MR. WATERSTREET:  And I just want the Court to be

14   clear that we didn't brush this off.  We made a very thorough

15   investigation.

16         THE COURT:  Okay.

17         MR. WATERSTREET:  So Mr. Ramadan's allegations of

18   an Agent Szegarski having come to visit him, claiming he was

19   an FBI agent, and wanting to interview him have been

20   established as being totally false.

21         THE COURT:  All right.  And you aren't asking for

22   any hearing or anything; you are going to accept the

23   statement?

24         MR. DENSEMO:  No, Your Honor.  Mr. Ramadan wants to

25   indicate that he did not make a false statement about this.

1  That an agent he believed to be from the FBI attempted to see

2  him, and he refused to talk to him.  If the U.S. Attorney's

3  Office said they checked the logbooks, and they've checked

4  with the FBI, and there is no Agent Szegarski or someone by

5  that name that attempted to see Mr. Ramadan on the date that

6  we've talked about, then I guess we the have to accept the

7  U.S. Attorney's Office's representation.

8          MR. WATERSTREET:  Well, Your Honor, there are three

9  agents that have somewhat similar names.

10          MR. DENSEMO:  Did any of them attempt to see

11  Mr. Ramadan?

12          MR. WATERSTREET:  None of those three -- all of

13  three of those were interviewed, all three of them did not

14  ever go to see Mr. Ramadan, and there is no record of any of

15  those three there during any of that time period.

16          THE COURT:  Okay.

17          MR. DENSEMO:  Thank you.

18          THE COURT:  All right.  Thank you.  That will be

19  it.  Court is adjourned.

20          THE LAW CLERK:  All rise.

21          (Proceedings concluded at 4:48 p.m.)

22                    —   —   —

23

24

25

1                                    CERTIFICATION

2

3              I, Robert L. Smith, Official Court Reporter of

4    the United States District Court, Eastern District of

5    Michigan, appointed pursuant to the provisions of Title 28,

6    United States Code, Section 753, do hereby certify that the

7    foregoing pages comprise a full, true and correct transcript

8    taken in the matter of UNITED STATES OF AMERICA vs. YOUSEF M.

9    RAMADAN, Case No. 17-20595, on Thursday, May 24, 2018.

10

11

12                             *s/Robert L. Smith*
                               Robert L. Smith, RPR, CSR 5098
13                             Federal Official Court Reporter
                               United States District Court
14                             Eastern District of Michigan

15
     Date:   06/08/2018
16   Detroit, Michigan

17

18

19

20

21

22

23

24

25