Case 2:17-cr-20595-VAR-EAS  ECF No. 98  filed 07/31/18  PageID.1887  Page 1 of 89
*Evidentiary Hearing/Motion for Bond • July 10, 2018*

1

1                         UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF MICHIGAN

2                           SOUTHERN DIVISION

3                         — — —

UNITED STATES OF AMERICA,

4

             Plaintiff,

5

6   vs.                          Case No. 17-20595

YOUSEF RAMADAN,            Hon. Marianne O. Battani

7

             Defendant.

8  _____/

9            EVIDENTIARY HEARING/MOTION FOR BOND

10        BEFORE THE HONORABLE MARIANNE O. BATTANI
              United States District Judge

11     Theodore Levin United States Courthouse
          231 West Lafayette Boulevard

12             Detroit, Michigan
          Tuesday, July 10, 2018

13

14  APPEARANCES:

15  For the Plaintiff:    RONALD W. WATERSTREET
                       MICHAEL M. MARTIN

16                  HANK MOON
                     U.S. Attorney's Office

17                211 W. Fort Street, Suite 2001
                     Detroit, MI 48226

18                (313) 226-9100

19  For the Defendant:    ANDREW DENSEMO
                       COLLEEN P. FITZHARRIS

20                Federal Defender Office
                     613 Abbott, 5th Floor

21                Detroit, MI 48226
                     (313) 967-5555

22  Also Present:        Elias Younes, Interpreter

23

24     *To obtain a copy of this official transcript, contact:*
        *Robert L. Smith, Official Court Reporter*

25     *(313) 234-2612 • rob_smith@mied.uscourts.gov*

1                        TABLE OF CONTENTS

2     WITNESSES:                                          PAGE

3     (No witnesses called)

4

5

6

7

8

9

10    EXHIBITS:                                       RECEIVED

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Detroit, Michigan

2  Tuesday, July 10, 2018

3  at about 1:06 p.m.

4            _   _   _

5        (Court, Counsel and Defendant present.)

6        THE CASE MANAGER:  Please rise.

7        The United States District Court for the Eastern

8  District of Michigan is now in session, the Honorable

9  Marianne O. Battani presiding.

10        You may be seated.

11        The Court calls Case No. 17-cr-20595, United States

12  of America vs. Ramadan.

13        THE COURT:  All right.  Just one minute, please.

14  May I have your appearances, please?

15        MR. MARTIN:  Good afternoon, Your Honor.

16  Michael Martin, Ronald Waterstreet, and Hank Moon for the

17  government.  And with us today is Darlene Secord, our

18  paralegal, and FBI Special Agent John Brant.

19        MR. DENSEMO:  Andrew Densemo on behalf of

20  Mr. Ramadan, Your Honor.

21        MS. FITZHARRIS:  Colleen Fitzharris on behalf of

22  Mr. Ramadan.

23        THE COURT:  All right.  We have an interpreter?

24        THE INTERPRETER:  Yes, Your Honor.

25        THE COURT:  Okay.  Would you please give your name

Case 2:17-cr-20595-VAR-EAS ECF No. 98 filed 07/31/18 PageID.1890 Page 4 of 89
Evidentiary Hearing/Motion for Bond • July 10, 2018

4

1   to the reporter.

2           THE INTERPRETER:  Elias Younes, E-L-I-A-S,

3   Y-O-U-N-E-S.

4           THE COURT:  Would you swear in the interpreter,

5   please, Jim.

6           THE CASE MANAGER:  Do you solemnly swear that you

7   will interpret accurately and completely from the Arabic

8   language to the English language and English to Arabic using

9   your best skill and judgment?

10          THE INTERPRETER:  I will.

11          THE COURT:  All right.  We have a motion by

12  defense, so you may proceed.

13          MR. DENSEMO:  Your Honor, today was the date and

14  time set for oral argument on the motions that have been

15  filed.  We are asking the Court to adjourn those oral

16  argument because of the additional discovery that had been --

17  that has been provided to defense on June 28th.

18          As the Court's well aware, the defense has been

19  pressing the government to provide all of the discovery to

20  which it is entitled for the past several months.  There has

21  been a continuing issue regarding the FBI -- regarding the

22  agents, all of the agents, the FBI agents, Homeland Security

23  agents, CBP officers, the communications that they were all

24  engaged in around the time of the initial investigation of

25  this case in August 15th, 2017.  The defense has always

1    believed that there were multiple communications that were

2    sent back and forth between the agents as they communicated

3    about the Ramadan investigation.

4         We were given discovery by the government.  Upon

5    reviewing that discovery we surmised that there had to be

6    additional communications between the officers based upon the

7    nature of what was being stated in the e-mails and the text

8    messages, and so we pursued this and we indicated to the

9    government there has to be more -- there are other additional

10   e-mails, there are additional text messages that these agents

11   generated because you can tell from the responses in the text

12   messages and the e-mails themselves.  The government insisted

13   that, no, we have given you everything.  And we filed motion

14   after motion because we were convinced that there were other

15   e-mails involved in this case, other text messages, and the

16   government still insisted that there weren't.

17        It was only after the Court ordered the government

18   to look further that the government found additional e-mails.

19   And when we received those e-mails we indicated to the

20   government, look, look at the e-mails that you sent us, look

21   at the test messages that you sent us, these messages are all

22   responsive e-mails.  They are asking for other responses.

23   And clearly there are -- there's additional information that

24   you haven't provided.

25        The government again insisted in open court that

```
 1    there weren't any -- there wasn't any additional information,
 2    that they had given the defense everything.  That then had
 3    conducted a thorough investigation and that they weren't
 4    aware or apprised of any additional e-mails or text messages
 5    that had sent.  And at our last hearing the Court again aided
 6    the defense and said, look again, see if there is anything
 7    else there.  And lo and behold we get this last set of
 8    e-mails again from the agents discussing at length the
 9    Ramadan case.
10         And what really surprised us, Your Honor, is
11    despite the government's protestations to the contrary, not
12    only were there a number of additional e-mails about the
13    Ramadan investigation, I think the Court was cc'd on the
14    June 28th, 2018 letter.  And I don't know if the Court --
15         THE COURT:  I have it.
16         MR. DENSEMO:  -- received the attachments.
17         THE COURT:  I did.
18         MR. DENSEMO:  The Court probably saw, as I did --
19    initially I paid no attention to it, and then co-counsel
20    Ms. Fitzharris indicated to me that Michael Martin's name is
21    on -- is cc'd in these e-mails, as well as Jonathan Tukel,
22    who used to be, I believe, the head of the U.S. Attorney's
23    Office Counterterrorism Unit.  So these e-mails which
24    contained the names of the U.S. Attorneys have been in the
25    possession of the U.S. Attorney's Office and these federal
```

Case 2:17-cr-20595-VAR-EAS  ECF No. 98  filed 07/31/18  PageID.1893  Page 7 of 89
*Evidentiary Hearing/Motion for Bond • July 10, 2018*

7

1    agents some from as late of August of 2017, August 21st, I

2    believe, 2017, or thereabouts.  So the government can't claim

3    as they have in the past that they were unaware of any

4    e-mails involving the Ramadan investigation or any additional

5    e-mails that were sent and received by the agents in this

6    case because they participated in the e-mails.  They were

7    cc'd on the e-mails.  They knew about them.  They were aware

8    of all of these e-mails that were sent.

9           These agents testified on the stand that they had

10    provided all of the e-mails, that they were unaware of any

11    additional e-mails.  The government indicated time and time

12    again there isn't anything else, we have looked, Judge, we

13    are tired of looking.  And it was only because a federal

14    judge told them to keep looking that they kept looking and

15    they kept digging, they kept providing additional

16    information.

17           Judge, if you hadn't intervened we wouldn't have

18    gotten any of this stuff.  We would have been told -- we

19    would have been stonewalled like we have been stonewalled

20    throughout the past nine months.

21           And the e-mails that we've gotten, Judge, are

22    redacted to the point where we don't know what's in those

23    e-mails.  We want complete information.  We won't complete

24    unredacted e-mails.  I sent the U.S. Attorney's Office an

25    e-mail telling them to send us complete information, give us

Case 2:17-cr-20595-VAR-EAS  ECF No. 98  filed 07/31/18  PageID.1894  Page 8 of 89
*Evidentiary Hearing/Motion for Bond • July 10, 2018*

8

1     complete information, unredacted information.  The

2     government's response was well, that's privileged

3     information, you don't need to see that, that's not Jencks.

4           At this point in time, Judge, I don't trust

5     anything that these prosecutors and these agents are telling

6     me about this investigation because I have had to go to the

7     Court too many times to get the discovery that we are

8     entitled to.  I have had to go to the Court too many times to

9     get accurate information.  And now I'm looking at page after

10    page of redacted e-mails, some of these redactions take up

11    half the page, and I'm supposed to believe it is unimportant,

12    that it doesn't relate to this investigation, that I'm

13    supposed to trust the government who says, oh, we've reviewed

14    it and you can trust us, it has nothing to do with any of

15    this.

16          My intent -- Mr. Ramadan has not received effective

17    assistance of counsel because we have not been given the

18    information that he needs his attorneys to have in order to

19    effectively represent him either this in terms of

20    consultation with him, advice, or after the hearings that

21    been conducted -- the multiple hearings that have been

22    conducted.  All of this information should have -- all of

23    this is relevant information that went to the heart of the

24    suppression issues that we were discussing with the Court,

25    that we were asking the Court to litigate, and we time and

1    time again we either get it late or we don't get it at all,

2    and we don't know at this point what else is out there.

3            My intent, Judge, is to file a motion to dismiss

4    this case based upon outrageous government conduct.  We have

5    looked at the transcripts.  These agents have, in my view,

6    committed perjury.  They have lied about their investigation.

7    They have indicated -- they have committed falsehoods before

8    the -- on the witness stand.  And to the U.S. Attorneys, I

9    don't know, but what I do know is I have gone through the

10   transcripts and these agents have said things under oath that

11   were not true, and their e-mails bear it out, the e-mails

12   that they were reluctant to turn over to the government.

13           Co-counsel, Ms. Fitzharris has spent hours -- spent

14   her vacation days preparing the supplemental brief in this

15   case.  That brief was prepared and filed I believe either a

16   day before or a day after we received this additional

17   information.  That brief probably should not have been filed

18   without this additional information because there's valuable

19   information in these e-mails that should have been included

20   in the supplemental brief, but because of the delay in

21   providing it to the defense it was not included.

22           So, again, Mr. Ramadan hasn't gotten the best

23   counsel -- the best legal representation he should have

24   gotten because of the government's -- because of the dilatory

25   manner in which we have been dealt with in this case, and, in

1  fact, probably, you know, the disrespectful manner in which

2  we have been dealt with in this case, Your Honor.  We

3  shouldn't have to come hat in hand to the Court every time

4  begging the Court to make them do what they are supposed to

5  do.  We shouldn't have to say, oh, you only respect

6  Judge Battani, you don't respect us, so you are not going to

7  give us anything until Judge Battani tells you to.  And as a

8  result, we have not been able to effectively represent this

9  man because of all of the things -- Judge, you know we filed

10  motion after motion after motion in this case, and it is

11  because we are trying to do our jobs properly, and we haven't

12  been able to do that because of the manner in which this

13  prosecution has been handled.

14          At this point, Judge, we would be even more

15  effective -- ineffective if we were to proceed to oral

16  argument in this case based upon the posture of this case

17  right now.

18          The government offered to bring in Agent Brown to

19  testify about his e-mails, but this goes beyond Brown, Your

20  Honor.  This involves everybody; Armentrout, Schmeltz,

21  Thomas, Kelley, every agent -- all of these e-mails relate to

22  all of these agents.  We would have had to start from the

23  beginning, and they wanted to just bring in Brown.  This goes

24  beyond -- this would be a monumental undertaking, Your Honor,

25  to go back and start this thing all over again, which is

 1    probably what is required at this point.

 2              THE COURT:  Okay.  Let's hear what the government

 3    has to say.  Mr. Waterstreet.

 4              MR. WATERSTREET:  Yes.  Thank you, Your Honor.

 5              Your Honor, if the Court recalls at the last

 6    suppression hearing the Court asked for me to check to see if

 7    there were any e-mails concerning agent -- Officer Brown, and

 8    I promised the Court that I would do that.  After reviewing

 9    the materials I came across three e-mails that were not

10    previously provided, and they were part of the packet that I

11    provided to defense counsel.  One of them was an e-mail

12    from --

13              THE COURT:  Which one?  Let me see.

14              MR. WATERSTREET:  This would be from James Brown.

15              THE COURT:  Okay.  August 24th?

16              MR. WATERSTREET:  This is the one of August 23rd,

17    Your Honor, which says when he was asked what the name of the

18    subject was it was Yousef Ramadan.

19              THE COURT:  Wait a minute.  Wait a second.  I want

20    to find it.

21              MR. WATERSTREET:  I will hand it up.

22              THE COURT:  I have it here.  I've got it, it was

23    just out of order.

24              MR. WATERSTREET:  The second one --

25              THE COURT:  What is the subject's name?  Okay.

 1    This is of no import.

 2              MR. WATERSTREET:  Correct.

 3              MR. DENSEMO:  Excuse me, Judge.  I don't mean to

 4    interrupt but --

 5              THE COURT:  Yes.

 6              MR. DENSEMO:  Your Honor, would the Court mind if

 7    one of Mr. Ramadan's wrists were uncuffed so he could take

 8    notes?

 9              THE COURT:  All right.  That would be fine.

10              MR. DENSEMO:  Thank you, Judge.

11              MR. WATERSTREET:  The second one, which was

12    provided, was an e-mail of what passport was the defendant

13    using, and the answer is, he was using his U.S. passport.

14    And that one is one that is dated August 28th, which is

15    several days after the incident but they are talking about

16    the incident.

17              The third one is an e-mail that starts -- that's

18    dated August 24th, and it starts off, just a quick note about

19    the case.

20              THE COURT:  Just one minute while I find that,

21    please.

22              MR. WATERSTREET:  I have a copy for the Court.

23              THE COURT:  Okay.

24              MR. WATERSTREET:  And the Court will note that I

25    highlighted it in a particular way, and I will give counsel a

 1    copy as well.

 2         And this is -- this is an e-mail which is a cut and

 3    paste from Schmeltz's report, that was provided to defense

 4    back in August of 2017.  And if the Court will note by

 5    looking at the report of Officer Schmeltz and comparing that

 6    to the e-mail of Officer Brown, you can see what paragraphs

 7    he cut and pasted from that report to update his supervisor

 8    as to what events took place on August 24th according to

 9    Officer Schmeltz.

10         So if the Court will note, the first paragraph,

11    which I have marked as A in the e-mail, you will find that

12    same paragraph word for word appearing in the same

13    highlighted marked area as A in the -- in the report of

14    Officer Schmeltz.

15         If we go to the next paragraph of Officer Brown's

16    e-mail, we will see what I have marked as paragraph B.  Go to

17    Officer Schmeltz's report and you will find the same words

18    word for word in paragraph B.

19         If we move now to paragraph C of Officer Brown's

20    report, we will see what I have marked as paragraph C from

21    Officer Schmeltz's report word for word taken and lifted from

22    that report.

23         And the same thing goes for paragraph D.

24         So, Your Honor, from this -- from this e-mail that

25    defense says they have not been able to prepare and not been

Case 2:17-cr-20595-VAR-EAS  ECF No. 98  filed 07/31/18  PageID.1900  Page 14 of 89
Evidentiary Hearing/Motion for Bond • July 10, 2018

14

1  able to give advice, the only new information they have is,

2  "Sir, just a quick note about the case", and then the last

3  sentence is, "Thank you for your support.  CBP is a main

4  player in this case."

5           They have certainly known the subject's name

6  Mr. Ramadan, and they have certainly known that he is -- he

7  flew on a U.S. Passport because that was part of the report

8  that was provided back in August of last year.  So I believe

9  counsel may be overstating the import of these documents that

10  were provided.

11           Defense is correct, they've made a lot of requests

12  of this Court to provide what they term is discovery.  Each

13  and every time we have filed a response, and the Court has

14  determined they are not entitled to the items they are

15  requesting.  What we are talking about right now is Jencks

16  material, simply straightforward statements made by the

17  witness who testified that are subject matter of their

18  testimony.

19           When finding these documents we handed them over,

20  and we even made the offer to have Officer Brown available to

21  testify to clear up these important new findings of the

22  defendant's name and that he traveled under a passport --

23  U.S. Passport.  All the other information -- when I said

24  somewhat tongue and cheek about the defendant's name and that

25  he traveled under U.S. Passport, is all the information they

1    had from the very beginning of this case, long before this

2    case was even indicted they have had this information.

3              THE COURT:  Okay.  How about these other documents?

4              MR. WATERSTREET:  As to these other documents, Your

5    Honor, several of these statements we believe are not

6    discoverable in any way, shape or form, but we provided to

7    them out of an abundance of caution.

8              For example, if the Court will recall part of the

9    delay in this matter was that the defense wanted to call

10   Officer Brown and Agent Thomas to testify.  As part of that

11   process of giving -- having federal agents testify on their

12   behalf, they had to file what is call a Touhy letter, and in

13   that Touhy letter defense outlined under a sworn statement in

14   an affidavit the subject matter of their testimony.  And we

15   went over that subject matter of their testimony and looked

16   at it very closely, and based upon what defense counsel said

17   they were going to ask them questions about, we provided all

18   of necessary Jencks material to counsel so that they would be

19   able to cross-examine -- or do a direct examination and the

20   Court gave them permission to do a cross-examination to be

21   able to challenge them on any statements that were the

22   subject matter of the areas they said they were going to ask

23   them about.

24             In the process of providing the testimony, defense

25   counsel went beyond what he promised and swore that he would

 1    only ask questions about and went into other matters, and

 2    those other matters had to do with the defendant's sister,

 3    and that was beyond the scope of the Touhy information.

 4          But we went back, we looked over any e-mails, any

 5    conversations whatsoever that had to do with the defendant's

 6    sister, and we provided those additional documents.  So this

 7    was as a result of what defense counsel did, it certainly

 8    wasn't anything that the government did.

 9          Some of the other documents were some documents --

10    if I may take it a step back, Your Honor.  As a result of

11    going through Officer Brown's and finding those three

12    e-mails, we made a concerted effort to go through and start

13    the process anew.  We went to their legal counsel, we went to

14    their supervisors, we went to the officers and the agents

15    themselves, and had the process start all over again because

16    we did not want to be in this situation where we are right

17    now where defense counsel is making claims saying we are

18    trying to hide anything.

19          So after this full review once again we came across

20    a set of three reports that were issued as a result of the

21    events that took place in August of last year when the

22    defendant was at the secondary inspection.  Those reports --

23    and if the Court wishes I could go over those in the same

24    manner I went over Officer Brown's, one is a review of media

25    report and the other is a seizure report.  And effectively,

 1    Your Honor, it is the same document that was provided back in

 2    August 29th, 2017 to defense counsel, it is the same

 3    information but just put in a slightly different format.  The

 4    items that were seized, the items that we reviewed, it's the

 5    same factual statements based upon the report of

 6    Officer Schmeltz back in August of 2017 that was provided to

 7    defense counsel.

 8            We told defense counsel if there were any questions

 9    to please let us know, and we provided that information to

10    them.  And in response to Mr. Densemo's request, we pointed

11    out that some of the redacted materials that he was

12    requesting were not Jencks material because they are

13    questions or statements of somebody else asking a question.

14    And some of these --

15            THE COURT:  The statements of what?  I'm sorry.

16            MR. WATERSTREET:  These are not Jencks materials

17    because they are -- let me take for an example, I write an

18    e-mail to you and I ask you what time did you get home.  My

19    question to you is not a Jencks because it's the answer that

20    you give because you are the person who is making the

21    statement, and you say I got home at 12:00 noon.  That is the

22    material that is not necessarily discoverable under Rule 16

23    but it is the Jencks Act material.

24            And so when counsel's suggesting that we are

25    improperly redacting items, there are some certain items that

1    were taking place several days after this event when we were

2    trying to get search warrants where all -- attorneys from our

3    office were asking questions about, you know, did you talk to

4    so-and-so, did you see so-and-so, and so we are giving the

5    answers back, we provided those answers, but not the

6    attorney-client privileged information that was going on

7    between the U.S. Attorney's Office and the agents.

8            So these are statements that were -- are of people

9    who are not even witnesses in the case that have been

10   redacted.  They touch upon subsequent events which were not

11   subject of the witness's testimony, and is personal

12   information such as phone number, e-mail addresses, record

13   numbers.

14           And, Your Honor, we can solve this problem very

15   quickly since the Court is the trier of fact in this case,

16   the determinative of whether to believe the witnesses or not,

17   we can provide to this Court a copy of the unredacted e-mails

18   that have been provided to defense counsel for the Court to

19   decide is this something that is so important that it is, in

20   fact, Jencks material, the Court can decide that.

21           But, Your Honor, based upon our reading of the

22   statements, our understanding of the law, these items are not

23   subject under the Jencks Act.  And we have tried to go above

24   and beyond to try to avoid this problem.  And to try to

25   prevent any further delay we asked counsel -- we told counsel

```
 1   we will have agent -- excuse me, Officer Brown available if
 2   they want to cross-examine him, and we have him available
 3   now.  And in the abundance of caution we have every single
 4   witness that is subject to anything that has been provided
 5   concerning any Jencks material available as well because we
 6   want to put this matter to rest.
 7          THE COURT:  What they are saying is they don't
 8   believe you as to what has been redacted.
 9          MR. WATERSTREET:  I understand that, and I will
10   give the Court the unredacted copies.
11          THE COURT:  I do want the unredacted copies.
12          MR. WATERSTREET:  Hopefully the Court will see what
13   I have just pointed out.  These are statements of people who
14   are not witnesses, they touch upon events that were not
15   subject to the witness's testimony, and is like personal
16   information such as phone numbers, e-mail addresses, record
17   ID numbers and things like that.
18          THE COURT:  Okay.  I will review these, and I guess
19   we will have to set another date after I review them.
20          MR. WATERSTREET:  And --
21          THE COURT:  Which I hate to delay this but --
22          MR. WATERSTREET:  I agree, Your Honor.  I
23   understand -- I don't want any error in this record at all,
24   but I want the Court to be mindful of the fact that we have
25   been doing our best to provide everything here.  There are --
```

1    those three documents, Your Honor, I will take full

2    responsibility for those three documents from Officer Brown.

3    Those are on my shoulder and my shoulder alone.  Those items

4    were on a disk that was misplaced in my office, I moved

5    offices twice during the pendency of this case.  And I tore

6    my office apart as well as an old office on another locker

7    area and ended up finding that disk, and that's where we

8    ended up with those three additional -- three additional

9    e-mails.

10           THE COURT:  Well, let me just say as to the

11   unredacted copies, maybe I can just take a minute and look at

12   them right now.

13           MR. WATERSTREET:  Okay.

14           THE COURT:  As to the first, which is the letter

15   from - yes, from August 24th from Mr. Brown?

16           MR. WATERSTREET:  Yes, Your Honor.

17           THE COURT:  And it is the bottom paragraph.

18   Basically it only lists the items that were taken from the

19   storage locker.

20           MR. WATERSTREET:  Correct, Your Honor.

21           THE COURT:  Which defendant knows.

22           MR. WATERSTREET:  Which defendant knew and were not

23   subject of any of this hearing because it was the events that

24   took place --

25           THE COURT:  Okay.  The Court is not going to have

Case 2:17-cr-20595-VAR-EAS ECF No. 98 filed 07/31/18 PageID.1907 Page 21 of 89
*Evidentiary Hearing/Motion for Bond • July 10, 2018*

21

1    you give that, there is no need, it is information that he

2    knows.

3            Okay.  What's the next -- okay.  You will have to

4    advise me, is this -- is there redacted material or is this

5    just the way it is copied?

6            MR. WATERSTREET:  That's just the way it is, Your

7    Honor.  That's a text message.

8            The next one is from one dated August the 16th.

9    And if the Court will look at the bottom of that page, it is

10   the office and cellphone number of the officer that was

11   removed.

12           THE COURT:  I can't seen find it.  Hold on.

13           MR. WATERSTREET:  It was the one right after the

14   text message, Your Honor.

15           THE COURT:  Okay.  Excuse me one second.  I'm

16   sorry.  I'm not used to working here and I can't quite get

17   comfortable.  It is keeps falling off.  Okay.  The next one

18   is August the 16th.

19           MR. WATERSTREET:  If we take a look at this

20   e-mail --

21           THE COURT:  Pardon me?

22           MR. WATERSTREET:  If we take a look at this e-mail

23   from Michael -- -

24           THE COURT:  Wait a minute.  I'm still having a hard

25   time finding where this e-mail is.

```
 1                MR. WATERSTREET:  Okay.

 2                THE COURT:  Got it.

 3                MR. WATERSTREET:  If the Court will take a look at

 4     this, this is again -- I can show the Court again, this is

 5     nothing more than a cut and paste from the report of

 6     Officer Schmeltz saying how many hard drives Mr. Ramadan was

 7     providing.  If the court wishes I can --

 8                THE COURT:  Let me just state for the record what I

 9     see here crossed out, I'm going back now to the August 16th

10     ones, are identifying like e-mail addresses.

11                MR. WATERSTREET:  E-mail addresses, telephone

12     numbers, yes, Your Honor.

13                THE COURT:  That's true on August 16th.  Now we get

14     to a bigger one, which is September 1st.  Let me find that.

15                MR. WATERSTREET:  And those are his classified

16     e-mail addresses, Your Honor.

17                THE COURT:  How would you classify what is on

18     9/1/17, page 1, on the bottom?

19                MR. WATERSTREET:  Just give me a second to try to

20     find that one.

21                THE COURT:  It was just a question of the --

22     regarding the passports.

23                MR. WATERSTREET:  9/1/17, this is a -- this is not

24     Jencks material because this is a question of somebody else,

25     so this would not be a statement of Agent Thomas, Your Honor.
```

1        THE COURT:  And the statement of the person who

2   wrote this as to what they are interested in, that would not

3   be Jencks material?

4        MR. WATERSTREET:  Correct.  The answer that was

5   given, which is at the top, that is not redacted in any way,

6   shape or form, is the statement --

7        THE COURT:  Right, and it does answer it exactly.

8        MR. WATERSTREET:  Correct.

9        THE COURT:  All right.  Thank you.  So that does

10  not come in.

11       The next one is dated August 21st.

12       MR. WATERSTREET:  Correct.

13       THE COURT:  That's just the names and telephone

14  numbers and the question and the answers given exactly, so

15  that doesn't come in.

16       MR. WATERSTREET:  Correct.

17       THE COURT:  Another August 21st, that whole middle

18  part is names and e-mails addresses, et cetera, telephone

19  numbers, so that doesn't come in.  Then the bottom part of

20  the next page -- Mr. Densemo, are you following where I am?

21       MR. DENSEMO:  Yes, Your Honor, I am.

22       THE COURT:  Again, these are just lists of one

23  question, which is on the top answered, and then the others

24  they are just names and e-mail addresses.

25       The next page is November 1st, the top part again

```
 1   is the telephone number, e-mail addresses, e-mail addresses,

 2   e-mail addresses, so that's fine.  The next one is simply a

 3   continuation of that.

 4           Okay.  Now, I am up to where it says on a sidenote

 5   in the middle and down below.  Let me read that.

 6           MR. WATERSTREET:  And that actually has to do with

 7   something that's totally unrelated to this case, Your Honor,

 8   which was --

 9           THE COURT:  Oh, something about a Dodge, et cetera.

10   It has nothing to does with this.

11           MR. WATERSTREET:  Correct.

12           THE COURT:  Okay.  That doesn't come in.  Okay.

13           MR. WATERSTREET:  So all of the --

14           THE COURT:  The next page is just -- there is one

15   blackout and that's just an ID number.

16           MR. WATERSTREET:  Correct, Your Honor.

17           THE COURT:  Is there anything else blacked out on

18   these pages?

19           MR. WATERSTREET:  I don't believe so but I will go

20   through each page.  Not until page 10, which is the date of

21   birth of Jeanine Ramadan, the dates of births of the

22   defendant's children because --

23           THE COURT:  Okay.

24           MR. WATERSTREET:  And then -- then there's -- on

25   the two-page document there's the one redaction, and it is
```

Case 2:17-cr-20595-VAR-EAS  ECF No. 98  filed 07/31/18  PageID.1911  Page 25 of 89
*Evidentiary Hearing/Motion for Bond • July 10, 2018*

25

 1     the encounter number that was assigned.

 2              THE COURT:  Okay.

 3              MR. WATERSTREET:  So --

 4              THE COURT:  That's all I see.

 5              MR. WATERSTREET:  Right.  And so based upon defense

 6     counsel's statement is the -- he could not move forward or

 7     give advice to his client based upon the redacted

 8     information, as the Court sees there's really nothing of any

 9     moment in any of that redacted information that would have

10     prevented him from giving the advice that he's given his

11     client all along.

12              THE COURT:  All right.  I agree from what I see,

13     and there is nothing new added here, and even though these

14     documents were not turned over there has been an explanation,

15     there's nothing wrong with this.

16              MR. DENSEMO:  Your Honor, there's other information

17     besides -- that's contained within the e-mails themselves

18     that the defense is talking about.  For instance, in the

19     document that's entitled Special Agent Kelley sent the text

20     message dated August 15th, screen shot, this document, Your

21     Honor, this is a document clearly that we should have gotten

22     along time ago, and it is important because it goes to a

23     number of things that the suppression issue talked about.

24     What was nature of the investigation?  Was this a routine

25     export investigation?  When did the investigation start?

     1   When were you aware of it?  What -- who were you
     2   communicating with?
     3            Look at the last sentence -- well, let's look at
     4   entire text message, Judge.  It starts with here now, so
     5   clearly to my mind someone is communicating with Kelley
     6   asking him are you at the airport?  Where are you?  What's
     7   your ETA?  Where are you going?  And Kelley responds here
     8   now.  So clearly there has to be another message that
     9   preceded this one.
    10            And then Kelley says CBP is going to seize body
    11   armor, plates, Taser, going to interview wife and subject
    12   with FBI Thomas.  Both are United States citizens.
    13            And here's what's really important, Judge.  The
    14   plan so far is for Thomas to forward the results to the
    15   Israelis after we're done.
    16            So this is -- had we seen this, had we had this at
    17   the time, we could have cross-examined Kelley about this very
    18   important text message because it goes to a number of issues
    19   that this Court will have to decide in this case, but because
    20   we didn't have it we weren't able to bring this out, we
    21   weren't able to effectively cross-examine Kelley to show the
    22   Court, look, Judge, we are right, this was -- this is more
    23   than just a simple export violation from Kelley's own text
    24   messages to Thomas or Brown, whomever, says that this is way
    25   bigger than export violation.  They are talking about

1    contacting the Israeli government about the results of their

2    conversation with Mr. Ramadan.

3         So clearly had we had this text message and the

4    other information -- this are other information in these

5    e-mails, Judge, where these agents contradict the things that

6    they said on the stand.  There is a text message which

7    contradicted what Brown said about Mr. Ramadan being

8    restrained.  There could be text messages the contradict

9    Armentrout and Schmeltz about Mr. Ramadan being cooperative

10   throughout the investigation.  I remember very clearly these

11   agents making those statements, but these text messages --

12   these e-mails and text messages clearly refute and rebut

13   those statements.  We should have had those things because

14   these are very important cross-examination tools that we

15   didn't get until the hearings were over and these men's --

16   these men were off the witness stand.  So there is more here

17   than just the redacted statements, there's meat on this

18   bone -- these bones, Judge, and we should have gotten those

19   things a long time ago.

20        THE COURT:  All right.  So you want to

21   cross-examine these witnesses?

22        MR. DENSEMO:  Judge, I do not want to reopen this

23   entire case.  I want you to dismiss it based upon my legal

24   theory that there has been outrageous government conduct,

25   that there has been -- that perjury has been committed.

```
 1            THE COURT:  My question right now is do you want to
 2   cross-examine these witnesses so we proceed today?
 3            MR. DENSEMO:  Judge, I don't think that we can
 4   proceed today.  Ms. Fitzharris has a hearing at 3:00.
 5            THE COURT:  But you are here.
 6            MR. DENSEMO:  Yes, I am here, Judge.  I had not
 7   prepared a cross examination -- a list of cross-examination
 8   questions for all much these witnesses, Your Honor, no, I did
 9   not come here prepared for reopen all of the
10   cross-examination.  I came here to tell the Court what I
11   would like to do, and what I would like to do is to complain
12   to the Court about the conduct of this investigation, the
13   nature of this investigation, this prosecution, and why I
14   believe the Court should seriously consider dismissing the
15   charges because I do believe that there has been outrageous
16   governmental conduct that has lead to the ineffective
17   assistance of counsel throughout these proceedings, and I
18   want to be able to present that in a formal motion to the
19   Court.  That's what my plan was, not to come here and reopen
20   this entire testimony of all of these various witnesses.
21            THE COURT:  And if that motion is denied, do you
22   want to cross-examine these witnesses?
23            MR. DENSEMO:  Yes.  We are going to ask for a
24   number of different things.  We are going to ask the Court to
25   strike the testimony, we are going ask the for an adverse
```

1    inference if the Court denies the motion.  So there will were

2    a number of things that we were going to ask for in this

3    motion.

4              THE COURT:  Okay.  Mr. Waterstreet.

5              MR. WATERSTREET:  Your Honor, I don't think there's

6    a need to reopen the entire event.  There is a distinct -- a

7    discrete statement about -- that certainly does not come as a

8    surprise I hope to counsel that Agent Kelley arrived at the

9    airport, because he testified to that.  That he's -- that

10   they were going seize the items.  Those items were, in fact,

11   seized.  They are going to interview the wife and Thomas, and

12   he testified that that's what was -- they were going to do.

13             THE COURT:  The first question was that text

14   message that he raised.

15             MR. WATERSTREET:  That's what I'm talking about,

16   the text message, Your Honor.

17             THE COURT:  Well, it says, here now.  What is he

18   responding to?

19             MR. WATERSTREET:  Well, it could be a phone call,

20   Your Honor.

21             THE COURT:  Well, it could be but without asking we

22   don't know.

23             MR. WATERSTREET:  Well, that's true, Your Honor,

24   but I think he testified that he got a phone call and was

25   told to go, but I will leave that to the Court's memory and

1    to the transcript.

2         But this does not need to reopen the entire event

3    as counsel suggested.  They are discrete areas, Your Honor,

4    and apparently the only grave issue is we're going to forward

5    the results to the Israelis.  Well, he was going to Israel,

6    and he was going to Israel with body armor, body armor

7    plates, Tasers and things of that nature.  So I don't think

8    that that would be all that much of a shock, and I'm not sure

9    the Court is shocked to find that out.  But since the Court

10   is the trier of fact, you could -- you could read these

11   things and make whatever adverse or decision you make based

12   upon these e-mails, or we can have these witnesses come back

13   and have defense counsel cross-examine them.  We are find

14   with both of those -- those alternatives, Your Honor, but it

15   certainly does not require restarting --

16        THE COURT:  Let me just ask one more question so

17   that I can be clear, and that is if these e-mails even though

18   that -- you know, they didn't contain anything new, the ones

19   that we've talked about, but they weren't turned over because

20   they just weren't found or they were from different people,

21   what?

22        MR. WATERSTREET:  They just weren't found, Your

23   Honor.  And as I said, there were some e-mails provided to

24   me, especially the ones for Officer Brown, that were put on a

25   disk.  That disk when I got it way back when, I was unable to

```
 1   open it, I put it aside.  And I learned about those things
 2   when I finally found that disk again after my two moves and
 3   tearing apart my office and other offices because I want to
 4   make sure that we are complying with everything and we uphold
 5   our responsibility.  We cannot make mistakes, Judge.  As the
 6   government we are not allowed to make mistakes.  We cannot
 7   fail to provide something.  I made a mistake, and I apologize
 8   to the Court and I apologize to defense counsel for that, but
 9   the mistake I did make, Your Honor, I don't think goes to the
10   merits of what this case is about.
11            THE COURT:  Let's me just stop you there.  As far
12   as I know right now, it does not appear that these go
13   anywhere near the merits because they have the information,
14   but I don't know what they are going to get from this
15   cross-examination --
16            MR. WATERSTREET:  I understand.
17            THE COURT:  -- that they want that might tell me
18   something different --
19            MR. WATERSTREET:  I understand that.
20            THE COURT:  -- that created something that I had no
21   idea about.  So I'm going to let them cross-examine these
22   witnesses as to the specific issues only in these documents,
23   so we are not reopening the whole case.  I'm going to allow
24   you to cross-examine on these documents.  The Court will
25   continue this matter for two days.  Let me look at the
```

```
 1    schedule.
 2            MR. DENSEMO:  You said two days or two weeks?
 3            THE COURT:  Two days.  I don't think this requires
 4    a lot of information but let me just see if I can do it.
 5    Hold on.
 6            THE COURT:  July 12th?
 7            MR. DENSEMO:  Your Honor, I don't know if we are
 8    going to be able to prepare cross-examination, we want all
 9    the witnesses, Brown, we want everyone brought back,
10    everyone.  We have e-mails from everyone, so we want Thomas,
11    Brown, Armentrout, Schmeltz, and Kelley.
12            MR. WATERSTREET:  They are all here.
13            THE COURT:  Excuse me just a minute.  Let's get a
14    date.
15            MR. WATERSTREET:  They are all here today as well,
16    Your Honor, so we will make sure they are here next time as
17    well.
18            THE COURT:  Is there anybody you can call today in
19    the next hour?
20            MR. DENSEMO:  Judge, I'm not prepared -- I'm into
21    mentally prepared to call anybody today.
22            THE COURT:  We don't want that.
23            MR. WATERSTREET:  Your Honor, as the Court looks
24    for a date, I'm technically on vacation right now, and I plan
25    to be on vacation for the rest of this week.  Also,
```

1    Ms. Secord is not available in two days.  And I'm not

2    suggesting that we delay this matter any further, I' just --

3              THE COURT:  Let's just see the next date, I see it

4    is not good for you guys, so let's just go on to --

5              MR. WATERSTREET:  Your Honor, the government is

6    prepared to move forward in two days.  I just brought

7    Ms. Secord's situation to the Court's attention.

8              THE COURT:  But the defense isn't.

9              MR. WATERSTREET:  Okay.

10             THE COURT:  So we are going to have to go --

11   defense is asking for how much time?

12             MS. FITZHARRIS:  I mean, I am at a two-week

13   training from the 15th through the 28th, so I --

14             THE COURT:  And I'm gone in August, so I guess we

15   will look at September.  How about Wednesday, September 12th?

16             MR. WATERSTREET:  That's fine for us.

17             MR. DENSEMO:  What date, Your Honor?

18             THE COURT:  September 12th?

19             MR. DENSEMO:  That's fine.

20             THE COURT:  You sure because I have to cancel other

21   things so I just want to make sure.

22             MR. DENSEMO:  I will make it work, Judge.

23             MR. WATERSTREET:  What time, Your Honor?

24             THE COURT:  We will start at 10:00, and we will go

25   until we are done.

Case 2:17-cr-20595-VAR-EAS  ECF No. 98  filed 07/31/18  PageID.1920  Page 34 of 89
*Evidentiary Hearing/Motion for Bond • July 10, 2018*

34

```
 1              MR. WATERSTREET:  Your Honor, one of the other
 2    issues that was set for schedule today was the bond --
 3              THE COURT:  The bond hearing.
 4              MR. WATERSTREET:  -- issue.  I assume we can go
 5    forward with that?
 6              THE COURT:  Yes, we can.  Okay.  September 12th at
 7    10:00.
 8              All right.  Mr. Densemo or Ms. Fitzharris, who is
 9    going to do.
10              MR. DENSEMO:  Your Honor, I believe the burden is
11    on the government to prove that there is a presumption in
12    this case that Mr. Ramadan should be released.  I believe the
13    burden is on the government to show that there is no
14    conditions or combination of conditions that would reasonable
15    assure his appearance or the safety of the community.
16              THE COURT:  All right.  Mr. Waterstreet or
17    Mr. Martin, I don't know who is arguing this.
18              MR. WATERSTREET:  Your Honor, we have as part of
19    our presentations to the Court prepared certain audio
20    demonstrations and video demonstrations, but I think the
21    power somehow has been turned off here.
22              THE COURT:  You know, I don't know how to use this
23    courtroom.  I'm very sorry I don't know how this works.
24              MR. WATERSTREET:  Everything was fine this morning.
25              THE COURT:  Is there a switch there?  Where is the
```

1    screen?

2           (An off-the-record discussion was held at

3           2:02 p.m.)

4           MR. WATERSTREET:  I think we are ready to go,

5    Judge.

6           THE COURT:  I'm sorry, I really am.  I just don't

7    know this system.  Can you see it at your table?

8           THE DEFENDANT:  Yes.

9           MR. WATERSTREET:  May I proceed, Your Honor?

10          THE COURT:  You may.

11          MR. WATERSTREET:  Your Honor, I know typically the

12   bond hearings are conducted by the magistrate judges, and I

13   apologize if I am saying things the Court already knows, but

14   there are certain factors under the statute, 18 U.S.C. 3142,

15   that the Court shall take into account, and they are

16   enumerated.  They are four major areas that the Court -- of

17   the information that is available to the Court shall take

18   into consideration in determining whether a bond should be

19   issued.

20          One is the nature and circumstances of the offense.

21   And the statute says whether it is a crime of violence,

22   terrorism, minor victim, controlled substance, firearm

23   explosive or destructive device.  Your Honor, I believe the

24   Congress set -- to set these type of cases apart from your

25   everyday case.

1           This is, in fact, a firearms case as clearly he's

2    charged with possession of two firearms with obliterated

3    serial numbers, and it says that you are supposed to take the

4    nature and circumstance the crime charged, and then other

5    circumstances that we have about this is terrorism, and

6    explosives.

7           The circumstances in this case there is more than

8    1,500 ISIS-related video and pictures on devices.  Now

9    defense I imagine may make challenge that number but I

10   believe they are challenging that number based upon their

11   limited request from the United States.  They only sought the

12   copy of the five-terabyte disk.  There is another device that

13   was in the defendant's possession that has more than a

14   thousand -- a thousand or more ISIS related videos and

15   pictures on that device.

16          Explosives.  I believe in the government's

17   response, and I'm not going to belabor the point, but found

18   during the execution of the search warrant at his storage

19   locker were all of the components to make an explosive.  So

20   of the few items that Congress set apart, we are hitting on

21   quite a number of them just in this one case alone just by

22   the charges alone.

23          And the nature of a firearm with an obliterated

24   serial number, it is a firearm that cannot be traced, it is a

25   non-traceable firearm.  The question is why would somebody

 1   want to have a non-traceable firearm?  Well, is it stolen?

 2   Was it used in another crime?  These are the answers we just

 3   don't know, but it is certainly something that the Court

 4   should take into account in determining whether this person

 5   is a risk of flight or danger to the community.

 6          The weight of the evidence against a person -- and

 7   the courts have been kind of clear about this, it is not how

 8   much evidence and how likely the defendant will be convicted,

 9   but it is the weight of the evidence deals with the factors

10   to be considered in determining whether there are conditions

11   which will assure his appearance and the safety of the

12   community.

13          Then it suggests that the Court look at the history

14   and characteristics of the person such as his character,

15   family ties, his employment, financial resources, length of

16   residence in the community.

17          Am I going too fast, Your Honor?

18          THE COURT:  No.

19          MR. WATERSTREET:  Community ties, past conduct,

20   history relating to drug or alcohol abuse, criminal history,

21   and the criminal history it is clear that it is not just

22   limited to criminal convictions but as to arrests or other

23   criminal conduct.  And record of appearing in other court

24   proceedings.  And whether at the time of the current offense

25   the person was on probation, parole, or other release,

Case 2:17-cr-20595-VAR-EAS  ECF No. 98  filed 07/31/18  PageID.1924  Page 38 of 89
*Evidentiary Hearing/Motion for Bond • July 10, 2018*

38

```
 1   pending trial, sentencing, appeal, or completion of a
 2   sentencing.
 3            So what Congress has pointed out is it is
 4   importance for the Court to consider if crimes were committed
 5   while under supervision by this particular individual.
 6   Whether under a court supervision he's willing to abide by
 7   court conditions or whether he's willing to ignore the court
 8   conditions and just engage in criminal conduct on his own.
 9            And then the fourth is the nature and seriousness
10   of danger to any person or community that would be posed by
11   the person's release.
12            Now, first I would like to talk a little bit about
13   his character, past conduct, drug use, and drug dealing.
14   Your Honor, the defendant's past criminal conduct and his
15   character, it's clear that he will not abide by court orders.
16   Now I understand this is defendant's first appearance before
17   this Court, but it is not his first appearance before a court
18   which he was placed on probation.
19            Now, to give the Court a little bit of time period
20   that we are talking about, it was part of the government's
21   exhibits which was the sentencing of the defendant on
22   June 11th, 2015 when the court in his conviction for the
23   theft of Social Security Administration funds by making false
24   statements, he was placed on a term of probation for three
25   years, and that probation started on June 11th, 2015, in
```

 1    which if not early terminated would have terminated on

 2    June 10th, 2018, which would have been just last month.

 3              However, because there was a warrant issued against

 4    him and he had to appear in court, and that warrant was

 5    resolved, on June 29th, 2017 he was no longer on probation.

 6              But it's all of his conduct that took place that

 7    while he was on probation and when he was specifically told

 8    by the court that he cannot commit any new offenses, which I

 9    believe is Government's Exhibit 10, which was the sentencing

10    which he said commit no new crimes, we find out that on

11    October 5th, 2015, which is just a few months after being

12    placed on probation, he was involved in stealing a firearm, a

13    one-of-a-kind firearm, an AR15, while he was working for a

14    cleaning company.  And the Court will -- I believe may recall

15    that this came up as part of the cross-examination of the

16    defendant.  And if I may bring the Court's attention to

17    Exhibit Number 11, which are photographs of the defendant

18    working for Star Carpet Cleaning.

19              Do you have those?  Can you bring those up?

20              There are two photographs, Your Honor.

21              THE COURT:  One is the Star Carpet's truck picture

22    and the other is all the cards.

23              MR. WATERSTREET:  Yes -- well, it is circled in

24    red.  I don't know how well your copy can came through.

25              THE COURT:  Okay.

1          MR. WATERSTREET:  But one is his identification

2     card saying he works for Star Carpet, and another is a

3     photograph -- a selfie that he took of himself standing in

4     front of the van that he used for carpet cleaning.

5          On October 5th, 2015, the defendant, according to

6     employer records, say that Mr. Ramadan was sole crew at the

7     victim's house on that day.  The victim said that he seemed

8     rather nervous and left in a hurry.  The following day the

9     victim found that her husband's gun case that contained his

10    one-of-a-kind AR15 was missing.  There was a receipt left

11    behind.  The receipt was left behind by Yousef, the carpet

12    cleaning person, which would be Yousef Ramadan.

13         And the important thing is that those parts for

14    that unique one-of-a-kind firearm was found in the

15    defendant's storage locker, and I believe those are Exhibit

16    Number 6.

17         If the Court will notice on Exhibit Number 6, the

18    first photograph is a photograph that was a picture that was

19    taken by the owner of the firearm prior to it being stolen.

20    This was -- as I said, it was a one-of-a-kind firearm.  That

21    it was made by the owner with his friend by putting together

22    parts from various different gun manufacturers, and that they

23    also did a one-of-a-kind unique camouflage painting for this.

24         So the first photograph is the picture by the

25    owner.  The second photograph, which is a picture by the

1    owner with a red circle around it, this will bring the

2    Court's attention to the handle of that particular firearm.

3    And then the third one is, again, another owner's photo of

4    the --

5              THE COURT:  Just a minute, Counsel.  I just want to

6    make sure because we have IT here that we can work this.

7    Will it work?

8              MS. SECORD:  As long as it is on your screen it is

9    working.

10             THE COURT:  I have nothing on this screen but the

11   little bar.

12             MS. SECORD:  That's all you should see right now.

13             THE COURT:  Okay.  Thanks, Bob.

14             MR. WATERSTREET:  I have the hard copies, if the

15   Court wishes.  We were only going to reserve this for the

16   videos and the audio presentation.

17             THE COURT:  I'm looking at the hard copies of the

18   pictures you can talking about now.

19             MR. WATERSTREET:  Thank you, Your Honor.  I believe

20   I'm on the third photograph.  It shows the soft-sided case,

21   as well as circled in the stock portion of firearm.  This is

22   an owner's photo, as well as two of the magazines in the

23   lower portion of that.  Does the Court have that one?  Okay.

24             The search warrants photo, this was the stock that

25   was recovered from Mr. Ramadan's storage locker.

 1          This next one are side by side photographs, a

 2   comparison of the owner's photo as long with the search

 3   warrant photo, and the Court will notice the unique

 4   camouflage pattern that was painted by the owner of that

 5   firearm.  It is very unique to the gun because he came up

 6   with the camouflage design all by himself.  The reason I

 7   cannot tell the Court anything more than the camouflage paint

 8   is because the defendant got rid of the portion --

 9          MR. DENSEMO:  Objection, Your Honor; calls for

10   speculation.

11          THE COURT:  Sustained.

12          MR. WATERSTREET:  Well, the firearm that was

13   recovered did not have the lower receiver portion that has

14   the number -- the firearm number that's associated with that

15   particular firearm, but it had all of the other parts, so

16   that was the only part that was missing, the one that had the

17   serial number for that particular firearm, but all the other

18   parts and components for the firearm were found.  These were

19   just to highlight the identification of it.

20          The next photograph is the side by side comparison

21   of the stock.  Again, you can see the unique paint job.  The

22   color variations is based upon the lighting source when the

23   photo was taken, but the camouflage pattern is identical.

24          We know after being ordered by the court on

25   June 11th, 2015 that he should not commit any new offenses, a

 1  firearm was stolen on October 5th, 2015, by a person named

 2  Yousef, and who was the only during -- the records -- the

 3  employer records says Yousef Ramadan was cleaning the

 4  victim's home.

 5          MS. FITZHARRIS:  Objection.  We don't know that

 6  Yousef stole the firearm.  We know that someone -- that the

 7  carpet cleaner was named Yousef, and the firearm went

 8  missing.

 9          MR. WATERSTREET:  And that the employer records

10  says that Yousef Ramadan, the employee for Star Carpet, was

11  the one cleaning that day.

12          THE COURT:  Correct.

13          MR. WATERSTREET:  Your Honor, if I may, if what

14  counsel is going to be responding to the bond issue?  I just

15  ask for the objections to be from the one attorney, if I may.

16          THE COURT:  All right.

17          MR. WATERSTREET:  Your Honor, the next issue

18  concerns the theft of firearms, jewelry, and cash.  That

19  theft took place on September 30th, 2015.  And defense's

20  response, I believe, said that the victim's wife was the

21  culprit, but there are some audio recordings between Ramadan

22  and the victim that were obtained in this case.  I did not

23  make them exhibits.  But there is no indication on any of

24  those recordings that the victim identified the wife as the

25  person being responsible.

```
 1              The next item was on October 22nd, 2015, he was
 2    arrested for child endangerment.  Defense's response was that
 3    he was not criminally charged, but, again, 3142 does not
 4    require a criminal charge or conviction; it can take the
 5    person's character as well as past conduct into account.
 6              There are several photographs that we have.  This
 7    was a case in which the defendant's daughter who was
 8    approximately three years old at the time was left unattended
 9    by the defendant.
10              MR. DENSEMO:  That's inaccurate.
11              THE COURT:  Just a minute.
12              MR. WATERSTREET:  Your Honor --
13              THE COURT:  Just a minute.  Which one of you are
14    going to --
15              MR. DENSEMO:  I am, Your Honor, and that's
16    inaccurate.  The child was much older.  She was not two years
17    old.
18              THE COURT:  That's really not a legal objection,
19    but go ahead.
20              MR. WATERSTREET:  I believe I said three years old,
21    Your Honor.
22              THE COURT:  You said three.
23              MR. WATERSTREET:  And that she was left unattended.
24    He was arrested for having dangerous narcotics and a loaded
25    firearm within the reach of the child.  The -- as a result of
```

Case 2:17-cr-20595-VAR-EAS ECF No. 98 filed 07/31/18 PageID.1931 Page 45 of 89
Evidentiary Hearing/Motion for Bond • July 10, 2018

45

1    that, his Glock firearm was seized, which I will get to

2    later.

3         There are some pre-event photos of his child

4    playing with that particular firearm.  As the Court will

5    recall, we were able to recover a number of imagines the

6    defendant took that were on his hard drive, and there are

7    photographs that predate October 22nd, 2015, which shows his

8    daughter playing with the exact gun that he was arrested for

9    having a loaded firearm within the daughter's reach in the

10   very same room where the firearm was found under the

11   mattress, and there were drugs on a pillow on a chair, and

12   those drugs were Vicodin.

13        In the execution of -- or review of the defendant's

14   electronic media, there were several items that were found,

15   and some of those have to do with -- bear with me a moment --

16   the drugs that he had on Exhibit Number 14 were photos of the

17   Vicodin, the very same type of Vicodin that the police said

18   were not found in a pill container, they could not find a

19   pill container with his name for this Vicodin.  We did,

20   however, recover imagines from the defendant's electronic

21   media which shows him having these Vicodin pills in a plastic

22   bag, and the pills laid out on some paper.  There are two

23   photographs of those indicative of somebody involved in

24   either the use or the --

25        THE COURT:  Just a minute.  My question, is the

```
 1    photograph with the pills laid out on paper, were the pills
 2    found laid out on paper or somebody took the pills from the
 3    plastic bag and laid them out?
 4              MR. WATERSTREET:  These were just two images that
 5    we found on the defendant's media, Your Honor.
 6              THE COURT:  You found it on the media.
 7              MR. WATERSTREET:  We found it on his media, which
 8    is consistent with what the police found when they went in
 9    and found the pills.
10              MR. DENSEMO:  Your Honor, part of --
11              THE COURT:  Pardon me?
12              MR. DENSEMO:  The government is doing -- the
13    government is making an offer of proof and is arguing at the
14    same time.  We would ask the government to do one or the
15    other.
16              THE COURT:  Overruled.  Go ahead.
17              MR. WATERSTREET:  Thank you, Your Honor.  These
18    pills -- the proffer I'm making to the Court, there were no
19    pill bottles found consistent with these.  This is consistent
20    with --
21              MR. DENSEMO:  Objection, that's argument.
22              MR. WATERSTREET:  I thought that was just
23    overruled, Your Honor.
24              THE COURT:  Just go on so we can get through this.
25              MR. WATERSTREET:  These are consistent with being
```

1    dangerous drugs packaged and laid out for distribution.

2            MR. DENSEMO:  Objection, Your Honor.  The argument

3    is argument that these are consistent.  This is not an offer

4    of proof.  The government -- I have no objection to the

5    government saying what they found on the media, what

6    convictions, because there are none, that Mr. Ramadan has.

7    But if we are going -- if he's going to argue then let this

8    be his argument.  Is he arguing now or is this an offer of

9    proof?

10           THE COURT:  He can combined this.  This is actually

11   argument.  You said he had the burden so I'm assuming he's

12   arguing this with these exhibits.

13           MR. WATERSTREET:  Yes.  If I may, Your Honor?

14           THE COURT:  Which you are going to do later.

15           MR. WATERSTREET:  Yes, Your Honor.

16           THE COURT:  Okay.

17           MR. WATERSTREET:  Thank you.

18           THE COURT:  Go ahead.

19           MR. WATERSTREET:  These pre-event photos are

20   evidence of dangerous narcotics packaging and the amount laid

21   out for distribution.

22           The Court will recall during our proffer of proofs

23   to show the defendant is very familiar with the legal system.

24   We introduced evidence that he was arrested on several

25   occasions, one of the arrest was for this child endangerment

1   which his Glock firearm was seized, and he was taken into

2   custody and was released sometime later.

3           In the -- in his media we found a video of the

4   defendant giving his clearly frightened daughter the promise

5   of candy if she would tell the truth about the events that

6   took place.  And if I can give a little bit of background,

7   the events that took place on that day was as a result of the

8   theft of cash and jewelry on September 30, 2015, more than

9   $200,000 from currency, firearm, and jewelry was stolen from

10  a relative of Mr. Ramadan who had hired Mr. Ramadan to come

11  and clean the carpets.  The victim was gone during the time

12  period that Mr. Ramadan came to clean the carpets.  When the

13  victim returned, they found the money, the jewelry, the

14  firearm missing.  They did not have any insurance for this so

15  they hired a private detective to try to find out if the

16  private detective could maybe help recover some of the items.

17          The private detective went to Mr. Ramadan's house

18  on October 22nd, 2015 to try to talk to Mr. Ramadan.  When he

19  got there, his young daughter was basically unattended, and

20  the reason I say basically unattended is because police

21  eventually found Mr. Ramadan either passed out or fast asleep

22  on his bed in his bedroom.

23          After private investigator saw the daughter leave

24  the house, walk out unattended, eventually go back in the

25  house, he knocked on the door, asked if the father was home.

| 1 | The daughter said that he had -- that he was -- he had a |

1  The daughter said that he had -- that he was -- he had a
2  stunt gun or a gun inside the house --
3          MR. DENSEMO:  Your Honor, excuse me, I apologize
4  for objecting to this.  One, I object to the prosecutor
5  testifying to things that I'm not going to be able to
6  cross-examine anybody about.  And I would like to see the
7  basis for these alleged statements from his daughter and the
8  private investigator.  I don't know if this story is true or
9  not.
10          THE COURT:  Okay.  Mr. Waterstreet.
11          MR. WATERSTREET:  Your Honor, it is an offer of
12  proof based upon the police reports that were obtained.
13          THE COURT:  All right.
14          MR. DENSEMO:  Where are the police reports?
15          THE COURT:  He said he's going to make an offer of
16  proof.  We will see.
17          MR. WATERSTREET:  I'm making an offer of proof.
18  Thank you, Your Honor.
19          And the daughter let the private detective in,
20  realized the daughter went back tried to wake Mr. Ramadan,
21  was unsuccessful, the.  Private investigator left, called the
22  police, told them about the incident.  The police showed up
23  and eventually found, as I said, Mr. Ramadan either asleep or
24  passed out on his bed for the entire period of time.
25          So we have Exhibits 17 and 18 in which the

Case 2:17-cr-20595-VAR-EAS   ECF No. 98   filed 07/31/18   PageID.1936   Page 50 of 89
*Evidentiary Hearing/Motion for Bond • July 10, 2018*

50

1    defendant, Mr. Ramadan, and his wife, who were both not

2    present, did not know what happened, were trying to get their

3    daughter to tell the truth by a promise of candy or taking

4    her to the park if she were to say that the man claimed to be

5    a police officer and he opened up the door and came in.  And

6    I have those, I believe they have been provided under seal

7    for the Court, because the daughter is involved in this.  I

8    will not play those in open court, I will leave that to the

9    Court's discretion to review those, but I ask the Court to

10   pay close attention to what is really going on here.

11           As to -- between July 2016 and September 2016 we

12   have other incidents where, while still under court order to

13   commit no new offense, the defendant -- the defendant is

14   involved in drug dealing.  There is a detailed conversation

15   he has with another individual about the growing, harvesting,

16   and distribution of marijuana.  There are photographs of the

17   grow operation, I believe that's Exhibit Number 24, that is

18   the marijuana itself, as well as I think the defendant posing

19   in front of some of the plants that were part of the grow

20   operation.  And then on Number 26 is some of the harvested

21   buds from that grow operation that were laid out on paper.

22   And then there are some buds that are placed in glass jars

23   dated 9/16/2016, 9/15/2016, and 9/16/2016.

24           And the reason I bring those dates to mind is there

25   is an audio recording dated September 8th, 2016, in which

Case 2:17-cr-20595-VAR-EAS  ECF No. 98  filed 07/31/18  PageID.1937  Page 51 of 89
Evidentiary Hearing/Motion for Bond • July 10, 2018

51

1   they were talking about the harvesting and drying process and

2   the profit of approximately $16,000 a month that they will

3   make from the harvesting of the drugs.

4          The reason why I brought those pictures of the

5   glass jars is because the direction that Mr. Ramadan was

6   being given he was told the process of how to dry it, and he

7   was told basically after seven to eight days in going through

8   the drying process he was told to put them at the very end,

9   those buds, in a jar.  And if my math is correct, eight days

10  from September 8th, 2016 is September 16th, 2016, and we find

11  those items in the jars on 9/16/2016, just as he was told to

12  do as part of the grow operation.

13         If the Court wishes, it is a rather lengthy audio

14  presentation, I will leave it to the Court's discretion if it

15  wishes to hear it at this time, but that's Exhibit Number 25,

16  and that has been provided to the Court as well.

17         THE COURT:  I don't need to hear it now.

18         MR. WATERSTREET:  Okay.  Thank you.

19         As to the issue of the defendant's potential

20  flight, some of factor that go into that are family ties and

21  employment.  As the Court knows and has been made fully aware

22  as a result of the suppression hearing, the defendant and his

23  family have packed up all of their worldly belongings, say

24  the firearms that he left in the storage locker, and

25  terminated their apartment lease, and they were leaving the

Case 2:17-cr-20595-VAR-EAS   ECF No. 98   filed 07/31/18   PageID.1938   Page 52 of 89
Evidentiary Hearing/Motion for Bond • July 10, 2018

52

1   United States.  His wife said they were leaving because of

2   legal problems related to domestic and fraud issues that they

3   had been having.

4          On August 29th, 2017, there was bond hearing for

5   Mr. Ramadan, which he consented to bond.  His wife and his

6   children were at that bond hearing.  Shortly after he

7   consented to being detained, they got on a plane, they left

8   the United States, and they have not been seen back here in

9   the United States since.

10         He has his family, his children, his wife, are no

11  longer here in the United States.  He owns no property here

12  in Michigan.  His wife acknowledged he was unemployed prior

13  to their departure.  He's unemployed now.  And there is also

14  an issue concerning his denaturalization.  And if the Court

15  will allow me to talk about that for a moment.

16         Before the defendant became a citizen of the

17  United States he has to go through a process of filling out a

18  naturalization application, it is an N400.  And in that N400,

19  one of the questions that is asked is have you committed any

20  offenses for which you have not been arrested.  I don't mean

21  to belabor this point, but what he failed to disclose was the

22  fact of the crime that he pled guilty to, that he admitted

23  beyond a reasonable doubt that he could be found guilty of

24  was taking money from the Social Security Administration for

25  which he was not entitled.  That criminal conduct predated

Case 2:17-cr-20595-VAR-EAS   ECF No. 98   filed 07/31/18   PageID.1939   Page 53 of 89
Evidentiary Hearing/Motion for Bond • July 10, 2018

53

 1    and postdated his application for naturalization.

 2          He thereafter went for an in-person interview.

 3    Again, was placed under oath, was asked the same question,

 4    and failed to honestly tell the truth, failed to disclose the

 5    fact that he was engaged and had been engaged in criminal

 6    conduct by making false statements to illegally obtain funds

 7    for which he was not entitled to.

 8          This was brought to defense counsel's attention,

 9    and I think that he has brought it up before, but because

10    this matter -- all of that criminal conduct took place in

11    California, that is not a charge that could be brought here

12    in this district.  However, he will face denaturalization in

13    the Southern District of California sometime here in the near

14    future.

15          Now, I understand the defense counsel's difficult

16    position they are placed in.  Their client demands that they

17    file a motion for bond, and they have to make the best

18    arguments they can based upon some of the evidence that they

19    have.  And, for example, we brought up some other thefts that

20    he was engaged in at the time while he was on bond when he

21    was working at the -- for the carpet company, which was ID

22    theft in which there was credit cards and Social Security

23    cards and checks and blank checks and driver's licenses which

24    were photocopies or photographed by the defendant and we

25    found in his media.

1      They suggest -- defense suggest, and I understand

2  they are trying to make the best of the bad situation, that

3  most, if not all, of the identification given to Mr. Ramadan

4  by the homeowners was to pay for cleaning services.  But if

5  we look at Exhibit 12 that does not explain why you make a

6  copy of a Social Security card.  You don't pay anything with

7  a Social Security card.  It also does not explain why he made

8  a photocopy of a blank check.  You do not -- a blank check is

9  not a payment.  It is, however, the person's personal

10  information, their account number, their home address, so

11  that if he chose to engage in some type of fraud with that he

12  could, but that certainly does not explain.

13      And it certainly does not explain Exhibit Number

14  13, which is a photograph of U.S. Customs and Border

15  Protection uniform that he took in a client's bedroom, as

16  well as employee's government identification card.  You do

17  not pay with a government identification card.  And it

18  certainly does not explain why he took a photo of the airport

19  access card for this employee.

20      Your Honor, this is something that gravely concerns

21  the United States because he went in unbeknownst to a

22  government agent, got the personal identification card, sees

23  how it's made, sees how the access to the airport is made

24  which is to general aviation, the airfield, the ramps, the

25  terminal, the commuter and freight area of the airport in

1    San Diego and finds out what a badge needs to look like in

2    order to gain access to that organization.  And then on top

3    of that, he makes sure that he takes a picture of the uniform

4    as well as the insignia for U.S. Customs and Border

5    Protection so that if he chose to take on somebody's identity

6    he could.  And, again, this is why he was still under court

7    order not to commit any new offenses.

8            Then there's the gun theft.  The defense's response

9    to that is that his lawful possession of firearms and firearm

10   paraphernalia does not preclude him from being released on

11   bond, but this was not lawfully possessed.  The firearm was

12   stolen.  Neither one of the firearms that he's charged with

13   are lawfully possessed because those serial numbers have been

14   obliterated, and he's in illegal possession of a silencer,

15   and he's also in possession of stolen firearm parts.

16           And this is another greater concern because of

17   something the defendant said when he was at the airport.  He

18   says if his weapons were confiscated he could simply buy more

19   weapons off the street.  So even if this Court were to make

20   sure that none of the firearms that were previously possessed

21   by the defendant he had access to, he still has said that

22   he's willing to get these firearms off the street, and I

23   think the proof is in the pudding because he has two firearms

24   with obliterated serial numbers that were -- that cannot

25   lawfully be exchanged, could not be lawfully be bought and

1    sold.

2           Another one was the fact that Mr. Ramadan allows

3    his children to handle and learn about firearms is not a

4    justifiable basis for denying bond in this case.  And defense

5    counsel attached some photographs of young -- younger

6    children holding firearms and suggest that that, well, since

7    the defendant has his young children holding firearms and

8    there's photos that he was able to find on the Internet of

9    younger children holding firearms it is appropriate, but he

10   says it is not a justifiable basis for denying bond in this

11   case, not justifiable.

12          Your Honor, to equate Government's Exhibits Number

13   21 and 22, which I will talk about in a moment, with

14   photographs of children -- or young children holding a

15   shotgun, if there is no difference between those two frankly

16   I should sit down now because Exhibit Numbers 21 and 22 is

17   Mr. Ramadan and his children shooting out the door of their

18   apartment building complex, shooting it into the -- over the

19   parked cars into the building across the way from the

20   apartment complex.  On the 4th of July, 2016, he and his two

21   oldest son independently shot a gun out of their patio

22   sliding door into an apartment complex.  How many people have

23   to be placed in danger by that stray bullet?

24          And then there was another video that we found,

25   Exhibit Number 23.  He apparently becomes upset because his

1   children did not learn to load the bullets into the gun

2   magazine well enough.

3           And then there is another video, 2-A, which he's

4   carrying around a loaded, cocked concealed weapon in his

5   house around his children.  Day/night difference between

6   photographs of NRA children learning how to shoot from the

7   NRA versus having -- shooting guns out the patio.

8           And, Your Honor, I'm going to ask the Court to take

9   a look at Exhibits Number 21 and 22 and 23.  I move for their

10  publication, Your Honor.

11          THE COURT:  Okay.  Go ahead.

12          MR. WATERSTREET:  This is 21, Your Honor, the first

13  one.

14          (Exhibit Number 21 played for the Court.)

15          MR. WATERSTREET:  Can we start that over, Your

16  Honor?  If I may, you will see his two sons standing to the

17  side, and what you will see is he is on the second floor, and

18  it is overlooking the parking lot of the apartment complex.

19          I also have some other documents of the apartment

20  complex and the apartment building so the Court can have a

21  better understanding of the layout.  It is Exhibit Number 30.

22          And if the Court will note, there is a living room,

23  and it shows the living room and the balcony.  They are

24  shootings out over the balcony.  And the second photo here

25  will show where they are shooting onto.  The red dot marks

Case 2:17-cr-20595-VAR-EAS  ECF No. 98  filed 07/31/18  PageID.1944  Page 58 of 89
*Evidentiary Hearing/Motion for Bond • July 10, 2018*

58

```
 1    their apartment building, and they are shooting off into the
 2    complex and into a neighborhood behind the apartment complex.
 3              Can we play 21, please?
 4              (Exhibit Number 21 played for the Court.)
 5              MR. WATERSTREET:  That was one of his twin sons
 6    shooting it.  There's another identical one for Number 22.
 7              THE COURT:  One is enough.  Thank you.
 8              MR. WATERSTREET:  The next one is how he becomes
 9    very upset with his children because they can't load the gun
10    magazine with a bullet, that's Exhibit Number 23.
11              (Exhibit Number 23 played for the Court.)
12              MR. WATERSTREET:  Your Honor, I think that's enough
13    for the point to be made.
14              MR. DENSEMO:  It is not enough.  Why don't we play
15    the whole thing?
16              MR. WATERSTREET:  Absolutely.
17              MR. DENSEMO:  Go right ahead, if you want to talk
18    about his parenting.
19              MR. WATERSTREET:  Your Honor --
20              (Exhibit Number 23 played for the Court.)
21              MR. WATERSTREET:  Your Honor, as I said, I believe
22    that's enough.  That's good.  Your Honor, this is also -- you
23    will see depicted in there the defendant's wife.  This is the
24    same woman who told the police at the airport she knew
25    nothing about what her husband did with firearms.
```

1        I think at this point, Your Honor, the government

2   has outlined and established that the defendant is a risk of

3   flight by the preponderance of evidence, and he's a danger to

4   the community by clear and convincing evidence.  But in all

5   bond cases, Your Honor, what is really comes down to is the

6   defendant's word, just like he gave the word to the judge

7   when he was sentenced and placed on probation that he will

8   abide by the law.

9        (Ms. Fitzharris exited the courtroom at 2:50 p.m.)

10        MR. WATERSTREET:  Now, if this was -- this is his

11   first time coming before this Court.  Had we not conducted

12   some of the hearings that we've had the Court would not know

13   what the defendant's word is worth, but we know having gone

14   before another court his word is not good that he will not

15   engage in other crime conduct while out on court release, he

16   will not follow court orders, and this can give us some

17   inside into the defendant's action.

18        In knowing what we know now about Mr. Ramadan, the

19   question the Court has to ask itself is do you think his word

20   is good?  Is he a man who will show up when he's ordered to

21   show up?  He is a man that will abide by the Court order, and

22   not commit any new offenses?

23        And what do we know about his word and how good his

24   word from this case along?  This is a man who said my guns

25   are at my friend's house.  And where were they found?  This

1    is the same man who made a false allegation about how the FBI

2    tried to interview him at Milan Detention Center, and we

3    rebutted that after defense counsel asked us to check in.

4    There was no -- that false statement that he made to the

5    Court was totally unsubstantiated.

6            I only own three guns, a Glock and two rifles.

7    Well, we know that Glock was seized by the police back in

8    California back in 2015.  He did not have a Glock.  We know

9    he had more than that; he had the stolen AR15 and he had the

10   two firearms with the obliterated serial number and he had a

11   silencer.  All of my guns are properly purchased and

12   registered.  Well, we know that's not true too.

13           And at the suppression hearing we played two

14   separate videos involving encounters Mr. Ramadan had with

15   uniformed police officers who were clearly displaying

16   firearms, and the purpose of that was to establish that

17   Mr. Ramadan could still become very aggressive when things

18   weren't going his way, and it was -- and it was totally

19   absent any wrongful conduct by the police.  And then

20   Mr. Ramadan was not intimidated by the mere presence of a

21   firearm, whether it was displayed or carried and concealed.

22           But in one video, if the Court will recall, was a

23   video of Mr. Ramadan cutting through the shopping mall

24   parking lot to avoid the traffic light with the Washtenaw

25   County Sheriff.  He made a false statement and he was caught

Case 2:17-cr-20595-VAR-EAS  ECF No. 98  filed 07/31/18  PageID.1947  Page 61 of 89
*Evidentiary Hearing/Motion for Bond • July 10, 2018*

61

```
1    in that false statement when he planned to stop at the store
2    but it was closed.  The officer immediately called out his
3    lie and he said, no, that store is open, there are people
4    shopping there right now, and then he quickly changed his
5    story is something else.
6              So we know from evidence that was just produced at
7    the suppression hearing alone Mr. Ramadan's word is no good.
8    We don't even have to look at his past conduct, but the
9    statute says you must, the Court shall take into account.
10             So what else do we know about his words?  From his
11   prior conviction we know he lied to get money that he is not
12   entitled to.  Lied under oath, penalty of perjury, to the
13   Social Security Administration employees as to where his
14   children were.  He lied to the inspector after he told the
15   inspector -- after the inspector told Mr. Ramadan he believed
16   he way lying.  He lied to the inspector after the inspector
17   showed Mr. Ramadan the travel documents to show that his kids
18   were out of the country, and Mr. Ramadan had the audacity to
19   look him square in the eye and say, no, they are right here
20   in Chula Vista when they were not.  So we know what his word
21   is worth, and we know it's not good.
22             In closing I just want to talk on two more things
23   and I will sit down.  One has do with the issue of flight.
24   On May 30th, 2018 Mr. Ramadan released -- moved for release
25   on unsecured bond, and defense stated in their responsible --
```

1   actually I believe that was the only thing they stated in the

2   response is that they agreed with the government because the

3   government pointed it out in its response.  So on May 30th,

4   2018, Mr. Ramadan was asking this Court to please allow him

5   out on unsecured bond, and while seeking permission and

6   awaiting for that hearing to take place, Mr. Ramadan was

7   caught at the Milan Detention Facility about escape

8   paraphernalia.

9        On June 11th, 2018, seized from his cell was a

10  black ski mask, a black thermal shirt, and a green duffel

11  bag.  And inmates at Milan are limited in the type of items

12  that they are allowed to wear while in custody, that is so

13  the prison personnel can quickly identify and easily identify

14  an inmate from a non-inmate.  And non-prison personnel cannot

15  wear certain things.  For example, on the bureauofprisons.gov

16  website it says visitors cannot wear khaki or tan pants

17  because the prisoners wear khaki clothing at Milan, yet the

18  defendant had what has been identified as escape

19  paraphernalia, and that is Exhibit Number 29.

20       And according to a report that I proffered to the

21  Court, Mr. Ramadan's explanation for having this dark

22  clothing to avoid being detected at night, being able to

23  cover his face to avoid identification or detection, and to

24  have a heavy canvas bag to lay across barbed wire to allow

25  him to escape, his explanation of how he came in custody of

1    these is he found them lying next to trash can and took them

2    back to his cell.

3         If the Court will recall, the defendant was placed

4    in the special housing unit for being involved in a fight

5    while at Milan.  Then he was -- then he was -- got in trouble

6    for writing graffiti on the walls at Milan, and now he's been

7    caught with escape paraphernalia after asking this Court for

8    a bond.

9         The last one is Exhibit 30.  This is an imagine

10   that we were able to recover from the defendant's media.

11   That is a video of him shooting one of the firearms that he's

12   charged with, and using the silencer attached to it, out the

13   back window of the very same apartment.  So if I could go

14   back to Exhibit 30, which is the Green Meadows Boulevard,

15   there is a balcony in the front and bedroom in the back.  As

16   part of that, Your Honor, out that back bedroom window is a

17   small stance of trees, and then there is a driving range, and

18   there is an apartment complex and homes that are behind his

19   apartment.  So he's shooting his children out of the front

20   porch over the balcony, and he himself is shooting out the

21   back window using the very firearm that he's charged with.

22   Do we have that?

23        (Exhibit Number 30 played for the Court.)

24        MR. WATERSTREET:  He will load the weapon with a

25   bullet and fire it out the back window, and you will see the

1　shell discharge.  He shows you the bullet he's putting in,

2　and then you will see the discharge hit the vertical blinds

3　on his right, and he looks down to try to find the spent

4　shell.  Thank you.

5　　　　　In closing, Your Honor, his word is no good, he's a

6　danger to the community, and he's a risk of flight.  Thank

7　you.

8　　　　　THE COURT:  Thank you.  Mr. Densemo.

9　　　　　MR. DENSEMO:  Mr. Ramadan is charged with an

10　offense that carries the presumption that he should be

11　released on bond while the case is pending.  This presumption

12　is supported by Mr. Ramadan's minimal criminal history.

13　　　　　He was placed on probation for a misdemeanor fraud

14　offense several years ago.  While the case was pending he did

15　is not miss any court dates, and no warrants issued for

16　failure to appear.  Additionally, no violation of his bond

17　conditions took place during the year or so that it took to

18　resolve the matter.  He successfully completed probation and

19　repaid the entire restitution amount.  He does not have any

20　other criminal convictions.

21　　　　　Mr. Ramadan is married, and he has four children.

22　He has been married for over ten years.  He was born in

23　Palestine but became a U.S. citizen approximately seven years

24　ago.  His wife and children U.S. citizens.  He has two

25　sisters and several other family members who reside in the

1  metro Detroit area.

2          He does not have a history of drug addiction or

3  alcohol abuse.  He is not addicted to gambling.  He does not

4  have any mental health issues that would make it difficult

5  for him to comply with bond condition.

6          He's charged with an offense that does not involve

7  the sale or distribution of drugs or firearms.  The offense

8  does not involve any allegation of violence or threats to

9  harm a member of or members of the community.

10          Mr. Ramadan has been employed in several capacities

11  over the past ten years, and he's easily able to obtain

12  employment.  If employment cannot be obtained in a relatively

13  short period of time, his family has the financial means to

14  support him until he's able to support himself.

15          The federal agents have already seized all of his

16  travel documents.  A bond condition prohibiting him from

17  obtaining new travel documents could address any concerns

18  about unauthorized travel.

19          A bond condition requiring no firearms at the bond

20  address and no possession of firearm would address any issues

21  regarding his possession of firearms.

22          Despite the government's attempt to betray

23  Mr. Ramadan as a violent criminal, he's never Been arrested,

24  investigated or charged with a crime of violence.

25          The government argues that Mr. Ramadan may have

Case 2:17-cr-20595-VAR-EAS ECF No. 98 filed 07/31/18 PageID.1952 Page 66 of 89
*Evidentiary Hearing/Motion for Bond • July 10, 2018*

66

1    been involved in other nonviolent criminal conduct but this

2    suspicion is not supported by any criminal charges against

3    him.

4              The government argues that Mr. Ramadan is a bad

5    parent yet questionable parenting skills are not a typical

6    impediment to release on bond.

7              The government argues that Mr. Ramadan's right to

8    the -- to freely exercise his religion is problematic in this

9    case because Mr. Ramadan professes to believe in caliphate,

10   which the government interprets as being counter to the

11   interest of the United States.

12             Mr. Ramadan has stated on more than one occasion

13   that though he believes in caliphate as millions of Muslims

14   do, he does not believe in the utilization of violence to

15   achieve it.

16             Individuals like Mr. Ramadan historical present a

17   very low risk of either danger to the community or a risk of

18   flight.  Individuals charged with far more serious offenses

19   and who have had a more troubling criminal history have

20   frequently released on bond, and more often than not no

21   violations of those conditions occur.  And in most cases --

22   in most cases prosecuted in federal court defendants will

23   typically have prior felony convictions, multi arrests,

24   warrants, probation and parole violation histories, yet many

25   are still released on bond if certain other factors are

```
 1    present such as, does the charge carry a presumption that the
 2    individual should be releases?  Is they offense of crime of
 3    violence, drug trafficking, sex crime, pornography?  Does the
 4    individual have strong ties to the community?  Are that
 5    housing issues?  Are there mental health issues?  Is the
 6    person employed or employable?  Is there a drug or alcohol
 7    history?  When you check all the boxes in favor of the person
 8    charged that person has to be released on bond without
 9    question because the Bail Reform Act mandates it.
10         All of the boxes are checked in favor of
11    Yousef Ramadan in this case.  His release shouldn't be a
12    matter of discussion.  So we have to ask ourselves why is it
13    being opposed by the prosecution.  If you accept the
14    proposition that on paper Mr. Ramadan is an ideal candidate
15    for bond, more so than most defendants, why then is the
16    government so opposed to his release?  He can't lawfully
17    travel outside of the United States without his passport.
18    The federal agents have that.  The same agents kept him under
19    surveillance from August 16th, 2017 until his arrest on
20    August 29th, 2017.  They could easily do so again if they
21    felt the need to do it.
22         Mr. Ramadan's convicted -- Mr. Ramadan has not been
23    convicted of any act of violence in his life.  He has argued
24    with police officers attempting to ticket him, but a lot of
25    citizens do the same thing.  Lack of civility isn't a
```

 1    barometer for danger.

 2         Mr. Ramadan recorded encounters he had with other

 3    motorists.  The government did not present the entire videos

 4    of these encounters.  Mr. Ramadan has ever right to stand up

 5    for himself and to protect himself from harm.  He does not

 6    have to shrink away from confrontation or continue to run

 7    when he's being followed by somebody.

 8         The government has presented -- the government

 9    hasn't presented any evidence that Mr. Ramadan has ever gone

10    out of his way to pick a fight with someone.  Just because

11    he's mouthy and talks back to the police doesn't mean he

12    should be looked up for doing so.

13         There are some places in the United States where

14    police officers are cursed out on a daily basis.  The police

15    officers, to their credit, recognize these individuals for

16    who they are, but unless the citizen engages in more than

17    mouthing off the officer does not attempt to make an arrest

18    or charge these citizens with an offense.

19         This is exactly what happened in the videos the

20    government showed in the suppression hearing.  Mr. Ramadan

21    disagreed with the ticket and he got mouthy with the

22    officers.  He was upset, argued with the officers, and drove

23    off in a huff.  These scenes of Mr. Ramadan behaving badly

24    aren't indicative of a dangerous person.  They are indicative

25    of somebody getting angry over a ticket when they feel they

1   didn't deserve it.  Unfortunately some motorists handle

2   getting a ticket better than others.

3           Everyday somewhere in the U.S. police officers and

4   parking lot -- parking attendants get an earful from citizens

5   over traffic and parking tickets.  It doesn't mean that they

6   are dangerous, it just means they are rude.

7           And finally we need to talk about the elephant in

8   the room.  Yousef Ramadan, an Arabic male, Muslim, born in

9   Palestine.  All things being equal in this case, Mr. Ramadan

10  should have been released on bond a long time ago, but on his

11  electronic media he had videos and photographs of a

12  complicated and terrible conflict.  What is most interesting

13  to me is that the photographs and videos and propaganda

14  aren't illegal to possess, watch, or discuss, but if you are

15  a Muslim you run the risk of being perceived as a supporter

16  of terrorism, and no matter what you say or what you do it is

17  extremely difficult to eliminate this perception.  It is as

18  if this information which contains seasons of brutality and

19  violent rhetoric can be constitutionally viewed, collected,

20  and discussed by anyone, except a Muslim, without any

21  preconceptions or assumptions being made that the viewer is a

22  potential danger to the community.  A greater level of

23  scrutiny is applied when a Muslim has materials related to

24  ISIS, Hamas, Hezbullah, Al-Qaeda or other groups of this

25  nature.  Eventually this heightened scrutiny will dissipate,

Case 2:17-cr-20595-VAR-EAS   ECF No. 98   filed 07/31/18   PageID.1956   Page 70 of 89
*Evidentiary Hearing/Motion for Bond • July 10, 2018*

70

1    but for now we have to acknowledge that it exists and it is

2    present in this case.

3          The government in its brief falsely stated that

4    Mr. Ramadan is an ISIS supporter.  Although Mr. Ramadan

5    affirmatively told the agents from the very beginning he does

6    not believe in the violence committed by ISIS, his statement,

7    which should have been a relief to hear, fell on deaf ears.

8    He told the agents he doesn't support Hamas, even going so

9    far as to say F, Hamas.  They didn't listen to him.  Their

10    preconceptions wouldn't allow them to comprehend some very

11    important words spoken by Yousef Ramadan.  I don't support

12    the violence ISIS is engaged in.  Without violence ISIS is

13    nothing more than another political group.  And Mr. Ramadan's

14    statements to the agents renouncing the violence and terror

15    tactics utilized by these groups are the most important

16    admissions he made to the agents on August 15th, 2017.  As

17    result of his words falling on deaf ears, Mr. Ramadan and his

18    family hasn't suffer privately and publically.

19          We respectfully ask that the Court make its

20    decision in this case and that that decision be based upon

21    primarily the presumption that Mr. Ramadan should be released

22    because he's charged with an offense that says that he should

23    be admitted to bail.

24          Judge, I would like to talk about some of the

25    things the government spoke about in its presentation.

1    Implicit in the government's argument is the assumption that

2    Yousef Ramadan is guilty of the things that they have said

3    are crimes, so the prosecution has already convicted him of

4    the allegations that are all several years old, and to date

5    no charges have ever grown out of any of these allegations at

6    all.  The allegation about the stolen firearm has been around

7    for a very long time.  Mr. Ramadan has never been arrested or

8    charged for that.  The allegation that money was stolen, that

9    was a family matter.  The individual in that case -- the

10   husband went out of town, he went overseas, I believe he even

11   went back to Palestine, and when he came back money and

12   jewelry was missing.  Now interestingly, Judge, the money and

13   jewelry were in a safe with a combination.  Now the

14   government wants you to believe that Yousef Ramadan was able

15   to -- and there was no indication that the safe was broken,

16   had been broken, broken into, bombed or any of that.  As it

17   turned out, there was a family meeting and the husband's wife

18   had went into that safe, found the money and the jewelry, and

19   took it.  They were subsequently divorced.  But, again,

20   Yousef Ramadan gets the blame because he was in the area.

21           I recall once my son did something that upset his

22   mother, and it upset her so bad that she called me, just like

23   in the movies, wait until your father gets home.  And I got

24   home and she told me what my son had done, and what she

25   expected me to do.  Now, in the black community we beat our

 1    kids.  We put a belt on them.  All right.  Not like white

 2    folk, we don't talk to them and tell them, oh, you did wrong.

 3    We put a belt on them.  And my wife told me beat his butt,

 4    and I did.  That was not my finest moment.  But I put a

 5    whooping on him like he never ever forgot.  Sometimes people

 6    from different cultures raise their kids differently.  They

 7    talk to their kids differently.

 8          The government's argument that that man should be

 9    locked up because they disagreed with how he parents his kids

10    is ridiculous, and it is not worthy of further consideration.

11          They talk about the history and characteristics.

12    His history is one misdemeanor for a nonviolent offense.  His

13    history is paying off $40,000 in restitution.  Not coming

14    back to court continuously saying, judge, I don't have it,

15    I'm broke, I haven't been able to work, my kids got sick.  He

16    was placed on probation, he completed the probation.  He paid

17    off the restitution.  There were no probation violations.

18    There were no warrants issued.  Nobody had to go looking for

19    Yousef Ramadan.  When the time came to court, he appeared in

20    court at every hearing.

21          The argument that he is a risk of flight is equally

22    as ridiculous, Judge.  The government offered Yousef Ramadan

23    a plea to a small amount of prison time and denaturalization.

24    He said I'm not going to give up my U.S. citizenship.

25          The decision to say in jail, Your Honor, in this

Evidentiary Hearing/Motion for Bond • July 10, 2018

**73**

1  case was Yousef Ramadan's decision. I asked him a long time

2  ago let me ask Judge Battani for bond. He said, no, I want

3  Judge Battani to hear from me before she makes that decision.

4  I want her to hear this case before she makes that decision.

5  And I told him this case will probably last a very long time

6  before that's done, and he said, that's fine, I will sit here

7  in jail and I will wait until she has heard the entire case.

8  So Yousef Ramadan, Your Honor, wasn't concerned

9  with his freedom. He was concerned about the truth getting

10  out. He was concerned about how you viewed him. And he

11  wasn't prepared to have a bond hearing until he felt that

12  everything had come out, the good and the bad. And we knew

13  that these photographs were going to be displayed to you. We

14  knew that he was going to be described as a horrible

15  individual. Oh, look, Judge, his kids have guns, the Muslim

16  kids have firearms, isn't that scary.

17  THE COURT: How old were those little boys?

18  MR. DENSEMO: I think --

19  THE DEFENDANT: 10 and 11.

20  MR. DENSEMO: 10 and 11. I grew up, Judge, on a

21  farm. My grandmother put a gun in my hand when I was 10

22  years old, 11 years old, and told me to go find this dog that

23  was killing her chickens. And me and my brothers, who were a

24  couple years younger than me, we went out with a shotgun --

25  me with a shotgun, and we found that dog just as my

1    grandmother had instructed me to.

2         My kids have never seen a gun, Judge.  I mean, they

3    have never been around one when they grew up, but the New

4    York photograph essay that we presented to the Court, Judge,

5    you know that there are people in United States who grow up

6    with guns and their children grow up with guns, and it is a

7    part of their lives.  They are hunters, they are collectors,

8    and they are folk who teach, like Mr. Ramadan, who teach

9    their kids at a very young age how to use firearms.  And

10   there are folks in this country who have grown up using

11   firearms and being around firearms, and sometimes I think

12   that's good because they know how -- they know how to use

13   these firearms.

14        So I don't believe that we should hold it against

15   Yousef Ramadan that he, like a lot of people, believe in

16   instructing their kids on firearms, having their kids know

17   firearms, about firearms, how to handle firearms, how to

18   shoot firearms.  I can have my own personal opinion about

19   that, about the NRA and about a lot of different things

20   regarding firearms, but that's -- that's a citizen's right to

21   have those firearms and to teach their kids about them.

22        So if the government is saying he should be locked

23   up, Judge, he's not trustworthy, he's a risk of flight

24   because he does what a lot of parents do in this country,

25   then that's -- then that's discriminatory.  Why should he be

1     singled out?  Why should his kids be singled out for learning

2     these lessons?

3            And, again, if the government is -- I discussed

4     that as well.  Your Honor, the government talked about pills

5     or photos of pills found on Mr. Ramadan's electronic media.

6     They want to extrapolate that into well, Judge, he must have

7     possessed these.  As I indicated in my brief, Your Honor,

8     Yousef Ramadan has photographs and pictures and videos off

9     pretty much anything you can imagine.  The man has recorded

10    just about everything in his life, everything he's ever seen.

11    Anything he finds of interest he keeps on his laptops, his

12    hard drives his phones.  There is no indication that

13    Yousef Ramadan has ever been found with or possessed a

14    controlled substance.  We don't even know -- since there is

15    no lab reports in this case we don't know if this -- the

16    photo from this electronic media is actually a controlled

17    substance except in the mind of the government it is a

18    controlled substance, it's a Vicodin.

19            The same thing with the marijuana, Your Honor.  If

20    you even assume that the government is true that

21    Yousef Ramadan was around marijuana, you've had clients of

22    mine who have used marijuana while their federal case was

23    pending, and the remedy is don't use it any more, I'm going

24    to test you, if you keep testing dirty then I'm going to send

25    you -- then I'm going to revoke your bond.

```
 1              So the idea that, hey, Judge, Yousef Ramadan has
 2     been around marijuana, you shouldn't give him a bond, if
 3     that's the case then marijuana becomes an automatic way to
 4     jail, and we all know that it isn't.  It is one of those bond
 5     violations that the bond department is reluctant to bring a
 6     petition on, and the courts are reluctant to revoke bond
 7     because there are other ways of dealing with the people who
 8     use or are around marijuana.
 9              The government talked about photographs of
10     individual IDs on Mr. Ramadan's electronic media.  Again, the
11     one in particular, I think it was Exhibit 24, is a photograph
12     of Mr. Ramadan's girlfriend, and she put the -- her
13     photograph and Social Security number -- Social Security
14     number into his computer.  That was not something he stole
15     from anybody, that was her using her computer and putting her
16     information into it.  I believe that's Exhibit 24.  So that
17     is where that came from, Your Honor.
18              The government did not say anything about --
19              THE COURT:  What exhibit are you talking about?
20              MR. DENSEMO:  I believe that's the exhibit with
21     the --
22              THE DEFENDANT:  They didn't give it.
23              MR. DENSEMO:  Do you have that?
24              THE COURT:  24 is the marijuana picture.
25              MR. DENSEMO:  No, I'm sorry.  I thought it was an
```

```
 1    exhibit of the young lady and her Social Security card.
 2              THE COURT:  11 maybe?
 3              MR. WATERSTREET:  12, I believe, Your Honor.
 4              MR. DENSEMO:  I'm sorry.
 5              THE DEFENDANT:  Mr. Densemo.
 6              (An off-the-record discussion was held at
 7              3:22 p.m.)
 8              THE COURT:  I have 12 is the checks but 11 is the
 9    picture of all the cards.
10              MR. DENSEMO:  Pardon me?
11              THE COURT:  11 is the picture of cards, the
12    driver's license.
13              MR. WATERSTREET:  It is last page of 12.
14              MR. DENSEMO:  The government is saying it is the
15    last page of Exhibit 12.
16              MR. WATERSTREET:  If that's what you are looking
17    for.
18              THE COURT:  Exhibit 12, last page.  Okay.  Got it.
19              MR. DENSEMO:  So that's a picture of his cousin's
20    girlfriend, and as indicated, she was using Mr. Ramadan's
21    computer and that's how that information got on his
22    electronic media.
23              THE COURT:  She put it on his computer?
24              MR. DENSEMO:  She put it on there herself.  The
25    other thing too, Judge, the government is saying that
```

1    Mr. Ramadan had some sort of bad purpose for these IDs.

2    There has never been -- if you check any of those IDs or

3    credit card numbers or anything, there has never been any

4    Fraud on any of those.  There has never been any fraudulent

5    activity on any credit card number or ID in Mr. Ramadan's

6    computers, none whatsoever for anybody.  Nobody has ever had

7    a charge to their credit card as a result of anything that

8    Yousef Ramadan may have done, nothing.  So there was never

9    any indication that Mr. Ramadan ever had any kind of criminal

10   intent whatsoever, which to me is important, because if you

11   have those things for identity fraud purposes or fraud

12   purposes you are going to use them, you don't just collect

13   them, except if you are Yousef Ramadan who collects

14   everything and saves everything, sometimes to his detriment,

15   but the man keeps everything on his computers.  And if there

16   was -- if there was any kind of fraud we would know about it,

17   and there hasn't been.

18          So, again, the government being the government is

19   suspicious of this.  You know, probably suspicious too, but

20   your suspicions are unfounded because nothing has been done

21   with the information.

22          THE COURT:  Okay.  Anything else?

23          MR. DENSEMO:  Yes, Your Honor.  I wanted to talk

24   about the firing of the -- Mr. Ramadan firing weapons.  Every

25   year around the country on the Fourth of July U.S. citizens

Case 2:17-cr-20595-VAR-EAS   ECF No. 98   filed 07/31/18   PageID.1965   Page 79 of 89
Evidentiary Hearing/Motion for Bond • July 10, 2018

79

1    fire off firearms.  I think they started firing off firearms

2    in the old west or back when the country first started

3    celebrating the Fourth of July people have been firing

4    firearm.  And on New Year's Eve I know that in Detroit we

5    love to fire -- to shoot firearms on the Fourth of July and

6    New Year's Eve and any other time that we think it is a good

7    idea.  So the fact that Mr. Ramadan did is it in this case,

8    Your Honor, I don't think is unusual.  Maybe again it shows a

9    lack of good judgment, but I don't think it suggests that

10   he's danger to the community.  And, again, a bond condition

11   which says you are not to be around firearms at all,

12   Mr. Ramadan, would cure any kind of concerns that we have

13   about Mr. Ramadan and firearms.

14            Just a couple more issues, Your Honor, and I think

15   that I am done.

16            THE DEFENDANT:  Mr. Densemo.

17            MR. DENSEMO:  One second.

18            (An off-the-record discussion was held at

19            3:25 p.m.)

20            MR. DENSEMO:  Your Honor, the other thing that we

21   wanted to point out that the bullets that were used by

22   Mr. Ramadan when he was firing with his kids, these were

23   blanks and they were just used for the sound.  And I think

24   that you can see that there was no ejection.

25            THE COURT:  Just for the sound?

1          MR. DENSEMO:  Just for the sound, just like a loud

2   firecracker.  And I believe that there would have been some

3   sort of ejection of that if that was from an automatic weapon

4   as we saw in the other video.

5          Again, Judge, I would like to finish up by saying

6   that of the hundreds of people that I have represented,

7   Mr. Ramadan is one of the few people that has such a minor

8   criminal record, that who is charged with an offense that

9   carries a presumption that he should be released on bond.  He

10  has no history of violence.  He has no history of

11  nonappearance.  He has strong ties to the community.  His

12  family is here and they have been here.  His sisters are

13  prepared to give him a place to live if the Court should

14  grant him release.

15         Much of what the government wants you to use as a

16  basis for denying bond are uncharged -- is uncharged conduct.

17  The government -- the only convictions that have arisen arise

18  in the mind of the government.  There has been no charge for

19  fraud.  There has been no charges for child abuse or child

20  endangerment.  There has been no charges for possession of

21  marijuana with intent to distribute.  There is no charges or

22  convictions for possession of Vicodin.  There is no charges

23  for possession of stolen firearms.  There's no charges for

24  possession of stolen goods.  All of these things, Judge, the

25  government is saying, Judge, lock him up for this stuff here.

1    He didn't get charged with it, there are no convictions, but

2    we know we know he did it so lock him up based on that, and

3    he's a bad parent.

4           So that's their argument.  That's their clear and

5    convincing evidence as to why he's a risk of flight, as to

6    why there are no conditions or a combination of conditions

7    that would reasonable assure his appearance.  And those

8    things don't -- they just aren't sufficient, Your Honor.  The

9    Court should not use those things, uncharged conduct, as a

10   basis for denying bond when the Court can impose conditions

11   that would assure his appearance, and we would ask the Court

12   to do so.

13          THE COURT:  Thank you.  Briefly.

14          MR. WATERSTREET:  Very briefly, Your Honor.  Your

15   Honor, a bond hearing isn't to see if somebody wins father of

16   the year award, and that's certainly not why I brought that

17   up, whether he's a good parent or a bad parent.  And this

18   bond hearing isn't for the Court to determine whether he's

19   rude to police officers or not.  And the issue isn't whether

20   he has been charged and convicted of prior offenses, but

21   whether the Court will follow the statute as required that

22   the Court shall take into account his past conduct.  And it

23   is not an example of did he maybe do this stuff; his videos

24   that he took himself shows him committing these acts.

25          Counsel referenced that he has not engaged in any

1    violence, but I believe if the Court will recall he was

2    arrested for domestic violence in the past, and also he made

3    reference to a video in which Mr. Ramadan, which I did not

4    play, the Court has it, which Mr. Ramadan gets out,

5    challenges somebody to a fight and then sprays them with

6    pepper spray when the person was just -- while they were

7    sitting in their car.

8         As to the issue of the passports, Your Honor, the

9    defendant also has access to a Palestinian passport because

10   he's Palestinian as well.  The United States has no control

11   over another country giving him a passport to travel under.

12        But what was not discussed, however, defense failed

13   to discuss anything about the obliterated serial number, the

14   silencer shooting out of the window while under court order

15   not to commit any new offenses.  And the shooting of the

16   silencer out the back into the neighborhood, if that doesn't

17   show dangerousness to the community nothing does.  And that

18   certainly was not on the Fourth of July.

19        Lying to gain U.S. citizen on more than one

20   occasion.  And he never touched anything about the escape

21   materials.  And lastly, his explanation is that well, there

22   wasn't really a bullet, it was blanks.  Your Honor, there

23   were no blanks found during the execution of that search

24   warrant on his storage locker, only live rounds were found.

25   Thank you.

```
 1              THE COURT:  All right.  The Court --
 2              MR. DENSEMO:  Judge, I just have a couple --
 3              THE COURT:  No, you are done.  We did it.  Thank
 4     you.
 5              The Court has reviewed this matter and the briefs
 6     that have been filed, and listened to the argument today.
 7     And clearly this is not a case where there is a presumption,
 8     but the standard, I believe, is in terms of risk of flight,
 9     clear and convincing, but I think that the standard here for
10     whether Mr. Ramadan is a danger to the community or a risk of
11     flight that the Court would use is clear and convincing.
12              The Court has to take into fact -- into
13     consideration a number of factors as considered -- or stated
14     specifically in 3142(g).  And the first one is the nature and
15     circumstances of the offense.  Here we know that this is a
16     firearms case with the obliterated serial numbers.  And this
17     case is serious because of the nature of why do you have
18     obliterated serial numbers except to avoid tracing these
19     guns.
20              We know that the defendant here -- and I think this
21     is the -- how do I want to say it?  This is maybe the
22     elephant in the room is the terrorism issue, and it is
23     because the defendant in his properties when they were
24     reviewed they found over 1,500 ISIS pictures.  And the
25     defendant talks about this being -- you know, he's
```

 1   sympathetic to ISIS though he does not believe in their -- in

 2   their desire to use physical force, although his actions

 3   really belie this because we know here in the -- in the

 4   storage locker there were the guns found, there were the

 5   parts of the gun that matched the gun that was stolen, there

 6   were explosives found, and I believe -- we did not talk about

 7   this today but I have read or there was testimony in prior

 8   hearings that the defendant could make a bomb in an hour if

 9   he had the materials.  So I think that this makes it a very

10   serious offense.

11          In terms of the weight of the evidence, clearly as

12   the charged crime the evidence is clear and convincing at

13   this point.

14          The Court has to look at the history and character

15   of the defendant, and we know that the defendant was on

16   probation for a Social Security fraud, and that he received

17   monies for children that weren't in the country, and that he

18   was placed on probation.  While he was on probation there is

19   allegations that he stole a firearm, and I think by clear and

20   convincing evidence those allegations could be proved given

21   the unique characteristic of that firearm as shown by the

22   photographs, particularly the side by side photographs of

23   these two firearms.

24          We know that the -- there was an issue of stealing

25   cash or jewelry, and I agree with the defense on that that

1   there is not proof that this defendant -- in fact, the proof

2   I guess is to the contrary that the family member took it and

3   not the defendant, and the Court is not considering that.

4            In terms of child endangerment -- and by the way,

5   these are things that the defendant has not been convicted of

6   or even charged, but the Court must consider all much these

7   things.  Evidently the defendant was either asleep or out or

8   something while this three-year-old was in an area where

9   there were narcotics and firearms.

10           I think the interesting thing is is that there is

11  here a series of individual events, individual circumstances,

12  no one circumstance perhaps meets the standard, but the Court

13  considers all of the circumstances, I look here that there

14  were narcotics found in the area with the child.  Then I see

15  that there is also a discussion of marijuana and how there

16  can be -- the defendant can make $16,000 a month.  There's

17  the photographs of the pills which we don't know where those

18  pills came from, but it is just another circumstance that

19  this defendant just happens to have these photographs like he

20  saves everything, and maybe he does, but that tells us a

21  little bit more about him.

22           And I think that the -- looking at his

23  characteristics, as to the children I don't think it is for

24  the Court to decide what kind of parent he may be, he may be

25  a wonderful parent, I don't know.  But certainly having young

1    children, 10 or 11, shooting out of a window.  Now we hear

2    today it is blanks, but we see where the defendant has taught

3    his children how to these firearms and how to load these

4    firearms, and I guess that's his parenting style, and I'm not

5    holding that against him.  I certainly don't agree, but if he

6    wants to teach his children to do this, that's something.

7    But to show them to shot out of a window on Fourth of July,

8    yes, lots of people do that, but to have 10 and 11-year-olds

9    doing that to me is totally irresponsible.

10         But that has nothing to do with what he's going to

11   do in terms of being a danger to the community.  But I find

12   by clear and convincing evidence that his shooting out the

13   window with a silencer on his rifle on a sunny day -- I don't

14   know if it is the middle of the day but certainly it's got to

15   be the middle or at least the afternoon or sometime because

16   the sun was so bright out that window, from an apartment

17   complex to a residential area shows me that he is clearly a

18   danger to the community.

19         In terms of the other things, the credit cards and

20   all those things he's copied, I don't think the Court even

21   needs to go into that.  The most I can say with that is

22   taking pictures of the uniform and identification cards of

23   the Customs officer does give me pause as to what one would

24   do with that but, again, I find that in and of itself is not

25   an indication of anything.  But I think if you take together

 1   with everything else it shows clearly that he could use these

 2   things to create a situation where he could, in fact,

 3   impersonate such people and cause havoc in our airports, or

 4   he could create a situation where he could leave the country.

 5       And that raises the issue of whether he's a flight

 6   risk.  We know that he's not working.  We know that he packed

 7   his family up and they went and bought their tickets and

 8   left -- or attempted to leave on the same day, so he had no

 9   lease.  He does have sisters who said they would support him

10   here, but we know that the wife and children are out of the

11   country and that he would have a desire to go there.

12       So I think that there is enough there to say that

13   he is a flight risk.

14       The Court also notes that he said at the time of

15   the interview the guns were at a friend's house when, in

16   fact, the guns were in a storage locker, although we don't

17   know, maybe there are guns at a friend's house, that's what

18   he said.  The Court has no reason to totally disregard that.

19   Again, he indicated he only owned two guns when, in fact, he

20   owned many more.

21       So I don't think I need to repeat everything that

22   was said here, but I do think that when we consider the

23   clothing that was found in his cell along with the graffiti

24   on the wall and the fact that he certainly -- he got into a

25   fight with somebody, and he says in his brief that this was

Case 2:17-cr-20595-VAR-EAS  ECF No. 98  filed 07/31/18  PageID.1974  Page 88 of 89
*Evidentiary Hearing/Motion for Bond • July 10, 2018*

88

 1   because he was protecting himself, and I think it was over a

 2   chair or something like that.  But, in any event, to have

 3   this clothing is very concerning to the Court because it does

 4   look like it's an effort that if he had an opportunity to

 5   escape he could take that opportunity.

 6           So considering all of these factors, the Court

 7   finds by a clear and convincing evidence that there is no way

 8   the Court could be assured that he would not be a flight risk

 9   or a danger to the community, so the motion is denied.

10           Thank you.  All right.  We will see you in

11   September.  Thank you.  Anything else, Counsel?

12           MR. DENSEMO:  Pardon me, Judge?

13           THE COURT:  Anything else?

14           MR. DENSEMO:  No, not at this time.

15           MR. WATERSTREET:  No, Your Honor.  Thank you.

16           THE COURT:  Okay.  Thank you.

17           THE LAW CLERK:  All rise.  Court is in recess.

18           (Proceedings concluded at 3:41 p.m.)

19                         —   —   —

20

21

22

23

24

25

1          *CERTIFICATION*

2

3               I, Robert L. Smith, Official Court Reporter of

4     the United States District Court, Eastern District of

5     Michigan, appointed pursuant to the provisions of Title 28,

6     United States Code, Section 753, do hereby certify that the

7     foregoing pages comprise a full, true and correct transcript

8     taken in the matter of U.S.A. vs. Ramadan, Case No. 17-20595,

9     on Tuesday, July 10, 2018.

10

11

12                              _____

13                              Robert L. Smith, RPR, CSR 5098
                                Federal Official Court Reporter
14                              United States District Court
                                Eastern District of Michigan

15

16

17    Date:  07/30/2018

18    Detroit, Michigan

19

20

21

22

23

24

25