Case 2:17-cr-20595-VAR-EAS  ECF No. 109  filed 10/19/18  PageID.2073  Page 1 of 149
*Evidentiary Hearing • September 12, 2018*

1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3                           —   —   —

     UNITED STATES OF AMERICA,
 4
                  Plaintiff,
 5
       vs.                              Case No. 17-20595
 6
     YOUSEF M. RAMADAN,                  Hon. Marianne O. Battani
 7
                  Defendant.
 8   _____/

 9                      EVIDENTIARY HEARING

10        BEFORE THE HONORABLE MARIANNE O. BATTANI
                  United States District Judge
11        Theodore Levin United States Courthouse
                  231 West Lafayette Boulevard
12                     Detroit, Michigan
                 Wednesday, September 12, 2018
13
     APPEARANCES:
14
     For the Plaintiff:    RONALD W. WATERSTREET
15                         MICHAEL M. MARTIN
                           U.S. Attorney's Office
16                         211 W. Fort Street, Suite 2001
                           Detroit, MI  48226
17                         (313) 226-9100

18   For the Defendant:    ANDREW DENSEMO
                           COLLEEN P. FITZHARRIS
19                         Federal Defender Office
                           613 Abbott, 5th Floor
20                         Detroit, MI  48226
                           (313) 967-5555
21

22   Also Present:         Tania Ghanem, Court Interpreter

23

24        To obtain a copy of this official transcript, contact:
                 Robert L. Smith, Official Court Reporter
25              (313) 234-2612 • rob_smith@mied.uscourts.gov
```

Case 2:17-cr-20595-VAR-EAS   ECF No. 109   filed 10/19/18   PageID.2074   Page 2 of 149
*Evidentiary Hearing • September 12, 2018*

2

# TABLE OF CONTENTS

WITNESSES                                                          PAGE

OFFICER CHARLES SCHMELTZ
Direct Examination by Mr. Densemo................. 10

AGENT MITCHELL ARMENTROUT
Direct Examination by Mr. Densemo................. 21
Cross-Examination by Mr. Waterstreet.............. 38
Redirect Examination by Mr. Densemo............... 44

AGENT PATRICK KELLEY
Direct Examination by Mr. Densemo................. 45

OFFICER JAMES BROWN
Direct Examination by Mr. Densemo................. 59
Cross-Examination by Mr. Waterstreet.............. 67
Redirect Examination by Mr. Densemo............... 70

AGENT MICHAEL THOMAS
Direct Examination by Mr. Densemo................. 73


ARGUMENT

Motion to Dismiss for Outrageous Governmental
Misconduct........................................ 82

Motion to Suppress Statements and Search of
Electronic Devices................................ 92

```
 1 ║  Detroit, Michigan
 2 ║  Wednesday, September 12, 2018
 3 ║  at about 10:43 a.m.
 4 ║                          —   —   —
 5 ║           (Court, Counsel and Defendant present.)
 6 ║           THE LAW CLERK:  Please rise.
 7 ║           The United States District Court for the Eastern
 8 ║  District of Michigan is now in session, the Honorable
 9 ║  Marianne O. Battani presiding.
10 ║           You may be seated.
11 ║           The Court calls Case No. 17-cr-20595, United States
12 ║  of America vs. Mohammed Ramadan.
13 ║           THE COURT:  Good morning.
14 ║           MS. FITZHARRIS:  Good morning, Your Honor.
15 ║           MR. DENSEMO:  Good morning.
16 ║           MR. MARTIN:  Good morning, Your Honor.
17 ║           THE COURT:  May I have your appearances, please?
18 ║           MR. MARTIN:  Yes, Your Honor.  Michael Martin and
19 ║  Ronald Waterstreet for the government, and with us today is
20 ║  FBI Special Agent John Banach and our paralegal
21 ║  Darlene Secord.
22 ║           THE COURT:  Okay.
23 ║           MR. DENSEMO:  Good morning, Your Honor.
24 ║  Andrew Densemo on behalf of Yousef Ramadan.
25 ║           THE INTERPRETER:  Good morning, Your Honor.
```

1  Tania Ghanem from Worldwide Interpreters, and I'll be the

2  interpreter.

3  THE COURT:  Okay.

4  MS. FITZHARRIS:  Good morning, Your Honor.

5  Colleen Fitzharris on behalf of Mr. Ramadan.

6  THE COURT:  All right.  Would you please swear the

7  interpreter in.

8  THE LAW CLERK:  Please raise your right hand.

9  Do you solemnly swear that you will interpret

10  accurately and truly Arabic into the English language and

11  English into the Arabic language to the best of your skill

12  and judgment?

13  THE INTERPRETER:  I do.

14  THE COURT:  All right.  Let's begin.  We have some

15  motions and, I understand, some witnesses.  Is that correct,

16  Mr. Martin?

17  MR. MARTIN:  Yes, Your Honor.  If I could just

18  address the Court and kind of tell you where I think things

19  stand at this time.

20  THE COURT:  Okay.

21  MR. MARTIN:  May I?

22  THE COURT:  Yes, please.

23  MR. MARTIN:  So before the hearing today, I went

24  back, and I looked at all the motions that have been filed as

25  well as the motions that have been ruled on, the motions that

1  have been outstanding, and then some recently filed motions

2  by the defense.  And so I believe, as I understand it, all of

3  the defense motions have been denied or dealt with, with the

4  exception of three, which are the Motion to Suppress Evidence

5  from the Defendant's Storage Locker, that's Docket Number 19,

6  the Motion to Suppress His Statements to Law Enforcement

7  Officers, that's Docket Number 20, and then I also believe

8  outstanding is his Motion for Return of Seized Property,

9  that's Docket Number 31, and that relates to his claim that

10  the government stole money and jewelry from him.

11        All of his other motions, discovery motions,

12  motions to dismiss, all of those have been denied by the

13  Court in two orders; one is Docket Number 82 and the other is

14  Docket Number 83.

15        THE COURT:  What is number 82?

16        MR. MARTIN:  That's an order from the Court denying

17  or granting in part all of the defendant's other discovery

18  motions and motions to be dismissed that have been filed over

19  the past six months or so.  So you've dealt with all of

20  those, I believe, in orders -- in your orders which are

21  Docket Numbers 82 and 83.

22        However, there -- in the past month the defense

23  filed two more motions.  One is a Motion to Dismiss for

24  Outrageous Government Conduct; that's Docket Number 100,

25  filed under seal.  The government responded to that on Monday

Case 2:17-cr-20595-VAR-EAS  ECF No. 109  filed 10/19/18  PageID.2078  Page 6 of 149
*Evidentiary Hearing • September 12, 2018*

6

1    by the due date, and that motion should probably be set for
2    some future hearing.  Then they also filed about two weeks
3    ago a Motion to Compel Discovery, that's Docket Number 103;
4    our response is not due until later this week.  So those two
5    new motions are outstanding.

6         What we are here for today is testimony from the
7    law enforcement officers who testified at the suppression
8    hearing so that the defense can cross-examine them on some
9    e-mails and other documents provided to them by the
10   government.  We are not here, in my view, to rehash all of
11   the testimony that these officers gave before or in previous
12   days of the suppression hearing.  We are simply here to allow
13   them to try to impeach their witnesses with the new
14   discovery, if you will, that they have received from the
15   government since their testimony the first time.

16        THE COURT:  Okay.

17        MR. MARTIN:  So in my view the testimony today
18   should really be rather limited in scope.  And I raise that
19   because I'm concerned that the defense may try to steer the
20   exam -- the cross-examination into areas that touch on these
21   two new motions that they filed, particularly this Motion for
22   Outrageous Government Conduct.  In that motion they ask the
23   Court for an evidentiary hearing so that they can examine not
24   only the law enforcement officer but myself, Mr. Waterstreet,
25   Hank Moon, the other assistant United States attorney on the

```
 1   case who couldn't be with us today, and they even asked to
 2   examine Ms. Secord.  My concern is -- well, really what they
 3   are trying to do is they want to get discovery on why the
 4   government made its decisions to produce certain documents
 5   and not, who was involved in that decision-making, and things
 6   of that nature, none of which would be proper examination for
 7   today's purposes which is simply to, again, provide them an
 8   opportunity to impeach these witnesses with respect --
 9             THE COURT:  Why don't we hear the Motion for
10   Outrageous Conduct today?
11             MR. MARTIN:  Well, we could, but I -- I'm prepared
12   to argue it, but my point though being, I think that that
13   motion can and should be decided on the law and that no
14   evidentiary hearing should be had.  Certainly, you know, I'm
15   not prepared to testify today.  I don't want --
16   Mr. Waterstreet, Ms. Secord, and I don't want to spend all
17   day with the agents and --
18             THE COURT:  We aren't having testimony of anybody.
19             MR. MARTIN:  Very well, then I'm very happy to
20   argue that on the law today.
21             THE COURT:  Okay.  Mr. Densemo or Ms. Fitzharris?
22             MR. DENSEMO:  I don't know what the -- if the
23   government is asking the Court to censure me, then I don't
24   believe --
25             THE COURT:  If the government -- what?  I'm sorry.
```

```
 1              MR. DENSEMO:  That the government -- I think the
 2    government is asking the Court to restrict my examination of
 3    these witnesses.
 4              THE COURT:  Well, you may examine these witnesses
 5    who have already testified to the extent that you have the
 6    new documents but only as to that; we are not going to repeat
 7    what they have done before.
 8              MR. DENSEMO:  That wasn't my intent, Your Honor.
 9              THE COURT:  Okay.
10              MR. DENSEMO:  And insofar as the government making
11    that assumption, I don't know why they would make an
12    assumption like that when I know the law as well as they do.
13              THE COURT:  Okay.
14              MR. DENSEMO:  So my questions that I have will be
15    directed hopefully with reference to the documents that have
16    been provided, and I have no intention of rehashing -- I have
17    no desire to rehash this entire case.
18              THE COURT:  Okay.
19              MR. DENSEMO:  So I'm prepared to proceed.
20              THE COURT:  What about the Motion for Outrageous
21    Conduct; any reason not to do that today?
22              MR. DENSEMO:  Well, if the -- well, no, if the
23    Court -- the Court has already indicated to Mr. Martin that
24    the Court is not going to take testimony, so that suggests to
25    me that the Court is probably prepared to rule on the
```

Case 2:17-cr-20595-VAR-EAS ECF No. 109 filed 10/19/18 PageID.2081 Page 9 of 149
*Evidentiary Hearing • September 12, 2018*

9

```
 1   documents, and has made some initial determination how it

 2   wants to proceed with regard to that motion, so we can go

 3   forward if the Court desires.

 4           THE COURT:  All right.  Let's start with the

 5   witnesses.

 6           MR. DENSEMO:  All right.  Thank you.  Your Honor,

 7   we would like to call officer -- if the government isn't

 8   going to call anyone, then we would like to start with

 9   Officer Schmeltz.

10           MR. MARTIN:  That's fine, Your Honor.  We have the

11   witnesses all in a room.

12           THE COURT:  Okay.  And what documents do you have

13   now?

14           MR. DENSEMO:  I have two e-mails, and I will show

15   them to the government, from Officer Schmeltz.  I can show

16   them to the Court.  Officer Schmeltz will be really brief.

17           THE COURT:  Okay.

18           MR. DENSEMO:  Thank you.

19           THE COURT REPORTER:  Would you please raise your

20   right hand.

21           Do you solemnly swear or affirm that the testimony

22   you are about to give this Court will be the truth, the whole

23   truth, and nothing but the truth, so help you God?

24           OFFICER SCHMELTZ:  I do.

25           MR. DENSEMO:  Ready?
```

1          THE COURT:  Ready.

2                  OFFICER CHARLES SCHMELTZ,

3    called at about 10:57 a.m., was examined and testified on his

4    oath as follows:

5                      DIRECT EXAMINATION

6    BY MR. DENSEMO:

7    Q.  Officer Schmeltz, could you state your full name for the

8    record?

9    A.  Charles Schmeltz.

10   Q.  And, Officer Schmeltz, you've testified previously

11   during the suppression hearing, haven't you?

12   A.  I have.

13   Q.  And you participated in the interview, examination,

14   interrogation, questioning of Yousef Ramadan on August 15th,

15   2017?

16   A.  I'm not a hundred percent on the date, but, yes, I

17   interviewed him.

18   Q.  All right.  And after that interview, you prepared

19   reports?

20   A.  Yes, I did.

21   Q.  Okay.  And during the course of -- and you have had

22   communications with people with whom you work such -- in the

23   form of e-mails; is that correct?

24   A.  I would have, yes.

25                  MR. DENSEMO:  May I approach the witness, Your

1  Honor?

2          THE COURT:  You may.

3  BY MR. DENSEMO:

4  Q.  Do you recognize the document I just handed to you,

5  Officer Schmeltz?

6  A.  Yes.

7  Q.  Okay.  What is that?

8  A.  It's an e-mail I sent to my supervisor.

9  Q.  And what does that e-mail say?

10  A.  "After a search of my e-mails, I have none pertaining to

11  Ramadan --

12          THE COURT REPORTER:  Slower.

13  A.  Oh, I'm sorry.  I get you every time.

14          It basically says, "After the search of my e-mails,

15  I have nothing pertaining to Ramadan.  I do have my reports

16  but nothing in e-mail.  Also I have no notes."

17  BY MR. DENSEMO:

18  Q.  You indicated this in an e-mail.  When was this e-mail

19  sent?  When was that e-mail sent?

20  A.  Hang on, I will tell you.  It looks like it was sent

21  Wednesday, February 14th, at 5:19.

22  Q.  What year?

23  A.  I believe it was 2018.

24          THE COURT:  I can't hear you.

25  A.  2018.

```
 1   BY MR. DENSEMO:
 2   Q.   I'm handing you another document.  Would you tell me
 3   what this document is?
 4   A.   Yep.  That is an e-mail from -- to my supervisor on
 5   August 15th, 2017.
 6   Q.   August 15th, 2017, that would have been close in time to
 7   the time that you interviewed Mr. Ramadan?
 8   A.   Yes.
 9   Q.   Okay.  And clearly this was in the -- the e-mail that
10   you sent in -- February 14th, 2018, you indicated that you
11   had no e-mails -- you indicated after a search of my e-mails
12   I have none pertaining to Mr. Ramadan?
13   A.   Yeah.
14   Q.   Is that what you wrote in August?
15   A.   I never said I never wrote one.  I said I have none,
16   which means I don't save my e-mails, but my supervisor saved
17   his and that's why he has this one, but I didn't save my
18   e-mails.
19   Q.   So you deleted all of your e-mails?
20   A.   I always do.
21   Q.   Pardon me?
22   A.   I always do, yes.
23   Q.   Okay.  When did you know that -- when did you know that
24   there was an ongoing federal investigation or that there was
25   going to be a continuation of the investigation of
```

1   Yousef Ramadan?

2   A.   I don't remember.

3   Q.   You don't remember?

4   A.   It has been like a year.  I don't remember when I found

5   out he was even arrested.

6   Q.   You don't remember?

7   A.   I don't know the exact date and time, if that's what

8   you're asking.

9   Q.   Pardon me?

10  A.   I don't know an exact date and time, if that's what

11  you're asking.

12  Q.   Did you know -- did you know at some point that there

13  was a continuing investigation regarding Yousef Ramadan?

14  A.   Yes.

15  Q.   And when did you destroy your e-mails?

16  A.   I delete my box probably --

17  Q.   If you know, when did you destroy your e-mails?

18  A.   I don't know, but I delete my box like once every couple

19  of weeks.

20  Q.   In your August 15th, 2017 e-mail, you indicated that you

21  and Armentrout were going to conduct an interview and create

22  an event for high-side checks.  What is -- what does that

23  mean, create an event for high-side checks?

24  A.   It's something we do standard.

25  Q.   Please explain to the Court what that is?

1    A.   Basically an event for high-side checks is you send

2    the -- you send it off to NTC to see if there's anything that

3    we can't see that you have would have to have a SCIF to go

4    see.

5    Q.   I don't understand any of that?

6    A.   Okay.  Basically --

7          THE COURT:  Could you move that microphone closer

8    to you and speak up.

9    BY MR. DENSEMO:

10   Q.   And please slow down.

11   A.   All right.  So when you create an event, you create an

12   event for everybody that has anything of significance or

13   whatever.  You can create an event for anything.  When you

14   create an event, you send it to NTC.  NTC is the National

15   Targeting Center --

16   Q.   Let me stop you.

17   A.   It's the National Targeting Center.

18   Q.   Let me stop you there.  Create an event in layman's

19   terms is you tell people what happened?

20   A.   It's a report basically.

21   Q.   It's a report.  You created a report; is that right?

22   A.   Well, I don't know if you classify it as a report

23   because there's going to be stuff in there from the report,

24   but it's -- there's a whole lot of other stuff to it as well.

25   Q.   Okay.  And then you send that where?

1   A.  It goes to the National Targeting Center in D.C.

2        THE COURT:  The National what?

3   A.  Targeting Center.

4        THE COURT:  Oh, Targeting Center.

5   A.  Yeah.

6   BY MR. DENSEMO:

7   Q.  Who do they target?

8   A.  What do you mean who do they target?  I don't know what

9   their job does.  I just know we send them things, and if

10   there is anything they have -- they have systems we don't

11   have access to, and if there is something we need to know,

12   they let us know; if they don't, they don't.

13   Q.  Who is the National Targeting Center?

14   A.  I don't know who they are.  I just know what it is.

15   Q.  What is it?

16   A.  It is a giant facility in D.C. that does -- basically

17   they run checks for other entities like ourselves.

18   Q.  Export violations?

19   A.  I don't know.  I don't know really what they do there.

20   Q.  Do you do this in every case?

21   A.  No.

22   Q.  Why did you do it in this case?

23   A.  Because for this case it would be normal.  If I --

24   Q.  For this case, what was it about this case that made

25   this normal?

1    A.   Excuse me?

2    Q.   You said for this case it is normal.

3    A.   Yes, just --

4    Q.   Okay.

5    A.   -- though items that he packed that day, the items that

6    he packed that day, and basically the stuff that we found on

7    his media devices.

8    Q.   What stuff?

9    A.   The ISIS stuff on his media devices.

10   Q.   Okay.  And JTTF is responding, that's also your e-mail.

11   Who is JTTF?

12   A.   That's the Joint Terrorism Task Force.

13   Q.   Okay.  And, again, Joint Terrorism Task Force was

14   brought in because of the stuff, the ISIS propaganda, that

15   was on the media devices?

16   A.   Yeah.  You would call the Joint Terrorism Task Force

17   when you find something terrorist related, yes, sir.

18        MR. DENSEMO:  I don't think I have any additional

19   questions.

20        MS. FITZHARRIS:  Mr. Densemo.

21        (An off-the-record discussion was held at

22        11:05 a.m.)

23   BY MR. DENSEMO:

24   Q.   All right.  Officer Schmeltz, in your August 15th

25   report, you indicate -- it indicates that this e-mail was

1    sent at 8:44 p.m.; is that right?

2    A.  It says it.  I don't remember it, but if it says it.

3    Okay.  Yes.

4    Q.  And so you sent this e-mail before the media devices had

5    been searched?

6    A.  Yeah, that would have been normal.

7    Q.  All right.  And you say you sent that -- you sent that

8    to this unknown -- this facility, this targeting facility,

9    because of the ISIS propaganda that was found on the media

10   devices?

11   A.  And the stuff that he packed in his bags, I said, yes.

12   Q.  But you sent the e-mail before the media devices had

13   even been searched.

14   A.  I don't recall when the media devices were searched, but

15   I would have sent that just for the stuff in his bags as

16   well; I would have sent that to NTC.

17   Q.  So you don't know -- so you have no recollection of when

18   the hard drive was searched?

19   A.   It's been like a year, I don't remember.  To be honest

20   with you, I just don't remember.

21   Q.   Is there a retention policy that your office has for

22   retaining e-mails and text messages?

23        MR. WATERSTREET:  Objection, Your Honor; this has

24   gone beyond the scope.

25        THE COURT:  Overruled.  I will allow it.

1    BY MR. DENSEMO:

2    Q.   Is there a retention policy that your office has for

3    retaining --

4    A.   I have no idea.  Every keystroke we have is recorded, so

5    for us as an individual, deleting our inbox and getting rid

6    of it means nothing.

7    Q.   So you are saying that you have no knowledge of what

8    Customs' and Border Patrol's policy is for the retention of

9    e-mails, text messages that relate to -- that relate to an

10   investigation?  You have no --

11   A.   I don't know what they do.  I know every keystroke is

12   recorded, and they keep everything.

13   Q.   So is your answer to my question yes or no?

14   A.   No.

15   Q.   You have no knowledge of what the policy is?

16   A.   For keeping e-mails, no.

17   Q.   Or text messages?

18   A.   Or text messages.

19   Q.   Have you ever read a booklet that had that information?

20   A.   I don't recall if I did or didn't.  I read lots of

21   books.  CBP has a lot of policies, I don't memorize them all.

22   Q.   So if there is a policy, you've forgotten it?

23   A.   No.  I'm just saying I don't -- you are asking me -- I

24   know where you're going with it, but I'm just trying to tell

25   you if you delete your e-mails, we still have -- CBP still

1   retains your e-mail.  So our personal inbox, you can delete

2   it until you're blue in the face, but it is still kept and

3   recorded but --

4   Q.  So you are aware -- I'm sorry.  So you are aware that

5   these e-mails should not be permanently deleted?

6   A.  Well, at the time I don't know if I knew there was even

7   an investigation or anything at the time.

8   Q.  That's not my question.  My question was:  So you're

9   aware that these e-mails and text messages should not be

10  permanently deleted?

11  A.  No, I don't -- I delete my inbox whenever it's full.

12  Q.  Did you hear the word permanently in my question?

13  A.  Nothing is permanently deleted at CBP.

14          THE COURT:  What does that mean, nothing is

15  permanently deleted?  Where is it?

16  A.  Every text message, everything you send is recorded in

17  our servers.  We don't have no control.  Like everything you

18  touch in our keyboards is recorded and kept.  That's all I

19  know.  I don't know how they do it, you know, I just --

20  that's what they do.

21          MR. DENSEMO:  Okay.  I don't have any additional

22  questions, Your Honor.

23          THE COURT:  Any examination?

24          MR. WATERSTREET:  No, no.  Thank you.

25          THE COURT:  All right.  You may step down, sir.

1                    (Witness excused at 11:09 a.m.)

2                    THE COURT:  Your next witness?

3                    MR. DENSEMO:  The next witness, Your Honor, would

4    be Mr. -- Agent Armentrout.

5                    THE COURT:  All right.  And which documents do you

6    have for him?

7                    MR. DENSEMO:  One second, Your Honor.  I have

8    e-mails and report -- two reports that were given to me by

9    the government.

10                   THE COURT:  Two reports and one e-mail?

11                   (An off-the-record discussion was held at

12                   11:10 a.m.)

13                   MR. DENSEMO:  Just one report, Your Honor.

14                   THE COURT:  Okay.

15                   MR. DENSEMO:  I can show that to the Court, one

16   report and one e-mail.

17                   THE COURT REPORTER:  Would you please raise your

18   right hand.

19                   Do you solemnly swear or affirm that the testimony

20   you are about to give this Court will be the truth, the whole

21   truth, and nothing but the truth, so help you God?

22                   OFFICER ARMENTROUT:  I do.

23                        OFFICER MITCHELL ARMENTROUT,

24   called at about 11:11 a.m., was examined and testified on his

25   oath as follows:

```
 1                    DIRECT EXAMINATION
 2   BY MR. DENSEMO:
 3   Q.   Officer Armentrout, would you state your full name for
 4   the record?
 5   A.   Mitchell Armentrout.
 6   Q.   And you're employed with?
 7   A.   Customs and Border Protection.
 8   Q.   And you've testified at the hearing previously in this
 9   case; is that right?
10   A.   Yes, sir, I did.
11   Q.   Mr. Armentrout, I'm handing you a document, and I'm
12   going to ask you if you recognize it?
13   A.   Yes, sir, I do.
14   Q.   And what is that?
15   A.   It's an electronic media report.
16   Q.   And does that say who generated that report?
17   A.   It says my name, sir.
18            THE COURT:  Okay.  You are going to have to speak
19   up, sir.
20   BY MR. DENSEMO:
21   Q.   It has your name --
22            THE COURT:  Counsel, none of these have been
23   marked, and I just, for purposes -- in the future they will
24   have to be marked.
25            MR. DENSEMO:  Okay.  That's fine, Judge.  So it is
```

1   clear, I will give the Court the two documents that were

2   presented to Officer Schmeltz, and we would ask that they be

3   marked Defense's 1A and 1B or however --

4          THE COURT:  You can mark them.  I don't need them.

5   You can just mark them, just so it's in the record.

6          MR. DENSEMO:  All right.

7          (Defendant's Exhibits 1A and 1B marked for

8          identification purposes.)

9   BY MR. DENSEMO:

10   Q.  And, Officer Armentrout, you indicated that you

11   generated a report on or about June 27th.  Was this

12   June 27th, 2018 or was this generated earlier?

13   A.  I'm sorry, sir.  I don't have that report in front of

14   me.

15   Q.  I will hand you what has been marked as

16   Defense Exhibit 2A.

17   A.  The listed incident date is the 16th of August, 2017.

18   Q.  What date?

19   A.  The 16th of August, 2017, right here.

20          THE COURT:  The 16th of August?

21   BY MR. DENSEMO:

22   Q.  The incident date?

23   A.  Yes, sir.

24   Q.  All right.  And --

25          THE COURT:  Wait a minute.  The incident date is

```
1    August 16th, and the report date is what?

2    BY MR. DENSEMO:

3    Q.  You indicated that -- the date, it says June 27th, 2018.

4    What day is that?

5    A.  That would have been the day it was printed.

6           THE COURT:  I can't hear you.

7    A.  The day that the report was printed.

8           THE COURT:  Oh, okay.

9    BY MR. DENSEMO:

10   Q.  But the date --

11          THE COURT:  When was it written?

12   A.  August 16th, 2017.

13   BY MR. DENSEMO:

14   Q.  And on August 16th, 2017, there is a column that says

15   reason for search; is that right?

16   A.  Yes, sir.

17   Q.  And in that column what did you write?

18   A.  It is a prefilled box; I didn't fill it in, I only

19   selected from the available options.

20   Q.  What option did you select, Officer Armentrout?

21   A.  National security concern, threshold/augment.

22   Q.  So in this column where it says reason for search, you

23   wrote NSC, which is shorthand for national security concern?

24   A.  It's a drop-down menu, sir.  That's just the one I

25   selected.
```

```
1    Q.  I'm not asking you what the menu is, sir.  I'm saying
2    what you wrote or put in the box.
3    A.  I didn't write that, it's a drop-down menu.
4    Q.  All right.  And you selected --
5    A.  I did select that one, correct.
6            THE COURT REPORTER:  Hang on.  One at a time,
7    Mr. Densemo.
8    BY MR. DENSEMO:
9    Q.  There were a number of options in this drop-down menu;
10   is that correct?
11   A.  Yes, sir, they have changed --
12   Q.  And from that menu you selected national security
13   concern, threshold/augment; is that right?
14   A.  I did.
15   Q.  And this was regarding a person with the last name
16   Ramadan; is that right?
17   A.  Yes, sir.
18   Q.  First name, Yousef?
19   A.  Yes, sir.
20   Q.  Country of birth, Palestine?
21   A.  Yes, sir.
22   Q.  Country of citizenship, United States?
23   A.  Yes, sir.
24   Q.  And you filled your name in, Officer Agent
25   Mitchell Armentrout?
```

1    A.  Yes, I did.

2    Q.  Approving supervisor, Marvin Stiggerwalt, III?

3    A.  Yes, sir.

4    Q.  And in it you detailed some items that were seized or

5    were turned over to Homeland Security; is that right?

6    A.  They were detained and turned over to Homeland Security

7    Investigations, yes, sir.

8    Q.  I'm handing you what has been marked as

9    Defense Exhibit 2D.  Do you recognize that document?

10   A.  Yes, sir, I do.

11   Q.  What is that?

12   A.  It appears to be an e-mail that I sent to Officer Brown.

13   Q.  Is it an e-mail that you sent to Officer Brown?

14   A.  Yes, sir.

15   Q.  May I?  And in that e-mail that you sent to

16   Officer Brown, do you list the items that were detained,

17   seized from Yousef Ramadan?

18   A.  May I see the e-mail again, sir?  It's been more than a

19   year.

20   Q.  Go right ahead.

21          THE COURT:  What is the date on that e-mail that it

22   was written?

23   A.  August 16th, 2017.

24          THE COURT:  Thank you.

25   A.  Yes, sir.  They are the same media items that appear in

Case 2:17-cr-20595-VAR-EAS   ECF No. 109   filed 10/19/18   PageID.2098   Page 26 of 149
*Evidentiary Hearing • September 12, 2018*

26

1    the inspection report.

2    BY MR. DENSEMO:

3    Q.   Could you tell us the -- would you read the list of

4    items on that -- in that e-mail?

5    A.   Okay.  ASUS gaming computer.  Would you like me to read

6    the serial number also?

7    Q.   No -- yes, you can.  Go right ahead.

8    A.   Serial number Golf 4 Papa Delta Charlie Golf 00111

9    November.  Hitachi hard drive.  Toshiba laptop computer,

10    serial number 6 Echo 038858 Papa.  Lenovo laptop computer,

11    serial number Papa Frank 01 Alpha Kilo Sierra Frank.

12    09 digital camera.  SD cards.  External hard drives.

13    Seagate Backup Plus Drive, serial number November Alpha 7

14    Tango Kilo 85 November.  Toshiba, serial number X-ray 19

15    Julie Tango Alpha 46 Tango Robert 48.  Seagate, serial number

16    November Alpha 47 Papa Victor 882.  There were two additional

17    external hard drives which I could not access.  One DVD disk.

18    One AT&T SIM card.  Four Apple iPhones.

19    Q.   The ASUS gaming computer, did you search that computer?

20    A.   It's been more than a year, and I honestly can't tell

21    you if I turned it on or not.

22    Q.   The Hitachi hard drive, did you search that computer --

23    that hard drive?

24    A.   Laptop or --

25    Q.   The Hitachi hard drive.

1  A.  Again, I -- I know I plugged it in.  Whether or not I

2  was able to view what's on it or not, I can't testify to.

3  Q.  The Toshiba laptop computer?

4  A.  Again, I can't testify whether or not I was able to

5  access it or even turned it on.

6  Q.  Did you search the Lenovo laptop computer?

7  A.  I can't testify whether or not I even turned it on.

8  Q.  The 09 digital camera with SD cards.

9  A.  I believe I looked at those and --

10 Q.  The Seagate external hard drive.

11 A.  Yes, sir, I did.

12 Q.  The Toshiba external hard drive with serial number

13 SNX19JTA46TR48C?

14 A.  Again, it's been more than a year, I can't -- and it

15 was -- I can't tell you if I looked at it or not.

16 Q.  Did you -- do you recall viewing one DVD disk?

17 A.  I don't.  I may have put it into the disk player, and I

18 couldn't tell you what was on it if it did come on.

19 Q.  Did you search one AT&T SIM card?

20 A.  I -- I honestly don't know.  I can't remember.

21 Q.  Four Apple iPhones?

22 A.  Oh, the answer is right there.

23 Q.  I want you to state the answer for the record, Mr. --

24 Officer Armentrout.

25 A.  Okay.  May I please?  As Mr. Ramadan refused the

1    passcodes to the phones, I detained them as only one line

2    item, Apple iPhones.

3    Q.   So you did not -- you did not view, see -- or see any

4    information on any iPhone?

5    A.   That is correct.

6    Q.   And you indicated that you did review information --

7    that you do recall seeing or searching one of the Seagate

8    hard drives; is that correct?

9    A.   That is correct, yes, sir.

10   Q.   On August 16th, 2017, did you write that media devices

11   were detained upon completion of the examination due to the

12   presence of ISIS propaganda videos, homemade pipe bombs and

13   videos which Mr. Ramadan stated that he made?

14   A.   If it appears in the report, yes, sir.

15   Q.   Is it illegal to have ISIS propaganda videos on

16   electronic media when departing or entering the

17   United States?

18   A.   No, sir.

19   Q.   Is it against the law to have videos or pictures of

20   homemade pipe bombs on electronic media when departing or

21   entering the United States?

22   A.   No, sir.

23   Q.   If you know, does a United States citizen have a

24   First Amendment right to view or listen to propaganda videos

25   from any organization or group on their private electronic

 1   media?

 2         MR. WATERSTREET:  Objection; argumentative, Your

 3   Honor.

 4         MR. DENSEMO:  It's not argumentative.

 5         THE COURT:  Overruled.  Go ahead.

 6   A.  Yes, sir, they do.

 7   BY MR. DENSEMO:

 8   Q.  Would you find -- would finding propaganda videos on

 9   electronic devices from groups that the United States has

10   deemed terrorist organizations constitute a violation of any

11   import or export laws?

12   A.  Import or export, no, sir.

13   Q.  Can electronic devices be taken from travelers entering

14   or leaving the United States simply because they have

15   pictures or videos of pipe bombs, grenades, silencers,

16   firearms, missiles, tanks, executions, killing or genocide?

17   A.  They would be detained for forensic -- they would --

18   Q.  My question was, can electronic devices be taken from

19   travelers entering or leaving the United States simply

20   because they have pictures of video -- or videos of pipe

21   bombs, grenades, silencers, firearms, missiles, tanks,

22   executions, killings or genocide?

23         MR. WATERSTREET:  Your Honor, that's what we are

24   here to find out, if these were properly seized or not, which

25   is the subject matter of this hearing and is not --

1          THE COURT:  Sustained.

2          MR. WATERSTREET:  Thank you.

3    BY MR. DENSEMO:

4    Q.  Officer Armentrout, do you have any newly discovered

5    e-mails, text messages, memos or recordings?

6    A.  Newly discovered?

7    Q.  Yes.  Do you have any e-mails or text messages that you

8    have discovered that you have not turned over to the

9    United States Attorney's Office?

10   A.  No, sir, I have not.  I turned over everything that I

11   was asked for to Supervisor Stiggerwalt in February of this

12   year.

13   Q.  In any of the -- the reports that you generated on

14   August 16th, 2017, you indicate that the cellphone devices

15   were detained, HSI took under own authority.  Who is HSI?

16   A.  Homeland Security Investigations.

17   Q.  And you indicate that that was August 16th, 2017; is

18   that right?

19   A.  Yes, sir.

20   Q.  And you indicate additional information, 6051D; what's

21   that?

22   A.  6051D it is the detention form.

23   Q.  It's the what form?

24   A.  Detention form.

25   Q.  And why was that generated?  Is that a -- is that a part

```
 1    of the process of detaining a traveler's personal property?
 2    A.   Yes, sir, it is, it's a receipt.
 3    Q.   That form has to be completed?
 4    A.   It is a receipt for the property, yes, sir.
 5    Q.   Was that form given to Mr. Ramadan?
 6    A.   Yes.
 7    Q.   When was it given to Mr. Ramadan?
 8    A.   I would imagine sometime between 2:30 and 3:30 that
 9    morning.
10    Q.   Did you give it to Mr. Ramadan?
11    A.   I can't testify to that.
12    Q.   So you don't know if he received a receipt or not?
13    A.   I don't.  It was at the end of a very long day.
14    Q.   I'm sorry.  You don't know.  Your testimony is that he
15    was supposed to be given a receipt; is that right?  Is it
16    your testimony that a traveler whose property has been
17    seized, has been taken, is supposed to receive a receipt from
18    your office regarding that property?
19    A.   I didn't seize any of Mr. Ramadan's property, sir.
20    Q.   Property was taken -- was detained; is that right?
21    A.   Yes.
22    Q.   Under your border search authority; is that right?
23    A.   Actually, according to the report it is under
24    Homeland Securities --
25    Q.   But you --
```

```
 1    A.  -- Border --
 2              MR. WATERSTREET:  Your Honor --
 3              THE COURT:  Just a minute.
 4              MR. WATERSTREET:  Can we allow him to answer the
 5    question before --
 6              THE COURT:  All right.  Wait until he's done with
 7    his answer, Mr. Densemo.
 8              MR. DENSEMO:  Okay.
 9              THE COURT:  Would you ask your question?
10    BY MR. DENSEMO:
11    Q.  All right.  Homeland Security -- somebody turned the
12    property over to Homeland Security, correct?
13    A.  Homeland did --
14    Q.  Somebody --
15              MR. WATERSTREET:  Your Honor --
16              THE COURT:  Let him answer.  You said correct, so
17    let him answer.
18              MR. WATERSTREET:  Thank you.
19    BY MR. DENSEMO:
20    Q.  Did some person turn the property over to Homeland
21    Security, yes or no?
22    A.  Yes, sir.
23    Q.  Who was that person, and who do they work for?
24    A.  That was me, and I work for Customs -- myself, and
25    Customs and Border Protection.
```

| | |
|---|---|
| 1 | Q.  Okay.  What gave you the right to have that property in |
| 2 | the first place? |
| 3 | A.  It was detained under HSI's authority. |
| 4 | Q.  Under HSI's authority? |
| 5 | A.  Yes, sir, that's why I wrote -- |
| 6 | Q.  Not your authority? |
| 7 | A.  That's why I wrote under HSI's authority in the report. |
| 8 | Q.  You initially seized the property under Homeland |
| 9 | Security's authority; is that right? |
| 10 | A.  No, sir, I didn't seize anything. |
| 11 | Q.  The property was -- what is the word that you are using |
| 12 | for the taking of Mr. Ramadan's property by you and your |
| 13 | fellow officers? |
| 14 | A.  The form, 6051D -- |
| 15 | MR. WATERSTREET:  Your Honor -- |
| 16 | A.  -- that you inquired -- |
| 17 | THE COURT:  Wait a minute.  I can't -- I can't do |
| 18 | it with everybody talking at once.  Okay. |
| 19 | MR. WATERSTREET:  Your Honor, may I object? |
| 20 | THE COURT:  Yes. |
| 21 | MR. WATERSTREET:  Thank you.  We are now going back |
| 22 | into rehashing information that was gone over before.  This |
| 23 | is beyond the scope of this very limited -- |
| 24 | THE COURT:  I agree, we have done it before. |
| 25 | MR. WATERSTREET:  Thank you. |

1        MR. DENSEMO:  Your Honor --

2        THE COURT:  Is there something different?

3        MR. DENSEMO:  I'm just asking him about the report,

4   Your Honor.  I don't know if I'm even rehashing anything.

5   This officer is being evasive as to what his authority is,

6   who he works for, and why he seized property.

7        THE COURT:  I don't think he's being evasive at

8   all, but you may ask specific questions about the report and

9   the property.

10  BY MR. DENSEMO:

11  Q.  In your report you indicate that the ASUS gaming system

12  computer was detained, HSI took under own authority, correct?

13  A.  I don't have it in front of me.  If you are reading from

14  my report, the answer is yes.

15  Q.  Am I correct that that's what your report says?

16  A.  Yes, sir.

17  Q.  And, in fact, the items you referenced in

18  Defense Exhibit 2B, your e-mail to Officer James Brown on

19  August 16th, 2017, you indicate that the ASUS gaming

20  computer, the Hitachi hard drive, the Toshiba laptop, the

21  Lenovo laptop, the 09 camera, digital SD cards, the external

22  hard drive, one DVD disk, one AT&T SIM card, four Apple

23  iPhone computers, all of these things were turned over by you

24  to, I believe it's Agent Keith, on or about August 16th,

25  2017, and that Agent Keith took possession of these items

1    from you under HSI's authority; is that right?

2    A.   That is correct.

3    Q.   And in your report, on page 12, did you indicate in your

4    report that Mr. Ramadan would not give his passcodes to his

5    cellphone, and he was very uncooperative throughout the

6    process?

7    A.   I don't have the report in front of me, sir.

8    Q.   Look at the checkmark.

9    A.   Yeah, yes, sir, that's what the report says.

10   Q.   That he was uncooperative throughout the process; is

11   that right?  That's what your report says?

12   A.   Yes, sir, it does.

13   Q.   And in your report, on page 13, you again list all of

14   the items that were contained in your August 16th e-mail to

15   Officer Brown; is that right?

16   A.   Yes, sir.

17   Q.   And in your report, on page 10, you indicate that the

18   media devices were retained upon completion of the

19   examination due to the presence of ISIS propaganda videos,

20   and homemade pipe bomb pictures and videos, which Mr. Ramadan

21   stated that he had made; is that right?

22   A.   Yes, sir.

23   Q.   Who detained them?

24        MR. WATERSTREET:  Asked and answered, Your Honor.

25        THE COURT:  Overruled.

1   A.   Are you asking who physically --

2   BY MR. DENSEMO:

3   Q.   I'm asking who -- you used the word detained, who

4   detained?

5   A.   Physically detained or signed the chain of custody form

6   for, under their direction?

7   Q.   Both.

8   A.   I physically detained them --

9   Q.   Okay.  Thank you.

10   A.   -- at the direction --

11   Q.   That answers my question.

12          MR. WATERSTREET:  Your Honor --

13          THE COURT:  Let him finish his answer.

14          MR. WATERSTREET:  -- let him --

15          THE COURT:  Go ahead, sir.

16   A.   At the direction of Homeland Security Investigations.

17          MR. DENSEMO:  I think I'm almost done, Your Honor.

18   I believe I'm done, Your Honor.  One second, Your Honor.  I'm

19   sorry.

20          (An off-the-record discussion was held at

21          11:33 a.m.)

22   BY MR. DENSEMO:

23   Q.   On page 12 of your report, Officer Armentrout, you

24   indicate that this is -- the external hard drive was shown to

25   HSI between 1:00 and 1:35 to FBI agents; is that right?  It's

1  at the bottom.

2  A.  Yes, sir.

3  Q.  The report reads, "Seagate Backup Plus Drive, this one

4  contained all of the ISIS propaganda and pipe bomb photos,

5  and was reviewed from 2222 on August 15th, 2017, until 1220

6  on August 16th, 2017; is that right?

7  A.  You took it before I could memorize the dates.  If

8  that's what it says.

9  Q.  Is that right?  The one at the bottom.

10  A.  Is this the one here you are asking me about, this one

11  here?

12  Q.  It is highlighted.

13  A.  Yes, sir.

14  Q.  Okay.  You finished by saying, this external hard drive

15  is viewed again from 0100 until 0135 to show the images to

16  FBI and HSI special agents; is that right?

17  A.  That is correct.

18  Q.  In your reports, did you list the amount of money or

19  gold that was on Mr. Ramadan?

20        MR. WATERSTREET:  Your Honor, I believe we have

21  been talking about electronic media report, and this is all

22  about the electronic media.  He's going beyond the scope.

23        MR. DENSEMO:  I'm asking him if it was in his

24  report, Your Honor; did he list any of these items in the

25  reports -- the two reports.

*Evidentiary Hearing • September 12, 2018*

```
 1              THE COURT:  Overruled.  You can answer the
 2    question.
 3    A.  I didn't read the report again this morning.
 4    BY MR. DENSEMO:
 5    Q.  Do you recall listing -- do you recall writing anything
 6    about gold or money being examined in your reports?
 7    A.  Off the top of my head, I don't recall, sir.
 8    Q.  You don't recall any amounts of money -- there is
 9    nothing your report -- in the report that I've shown you this
10    morning about any gold or money being on Mr. Ramadan's
11    person; is that right?
12    A.  I didn't read the entire report this morning.
13              MR. DENSEMO:  I don't have anything additional,
14    Your Honor.
15              MR. WATERSTREET:  May I, Your Honor?
16              THE COURT:  Yes.
17              MR. WATERSTREET:  Okay.  Thank you.
18                      CROSS-EXAMINATION
19    BY MR. WATERSTREET:
20    Q.  Officer Armentrout, you've been asked some very specific
21    questions about particular items that you may or may not have
22    reviewed during your -- during the review of the electronic
23    media that was in Mr. Ramadan's possession?
24    A.  Yes, sir.
25    Q.  And within your report, were you -- did you detail what
```

1    items you did review, were able to review, approximately how

2    long it took you to review them?

3    A.   Yes, sir, I did.

4    Q.   Okay.  Would it refresh your memory if you were given a

5    copy of that report, or the incident log report, that would

6    identify what items you looked at, how long you looked at

7    them and things of that nature?

8    A.   Although the incident report and the report I wrote

9    share some similar information, the one that I actually wrote

10   would be more beneficial.

11   Q.   Okay.

12          MR. WATERSTREET:  What exhibit is this?

13          MR. DENSEMO:  Which one are you talking about?

14          MR. WATERSTREET:  The electronic media report.

15          MR. DENSEMO:  Yes.

16          MR. WATERSTREET:  Did you mark that?

17          MS. FITZHARRIS:  2A.

18          MR. MARTIN:  It's 2A.

19          MR. DENSEMO:  I'm sorry, give me a second, Ron.

20   I'm missing a page -- I'm missing the beginning pages.  1B,

21   1A, 2B.  Where is 2A?  Did I give it to you?

22          MS. FITZHARRIS:  No, I have my own version.

23          (An off-the-record discussion was held at

24          11:40 a.m.)

25

 1  BY MR. WATERSTREET:

 2  Q.  I'm going to show you what has been recently marked as

 3  2A, but this is a copy.  Can you look on that electronic

 4  media report and identify what items you did review?

 5  A.  Yes, sir.

 6  Q.  And does that help refresh your memory as to when

 7  counsel was asking you what items you may have reviewed that

 8  evening or that morning?

 9  A.  Yes, sir.

10  Q.  And can you tell the Court what items you did review and

11  which ones you were able to review?

12  A.  I reviewed the Seagate Backup Plus, and that was --

13  Q.  And what serial number was that?

14  A.  That is November Alpha 7 Tango Kilo 85 November.

15  Q.  Would you identify just briefly some of the items that

16  you found on there?

17  A.  That contained ISIS propaganda and pipe bomb photos.

18  Q.  And you viewed that from 22:22 on 15 AUG 2017 until

19  12:20 on 16 August 2017?

20  A.  It should have read 00:20, but, yes, 12:20 a.m.

21  Q.  So that was a mistake on your part?

22  A.  Yes, sir, it was early in the morning.

23  Q.  Okay.  So basically from 10:22 in the evening on the

24  15th until about 12:20 in the morning on the 16th?

25  A.  Yes, sir.

Case 2:17-cr-20595-VAR-EAS   ECF No. 109   filed 10/19/18   PageID.2113   Page 41 of 149
*Evidentiary Hearing • September 12, 2018*

41

1   Q.   Okay.  And then this same external hard drive was viewed

2   again from when to when?

3   A.   01:00 to 01:35.

4   Q.   They were shown to whom?

5   A.   FBI and HSI agents that were on the scene.

6   Q.   Now, the information that we've just gone over is not

7   something that was brought --

8                 MR. DENSEMO:  Objection, Your Honor; it's leading.

9                 THE COURT:  It is cross.  Go ahead.

10  BY MR. WATERSTREET:

11  Q.   Well, it was brought to defense's attention; this was

12  part of the initial incident log query that was provided for

13  the benefit of the Court on August 29th, 2017?

14                MR. DENSEMO:  Objection, Your Honor; it's not a

15  question, it's argument.

16                MR. WATERSTREET:  I'm providing this information to

17  the Court.

18                THE COURT:  I will take it though, this is a

19  hearing.

20  BY MR. WATERSTREET:

21  Q.   This exact same information that's contained in the

22  electronic media report was in this report that if you accept

23  my proffer of being provided?

24                THE COURT:  How would he know though?  Why is he

25  being asked this question?

 1   BY MR. WATERSTREET:

 2   Q.   It's the same material, correct?  If I showed a copy of

 3   that, you would be able to identify what items you reviewed

 4   and when you reviewed them?

 5   A.   Yes, sir.

 6   Q.   Okay.  Particularly going to page 3 of the incident log

 7   report, can you compare those incident log reports to the

 8   media report, and doesn't -- is it the exact same

 9   information, and the exact same typographical error with the

10   time?

11   A.   Yes, sir, it does.

12   Q.   So they are one in the same?

13   A.   The information contained is identical, yes, sir.

14   Q.   With the same typo?

15   A.   Yes, sir.

16   Q.   Okay.  And electronic media report, is an electronic

17   media report a document that lists everything that the

18   defendant had in his possession that day other than

19   electronic media?  For example, I noted there wasn't the body

20   armor on that report --

21          MR. DENSEMO:  Your Honor, he's --

22   BY MR. WATERSTREET:

23   Q.   -- as being seized?

24          MR. DENSEMO:  Excuse me, Your Honor.  I object as a

25   compound question.

1        MR. WATERSTREET:  Okay.

2        THE COURT:  Sustained.

3   BY MR. WATERSTREET:

4   Q.  Is it -- it's called an electronic media report.  What

5   is an electronic media report?

6   A.  It's a report for accountability of any electronic media

7   items that I view.

8   Q.  So when you ask a question about money or jewelry not

9   being in that report, is that something that would appear in

10  an electronic media report?

11  A.  No, sir.

12  Q.  Okay.  Because as you've testified previously, there

13  were an number of other items like the body armor, the gas

14  mask, the gun holsters, the gun scopes and things of that

15  nature, that is not -- does not appear in the electronic

16  media report, does it?

17  A.  No, sir.

18  Q.  Okay.  And then the question about reason -- reason for

19  the search.  You were trying to explain this drop-down menu.

20  Can you explain to the Court what choices you have in this --

21  I don't imagine you memorized the entire drop-down menu.

22  A.  I don't, and they have changed in the last two years

23  that it's existed.

24  Q.  But based upon the fact that you found the body armor,

25  you are aware of the body armor, you had conversations with

 1 the defendant, you reviewed all of the electronic media.  Did

 2 you try to pick the drop -- the selection from the drop-down

 3 menu that seemed appropriate or closest as possible to what

 4 situation you were dealing with?

 5 A.  Based on the totality of the circumstances with the

 6 images viewed and the physical items that were there, I tried

 7 to make the best available choice.

 8 Q.  Okay.  Thank you.

 9                     REDIRECT EXAMINATION

10 BY MR. DENSEMO:

11 Q.  And, in your opinion, the best available choice was

12 national security concerns?

13 A.  Yes, sir.

14          THE COURT:  All right.  You may step down, sir.

15 Thank you.

16          (Witness excused at 11:47 a.m.)

17          THE COURT:  Defense, any other --

18          MR. DENSEMO:  Yes, Your Honor.  We would like to

19 call Agent -- I think I would like Agent -- I will take

20 Agent Kelley next.

21          THE COURT:  All right.  While he's coming in, what

22 documents are you referring to?

23          MR. DENSEMO:  Just one, Your Honor.

24          THE COURT:  Okay.

25          MR. DENSEMO:  I would like to have that marked so I

```
 1    can keep track of it.  It's Exhibit 2C.
 2              THE COURT:  You can submit all of these to the
 3    Court when we are done with the hearing.
 4              THE COURT REPORTER:  Would you please raise your
 5    right hand.
 6              Do you solemnly swear or affirm that the testimony
 7    you are about to give this Court will be the truth, the whole
 8    truth, and nothing but the truth, so help you God?
 9              AGENT KELLEY:  I do.
10                      AGENT PATRICK KELLEY,
11    called at about 11:48 a.m., was examined and testified on his
12    oath as follows:
13                       DIRECT EXAMINATION
14    BY MR. DENSEMO:
15    Q.  Agent Kelley, good morning.  How are you?
16    A.  Good morning.
17    Q.  Agent Kelley, give us your full name, for the record.
18    A.  Patrick Kelley.
19    Q.  And you've testified previously in this hearing, haven't
20    you, agent?
21    A.  Yes, sir.
22    Q.  And you participated in the investigation or questioning
23    of Yousef Ramadan on August 15th, 2017?
24    A.  Yes.
25    Q.  All right.
```

```
 1              THE COURT:  Just to refresh my memory, what agency
 2   do you work for?
 3   A.  Homeland Security Investigations.
 4              THE COURT:  Thank you.
 5   BY MR. DENSEMO:
 6   Q.  And not to rehash too much of this but, Agent Kelley,
 7   you were where when you got the call to come to the airport?
 8   A.  At my residence.
 9   Q.  Okay.  And you got a call and you responded to the
10   Detroit Metro Airport?
11   A.  Correct.
12   Q.  All right.  And do you recall who contacted you?
13              MR. WATERSTREET:  Objection, Your Honor; this has
14   been asked and answered before.
15              MR. DENSEMO:  That's fine, that's fine, Judge,
16   that's fine.
17              THE COURT:  No.  I would like to hear this because
18   I think it could relate to this document.
19              MR. DENSEMO:  It does.
20              THE COURT:  So you may answer the question.
21   A.  Supervisor CBP Salinas.
22   BY MR. DENSEMO:
23   Q.  Did you have a -- did you have a phone call or exchange
24   any text messages or e-mails with Officer Michael Thomas?
25   A.  When is -- when are you referring to?
```

1   Q.  After you left your home and you were on your way to the

2   airport, did you have contact with Agent Thomas?

3   A.  At the airport.

4   Q.  All right.  I'm going to hand you a document that has

5   been marked Defense Exhibit 2C.

6   A.  Okay.

7   Q.  Do you recognize that document?

8   A.  Yes.

9   Q.  And what is that?

10  A.  A text message.

11  Q.  From whom to whom?

12  A.  From me to my group supervisor.

13  Q.  Who might that be?

14  A.  Agent Desmerits (phonetic).

15  Q.  Desmerits?

16  A.  Yes.

17  Q.  Okay.  Why don't you hold on to that.  And do you see

18  the time on that text message?

19  A.  Yes.

20  Q.  What time is that?

21  A.  It says 11:05 p.m.

22  Q.  11:05?  May I see that again?  I'm sorry.

23          There is a time of 10:02 a.m. -- I'm sorry, that is

24  a.m., so that was earlier in the morning regarding this DD?

25  Is this your phone?

1    A.   I see 11:05 p.m. for the text.

2    Q.   All right.

3    A.   Correct.

4    Q.   And that was Tuesday, August 15th?  That's what it says,

5    right, Tuesday, August 15th, 11:05?

6    A.   Yes.

7    Q.   All right.  And in the text did you write, "here now" or

8    did somebody else write "here now"?

9    A.   The darker -- the first text is my writing.

10   Q.   Is what?

11   A.   The first text on the top is my writing.

12   Q.   Is your --

13   A.   My text.

14   Q.   Is your text?

15   A.   I wrote the text, correct.

16          THE COURT:  Is that the text that starts "here

17   now"?

18          MR. DENSEMO:  Yes.

19          THE COURT:  Okay.

20   BY MR. DENSEMO:

21   Q.   Okay.  And is that in response to a question?  A -- is

22   that -- that "here now" is an answer to a question; is that

23   right?

24   A.   No, it is me saying I'm here now.

25   Q.   Okay.  So you just voluntarily -- this was not in

*Evidentiary Hearing • September 12, 2018*

1   response to a question?

2   A.   No.

3   Q.   When you arrived, you texted Desmerits?

4   A.   My acting supervisor.

5   Q.   You texted him that you're here now?

6   A.   Yes.

7   Q.   All right.  Did he text you back?

8   A.   The --

9   Q.   The "okay" is his?

10  A.   Yes.

11  Q.   Okay.  So this conversation is between you and your

12  supervisor, correct?

13  A.   The texts, yes.

14  Q.   These one, two, three, four, five, six text boxes that

15  appear in Defense Exhibit 2C are exchanges between you and

16  your supervisor, is that right, just so we know?

17  A.   My supervisor Desmerits, right, yes.

18  Q.   That's right.  All of this is you and Desmerits?

19  A.   Yes.

20          THE COURT:  Can I see it, please?

21          MR. WATERSTREET:  Your Honor, I can give you my

22  copy so the Court has it while they are discussing this

23  matter.

24          THE COURT:  Okay.  Thank you.

25

 1   BY MR. DENSEMO:

 2   Q.   Let me give this back to you so you can see it.

 3   A.   Yes, sir.

 4   Q.   Okay.

 5        THE COURT:   Counsel, counsel, did you mark this for

 6   the record so we have a --

 7        MR. DENSEMO:   Yes, I think it is 2C, Your Honor,

 8   yes.

 9        THE COURT:   2C?

10        MR. DENSEMO:   Yes, it's 2C.

11        THE COURT:   Thank you.

12   BY MR. DENSEMO:

13   Q.   So when you arrive you write "here now"; is that right?

14   A.   This exchange was when I was in the interview room.

15   Q.   Okay.  So you are -- you are in the interview room and

16   you are texting this to your supervisor, is that where we

17   are, right?

18   A.   Yes.

19   Q.   All right.  And in the text message you also write that

20   CBP was going to seize body armor plates, Taser; is that

21   right?

22   A.   Yes.

23   Q.   You wrote -- you wrote that the plan so far is for

24   Thomas to forward results to the Israelis after we're done;

25   is that right?

1    A.   Yes.

2    Q.   So was this plan formulated before you met with

3    Agent Thomas or was this plan formulated during the course of

4    the questioning?

5    A.   This is discussions before the interview began.

6    Q.   So even before the interview began, a plan had been

7    developed to notify the Israeli government about

8    Mr. Ramadan's return to Palestine?

9    A.   I don't know who with the Israelis.

10   Q.   Pardon me?

11   A.   I don't know who with the Israelis.  You say the Israeli

12   government, I don't know.

13   Q.   Okay.  So let's go back.  The plan so far is for Thomas

14   to forward results to the Israelis after we're done, right?

15   That's what's in your text message, right?

16   A.   Yes.

17   Q.   And we're going -- is it fair to assume that by Israelis

18   you mean some branch of the Israeli government or law

19   enforcement; is that a fair --

20   A.   The FBI would contact somebody with the Israelis, that's

21   what I knew.

22   Q.   All right.  And, again, being a law enforcement officer,

23   a fair assumption here is that these law enforcement

24   communities would be communicating about this; is that right?

25   A.   Federal law enforcement has contacts internationally; so

1    different countries, we have contacts.

2    Q.  Agent Kelley, tell the Court -- tell the Court what you

3    discussed with -- let's make it real easy.  What did you say

4    and what did Thomas say about this plan?

5    A.  I don't remember what I wrote in the text.

6    Q.  But the plan had been developed even before the

7    questioning of Mr. Ramadan began, is that what you just said?

8    A.  I sent this text before --

9    Q.  No, no.  I'm saying the plan had been developed.  You

10   indicated that this plan had been developed even before the

11   questioning of Mr. Ramadan began; is that right?

12   A.  I sent the text "the plan so far is for Thomas to

13   forward results to the Israelis after we're done."

14   Q.  And now my question, this plan had been developed before

15   the questioning of Mr. Ramadan had begun?

16   A.  Conversations between Thomas and I, that's the results

17   of the conversation we had.

18   Q.  Did the conversation between you and Thomas take place

19   before the questioning of Mr. Ramadan had begun?

20   A.  Yes.

21   Q.  Do you recall -- do you recall when you and Agent Thomas

22   had agreed upon this course of action, or when had you

23   been -- do you recall when you and Agent Thomas had agreed

24   upon this course of action, what time was it?

25   A.  I don't remember.

1    Q.   Do you know when you began questioning Mr. Ramadan?

2    A.   The exact time, no, I don't remember.

3    Q.   When had you been instructed to pursue this course of

4    action, to contact the Israelis following your interview of

5    Mr. Ramadan?

6    A.   I was never instructed to contact the Israelis.

7    Q.   So this was a plan developed by you and Thomas?  Yes?

8    If you hadn't been instructed --

9    A.   This text was result of a conversation between --

10   Q.   Excuse me, but --

11          MR. WATERSTREET:  Your Honor, can he answer the

12   question, please?

13          THE COURT:  All right.  Go ahead.

14   A.   The text I sent was the result of the conversation I had

15   with Agent Thomas.

16   BY MR. DENSEMO:

17   Q.   Okay.  So the plan -- this plan about contacting

18   Israelis was a plan that you and Thomas came up with; is that

19   right?  Yes or no.

20   A.   We had discussions, Agent Brown, Agent Thomas, myself.

21   Q.   Okay.  So the three of you came up with this plan?  Yes?

22   A.   That was what we discussed, this is what I notified my

23   supervisor of.

24   Q.   Okay.  So no one instructed you to pursue this course of

25   action, and you weren't following any orders to do so?

1  A.  No.

2  Q.  Your interrogation of Mr. Ramadan, was one of the

3  purposes -- was one of the purposes to extract information

4  from him that would aid the Israelis in identifying potential

5  threats to their security?

6  A.  Ah --

7  Q.  Do you want me to repeat my question?

8  A.  Yes.

9  Q.  Was one of the purposes of your interrogation of

10  Mr. Ramadan to extract information from him that would aid

11  the Israelis in identifying potential threats to their

12  security?

13  A.  It was an interview questioning of Mr. Ramadan, and --

14  that wasn't my main focus.  It was --

15  Q.  So it was one of your focuses?  It may not --

16  A.  My focus was the -- him having the items that he had

17  with him that evening, and why, and where, and how they were

18  with him, and why he was taking them out of the country.

19  Q.  So it wasn't your main focus, but it was one of your

20  focuses; is that a fair statement, Agent Thomas -- I mean,

21  Agent Kelley?

22  A.  It --

23  Q.  Was it -- was it one of your purposes?

24  A.  If he had information that was relative to the Israelis.

25  Q.  And their security?

```
 1          THE COURT:  Are you asking him if he was trying to
 2   get information specifically that would be helpful to the
 3   Israelis, like he was working for the Israelis?
 4          MR. DENSEMO:  No, Your Honor.  The question I asked
 5   was, was one of the purposes of the interview -- he -- the
 6   e-mail said a plan had been developed to forward the
 7   information to the Israeli -- to the Israelis.  It seems
 8   logical then that they would want to extract information that
 9   may benefit a U.S. ally, that may be helpful to a U.S. ally.
10   And I believe Agent Kelley has indicated it wasn't his main
11   purpose, but it was one of the purposes.
12          THE COURT:  Could you --
13          MR. WATERSTREET:  No, no.
14          THE COURT:  Just a minute.  Could you, agent, state
15   what you had in mind regarding the Israelis at that point, if
16   anything?
17   A.   Discussions with Agent Thomas before, one of the
18   ideas -- one of the -- if information was relevant, that the
19   FBI would contact somebody with the Israelis with
20   information.
21          THE COURT:  Okay.
22          MR. DENSEMO:  Thank you, Your Honor.
23   BY MR. DENSEMO:
24   Q.   If you know, pursuant to your plan, as outlined in your
25   text message, did Agent Thomas give the Israelis information
```

1  that was developed during the interrogation of Mr. Ramadan?

2  A.   I don't know.

3  Q.   Did you or anyone in your office, pursuant to your plan,

4  contact any member of the Israeli government regarding the

5  interrogation of Yousef Ramadan?

6  A.   I can answer to myself; I did not.

7  Q.   Do you know if any officer with whom you are associated

8  did so?

9  A.   In my agency?

10  Q.   Yes.

11  A.   I don't know, not that I know of.

12  Q.   So you don't know anything about when the information

13  may have been forwarded to the Israeli government?

14  A.   I don't.

15  Q.   If you know, did the Israelis place Mr. Ramadan's name

16  on a watch list pursuant to the information that may have

17  been provided?

18         MR. WATERSTREET:  Your Honor, with all due respect,

19  what's the relevancy as to what --

20         THE COURT:  Sustained.

21  BY MR. DENSEMO:

22  Q.   You indicated in the -- in the -- what's been marked as

23  Defense Exhibit 2C, there's a question from your supervisor,

24  "Does he appear to be psycho?"  Is that right?

25  A.   Correct.

1   Q.  And you respond, "Possibly.  Security guard, moving all

2   of their stuff to Bethlehem."  Is that right?

3   A.  That's correct.

4   Q.  That's because Mr. Ramadan had told you he was a

5   security guard?

6   A.  He had not told me, no.

7   Q.  How did you find out he was a security guard?

8   A.  Discussions with the agents.

9   Q.  Which agents?

10  A.  Agent Thomas, Agent Brown.

11  Q.  And you received an e-mail -- I mean -- I'm sorry, a

12  text from your supervisor saying, "Get the hell out of there

13  and get some rest."  And would have that been on August 16th

14  at 3:57 a.m. -- no, it says 3:57 p.m.

15  A.  No.

16  Q.  Do you know what time you got this e-mail from Desmerits

17  telling you to get out of there and get some rest?

18  A.  I don't know the exact time.

19  Q.  Do you have any other e-mails or text messages that

20  you've discovered since the last time you testified?

21  A.  No.

22  Q.  Have you looked for any new e-mails -- have you been

23  asked to look for any new e-mails or text messages?

24          MR. WATERSTREET:  Your Honor, we are now going into

25  other issues that the Court said was inappropriate.

 1                THE COURT:  Sustained.

 2                MR. DENSEMO:  All right.  I do not have any

 3     additional questions for Agent Kelley, Your Honor.

 4                THE COURT:  Okay.  Cross, government?

 5                MR. WATERSTREET:  Thank you, Your Honor.

 6                THE COURT:  All right.  You may step down.  Thank

 7     you, sir.

 8     A.   Thank you.

 9                (Witness excused at 12:06 p.m.)

10                THE COURT:  Next?

11                MR. DENSEMO:  Next we would like to call

12     Officer Brown, Your Honor.

13                THE COURT:  Okay.  Whose document is this?  Jim, is

14     this yours or --

15                THE LAW CLERK:  The government's.

16                THE COURT:  I'm sorry.  The documents regarding

17     Mr. Brown?

18                MR. DENSEMO:  There are four e-mails, Your Honor.

19                THE COURT:  And you've marked them?

20                MR. DENSEMO:  I'm showing him three, Your Honor.

21                THE COURT:  Okay.

22                THE COURT REPORTER:  Would you please raise your

23     right hand.

24                Do you solemnly swear or affirm that the testimony

25     you are about to give this Court will be the truth, the whole

1  truth, and nothing but the truth, so help you God?

2  OFFICER BROWN:  I do.

3  OFFICER JAMES BROWN,

4  called at about 12:07 p.m., was examined and testified on his

5  oath as follows:

6  DIRECT EXAMINATION

7  BY MR. DENSEMO:

8  Q.  Officer Brown, state your full name, please.

9  A.  James Eric Brown.

10  Q.  And with whom are you employed?

11  A.  I am a CBP -- Customs and Border Protection officer.

12  Q.  August 15th, 2017, you were a part of an investigation

13  regarding Yousef Ramadan, were you not?

14  A.  At this point I don't exactly remember the date, but

15  somewhere in August I was there, yes.

16  Q.  Okay.  During the course of that investigation,

17  following the questioning of Mr. Ramadan, you sent e-mails to

18  a number of individuals such as John Kruczek; is that right?

19  A.  John Kruczek, yes, sir.

20  Q.  Nicholas Zambeck?

21  A.  Nick Zambeck, yes, sir.

22  Q.  All right.  And on August 30th, 2017, at about

23  9:31 a.m., you sent an e-mail to John Kruczek, did you not?

24  A.  I don't recall the date or the time.

25  Q.  I'm handing you an e-mail to see if you recognize that.

Case 2:17-cr-20595-VAR-EAS   ECF No. 109   filed 10/19/18   PageID.2132   Page 60 of 149
*Evidentiary Hearing • September 12, 2018*

60

1    A.   Yes, I do.

2    Q.   And what is that?

3    A.   That is a -- basically a -- just a statement of what

4    was --

5    Q.   Is that an e-mail?

6    A.   Oh, yeah, it is an e-mail, yes.

7    Q.   From?

8    A.   From me.

9    Q.   To?

10   A.   Mr. Kruczek.

11   Q.   At what time?

12   A.   9:31 a.m.

13   Q.   All right.  And in that e-mail you stated Mr. Ramadan

14   was very uncooperative throughout the process; is that right?

15   A.   Can I take a second to read it?

16   Q.   Go right ahead.

17   A.   This is a cut-and-paste e-mail.

18   Q.   I'm asking you, in your e-mail --

19   A.   Right.

20   Q.   -- to Kruczek --

21   A.   Uh-huh.

22   Q.   -- does that e-mail state that Mr. Ramadan was very

23   uncooperative throughout the process?  Yes or no.

24   A.   I'm still trying to find that.  Sir, forgive me, but I

25   don't see where it says that he was not cooperative

1  throughout the whole process.

2  Q.  All right.  Read the last line, read it out loud.

3  A.  Oh, there it is.  "Mr. Ramadan would not give his

4  passcode for his phones.  He was very uncooperative

5  throughout the process."  Yes, sir.

6  Q.  Thank you.

7  A.  Uh-huh.

8  Q.  May I?

9  A.  Sure.

10  Q.  In this same e-mail you wrote that Mr. Ramadan stated

11  that he will not answer any more questions and became

12  aggressive, and, again, was placed in restraints, and when he

13  calmed down he was taken out; is that right?

14  A.  That's what that e-mail states, yes.

15  Q.  All right.  Now, were you in the interview room with

16  Officer Schmeltz and Mr. Ramadan when Officer Schmeltz

17  handcuffed him the first time?

18  A.  Negative.

19  Q.  Did you assist Officer Schmeltz in handcuffing

20  Mr. Ramadan?

21  A.  Did not.

22  Q.  Did you see Officer Schmeltz remove handcuffs from

23  Mr. Ramadan the first time?

24  A.  I did not, sir.

25  Q.  On August 28th, 2017, you responded to an e-mail from

 1   Nicholas Zambeck, did you not?

 2   A.   I, again, don't remember the date, but, yes, I do

 3   remember responding to an e-mail from Mr. Zambeck.

 4   Q.   And in his e-mail to you Mr. Zambeck asked, "What

 5   passport was Mr. -- was Ramadan traveling on, when?"

 6   A.   Yes, he did.

 7   Q.   In your response you reply, "his passport"?

 8   A.   His U.S. --

 9   Q.   U.S. passport?

10   A.   His U.S. passport, yes, sir.

11   Q.   Did Mr. Zambeck's e-mail end as it appears here with an

12   incomplete question, or was there -- or were there more words

13   that have been deleted or left out of the message that he

14   sent to you?

15   A.   Could you repeat that question, please?

16         MR. WATERSTREET:  Your Honor, we have already gone

17   through the redaction process, and the Court has already

18   reviewed the original document compared to the redacted

19   document and said all the redactions were appropriate because

20   they did not relate to the matter at hand.  Now he's asking

21   about the redactions the government made that the Court

22   already approved.

23         MR. DENSEMO:  Well, I didn't know that these --

24         THE COURT:  I don't --

25         MR. DENSEMO:  I don't recall this being redacted,

1   Your Honor.

2           THE COURT:  Was there a redaction on there?

3           MR. DENSEMO:  This is the document that we

4   received, Your Honor.

5           THE COURT:  Excuse me.  Is there a redaction on

6   there?

7           MR. DENSEMO:  This is the document we received,

8   Your Honor.  I don't know if it was blacked out as this one

9   had been.

10          MR. WATERSTREET:  The question is what passport was

11  Ramadan traveling on when?  And the answer was A U.S.

12  passport.  If there's other items that were not subject of

13  his testimony, they were not provided.  And as we went over

14  before, Your Honor, there are other sensitive matters

15  concerning other investigations and -- -

16          THE COURT:  All right.  But this doesn't show any

17  blackout.  Is there anything else on this e-mail from this

18  date?

19          MR. WATERSTREET:  I don't have that, Judge, because

20  I don't have that with me.

21          MR. DENSEMO:  And, again, Judge, I did not ask

22  Officer Brown what was in the e-mail.  I asked him were there

23  other information.

24          THE COURT:  All right, I will take the answer.

25  A.  Can you repeat the question, sir?

Case 2:17-cr-20595-VAR-EAS   ECF No. 109   filed 10/19/18   PageID.2136   Page 64 of 149
*Evidentiary Hearing • September 12, 2018*

**64**

1     THE COURT:  If he knows?

2  BY MR. DENSEMO:

3  Q.  Did Mr. Zambeck's e-mail end -- I will show you.  Do you

4  recall one -- do you recall Zambeck sending you that e-mail?

5  A.  I do, sir.

6  Q.  Did Mr. Zambeck's e-mail end as it appears here with an

7  incomplete question, or were there more words that have been

8  deleted or left out of the message that he sent to you?

9  A.  This was the way it was sent to me.  There was nothing

10  deleted.

11  Q.  So it ended, when?

12  A.  Yes, sir.

13  Q.  So you knew what Zambeck was talking about even though

14  he did not make a complete sentence?

15  A.  I did, and that's why I responded with his

16  U.S. passport.

17  Q.  Okay.

18  A.  Do you want this back?

19  Q.  Yeah, if you don't mind.  And that was

20  Defense Exhibit 2E, Your Honor.

21     Handing the witness Defense Exhibit 2F.  On

22  August 23rd, 2017, you received an e-mail from John Kruczek;

23  is that right?

24  A.  Yes, sir.

25  Q.  In it he asks what's the subject's name; is that right?

1   A.   Yes, sir.

2   Q.   You reply "Yousef Ramadan"; is that right?

3   A.   Yes, sir.

4   Q.   How did you know what subject he was talking about?

5   A.   We had a phone call -- a message -- or talked -- I

6   talked to him on the phone earlier before that.

7   Q.   Okay.  Were there other e-mails, texts or phone calls

8   between you and Kruczek before these e-mails were exchanged?

9   A.   Not to my knowledge, no, sir.

10   Q.   Okay.  Do you have any other e-mails -- newly discovered

11   e-mails, text messages, memos or recordings that have been --

12   that you -- that had not -- that have not been previously

13   turned over to the government or the defense?

14   A.   No, sir, I do not.

15        MR. WATERSTREET:  Your Honor, if I may, that were

16   the subject matter of the witness's testimony for this

17   particular proceeding.  I imagine there are some more e-mails

18   concerning other parts of the investigation that happened way

19   after these events, but I want to make sure that counsel is

20   asking that question.  Is that correct, Counsel?

21        MR. DENSEMO:  I wasn't listening to what you were

22   saying.

23        MR. WATERSTREET:  Well, what was your question

24   directed at, for this subject matter of his testimony here,

25   or any other e-mails?

```
 1              MR. DENSEMO:  Well, I don't think I have to respond
 2      to you.  I think you can make an objection.
 3              MR. WATERSTREET:  I am making an objection, and
 4      asking for a particularized -- to have him narrow his
 5      question, Your Honor, so that we all understand what the
 6      question is.
 7              THE COURT:  Well, he asked him if there were any
 8      other e-mails.
 9              MR. DENSEMO:  Any newly discovered e-mails.
10              THE COURT:  Newly discovered.
11              MR. DENSEMO:  E-mails, text messages that he had
12      not turned over to --
13              THE COURT:  Regarding Mr. Ramadan in general.
14              MR. DENSEMO:  That's correct.
15      A.  Not to my knowledge, ma'am.
16              THE COURT:  Okay.
17              MR. DENSEMO:  I don't have any other additional
18      questions, Your Honor.
19              THE COURT:  Okay.  Government.
20      A.  Sir --
21              MR. DENSEMO:  Thank you.  I appreciate it.
22              MR. WATERSTREET:  So I have the right number, may I
23      see --
24              MR. DENSEMO:  2D.
25              MR. WATERSTREET:  It's 2D?
```

1    MR. DENSEMO:  Yeah.

2                        CROSS-EXAMINATION

3    BY MR. WATERSTREET:

4    Q.  Officer Brown, I'm going to show you what has been

5    marked 2D.

6    A.  Yes.

7         MR. WATERSTREET:  It's D as in dog, right, Andrew?

8         MR. DENSEMO:  Yes.

9    BY MR. WATERSTREET:

10   Q.  This is an e-mail that you sent to John Kruczek, is that

11   correct, on August 30th, 2017?

12   A.  Yes, sir.

13   Q.  And this was to let them know about -- a quick note

14   about the case, correct?

15   A.  Yes, sir.

16   Q.  All right.  And did you sit down and type out word for

17   word each word that is part of this e-mail?

18   A.  No, sir, not at all.

19   Q.  Okay.  Where did you get the words for this particular

20   e-mail?

21   A.  I had cut and paste from the reports.

22   Q.  So you cut and pasted from a report -- the incident log

23   report that was written by Charles Schmeltz?

24   A.  Yes, sir.

25   Q.  Okay.  So this is not necessarily your statement; this

 1   is a cut and paste of somebody else's statement to let your

 2   bosses know what's going on?

 3   A.  Yes, sir.

 4         MR. WATERSTREET:  Your Honor, if I may, and proffer

 5   to the Court, I think I did this once before last time we

 6   were in court, and I will give the Court a copy once again of

 7   the word-for-word cutting and pasting from Officer Schmeltz's

 8   report, his statements.

 9         MR. DENSEMO:  Your Honor, he can't -- one, he wants

10   Schmeltz here, he can get it in through Schmeltz, but we

11   object to him just giving a document to the Court without

12   laying any foundations.

13         MR. WATERSTREET:  Well, this is part of the

14   discovery that has been provided in this case, Your Honor,

15   and it has been --

16         THE COURT:  Ask the witness if this is the document

17   that he got the information from.

18   BY MR. WATERSTREET:

19   Q.  Is this the document that you got the information from

20   that you cut and pasted to create this update for your -- for

21   your supervisor?

22   A.  Yes, it is.

23   Q.  Okay.

24         THE COURT:  All right.  The Court will accept it.

25         MR. WATERSTREET:  Your Honor, as I mentioned in our

1   previous hearing, I went through and marked for the Court's

2   benefit word for word where he cut and pasted it from the

3   report.

4           MR. DENSEMO:  Your Honor, what is -- is this -- is

5   this argument at this point?

6           MR. WATERSTREET:  Your Honor, I'm just trying to

7   explain.

8           THE COURT:  It sounds like an explanation.

9           MR. WATERSTREET:  I'm trying to explain the

10  document for the benefit of the Court and for counsel.

11          Your Honor, what I did, as we did previously in the

12  other hearing, I went through and highlighted the section

13  from the report that made its way into this e-mail that was

14  sent, and I will proffer that up to the Court.

15          THE COURT:  And would you mark it?

16          MR. WATERSTREET:  I will mark that as Government's

17  Exhibit -- I will mark it as Government's Exhibit Brown 1 and

18  Brown 2, if I might, Your Honor.

19          THE COURT:  Okay.

20          MR. WATERSTREET:  My handwriting is horrible.

21          THE COURT:  What's Brown 2?

22          MR. WATERSTREET:  Brown 1 will be the report, and

23  Brown 2 will be the update that he was providing his

24  supervisor via e-mail.

25          THE COURT:  It will be the same as 2D?

1   MR. WATERSTREET:  Yes, yes, it would be, but mine

2  has the markings on it for the Court's benefit.

3   THE COURT:  Thank you.

4   MR. WATERSTREET:  Thank you.

5   THE COURT:  All right.

6   REDIRECT EXAMINATION

7  BY MR. DENSEMO:

8  Q.  Officer Brown, it is your testimony that you did not

9  review -- that you used that report -- you read that report,

10  and you then cut and pasted and sent it to your supervisor?

11  A.  Correct, sir.

12  Q.  So you saw the language in the report before you sent

13  it, right?

14  A.  I highlighted -- I highlighted the highlights, yes, sir.

15  Q.  You read it before you sent it?

16  A.  Yes, sir.

17  Q.  So you knew what was in it, right?

18  A.  I had an idea, yes, sir.

19  Q.  You read it?

20  A.  Yes, sir.

21  Q.  And you sent it anyway?

22  A.  Yes, sir.

23  Q.  And you would not have sent it if you didn't agree with

24  it, right, if there was -- if there was incorrect or

25  misinformation in there, right?

1    A.   No, sir, it wouldn't have been right.

2    Q.   Okay.  Thank you.

3    A.   Uh-huh.

4         THE COURT:  All right.  You may step down, sir.

5    Thank you.

6    A.   Thank you, ma'am.

7         (Witness excused at 12:23 p.m.)

8         THE COURT:  Your next witness?

9         MR. DENSEMO:  Your Honor, could we take a bathroom

10   break, if you don't mind?

11        THE COURT:  All right.  What we will do is take our

12   lunch break.  We will break now until 1:30, and then we will

13   go to 2:00.  I do have a hearing at 2:00.

14        MR. DENSEMO:  We just have one witness, Your Honor,

15   and as the Court can see, the witnesses have been pretty

16   short, so there is just one witness left.

17        (An off-the-record discussion was held at

18        12:24 p.m.)

19        THE COURT:  The 2:00 is off so we are ready to go

20   into argument on motion and final argument.

21        MR. DENSEMO:  No, I was saying we still have one

22   witness left.

23        THE COURT:  After we do that.  We are going to

24   break and then we will come back.

25        MR. DENSEMO:  So we are going to take our lunch

```
 1   break, and come back at 2:00?
 2            THE COURT:  We will come back at 1:45.
 3            MR. DENSEMO:  Okay.
 4            THE COURT:  All right.
 5            THE COURT REPORTER:  All rise.  Court is in recess.
 6            (Court recessed at 12:25 p.m.)
 7                          —   —   —
 8            (Court reconvened at 1:50 p.m.; Court, Counsel and
 9            Defendant present.)
10            THE LAW CLERK:  All rise.
11            Calling Case No. 17-20595, United States vs.
12   Ramadan.  Back on the record.
13            THE COURT:  Good afternoon.
14            MR. DENSEMO:  Good afternoon, Your Honor.
15            THE COURT:  All right.  We will continue with your
16   next witness.
17            MR. DENSEMO:  Yes, Your Honor, Agent
18   Michael Thomas.  And, Your Honor, I have shown the government
19   three e-mails that we will be focusing our questioning on.
20   And, Judge, I do intend to ask Agent Thomas some questions
21   about the information that we had not previously received
22   about the questioning -- regarding Israel -- contacting the
23   Israeli government and things like that.  Again, we had not
24   previously been made aware of any of that, and that is part
25   of the discovery that we received back in June.
```

1           THE COURT:  Okay.

2           MR. DENSEMO:  Thank you.

3           THE COURT:  Here, I have Brown's exhibits, they

4   should be kept together.

5           THE COURT REPORTER:  Would you please raise your

6   right hand.

7           Do you solemnly swear or affirm that the testimony

8   you are about to give this Court will be the truth, the whole

9   truth, and nothing but the truth, so help you God?

10          AGENT THOMAS:  Yes, I do.

11                     AGENT MICHAEL THOMAS,

12  called at about 1:52 p.m., was examined and testified on his

13  oath as follows:

14                      DIRECT EXAMINATION

15  BY MR. DENSEMO:

16  Q.   Agent Thomas, good afternoon.

17  A.   Good afternoon, sir.

18  Q.   State your full name for the record, sir.

19  A.   Michael J. Thomas.

20  Q.   And could you state the agency with whom you are

21  employed?

22  A.   Federal Bureau of Investigation.

23  Q.   And, Agent Thomas, you previously testified in this

24  suppression hearing, have you not?

25  A.   Yes, sir, I have.

1  Q.  And we're talking about the investigation involving

2  Yousef Ramadan, correct?

3  A.  Yes, sir.

4  Q.  And September 1st, 2017, you sent an e-mail -- I'm

5  handing you what has been marked as Defense Exhibit --

6  A.  3A, sir.

7  Q.  -- 3A.  Do you recognize that, Agent Thomas?

8  A.  Yes, sir, I do.

9  Q.  Okay.  And in that September 1st e-mail from you to

10  Dave Banach -- and Officer Banach is the officer -- he is

11  FBI -- is he the FBI agent in charge of this case?

12  A.  That's correct, sir.

13  Q.  Okay.  You wrote, "I do not recall an excessive or

14  unusual amount of jewelry discovered during their

15  inspection"; is that right?

16  A.  Yes, sir.

17  Q.  I should know -- "I know he had under $10,000 in cash on

18  him.  Again, exact amount should be in CBP report

19  provided"; is that right?

20  A.  Yes, sir.

21  Q.  Agent Thomas, did you see or count any money --

22  A.  No, sir.

23  Q.  -- that was in the possession of Mr. Ramadan?

24  A.  I'm sorry.  No, sir, I did not.

25  Q.  Okay.  And your statement that you do not recall an

1    excessive or unusual amount of money during their inspection

2    was based upon representations made to you by other agents;

3    is that right?

4    A.   By CBP officers, yes, sir.

5    Q.   And CBP officers were the ones that advised you of

6    whatever they may have found in terms of money and jewelry

7    and things like that?

8    A.   That's correct, sir.

9    Q.   Okay.  Did you see any jewelry at all connected with

10   Mr. Ramadan, and did you handle or examine or inspect any

11   jewelry at all in connection to Mr. Ramadan?

12   A.   I don't recall seeing any jewelry, nor did I ever handle

13   or process any.

14   Q.   How about cash?

15   A.   No, sir.

16   Q.   Did you ever see this CBP report that you mentioned in

17   your e-mail that should be -- that should be prepared and

18   provided?

19   A.   I'm sure I did see that CBP report, sir.  I'm not sure

20   specifically which one it is, but I'm sure I did see it if I

21   wrote it.

22   Q.   Did you see a CBP report -- or do you recall a CBP

23   report that stated an exact amount of money as you predicted?

24   A.   Not that I can recall, sir.

25   Q.   Did you see a CBP report regarding jewelry or anything

Case 2:17-cr-20595-VAR-EAS   ECF No. 109   filed 10/19/18   PageID.2148   Page 76 of 149
*Evidentiary Hearing • September 12, 2018*

76

1    like that?

2    A.   No, sir, not that I recall.

3    Q.   On August 15th, 2017, do you recall sending an e-mail or

4    receiving an e-mail from Homeland Security Agent Kelley?

5    A.   I do not recall.

6    Q.   When Agent Kelley arrived at the airport at secondary

7    inspection, you and he talked about or developed plans to

8    forward the results of your interrogation of Mr. Ramadan and

9    his wife to the Israelis, did you not?

10   A.   First, sir, I never interrogated Mr. Ramadan, and I

11   don't recall this conversation with Mr. Kelley.

12   Q.   So --

13            THE COURT:  You don't recall what?

14   A.   I don't recall this conversation with Mr. Kelley.

15   BY MR. DENSEMO:

16   Q.   You don't recall a conversation between you, Kelley and

17   Brown where the three of you discussed sending the results of

18   the questioning of Yousef Ramadan to the Israelis?

19   A.   I do not recall that conversation, no, sir.

20   Q.   Did you transmit the results of your conversation

21   with -- or interrogation, or interview, or questioning of

22   Mr. Ramadan, did you transmit results to the Israeli

23   government?

24   A.   No, sir.  I would never correspond directly with the

25   Israeli government.

1    Q.   Did some other member -- did you give information to

2    someone else to give to the Israeli government?

3    A.   Sir, I'm not sure if information got transmitted to the

4    Israeli government, not by myself.

5    Q.   My question is, did you give some information to someone

6    else to give to the Israeli government?

7    A.   Can you repeat that, sir?

8    Q.   Did you give information, the results that were -- the

9    information that you derived from the interrogation,

10   interview, questioning, examination of Yousef Ramadan, did

11   you give the results of that interview, interrogation, exam,

12   to someone else to give to a branch of the Israeli

13   government?

14   A.   No, sir, I did not.

15   Q.   Did you develop a report in this case?

16   A.   I generated a 302, yes, sir.

17   Q.   Okay.  And was that 302 given to one of your superiors?

18   A.   Yes, sir.

19   Q.   Did you -- did you ask or direct someone to place

20   Jeanine Ramadan's name on a lookout list?

21   A.   I do not recall that, sir.

22   Q.   So you could have done it, but you don't remember if you

23   did it or not?  That's what I can't recall means; is that

24   right, Agent Thomas, that you don't remember if you did or

25   you didn't do it?

1  A.  I do not remember, sir.  I cannot recall.  I would not

2  have been the case agent on this.  I was not the case agent,

3  so I would say no, but I can't specifically recall.

4  Q.  Were you advised that the information -- were you

5  advised or do you know if some or all of the information from

6  your interview, interrogation, questioning of Yousef Ramadan

7  was eventually provided to the Israeli government?

8  A.  I do not know if it was or was not, sir.

9  Q.  Were you told that it was?

10  A.  I was not told that, sir.

11  Q.  But you are saying that you never had a conversation --

12        MR. WATERSTREET:  Your Honor, first of all, I don't

13  know what the relevancy of this is to whether the defendant

14  was beaten or forced or coerced to make a statement, which is

15  the subject matter of this -- of these proceedings, and the

16  agent has over and over said he does not know, and so I don't

17  understand this line of questioning and how it is relevant.

18        MR. DENSEMO:  It is relevant to -- Your Honor, one

19  of the questions that you have to determine is, is the

20  government correct in this was simply a routine secondary

21  inspection involving an export violation.  That is what the

22  government has hung its hat on in this case, that they had

23  the right to do this because this was nothing more than a

24  routine secondary inspection involving nothing more than an

25  export violation that happens every day.

1     THE COURT:  I will take the answer.

2   A.   Could you please repeat the question, sir?

3     MR. DENSEMO:  I'm sorry.  Could you read my

4   question back for me?

5     (The requested portion of the record was read by

6     the reporter as follows:

7     "Q.  Were you advised that the information -- were

8     you advised or do you know if some or all of the

9     information from your interview, interrogation,

10     questioning of Yousef Ramadan was eventually

11     provided to the Israeli government?")

12     MR. DENSEMO:  Thank you.

13   BY MR. DENSEMO:

14   Q.   And your answer to that was?

15   A.   I'm not aware, sir.  It is possible, but I'm not aware.

16   Q.   And it's your position that you never had a conversation

17   with Agent Kelley and Brown about developing plans to send --

18   about a plan to send this information to the Israeli

19   government?  Your statement was you never had that

20   conversation.  Do you --

21     MR. WATERSTREET:  Your Honor --

22   A.   My statement was I do not recall.

23     MR. WATERSTREET:  Your Honor, Your Honor, if I may,

24   he has asked three different questions.

25     THE COURT:  Sustained.  Break it down.

1    BY MR. DENSEMO:

2    Q.   Let me ask this simple question, this one question.

3    It's your position that there was no conversation between you

4    and Agents Kelley and Brown about developing a plan to send

5    information to the Israeli government?

6    A.   I do not recall that conversation, sir.

7    Q.   So it could have happened, but you don't recall, or it

8    never happened?

9    A.   It could have happened; I just don't recall that

10   conversation.

11   Q.   In your August 27th, 2017 e-mail, which I'm handing you,

12   which has been marked as Defense Exhibit 3B, do you recall --

13   do you recognize that e-mail?

14   A.   Yes, sir, I do.

15   Q.   May I?

16   A.   Yes, sir.

17   Q.   In this e-mail you indicate -- and this e-mail was from

18   you to Nicholas Zambeck; is that right?

19   A.   Can I see it again, sir?

20   Q.   Sure.

21   A.   Yes, from me to my supervisor, Nick Zambeck.

22   Q.   Okay.  Thank you.  And you write, "We know this because

23   his wife advised this before she was released and departed

24   the airport with her sister-in-law."  What does this relate

25   to, "we know this"?

1   A.  Can I please see that, sir?  You keep taking it away and

2   I can't understand the context of what you're asking and what

3   you're seeing.

4   Q.  Sure.

5   A.  Yes.  When I was out talking to the sister-in-law in the

6   hallway -- or outside of the CBP area, I heard a statement

7   that she was going around to get the van, and that's -- and I

8   further explain we know this because the wife advised that

9   she was going with the sister-in-law.

10  Q.  Okay.  So this was in response to -- from a prior e-mail

11  from Zambeck?

12  A.  I'm not sure if it was in response to an e-mail -- a

13  prior e-mail or telephone call.

14  Q.  You don't recall?

15  A.  I don't recall.

16  Q.  Hopefully I didn't ask you this question already,

17  Agent Thomas.  Did you put -- as a result of your

18  interrogation of Mr. -- I mean your examination or interview

19  of Mr. Ramadan, did you place any member of his family's name

20  on a watch list?  Did you do that?

21          MR. WATERSTREET:  Your Honor --

22  A.  No, sir.

23          MR. DENSEMO:  Okay.  I think I'm done, Your Honor.

24          THE COURT:  All right.  Government?

25          MR. WATERSTREET:  No questions.  Thank you, Your

1    Honor.

2            THE COURT:  You may step down, sir.

3    A.   Thank you, Your Honor.

4            (Witness excused at 2:05 p.m.)

5            MR. DENSEMO:  That is all the witnesses we wish to

6    call at this time, Your Honor.  I believe that the government

7    has indicated that Officer Robinson is out of the country.

8            THE COURT:  Okay.  Government, anything?

9            MR. WATERSTREET:  No.

10           THE COURT:  All right.  Let's do argument.  Excuse

11   me one minute.  Let me pull up -- I would like you to do the

12   argument on the Motion to Dismiss Due to Outrageous

13   Government Conduct.

14           MR. DENSEMO:  Your Honor, I -- the defense's

15   position is laid out in the pleadings that we've submitted.

16   It is our position that the number of motions that we've had

17   to file for discovery, and the information that has been

18   withheld from the defense, the testimony that has been

19   elicited from the witnesses with the government's knowledge,

20   that there are huge --

21           THE COURT:  There are what?

22           MR. DENSEMO:  Huge discrepancies, if not

23   falsehoods, that have been -- that have been placed on the

24   record in this case, again, with the government's knowledge

25   and with no interference or interruption or correction by the

 1    government.

 2          We believe that the position that we have been

 3    placed in, in having to repeatedly petition this Court for

 4    discovery in the face of government representations that

 5    there wasn't anything else, has placed the defense at a huge

 6    disadvantage, and as a result we have not been able --

 7    Mr. Ramadan has not had as effective assistance of counsel as

 8    he should have received as a result of the government's

 9    negligence, if not outright willfulness, in not providing

10    information, discovery, that the defense is entitled to in a

11    timely manner and in -- in a timely manner and in a fashion

12    which would allow the defense to effectively cross-examine

13    these witnesses and to deal with the -- with their testimony.

14          Even today we can see that these witnesses have

15    prepared themselves for defense questioning regarding these

16    newly discovered e-mails.  In particular, Agent Kelley, who I

17    viewed as extremely forthcoming during the initial

18    suppression hearing, today, in my mind, wasn't as forthcoming

19    or unwilling to give straightforward answers as he was during

20    the initial proceedings.  And there appears to be a huge gap

21    between his testimony regarding these plans and the testimony

22    of Agent Thomas regarding what plans had been developed

23    regarding submission of information to the Israeli

24    government.

25          I know the Court has indicated that the Court is

1   not prepared to call the prosecutors in this case or the

2   agents or the prosecutorial staff, and we understand that.

3   But I do think, Judge, that we've gone -- the we've had to

4   jump through too many hoops as a result of the government not

5   providing us with what we needed when we needed it, and that

6   we have not been as effective as we could have been, and I

7   think that this was -- this -- this had to have been

8   strategic by the government to try to withhold as much as it

9   could for as long as it could.

10          And we ask the Court to sanction the government

11  through dismissal.  I know this is an extraordinary remedy,

12  one that is not often granted, but I think the facts of this

13  case are sufficient; that the Court can find that the defense

14  has been hindered throughout this case in presenting as

15  effective defense as it could have on behalf of Mr. Ramadan,

16  and that his due process rights have suffered immeasurably as

17  a result of the government's conduct in this case, and we

18  would ask the Court to dismiss it.

19          THE COURT:  Thank you.  Mr. Martin.

20          MR. MARTIN:  Your Honor, the legal basis upon which

21  the defense seeks dismissal doesn't actually exist in the

22  Sixth Circuit, and that's a fact that Mr. Densemo and

23  Ms. Fitzharris have not recognized either in the oral

24  argument or in their pleading.  They caption their motion a

25  Motion to Dismiss Due to Outrageous Governmental Conduct, but

1    as the government pointed out in our brief, the Sixth Circuit

2    has soundly rejected the notion that a due process -- just

3    general due process violation by the government having

4    nothing to do with the defendant's guilt or some kind of

5    misconduct of the government during the course of the

6    criminal proceedings; in other words, something some agent

7    did before the case was even brought into court would ever

8    serve as a basis to dismiss indictment due to the outrageous

9    nature of the government conduct.

10           The Sixth Circuit has rejected that as a legal

11   theory for relief for the defense, a fact that they don't

12   even tell you about.  So the entire basis for their motion

13   does not apply in this Court.

14           So what they do instead is they ask you to dismiss

15   the indictment based on your own supervisory powers.  And

16   there is some case law in the Sixth Circuit that does seem to

17   indicate that a court, in exercising its supervisory powers,

18   could dismiss an indictment due to some kind of governmental

19   misconduct.  In those cases it's typically some kind of

20   allegation that the government attorneys did something

21   improper before the Grand Jury, that's the most typical fact

22   pattern in those cases, but it is an extraordinary remedy,

23   and the Sixth Circuit has said that remedy should only be

24   given by the Court if two conditions are met.

25           And one is if the defendant shows the Court that

 1    there is a longstanding pattern of that type of misconduct in
 2    the judicial district, and, second, that -- that the
 3    defendant was prejudiced by the governmental misconduct.  So
 4    those two things have to be present; longstanding pattern and
 5    actual prejudice to this defendant.
 6            And the -- Mr. Ramadan has not alleged in his
 7    brief, let alone established any proof, that the type of
 8    allegations that he's making against me and Mr. Waterstreet
 9    are a longstanding pattern in the Eastern District of
10    Michigan.
11            And, yes, the defense has filed many discovery
12    motions, but they have all been denied by the Court because
13    they lack merit with the exception of a few instances where
14    the Court has provided them additional discovery, but even
15    then the Court made comments on the record indicating that
16    the Court didn't believe it was necessarily required under
17    the law, but simply prudent to do so in this circumstance.
18            For example, the Giglio information regarding
19    Agent Thomas that we litigated earlier, and the government's
20    position was Giglio did not apply to a witness called by the
21    defense, and the Court indicated on the record that you
22    believed that to be true, but nevertheless were ordering the
23    government to provide the Giglio information with respect to
24    Agent Thomas to the defense, which we did, and they impeached
25    him with it when he testified, you know, his discipline for

1  some prior case.

2          So, yes, they have filed many defense motions, but

3  simply filing motions doesn't equate to governmental

4  misconduct when your motions are meritless and are denied by

5  the Court.  So for those reasons I don't believe the Court

6  should grant the motion.  Thank you.

7          THE COURT:  Thank you.  Any reply?

8          MR. DENSEMO:  Your Honor, just -- the whole issue

9  about Agent Thomas being our witness, how he became our

10  witness was the government refused to call him, and the

11  government maneuvered to have Agent Thomas be our witness and

12  for us to call him so that they could make this argument.

13          As I indicated, the government has made a number of

14  maneuvers in this case to try to put the defense at a

15  disadvantage, beginning with arguing this whole issue about

16  burden of proof, which in my colleague's, Ms. Fitzharris'

17  brief showed that that argument was a specious argument.  It

18  wasn't even a legitimate argument that they were making.  It

19  was, again, as we argued, an attempt to put the defense at a

20  disadvantage, to make the defense call witnesses out of order

21  so the government wouldn't have to fulfill certain

22  obligations like their obligations under Giglio.

23          This -- the entire -- the entirety of the

24  government's prosecution in this case, you know, the whole

25  trajectory of this prosecution has been to subvert and to try

1   to get around normal procedures that typically happen in a

2   felon-in-possession case or an obliterated serial number

3   case, and it has been extraordinary.

4        The steps that they have taken to try to get around

5   typical things that are done in these very unusual cases like

6   having the defense call witnesses, having -- making the

7   defense submit a Touhy letter, a subpoena.  This is the first

8   time that I have ever seen or heard of a Touhy letter in a

9   case, or having the defense subpoena witnesses who were

10  involved in the interrogation of an individual.

11       Again, Judge, I'm not going to belabor the point.

12  It just seems to me, as I indicated a long time ago, that

13  this molehill has been made into a mountain, and one year

14  later into this case, we are still arguing about discovery

15  and about civility and how to -- and about what the defense

16  should receive and shouldn't receive.  And the government's

17  efforts to subvert Mr. Ramadan's due process rights in this

18  case to my mind are clear, and I think they warrant sanctions

19  in this case.  Thank you.

20       THE COURT:  All right.  The Court has reviewed the

21  briefs submitted in this case and has, of course, heard the

22  testimony at the hearing in the past and today.  It's the

23  claim of the defense that the government's conduct is so

24  outrageous that the motion must be dismissed [sic].

25       I agree with the government that I don't know this

 1    Motion to Dismiss For Outrageous Conduct.  It does exist, as

 2    I understand it, in some other districts outside of the State

 3    of Michigan, but I looked for cases in which it was actually

 4    applied, and I didn't find any case in which a case was

 5    dismissed based upon outrageous government conduct.

 6          Certainly the Court can take into consideration the

 7    conduct of the government and dismiss on its own right

 8    because of conduct that is so, quote/unquote, outrageous.

 9          The Court looked at the things that are -- that are

10    suggested by the defendant.  And, for instance -- I would

11    like to go through these that are listed in the brief -- that

12    the government knew that FBI Agent Michael Thomas had been

13    investigated and disciplined and withheld exculpatory

14    evidence.  The Court doesn't find that it was withheld, and

15    this was such a notorious case that he was in, that it would

16    be foolhardy to withhold it.  I understand defense's theory

17    that the government deliberately did not call Agent Thomas,

18    but I don't really see any evidence that this was

19    deliberately to avoid this issue of his prior reprimand.

20          Also, in terms of the discovery motions that were

21    filed, many of the discovery motions -- well, I think most of

22    them were denied, but they were brought to find information,

23    and the only thing that I can recall is that there was

24    subsequent documents that were given to the defense, that's

25    very true, that the government says that they discovered

1    having gone back.

2         And the Court looked at those specific documents
3    and, you know, they really didn't change the picture of the
4    testimony in this case at all.  It did show as -- in fact,
5    today, some of them, that there was this conflict between
6    some of the agents as to what was said, but that discrepancy
7    in testimony is not unusual when there's more than one person
8    involved, and it didn't really make any difference.

9         For instance, the testimony about giving the
10   information to the Israeli government, did they or didn't
11   they, really has nothing to do with the motion that we are
12   here -- the basic motion that we are here on in any event.

13        The testimony about who handcuffed the defendant
14   and how many times was he handcuffed, were there actual
15   handcuffs or not, again, doesn't go to the issue that we are
16   here on.

17        It does go to an issue which the Court will discuss
18   in its ruling on the main motion in its opinion, but it goes
19   to an issue to me of whether he was free to leave.  I mean,
20   to me that is an issue that handcuffing has to deal with.

21        There is a claim by defendant that the border
22   patrol officers violated policy and procedure in conducting
23   the search, and there was some implication that there was
24   some policy regarding written notes.  All of that has not
25   been shown, so I find that is without merit.

1      And also there was the issue which was brought up
2  today, and it may have been brought up before, I honestly
3  don't recall, about the receipt that Mr. Ramadan did not --
4  allegedly did not get for his goods.  But, again, it sounds
5  to the Court that the custom was that they would fill out
6  this form and a copy would go to the person whose goods they
7  had seized, but that in this case does not have any effect on
8  the basic motion at hand.
9      Yes, there's testimony from Mr. Ramadan that
10  differs with what the agents say, and for the Court to
11  validate Mr. Ramadan's testimony.  I would have to say all --
12  I think there were five or six agents that testified
13  regarding, for instance, the beating that was referenced in
14  the -- in the briefs, and the Court is not willing to do
15  that.  I think there's a conflict in testimony, which is not
16  unusual in these cases, and I certainly think there is a big
17  conflict, but I find it difficult to believe that each of
18  these agents made up some stories as they went along, that
19  the government made up stories.
20      And, again, we have to talk about the government
21  and what happened since the indictment.  I don't think I need
22  to go through that law, but all in all I don't find that the
23  government's actions here were outrageous if, in fact, this
24  claim exists, but I don't find that there's any basis to
25  dismiss this indictment.

1    MR. DENSEMO:  Thanks, Your Honor.

2    THE COURT:  Okay.  Let's go on now to the main

3    motions and have argument on those.  Who's going to do that?

4    MS. FITZHARRIS:  Really what both motions come down

5    to is whether the officers' actions on August 15th and

6    through the morning of August 16th were for the purpose of

7    investigating a crime.  In both contexts there are -- once

8    they are investigating a crime, there are certain procedural

9    protections that are triggered.  Searches and seizures must

10   be reasonable.  They are no longer in a balancing test where

11   searches can be motivated by special needs.  Miranda warnings

12   have to be issued if it is an interrogation about criminal

13   activity where it's likely that an incriminating statement

14   would be elicited.

15   And the government's position right now is that

16   just because this is at a border, all of those protections

17   are irrelevant as long -- because in this case I think the

18   evidence that has been elicited at these hearings shows that

19   they were not -- that this was not about a Customs violation.

20   This was really about an investigation into terrorism.

21   With that kind of broad picture in mind, I'm going

22   to talk -- kind of break some things down and talk about what

23   specifically we think needs to be suppressed, and it all

24   comes down to the warrant, what's included in that warrant

25   for the storage locker.  I'm going to go through it

1    painstakingly so the record is clear.

2            Paragraph 8 talks about contents of the media

3    search of the hard drive.  We challenge the constitutionality

4    of that search.  Anything found as a result of the search of

5    the hard drive at the border was not -- didn't -- there was

6    no warrant, there was no reasonable suspicion, and we believe

7    it was unreasonable.

8            Paragraph 10, Mr. Ramadan's statements about the

9    context of that hard drive and about the photos and about the

10    videos.  Those statements weren't Mirandized, in a coercive

11    environment, and they were the product of the search of the

12    hard drive.

13            Paragraph 11, statements made about pipe bomb

14    photos.  Again, the search was -- if the search was illegal,

15    his statements in response are fruits.  If his statements --

16    if he was required to receive Miranda warnings, those

17    statements should also be suppressed.  And if they were

18    coerced, they should be suppressed.

19            Paragraph 12, any statement about the YouTube

20    channel and guns.  Again, those were all questions prompted

21    by the search of the computer, given without warnings in a

22    coercive environment.

23            Paragraph 13, again, talks about the YouTube

24    channel.  I don't want to repeat myself too much, but, again,

25    the YouTube channel -- the finding it on the internet was the

1   product of his statements made at the airport.

2           Paragraph 14, any statements about ownership,

3   possession of weapons, the existence of a storage unit,

4   whether he kept those -- any firearms he owned in the storage

5   unit.  Those too were the product of -- based on questions

6   about photos they found on his media where he's holding guns,

7   and also the product of un-Mirandized coerced statements.

8           Paragraph 15, I really want to focus on page 10 of

9   the warrant.  Specifically, there's a statement in there that

10  ICE examined an iPhone 7, model A1661, with a serial number

11  of F2LSR4XGHFYZ.  They did not have a warrant to search the

12  iPhone before that.  We clarified with Officer Armentrout

13  today; he did not search the iPhone at the airport.  So that

14  means the ICE officer who searched that iPhone 7 searched it

15  without a warrant, not at the border.  What they found was a

16  letter from Devon Storage regarding a rent payment.  That,

17  again, is product of an illegal search.

18          Paragraph 16 through 17 include Mr. Ramadan's

19  statements about the various images containing ISIS photos or

20  photos of conflict around the world.  Those are also the

21  product of the search, un-Mirandized statements and a

22  coercive environment.

23          And finally, Your Honor, paragraph 18, although

24  this is not as important, statements about the fact that he's

25  a private person, where he was asked about whether he shares

Case 2:17-cr-20595-VAR-EAS   ECF No. 109   filed 10/19/18   PageID.2167   Page 95 of 149
*Evidentiary Hearing • September 12, 2018*

95

1    information with his wife.  That's not necessarily a product

2    of the search, but it is a product of un-Mirandized

3    questioning in a coercive environment.

4         It is uncontested -- I'm going to talk right now a

5    little bit -- I'm going to talk about the statements.  First,

6    I will begin with why the evidence shows that Mr. Ramadan was

7    in custody, and according to not only the law on

8    Fifth Amendment Miranda but also CBP training materials, they

9    were -- Mr. Ramadan should have been read Miranda warnings.

10        The evidence establishes that Mr. Ramadan was

11   handcuffed at least two times, we know three; twice by

12   Officer Schmeltz and once by Officer Brown.  I know

13   Officer Brown and Officer -- Agent Thomas has suggested that

14   he didn't have his handcuffs that day.  Agent Kelley

15   testified before there was any of this kerfuffle about

16   whether Brown or Thomas would testify at all that he saw

17   Officer Brown put handcuffs on him.  And in the reports of

18   the incident were -- suggested that it was Officer Brown who

19   put handcuffs on him.  If the Court wants to find that he

20   deliberately lied, I think there is evidence to find that.

21        But regardless, when trying to decide whether he

22   was in custody, whether the environment was coercive such

23   that Miranda warnings should have been given, the evidence is

24   crystal clear; he was handcuffed and not free to leave.

25   Every single agent to testify said that he was not free to

 1   leave.  If he had wanted to go, he could not go until they
 2   were done asking him questions and until they were satisfied
 3   with his responses.
 4         Then that brings me to another issue.  He was
 5   repeatedly questioned about the same thing.  When he said
 6   that he did not want to ask [sic] questions, they asked him
 7   again.  When he said he did not want to provide his passcode
 8   to the iPhone, he was asked again and again and again and
 9   then handcuffed.  So when you talk about whether he had a --
10   he was actually free to refuse consent or refuse to answer
11   anything, we show a pattern of repeating -- repeated
12   questioning and then some sort of physical response; a
13   further restraint on his liberty.
14         The place where this took place.  It was in a
15   secondary inspection area.  It is true that the -- the first
16   interview room where they placed Mr. Ramadan had windows, but
17   it was out -- they were windows out into another seating area
18   with no windows to the outside.  There's no natural light in
19   that room.  Regular passersby in the airport cannot see in.
20   The evidence is pretty -- is very clear on this point, that
21   only the Ramadan family and the officers involved in this
22   interrogation were present.  There were no neutral observers
23   in the room.  He was isolated.
24         On every single wall in the room, there's a plaque
25   with the obstruction of justice statute and the seal of

```
 1    Customs and Border Protection patrol.
 2            The room Mr. Ramadan was placed in was very small;
 3    it would be quite cramped with the two officers and
 4    Mr. Ramadan.  He was placed with his back to the window and
 5    to the door, although there was some testimony about the door
 6    being opened and closed at points in the evening.  It was not
 7    ever opened because Mr. Ramadan wished it to be.  He was
 8    put with his back to the window because -- and so he could
 9    not see his family; he could not see his children.
10            As far at the impact that has on him.  Part of the
11    coercive environment is someone's subjective experience of
12    it.  It's already stressful to be traveling, particularly
13    internationally, with small children, but when they were
14    taken off the plane and put in that room, his children were
15    terrified.  His daughter wet herself, she was so scared, and
16    she's of an age where that is not a common response.  His
17    wife was noticeably scared, and his children were crying.
18    That, as any parent would know, would have an impact on their
19    experience of the situation, and the experience of the
20    questions, and the desire to leave, and the feelings that if
21    you don't answer questions something might happen to the
22    children.
23            The nature of the questions was directed --
24    initially they were regular Customs questions; where are you
25    going, what are your plans?  Mr. Ramadan answered those.
```

*Evidentiary Hearing • September 12, 2018*

1    Very quickly, however, the questions steered off those topics

2    to topics that are about criminal conduct.  They asked him

3    about his political views, whether he supported Hamas,

4    whether he supported ISIS.  They asked him whether he liked

5    Jews.  These are not normal Customs questions.

6              There's testimony that -- you know, Mr. Ramadan

7    testified that at one point he was told that he was going to

8    go to Guantanamo, and the impact that has, particularly on a

9    person -- a Muslim person in the post-911 world is

10   tremendous.  There are people still there who have never

11   received a trial, never been charged.  That is a terrifying

12   prospect for someone.

13             They asked him also about guns, whether he

14   possessed them legally and where they were.  These, again,

15   are not normal Custom questions.  These are not questions --

16   he already admitted upfront, I do not have an export license,

17   he said.  It's pretty common according to Officer Schmeltz

18   that a lot of people don't realize that they have to declare

19   certain items, and he said usually what happens is they

20   either forfeit the items or there's some sort of process

21   where they can come back and get them, but it is pretty

22   common, just having an export-control-violation item, you

23   know, but this strayed way beyond that.  They had what they

24   needed to know to decide whether there had been a potential

25   export violation, but it went a lot further.

1    These officers all had weapons.  They may have been

2    holstered, but Mr. Ramadan was aware of their presence.  He

3    is not -- we are not arguing that mere presence of weapons is

4    some sort of deciding factor in whether somebody is in

5    custody or whether the environment is coercive, but it is a

6    factor.  And even an NRA member, if unarmed in a room

7    surrounded by multiple people with firearms, will feel some

8    terror at the prospect of being unarmed with people trained

9    to use -- to shoot to kill.

10    We also know that there was a long period of time.

11   Officer Robinson testified that he delivered the Ramadan

12   family to the secondary inspection area around 9:00 p.m.

13   Mr. Ramadan was not released from custody until somewhere

14   between 4:00 and 5:00 in the morning.  It's an extraordinary

15   amount of time where he did not eat, and he was not exactly

16   in a position where he could sleep given the stressful

17   environment.

18    Based on some of the testimony today, we learned

19   that maybe some of the sets -- so there were multiple

20   questionings with Officers Schmeltz and Armentrout, and then

21   there was another questioning in a separate room with FBI,

22   HSI, CBP officers present.

23    The moving from room to room is another factor when

24   considering whether an environment is coercive and whether a

25   person is in custody.  Again, during that period it is not

Case 2:17-cr-20595-VAR-EAS  ECF No. 109  filed 10/19/18  PageID.2172  Page 100 of
149
Evidentiary Hearing • September 12, 2018

100

1    like he had a choice to go into that room.

2            He did not eat the entire time.  When he emerged

3    from the conference room, which does not have windows, he did

4    not know where his family was.  Eventually he was told -- he

5    was told that they had gone home, but, again, after hours

6    being in a place early in the morning, not knowing where

7    family is, that puts a lot of psychological strain on a

8    person.

9            He also asked that the conversation be recorded,

10   and he has good reason to do that.  Your Honor saw that

11   Mr. Ramadan has had contact with police officers in the past,

12   and it has been dangerous for him, where he was dragged to

13   the ground, and he was beaten.  And so that subjective

14   experience goes into the question of whether his answer --

15   his statements were coerced, the product of a coercive

16   environment, and whether he felt coerced.  And he asked for

17   it to be recorded for that reason.

18           All of these things, all of these many factors,

19   leads to the conclusion that this was -- that Mr. Ramadan was

20   in custody.  I think, you know, the in-custody factors courts

21   look at are the purpose of the questioning, the place, the

22   length, whether the person was free to leave, whether the

23   person had unrestrained freedom, and whether he initiated the

24   contact.  All of these factors are present here.

25           He was not free to leave.  He did not initiate this

Case 2:17-cr-20595-VAR-EAS ECF No. 109 filed 10/19/18 PageID.2173 Page 101 of
149
Evidentiary Hearing • September 12, 2018

101

1   contact.  It was not voluntary.  So he should have been read

2   Miranda warnings, but also important is the fact that he

3   should have been provided a lawyer when he asked for a

4   lawyer.  On that point, the case law is extremely clear.

5          And I know the government is going to mention a

6   case called Galloway, which they claim stands for the

7   proposition that Miranda warnings are not required at the

8   border.  That's actually not what Galloway says.  Galloway

9   says that Miranda warnings are not required for routine

10  Customs inspections.

11         At the beginning of this talk, I mentioned that

12  this was not routine.  This was a criminal investigation, and

13  the minute that it escalated from routine questions about

14  travel plans, contents of the luggage, and they started

15  asking him about terrorism and guns, they should have read

16  him Miranda warnings.

17         And frankly that escalation point happened quite

18  immediately because as soon as they found these

19  export-controlled items, the Joint Terrorism Task Force was

20  called.  Agent Thomas of the FBI, not a Customs or border

21  agent, was contacted and asked to come for questioning.  So

22  was Agent Kelley of Homeland Security.

23         Very early on, as we heard from Agent Kelley, they

24  were talking about a plan where they would provide law

25  enforcement intel to the Israelis; in case the United States

Case 2:17-cr-20595-VAR-EAS ECF No. 109 filed 10/19/18 PageID.2174 Page 102 of
149
Evidentiary Hearing • September 12, 2018

102

 1    did not bring charges against Mr. Ramadan, the Israelis might

 2    be able to.  The whole purpose of these conversations -- of

 3    this questioning was not to determine the export violation;

 4    it was to build a case or to find out if Mr. Ramadan was

 5    involved in criminal activity, specifically terrorism.

 6            Again, we see that from the notes, we see that from

 7    the only notes we have which are from Agent Thomas who said

 8    that -- who wrote on a paper that Mr. Ramadan was a member of

 9    Hamas/ISIS, and he was a lone wolf, and he circled that.

10    Again, this is nothing to do with Customs violations because

11    in their mind they had built a narrative about who

12    Mr. Ramadan was based on some very limited information.  They

13    believed he was a terrorist, and that was what they were

14    driving at.

15            So he should have been received -- he should have

16    received the panoply of protections provided to people who

17    are suspected of criminal activity.  And I would say that at

18    the point at which, if we are going to draw a line in the

19    evening when that occurred, it was when they contacted the

20    Joint Terrorism Task Force.  As soon as they made that

21    decision, and the purpose of the questioning was to determine

22    whether he was involved in terrorist activity, that's when

23    Miranda warnings should have been given.

24            I have gone through all of the factors and

25    explained why he was in custody, why he should have received

Case 2:17-cr-20595-VAR-EAS   ECF No. 109   filed 10/19/18   PageID.2175   Page 103 of
149
Evidentiary Hearing • September 12, 2018

103

1    Miranda warnings, but a lot of these same factors are the
2    same ones you would use to determine whether somebody's
3    statements have been coerced.  It does not require a physical
4    beating.  That is a component here.
5         Most of Mr. statements -- most of Mr. Ramadan's
6    statements he made were made before he was punched in the
7    stomach.  They were -- you know, there was some statements --
8    he -- but that was the culmination of the coercive
9    environment, and I've already gone through all of the reasons
10   to believe that.
11        Physical punishment.  There was some form of
12   physical punishment for his failure to respond to questions.
13   When he didn't provide his passcodes, he was handcuffed.
14   Yeah, he was agitated when he was asked repeatedly to provide
15   his passcodes, but the message when they put handcuffs on him
16   behind his back in an uncomfortable position is that failure
17   to submit to their requests and their demands would result in
18   a further restraint on his freedom of motion -- movement.
19        Mr. Ramadan -- everybody testified -- all the
20   agents testified that he was uncooperative throughout this.
21   He did not want to answer these questions.  And so when you
22   are asking whether his statements were voluntary or
23   involuntary, that is an important component because there was
24   something about that environment, despite his lack of
25   cooperation, despite the fact that he did not want to answer

 1    these questions, that made him answer them, and it was the
 2    threat that they would misunderstand him, potentially send
 3    him to Guantanamo, or that they would not let him go home to
 4    his family.
 5         Let's talk a little bit about why suppression for
 6    the Miranda violation and the involuntary statements is the
 7    appropriate remedy here.
 8         So in Patane the Supreme Court said that the
 9    statements -- involuntary statements may never be used
10    against a defendant at trial.  But there's an additional
11    reason why the un-Mirandized statements, statements made
12    without a lawyer, should be suppressed, and that's because
13    Miranda is a prophylactic measure to prevent these kind of
14    coercive environments, police abusing this kind of coercive
15    environment and then subsequently using statements --
16    unwarranted statements against a defendant in a criminal
17    proceeding.  That does not have to be limited to a trial,
18    that is the most common circumstance, but here they actually
19    did use Mr. Ramadan's un-Mirandized statements against him in
20    a criminal proceeding, a warrant, signed by a magistrate
21    judge.  They were submitted to him.  It was as if Mr. Ramadan
22    was testifying against himself in front of that magistrate
23    judge, and that's why a suppression of those statements,
24    excising them from the warrant, is the appropriate remedy
25    here because as all the case law shows on the fruits

Case 2:17-cr-20595-VAR-EAS  ECF No. 109  filed 10/19/18  PageID.2177  Page 105 of
149
Evidentiary Hearing • September 12, 2018

105

 1  doctrine, at least statements made -- evidence seized

 2  illegally cannot then be used in a search warrant.  The

 3  proper remedy is to excise them from the warrant, and then go

 4  back and review it for probable cause.  Probable cause will

 5  go away without his statements at all.

 6      Unless the Court has questions about the statements

 7  issue, I'm going to move on to the border search.

 8      THE COURT:  Okay.

 9      MS. FITZHARRIS:  There is a difference in the case

10  law between searches to uncover evidence of a crime and

11  searches for some other special needs, and so that's why a

12  huge focus of these proceedings has been on trying to

13  determine what the purpose of looking at the files -- the

14  digital media was.  I know the government has cited the

15  border search exception, but I want to kind of return to

16  first principles as the Supreme Court recently did in

17  Carpenter, the most recent case that we have on digital

18  privacy.  It changes, you know, anything dealing with the

19  seismic shift of technology nowadays.

20      The Fourth Amendment is about safeguarding a

21  person's privacy and security against arbitrary power, and to

22  prevent some form of permeating police surveillance.  It's

23  quite simply not an option for people not to travel.  As the

24  Court recognized -- the Supreme Court recognized, to say

25  somebody -- phones, digital media, they have become a part of

Case 2:17-cr-20595-VAR-EAS ECF No. 109 filed 10/19/18 PageID.2178 Page 106 of
149
*Evidentiary Hearing • September 12, 2018*

106

1   our lives in a way that we never thought before.

2           In Riley the Supreme Court compared a cellphone --

3   a smartphone to an appendage of the body because they are so

4   connected to our lives.  And they are particularly sensitive

5   because of just how much sensitive information can be stored

6   on there.  You can learn more about a person by looking at a

7   cellphone or a hard drive than you can by even going through

8   someone's house; you have medical records, phones [sic],

9   e-mails, text messages.  You can relocate -- you can

10  reconstruct where a person has been for years by just looking

11  at a cellphone.  That the quantity and quality of that

12  information is such that the Supreme Court has said both in

13  Riley and in Carpenter, we need different rules.  In fact,

14  the Court said we should not uncritically extend certain

15  doctrines in the wake of this new technology, and that's a

16  direct quote from Carpenter, the most recent decision.

17          And so in Carpenter what the Court did was it said

18  all of this information you can learn about a person from

19  collecting cell tower information and reconstructing their

20  locations, it's so different than anything else before.  And

21  so collecting it and reconstructing someone else's --

22  someone's -- we are not going to extend the third-party

23  doctrine to that data, to that media.

24          And Riley says the same thing about searches

25  incident to arrests in cellphones.  We are just in a

Case 2:17-cr-20595-VAR-EAS   ECF No. 109   filed 10/19/18   PageID.2179   Page 107 of
149
Evidentiary Hearing • September 12, 2018

107

 1    different world.  And the border search doctrine is not one

 2    that we should extend uncritically in the world of digital

 3    media.  It has been a seismic shift.

 4            To the end, you know, then -- so what do we do in

 5    this case?  What level of suspicion should be required?  We

 6    shouldn't just say anything goes when it comes to digital

 7    media.  And as I said earlier, you know, there's current

 8    practice, no suspicion required, reasonable suspicion,

 9    probable cause without a warrant, probable cause with a

10    warrant.  Obviously the last one, probable cause warrant,

11    that's the gold standard.  And particularly given the ease

12    with which people can obtain warrants -- law enforcement

13    officers can obtain warrants, it is not a tremendous burden

14    on the government to require a warrant to search media at the

15    border.

16            But I suggest at the very least some form of

17    reasonable suspicion is required even at the border to search

18    someone's cellphone.  That is more than a hunch, a reasonably

19    articulable basis to search digital media, not just to

20    believe that some criminal violation has existed.

21            All the Fourth Amendment case law requires a nexus

22    between the crime suspected and the thing or place to be

23    searched.  All right.  So it's not enough just to say that

24    someone committed an export violation.  There must be some

25    reason to suspect that there's information related to the

```
 1    export violation on the phone, hard drive, computer or other

 2    digital media in order for the search to be reasonable.  And

 3    the purpose of that search has to be connected to the purpose

 4    of a border search, which is to determine whether there are

 5    custom violations, import and export violations, and to

 6    determine if someone is eligible to leave the country.

 7              Going all the way back to the 1886 case of Boyd vs.

 8    United States, the Supreme Court observed the goods --

 9    searches for goods liable to duties are totally different

10    than a search of a man's private books and papers for the

11    purpose of obtaining information therein or using them as

12    evidence against him.

13              So where are we taking this case?  Like I said, you

14    have these options.  A warrant supported by probable cause is

15    minimal burden on the government and would protect this

16    sensitive information to the best of its ability, but at the

17    very least reasonable suspicion is required, and there is not

18    reasonable -- there was not reasonable suspicion to believe

19    Mr. Ramadan had evidence of a Customs violation on his phone.

20              I know the government has made that assertion; that

21    the facts that that is a criminal offense alone provides a

22    basis to search his -- his digital device.  But, again, I'm

23    going back to kind of really elementary principles, Zurcher

24    vs. Stanford Daily, 436 U.S. 547, at page 554, says that

25    there is a need to establish that the evidence of a crime
```

Case 2:17-cr-20595-VAR-EAS  ECF No. 109  filed 10/19/18  PageID.2181  Page 109 of
149
Evidentiary Hearing • September 12, 2018

109

 1   will be in the place searched.

 2          Officer Armentrout, Officer Schmeltz, neither one

 3   of them had any reason to believe that the Seagate hard drive

 4   would contain any information having to do with the export

 5   violations.  There is no testimony of that.

 6          So what do we have?  We have the fact that this HSI

 7   tip from 2010, stale information, at least seven years old,

 8   an anonymous tip with a ludicrous claim.  The Supreme Court

 9   has said over and over again that anonymous tips without

10   corroborating evidence are insufficient to support any kind

11   of reasonable suspicion or probable cause, particularly when

12   something like an anonymous tip line where anybody, even a

13   disgruntled neighbor, can come -- can call in and make a

14   claim about someone.

15          Officer Schmeltz admitted as much on the stand;

16   that it is not really something that you pay attention to

17   because it doesn't mean a whole lot.

18          Then you have export violation.  Again, just

19   because an export violation has occurred doesn't mean you can

20   go into a hard drive.  There has got to be a connection.

21          Then, you know, his answers were they say

22   suspicious or untruthful.  He said that he had -- he was a

23   carpenter, he had worked construction, and that he planned to

24   go overseas to film the conflict in -- on the West Bank.  He

25   had lots of cameras in his luggage, and he had a vest

1   indicating press.  These are not untrue statements.  There is

2   nothing bizarre about it.  Photo journalism nowadays is not

3   something you necessarily get a degree for.

4         Many people can -- I can actually testify from

5   personal experience; my husband and I went and lived in

6   Russia.  He had no journalism experience, and he was hired to

7   write -- to report on issues in Russia.  That's not the way

8   modern journalism works.  So the fact that he didn't have his

9   credentials or a degree doesn't mean a whole lot.

10        So what are we left with?  A man named

11  Yousef Ramadan who's going with his family, his whole family,

12  to Bethlehem to take care of an aging father who likes -- who

13  has an affinity for guns and, you know, BB guns, shooting,

14  camping, and who wants to -- and he has some of those items

15  in his luggage.  That's it.  There's no reason to suspect

16  that any information related to a Customs or immigration

17  violation will be on those hard drives.

18        Turning to the issue -- I know that it has come up

19  a lot in the case law regarding forensic versus manual

20  searches.  Testimony at these hearings suggest that this was

21  more than just casually flipping through.  I mean, I'm sure

22  Your Honor has -- can open up a file on the computer and

23  there are various documents, and you can click and open them.

24  This was more than that.  We heard testimony that there was

25  proprietary software that allowed kind of a speedier review

Case 2:17-cr-20595-VAR-EAS  ECF No. 109  filed 10/19/18  PageID.2183  Page 111 of
149
*Evidentiary Hearing • September 12, 2018*

**111**

1       of the media.  And as Mr. Ramadan testified, he and the

2       defense team have spent hours and hours individually clicking

3       on each photo and each image and each video.  It is not

4       possible to review it in four hours, manually clicking

5       through; it simply is not possible.

6               And so there is evidence to suggest that this

7       requires specialized software, not to mention the fact that

8       any kind of review that they would need would have to

9       preserve the metadata, would have to make sure it wasn't

10      altering any aspect of the file in case it is used for future

11      prosecution of some kind.  And so there's ample reason at

12      least to believe -- I recognize there's not testimony to

13      this.  There was testimony about software, but some special

14      software was used; it wasn't just a manual search.

15              Even so, that distinction between forensic and

16      manual searches is pretty meaningless.  In fact, one of the

17      things that in Carpenter the Supreme Court was really

18      concerned about was the ease with which you could reconstruct

19      someone's life in rather simple ways using cell site-tower

20      information.  You can learn a whole lot about someone's

21      personal life just by manually going through a computer.  You

22      don't need special software to open an e-mail; you don't need

23      special software to open an app that might take you to bank

24      statements.  It is -- the distinction is meaningless.

25              And I think the best evidence we have of that comes

Evidentiary Hearing • September 12, 2018

```
 1    from Riley where there were two types of cellphones at issue.
 2    One defendant had a flip phone, one of those sort of old
 3    phones back when, you know, it flipped open, didn't have any
 4    other features to it other than maybe taking a photo, and
 5    then there was a smartphone.  The Supreme Court said there
 6    was really no differences.  Both phones in order to search
 7    them required a warrant.
 8            So I recognize the Supreme Court has not talked --
 9    has not spoken on this issue directly, but they have provided
10    a lot of clues about how courts in your position should go
11    about looking at new -- about -- looking at Fourth Amendment
12    rights in the digital age.
13            In the end, we are talking about the remedy.  I
14    talked about the remedy for statements, but I want to talk a
15    little bit about the remedy for the Fourth Amendment
16    violation here and the search of the digital media.  The
17    government, in its initial brief, made the argument that the
18    contents of the storage unit were inevitably discoverable.
19    There has been no evidence in this record at all regarding
20    any investigative efforts they were making that would have
21    led them to that storage unit independent of Mr. Ramadan's
22    statements, so I think it's very easy to dispose of that.
23            The bigger issue is good faith, and really extreme
24    expansion of what Davis says about good faith.  Davis talked
25    about, you know, it was about the good old days.  Maybe the
```

Case 2:17-cr-20595-VAR-EAS  ECF No. 109  filed 10/19/18  PageID.2185  Page 113 of
149
Evidentiary Hearing • September 12, 2018

113

 1    Court remembers the confusion about Belton searches and the
 2    change that Gant brought about.  And what happened is that --
 3    is that Mr. Davis' car was searched before Gant was decided
 4    but while -- but as it was on appeal, he argued that Belton
 5    was wrongly decided and a different standard should apply,
 6    and while his case was pending on appeal the Supreme Court
 7    decided Gant.  So you have a dramatic change in the law while
 8    it was going on.  And the officers in that case had followed
 9    existing Supreme Court case law to the letter.
10            We have a very different circumstance here because
11    there is not a Sixth Circuit case directly on point after
12    Riley.  Even before Riley -- I know the government has argued
13    that Stewart is directly on point.  I have pointed out the
14    reason why that's not true because Stewart did not raise this
15    specific issue, and it would have been an advisory opinion if
16    the court had reached the question of whether search of a
17    digital device at the border is unconstitutional without a
18    warrant.  In addition -- and so you can't take a whole lot
19    from Stewart.
20            In the interim between Stewart, there was Riley,
21    and Riley was a pretty big shift, as the DOJ recognized, and
22    recognized the concerns and the implications that Riley would
23    have for border searches.
24            Then in 2015 there is Lichtenberger, which I cited
25    in all of my briefs, that acknowledge this difference in how

Case 2:17-cr-20595-VAR-EAS  ECF No. 109  filed 10/19/18  PageID.2186  Page 114 of
149
Evidentiary Hearing • September 12, 2018

114

1  Riley made clear that the balance between the government's

2  interest and privacy in digital devices shifted.  So to the

3  extent that -- so they cannot argue that there is a case

4  clearly on point after Riley that authorizes this search.

5       So what are officers supposed to do in this gray

6  zone?  The answer is get a warrant.  If the state of the law

7  is unclear, officers should take caution to ensure that

8  liberties -- civil liberties are protected.  They should not

9  try to interpret case law on their own and assume that

10  everything that they are doing is fine.

11       And here, you know, the case law is going -- is

12  going different ways.  It is not a case where there is a

13  specific case on point after Riley, authorizing this conduct

14  in saying that it is appropriate.  And there is ample reason

15  for these officers to believe that the -- that searches of

16  digital devices at the border are not reasonable without a

17  warrant or some level of suspicion.

18       There is the other issue that was left open by

19  Davis which is when -- you don't want constitutional law to

20  ossify, which is what will happen if there is no remedy for

21  any violation.  And so the -- there was some implication that

22  a defendant who raises an issue and prevails, even if it is

23  novel, should get a benefit of a suppression order.

24       And then there is the final issue of deterrence.

25  In this case these officers acted like just because they were

Case 2:17-cr-20595-VAR-EAS   ECF No. 109   filed 10/19/18   PageID.2187   Page 115 of
149
Evidentiary Hearing • September 12, 2018

**115**

 1    at the border, it was a constitution-free zone.   They

 2    repeatedly said we don't interrogate people at the border.

 3    We don't have to give Miranda warnings at the border.   Even

 4    if Mr. Ramadan had asked for a lawyer, we wouldn't have to

 5    give him one.   That is not the law.   So either they need to

 6    have retaining or they need to be sent a message that this

 7    kind of unconstitutional conduct will not be tolerated.

 8    There will be consequences, and one of the consequences is

 9    suppression of the evidence.

10            Unless the Court has questions, I'm done.

11            THE COURT:   Thank you.   Good argument.   Government.

12            MR. MARTIN:   Your Honor, I'm going to address the

13    motions one at a time because they all have their own unique

14    legal analysis that the Court has to go through.

15            And if I had a criticism of the defense's argument

16    there, I would say they just kind of lumped it all together

17    and didn't really articulate what the legal standard was for

18    each of their pending motions, so I'm going to do that, and

19    I'm going to start where Ms. Fitzharris left off and that's

20    the border search.

21            First off, the burden.   Mr. Densemo earlier accused

22    me of taking the position with respect to the burden as part

23    of a grand conspiracy to undermine the rights of the

24    defendant.   We have briefed this topic now separately.

25    There's clear Sixth Circuit case law that says that it is the

Case 2:17-cr-20595-VAR-EAS  ECF No. 109  filed 10/19/18  PageID.2188  Page 116 of 149
Evidentiary Hearing • September 12, 2018

116

1    burden on the moving party, the party moving to suppress, to

2    persuade the Court that the evidence should be suppressed,

3    that a violation has taken place in some way.

4          So in this case that's the defense.  The defense,

5    their motion, they have the burden to establish that

6    Mr. Ramadan's Fourth Amendment rights have been violated, and

7    that the evidence should be suppressed.

8          The burden issue changes depending on the Miranda

9    issue and then the due process, so I will address the burden

10   when I talk about those, but at least with respect to the

11   Fourth Amendment issue, the burden is on the defense, and

12   they have not met that burden.

13         In large part, because there was no evidentiary

14   burden ever to meet, because as a matter of law, a search of

15   electronic devices at the border does not require a warrant,

16   and there is no federal case from any district or any circuit

17   that requires a warrant to search electronic devices at the

18   border, none.

19         So the defense says, well, okay, this Riley

20   decision that had to do with search incident to arrest, that

21   changed the landscape, and now because cellphones are so, you

22   know, important to our daily lives and, you know, contain

23   such sensitive information that, you know, this has

24   dramatically changed the situation.  We are in a new world, I

25   think is the claim.

Case 2:17-cr-20595-VAR-EAS  ECF No. 109  filed 10/19/18  PageID.2189  Page 117 of
149
Evidentiary Hearing • September 12, 2018

117

 1            And when I was looking -- this is sort of an aside,
 2    but I think it is relevant, so I'm going to raise it.  I was
 3    looking at cases involving searches at the border, and there
 4    was a case from the 1970s involving a search of international
 5    mail.  And the Circuit for the District of Columbia ruled
 6    that probable cause was required to search mail at the
 7    international border.  And the D.C. Circuit said, and this is
 8    a quote, "Letter mail is a vital means of communication in
 9    our society.  Letters express the most important and
10    sensitive of personal, familial, political, professional and
11    financial affairs.  They implicate both our deepest privacy
12    and our interest in free expression far more than packages or
13    suitcases or automobiles.  In the words of Justice Holmes,
14    the use of the mail is almost as much a part of free speech
15    as the right to use our tongues."
16            This is so dramatic, but when I read that, what I
17    think is, boy, the more things change, the more they stay the
18    same.  You know, what a letter was in the 1970s, we now hear
19    defense counsel arguing is the equivalent of a cellphone in
20    the modern day and age.
21            And there are probably some differences; the volume
22    of information that a cellphone can hold is definitely
23    different than a letter, and that's been cited by the Supreme
24    Court in some of their recent cases.  But volume and a lot of
25    these issues break down at the international border because

Case 2:17-cr-20595-VAR-EAS   ECF No. 109   filed 10/19/18   PageID.2190   Page 118 of
149
Evidentiary Hearing • September 12, 2018

118

1    at the international border the volume of material the

2    government can lawfully search is huge.

3              I look out my office and I see hundreds of trucks

4    crossing the Ambassador Bridge every hour.  You see those

5    freighters going down the Detroit River.  How much data, how

6    much packages, how much paper could a semitruck or a

7    freighter hold?  And the Customs and Border Protection

8    officers are responsible for inspecting all of that.

9              In fact, a recent case from another circuit pointed

10   out you could take your mobile home to the border, your home,

11   and it could be subjected to a border search, your bedroom,

12   and that is permissible because you are at the border.

13   Things are different at the border, and that is what the

14   Supreme Court has said time and time and time again.  Merely

15   because you are at the border gives the government a right to

16   search your conveyances and your materials with no warrant.

17             Now, the next step that the defense is taking and

18   says, okay, fine, no warrant is required but at least

19   reasonable suspicion.  And there are a couple circuits, I

20   think it is the Ninth and the Fourth, that have said that

21   looking at people's digital devices at the border requires at

22   least reasonable suspicion.

23             The Sixth Circuit has taken the exact opposite

24   position in a case called Stewart that Ms. Fitzharris alluded

25   to.  And this case is a critical case, I have talked about it

Case 2:17-cr-20595-VAR-EAS  ECF No. 109  filed 10/19/18  PageID.2191  Page 119 of
149
Evidentiary Hearing • September 12, 2018

119

1    at some length before, and I'm going to go over it again with
2    the Court because it is so important and because it is
3    binding precedent on you.
4            In Stewart an individual was flying in from Japan
5    and he had computers on him, laptops.  Customs and Border
6    Protection looked at the laptop -- some of his other
7    electronic devices and saw what they thought could be child
8    pornography, like on a cellphone or something.  They tried to
9    power up the laptop to look at that, but they couldn't do it
10   because the battery was dead, and they didn't have a cord
11   to -- an appropriate-sized cord or something like that to
12   plug in and actually power it up at the airport.
13           So they gave it to the Immigration and Customs
14   agents, who are all part of the Department of Homeland
15   Security, and they transported it 20 miles to downtown
16   Detroit, and the next day they conducted an examination of
17   that laptop.
18           The case was actually before Judge Lawson; it came
19   out of our District.  And Judge Lawson held that because the
20   laptop was transported downtown it became an extended border
21   search, it wasn't a search at the actual border, but it
22   became an extended border search and therefore required
23   reasonable suspicion, not a warrant but at least reasonable
24   suspicion.  And he said they had reasonable suspicion to
25   search it, so he denied the defense motion to suppress.

```
 1              When the case -- the defendant was convicted, case
 2    goes up to the Sixth Circuit, and the Sixth Circuit says we
 3    are affirming the denial of the motion to dismiss, but we are
 4    doing so for different reasons.  This was not an extended
 5    border search.  Customs and Border Protection and HSI are
 6    allowed to take a laptop down to Detroit and search it the
 7    next day, that's a border search, and it requires no warrant
 8    and no reasonable suspicion.  That case is the status of the
 9    law in our circuit as of today.
10              So when the officers are at the airport and someone
11    comes in with an electronic device, if they have a
12    Sixth Circuit decision that says they can take that
13    electronic device downtown and search it the next day,
14    certainly they can search it there at the airport with no
15    reasonable suspicion or warrant.  And that's what the
16    officers in this case that's -- that was the position they
17    were in.
18              Almost every case that I've looked at, almost every
19    case, and I've laid them out in our brief, I think there is
20    now over 15 or 16 different cases, say that Riley, this new
21    decision from the Supreme Court that dealt with search
22    incident to arrest, did not change the law when it comes to
23    border searches.
24              And the most recent case -- I shepardized it before
25    I came, is a case from the Eleventh Circuit, I believe it was
```

Case 2:17-cr-20595-VAR-EAS ECF No. 109 filed 10/19/18 PageID.2193 Page 121 of
149
Evidentiary Hearing • September 12, 2018

121

1    decided in May of this year, and it is United States vs.

2    Touset.  It is on page 10 of our brief, Docket Number 96.

3    "Riley, which involved the search incident to arrest

4    exception, does not apply to searches at the border.  Nothing

5    in Riley undermines the government's interest searching at

6    border."  Nothing undermines the government's interest

7    searching at border.  And they go on to say, "The

8    Fourth Amendment does not require any suspicion for forensic

9    searches of electronic devices at the border."

10           So there is a big body of case law in response to

11   Ms. Fitzharris.  There is a large body of case law that cuts

12   against the defense.  And even those cases that say -- after

13   Riley that some level of suspicion is needed, it's not a

14   warrant, it's simply reasonable suspicion.  And even if the

15   Court were to require that, we have it here.  You know, think

16   about the facts that the officers had in front of them before

17   they went and searched -- before Officer Armentrout started

18   looking at that electronic media.  They had the

19   export-controlled body armor, the export-controlled rifle

20   scope, the export-controlled Taser in his luggage.  And I

21   know because I have had export-controlled cases in front of

22   Your Honor, that you know that export violations can be

23   violations of federal law.  So right there the contraband is

24   in the bag.  That would give reasonable suspicion to search,

25   that and that alone.

Case 2:17-cr-20595-VAR-EAS  ECF No. 109  filed 10/19/18  PageID.2194  Page 122 of
149
*Evidentiary Hearing • September 12, 2018*

**122**

 1         But then on top of that they had, well, his weird

 2   story about being a reporter in the Middle East when he had

 3   no experience or credentials being a reporter.  They had his

 4   explosive reaction when he -- when they asked him to look at

 5   his cellphone.  If you recall, that's when the agents

 6   testified that he got really aggressive, and that's when the

 7   handcuffs came on.

 8         So you have all of these other factors pointing

 9   toward reasonable suspicion, but finding the evidence in the

10   luggage in and of itself is sufficient, so we meet that

11   standard even here, even though it is not required we meet it

12   here.

13         Lastly, I would point out that I don't even think

14   you need to wade into -- if you didn't want to, I don't think

15   you need to even wade into deciding whether a warrant or

16   reasonable suspicion is required because you have the good

17   faith exception.

18         As I mentioned earlier, officers -- these officers

19   would have looked at that Stewart case in our Circuit and

20   they would have said to themselves, we are not doing anything

21   illegal here, this is permitted.

22         But the other key fact is not only would they have

23   the perception of what they did was permitted at the time at

24   the airport, but then a few days later the FBI went to a

25   federal judge and got a federal search warrant for those same

Evidentiary Hearing • September 12, 2018

```
 1    exact electronic devices.  So the government did the right
 2    thing.  We did get a warrant, unlike so many of these other
 3    cases where they just look at it at the border, and then the
 4    prosecution proceeds.  The sequence of events here is they
 5    examined the devices at the border, devices are detained,
 6    government obtains a Federal search warrant for those
 7    devices, and now they are -- the defense is here attempting
 8    to suppress the evidence from the storage locker and those
 9    devices that was based on a federal search warrant.
10    Certainly the agents executing the -- the FBI agents
11    executing those warrants for the devices and the storage
12    locker were entitled to rely on that warrant.  That's the
13    very definition of good faith.
14            So there really is no reason for the Court to
15    suppress the evidence here under the Fourth Amendment.  So
16    that's going to conclude my remarks with respect to the
17    Fourth Amendment.
18            Let me move on now to suppression of the
19    statements, and there are two separate lines of inquiry here
20    that we have to look at, and they are completely different,
21    completely different.
22            The first is did the government -- did the agents
23    and officers, at the time they took the statements from the
24    defendant, violate its Fifth Amendment rights by not
25    Mirandizing him?  And then there is a separate argument that
```

Case 2:17-cr-20595-VAR-EAS  ECF No. 109  filed 10/19/18  PageID.2196  Page 124 of
149
*Evidentiary Hearing • September 12, 2018*

**124**

1  is a separate legal analysis.  Did they violate his

2  Fifth Amendment rights to due process by coercing him?  Two

3  separate lines of inquiry here.

4  Let me focus on the Miranda.  The question under

5  the Miranda is, is the defendant here in custody?  The law

6  defines custody in this area as being under a formal arrest

7  or a restraint on freedom of movement of the degree

8  associated with a formal arrest.  So either you are actually

9  under arrest or there's such a restraint on your freedom that

10  it is just like you being under arrest -- under arrest.

11  And back to the issue of burdens, Your Honor, the

12  defendant must demonstrate by a preponderance of the evidence

13  that he was entitled to receive Miranda warnings, i.e., that

14  he was subjected to a custodial interrogation.  So here back

15  to the burden issue, it is the defendant's burden to prove to

16  you by a preponderance of the evidence that he was in

17  custody, i.e., that he was either arrested or there were such

18  restrictions on him that it was just like an arrest.

19  And the inquiry is not subjective.  It doesn't

20  matter what Mr. Ramadan believed, and it doesn't matter what

21  the interrogating or questioning officers believed.  The

22  only -- and this is a quote from the Supreme Court, Berkemer

23  vs. McCarty, a 1984 case, 468 U.S. 420.  "The only relevant

24  inquiry is how a reasonable man in the suspect's shoes would

25  have understood his situation."

Case 2:17-cr-20595-VAR-EAS ECF No. 109 filed 10/19/18 PageID.2197 Page 125 of 149
Evidentiary Hearing • September 12, 2018

125

 1          So it is an objective analysis here.  We don't care
 2     about what Mr. Ramadan thought, we don't care about what the
 3     intentions or the motives of the officers were, just what
 4     would an objective person who is in his exact situation
 5     understand the situation to be.  And to figure this out, it
 6     is a totality of the circumstances analysis, so you look at
 7     everything.
 8          In a way the Sixth Circuit has already answered
 9     this question for you because of this Galloway case,
10     United States vs. Galloway, that Ms. Fitzharris mentioned.
11     In that case, the Sixth Circuit ruled, "we hold that Miranda
12     is inapplicable because a secondary Customs inspection is a
13     routine noncustodial detention."  So generally speaking
14     Miranda is not required.
15          But what about the fact that you are not free to
16     leave?  Doesn't that make this like an arrest, the
17     not-free-to-leave kind of view?  The answer is, no, and we
18     know that from another Sixth Circuit case, United States vs.
19     Ozuna, it's a 1999 case, and it dealt with a Customs
20     inspection.  It dealt with a Customs inspection.  Here is
21     what the Sixth Circuit said.  They said, "Every day thousands
22     of travelers come into the United States, and, quote, each is
23     detained until a search has been made of his --"  I'm sorry.
24     "Each is detained until a search has been made, or his
25     answers to questions have convinced the custom agent that no

Case 2:17-cr-20595-VAR-EAS  ECF No. 109  filed 10/19/18  PageID.2198  Page 126 of
149
Evidentiary Hearing • September 12, 2018

126

 1    search is necessary.  To say that by reason of such detention

 2    each is in custody would distort the Miranda rule beyond

 3    recognition."

 4              So just because you are in a secondary inspection

 5    doesn't mean you are arrested, and it doesn't mean you are

 6    detained like an arrest.  And the Sixth Circuit has said in

 7    the Galloway case that I mentioned, "although we had once

 8    stated the Miranda standard as being whether a defendant

 9    feels free to go, Ozuna demonstrates that this standard is

10    not correct."

11              And, of course, if you think about it, we all know

12    that's true.  I mean, what is the most common situation that

13    an everyday American would experience this exact dichotomy in

14    their everyday lives?  A traffic stop.  When you are pulled

15    over by the police, you are not free to leave.  You can't

16    just say, officer, have a nice day, I'm out of here.  You

17    have to stay there until the officer is done giving you your

18    ticket or letting you go.  But when the officer comes up to

19    your car and says roll down the window, you do.  And he says

20    do you know why I pulled you over?  And you say, yeah, I

21    think I was going over the speed limit.  That's admissible

22    against you, he didn't Miranda you, you are not free to

23    leave, but Miranda is not applicable.  Why?  Because the not

24    free to leave is not the correct inquiry.  The correct

25    inquiry is what would an objective person understand their

Case 2:17-cr-20595-VAR-EAS   ECF No. 109   filed 10/19/18   PageID.2199   Page 127 of
149
Evidentiary Hearing • September 12, 2018

127

1   situation to be.  Would an objective person understand a

2   traffic stop to be they are arrested?  Well, no, of course

3   not.  Would an objective person believe a secondary

4   inspection at the international border means they are

5   arrested?  Of course not because so many people do it on such

6   a routine basis.  Everybody has to go through Customs at the

7   border.  Sometimes that Customs inspection is short,

8   sometimes it is long, but the fact is everybody has to go

9   through it, and you understand you are not under arrest when

10  you do.

11          The length of time, the questions they ask, none of

12  those things convert a normal Customs inspection into an

13  arrest, none of them.

14          There are cases -- the Ozuna case again, and I cite

15  it because it is a Sixth Circuit case from 1999, says,

16  "Brevity is not a precondition of lawfulness of questioning

17  at the border.  There is no fixed time limit to the length of

18  the questioning, and its duration is simply one factor to

19  consider in assessing the lawfulness of the officer's

20  activity.  A defendant must do more than simply show that the

21  questioning somehow deviated from the questioning of the

22  average Customs interrogee.  And the length of the interview

23  can result from the defendant's own acts namely giving

24  incomplete and inconsistent answers which necessitated

25  repetition of the questions."  That's the Ozuna case.

1           And I would submit to the Court that that is what

2    we had here.  The officers looked in his bags, they find

3    these suspicious items; sort of odd that you are moving to

4    the Middle East and you've got export-controlled body armor,

5    rifle scope and Taser in your bag, along with a bunch of

6    paramilitary material, clothing, ammunition pouches, a rifle

7    grip, knives, a gas mask, other body armor.  Unusual, so they

8    ask him questions about what he's doing; this is in the first

9    interview with Officer Schmeltz and Officer Armentrout.  And

10   he says I'm moving to the Middle East to be a reporter.  So

11   they say to him, do you have any credentials?  Have you ever

12   been a reporter before?  Who is your press contact?  He can't

13   answer any of those.

14          So then they say, okay, let's look at your

15   cellphone.  He won't provide the password.  When they asked

16   him again, he becomes really agitated, so much so that they

17   had to put him in handcuffs.  He's not being cooperative, and

18   that necessitates looking at the electronic media, and that's

19   what they do next, and that necessitates further questioning,

20   and that's what they do later on in the conference room.  So

21   all of that transpires because initially he's not giving

22   clear answers, and he's not being helpful in them conducting

23   their inspection.

24          Lastly, with respect to the Miranda, I want to

25   point out that even if you were to find a Miranda violation,

Case 2:17-cr-20595-VAR-EAS  ECF No. 109  filed 10/19/18  PageID.2201  Page 129 of
149
Evidentiary Hearing • September 12, 2018

129

```
 1   which I'm not inviting you to do obviously, but even if you
 2   were, that does not mean that the search warrant should be
 3   suppressed.  A finding of a Miranda violation would just
 4   require suppressing the actual statements at the trial, not
 5   suppression of the search warrant that incorporated the
 6   statements, and that's because the fruit of the poisonous
 7   tree doctrine does not apply to the collection of physical
 8   evidence that is based on the illegally obtained
 9   un-Mirandized statements, and that's a Sixth Circuit case.
10           "The fruits of the poisonous tree doctrine does not
11   apply to physical evidence seized as a result of a Miranda
12   violation."  United States vs. Bradley.  It is a
13   Sixth Circuit case from 2005.  And that case is based on a
14   Supreme Court case from 2004, United States vs. Patane.  And
15   if you look that case up, you will see that that proposition
16   of law is very well entrenched.  This Patane case is cited
17   repeatedly by many circuits for the idea that the fruit of
18   the poisonous tree doctrine doesn't apply to Miranda
19   violations in search warrants.
20           Okay.  Lastly, the voluntariness of the statement
21   under the due process clause.  With respect to burdens, here
22   it is the government's burden to show that the statement was
23   voluntary.  But unlike the Miranda issue, the voluntariness
24   issue does have a subjective component to it.  It is not
25   solely an objective inquiry.
```

Case 2:17-cr-20595-VAR-EAS  ECF No. 109  filed 10/19/18  PageID.2202  Page 130 of
149
Evidentiary Hearing • September 12, 2018

130

 1           Here are the three questions you have to ask
 2    yourself.  Number one, was the police activity objectively
 3    coercive, not that Mr. Ramadan believed it was, but was it
 4    actually objectively coercive?  Number two, was the coercion
 5    in question sufficient to overbear the defendant's will?  So
 6    here is the subjective part; did it, in fact, overbear
 7    Mr. Ramadan's will assuming it was objectively coercive?  Was
 8    he actually coerced by it?  And, number three, did the
 9    misconduct -- excuse me.  Was the misconduct a crucial
10    motivating factor in the defendant's decision to speak?
11           So you could conceivably find yourself in a
12    situation where the police acted objectively, coercively.
13    The coercion did, in fact, overbear the defendant's will at
14    some point, but that coercion was not the reason he made the
15    statement.  Maybe he made the statement for some other reason
16    because he was trying to help a friend who was a codefendant
17    and wanted to take the blame himself, for example.
18           So those -- all three of those things must be
19    present, and what that shows you is this is a very high bar.
20    Government coercion is not enough to suppress a statement for
21    a due process violation.
22           It, like the Miranda issue, is a totality of the
23    circumstances, so you look at everything.  You look at who
24    the defendant is, you look at what the agents were doing, you
25    look at the circumstances.  And we've -- we've debated a lot

 1    between the parties about the circumstances of the events at

 2    the airport.  Many of the most egregious allegations made

 3    with respect to police -- or law enforcement misconduct are

 4    allegations that have only been attested to by the defendant

 5    himself.  There's no other corroboration for the most

 6    egregious allegations.  Things like the beating that the

 7    Court has referenced, he's the only one that testified to

 8    that.  There is no corroboration of any kind, no photos of

 9    any injuries, no evidence that he ever went to a doctor to be

10    treated for any injuries.  It was just his testimony on the

11    stand which was contradicted by all of the law enforcement

12    officers.

13          But other things like he was told that he was

14    good -- he would go to Guantanamo Bay.  He's the only one

15    that testified to that.  The officers never agreed they said

16    that to him.

17          He was the only one who said he was handcuffed in a

18    painful fashion.  I remember him saying that he was

19    handcuffed, and his hands were put behind his back, and they

20    intentionally raised his arms to cause him pain.  He's the

21    only one who testified to that.  None of the officers agreed

22    with any of that.

23          So the same thing with -- you know, he testified

24    that he asked for a lawyer and that he said that he didn't

25    want to talk anymore, and they kept pestering him, and he

Case 2:17-cr-20595-VAR-EAS  ECF No. 109  filed 10/19/18  PageID.2204  Page 132 of
149
Evidentiary Hearing • September 12, 2018

132

1  asked to invoke his rights and all of that.  None of the
2  agents testified to that.
3          So the most egregious conduct comes solely from
4  him.  And as I'm sure the Court can understand, the
5  government does not find him to be a credible witness.  He's
6  committed crimes of dishonesty in the past.  He's -- he's
7  admitted in his own testimony that he lied to the officers
8  that night.  Remember, he testified that he initially told
9  them that his guns were in a storage locker, but he, himself,
10  admitted that he then changed the story and said they were
11  with a friend.  He acknowledged that that was lie.  He's also
12  said -- he said in his testimony, I think too, that he has
13  memory problems from a head injury of some kind.  So he is
14  not a very credible witness.
15          And so if you take away the most egregious
16  allegations, what's left in terms of objective evidence that
17  the government engaged in coercion?  Well, it is things like
18  the size of the interrogation room was really small, there
19  were plaques on the wall citing a U.S. code, the officers had
20  guns holstered, you know, under their civilian clothing,
21  those sorts of things.
22          And in -- but what I was looking for was a
23  supplemental brief that we filed on the topic of the
24  suppression of the Fourth Amendment as well as the
25  Fifth Amendment due process.  I was looking for -- oh, here

Case 2:17-cr-20595-VAR-EAS  ECF No. 109  filed 10/19/18  PageID.2205  Page 133 of
149
Evidentiary Hearing • September 12, 2018

133

 1    it is.  It is Docket Number 96.  We lay out the case law that

 2    says, look, being interrogated in an 8-by-10 interrogation

 3    room, there are cases that says that's a normal interrogation

 4    room and that's not coercive.

 5          How about the presence of firearms?  There are

 6    plenty of cases that say the mere presence of firearms is not

 7    coercive as a matter of law.  It would be a different story

 8    maybe if the officers pulled them out and said confess or I'm

 9    going to shoot you, but that didn't happen here.

10          So all of these factors, when you start breaking

11    them down, none of them are in and of themself coercive, and

12    none of them rise to the level of coerciveness when you

13    combine them.  And the fact is none of them actually coerced

14    Ramadan in this case, and that's the second factor.

15          Think about what he testified to.  How many times

16    did he say in his testimony that he resisted the agents'

17    demands that he give a password to his cellphone?  I mean,

18    his version is he must have resisted it two dozen times.  You

19    know, his version is they kept asking me and asking me, and I

20    kept saying no, it's my honor, I'm not going to give you my

21    cellphone password.  Well, if you are really coerced and not

22    acting under your free will, you can't say no, that's the

23    whole definition of being coerced.

24          Or what about his testimony about changing his

25    story about the storage locker?  You know, a coerced person

Case 2:17-cr-20595-VAR-EAS   ECF No. 109   filed 10/19/18   PageID.2206   Page 134 of 149
Evidentiary Hearing • September 12, 2018

134

1    wouldn't give one version and then make up the story about

2    the friend if someone had truly lost their will to exercise

3    control of themself.

4            And then the last factor, that the coercion has to

5    cause the confession also doesn't really exist here because

6    the most egregious form of coercion that he alleges, the

7    beating, took place at the end of the night allegedly when

8    all the questioning had ceased.  So there is no way the

9    second handcuffing, the punching, none of that could have

10   affected his statements or coerced his statements because

11   there were no statements after those alleged acts took place.

12           We are back to at the end of the day him in the

13   interrogation room -- interview room, excuse me, in an

14   8-by-10 interview room with glass walls looking out into a

15   lobby in the secondary Customs inspection area where anybody

16   who is subjected to a secondary Customs inspection goes, and

17   he's interviewed for a period of -- well, initially in the

18   Schmeltz and Armentrout interview he's interviewed for 40 to

19   45 minutes, that's the length of the first interview.  And

20   during that interview he's handcuffed, according to Schmeltz,

21   for five to ten minutes while he calms down because he was

22   getting aggressive, and then the handcuffs were taken off.

23   All of the officers testified that when he went into that

24   second interview in the break room where they sat around a

25   round table and talked.  He was not handcuffed in that, and

1   that lasted for an hour to an hour and a half.  So you are

2   talking two hours total -- a little over two hours of

3   questioning at the border.  That's not a coercive length of

4   time.  The Supreme Court cases and other cases have said a

5   coercive length of interrogation is days, not a few hours.

6           So, Your Honor, the statements in this case were

7   voluntary, there was no coercion, Miranda warnings were not

8   required, and there was no violation of his Fourth Amendment

9   rights because suspicionless searches at the border are

10  permitted under the law.  So for those reasons I would ask

11  the Court to deny the defendant's various motions to

12  suppress.

13          THE COURT:  Thank you.  Reply.

14          MS. FITZHARRIS:  Yes, Your Honor.  I'm going to

15  begin by addressing the voluntariness issue, and there's a

16  lot of conflicting testimony.  There's really no -- I won't

17  disagree with that.  But there's a lot of interlocking

18  testimony, and I think there are a lot of ways that the

19  interlocking and overlapping testimony from Mr. Ramadan and

20  the officers shows the coercive environment.

21          Mr. Martin is suggesting -- is citing cases that

22  talk where you look at one factor, the length of time, that

23  alone, two and a half hours is not enough to be coercive.

24  That's not the test, it's the totality of the circumstances.

25          True, mere presence of guns is not enough to be

 1    coercive.  But what do you have when you keep somebody for

 2    eight hours, plus you have presence of guns, plus you have

 3    aggressive questioning, plus you have questions about whether

 4    you like Jews and, hey, it's okay, I don't like Jews either

 5    because I'm German, right.  How far -- it is all of these

 6    things combined.  The government can't cannibalize it down to

 7    one particular factor.

 8            And it is not true that a coercive environment must

 9    be days, interrogation must be days, or that the actual

10    questioning has to be days.  Mr. Ramadan was questioned

11    multiple times over a span of about eight hours in the wee

12    hours of the morning.  The government cannot break it down

13    like that.

14            I'm going to talk a little bit about some

15    overlapping testimony, the things that I think is very clear

16    to everyone.  Descriptions of the room, it's all the same.

17    Everyone agrees there were guns.  Everyone agrees there was a

18    significant length of time.  Although there is some testimony

19    about who put handcuffs on who, we all agree Mr. Ramadan was

20    put in handcuffs.

21            Mr. -- Officer Brown said that he did put his hands

22    on Mr. Ramadan, and Agent Thomas testified to that.  We know

23    that he at least physically restrained him.  There was

24    some -- they deny that he actually had handcuffs, and he put

25    them on.  I submit that's simply not credible.  Until today I

Case 2:17-cr-20595-VAR-EAS ECF No. 109 filed 10/19/18 PageID.2209 Page 137 of
149
Evidentiary Hearing • September 12, 2018

137

1    would have said that Agent Kelley's testimony was the most

2    credible of all of them, and he said that Officer Brown put

3    handcuffs on Mr. Ramadan in the central area -- waiting area

4    of the secondary inspection area.

5            But what we did hear the officers actually say is

6    that Officer Brown physically restrained Mr. Ramadan towards

7    the end of the evening when they were talking about the

8    storage unit.  That overlaps.  It overlaps.  Mr. Ramadan

9    testified that Officer Armentrout asked him about whether he

10   liked Jews.  Officer Armentrout admitted that.  These are not

11   routine questions.

12           And all of the circumstances taken together, the

13   government doesn't want to touch these circumstances about

14   his children and the psychological impact that it has on a

15   person to have your children crying and wetting themself and

16   then disappear without really knowing where they are.  Sure,

17   they were safe, but that has a tremendous psychological

18   impact on a person, and they want to ignore that.

19           And so the government correctly states the law, it

20   does require objectively coercive circumstances, and there

21   is.  The reason I analyzed that together with Miranda has to

22   do with the fact that there is overlap because Miranda

23   warnings come into play when there is that coercive

24   environment of an arrest and an interrogation.  For all the

25   reason that I laid out before, we have this here.

Case 2:17-cr-20595-VAR-EAS  ECF No. 109  filed 10/19/18  PageID.2210  Page 138 of
Evidentiary Hearing • September 12, 2018
149

138

```
 1              Government also wants to have it both ways when it
 2   comes to Mr. Ramadan.  They want to say he extended the
 3   interrogation because he was being uncooperative, but, you
 4   know, he couldn't possibly have -- his statements must be
 5   voluntary because even though he was being uncooperative, he
 6   made some statements.  It doesn't work like that.  He did not
 7   want to talk to them.  He did not want to answer their
 8   questions.  It was because of the coercive environment, the
 9   repeated questioning of it, that he felt that in order to
10   just go home he had to talk, and it was the motivating
11   factor.  There was no other reason for him to talk at all.
12   It is not like the circumstance Mr. Martin was talking about
13   about where he was trying -- where there was some other
14   reason behind his statements.  So I think the evidence shows
15   that his statements were not voluntary.
16              Turning to the Miranda issue, Mr. Martin made some
17   statements about the case law that are just not accurate that
18   really need to be corrected.
19              The first has to do with Galloway.  Galloway -- the
20   defendant said that routine -- argued that routine secondary
21   Customs inspection and Miranda warnings were required.  The
22   key there is routine.  But the Sixth Circuit went on to say
23   that when there are circumstances where the questioning
24   transforms beyond the routine, and they said something along
25   the lines of when there is probable cause to believe a crime
```

Case 2:17-cr-20595-VAR-EAS  ECF No. 109  filed 10/19/18  PageID.2211  Page 139 of
149
Evidentiary Hearing • September 12, 2018

139

 1   has been committed then we are in a totally different ball
 2   game, and that's confirmed by a number of cases admittedly
 3   out of circuit that the government has not addressed at all.
 4   And I'm going to bring them up right here in part for the
 5   sake of completeness.
 6          The first is this case out of the First Circuit, a
 7   2015 case, United States vs. Molina Gomez, 781 F.3d 13,
 8   holding that questioning by CBP agents in a small windowless
 9   room in secondary inspection constituted an in-custody
10   interrogation.
11          Second Circuit, 2011 case, United States vs. first
12   name unknown, last name unknown, 653 F.3d 144, acknowledging
13   that whether questioning at the border ripens into an
14   interrogation may turn into a holistic -- turn on a holistic
15   view of the facts.
16          And then United States vs. Djibo, D-J-I-B-O,
17   151 F. Supp. 3rd 297, that's an Eastern District of New York
18   case, finding that a man who was at the -- leaving the
19   country on an airplane at the airport should have been given
20   Miranda warnings during questioning at a secondary inspection
21   area.
22          All of these cases say that you look at the
23   circumstances and whether there is an objectively reasonable
24   basis for someone to believe they are under arrest.  And for
25   all of the reasons I laid out in the -- before, I think every

```
 1    single one of these is hit.

 2            I'm going to specifically cite United States vs.

 3    Swanson, a Sixth Circuit case from 2003, 341 F.3d 524.  The

 4    Sixth Circuit says you look at a number of factors.  The

 5    purpose of the questioning?  Whether the place of the

 6    questioning was hostile or coercive?  The length of the

 7    questioning?  Other indicia of custody such as whether the

 8    suspect was informed at the time of the questioning that the

 9    questioning was voluntary or that the suspect was free to

10    leave, or to request the officers to do so?  Whether the

11    suspect possessed unrestrained freedom of movement during the

12    questioning?  And whether the suspect initiated contact with

13    the police or acquiesced to their request to answer some

14    questions?  That's Sixth Circuit case law.  And so to the

15    extent that the government has argued that it is otherwise, I

16    respectfully disagree.

17            On the issue of suppression and the reliance on

18    Patane, and the United States vs. Bradley case, which is

19    again relying on Patane.  This case, we really have to go not

20    just quote selectively from the Supreme Court, we have to

21    look at the context of what they are saying.  What they are

22    saying is that in that circumstance where there was a search

23    of the suspect's home, they come in, the man is arrested

24    before he's read Miranda warnings -- or as actually they are

25    reading them -- it's a plurality opinion, not actually a
```

Case 2:17-cr-20595-VAR-EAS   ECF No. 109   filed 10/19/18   PageID.2213   Page 141 of
Evidentiary Hearing • September 12, 2018
149

141

 1   majority opinion because there was some disagreement about
 2   what happened, but he blurts out that his gun is somewhere in
 3   the house.  All right.  Those statements -- then the police
 4   officers go and find the gun.  At no point were those
 5   statements ever used in court or in any kind of legal
 6   document against Mr. Patane.  And this is where it kind of --
 7   like going back and looking -- you know, testimony -- what
 8   exactly it means to have someone's statements used against
 9   them, and this is where the analysis -- and I'm going to kind
10   of rely a little bit on Crawford analysis, what exactly a
11   testimonial statement is and whether somebody's testimonial
12   statement is being used against them at trial.
13           And as Crawford said, some -- a person's statement
14   in custody to police is quintessentially testimonial.  All
15   right, and particularly testimony that is incriminating.  And
16   then having those statements, those testimonial statements,
17   used against them in a criminal proceeding that is
18   fundamentally different than an on-the-fly criminal
19   investigation as happened in Patane.  So the logic of Patane
20   is not applicable in this case, and that's why the proper
21   remedy is to go through the warrant and excise the
22   un-Mirandized statements and then assess whether there is
23   probable cause because the government cannot cleanse the
24   unconstitutional search by then going back and getting a
25   warrant.  Mr. Martin seemed to suggest that could be the

Evidentiary Hearing • September 12, 2018

```
 1    case; that they could unconstitutionally search digital
 2    devices, get a warrant, and then search again as if the first
 3    search never happened, while using the information gathered
 4    during the first search.  That's just not the way it works.
 5         And so the proper remedy -- to remedy the
 6    violation, the unconstitutional search here, is to edit the
 7    warrant out, take out information gained through illegal
 8    means.
 9         Now I'm going to turn to the Fourth Amendment
10    issue, the burden of proof.  Mr. Martin is incorrect that we
11    bear the burden of proof, but I think it's rather semantic at
12    this point, right, because burden of proofs have to do
13    with -- not with law, right.  We are asking a legal question;
14    was the search -- the warrantless search of Mr. Ramadan's --
15    the warrantless and suspicionless search of his digital
16    devices unconstitutional?  That's a legal question.  Burdens
17    of persuasion actually don't matter much.  But the Supreme
18    Court has said that warrantless searches are presumptively
19    unconstitutional.  They cannot get around that.
20         And so this argument about burdens of proof is kind
21    of meaningless.  I agree that it is our burden of proof to
22    show that the circumstances were sufficiently custodial to
23    warrant Miranda warnings, that's the case law, and that is
24    clear.  I think we have demonstrated that.  And then it would
25    be on the government to prove that Miranda warnings were
```

 1  given, which they unquestionably were not, and then they bear

 2  the burden on proof on voluntariness.  So on that we can

 3  agree.

 4          On the issue of -- Mr. Martin is kind of

 5  selectively picking the cases about border searches or

 6  cellphones.

 7          Kolsuz out of the Fourth Circuit said -- cited with

 8  Cotterman and said at least reasonable suspicion is required

 9  to search a digital device at the border.  In that case they

10  found good faith applied, but it was a case very different

11  from here where the facts supporting reason to think there

12  would be something on the computer were far greater.

13          The government does not even engage with the

14  District of Massachusetts' opinion where the ACLU has brought

15  a lawsuit challenging these practices where the court denied

16  a motion to dismiss finding that the plaintiffs had stated

17  viable claims of constitutional violations for warrantless

18  searches.

19          And so the government just selectively chooses this

20  opinion from the Eleventh Circuit which, I have fully

21  explained in the supplemental brief, misses the mark

22  analysis-wise.  And that's what -- I'm going to close with

23  two final things.

24          First, Mr. Martin referenced how letters were a

25  usual part of life and that shouldn't control the analysis.

Case 2:17-cr-20595-VAR-EAS  ECF No. 109  filed 10/19/18  PageID.2216  Page 144 of
149
Evidentiary Hearing • September 12, 2018

144

 1    I have with me the opinion of Carpenter where the Court was

 2    talking about the third-party doctrine and the reasons why

 3    information shared -- certain information shared to third

 4    parties was not -- getting that information was not a search

 5    because of the diminished expectations of privacy.

 6            And in this passage I'm going to read, which is on

 7    page 16 of the opinion, says the following about Smith and

 8    Miller.  "Smith and Miller after all did not rely solely on

 9    the act of sharing.  Instead they considered the nature of

10    the particular documents sought to determine whether there is

11    a legitimate expectation of privacy concerning their

12    contents.  Smith pointed out the limited capability of a pen

13    register, and as explained in Riley call logs reveal little

14    in the way of identifying information."

15            And then Miller likewise noted that checks are not

16    confidential communications but negotiable instruments to be

17    used in commercial transactions.

18            But then the court goes on and says, "In

19    mechanically applying the third-party doctrine to this case,

20    the government fails to appreciate that there is no

21    comparable limitations on the revealing nature of CSLI --"

22    computer -- cellphone store -- I forget the L, but the

23    information that cell towers collect.

24            There is no comparable -- nothing comparable in

25    terms of privacy and sensitive nature on digital devices,

 1    nothing.  Letters, nothing.  Cellphones reveal letters,

 2    health records.  I have gone through all of this.  But it is

 3    not comparable to a letter, and the Supreme Court has said as

 4    much in Riley.

 5          Finally on the issue of Stewart, it is not directly

 6    on point or binding.  Whether the search of the computer at

 7    the border at the airport without a warrant violated the

 8    Constitution was uncontested.  We cannot draw inferences or

 9    assume binding precedent on an uncontested issue.  The

10    Sixth Circuit did not have to grapple with that issue.  And

11    Riley is an intervening case which, as I said before,

12    Lichtenberger acknowledges.  Stewart is called into question;

13    it is not binding anymore, it was not binding on the

14    officers, and it is not binding on Your Honor.

15          So for those reasons you should suppress the

16    evidence obtained as a result of the search of the storage

17    locker.

18          Unless the Court has questions, I'm all set.

19          THE COURT:  Thank you.  All right.  The Court will

20    issue an opinion and let you know as soon as possible.  All

21    right.

22          MR. DENSEMO:  Thank you.

23          THE COURT:  Anything else?

24          MR. DENSEMO:  Judge, I would like to submit an

25    order to have -- to allow an electronic hard drive into

Case 2:17-cr-20595-VAR-EAS  ECF No. 109  filed 10/19/18  PageID.2218  Page 146 of
149
Evidentiary Hearing • September 12, 2018

146

1    Dickerson.  We just received a couple of electronic external

2    hard drives with some additional discovery and information,

3    and we got that yesterday, and we would like the opportunity

4    to have Mr. Ramadan go over that at Dickerson, so we will be

5    submitting an order to the Court to allow us to take that

6    hard drive and a laptop into Dickerson maybe Friday.  The

7    government doesn't have any objection, I don't think, to it.

8            MR. WATERSTREET:  Well, Your Honor, just two

9    things.  One, the recent providing of that information,

10   that's because defense didn't ask for it anytime earlier.

11           THE COURT:  They did what?

12           MR. WATERSTREET:  They did not ask for that

13   information earlier.  As a matter of fact, all the way back

14   in October and November of last year.  I asked them to please

15   provide me with the equipment so we could give them copies,

16   and we told them it was 20 terabytes of information.  They

17   only supplied an 8-terabyte hard drive, and after going back

18   and forth, we supplied the information they wanted.  After

19   that date they never requested it anymore.  It wasn't until a

20   couple months ago that I suggested, hey, you know, there is

21   still this information that you may want to have, that they

22   then contacted me and provided me with a 20-terabyte hard

23   drive.

24           So I want the Court and the record to be clear,

25   since we have been alleged to have engaged in some type of

Evidentiary Hearing • September 12, 2018

```
 1    misconduct in the past, the Court to understand that's
 2    nothing on our part.
 3              As to part two of his request, I was contacted once
 4    before by defense counsel and asked for permission to agree
 5    to allow them to take a computer into a facility.  We agreed
 6    with one provision, that as long as it met the requirements
 7    of Milan or the Department of Prisons.  I got a phone call
 8    from an attorney at the Department of Prisons and asked why I
 9    agreed to?  They said they have their own computers there
10    that an individual can review the information.
11              So I have no problem with the defendant looking at
12    discovery, personally I do not, as long as it complies with
13    whatever the Department of Prisons' requirements are about
14    bringing outside information into the -- to a prison.  We
15    have no objection to that as long as it meets their
16    requirements, Judge.
17              THE COURT:  Okay.
18              MR. WATERSTREET:  Okay.
19              MR. DENSEMO:  Judge, we contacted the Department of
20    Corrections or Federal Detention Center and they said we have
21    computers that you can use, you can't bring your own laptop.
22    We said fine, no problem.  Dickerson doesn't have any laptops
23    in those cells.  I don't know if Mr. Waterstreet has ever had
24    an opportunity to go over to Dickerson and see their visiting
25    rooms, but they don't have the same facilities that Milan
```

Evidentiary Hearing • September 12, 2018

1    has.  There are no computers in that.  Obviously if we can't

2    bring them in, the people at Dickerson are going to tell us

3    we are not going to allow it, and I will turn around and

4    leave if they say I can't bring it in.

5            THE COURT:  You can bring a computer in if it is

6    allowed by the facility.

7            MR. DENSEMO:  That's all we are asking.

8            THE COURT:  I don't have any problem with that.

9            MR. DENSEMO:  Okay.

10           THE COURT:  In the order, if you would submit it,

11   just say as allowed by the facility so we know it is right in

12   there.

13           MR. DENSEMO:  That's fine.  I appreciate it.

14           MR. WATERSTREET:  Thank you very much, Your Honor.

15   I appreciate it.

16           THE COURT:  Is there anything else?

17           MR. DENSEMO:  No, Your Honor.  Have a great day.

18           THE COURT:  Thank you.

19           THE LAW CLERK:  All rise.  Court is adjourned.

20           (Proceedings concluded at 3:54 p.m.)

21                       —   —   —

22

23

24

25

1     *CERTIFICATION*

2

3             I, Robert L. Smith, Official Court Reporter of

4     the United States District Court, Eastern District of

5     Michigan, appointed pursuant to the provisions of Title 28,

6     United States Code, Section 753, do hereby certify that the

7     foregoing pages comprise a full, true and correct transcript

8     taken in the matter of U.S.A. vs. Ramadan, Case No. 17-20595,

9     on Wednesday, September 12, 2018.

10

11

12                         *s/Robert L. Smith*
                          Robert L. Smith, RPR, CSR 5098
13                        Federal Official Court Reporter
                          United States District Court
14                        Eastern District of Michigan

15

16

17    Date:  10/19/2018

18    Detroit, Michigan

19

20

21

22

23

24

25