**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

     Plaintiff,

                               Case No. 17-20595

v.

                               Hon. Marianne O. Battani

YOUSEF MOHAMMAD RAMADAN,

     Defendant.

_____/


**OPINION AND ORDER DENYING DEFENDANT'S**
**MOTIONS TO SUPPRESS STATEMENTS AND EVIDENCE**

## I.   INTRODUCTION

Defendant Yousef Mohammad Ramadan is charged in a September 7, 2017 indictment with two counts of knowing possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k).  Federal law enforcement officers discovered these firearms on August 23, 2017, when they executed a warrant to search a storage locker in Ann Arbor, Michigan that was rented in the name of Defendant's wife.  The federal officers learned of this storage unit in the course of an August 15, 2017 interview of Defendant at the Detroit Metropolitan Airport, after Defendant, his wife, and the couple's four children were removed from a flight to Jordan following the discovery of body armor and tactical gear in Defendant's checked baggage.

Presently before the Court are Defendant's two motions to suppress (i) the evidence obtained as a result of a warrantless search of digital devices found in Defendant's bags when he was detained at the airport on August 15, 2017, and (ii) the

statements made by Defendant to federal agents during this airport detention.  In support of the first of these motions, Defendant argues that the federal agents at the airport conducted forensic searches of his electronic devices that exceeded the scope of the warrantless, suspicionless searches that are permitted at an international border. As for his second motion to suppress, Defendant contends that the statements he made to federal agents during his airport detention were involuntary, in light of (i) the conduct of the agents during his interrogation, which allegedly included handcuffing and physical assault, and (ii) the agents' alleged representations that Defendant had no right to an attorney and could not refuse to answer their inquiries.

Defendant's two motions were addressed at an evidentiary hearing that extended over seven days between January 30 and September 12, 2018.  In the course of this lengthy proceeding, the Court heard the testimony of Defendant, Defendant's sister Asma Ramadan, and eight federal law enforcement officers — Transportation Security Administration ("TSA") Officer Shannon Vasher, Customs and Border Protection ("CBP") Officers Mitchell Armentrout, Matthew Robinson, Charles Schmeltz, and James Brown, Homeland Security Investigations ("HSI") Special Agent Patrick Kelley, and Federal Bureau of Investigation ("FBI") Special Agents David Banach and Michael Thomas.  In addition, the Court received a number of exhibits into evidence and heard the arguments of the parties' counsel.  Having reviewed the evidentiary record and considered the arguments of counsel, the Court **DENIES** Defendant's two motions to suppress.

## II.    FACTUAL BACKGROUND

At around 3:00 p.m. on August 15, 2017, Defendant Yousef Ramadan, his wife, and his four children arrived at the Detroit Metropolitan Airport and purchased one-way tickets for an international flight to Jordan later that evening.  Defendant and his family checked fifteen pieces of luggage with an airline agent, and then passed through a security checkpoint with six carry-on bags.  (Dkt. 80, 5/23/2018 Hearing Tr. at 153.) When a Transportation Security Administration ("TSA") agent, Officer Shannon Vasher, ran one of Defendant's checked bags through an x-ray scanner but was unable to ascertain its contents, he opened the bag and found body armor plates that were designed to fit into a bulletproof vest.  (Dkt. 41, 1/30/2018 Hearing Tr. at 43-45.)  Officer Vasher determined that the armor plates were export-controlled, meaning that a traveler needed to secure the appropriate documentation before taking them out of the country. (*Id.* at 46-47, 55.)  Accordingly, Officer Vasher alerted his supervisor, who in turn notified officers from Customs and Border Protection ("CBP").  (*Id.* at 47.)

CBP Officer Matthew Robinson was stationed at the gate where Defendant's flight to Jordan was departing.  When a supervisor informed Officer Robinson about the body armor found in Defendant's luggage, Defendant and his family had already boarded the plane,[1] so Officer Robinson asked an airline agent to bring Defendant to the front of the aircraft in order to speak to him about the export-controlled items in his checked bag.  (1/30/2018 Hearing Tr. at 199-201.)  Defendant confirmed that he had packed body armor in his luggage, explaining that he planned to travel to Palestine to

---

[1]Defendant estimated that he and his family boarded the flight at around 8:00 or 8:15 that evening.  (5/23/2018 Hearing Tr. at 154.)

film the conflict between the Israelis and the Palestinians.  (*Id.* at 203-04.)  However, when Officer Robinson advised Defendant that he needed a license in order to take the body armor out of the United States, he responded that he was unaware of this requirement and had not obtained the necessary documentation.  (*Id.* at 203-04; *see also* 5/23/2018 Hearing Tr. at 156-57.)  Accordingly, Officer Robinson advised Defendant that he would have to disembark from the plane in order to complete the paperwork needed to take the export-controlled items out of the country, and that, due to the late hour, this process was unlikely to be completed in time for Defendant to catch his flight to Jordan.  (1/30/2018 Hearing Tr. at 205.)  In addition, because Defendant had been removed from the flight, CBP officials advised the airline that all of Defendant's checked bags had to be removed from the plane for further inspection.  (*Id.* at 206-07.)  At this point, however, Defendant's wife and children remained on the plane.

According to Defendant, he realized as he left the plane that he had his children's medications and travel documents in his possession, and he asked Officer Robinson and another CBP officer to allow him back on the plane so he could give these items to his wife.  (5/23/2018 Hearing Tr. at 157-58.)  Defendant testified that the two CBP officers led him back onto the plane, and that, as they did so, one of the officers took a computer hard drive from an open pouch in one of his family's carry-on bags.  (*Id.* at 158.)  It was at this point, according to Defendant, that the CBP officers instructed his whole family to retrieve their carry-on bags and leave the aircraft.  (*Id.* at 158-59.)

Officer Robinson recalled this initial encounter somewhat differently.  He testified that as he asked Defendant about the items found in his checked luggage and whether

4

he had obtained the necessary documents for the export-controlled body armor, he received a phone call from CBP Officer Charles Schmeltz.  (1/30/2018 Hearing Tr. at 210.)  Officer Robinson informed Officer Schmeltz about his conversation with Defendant regarding the items found in his checked bag, and the two officers also discussed a "prior record" associated with Defendant arising from a call to an Immigration and Customs Enforcement ("ICE") "tip line" that evidently concerned "possible recruitment or marriage fraud, something along those lines."  (*Id.*)  According to Officer Robinson, he and Officer Schmeltz determined during this phone call that since all of Defendant's checked bags were being removed from the flight to Jordan, Defendant's entire family should be taken off the plane as well.  (*Id.*)

Once Defendant, his wife, and his children were removed from the flight, they were taken to a secondary inspection area in the airport terminal.  (*Id.* at 212.)  Defendant and his family initially were brought to a lobby within this secondary inspection area, and Officer Schmeltz and CBP Officer Mitchell Armentrout then led Defendant to an adjacent interview room while the rest of his family remained in the lobby.  (*Id.* at 212-13; *see also id.* at 74, 77; Dkt. 61, 3/6/2018 Hearing Tr. at 17.)  As his fellow CBP officers began to interview Defendant, Officer Robinson began searching through the fifteen pieces of luggage checked by Defendant and his family.  Apart from the body armor found by TSA Officer Vasher, Officer Robinson discovered such items as a stun gun, OC spray, tactical gear, rifle scopes, knives, and a gas mask.  (1/30/2018 Hearing Tr. at 214-19; *see also id.* at 101-07.)  Officer Robinson also came across a number of electronic devices in Defendant's luggage, including cell phones, tablets, memory cards, and external hard drives.  (*Id.* at 219.)  He took photographs of some of

5

these items, prepared a report of the items that were seized in the course of the search, and notified Officers Schmeltz and Armentrout about the items found in Defendant's bags.  (*Id.* at 215, 219-21, 233-35; *see also* 3/6/2018 Hearing Tr. at 28-29.)

While Officer Robinson conducted this search, Officers Schmeltz and Armentrout interviewed Defendant in a room adjacent to the lobby where his wife and children were waiting.  As explained by Officer Armentrout, and as Defendant confirmed, this interview room had a glass window that permitted Defendant and the CBP officers to be seen from the lobby, and likewise enabled Defendant to look out to the lobby and see his family.  (1/30/2018 Hearing Tr. at 75, 77; *see also* 5/23/2018 Hearing Tr. at 166.)  The officers initially asked Defendant about his travel plans and inquired about the body armor found in his luggage.  (1/30/2018 Hearing Tr. at 78-79; *see also* 3/6/2018 Hearing Tr. at 18-19; 5/23/2018 Hearing Tr. at 166-67.)  In response, Defendant explained that he was traveling to Palestine in order to record and report upon the ongoing conflict between the Israelis and the Palestinians, and that he brought along the body armor for his protection as he ventured into the dangerous territory engulfed by this conflict. (1/30/2018 Hearing Tr. at 7983; 3/6/2018 Hearing Tr. at 18-19.)  When the CBP officers asked why Defendant would take his children to an area he regarded as unsafe, he responded that his children would stay at his father's home in Bethlehem.  (1/30/2018 Hearing Tr. at 80-82; 3/6/2018 Hearing Tr. at 18-19.)

According to Defendant, after the CBP officers' initial questions, they began to interrogate him about his possible ties to terrorist organizations or activities.  (5/23/2018 Hearing Tr. at 167-68.)  The officers asked, for example, whether Defendant planned to go to Syria or Iraq, whether he was a member of a terrorist organization, or whether he

intended to join ISIS.  (*Id.* at 167-68.)  Defendant testified that when the officers questioned him about these subjects, he asked for a lawyer and an interpreter.  (*Id.* at 168.)  According to Defendant, the officers responded that he was not entitled to a lawyer, that he "ha[d] to speak" to them, and that it would be "better for [him]" if he answered the officers' questions.  (*Id.* at 168-69.)  In addition, one of the officers threatened to "send [him] to Guantanamo" if he remained silent and refused to cooperate.  (*Id.* at 170-71.)

The testimony of Officers Schmeltz and Armentrout differs from Defendant's account in several respects.  Most notably, the officers denied that Defendant ever asked for an attorney or a translator.  (1/30/2018 Hearing Tr. at 127-28, 176, 189; 3/6/2018 Hearing Tr. at 36, 69, 78.)  In addition, while the officers acknowledged that they sought Defendant's views about certain terrorist organizations, including Hamas and ISIS, (1/30/2018 Hearing Tr. at 91-92; 3/6/2018 Hearing Tr. at 21-22, 31-32), nothing in their testimony indicates that they asked Defendant whether he was a member of a terrorist organization or if he planned to engage in any terrorist activities, nor does their testimony reflect any threats that Defendant would be sent to Guantanamo if he refused to cooperate.  Rather, the officers testified that they raised the subject of Hamas with Defendant after a database search uncovered an entry in the Treasury Enforcement Communication ("TEC") system stating that a tipster had called in a report that an individual with Defendant's name and who shared other characteristics with Defendant may have been involved with this terrorist organization. (1/30/2018 Hearing Tr. at 86-91; 3/6/2018 Hearing Tr. at 21-22.)  In response to this

inquiry, Defendant stated "f*** Hamas."  (1/30/2018 Hearing Tr. at 92; 3/6/2018 Hearing Tr. at 22.)

As the CBP officers questioned Defendant about his travel plans and the purpose of the body armor found in his luggage, they viewed his responses as less than fully truthful and forthcoming.  The officers testified, for instance, (i) that Defendant stated reason for his trip to Palestine "changed several times" during the interview, (ii) that Defendant admitted that he had no training, press credentials, contacts, or potential employers or buyers that could assist him in his stated mission to serve as a photojournalist reporting on the Israeli/Palestinian conflict, and (iii) that he identified his prior work experience as in construction rather than journalism.  (1/30/2018 Hearing Tr. at 79-80; *see also* 3/6/2018 Hearing Tr. at 18-20.)  In addition, when Defendant explained that he needed the body armor for protection when he traveled to dangerous areas, the officers questioned why he would take his children to a dangerous place, and they were not altogether satisfied with Defendant's response that his children would "stay in the house" in Bethlehem.  (1/30/2018 Hearing Tr. at 81-82; 3/6/2018 Hearing Tr. at 19.)

In light of their concerns with Defendant's responses to their inquiries, the CBP officers decided to review the other items found in Defendant's luggage, including the electronic media uncovered in this search.  (1/30/2018 Hearing Tr. at 84, 96; 3/6/2018 Hearing Tr. at 20, 22.)  Before they did so, the officers gave Defendant a form identifying the legal authority for searching electronic media at an international border, and they asked him for the passcode that would enable them to gain access to his cell phone.  (1/30/2018 Hearing Tr. at 96-97; 3/6/2018 Hearing Tr. at 24-25.)  In response,

Defendant first attempted to negotiate the terms under which he would grant access to his cell phone, requesting "immunity from whatever [the officers] might find on the phone," but the officers explained that they could not "provide any sort of immunity from anything." (1/30/2018 Hearing Tr. at 97; *see also* 3/6/2018 Hearing Tr. at 24.) The officers testified that Defendant's demeanor changed dramatically at that point; though he previously had been cooperative in answering the officers' questions, he "became agitated, upset, and visibly aggressive." (1/30/2018 Hearing Tr. at 97, 166-67; *see also* 3/6/2018 Hearing Tr. at 25-26.) In an effort to "calm [Defendant] down" and ensure the safety of Defendant and the CBP officers, Officer Schmeltz placed him in handcuffs, advising him that he was "not under arrest" and that the handcuffs would be removed when he calmed down. (3/6/2018 Hearing Tr. at 25; *see also* 1/30/2018 Hearing Tr. at 97-98.) Officer Schmeltz estimated that Defendant remained in handcuffs for approximately five to ten minutes, and that the interview then resumed without incident. (3/6/2018 Hearing Tr. at 28, 30.)

Again, Defendant's account of the events leading up to his handcuffing is somewhat different. He testified that when the CBP officers asked for the passcode that would allow them to access his cell phone, he refused on the ground that this device contained personal information and photos of his wife that he did not wish the officers to see. (5/23/2018 Hearing Tr. at 173.) He further explained that it was "against the Muslim culture and [his] own belief[s] and culture" to allow someone to view the photos and information. (*Id.* at 174.) Defendant also recounted a prior experience in 2015 when he had complied with a request by law enforcement officers to provide a passcode for his cell phone, and the officers had used this passcode to erase a video

recording from the phone that evidently would have revealed the officers' illegal or improper conduct in their interactions with Defendant.  (Dkt. 81, 5/24/2018 Hearing Tr. at 10-12.)

According to Defendant, when he informed the officers that he would not give them the passcode, one of them — he initially believed it was Officer Armentrout, (5/23/2018 Hearing Tr. at 175), but later indicated that it was Officer Schmeltz, (5/24/2018 Hearing Tr. at 8) — ordered him to stand up and turn around, and he was then handcuffed with his arms behind his back.  (5/23/2018 Hearing Tr. at 175.) Defendant testified that his wife could see from the lobby that he had been placed in handcuffs, but that the CBP officers tried to position him in the interview room so that his family could not observe the officers handcuffing him.  (*Id.*)  Defendant further testified that when he complained to the officers that the handcuffs were too tight, one of them responded that "you'll be fine."  (*Id.*)

Defendant testified that once Officer Schmeltz placed him in handcuffs, this officer left the room and he was alone with Officer Armentrout for about 20 minutes. (5/24/2018 Hearing Tr. at 14.)  According to Defendant, Officer Armentrout began asking Defendant how he felt about Jewish people, with the officer stating that he was originally from Germany and that, if he "had the choice," he would "go kill all the Jews." (5/23/2018 Hearing Tr. at 172.)[2]  In response, Defendant stated that he "like[s] all kind[s] of people," explaining that "if the Zions are terrorists, not necessarily all Jews are

_____

[2]When asked about this exchange on cross-examination, Officer Armentrout acknowledged that he told Defendant he did not like Jewish people "in an attempt to gain [Defendant's] confidence," but he denied stating "anything about killing Jews." (1/30/2018 Hearing Tr. at 167-68.)

terrorists," and observing that many of his customers and the lawyers he had retained in the past had been Jewish.  (5/23/2018 Hearing Tr. at 172-73.)  At some point while Defendant was alone in the interview room with Officer Armentrout, the officer removed the handcuffs from Defendant.  (5/24/2018 Hearing Tr. at 15-16.)[3]

Officers Schmeltz and Armentrout have testified that they interviewed Defendant for approximately 40 to 45 minutes.  (1/30/2018 Hearing Tr. at 163, 179; 3/6/2018 Hearing Tr. at 33.)  At the conclusion of this interview, Officer Armentrout went to a nearby command center in the secondary inspection area to begin reviewing the contents of the electronic media found in Defendant's luggage.  (1/30/2018 Hearing Tr. 109.)  Officer Armentrout testified that he conducted this review by plugging certain of these electronic devices — including external hard drives, thumb drives, and memory cards — into a standalone computer in the command center that was not connected to any external computer network.  (Id. at 109-11.)  He was unable to gain access to other devices found among Defendant's belongings, however, such as laptop computers and the cell phone for which Defendant refused to provide the passcode.  (Id. at 111.)

As for the storage devices that he was able to review, Officer Armentrout stated that he did not employ any sort of forensic software or tools, but instead manually inspected the files he found on these devices.  (Id. at 110-12.)  He testified that this review took approximately four hours.  (Id. at 112.)  Among the files he examined, Officer Armentrout identified photos of (i) Defendant wearing a load-bearing vest and

_____

[3]As noted earlier, Officer Schmeltz has testified that he removed the handcuffs from Defendant, (3/6/2018 Hearing Tr. at 28, 30), and Officer Armentrout similarly testified that Defendant was still in handcuffs when he left the interview room, (1/30/2018 Hearing Tr. at 179-80).

carrying firearms, (ii) scenes bearing the insignia of the terrorist group ISIS, and (iii) a pipe bomb. (*Id.* at 114-16, 124-25, 127.) Based on this review of Defendant's electronic media, as well as the other items found in Defendant's luggage, the CBP officers contacted other law enforcement agencies to conduct a further investigation, and three other officers were summoned to the airport's secondary inspection area: FBI Special Agent Michael Thomas, CBP Officer James Brown, and HSI Special Agent Patrick Kelley. (*Id.* at 125-26; *see also* 3/6/2018 Hearing Tr. at 30-31.)

When these three law enforcement officers arrived in the secondary inspection area, they initially stopped by the command center to review the items found in Defendant's luggage and electronic media. (3/6/2018 Hearing Tr. at 84; 5/23/2018 Hearing Tr. at 46, 48, 111, 114.) Officer Brown and Special Agents Thomas and Kelley then interviewed Defendant's wife, Jeanine Ramadan, for approximately 30 minutes in a conference room in the secondary inspection area. (3/6/2018 Hearing Tr. at 85-86; 5/23/2018 Hearing Tr. at 49-52, 115-16.) Officer Brown and Special Agent Thomas testified that at the conclusion of this interview, they stepped outside of the secondary inspection area and spoke to Defendant's sister to confirm that she was able to give Mrs. Ramadan and the children a ride from the airport to her home, where Mrs. Ramadan indicated that she and her family were staying. (5/23/2018 Hearing Tr. at 52-53, 116-17.)[4]

─────────────

[4]Defendant called one of his sisters, Asma Ramadan, as a witness to challenge the testimony of Special Agent Thomas on this point. According to Asma, Special Agent Thomas approached Defendant's wife, Jeanine, while both women were waiting in baggage claim for Defendant to be released from the secondary inspection area. (*Id.* at 74.) When Asma attempted to join this conversation, Special Agent Thomas indicated that he only wanted to speak to Jeanine, but Defendant's wife responded that

Officer Brown and Special Agents Thomas and Kelley then asked for Defendant to be brought into the conference room where they had spoken to his wife, and Officer Schmeltz joined in this interview.  (3/6/2018 Hearing Tr. at 33-34, 87; 5/23/2018 Hearing Tr. at 53-54, 119-20.)  Defendant testified that he was handcuffed when he was brought into the room and remained in handcuffs throughout the ensuing interview, (5/24/2018 Hearing Tr. at 23-24), but the officers uniformly denied that Defendant was handcuffed at any time during this interview, (3/6/2018 Hearing Tr. at 34, 87; 5/23/2018 Hearing Tr. at 62-63, 133.)  Likewise, although Defendant testified that he requested a lawyer and an interpreter during the interview, and that he asked for the interview to be recorded, (5/24/2018 Hearing Tr. at 28, 31-32), the officers stated that he made no such requests, (3/6/2018 Hearing Tr. at 36-37, 78, 88, 90; 5/23/2018 Hearing Tr. at 55, 133).  Defendant further testified that Special Agent Thomas threatened him that "if you're not going to talk you're going to be going to Guantanamo," (5/24/2018 Hearing Tr. at 32), but Special Agent Thomas denied that he or any of the other officers made such a threat, (5/23/2018 Hearing Tr. at 62).

According to the officers, their interview of Defendant lasted around an hour or an hour and a half.  (3/6/2018 Hearing Tr. at 91; 5/23/2018 Hearing Tr. at 62, 125.)  In the course of this interview, the officers spoke with Defendant on a variety of subjects, including (i) his awareness that certain items found in his luggage were export-

---

it was okay for the agent to talk in front of Asma.  (*Id.*)  Special Agent Thomas then advised Jeanine that if her husband did not cooperate, he was "going to stay in custody."  (*Id.*)  After returning to the secondary inspection area for a few minutes, the agent emerged again and showed the two women a photo on his cell phone depicting what appeared to be a pipe bomb.  (*Id.* at 75.)  Later, Special Agent Thomas once again reentered the baggage claim area to speak to Jeanine one more time.  (*Id.*)

controlled, (ii) his reasons for bringing export-controlled items and tactical gear along on his trip to Palestine, (iii) his reasons for maintaining ISIS-related and combat photos and videos on his electronic storage media, (iv) his views on ISIS and the Islamic caliphate, and (v) his interest in and ownership of firearms. (3/6/2018 Hearing Tr. at 113-19, 125-26; 5/23/2018 Hearing Tr. at 57-59, 122-23.) In response to these inquiries, Defendant stated (i) that he was unaware that he needed to obtain documentation to take export-controlled items out of the country, (ii) that he planned to use the tactical equipment in his luggage to assist in his work as an photojournalist covering the Israeli/Palestinian conflict, (iii) that he enjoyed watching the combat footage, and that he watched videos from ISIS and other sources "just to see what's going on around me and in the world," (iv) that he believed in the caliphate and ISIS's efforts to establish a caliphate, but did not support ISIS's use of violence to achieve this goal, and (v) that he had legally purchased firearms. (3/6/2018 Hearing Tr. at 44, 115-20, 126; 5/23/2018 Hearing Tr. at 57-59, 122-24; 5/24/2018 Hearing Tr. at 15, 27-28.) When Defendant indicated that he owned firearms, the officers asked him where they were located, and he responded that he kept them in a storage locker. (3/6/2018 Hearing Tr. at 34, 88-89; 5/23/2018 Hearing Tr. at 59, 62, 133-34; 5/24/2018 Hearing Tr. at 42.) Defendant further stated that he could not recall the address of the storage unit, but he indicated that he knew how to get there, and he offered to accompany the officers to the location of this storage facility at the conclusion of the interview. (3/6/2018 Hearing Tr. at 34, 89; 5/23/2018 Hearing Tr. at 62, 134.)

After the four officers completed their interview of Defendant, they led him back out to the lobby of the secondary inspection area. (3/6/2018 Hearing Tr. at 34-35, 90;

5/23/2018 Hearing Tr. at 125.)  By this time, Defendant's wife and children had left the area.  While in the lobby, the officers showed Defendant screen shots of two more photos that had been found in the ongoing search of his electronic media:  a photo of broken glass on a tile floor and a picture of a pipe bomb.  (3/6/2018 Hearing Tr. at 92; 5/23/2018 Hearing Tr. at 134-38; 5/24/2018 Hearing Tr. at 42, 44.)  According to Defendant, he told the officers that the first of these photos was taken at his family's home in Bethlehem, and that the picture of the pipe bomb was taken off the internet. (5/24/2018 Hearing Tr. at 44.)  In response, Special Agent Thomas accused Defendant of lying and asserted that the two photos were taken in the same location.  (*Id.*)  Special Agent Thomas also asked Defendant if he knew how to make a pipe bomb, and Defendant responded that he personally did not, but that he had seen a program on television that explained how to make one.  (*Id.* at 45.)  Officer Brown recalled this interaction differently, testifying that Defendant initially admitted that he had made the explosive device shown in the photo, but then "backtracked" and denied that he had assembled this device.  (5/23/2018 Hearing Tr. at 138-39.)

Following this discussion in the lobby of the secondary inspection area, the officers sought to take Defendant up on his offer to accompany them to the storage locker where he kept his firearms.  (3/6/2018 Hearing Tr. at 35, 92-93; 5/23/2018 Hearing Tr. at 62, 139-40.)  At this point, Defendant "changed [his] story" and told the officers that he had given his firearms to a friend who he refused to identify.  (5/24/2018 Hearing Tr. at 47-48; *see also* 3/6/2018 Hearing Tr. at 35, 93; 5/23/2018 Hearing Tr. at 62, 140.)  Defendant testified that Officer Brown then "got mad," yelled at him to stand up and turn around, handcuffed him with his arms behind his back, lifted him by the

15

arms, and punched him twice in the stomach.  (5/24/2018 Hearing Tr. at 48.)  Defendant

further testified that Officer Brown called him a "[s]and n*gger," twisted his ear and

pulled his hair, and threatened to "keep on hitting [him] all night" until he took the

officers to the location where his firearms were kept.  (*Id.* at 48-49.)

The officers recalled this incident differently.  They testified that after Defendant

changed his story and stated that he had given his firearms to an unidentified friend, he

became "agitated," stood up from his chair, adopted an "aggressive stance/posture"

toward the officers, and began yelling at them.  (3/6/2018 Hearing Tr. at 95; *see also id.*

at 35; 5/23/2018 Hearing Tr. at 62, 142.)  Officer Schmeltz — who had placed

Defendant in handcuffs earlier in the evening — testified that he again handcuffed

Defendant and told him they would be removed once he calmed down, and that he

removed the handcuffs within five minutes.  (3/6/2018 Hearing Tr. at 35-36.)  The other

officers, in contrast, testified that it was Officer Brown, rather than Officer Schmeltz, who

stepped in and took action when Defendant began to behave more aggressively.

(3/6/2018 Hearing Tr. at 95; 5/23/2018 Hearing Tr. at 65, 142.)  Special Agent Kelley

expressed his belief that Officer Brown placed Defendant in handcuffs and led him to an

interview room, (3/6/2018 Hearing Tr. at 95), but Officer Brown testified that he

"embarrassingly" discovered that he did not have his handcuffs, so he instead led him

into an interview room to "sit down" and "cool off a little bit," (5/23/2018 Hearing Tr. at

142; *see also id.* at 65, 67, 126).  All four officers uniformly testified, however, that they

did not witness a physical assault of the sort that Defendant accused Officer Brown of

committing.  (3/6/2018 Hearing Tr. at 38, 95-96; 5/23/2018 Hearing Tr. at 66-67, 126-27,

133.)

Defendant eventually was escorted out of the secondary inspection area and allowed to leave the airport.  (5/24/2018 Hearing Tr. at 52-53; *see also* 3/6/2018 Hearing Tr. at 75, 95.)  Defendant estimated that he left the airport at around 5:00 or 6:00 a.m. on August 16, 2017, (5/24/2018 Hearing Tr. at 53), approximately 14 or 15 hours after he had arrived at the airport with his family.

Following Defendant's release, the FBI investigated his statement at the airport that he kept firearms in a storage locker.  According to a criminal complaint and accompanying affidavit filed at the outset of this case, FBI agents learned of a storage unit in Ann Arbor, Michigan that had been rented in the name of Defendant's wife, and they further determined that Defendant was listed as the emergency contact for the locker and that he had made some of the rental payments for this unit.  The FBI obtained a search warrant for the storage unit, and this warrant was executed on August 23, 2017.  Inside the locker, agents found several firearms and rounds of ammunition, as well as a silencer and various other gun parts and magazines.  Two of these weapons had obliterated serial numbers, giving rise to the two counts in Defendant's September 7, 2017 indictment.  In light of these discoveries, a warrant was issued for Defendant's arrest, and he was taken into custody on August 25, 2017.

III.     **ANALYSIS**

A.     **Defendant's Motion to Suppress the Evidence Found in the Warrantless Airport Search of His Electronic Devices**

1.     **Standard of Review**

In the first of his two pending motions to suppress, Defendant challenges the lawfulness of the Government's warrantless search of his cell phone and other digital devices at the Detroit airport, and he seeks to exclude the evidence found in this search, as well as any evidence subsequently uncovered as the product of this allegedly unlawful search.  As the Supreme Court has emphasized, in assessing the lawfulness of a search under the Fourth Amendment, the "ultimate touchstone . . . is reasonableness," and this standard of reasonableness "generally requires the obtaining of a judicial warrant."  *Riley v. California,* __ U.S. __, 134 S. Ct. 2473, 2482 (2014) (internal quotation marks and citations omitted).  Where, as here, law enforcement officers conduct a search without a warrant, this search is reasonable "only if it falls within a specific exception to the warrant requirement."  *Riley,* 134 S. Ct. at 2482.

In this case, the Government asserts that the law enforcement officers who examined the contents of Defendant's electronic devices at the airport acted in accordance with a recognized exception to the warrant requirement.  Specifically, the Government appeals to the well-established principle that searches conducted at an international border "are per se reasonable, meaning that they typically do not require a warrant, probable cause, or even reasonable suspicion." *United States v. Stewart,* 729 F.3d 517, 524 (6th Cir. 2013).

18

The parties differ as to which of them shoulders the burden of establishing that the challenged search of Defendant's digital devices fell within a recognized exception to the warrant requirement.  In arguing that the Government should bear this burden, Defendant acknowledges as a threshold matter that "the Supreme Court has never spoken in terms of burdens of proof" as it has considered the lawfulness of warrantless searches.  (Dkt. 40, Defendant's 2/8/2018 Suppl. Br. at 2.)  Nevertheless, in light of the "general rule that warrantless searches are presumptively unreasonable," *Horton v. California,* 496 U.S. 128, 133, 110 S. Ct. 2301, 2306 (1990) (footnote omitted), it stands to reason, in Defendant's view, that the Government should bear the burden of overcoming this presumption and establishing that the warrantless search at issue here was reasonable.

As Defendant recognizes, however, the Government has cited a case that could be viewed as placing the burden of proof on Defendant.  Specifically, in *United States v. Smith,* 783 F.2d 648, 650 (6th Cir. 1986), the Sixth Circuit broadly stated that "[t]he burden of production and persuasion rests on the person seeking to suppress evidence."  Defendant argues that *Smith* is distinguishable, where the challenged search in that case was conducted pursuant to a warrant, and the issue before the court was whether the defendant could "establish a legitimate expectation of privacy with respect to his presence in" the home being searched.  *Smith,* 783 F.2d at 650.  Here, in contrast, the question is whether a warrantless search satisfies the Fourth Amendment standard of reasonableness.

Yet, *Smith*'s statement of the burden of proof has been repeated in at least one subsequent Sixth Circuit decision addressing the lawfulness of a warrantless search.  In

19

*United States v. Blakeney,* 942 F.2d 1001, 1015 (6th Cir. 1991), the defendant challenged the government's assertion that a warrantless search of a residence was lawfully "conducted pursuant to [the defendant's] voluntary consent," and the court held that the defendant had "the burden of establishing that the evidence was secured by an unlawful search." *Blakeney* is somewhat unclear on this point, however, as the court also quoted from a Supreme Court decision that calls upon the government to "demonstrate" that a defendant's consent to a warrantless search was "voluntarily given, and not the result of duress or coercion." *Blakeney,* 942 F.2d at 1015 (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 248, 93 S. Ct. 2041, 2059 (1973)). Moreover, the Sixth Circuit has expressly stated in other cases that "[t]he burden of proving the legitimacy of a warrantless search is on the government." *United States v. Akrawi,* 920 F.2d 418, 421 (6th Cir. 1990); *see also United States v. Murrie,* 534 F.2d 695, 697 (6th Cir. 1976) ("Where the issue is the validity of a search without a search warrant, the burden is on the government to show that exigent circumstances excused the requirement of a search warrant."). In the Court's view, these more explicit statements govern over the broader language found in *Smith* and *Blakeney.*

In any event, the proper allocation of the burden of proof arguably is less important here, given the parties' shared recognition that the outcome of Defendant's motion likely is controlled more by legal than by factual issues. First and foremost, Defendant argues that in light of the Supreme Court's recent decision in *Riley,* the Government's usual authority to conduct warrantless searches at international borders does not extend to searches of cell phones and other electronic devices. In determining *Riley'*s impact on the lawfulness of the Government's border search of Defendant's

digital devices, the Court must address purely legal issues that do not depend upon burdens of proof or persuasion.

To be sure, factual issues may arise if the Court were to conclude, consistent with at least some decisions issued in the wake of *Riley,* that individualized suspicion is required to perform a more thorough examination of an electronic device following its initial seizure and a brief inspection of its contents. *See, e.g., United States v. Kolsuz,* 890 F.3d 133, 136-37 (4th Cir. 2018) (holding that the off-site "forensic examination" of the defendant's cell phone after it was taken from him at the airport was a "nonroutine border search" that "requir[ed] some measure of individualized suspicion"). In this event, the burdens of proof and persuasion would be relevant to the Court's determination of the facts bearing upon such questions as (i) whether the search of Defendant's devices should be characterized as routine or nonroutine, and (ii) whether the facts available to the federal agents during their encounter with Defendant would establish the requisite individualized suspicion to justify this search. As explained, the Court reads the relevant case law as placing the burden upon the Government to prove that these factual issues should be resolved in its favor.

> **2.     The Warrantless Search of Defendant's Electronic Devices at the Detroit Airport Was Justified Under the Exception for Searches Conducted at an International Border.**

All are agreed that the federal law enforcement officers who interacted with Defendant at the Detroit airport on August 15, 2017 neither sought nor obtained a warrant before searching Defendant's cell phone and the other digital devices found in his checked baggage. Although Defendant acknowledges that most searches conducted at an international border "are per se reasonable, meaning that they typically

do not require a warrant, probable cause, or even reasonable suspicion," *Stewart,* 729 F.3d at 524, he argues that border searches of cell phones and electronic devices are subject to more rigorous standards, including a warrant requirement, in light of the Supreme Court's recent decision in *Riley.*  Because the federal agents who searched his digital devices did not secure a warrant, and because, in his view, the agents lacked any sort of individualized suspicion that might justify a warrantless search, Defendant contends that the evidence uncovered in this search must be suppressed.

### a.  The *Riley* Decision

The starting point of the Court's inquiry is the Supreme Court's ruling in *Riley.*  In that decision*,* the Court addressed two cases in which police officers conducted warrantless searches of cell phones incident to arrests.  At the threshold of its analysis, the Court observed that "[i]n the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement."  *Riley,* 134 S. Ct. at 2482.  Under one such long-recognized exception, an officer may conduct a warrantless search "incident to a lawful arrest."  134 S. Ct. at 2482.  The Court recognized that this search-incident-to-arrest exception was appropriate "in the context of physical objects" found on the person of a suspect.  134 S. Ct. at 2484.  It reasoned, however, that "[a] search of the information on a cell phone bears little resemblance to the type of brief physical search considered in" its prior precedents addressing searches incident to an arrest, given the "vast quantities of personal information" stored on these devices.  134 S. Ct. at 2484-85.  Thus, the Court "decline[d] to extend" its search-incident-to-arrest decisions "to searches of data on cell phones," and instead held that "officers must generally secure a warrant before conducting such a search."  134 S. Ct. at 2485.

In Defendant's view, just as *Riley* holds that cell phone searches fall outside the scope of one exception to the warrant requirement — *i.e.,* the exception for searches incident to an arrest — this same reasoning should likewise prohibit warrantless cell phone searches under the exception invoked by the Government here — *i.e.,* the exception for searches conducted at an international border.  As Defendant observes, the Sixth Circuit has acknowledged in a post-*Riley* decision that when the personal belonging to be searched "is a device like a cell phone, the balance between governmental and privacy interests shifts enormously," "adding weight to one side of the scale while the other remains the same."  *United States v. Lichtenberger,* 786 F.3d 478, 487-88 (6th Cir. 2015).  Moreover, Defendant points to the recognition by "[l]egal scholars" that *Riley* "undermines the government's authority to search electronic devices without a warrant," as well as the Department of Justice's similar acknowledgment in a memo that "*Riley* call[s] into question previous, pre-*Riley* border search doctrine" and that, in light of this Supreme Court ruling, "some level of suspicion is required to search an electronic device at the border."  (Dkt. 29, Defendant's 12/6/2017 Reply Br. at 4 (citing authorities).)  Finally, a few decisions issued in the wake of *Riley* lend support to Defendant's position that at least some degree of individualized suspicion, if not a warrant, is required in order to conduct more than a cursory search of a digital device at the border.  *See, e.g., Kolsuz,* 890 F.3d at 144; *United States v. Wanjiku,* No. 16-296, 2017 WL 1304087, at *5 (N.D. Ill. April 6, 2017); *United States v. Kim,* 103 F. Supp.3d 32, 55-57 (D.D.C. 2015).

In response, the Government first suggests that the Sixth Circuit's decision in *Stewart* binds this Court and "resolves this case."  (Dkt. 23, Gov't 11/17/2017 Response

23

Br. at 8.)  In *Stewart,* a CBP officer searched one of the defendant's two laptop computers following his arrival at the Detroit airport on a flight from Japan, and this search uncovered images that the officer believed to be child pornography.  729 F.3d at 520-21.  The defendant was allowed to board a flight from Detroit to Maryland, but his computers remained in the custody of federal agents and were taken to a nearby Immigration and Customs Enforcement ("ICE") facility for further examination, which revealed suspected child pornography on the defendant's other laptop.  Based on these findings, federal agents obtained a search warrant and conducted a more thorough forensic examination of the defendant's two computers.

The defendant did not challenge the initial search of one laptop computer at the airport, but he moved to suppress the evidence uncovered during the subsequent warrantless search of his two laptops at the ICE facility.  The district court denied this motion and the Sixth Circuit affirmed, rejecting the defendant's contention that once his computers were removed from the airport, any further examination of these devices qualified as an "extended border search" that had to be justified by reasonable suspicion.  729 F.3d at 525.  Instead, the court held that "[a] routine border search of a laptop computer is not transformed into an 'extended border search' simply because it is transported twenty miles beyond the border and examined within twenty-four hours of the initial seizure."  729 F.3d at 525.

In the Government's view, the warrantless search of Defendant's electronic devices in this case is materially indistinguishable from the search upheld in *Stewart.* Because "the Sixth Circuit still applied the border-search doctrine to permit a suspicionless search of [the] laptops" at issue in *Stewart,* the Government contends that

24

this ruling "forecloses [Defendant's] challenge to the searches here."  (Gov't 11/17/2017 Response Br. at 8.)  As Defendant observes in response, however, the decision in *Stewart* predates the Supreme Court's ruling in *Riley,* so the Sixth Circuit had no occasion to decide whether the Supreme Court's reasoning in the context of searches incident to an arrest might apply as well to border searches of electronic devices. Moreover, Defendant asserts that *Stewart* is factually distinguishable, since it addressed the legality of a warrantless off-site search rather than "the level of suspicion required to search computers at the border."  (Defendant's 12/6/2017 Reply Br. at 2.)  Thus, while the ruling in *Stewart* bears upon other related issues addressed below, the Court agrees with Defendant that neither this decision nor any other Sixth Circuit precedent resolves the immediate question:  namely, whether *Riley*'s warrant requirement for searches of electronic devices incident to arrest should carry over to the context of border searches.

### b.  The Application of *Riley* to Border Searches

Notwithstanding the absence of binding precedent on this subject, a number of courts have considered *Riley*'s impact upon border searches of electronic devices, and nearly all of them have concluded that *Riley* does not alter the existing rule that such searches may be conducted without a warrant.  In *United States v. Feiten,* No. 15-20631, 2016 WL 894452, at *4 (E.D. Mich. March 9, 2016), for instance, a court in this District observed that *Riley* addressed only warrantless searches of digital devices incident to an arrest, and did not purport to adopt "a blanket rule applicable to any data search of any electronic device in any context."  Rather, just as the Court in *Riley* inquired whether the "application of the search incident to arrest doctrine to searches of digital data would untether the rule from the justifications underlying it," the court in

25

*Feiten* sought to "determine whether allowing agents to forensically search an entrant's laptop at the border without first obtaining a warrant would necessarily untether [the border search] rule from the historical justifications underlying it." *Feiten,* 2016 WL 894452, at *4-*5 (internal quotation marks, alteration, and citation omitted). Upon conducting this inquiry, the court concluded:

> Allowing customs officials without a warrant to forensically search an electronic device presented at an international border or its equivalent is utterly consistent with [the border search doctrine's] historical mooring of protecting the country by preventing unwanted goods from crossing the border into the country. Laptops and cell phones are indeed becoming quantitatively, and perhaps qualitatively, different from other items, but that simply means there is more room to hide digital contraband, and therefore more storage space that must be searched. Merely because a large container is presented at the border, the government's right to inspect its contents is not diminished as compared to its right to inspect a comparatively small container. If customs officials may search an entire cargo container, which they may, then they may search an entire computer.

2016 WL 894452, at *6 (citations omitted). Thus, the court held that government agents were lawfully entitled to search the defendant's laptop computer without a warrant even after it was moved from the border to a nearby facility, and that this authority encompassed both an initial "manual search" and a "more intrusive complete forensic exam" performed over a month-long period after the seizure of the device. 2016 WL 894452, at *6-*7 (internal quotation marks and citation omitted); *see also United States v. Caballero,* 178 F. Supp.3d 1008, 1017-20 (S.D. Cal. 2016) (finding that "neither [a] warrant nor reasonable suspicion" is needed "to justify a manual cursory search of a digital device being brought across an international border"); *United States v. Saboonchi,* 48 F. Supp.3d 815, 817-18 (D. Md. 2014) (concluding that *Riley* does not

alter the rule that warrantless "routine border searches . . . are permissible with absolutely no suspicion").

Similarly, a number of appellate courts have found that *Riley* does not displace the authority of customs officials to conduct warrantless searches of digital devices at the border, but at most requires individualized suspicion to perform a more thorough forensic examination of such a device following its initial seizure and a brief inspection of its contents.  In *United States v. Touset,* 890 F.3d 1227, 1231-32 (11th Cir. 2018), for example, the Eleventh Circuit held that "the Fourth Amendment does not require any suspicion for forensic searches of electronic devices at the border," and found in the alternative that "the searches of [the defendant's] electronic devices were supported by reasonable suspicion."  In that case, the government had uncovered evidence in an investigation that the defendant, Karl Touset, was involved with child pornography, and upon his arrival at the Atlanta airport on an international flight, a CBP officer inspected his luggage and found two cell phones, a camera, two laptop computers, two external hard drives, and two tablets.  *Touset,* 890 F.3d at 1230.  A manual inspection of the cell phones and camera did not reveal any evidence of child pornography, and these devices were returned to Touset.  His remaining devices were detained, however, and off-site forensic searches by computer forensic analysts "revealed child pornography on the two laptops and the two external hard drives."  890 F.3d at 1230.  Touset filed a motion to suppress this evidence, as well as the fruits of these searches, but the district court denied this motion, reasoning that "reasonable suspicion is required for a forensic search of electronic devices at the border" but finding that the government had met this standard.  890 F.3d at 1231.

27

In affirming this decision, the Eleventh Circuit first pointed to its recent ruling in *United States v. Vergara,* 884 F.3d 1309, 1312-13 (11th Cir. 2018), that the government need not establish probable cause or obtain a warrant in order to conduct a forensic search of a cell phone at the border. *Touset,* 890 F.3d at 1232-33. The court then turned to the question left open in *Vergara:* namely, whether such a search must be justified by reasonable suspicion. In concluding that no such showing is required, the court reasoned that while the Supreme Court had insisted upon some degree of heightened suspicion for "highly intrusive searches" or "prolonged detention" of a person at the border, it had never imposed such a requirement for border searches of personal property. 890 F.3d at 1233. Thus, the court explained that it "s[aw] no reason why the Fourth Amendment would require suspicion for a forensic search of an electronic device when it imposes no such requirement for a search of other personal property." 890 F.3d at 1233. In the alternative, the Eleventh Circuit agreed with the district court that "[t]he government had a particularized and objective basis for suspecting that Touset possessed child pornography on his electronic devices," and that this "provided reasonable suspicion for the forensic searches of" these devices." 890 F.3d at 1237 (internal quotation marks and citation omitted).

In *Kolsuz,* 890 F.3d at 146, in contrast, the Fourth Circuit viewed *Riley* as having a somewhat greater impact on border searches of electronic devices. In that case, defendant Hamza Kolsuz departed on a flight from the Miami International Airport to Turkey, with an intermediate stop at Washington Dulles International Airport. When Kolsuz and his luggage reached the Dulles airport, CBP officers examined his two checked bags and found "multiple firearms parts," at least some of which "could not be

removed from the country without a license," and Kolsuz admitted that he lacked the requisite export license. *Kolsuz,* 890 F.3d at 139.[5]  Upon discovering these items in Kolsuz's luggage and escorting him to a secondary inspection area, the CBP officers conducted an initial search of a cell phone found in Kolsuz's possession.  The court explained that this "manual" search "involved using the iPhone's touch screen, which was not password protected, to scroll through Kolsuz's recent calls and text messages." 890 F.3d at 139.

After the CBP officers interviewed Kolsuz and confirmed that he had no export license for the firearms parts in his luggage, he was placed under arrest and his phone was taken in order to conduct a forensic search.  To carry out this procedure, the phone was transported a few miles away to a Homeland Security facility, where a computer forensic agent used specialized software to "conduct[] an advanced logical file system extraction."  890 F.3d at 139.  This "data extraction process lasted for a full month, and yielded an 896-page report that included Kolsuz's personal contact lists, emails,

---

[5]The Fourth Circuit noted that Kolsuz "never has suggested that th[e] standard customs search of his checked luggage presents any constitutional problem," and observed that any such objection would lack merit in light of the "long established" rule that "a search of luggage taken from or bound for an overseas flight is a routine border search that may be conducted on a suspicionless basis."  890 F.3d at 139 n.1.  The court further emphasized that although "the search in question was initiated when Kolsuz attempted to exit the country, not to enter," it had "long held that the rationales underlying the border exception extend to exit as well as entry searches."  890 F.3d at 137.  As the court explained, the border search exception as applied to exit searches is "justified by the government's power to regulate the export of currency and other goods," and this "power surely extends to controls on the exports of dangerous weapons, like the firearms parts at issue here."  890 F.3d at 138.  Notably, the Sixth Circuit has similarly held that the border search exception applies to searches of persons and items leaving the country, and not just to searches upon entering the country.  *See United States v. Boumelhem,* 339 F.3d 414, 420-23 (6th Cir. 2003).

messenger conversations, photographs, videos, calendar, web browsing history, and call logs, along with a history of Kolsuz's physical locations down to precise GPS coordinates." 890 F.3d at 139. Kolsuz moved to suppress this report but the district court denied his motion, reasoning that the forensic analysis of Kolsuz's phone was a "nonroutine border search" that "required particularized suspicion," but concluding that the government had "more than reasonable suspicion that a forensic examination of Kolsuz's phone would reveal evidence of both past and ongoing attempts to export firearms illegally." 890 F.3d at 140-41 (internal quotation marks and citation omitted).

On appeal, the Fourth Circuit first emphasized that the issue presented was "a narrow one," where Kolsuz did not challenge (i) the "manual search of his smartphone, undertaken on-site at the airport," or (ii) the "seizure of his phone, either initially at the airport or later" when it was taken off-site for more thorough examination. 890 F.3d at 141. Rather, the only question before the court was "whether the forensic search of Kolsuz's phone, and the associated invasion of Kolsuz's privacy, was justified under the border search exception." 890 F.3d at 141.

Upon turning to this question, the court upheld each aspect of the district court's ruling. First, the Court of Appeals agreed with the district court that "the border exception is not rendered inapplicable because a search initiated at a border ultimately is conducted at some physical or temporal remove." 890 F.3d at 142. Nonetheless, the Fourth Circuit further agreed with the court below that in the wake of *Riley,* "a forensic border search of a phone must be treated as nonroutine, permissible only on a showing of individualized suspicion." 890 F.3d at 144. In so ruling, the court observed that the Department of Homeland Security had recently "adopted a policy that treats forensic

30

searches of digital devices as nonroutine border searches, insofar as such searches now may be conducted only with reasonable suspicion of activity that violates the customs laws or in cases raising national security concerns." 890 F.3d at 146. Finally, as for the district court's holding that a showing of reasonable suspicion, and not probable cause, was sufficient to justify the forensic search of Kolsuz's cell phone, the Fourth Circuit reasoned that it need not decide precisely what degree of individualized suspicion was required, where at the time of the search "there was no case suggesting that . . . more [than reasonable suspicion] would be necessary — for a forensic search of a phone at the border or, indeed, for *any* border search, no matter how nonroutine or invasive." 890 F.3d at 147. Under these circumstances, the court found that the CBP officers who conducted the forensic analysis of Kolsuz's phone could reasonably "rely on the established and uniform body of precedent allowing warrantless border searches of digital devices that are based on at least reasonable suspicion." 890 F.3d at 148.

A number of points of consensus emerge from this case law addressing the impact of *Riley* on border searches of cell phones and other electronic devices. First, none of these cases hold that a warrant, or even probable cause, is required in order to conduct even the most extensive forensic search of a cell phone found in the possession of an international traveler. To the contrary, the Eleventh Circuit ruled in *Touset* that a forensic search of a cell phone at the border need not be supported even by a showing of reasonable suspicion. While the Fourth Circuit held in *Kolsuz* that some degree of individualized suspicion is needed to perform a forensic search of a digital device, it observed that "there are no cases requiring more than reasonable suspicion" to justify such a search. *Kolsuz,* 890 F.3d at 147. Finally, none of these

31

courts have held that a manual, nonforensic search of a cell phone or other electronic device at the border requires even a showing of reasonable suspicion, much less probable cause or a warrant.

### c.  Applying the Post-*Riley* Decisions to This Case

Returning to this case, the Government contends that the CBP officers' search of Defendant's digital devices was lawful on two grounds.  First, it asserts that the searches at issue here were only manual inspections, not forensic examinations, and thus were authorized under the border search doctrine without a warrant or individualized suspicion.  Next, even if the Court were to hold that the officers needed reasonable suspicion to search Defendant's electronic devices, the Government argues that the facts here establish the requisite degree of individualized suspicion, where (i) export-controlled items had been found in Defendant's checked baggage, and (ii) the officers found Defendant to be less than truthful and forthcoming when they spoke to him about the items in his luggage.  As discussed below, the Court agrees on both scores.

As is clear from the foregoing survey of the case law, and as both parties recognize, the degree of individualized suspicion (if any) that is necessary to justify a border search of an electronic devices is determined in significant part by the type of search at issue.  Both the Sixth Circuit and other courts have distinguished between "routine" or "manual" searches of digital devices, on one hand, and "nonroutine" or "forensic" searches, on the other.  *See Stewart,* 729 F.3d at 525 (referring to the search in that case as "routine" and "non-forensic"); *see also Touset,* 890 F.3d at 1230, 1234; *Kolsuz,* 890 F.3d at 140, 146 & n.6; *United States v. Molina-Isidoro,* 884 F.3d 287, 293

(5th Cir. 2018).   Indeed, the Ninth Circuit has colorfully referred to an extensive forensic examination of a digital device as "essentially a computer strip search."   *United States v. Cotterman,* 709 F.3d 952, 966 (9th Cir. 2013).

In this case, Defendant submits that the CBP officers conducted a "non-routine, forensic" search of his digital devices, where they "used a USB cable to connect [Defendant's] hard drive to a 'special computer,'" and then reviewed the files on this device "[w]ith the help of proprietary software."  (Dkt. 97, Defendant's 6/29/2018 Suppl. Br. at 12.)  This contention, however, runs afoul of both the evidence and the law.  First, Defendant's reference to a "special" computer derives from the testimony of CBP Officer Robinson, who explained that he did not review the electronic devices he found in Defendant's checked luggage because "[w]e don't have the capability there to review them" or the "special computer . . . that they use" for this purpose.  (1/30/2018 Hearing Tr. at 220.)  Yet, the officer who actually conducted this review, CBP Officer Armentrout, testified that he connected Defendant's digital devices to a "standalone" computer in a command center adjacent to the secondary inspection area where Defendant was being interviewed, and he explained that he referred to this computer as "standalone" because it was "not connected to any other system" or network.  (*Id.* at 109-10.)  Officer Armentrout further testified that he accessed the contents of Defendant's digital storage devices by plugging them into the standalone computer and then opening and reviewing the files stored on these devices, without the use of any forensic tools to speed up this process.  (*Id.* at 111-12.)  Under this record, it cannot be said that Officer Armentrout employed any "special" equipment or technology to review Defendant's electronic devices, beyond what could be achieved with an ordinary computer.

33

As for Defendant's claim that the CBP officers accessed Defendant's digital devices "[w]ith the help of proprietary software," this misrepresents the relevant testimony at the evidentiary hearing.  In defense counsel's questioning of CBP Officer Brown, he agreed that CBP has software that facilitates the review of data stored on digital devices.  (5/23/2018 Hearing Tr. at 98.)  He further testified, however, that he had never used this software, but instead would "usually go through [a digital device] manually" and "rely on . . . other officers" if a device could not be searched in this manner.  (*Id.* at 98-99.)  More importantly, it was Officer Armentrout, and not Officer Brown, who conducted the review of Defendant's electronic devices.  As noted above, Officer Armentrout testified that he manually reviewed the contents of these devices, without the assistance of any forensic tools.  (1/30/2018 Hearing Tr. at 110-12.)  To the extent that Officer Brown had knowledge of how Officer Armentrout carried out this search, he testified — consistent with the testimony of Officer Armentrout — that it was done by connecting Defendant's devices to a standalone computer via a USB port. (*See* 5/23/2018 Hearing Tr. at 100.)

Defendant also invites the Court to infer that the CBP officers must have used some sort of special computer or software to review the contents of Defendant's "five terabyte hard drive," where Officer Armentrout testified that he spent four hours conducting this review but it took Defendant and his counsel "at least fourteen hours" to manually review the files on this device.  (Defendant's 6/29/2018 Suppl. Br. at 12-13.) Yet, Defendant assumes without basis that the CBP officers comprehensively reviewed "all" the files on Defendant's hard drive, (*see id.* at 12), when in fact Officer Armentrout made no such claim in his testimony at the evidentiary hearing.  Instead, he

34

characterized the process he employed as "screen[ing]" the contents of Defendant's digital devices to "see what sort of thing[s]" were stored on them, and looking at "large icons" of files to enable him to "move on quickly to the next file."  (1/30/2018 Hearing Tr. at 111-12.)  This testimony is not inherently suggestive of the use of forensic tools or specialized equipment — and, of course, Officer Armentrout expressly testified to the contrary.

Viewing this record in light of the pertinent case law, the Court readily concludes that the CBP officers conducted a routine manual search of Defendant's electronic devices.  In *Stewart,* 729 F.3d at 521, although an initial search of the defendant's computer was conducted by a "certified forensic analyst" at an ICE field office "about twenty miles from the airport," the Sixth Circuit found that this was "not a forensic examination," and that the analyst instead "only previewed" the contents of the computer "by scrolling through about twenty-five images per page, searching for contraband."  In concluding that this "routine border search" was exempt from the Fourth Amendment requirements of a warrant or probable cause, the court observed that the analyst's off-site search was "substantially the same" as the airport search of a second computer found in the defendant's possession, and it pointed to the defendant's acknowledgment that this airport search of his computer by "previewing images" was "constitutionally permissible."  *Stewart,* 729 F.3d at 525.  "That the government had to travel twenty miles and wait twenty-four hours to perform the same search that they could have done the previous day had the proper equipment been present at the airport does not transform a routine border search into an extended border search for which reasonable suspicion is required."  729 F.3d at 526.

35

Other courts have adopted similar definitions of manual and forensic searches. In *Kolsuz,* 890 F.3d at 146 n.6, for instance, the Fourth Circuit explained that manual searches "are examinations of an electronic device that do not entail the use of external equipment or software," while forensic searches "involve the connection of external equipment to a device . . . in order to review, copy, or analyze its contents." Likewise, the Ninth Circuit has found that the determination whether law enforcement has conducted a routine search or a "forensic examination" turns on the "commonsense differentiation between a manual review of files on an electronic device and application of computer software to analyze a hard drive." *Cotterman,* 709 F.3d at 967; *see also Feiten,* 2016 WL 894452, at *6 (noting the defendant's suggestion that a forensic search of a laptop computer "includes anything more extensive than border agents manually clicking through the desktop, media folders, and internet browsing history," but finding that the software used by law enforcement in that case did not transform a file review into a forensic search because the software was "actually *less* invasive of personal privacy than is a search done by hand" (internal quotation marks and citation omitted)).

The file review at issue here has none of the characteristics of a "forensic" search, but instead is properly deemed a routine manual search. In reviewing the files on Defendant's digital devices, Officer Armentrout merely connected these devices to a standalone computer and manually screened their contents by looking at large icons corresponding to each file. He did not use any sort of sophisticated equipment, specialized software, or forensic tools. Although Defendant suggests that the CBP officers used some sort of "special" computer to review the contents of his digital media, (Defendant's 6/29/2018 Supp. Br. at 12), Officer Armentrout testified to the contrary,

explaining that he connected the electronic devices to a ordinary "standalone" computer in order to gain access to their contents, (1/30/2018 Hearing Tr. at 109-10.)  Moreover, to the extent that Defendant cites Officer Armentrout's four-hour file review as evidence of a non-routine search, the court in *Feiten* noted the absence of any "authority, either binding or instructive, which suggests that a four-hour duration transforms an otherwise reasonable border search into a non-routine border search."  2016 WL 894452, at *3.

Accordingly, because Defendant's electronic devices were subjected only to routine manual review, the CBP officers did not need any sort of individualized suspicion in order to conduct this search.  As is evident from the Court's foregoing survey of the case law, the courts have uniformly held that routine manual searches of digital devices at a border fall within a recognized exception to the Fourth Amendment requirements of a warrant and probable cause, and this remains true in the wake of the Supreme Court's decision in *Riley*.  Although Defendant seemingly suggests that some degree of individualized suspicion is necessary if the "purpose of the search" of Defendant's electronic devices was to "further a criminal investigation," (Defendant's 6/29/2018 Suppl. Br. at 10), he cites no authority indicating that the Court should inquire into the motives of the CBP officers in order to assess the legality of their search.  *Cf. Whren v. United States,* 517 U.S. 806, 812, 116 S. Ct. 1769, 1774 (1996).  Indeed, the Fifth Circuit expressly rejected this argument under facts similar to those presented here, explaining that the defendant in that case had failed to identify any decision that distinguished between a "border encounter" and a "law enforcement investigation," and that the case law instead ran counter to this proposed distinction.  *Molina-Isidoro,* 884 F.3d at 292-93 n.2; *see also United States v. Cano,* 222 F. Supp.3d 876, 881 (S.D. Cal.

37

2016) (finding no support for the "proposition that if the search is 'investigatory,' it ceases being a border search").

Alternatively, even if the Court were to hold that the Government needs to show some degree of individualized suspicion in order to justify the warrantless search of Defendant's electronic devices at the border, the Court is satisfied that the record here establishes the requisite reasonable suspicion. Most notably, a number of export-controlled items — including body armor, a rifle scope, and a taser — were found in Defendant's checked luggage, and this discovery of apparently unlawful activity warranted further inquiry. Although Defendant suggests that no further investigation was necessary once he admitted that he lacked the requisite license to remove these items from the country, this bare acknowledgment did not obviate the need for the CBP officers to explore the purpose for which Defendant was taking these items along on his overseas travel with his wife and children. This further inquiry was all the more justified in light of the other tactical gear that was also found in Defendant's luggage. Although it was not unlawful for Defendant to travel with these items, the officers were entitled to consider this gear, in combination with the export-controlled items, in making their determination that additional investigation was warranted.

Next, as the CBP officers began to engage in this further investigation, they found that Defendant's responses to their inquiries only heightened their suspicions. First, while Defendant stated that he was traveling to Bethlehem in order to record and report upon the ongoing conflict between Israel and the Palestinians, the officers learned that Defendant had no training, past experience, press credentials, contacts, or potential employers that might assist him in this endeavor. The officers also viewed

Defendant as changing his story about the reason for his travel, and they expressed skepticism that Defendant was bringing his wife and children along to a place where he believed he needed body armor for protection.  Finally, the officers were entitled to consider Defendant's aggressive and agitated reaction when they asked for access to his cell phone, as well as his request that he be granted immunity from anything incriminating that might be found on this device.  The totality of these circumstances gave rise to reasonable suspicion that justified the warrantless search of Defendant's digital devices.

### 3. Even If the Warrantless Search of Defendant's Electronic Devices Was Unjustified, the Evidence Uncovered in This Search Would Not Be Subject to Exclusion.

Finally, even if the Court were to find that the search of Defendant's electronic devices was unlawful, the Court agrees with the Government that the good-faith doctrine would defeat the application of the exclusionary rule under the circumstances presented here.  As observed by the Government, the Supreme Court has held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule," even if this precedent "is later overruled." *Davis v. United States,* 564 U.S. 229, 231, 131 S. Ct. 2419, 2423-24 (2011).  Under the Sixth Circuit's decision in *Stewart,* 729 F.3d at 525-26, the CBP officers in this case were authorized to conduct a routine border search of Defendant's electronic device without a warrant, probable cause, or even reasonable suspicion.  Although Defendant maintains that *Stewart* has been effectively overruled in light of the Supreme Court's more recent decision in *Riley,* the Sixth Circuit has yet to confirm this.  In the meantime, a law enforcement officer may act in good-faith reliance on this precedent despite the

39

(as yet unrealized) possibility that the Sixth Circuit might ultimately determine that its ruling can no longer stand in the wake of *Riley.*

The rulings of other courts underscore this conclusion.  In *Molina-Isidoro,* 884 F.3d at 290, the Fifth Circuit elected not to "decide the Fourth Amendment question" presented by the warrantless search of the defendant's cell phone at the border, and instead determined that the case was governed by the good-faith exception to the exclusionary rule.  In so ruling, the court reasoned that "[t]he agents searching [the defendant's] cell phone reasonably relied on the longstanding and expansive authority of the government to search persons and their effects at the border."  884 F.3d at 290. As for the defendant's contention that *Riley* calls this longstanding authority into question where a border search encompasses electronic devices, the court pointed to the Supreme Court's express recognition that "other case-specific exceptions may still justify a warrantless search of a particular phone," 884 F.3d at 292 (quoting *Riley,* 134 S. Ct. at 2494), and then explained:

> That caveat [in *Riley*] means it was reasonable for the agents to continue to rely on the robust body of pre-*Riley* caselaw that allowed warrantless border searches of computers and cell phones.  What is more, not a single court addressing border searches of computers since *Riley* has read it to require a warrant.  Although what ultimately matters is the reasonableness of the officers' actions at the time of the search, it is telling that no post-*Riley* decision issued either before or after this search has required a warrant for a border search of an electronic device.  Also noteworthy is that the leading Fourth Amendment treatise continues to include searches of a laptop or other personal electronic storage devices[] among the types of border searches that may be made without first obtaining a search warrant and without establishing probable cause . . . . If federal judges and a leading Fourth Amendment scholar do not believe *Riley* overrides the caselaw allowing warrantless border searches of cell phones (especially nonforensic ones), it is reasonable for government agents to take the same view until something changes.

> The bottom line is that only two of the many federal cases addressing border searches of electronic devices have ever required any level of suspicion.  They both required only reasonable suspicion and that was for the more intrusive forensic search.  Here we have a manual, sometimes called "cursory" in the caselaw, search of a phone . . . .  Given the state of the law when agents looked at . . . [the defendant's] phone, it was eminently reasonable for them to think that the probable cause they had to believe it contained evidence of drug crimes made the search a lawful one.

*Molina-Isidoro,* 884 F.3d at 292-93 (internal quotation marks, citations, and footnotes omitted); *see also Kolsuz,* 890 F.3d at 147-48 (invoking the good-faith exception to the exclusionary rule because "[e]ven as *Riley* has become familiar law, there are no cases requiring more than reasonable suspicion for forensic cell phone searches at the border").

Applying this reasoning here, the good-faith doctrine defeats Defendant's appeal to the exclusionary rule.  At the time the CBP officers conducted their routine manual search of Defendant's electronic devices at the Detroit airport, no Supreme Court or Sixth Circuit precedent mandated that this search be supported by some sort of individualized suspicion.  Indeed, this remains true to this day.  Moreover, a survey of the post-*Riley* case law discloses no decision by any other appellate court requiring individualized suspicion to conduct a routine, non-forensic border search of a digital device.  It follows that even if this emerges as the law at some point, the CBP officers in this case acted in reasonable reliance on the law as it stood when they manually searched Defendant's digital devices.

### B. Defendant's Motion to Suppress the Statements Made During His Detention at the Airport

#### 1. Standard of Review

In the second of his two motions, Defendant seeks to suppress the statements he made to federal law enforcement officers after he was removed from his flight to Jordan and held in a secondary inspection area at the Detroit airport.  Although, as discussed earlier, the parties disagree as to the standards and burdens of proof that apply to Defendant's motion to suppress the evidence found in the airport search of his digital devices, there is no such disagreement as to the standards governing his remaining motion.

First, to the extent that Defendant seeks the suppression of his statements on the ground that he was not given the warnings called for under *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1966), the parties agree that Defendant bears the threshold burden to "demonstrate by a preponderance of the evidence that he was entitled to receive [*Miranda* warnings]; *i.e.,* that he was subjected to a 'custodial interrogation.'" *United States v. Lawrence,* No. 88-2056, 892 F.2d 80, 1989 WL 153161, at *5 (6th Cir. Dec. 18, 1989).  Once he has established this entitlement, the Government bears the burden of demonstrating by a preponderance of the evidence that Defendant waived the rights conveyed in the *Miranda* warnings.  *See Colorado v. Connelly,* 479 U.S. 157, 168, 107 S. Ct. 515, 522 (1986).  Alternatively, to the extent that Defendant contends that his statements were the involuntary product of coercion, the Government "bears the burden of proving by a preponderance of the evidence" that Defendant's statements were in fact voluntary.  *United States v. Mahan,* 190 F.3d 416, 422 (6th Cir. 1999).

> **2.     Defendant Has Failed to Establish His Entitlement to *Miranda* Warnings During His Questioning in the Airport's Secondary Inspection Area.**

As the first ground for seeking to suppress the statements he made to federal law enforcement officers while he was held in the secondary inspection area at the Detroit airport, Defendant argues that the officers unlawfully elicited these statements from him without first giving him the required *Miranda* warnings.  Under well-established principles founded upon the Fifth Amendment privilege against self-incrimination, "incriminating statements elicited  from suspects in custody cannot be admitted at trial unless the suspect was first advised of his or her *Miranda* rights."  *United States v. Salvo,* 133 F.3d 943, 948 (6th Cir. 1998).  "The *Miranda* rule's application is limited to 'custodial interrogations,' which the Supreme Court has defined as[] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in a significant way."  *Salvo,* 133 F.3d at 948 (internal quotation marks and citations omitted).  "Thus, in order for *Miranda* to apply, the suspect must either be actually taken into custody or the restraint on his freedom must rise to the level associated with a formal arrest."  133 F.3d at 948.

As the Government observes, the Sixth Circuit has expressly held that "*routine* customs inspections are non-custodial and do not require the reading of *Miranda* rights."  *United States v. Galloway,* 316 F.3d 624, 630 (6th Cir. 2003).  In that case, the defendant argued that this rule should apply "only to *primary* customs inspections," and not "more particularized *secondary* inspections like the one to which [the defendant] was subjected."  *Galloway,* 316 F.3d at 630.  In support of this contention, the defendant maintained that "the accusatorial and focused nature of a secondary inspection goes well beyond what the reasonable traveler would consider routine or non-custodial."  316 F.3d at 630.  The Sixth Circuit declined to adopt this proposed across-the-board

43

distinction between primary and secondary inspections, explaining that "the fact that an interrogation is not random, but focused on a particular defendant, does not automatically render it custodial."  316 F.3d at 630.  Instead, the court determined that in the case of "customary border stops," be they "primary or secondary," *Miranda* warnings are not required.  316 F.3d at 630.  This is so, explained the court, even though "the traveler is not free to go."  316 F.3d at 630; *see also United States v. Ozuna,* 170 F.3d 654, 658-59 (6th Cir. 1999) (holding that detention at the border for the purpose of "routine questioning" does not necessitate *Miranda* warnings).  The Sixth Circuit emphasized, however, that its ruling applied only to "routine customs inquir[ies]," and not those in which "the circumstances surrounding [an] inspection ma[k]e it akin to an arrest."  *Galloway,* 316 F.3d at 630.

The question, then, is whether the circumstances surrounding the questioning of Defendant in the secondary inspection area of the Detroit airport rose to the level of an arrest.  The Sixth Circuit has emphasized that "neither the perception of the defendant nor of the police" is relevant to this inquiry, and that the question whether a defendant is in custody "is determined by the objective perception of a reasonable man in the defendant's shoes."  *Galloway,* 316 F.3d at 629.  Moreover, given that a traveler has made a voluntary decision to enter or exit the country with the understanding that he will be subject to an initial "cursory screening" and perhaps also "held over for secondary inspection," the Sixth Circuit has observed that "events which might be enough to signal 'custody' away from the border will not be enough to establish 'custody' in the context of" international travel.  316 F.3d at 629 (alteration, quotation marks, and citation omitted); *see also United States v. FNU LNU,* 653 F.3d 144, 154 (2d Cir. 2011) ("That

44

[an international traveler] expects both constraints and questions — and that, at least initially, every traveler in the airport must submit to the same sort of questioning while not free to leave — reduces the likelihood that reasonable persons in that situation would consider themselves to be under arrest.").  In determining whether an airport inspection rises to the level of custodial interrogation for which *Miranda* warnings are required, the courts consider such factors as (i) the lines of questioning pursued, (ii) the manner of questioning, (iii) the environment in which the inspection occurred, and (iv) the length of the detention.  *See Galloway,* 316 F.3d at 630-31; *FNU LNU,* 653 F.3d at 153-55.

Turning to the circumstances presented here, the Court finds that *Miranda* warnings were not required.  First, the questions asked of Defendant were almost entirely directed at either (i) topics relevant to a routine border inspection, or (ii) subjects reasonably arising from and related to Defendant's responses to these inquiries or the items found in his luggage.  In particular, the record reveals that Defendant initially was asked about his travel plans and the export-controlled items and tactical gear, such as body armor and rifle scopes, that were found in his luggage.  While the CBP officers and other law enforcement agents also sought Defendant's views about certain terrorist organizations, the CBP officers testified that this subject initially arose when a search of a law enforcement database revealed a tipster's report of Defendant's possible involvement with one of these organizations.  Moreover, the record discloses that the officers returned to this topic when a search of Defendant's electronic media uncovered ISIS-related and combat photos and videos.  Although Defendant accuses the officers and agents of engaging in an unbounded fishing expedition, the Court finds that their

45

questions were consistent with the inquiry that one would expect at an international border, particularly in light of Defendant's responses to their questions and the nature of the items found in his luggage.

Next, Defendant contends that the manner of the officers' and agents' questioning and the environment in which this questioning occurred gave rise to an atmosphere tantamount to custodial interrogation. He notes, for example, that the officers and agents all were armed, that he was separated from his family and placed in interview rooms with the doors closed, and that he was outnumbered during each of the interviews. He further contends (i) that the officers threatened him at times during these encounters — most notably, by purportedly stating that he would be sent to Guantanamo if he did not cooperate, (ii) that he was handcuffed on three occasions during the course of his detention, (iii) that the officers ignored his requests for a lawyer and a translator, and (iv) that CBP Officer Brown called him a "[s]and n*gger," twisted his ear, pulled his hair, and punched him in the stomach.

The Courts finds that Defendant's testimony on certain of these points is not credible, and that his remaining complaints about the manner and environment of his questioning do not establish that he was subject to custodial interrogation. First, while the officers and agents who interviewed Defendant acknowledged that they were carrying firearms, they uniformly testified that they wore plainclothes and that their weapons were not visible. (*See* 1/30/2018 Hearing Tr. at 60, 132; 3/6/2018 Hearing Tr. at 16; 5/23/2018 Hearing Tr. at 54, 121.) Although Defendant testified that he could see at least some of these firearms, the Court credits the uniform testimony of the officers and agents to the contrary, and Defendant does not claim that any of the officers or

46

agents brandished or otherwise displayed their weapons in a threatening manner.  Next, the record discloses that the initial room in which Defendant was interviewed had a glass window that permitted him to look out to the lobby where his family was waiting, and that likewise allowed those on the outside to see into the interview room.  Although Defendant subsequently was interviewed in a conference room that had no windows, CBP Officer Brown described this room as a "more relaxed setting" where the CBP officers eat lunch.  (5/23/2018 Hearing Tr. at 115.)

It is true, of course, that Defendant was outnumbered by the officers and agents during these interviews.  Yet, the testimony reveals that Defendant was generally cooperative in responding to the officers' inquiries, becoming more combative only when he was questioned on certain topics.  In addition, while Defendant was twice placed in handcuffs during the time he remained in the secondary inspection area, the officers and agents testified that handcuffs were used only to calm Defendant down and removed once he had done so.  Under this record, it cannot be said that the interviews were conducted in a particularly coercive or threatening manner or setting, such that they were transformed from routine customs-related inquiries into something more akin to an arrest.

To be sure, Defendant has testified that he was threatened at times during these interviews, that he was kept in handcuffs during the second interview, and that the officers and agents ignored his requests for a lawyer and a translator.  On each of these points, however, the officers and agents uniformly testified to the contrary, stating (i) that Defendant was not threatened, whether with detention at Guantanamo or otherwise; (ii) that he did not request a translator or lawyer; (iii) that he was not

47

handcuffed at all in the second interview; (iv) that he was handcuffed in the first interview only for about five to ten minutes until he calmed down, after which the interview resumed without incident; and (v) that Defendant was not asked any questions at any time while he was in handcuffs. Similarly, while Defendant claims that Officer Brown used a racial epithet and physically assaulted him, Officer Brown and the other officers and agents who were present at this encounter uniformly denied that this misconduct occurred.

The Court credits the testimony of the officers and agents over Defendant's account. Most notably, the officers and agents offered almost wholly uniform testimony about their interactions with Defendant, and Defendant has not identified any material inconsistencies in this testimony or otherwise provided a basis for calling the officers' and agents' accounts into question. This uniformity is especially striking in light of the fact that six law enforcement officers were called to testify about their interactions with Defendant at the Detroit airport. The sole discrepancy pointed to by Defendant is a conflict in the testimony of the officers and agents as to the second time Defendant was placed in handcuffs; Officer Schmeltz testified that he handcuffed Defendant on both occasions, while Special Agent Kelley recalled that Officer Brown placed Defendant in handcuffs and Officer Brown stated that he meant to do so but discovered that he did not have handcuffs in his possession.

Against this single and fairly modest inconsistency, there are a number of reasons to discount Defendant's testimony about certain aspects of his interactions with the officers and agents. First, the Government correctly observes that Defendant has offered no corroboration for his claim that he was physically assaulted, such as

48

photographs of injuries, the testimony of others who saw signs or heard reports of his injuries, or evidence that he sought medical attention.  Next, the Government points to Defendant's admissions during his testimony (i) that he had previously pleaded guilty to the misdemeanor offense of accepting Social Security payments to which he was not entitled, (5/24/2018 Hearing Tr. at 83-84); (ii) that he lied to the officers and agents at the airport when he initially stated that he kept his guns in a storage locker, but later told them that he had given them to a friend, (*id.* at 111-12); and (iii) that he sometimes experiences memory problems, (*id.* at 109-10).  In addition, Defendant incorrectly recalled at least some of the events of his airport detention:  he testified, for instance, that Officer Armentrout was present when he was interviewed for a second time in the secondary inspection area conference room, (*see id.* at 23-26), but the record is clear that Officer Armentrout was engaged at that point in a review of Defendant's electronic devices, (*see* 1/30/2018 Hearing Tr. at 111-12, 170-72).  More generally, the Court found Defendant to be somewhat evasive and less than forthcoming in his testimony at the evidentiary hearing, particularly when he was cross-examined by the Assistant U.S. Attorney.  Based on all of these considerations, the Court credits the testimony of the officers and agents over Defendant's contrary testimony regarding Defendant's claims (i) that the officers threatened to have him sent to Guantanamo, (ii) that they ignored his requests for a lawyer and a translator, (iii) that they kept him in handcuffs during their second interview of him, and (iv) that Officer Brown used a racial epithet and physically assaulted him.

Turning finally to the length of Defendant's detention, the Sixth Circuit has emphasized that "[b]revity is not . . . a precondition to the lawfulness of questioning at a

border," that "[t]here is no fixed limit to the length of the questioning," and that "its duration is simply one factor to consider in assessing the lawfulness of the officers' activities." *Ozuna,* 170 F.3d at 658.  Admittedly, the overall duration of Defendant's stay in the secondary inspection was quite long, spanning roughly from 9:00 p.m. to 5:00 a.m. the following morning.  Within this period, however, the record discloses that the two interviews of Defendant lasted about 45 minutes and an hour and a half, so the period of actual questioning was not so extensive.  In addition, the courts have recognized that lengthy questioning may be deemed less coercive if "[t]he length of the interview result[s] from [the] defendant's own acts," such as "giving incomplete and inconsistent answers."  *Ozuna,* 170 F.3d at 659; *see also Galloway,* 316 F.3d at 631. Such is the case here, where the CBP officers who conducted the first interview of Defendant found that he was less than forthcoming and somewhat inconsistent in his explanations of his travel plans and the purpose of the export-controlled gear in his luggage, and where the items discovered in Defendant's luggage and materials stored in his digital devices necessitated additional and more extensive inquiries.

Considering all of these circumstances in their totality, the Court holds that Defendant's detention and questioning in the secondary inspection area did not depart so far from a routine border inquiry as to be tantamount to an arrest.  Most importantly, although Defendant views the officers and agents as having embarked upon a full-blown interrogation into possible criminal activity, the Court finds that the questioning of Defendant was reasonably confined to the export-controlled items and tactical gear found in his luggage, the terrorism-related pictures and photos discovered in the search of his electronic devices, and other matters arising from and relating to Defendant's

responses to the officers' inquiries.  Moreover, nothing in the manner or duration of Defendant's questioning or in the circumstances under which it took place transformed this encounter into a custodial interrogation.  Consequently, because the detention of Defendant in the secondary inspection area of the Detroit airport was not "custodial" within the meaning of the relevant case law, Defendant was not entitled to *Miranda* warnings, and his statements need not be suppressed for failure to give these warnings.

### 3. Defendant's Statements Are Not Subject to Suppression as Involuntarily Made.

Even assuming that he was not entitled to *Miranda* warnings, Defendant contends in the alternative that his statements at the Detroit airport must be suppressed as involuntarily made.  The Sixth Circuit "has established three requirements for a finding that a confession was involuntary due to police coercion:  (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement."  *Mahan,* 190 F.3d at 422.  The factors relevant to this inquiry "may include the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food or sleep."  *Mahan,* 190 F.3d at 422-43.

For many of the reasons set forth earlier, the Court finds that Defendant's statements were not the product of actions by the officers and agents that could be deemed objectively coercive.  As already discussed, while the duration of Defendant's questioning exceeded a more typical inquiry in a secondary inspection area, this was

not due to coercive tactics, but rather such factors as (i) Defendant's somewhat inconsistent and less-than-forthcoming responses to the CBP officers' initial inquiries about his travel plans and the purpose of the items in his luggage, (ii) the significant quantity of export-controlled and tactical gear found in Defendant's luggage, and (iii) the terrorism-related materials discovered in the search of his electronic devices.  Similarly, the Court has already explained that the subject matter of the officers' and agents' questioning of Defendant was reasonably related to the items found among Defendant's possessions and his responses to prior inquiries.

Moreover, to the extent that Defendant has testified that the officers and agents used physical force or threats to elicit responses to their queries, and that he was kept in handcuffs for at least a portion of the questioning, the Court has determined that Defendant's testimony on these points is not credible, and that the contrary and mutually consistent testimony of the agents and officers should instead be credited. Likewise, the Court had observed that the setting in which Defendant was questioned was not inherently coercive, where he was first interviewed in a room with a glass window, and he next was questioned in a room where CBP officers eat their lunch. Although Defendant was twice placed in handcuffs, the officers and agents have uniformly testified that he was not questioned while he was handcuffed, so his statements cannot be viewed as the product of any coercion arising from the use of handcuffs.  And, again, to the extent that Defendant has testified differently about the use of handcuffs, the Court has explained why it does not credit this testimony.

Finally, there is nothing about Defendant's age, education, or intelligence that would make him more susceptible to coercive interrogation tactics.  He is a United

States citizen, is educated, and did not exhibit any barriers to understanding over the course of the lengthy proceedings on his motion.  To the contrary, it is fair to say that Defendant was fully engaged in these proceedings, following along intently and conversing with his attorneys during the questioning of the federal agents and officers. Accordingly, considering the totality of the circumstances under which Defendant was questioned, the Court finds that these circumstances fall well short of creating a coercive environment that would render Defendant's statements involuntary.

## IV.    CONCLUSION

For these reasons, the Court **DENIES** Defendant's October 25, 2017 motion to suppress the evidence found in the search of his electronic devices (Dkt. 19), and also **DENIES** Defendant's October 25, 2017 motion to suppress statements (Dkt. 20).

**IT IS SO ORDERED.**

Date: October 25, 2018                                    s/Marianne O. Battani
                                                         MARIANNE O. BATTANI
                                                         United States District Judge


CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on October 25, 2018.

                                                         s/ Kay Doaks
                                                         Case Manager