UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

YOUSEF MOHAMMAD RAMADAN,

    Defendant.

_____/

Case No. 17-20595
Honorable Victoria A. Roberts

### ORDER DENYING DEFENDANT'S EMERGENCY MOTION FOR TEMPORARY RELEASE FROM PRETRIAL DETENTION [ECF No. 181]

**I.    INTRODUCTION**

Yousef Mohammad Ramadan's Emergency Motion for Temporary Release Pursuant to 18 U.S.C. § 3142(i) because of COVID-19 Pandemic ("Motion for Release") is before the Court.  [ECF No. 181].

The Motion for Release is fully briefed, and the Court held a video hearing on the motion on May 6, 2020.  Ramadan was present at the hearing and participated with the assistance of an interpreter.

The Court **DENIES** Ramadan's Motion for Release [ECF No. 181].

## II. BACKGROUND

The government charged Ramadan in a superseding indictment with: (1) possession of a firearm with an obliterated serial number, 18 U.S.C. § 922(k); (2) possession of a stolen firearm, 18 U.S.C. § 922(j); and (3) possession of an unregistered silencer, 26 U.S.C. § 5861(d).

Ramadan's contact with law enforcement related to these charges began on August 17, 2017 at the Detroit Metropolitan Airport. Ramadan and his family arrived at the airport and purchased one-way tickets to Jordan departing later that evening. They checked fifteen pieces of luggage and carried on six. When a Transportation Security Administration agent ran one of Ramadan's bags through an x-ray scanner, he was unable to view the contents. As a result, the agent opened the bag and discovered export-controlled body armor plates made to fit into a bulletproof vest. Id.

Because the body armor required documentation to be taken out of the country, Custom and Border Protection ("CBP") officers went to the gate where Ramadan's flight was departing. Ramadan and his family were already on the plane. The officers asked Ramadan to step off the plane, and they spoke with him for a few minutes near the gate. When officers told Ramadan the questioning would likely cause him to miss his flight, Ramadan asked if he could give his wife her medication before the plane

left. The officers agreed, and they accompanied Ramadan back onto the plane. But, instead of handing his wife medication, Ramadan tried to slip a hard drive into her purse. The officers caught him in the act and confiscated the hard drive. Then they escorted Ramadan and his entire family off the plane.

Officers took Ramadan and his family to a secondary inspection area. A CBP officer searched Ramadan's luggage and found armor plates, three load bearing vests (armor plate carriers), a bullet proof vest, gun magazines and holsters, a Taser with two extra cartridges and an extra battery pack, law-enforcement grade pepper spray, rifle scopes, tactical knives, a gas mask, a black mask, a remote-controlled aerial drone, a combat carrying bag, and numerous electronic devices, including cellphones, tablets, memory cards, and external hard drives.

Other CBP officers spoke to Ramadan and reviewed his electronic media.  Ramadan's files included over 1500 pictures and videos of violent ISIS propaganda, photos and videos of a suspected homemade pipe bomb, and pictures of Ramadan posing with weapons while making an ISIS hand gesture

Based on this review, CBP contacted the FBI and Homeland Security to conduct a further investigation.  Agents arrived and interviewed

3

Ramadan about ISIS, among other things.  Ramadan said that he did not support the violent acts ISIS took, but that he did support ISIS's goal of creating an Islamic caliphate.

When confronted with the fact that the ISIS videos on his device depicted almost exclusively violent acts, Ramadan allegedly said that if he wanted to do a violent act he would not travel overseas—that he would do it in the United States because it would be much easier.  And, he stated that even if his weapons were confiscated, he could simply buy more weapons "off the streets."

Ramadan stated that the photographed item that appeared to be a pipe bomb was, in fact, a large "firework" that made a loud bang when detonated (and which was sometimes used overseas to throw at soldiers).  Ramadan stated that the pipe bomb took "about one hour" to build (but later attempted to recant that admission).

Ramadan informed the officers that he had legally purchased certain firearms and stored them in a storage locker. Ramadan told the officers that although he could not recall the specific address of the storage facility, he knew how to get there and offered to take the officers there at the conclusion of the interview.  When agents took him up on this offer,

4

Ramadan changed his story, telling the agents that he had given his firearms to a friend, whom he refused to identify.

Ramadan and his family were ultimately released without any charges being filed.

Following Ramadan's release, agents located a storage locker in Ann Arbor that had been rented in Ramadan's wife's name; Ramadan was listed as the emergency contact and had made rental payments.

The FBI obtained a search warrant for the storage unit, which it executed on August 23, 2017. Inside the locker, agents found ammunition and several firearms/rifles, as well as a silencer, riflescopes, and various gun parts and magazines. Two of the firearms – a Jennings .22 caliber handgun and a Ruger .22 caliber handgun – had obliterated serial numbers.

The FBI continued its investigation. It found evidence demonstrating that Ramadan stole the Jennings handgun. Moreover, multiple videos recovered from Ramadan's electronic media showed him firing his defaced Ruger with the silencer attached. In one video, Ramadan uses the silencer to fire his Ruger out of his apartment window in a residential neighborhood.

On August 25, 2017, the government filed a criminal complaint charging Ramadan with knowingly possessing a firearm with an obliterated

5

serial number and a warrant for Ramadan's arrest was issued.  Law enforcement arrested Ramadan and he appeared in Court for an Initial Appearance on August 26, 2017.

In anticipation of a detention hearing, Pretrial Services issued a report on August 28, 2017, recommending that bond be denied and Ramadan be detained pending trial:

> Due to the defendant's significant family ties overseas, his immediate family's impending relocation overseas, his continued possession of a United States passport, and that the defendant quit his job and dispossessed himself of most or all of his personal property in preparation to move overseas himself, Pretrial Services believes the defendant presents a serious risk of flight.
>
> * * *
>
> Due to the nature and seriousness of the instant alleged offense, in addition to conduct discovered at the time of arrest, Pretrial Services considers the defendant a risk of danger to the community.
>
> * * *
>
> In light of the above, Pretrial Services believes there is no condition or combination of conditions which would reasonably assure both the safety of the community as well as the appearance of the defendant at any future proceedings, if he were to be released on bond by this Court. Accordingly, detention is recommended.

[Pretrial Services Report, at p. 4 (Aug. 28, 2017)].

6

On August 29, 2017, Ramadan waived his right to a detention hearing and consented to detention pending trial.

However, on May 30, 2018, Ramadan filed a motion for release on unsecured bond. The government opposed the motion.

On July 10, 2018, the Honorable Marianne O. Battani – the judge presiding over this case until January 28, 2020 – held a bond/detention hearing. After lengthy argument from the government and defense counsel, Judge Battani denied Ramadan's motion for release, finding by clear and convincing evidence that no condition or combination of conditions would reasonably assure Ramadan's appearance or the safety of the community. [*See* ECF No. 98, PageID.1974].

In so finding, Judge Battani held – among other things – that: (1) this is a "very serious offense," because "why do[es] [one] have obliterated serial numbers except to avoid tracing these guns" [*id.*, PageID.1969-70]; (2) there is significant evidence regarding Ramadan's dangerousness and with respect to the charged crime since, although Ramadan says he is sympathetic to ISIS and does not believe in their desire to use physical force, "his actions really belie this because we know . . . in the storage locker there were the guns found, there were the parts of the gun that matched the gun that was stolen, there were explosives found, and . . .

7

there was testimony in prior hearings that the defendant could make a bomb in an hour if he had the materials [*id.*]; and (3) "I find by clear and convincing evidence that [Ramadan's] shooting out the window with a silencer on his rifle on a sunny day . . . from an apartment complex to a residential area shows me that he is clearly a danger to the community" [*id.*, PageID.1972].

Judge Battani also found that Ramadan "is a flight risk" because: (1) "he's not working[,] . . . he ha[s] no lease[,] . . . [and his] wife and children are out of the country [such] that he would have a desire to go [to them]" [*id.*, PageID.1973]; (2) having unapproved clothing that constitutes escape paraphernalia in his cell "is very concerning to the Court because it . . . look[s] like it's an effort that if he had an opportunity to escape he could take that opportunity" [*id.*, PageID.1973-74]; and (3) evidence of Ramadan's prior actions – e.g., Ramadan's history of taking pictures of the uniform and identification cards of a Customs officer and copying credit cards – "shows clearly that he could . . . create a situation where he could, in fact, impersonate such people and cause havoc in our airports, or he could create a situation where he could leave the country" [*id.*, PageID. 1972-73].

On April 13, 2020, Ramadan filed the Motion for Release.

8

## III. ANALYSIS

The Court reviewed the superseding indictment, transcript of the July 10, 2018 detention hearing, many of the parties' previous filings, and the parties' briefs on Ramadan's Motion for Release.

The Court may reopen a detention hearing if: (1) new information exists that was unknown to the movant at the time of the hearing; and (2) the new information is material to release conditions regarding flight or dangerousness. *See* 18 U.S.C. § 3142(f)(2)(B); *United States v. Watson*, 475 Fed. Appx. 598, 600 (6th Cir. 2012). Where the defendant is the movant, "the new information ***must be*** of a nature that would increase the likelihood that [he or she] will appear at trial and would show that [he or she] is less likely to pose a danger to the community." *Id.* at 600 (emphasis added).

Ramadan fails to address this standard in a meaningful way; he merely states that "the COVID-19 pandemic constitutes new information that was not known to the movant at the time of the hearing that would allow this Honorable Court to reopen the detention hearing." [ECF No. 181, PageID.2723]. Ramadan is incorrect.

The existence of the Coronavirus pandemic – and its effect on Ramadan's health and/or ability to meet with his attorney or prepare a

9

defense – is not material to either the likelihood that Ramadan will appear or to the risk posed to the public if he is released. *See United States v. Aiad-Toss*, No. 19-CR-00521, 2020 WL 1514482, at *2 (N.D. Ohio Mar. 30, 2020) (finding that "defense counsel's current inability to visit [defendant] in jail due to the COVID-19 virus is not a change in circumstances related to [defendant's] risk of flight or danger to the community").

Ramadan fails to demonstrate that the detention hearing should be reopened under 18 U.S.C. § 3142(f)(2)(B).

Alternatively, Ramadan says the Court has discretion to temporarily release him from detention under 18 U.S.C. § 3142(i).

Under § 3142(i), the Court "may" order the "temporary release of [a] person[] in [federal custody] to the extent that [the Court] determines such release [is] necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i).

Ramadan says a compelling reason exists for his release because "he [*thinks*] he [is] suffering from diabetes." [*See* ECF No. 185, PageID. 3312 ("[O]n January 2, 2020, long before the COVID-19 pandemic became an issue in this country, Defendant stated to [a] nurse practitioner . . . that he thought he was suffering from diabetes.") (emphasis added)].

10

At first, Ramadan claimed in his Motion for Release that he had both diabetes and chronic asthma. In response, the government established – through numerous medical records from 2014 to 2020, showing both negative tests and Ramadan's own affirmations – that Ramadan **does not** have diabetes, asthma, or other respiratory issues. [*See* ECF No. 183, PageID.2757-58]. Despite recognizing that he had been caught in a lie, Ramadan was reluctant to admit in his reply brief that he fabricated his medical conditions in his Motion for Release:

> It is true that the records do not show a history of being asthmatic or diabetic. However, that does not mean that Defendant is not suffering from those conditions. . . . In fact, on January 2, 2020, long before the COVID-19 pandemic became an issue in this country, Defendant stated to [a] nurse practitioner . . . that he **thought he was suffering from diabetes** and requested an A1c [sic] test be performed.

[ECF No. 185, PageID.3311-12 (emphasis added)]. On January 22, 2020, only three weeks after Ramadan requested an A1C test be performed, the Federal Bureau of Prisons administered an A1C test on Ramadan. [*See* ECF No. 184-6, PageID.3299]. The results – again – showed that Ramadan does not have diabetes; his A1C level was 4.9. Levels between 5.7 and 6.4 constitute "high risk"; above 6.4 is indicative of diabetes. [*Id.*]. Ramadan's statement that he has diabetes is entirely false, and his subsequent position that he "thinks" he has diabetes is far from a

11

compelling reason to justify his release where all available medical records undermine his baseless lay opinion.

Moreover, Ramadan failed to provide any justification in his reply brief for falsely claiming that he had chronic asthma. His fabrication of having asthma does not constitute a compelling reason for his release.

Ramadan falls far short of establishing that his medical conditions constitute a compelling reason for releasing him under 18 U.S.C. § 3142(i). The Court agrees with Ramadan that COVID-19 is a serious public health concern. The Court also acknowledges that, in certain circumstances, the threat of COVID-19 may constitute a compelling reason warranting the release of a defendant on bond.

However, having no extraordinary medical condition that puts him in a high-risk category for susceptibility to COVID-19, Ramadan must rely only on his generalized concerns of the COVID-19 pandemic – i.e., those threats that COVID-19 poses to the entire prison population. Courts deny motions when the concern of contracting COVID-19 is generalized. *See, e.g.*, *United States v. Tubbs*, Case No. 20-20161, ECF No. 23, PageID.239 (E.D. Mich. April 15, 2020) ("[T]he Court finds Defendant's generalized concerns about the risk of contracting the virus do not warrant his release pending trial under either § 3142 or § 3145(c) in light of the record in this

matter."); *United States v. Clark*, --- F. Supp. 3d ----, No. 19-40068-01-HLT, 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020) ("The court is mindful of the unprecedented magnitude of the COVID-19 pandemic and the extremely serious health risks it presents. But, in that context, a defendant should not be entitled to temporary release under § 3142(i) based solely on generalized COVID-19 fears and speculation.").

Ramadan also says the Court should release him under § 3142(i) because "the restricted access to computers caused by the prison administration's response to the pandemic makes it very difficult for [him] to prepare his defense." [ECF No. 181, PageID.2734]. This conclusory allegation is insufficient to demonstrate that his release is necessary to prepare his defense.

Ramadan fails to establish that he is entitled to release under 18 U.S.C. § 3142(i).

Moreover, independent of the fact that Ramadan failed to demonstrate a change of circumstances to warrant reopening the detention hearing and failed to establish that his release was necessary for a compelling reason or to prepare his defense under § 3142(i), Ramadan does not show that a condition or combination of conditions exist to reasonably assure the safety of his community or his appearance. Indeed,

13

in consideration of the factors set forth in 18 U.S.C. § 3142(g) – and for the same reasons expressed by Judge Battani during the July 10, 2018 detention hearing – the Court finds by clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of the community and Ramadan's appearance.

In addition to the reasons given by Judge Battani, the Court finds that Ramadan has a history of lying and engaging in deceitful and fraudulent behavior which makes him entirely untrustworthy. During the detention hearing and throughout its brief, the government set forth numerous instances of Ramadan's dishonesty. [*See* ECF No. 98, PageID.1945-48; ECF No. 183].

Ramadan made several additional untruthful statements to this Court related to his Motion for Release. Even though all of his medical records demonstrated that he does not have diabetes or asthma, Ramadan misrepresented to the Court that he had those medical conditions and they constituted a compelling reason necessitating his release.

Ramadan also made untruthful statements either (i) in his reply brief, (ii) in relation to his previous motion for release, or – the most likely scenario – (iii) in both instances. On June 11, 2018 – after filing his first motion for release on unsecured bond but before Judge Battani held the

detention hearing – Ramadan was caught with escape paraphernalia (i.e., a green duffel bag which the government says escapees use to lay across barbed wire fence, a black ski mask, and a black thermal shirt) in his cell. [ECF No. 98, PageID.1948-49]. When questioned about this paraphernalia in June 2018, Ramadan's explanation for how he obtained these items was that he found them lying next to a trash can and took them back to his cell. [*See id.*]. However, now – in his reply brief – Ramadan says "the green duffel bag was given to [him] by a correctional officer for him to use to bring his legal papers to court, and the black ski mask and black thermal shirt were already in the bag when he received it. . . . It is Defendant's position that he was set up by the correctional officer and that he never had the intent to escape." [ECF No. 185, PageID.3310].

It appears Ramadan has difficulty keeping his lies straight. While neither of Ramadan's stories seems even remotely plausible, there is no doubt that at least one of his stories is a complete fabrication of the truth.

Because the record is replete with instances of lies, deceitful activity and general untrustworthiness, the Court finds that Ramadan has no credibility and cannot be trusted. This further increases his risk of flight and the danger he would pose to the community if he were released.

## IV. CONCLUSION

Ramadan's Motion for Release [ECF No. 181] is **DENIED**.

**IT IS ORDERED**.

s/ Victoria A. Roberts  
Victoria A. Roberts  
United States District Judge

Dated:  May 7, 2020