```
 1                 IN THE UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3   UNITED STATES OF AMERICA,     )
                                   )
 4              Plaintiff,         )
                                   )      Criminal Case No.
 5   -vs-                          )
                                   )      2:17-cr-20595-VAR
 6   YOUSEF MOHAMMAD RAMADAN,      )
                                   )
 7              Defendant.         )
     _____

 8

 9                            MOTION HEARING
             BEFORE THE HONORABLE VICTORIA A. ROBERTS
10                  UNITED STATES DISTRICT JUDGE
           Virtual Hearing Via Zoom - Friday, January 15, 2021

11

12   APPEARANCES:

13   FOR THE GOVERNMENT:   HANK MOON, ESQ. and
                           DOUGLAS C. SALZENSTEIN, ESQ.
14                         United States Attorney's Office
                           211 W. Fort Street, Suite 2001
15                         Detroit, Michigan 48226
                           (313) 226-0220
16

17   FOR THE DEFENDANT:    ANDREW DENSEMO, ESQ.
                           Federal Defender Office
18                         613 Abbott, 5th Floor
                           Detroit, Michigan 48226
19                         (313) 967-5555

20   ALSO PRESENT:         Rania Hijazeen, Arabic Interpreter
                           Kody Bellamy, Pretrial Services
21                         Patricia Trevino, Pretrial Services
                           Essence Patterson, Judicial Law Clerk
22                         Linda Vertriest, Case Manager

23

24   REPORTED BY:          Darlene K. May, CSR, RPR, CRR, RMR
                           231 W. Lafayette Boulevard
25                         Detroit, Michigan 48226
                           (313) 234-2605
```

| 1 | TABLE OF CONTENTS | |
|---|---|---|
| 2 | PROCEEDINGS: | PAGE: |
| 3 | Appearances | 3 |
| 4 | Preliminary Matters | 4 |
| 5 | Arabic Intepreter Sworn | 4 |
| 6 | Court Addresses Plea and Discovery Issues | 4 |
| 7 | Remarks by Mr. Densemo | 4 |
|   | Remarks by Mr. Moon | 6 |
| 8 | Response by Mr. Densemo | 10 |
|   | Requests by the Court | 15 |
| 9 | Court's Ruling | 41 |
| 10 | Court Addresses Motion for Bond | |
| 11 | Argument by Mr. Densemo | 24 |
|   | Reply by Mr. Moon | 33 |
| 12 | Response by Mr. Densemo | 37 |
|   | Court's Ruling | 41 |
| 13 | Remarks by Ms. Trevino | 50 |
| 14 | Court Reporter's Certificate | 62 |

15

16

17

18

19

20

21

22

23

24

25

1           Friday, January 15, 2021

2           10:34 a.m.

3                           -- --- --

4           THE CLERK OF THE COURT:  The United States District

5   Court for the Eastern District of Michigan is now in session.

6   The Honorable Victoria A. Roberts presiding.  Calling the case

7   United States of America versus Yousef Ramadan, case number

8   17-20595.

9           MR. MOON:  Good morning, Your Honor.  Hank Moon on

10  behalf of the United States.

11          THE COURT:  Good morning.

12          MR. SALZENSTEIN:  And Doug Salzenstein on behalf of

13  the United States, Your Honor.

14          THE COURT:  Good morning.

15          MR. DENSEMO:  Good morning, Your Honor.  Andrew

16  Densemo on behalf of Yousef Ramadan.

17          THE COURT:  Good morning.

18          MR. DENSEMO:  Good morning.

19          THE COURT:  And Mr. Ramadan, we have an interpreter,

20  Ms. -- I'm sorry.  How do you say your name?

21          THE INTERPRETER:  Your Honor, Rania Hijazeen.

22          THE COURT:  Hijazeen, thank you very much.  And we'll

23  swear you in.

24          THE CLERK OF THE COURT:  Ms. Hijazeen, can you raise

25  your right hand?

1          Do you solemnly swear or affirm that you will

2  translate the questions and the answers put to this defendant

3  to the best of your ability?

4          THE INTERPRETER:  Yes, I do.

5          THE COURT:  All right.  Thank you.

6          And we also have present our court reporter, Darlene

7  May.  Thank you.  Kody Bellamy and Patty Trevino and one of my

8  law clerks, Essence Patterson.

9          All right.  There are a few things on this agenda this

10  morning for this hearing that we are going to talk about.

11  Whether Mr. Ramadan is going to plea and, if so, what would be

12  the terms of that.  There's issues concerning access at Milan

13  by counsel and Milan's response to that that I would like to

14  get on the record, and there's a motion for bond that

15  Mr. Densemo has made for his client.

16          For starters, Mr. Salzenstein, you in one of your

17  E-mails said that we were doing a lot of E-mail communications

18  and everything needed to be on the record.  I don't know that I

19  agree with that, but everything has been -- there haven't been

20  any ex-parte communications.  But I invite you to put on the

21  record and to file anything and everything that you think need

22  to be filed formally as part of the record.  All right?

23          MR. SALZENSTEIN:  Thank you, Your Honor.  I agree.  It

24  was just a precaution, I think, for the future to schedule a

25  hearing.  And I appreciate that, Your Honor, scheduling this

1  hearing today.

2         THE COURT:  All right.  Can someone update me first on

3  the likelihood of a plea here?

4         MR. DENSEMO:  Your Honor, I don't think that we can

5  give the Court an update on that.  Two days ago I received an

6  E-mail from Mr. Moon and Mr. Salzenstein that there was a

7  possibility of a conditional plea.  I then sent an E-mail to

8  Mr. Ramadan advising him that there had been an opening in

9  terms of the possibility of a conditional plea and I have not

10  had any conversations with Mr. Moon or Ms. Salzenstein about

11  what that conditional plea would look like.

12         Mr. Ramadan said that he is interested in seeing what

13  a conditional plea might look like.  So we are open to those

14  kinds of discussions, but we haven't had any formal discussions

15  regarding what the parameters of that plea agreement would be.

16  So at this point in time, Your Honor, we can say that we intend

17  to pursue that option or look into it, but that's about all

18  that I can say about that at this point.

19         THE COURT:  Okay.  All right.  Thank you.

20         And Mr. Moon, Mr. Salzenstein, do you have anything

21  more on that?  You did indicate, yes, you're open to a

22  conditional plea.  Do you have anything more on that right now?

23         MR. MOON:  Nothing further at this point, Your Honor.

24  From talking with Your Honor -- and the Court, we've offered

25  the conditional plea to appeal the suppression issue and are

1   waiting for Mr. Densemo to let us know what --

2           THE INTERPRETER:  Your Honor?

3           THE COURT:  Wait.  Wait, Mr. Moon.

4           THE INTERPRETER:  The interpreter apologizes and asks

5   the Court to go a little bit slower, if you please.  Mr. Moon

6   spoke a little bit too fast and there was sound issues for the

7   interpreter.

8           THE COURT:  All right.  Thank you.

9           So, Mr. Moon, can you start over and slow down.

10          MR. MOON:  My apologies.  As Your Honor indicated, the

11  government received permission for a conditional plea to allow

12  Mr. Ramadan to appeal the suppression issues, which is our

13  understanding of what he would like to appeal.  And we, as

14  Mr. Densemo said, have heard nothing back on that and are happy

15  to engage in those conversations.

16          THE COURT:  Are you waiting to hear from Mr. Densemo

17  or are you waiting to hear from someone else with the

18  government?

19          MR. MOON:  From Mr. Densemo, Your Honor.

20          THE COURT:  And he sounds like he's waiting to hear

21  from you.  So where's the breakdown here?

22          MR. MOON:  In our E-mail, we indicated that we would

23  offer Mr. Ramadan a conditional plea to appeal the suppression

24  issue if he's interested, to let us know if he's interested and

25  we will work out all the terms, and we never heard back.

1          MR. DENSEMO:  Your Honor, obviously, I've been -- I've

2     had some communications with Mr. Ramadan over the phone, but

3     those have been of a limited nature.  And they are unmonitored,

4     which is one of the things that we'll get into in the detention

5     hearing.

6          THE COURT:  You said and they have been monitored?

7          MR. DENSEMO:  There was one unmonitored phone call and

8     that was initiated with the assistance of the U.S. Attorney's

9     office and that is the phone call wherein I indicated to

10    Mr. Ramadan that the government indicated that there was a

11    conditional plea.  That they were willing to a conditional

12    plea.

13          But, obviously, we did not have the time or the

14    facilities to go into -- to have a lengthy, meaningful

15    conversation about that.  The government assumes that the only

16    issue that Mr. Ramadan is interested in appealing is the

17    suppression issue.  That is an incorrect assumption, I believe.

18    I believe that there are other issues that were raised during

19    the course of these proceedings that Mr. Ramadan would probably

20    be interested in appealing as well.  So I would have to talk to

21    Mr. Ramadan and find out exactly what other issues he'd be

22    interested in appealing and then get back with the government

23    to see if they had any objections to an appeal on those issues.

24    So there's still more work to be done.

25          THE COURT:  All right.  So I just want to make sure on

1   who is waiting on who.  It sounds like the ball is in your

2   court, Mr. Densemo, to have a discussion with your client and

3   then to get back with Mr. Moon.

4          MR. DENSEMO:  That's correct, Your Honor.  I agree

5   with that.

6          THE COURT:  All right.  And you want to have an

7   unmonitored call or a visit?

8          MR. DENSEMO:  I would like my client released and that

9   would obviate any need for a monitored call or for a visit at

10   the detention center.

11          THE COURT:  Okay.

12          MR. DENSEMO:  We could have unfettered access to one

13   another and have a real meeting between attorney and client.

14          THE COURT:  All right.  Can we spend a little bit of

15   time talking about these phone calls?  Because it's a broader

16   issue than this case that I would like to follow up on after we

17   have done -- are done with this.

18          Mr. Moon, your information from the warden is that

19   unmonitored phone calls are scheduled whenever attorneys

20   request them; is that true?

21          MR. MOON:  Yes, Your Honor.  And in a follow-up, I got

22   some numbers from the court.  In -- as the court indicated, in

23   December there were 32 legal or unmonitored calls and 15 legal

24   or unmonitored visits.  And that was, obviously, during the

25   COVID outbreak, for 47 in December.

1          Thus far in January, there have been nine legal visits

2    and 47 legal calls.  With an additional 17 legal calls

3    scheduled between now and January 22nd.  In total, Your Honor,

4    that's 120 legal calls or visits in the last six to seven

5    weeks.

6          I know Mr. Ramadan (sic) has had both a legal call and

7    a legal visit, that I'm aware of, with his client.  We've

8    provided the discovery log as well as Mr. Ramadan's request in

9    2020 for legal calls.  There were, I believe, five in March.

10   All were granted.  According to Milan, the only instance where

11   Mr. Densemo requested a call or visit and was denied was on

12   December 8th, 2020 when Mr. Ramadan was in isolation for

13   testing positive.

14         You know, finally, I would say there seems to be some

15   confusion over what is a recorded call and what isn't.  Inmates

16   are only allowed to place two types of calls.  Regular calls

17   that they generally make to their families.  Of course, they

18   can also call their attorney this way.  But any of those calls

19   starts with a very clear disclaimer that the call is monitored.

20   And, in fact, the other end or recipient of that call has to

21   hit a button to accept those terms before starting the call.

22         The only other option are legal calls, which are

23   always unmonitored.  So the only way that Mr. Densemo could

24   have been on an unmonitored call is if he or someone in his

25   office that answered the call acknowledged that it was

1   monitored and proceeded anyway.

2          I'm happy to go into further details on the discovery

3   issues or call logs.  Again, I've provided those.  Mr. Ramadan

4   has reviewed his discovery 80 times since he's been

5   incarcerated totaling hundreds of hours.  He was offered a

6   chance to review his discovery on December 29th and declined.

7          He reviewed it for three hours and 45 minutes on

8   November 24th and the logs indicated that there are no requests

9   of Mr. Ramadan to make a call or view his discovery that was

10  denied.

11         THE COURT:  All right.  Any response to that,

12  Mr. Densemo?

13         MR. DENSEMO:  Yes, Your Honor.  I just began using

14  monitored phone calls.  And this was at the insistence of

15  Mr. Ramadan who advised me that our calls were being monitored.

16  Now, Mr. Moon is correct that there is a recorded voice that

17  tells you at the beginning of the call that the calls may be

18  monitored.  And I typically in the past have indicated that

19  this is an attorney/client phone call and the call should not

20  be monitored to advise the official that what they are

21  listening to is a privileged communication.

22         THE COURT:  May I just interrupt for a moment?  So are

23  there magic words that have to be said?  You said it's a

24  recording, Mr. Moon.  What has to be said in order to make sure

25  that the call does not get monitored?

1       MR. MOON:  Well, again, I think there's some confusion

2   over monitoring.  The call is recorded automatically by a

3   computer system.  In terms of monitoring, we have never

4   requested, at least to my knowledge, Mr. Ramadan's recorded

5   phone calls.  Certainly since I have been on the case in the

6   last year and, to my knowledge, nobody has listened to them.

7       So by monitored I mean they are recorded by a computer

8   system.  That is different from listened to or reviewed -- and,

9   again, I can't speak for Milan.  I don't represent them.  But

10  certainly for Mr. Salzenstein, myself, the agents investigating

11  this case, we have not obtained Mr. Ramadan's phone calls.  At

12  least in the last year since I have been active on the case.

13      THE COURT:  So, Mr. Moon, for me to be clear, is

14  everything, then, recorded, even monitored and unmonitored?

15  What gets recorded?

16      MR. MOON:  The nonlegal calls get recorded.

17      THE COURT:  Okay.

18      MR. MOON:  So when an inmate wants to call out from

19  the facility -- I believe during COVID they have 500 minutes in

20  a month.  They go to the kind of open phone banks and they make

21  a monitored calls.  Whenever an attorney or the inmate requests

22  a call with his attorney, they go to a separate room to an

23  unrecorded, unmonitored line.  And, of course, the government

24  never has access to those nor are they recorded.

25      You know, Mr. Densemo can state what he would like at

1   the beginning of a computer recorded phone call, but the

2   computer is going to record that phone call regardless of what

3   he says.

4          THE COURT:  Okay.  All right.

5          Just to be clear, Mr. Densemo, I'm sure you know there

6   is a separate bank of phones that are to be used by your

7   client?

8          MR. DENSEMO:  I know that now, Your Honor.

9          THE COURT:  You didn't know it before.  All right.

10          So, Mr. Moon, when a lawyer -- okay.  A separate bank

11   of phones for an inmate to go to to make a legal call.  When a

12   lawyer wants to call in on a legal call, how does that happen?

13          MR. MOON:  The attorney can contact the facility.  And

14   there's a legal guide that was just updated in January of this

15   year.  He can call the case managers for Mr. Ramadan and they

16   will facilitate and set up that call.  So it goes either way.

17   Either Mr. Ramadan can request of his case handlers or

18   Mr. Densemo can call or E-mail and request a call or visit that

19   way.

20          MR. DENSEMO:  Your Honor, that sounds good in theory,

21   but that's not what happens in practice.  Mr. Ramadan has

22   requested monitored phone calls.  They have gone -- they have

23   been ignored.  I have sent E-mails to counsel -- to the

24   counselor at the facility and there are sometimes I haven't

25   even gotten a response from these counselors.  I've had to ask

1  my legal assistants if they will contact the counselors because

2  the counselors seem hesitant or unwilling to return my E-mails.

3          And this has been done for both visits -- for visits

4  for days other than Mr. Ramadan's visits on Fridays and Sundays

5  and for unmonitored phone calls.  So in theory all of this

6  sounds very good, but it doesn't work that way in practice.

7  And not only for me, but there are other attorneys in my office

8  who are having the same experience and attorneys in private

9  practice are having the same experience.

10          These counselors are inundated with work.  And getting

11  to -- responding to requests for an unmonitored phone call

12  sometimes goes unanswered, oftentimes goes unanswered.  I've

13  gotten very frustrated with counselors not returning an E-mail.

14  Not responding to my requests to see and meet with my clients.

15  Not only Mr. Ramadan, but there are other clients at Milan as

16  well.

17          So what the facility is telling the U.S. Attorney's

18  Office and the Court, it is the same thing.  I had no problem

19  getting an unmonitored phone call with Mr. Ramadan when the

20  U.S. Attorney's Office was involved or when the probation

21  department and pretrial services is involved.  Once these

22  individuals at the facility see that there is someone looking

23  at how they are conducting their business, then all of a sudden

24  they're sufficient.  But if there are no eyes on them, then

25  they don't operate in the same way.

1          Now, as to the representations about my contact with

2     Mr. Ramadan in December, I attempted to see Mr. Ramadan at the

3     beginning of December and was turned away because there was a

4     hundred -- the west unit had been shut down because a hundred

5     inmates had tested positive.

6          Then, a week later, we received two E-mails.  No

7     visits.  No contact.  Nothing.  No phone calls.  So these

8     representations about access are false.  There was no contact

9     in December with inmates at Milan.  And I can send the U.S.

10    Attorney's Office and the Court the E-mails saying you cannot

11    call your client, you cannot see your client and they can't

12    call or see you or anyone else for that matter.  We have an

13    outbreak here.  There's no one in.  No one out.

14          So these representations that the BOP is giving the

15    government, that sounds good.  I didn't see that in operation.

16          MR. MOON:  Your Honor, may I respond just very

17    briefly?

18          THE COURT:  Just give me one moment, Mr. Moon.  So in

19    our E-mail communications, Mr. Densemo, I did ask that you go

20    back to your office.  I think you had already told the Court

21    about a contact that Mr. Minock had tried to make --

22          MR. DENSEMO:  That's right.

23          THE COURT:  -- that was not successful.  And I've

24    asked that in order to follow up on this, because it's not

25    going to be resolved in this hearing.  I think that there is an

1    important issue of access being raised that should be examined.

2    But I think that the attempts that you're talking about that

3    people have made where they have been denied, they need to be

4    documented.  And so, what about that?

5              MR. DENSEMO:  I've asked -- I've talked to Mr. Leon

6    Parker who expressed similar concerns or similar situations

7    that he's had.  Rafael Villaruel has indicated that he was

8    going to contact the Court as well.  I believe there may have

9    been one or two other attorneys in my office who indicated that

10   they were going to contact the Court.  If they haven't, I will

11   urge them to immediately contact the Court with their

12   experiences regarding access at Milan.  But I did have

13   conversations with Mr. Villaruel and Mr. Parker regarding this

14   issue.

15             THE COURT:  Okay.  So Mr. Densemo, can I ask that this

16   be a little more formal and rather than I get an E-mail or call

17   from someone --

18             MR. DENSEMO:  Absolutely.

19             THE COURT:  -- could your office capture everything

20   and send it out together?

21             MR. DENSEMO:  I will talk to Mr. Carter, the head of

22   our office, Your Honor, and ask him to formalize a letter to

23   the Court with instances where we have had difficulty obtaining

24   access with our client.

25             THE COURT:  All right.  Thank you.

1          Mr. Moon, yes?

2          MR. MOON:  Two points, Your Honor.  First, in regards

3    to global access at Milan, you know, that is clearly beyond

4    this case.  Not that it's not an important issue.

5          THE COURT:  Right.

6          MR. MOON:  I don't represent Milan and I certainly

7    don't speak for our office.  I've tried to provide the

8    information that I can, you know, about the 120 calls and

9    visits.  But beyond that, I don't have much authority there and

10   I would somehow request that that -- if it's a larger issue, be

11   raised as a larger issue.

12         THE COURT:  Yes.  What's your second point?

13         MR. MOON:  To Mr. Ramadan in particular, Your Honor, I

14   provided the discovery logs and his requests.  The court -- or

15   the facility writes down every time he's requested a legal

16   call.  The Court monitors his discovery on an individual basis.

17   And it isn't the first time that Mr. Ramadan has made these

18   claims.

19         In August of 2019 in front of Judge Battani,

20   Mr. Ramadan claimed that he was denied access to his discovery

21   for two or three months.  But if you look at the discovery log,

22   he had access to his discovery 14 times in that three-month

23   period, totaling 75 hours worth of access.  So Mr. Ramadan

24   keeps making these claims that are provably false, that are

25   demonstratively false.

```
 1              You know, you have seen them yourself with his health
 2   issues.  And every time he makes these claims, the government
 3   spends hours running them down.  It's not just those issues.
 4   He's claimed that he was beaten before.  He's claimed that he's
 5   had money and gold jewelry stolen from him.  He lied about his
 6   escape paraphernalia.  In every one of these issues, the
 7   government is left to prove a negative and we do so and we
 8   present that evidence with nothing that we can argue about.
 9              Again, we haven't seen a single E-mail or phone call
10   that went unanswered or a single incident of Mr. Ramadan being
11   denied access to anything.
12              MR. DENSEMO:  Well, I'm telling you he's been denied
13   access and I'm not lying to you.  I'm telling you there have
14   been instances where I haven't had access to him and I couldn't
15   see him and weeks have gone by that we haven't talked and I
16   haven't gotten a phone call or an E-mail from him.  So I'm
17   telling that you that there have been access issues and that he
18   has constantly complained to me about being unable to review
19   his discovery or being moved out of the discovery room because
20   he had to go to the bathroom and being told, well, since you
21   left the discovery room, you are no longer able to review your
22   discovery.  Simply because he had to go and use the bathroom or
23   because he was hungry or some other excuse that the BOP made to
24   get him out of the discovery room and move another inmate in.
25              There are 300 inmates at that facility all wanting to
```

1  use two or three computers.  And so there is this rush for all

2  of these inmates to try and get in and help themselves on their

3  cases as much as they can.  There have been times when

4  Mr. Ramadan asked for access to the discovery and was told it

5  was unavailable or he couldn't get in because other people were

6  there.

7         This whole issue of Mr. Ramadan is lying and you can't

8  trust him, well, I'm telling that you I have had problems with

9  access to my client on several occasions and I'm not lying to

10  you.

11         THE COURT:  Okay.  I agree with you, Mr. Moon, that

12  these access issues are broader than Mr. Ramadan and that's why

13  I've asked Mr. Densemo to go back to his office and have

14  Mr. Carter document the complaints that Mr. Densemo has in the

15  Ramadan case as well as the complaints that other officers of

16  the court say that they have had with access.  So I think we

17  can move on.

18         But once I get that and deal with it within our court,

19  whom from the U.S. Attorney's Office or Bureau of Prisons,

20  Milan, should we be in touch with?

21         MR. DENSEMO:  Well, apparently, it appears to be

22  Mr. -- I'm sorry.

23         THE COURT:  No.  No.  I'm talking to Mr. Moon or

24  Mr. Salzenstein.

25         MR. DENSEMO:  All right.

1       THE COURT:  Mr. Moon, are you frozen?  Are you there?

2       MR. MOON:  I'm sorry.  I was frozen there for a

3   moment.  I heard once I get that whom.  I'm assuming you're

4   asking whom in my office would you contact?

5       THE COURT:  Yes, exactly.  Yes.

6       MR. MOON:  I would recommend contacting the criminal

7   chief, Mark Chutkow.

8       THE COURT:  Okay.

9       MR. MOON:  He's aware of these issues through this

10  case and I think he or the deputy, Ben Coats, would be in the

11  best position to address those.

12      THE COURT:  Okay.  All right, then.  Thank you.

13      Maybe, Mr. Moon, if I could just ask you, if

14  Mr. Chutkow is already aware, then, perhaps he's already aware

15  of the information you have provided to me through the E-mails

16  and so can you make sure that he has all of that to bring him

17  current and then we will move outside of the realm of this case

18  and try to address the access issues.

19      MR. MOON:  Yes, Your Honor.

20      THE COURT:  All right.  Thank you.

21      All right.  So we've talked about the plea.  We know

22  the plan there.  We've talked about Milan.

23      I did ask -- there wasn't ...

24      Mr. Densemo, your client has his hand up.

25      MR. DENSEMO:  Yes.  I saw that, Your Honor.  I think

1    he wants to address the Court.

2           THE COURT: Do you want him to address the Court?

3           MR. DENSEMO: I think he wants to talk about the

4    conditions at Milan, Your Honor.

5           THE COURT: All right. I don't know that I want to do

6    that, generally.

7           Mr. Ramadan, I'm not prepared to do that right now.

8    So let me move on with what we have here to address as part of

9    this hearing.

10           When we were on the telephone conference last time

11    there was a -- we did talk about guideline calculations. I did

12    ask Kody Bellamy to take a look at those calculations in

13    addition to what had been done by Mr. Moon and done by

14    Mr. Densemo. I know this agreement between Mr. Moon and

15    Mr. Densemo on what those calculations should be, but the

16    preliminary calculations that I got back from Mr. Bellamy were

17    an offense level of 24, criminal history category of one and

18    guideline range of 51 to 63 months.

19           Is that correct, Mr. Bellamy? Thumbs up?

20           PRETRIAL SERVICES REPRESENTATIVE: Yes, Your Honor.

21    That's correct.

22           THE COURT: All right. Thank you. I just wanted to

23    share that with you, counsel.

24           All right. Is there anything more before we talk

25    about the motion for bond?

1      MR. DENSEMO:  No, Your Honor.

2      THE COURT:  Mr. Moon, do you have anything else?

3      MR. MOON:  Your Honor, before I close that last issue,

4  I just wanted to let Your Honor know that Milan did indicate

5  that they would provide the Court twice weekly updates on the

6  conditions at Milan.  Again, those won't go through me.  They

7  should go directly from Milan to the Court.

8      THE COURT:  Yeah.

9      MR. MOON:  But I'm happy to provide contact

10 information there.  I was also told to share that there are

11 currently zero COVID cases among inmates at the detention

12 center and that's all the knowledge I have on that issue.

13     THE COURT:  All right.  Thank you.  We were getting

14 weekly reports from Milan.  They were going to David Weaver.

15 He was sharing them with all the judges and then they just

16 stopped.  But that information was very helpful as we were

17 handling these COVID cases coming out of Milan And I'm glad

18 that it's going to resume.  I know that our new court

19 administrator Ms. Essix has been in touch with someone at Milan

20 and I'm glad they're going to resume.

21     MR. DENSEMO:  Your Honor, if I may, I know the Court

22 wants to move on, but I'd like Mr. Ramadan to respond to that

23 very last statement made by Mr. Moon in that there are zero

24 cases at the detention center.  I would like to find out if

25 that's his understanding.

1      I mean, he's -- Mr. Ramadan is in the unit with these

2   individuals.  He can see who is being isolated and who is

3   testing positive.  So I would just like to get -- have him

4   respond to that because I don't know.

5           THE COURT:  I'll give your client a few moments, but I

6   don't want to spend a lot of time on that.

7           MR. DENSEMO:  I understand, Judge.

8           THE DEFENDANT:  I will thank everybody to schedule

9   this hearing first and to give me the time.  And, actually, you

10  know, we still have COVID cases here and there's still

11  isolation.  I think at least in the west unit here, you know,

12  they have -- they move the individual to a different area.  And

13  if you want, I can call the health service right now.  She's in

14  front of the door.  I can call her to the door about this.

15          MR. DENSEMO:  You just tell the judge what you know

16  about COVID cases in your unit?

17          THE DEFENDANT:  Okay.  So currently we just finished

18  the lockdown for the COVID.  And we have, I believe, zero cases

19  in that unit.

20          But I would like to address that phone call -- I mean,

21  the phone calls and about the attorney phone calls.  All the

22  numbers that Mr. Moon he was talking about in December, this

23  only has been in the east side and not the west side.  Because

24  the west was locked down.  No phone calls coming out.  Nobody

25  come here.

1    THE COURT:  Okay, Mr. Ramadan, I don't want to be

2    rude, but I don't want to go back to the phone call issue, I

3    think Mr. Densemo has sufficiently addressed it.  I don't have

4    all the information that is necessary to go back to the other

5    judges and see if there is anything that we want to do at the

6    bench, but that's how I'm leaving it right now.

7    I have enough information on your case and I would now

8    like to move to the motion for bond.  And I would like to hear

9    from Mr. Densemo.  Thank you.

10   MR. DENSEMO:  Thank you.

11   THE DEFENDANT:  Okay.

12   MR. DENSEMO:  Your Honor, before I do that, what

13   Mr. Ramadan said was pretty interesting.  If, in fact, the data

14   that Mr. Moon quoted was data from one unit, the east unit and

15   not the west unit, then the BOP is deliberately providing the

16   U.S. attorney and the courts false information.  So that should

17   be looked into.  I think that is pretty serious.

18   Because the government has relied and indicated to the

19   Court that there is access and here are the numbers.  But if

20   the numbers are coming from the east unit which was open and

21   not the west unit, that's deceptive and deliberately

22   misleading.

23   Now, as to the bond, Your Honor.

24   THE COURT:  Mr. Ramadan, can you put your mute on?

25   THE DEFENDANT:  (Complies.)

1           THE COURT:  Thank you.

2           MR. DENSEMO:  Shall I proceed, Your Honor?

3           THE COURT:  Yes, please.

4           MR. DENSEMO:  By our calculations Mr. Ramadan has

5   probably served the time he would have been required to serve

6   if he had been sentenced to around five years.

7           With the addition of sentencing credits and halfway

8   house or home confinement, Mr. Ramadan has served more than the

9   time he would have been required to serve given the additional

10  sentencing credits built into the First Step Act.  Eighty-five

11  percent of a 57-month sentence, which in this case would be a

12  midpoint of the guidelines, is 48 months.  Six months halfway

13  house or home confinement placement would mean that Mr. Ramadan

14  would be released from custody next month or possibly this

15  month.

16          Each additional month Mr. Ramadan spends in custody

17  means that he may be serving a longer prison sentence under the

18  most dire circumstances than the law requires.

19          THE COURT:  Mr. Densemo, may I just interrupt you one

20  moment?  I just want to make sure.

21          Mr. Moon, you continue to oppose this motion for bond?

22          MR. MOON:  Yes, Your Honor.  That's correct.

23          THE COURT:  Okay.  All right.  Go ahead,

24  Mr. Densemo.

25          MR. DENSEMO:  And what if Mr. Ramadan's acquitted at

1  trial?  All the time he's spent in custody can't be returned to
2  him.  All the special events in our lives that we often take
3  for granted will continue to pass him by as he languishes in
4  custody waiting for the court's reopening and wondering where
5  in the long line of individuals waiting for trial will he be
6  placed.  Some may adopt a position that he's guilty anyway.  So
7  let him sit there until next year if need be.  I know that is
8  not the view of this Honorable Court.

9          Punishment has already been meted out.  Our message to
10 the community has already been sent.  If spending nearly four
11 years in prison and contracting a deadly virus doesn't deter
12 criminal conduct, little else will.  Not being with your family
13 and being deprived of a normal life for nearly four years truly
14 insensitives law abiding conduct.  If Mr. Ramadan were released
15 today and never served another day in prison, it would be hard
16 to argue that he had not already received a great deal of
17 punishment for any unlawful conduct.  The question becomes how
18 much more punishment does he deserve.

19         In *United States versus Spano* at 476 F.3d 476, a
20 Seventh Circuit case, the court held that conditions of
21 confinement is a valid 3553(a) consideration.  Recognizing that
22 sentencing judges can take into account the harshness of prison
23 conditions when assessing the severity of the sentence.

24         In the *United States versus Indarte*, 17-5554, Westlaw
25 6060299 from the Western District of Washington.  It's a 2020

26

1  case.   The court held that:   "The factors relating to the need

2  for just punishment has dramatically shifted and that lockdown

3  measures have made confinement much more punitive than was

4  contemplated."

5       In *United States versus Noriega*, the court stated

6  that: "Segregated confinement is a more difficult type of

7  confinement than in general populations.  For some, the

8  consequences of such depravation can be serious."

9       Consider also that the government has for the past

10 41 months consistently advised Mr. Ramadan that he will also

11 face prosecution in the state of California for citizenship

12 fraud.  If this threat is carried out, Mr. Ramadan will be

13 incarcerated for another year or more and enduring the same

14 depravations -- sickness and diseased surroundings.

15      For an entire month or more, Mr. Ramadan has had no or

16 very limited access to his attorney, legal materials or law

17 library, because of the spread of the coronavirus in the

18 detention center he was exposed to and contracted the virus.

19 In addition to the lockdown that was already in place, he was

20 subjected to a 10 to 14-day quarantine where he had even less

21 access to anything or anyone than he had before.

22      Even now, unmonitored phone calls are not easily set

23 up.  Monitored phone calls are, obviously, not private and are

24 a short duration.  Attorney visits have supposedly resumed but

25 at what cost to defense counsel and the family and community

1   the attorneys return to.  No one was advised that Mr. Ramadan
2   had tested positive.  As a result, I met with Mr. Ramadan
3   unaware of the risk to my health in doing so.  Mr. Ramadan
4   would not have been retested if not for court intervention.
5           The government has argued that Milan and BOP
6   facilities are safe since the beginning of the pandemic.  This
7   was and continues to be false prophesy.  The expansive threat
8   of the coronavirus within federal, state and local prisons
9   proves that the virus goes wherever people are gathered
10  including and especially in close --
11          THE INTERPRETER:  Your Honor, the interpreter requests
12  Mr. Densemo go a little bit slower, if you mind.
13          MR. DENSEMO:  I'm sorry.  I will.
14          THE INTERPRETER:  Thank you.
15          THE COURT:  Thank you.
16          MR. DENSEMO:  There's no BOP exemption for the
17  coronavirus.  The effects of the virus within the BOP has been
18  the severe limitation of access of inmates to their attorneys
19  and families because of safety protocols and recurring
20  lockdowns.  This has given the government even more of an
21  advantage in the prosecution of pretrial detainees than they
22  had before.
23          Studies have shown that pretrial detainees are more
24  likely to be convicted and receive higher sentences on average
25  than defendants on pretrial release who are charged with the

1    same offenses with similar criminal history.

2         Mr. Ramadan has been chastised by BOP officials for

3    bringing the lack of contact between he and I to the Court's

4    attention via this bail proceeding.  He feels reprisals may be

5    forthcoming.  The government will likely brush this off as

6    prison paranoia of Mr. Ramadan's untrustworthiness in reporting

7    on these matters.  Despite the skepticism, Mr. Ramadan is truly

8    afraid that should this bond motion fail and he is left in the

9    custody of the detention center, a reason will be found to

10   place him in the special housing unit where he will be isolated

11   and have even less access to his attorney, legal materials and

12   law library.

13        Mr. Ramadan is not a career or armed career criminal.

14   He does not have a felony conviction.  Mr. Ramadan has never

15   been incarcerated in his life from being -- was never

16   incarcerated in his life before being charged in this case.

17   Mr. Ramadan doesn't even have a misdemeanor crime of violence.

18   He doesn't have a history of missed court appointments, traffic

19   warrants, probation or parole violations.  He doesn't have a

20   history of substance abuse.  He doesn't have any DUI offenses.

21   No domestic violence offenses.  He doesn't have any connections

22   or associations with gangs or organized crime.

23        He has a 10 to 15-year history of employment. He is

24   married with four children.  He has strong ties to the

25   community and after three and a half years there's no evidence

1   that he has ever done anything to jeopardize the safety of U.S.

2   citizens through acts of support of anti-government groups or

3   organizations.

4        Mr. Ramadan's name and religion didn't justify his

5   detention in 2017 and they still do not support his detention

6   41 months later.  The government's stated reasons for detaining

7   Mr. Ramadan have all expired.  They do not have an

8   indeterminate shelf life.  The prosecution has argued against

9   Mr. Ramadan's pretrial release using a set of factors

10  antithetical to the mandates of Bail Reform Act.  The nature of

11  the offense and the history and characteristics of the

12  individual have become subordinate to suspicion and

13  speculation.

14       There once was a man named Arif Nagi, Arif, A-r-i-f.

15  Nagi, N-a-g-i.  And Arif Nagi was the lead defendant in a

16  91-defendant case, United States versus the Highway Motorcycle

17  Club or motorcycle gang.  Mr. Nagi filed three bond motions in

18  his case.  He was held in custody approximately 36 months.  He

19  finally filed an interlocutory appeal.

20       In his appeal, the Sixth Circuit said Mr. Nagi argues

21  that he presented sufficient evidence to rebut the presumption.

22  The Court of Appeals says we do not agree.  The presumption

23  does not banish simply because the defendant comes forward with

24  evidence to rebut it where the presumption to banish given too

25  little deference to congress's finding regarding this class.

1          The court found, however, that Mr. Nagi should be

2    released because he had spent too much time in custody in

3    pretrial detention.  The court says a period of pretrial

4    detention as long as Nagi weighs in favor of finding a due

5    process violation, but it's not dispositive.  The second

6    factor, the extent of the prosecution's responsibility for

7    delay also weighs in Nagi's favor.

8          The government must bear some responsibility for the

9    more than two-year delay between Nagi's arrest and the

10   superseding indictment.  The charges against Nagi are serious,

11   but they do not include the even more serious conspiracy to

12   commit murder charges that some of Nagi's co-defendants face.

13   Some of whom remain free on bond and none of whom have spent

14   anywhere close to a three plus year --

15         THE INTERPRETER:  Your Honor, the interpreter requests

16   Mr. Densemo go a little bit slower.  The camera is away from

17   his mouth so the interpreter is not even able to see -- to read

18   the pronunciation of what is happening and it's very difficult

19   to go this long with the sound issues on the mic.

20         So the interpreter is just asking, please, the court,

21   to just go a little bit slower so she is able -- so the

22   interpreter is able to give an accurate interpretation.

23         THE COURT:  Thank you.

24         Mr. Densemo, can you address your -- adjust your

25   camera so that she can maybe be aided by reading lips where

1 necessary.

2 MR. DENSEMO: Okay. That's fine, Your Honor.

3 Mr. Nagi was eventually -- was -- the court ruled in

4 Mr. Nagi's favor that the three year period of detention that

5 he had been in was a due process violation. Mr. Nagi -- the

6 case was sent back. Judge Edmunds released Mr. Nagi on bond.

7 Two years later Mr. Nagi was sentenced.

8 Mr. Nagi, Your Honor, was sentenced to 340 months on

9 Count One; 324 months on Count Two; 10 years concurrent -- five

10 years concurrent on Count 16; 324 months concurrent on Count

11 19; 10 years consecutive on Count 31.

12 Mr. Ramadan isn't facing anywhere near that kind of

13 time. Despite the fact that Mr. Nagi was looking at a

14 substantial period of incarceration, the Court of Appeals says

15 three years in custody is too long.

16 There is no end in sight for this case. The Court is

17 not responsible and cannot control the court reopening. We are

18 all waiting for some relief in terms of this pandemic. But we

19 don't know when Mr. Ramadan's case is going to be set for

20 trial. No one knows. We don't know when the court is going to

21 reopen, Your Honor. So conceivably, this case can stretch into

22 the end of this year or possibly into next year.

23 Are we going to continue to allow use of Mr. Ramadan

24 to remain in custody for another six months to a year? For

25 another month?

1         As I indicated, Your Honor, this is a presumption case

2 in favor of Mr. Ramadan. You have a man with a misdemeanor

3 conviction for a -- receiving Social Security benefits. In any

4 other circumstance, Mr. Ramadan would have been released. This

5 is the only client that I have ever represented in 30 years who

6 has been in custody this long for this kind of offense with the

7 background that Mr. Ramadan has. It is mind boggling to me

8 that this client is still in custody. He should not be.

9         Every measure that has ever been utilized says that

10 Mr. Ramadan should be released. He should have been released a

11 long time ago. And if the reasons that the government

12 proffered in 2017 were viable then, they're not viable now.

13 That was four years ago, Your Honor. How long are we going to

14 let the government get away with using the same tired

15 rationale? Are we going to allow this rationale to continue

16 into next year and into the following year?

17         The Sixth Circuit said in Mr. Nagi's case enough is

18 enough. Despite the violence of the highwaymen, despite the

19 violence charged in the indictment, despite the violence

20 associated with Mr. Nagi or alleged against Mr. Nagi, enough is

21 enough. Long enough is long enough and you have to release

22 him.

23         If you put all of that together, Your Honor, with the

24 time that he's been in custody and the problems that

25 Mr. Ramadan and I are having and other defense attorneys and

1   their clients are having with an inmate participating in their

2   defense, having access to their lawyer, receiving the effective

3   assistance of counsel, Mr. Nagi -- I'm sorry.  Mr. Ramadan must

4   be released today, Your Honor.  As the Sixth Circuit indicated

5   there's -- due process requires his release.

6           Thank you, Your Honor.

7           THE COURT:  Thank you.

8           Mr. Moon, response?

9           MR. MOON:  Yes, Your Honor.  Preliminarily, obviously,

10   the detention facility was not going to disclose Mr. Ramadan's

11   sensitive medical history to anyone outside of Mr. Ramadan and

12   that would include his attorney.  Mr. Ramadan knew that he

13   tested positive and he could have shared that with Mr. Densemo

14   at any point.  But I don't think anybody's asking the prison

15   officials, the Bureau of Prisons, to share medical information

16   outside a patient without their request.

17           As for his due process argument, this is the first

18   time he's made that argument.  It's not in either of his

19   earlier motions --

20           MR. DENSEMO:  That's not true.  Mr. Moon, I beg to

21   differ.  It is.  I said in my motion enough is enough and he's

22   been incarcerated long enough.  So this is no surprise to you.

23           MR. MOON:  Mr. Densemo, I'm speaking.

24           THE COURT:  All right.  Excuse me.  So Mr. Densemo,

25   you'll have an opportunity to respond, but please don't

34

1    interrupt.  Thank you.

2              MR. DENSEMO:  All right.

3              MR. MOON:  He did not cite the due process clause or

4    this *Nagi* case.  And we're left with the facts here.  And the

5    first, obviously, Mr. Ramadan, Mr. Densemo, the Court and the

6    government is concerned with the time that Mr. Ramadan has

7    spent in prison.  But there's two aspects to that.  The first

8    are, A, his guidelines, and B, what he will be sentenced to.

9              We don't know what his guidelines are.  The government

10   believes they will be higher or will push for them to be

11   higher.  And even if they aren't, given the facts of this case,

12   the government will ask for a sentence above 41 months.  So we

13   don't know what the Court will do in that regard.

14             And second, contrary to the *Nagi* case, we have to look

15   at the delay here.  Mr. Densemo keeps saying that this is a

16   four-year delay and that's -- first, it's 40 months to be fully

17   accurate.  But even then, the overwhelming majority of that

18   delay is on Mr. Ramadan.  Mr. Ramadan kept pushing his trial

19   date.  As I mentioned, in December of 2019 Mr. Densemo filed a

20   bond motion -- or filed a motion asking to push the trial date

21   once again.  That was two years after he had been arrested on

22   these charges.  He claimed that he didn't have access to his

23   discovery at that time.  But as the discovery logs have shown,

24   he viewed his discovery for 75 hours in the three months prior

25   to that motion.  Those allegations simply aren't true.  And the

1   government opposed that request and asked Judge Battani to set

2   this or to keep the trial date in 2019, which would have

3   mitigated this entire issue.  Judge Battani, I believe over her

4   better judgment, decided to give Mr. Densemo the extra time and

5   that brought us into COVID time.

6         And certainly these are difficult times.  They are

7   times that are beyond our control, but they don't obviate or

8   they don't require Mr. Ramadan's release.

9         As we pointed out in our motion, Mr. Densemo has not

10  actually cited any grounds for either reopening this hearing or

11  for the defendant's release.  If you look at 3142(f), that

12  requires new information material to Mr. Ramadan's either risk

13  of flight or detention as Your Honor already found in this case

14  last year.  He provided nothing on that.

15        The other issue is 3142(i), temporary detention.  And

16  this issue was already decided upon by the Sixth Circuit in

17  this very case in which they held, quote, temporary release is

18  not warranted when a defendant has had ample time to prepare

19  his defense even given the practical limitations on his access

20  to telephones and the attorney conference room, end quote.

21        Again, that's the Sixth Circuit in this case.  The

22  government has provided evidence that Mr. Ramadan has reviewed

23  his discovery for hundreds of hours.  And there's no evidence

24  in this record besides the brief period in December when

25  Mr. Ramadan was in quarantine and the facility was admittedly

1    slowed down, shut at times, that he's ever been denied access
2    to discovery or his counsel.
3          So really we're left with Mr. Ramadan's pleas that he
4    should be out of jail because he served 40 months.  And, again,
5    that neither applies to any support in the law, but also
6    completely ignores the danger and flight risk that Mr. Ramadan
7    poses that Mr. Densemo simply ignores.  The thousand ISIS
8    images and videos that were found on his person.  The export
9    control items he tried to take out of the United States and
10   tactical gear, body armor, TASERs, knives, clips, a gas mask,
11   the stolen firearm that Mr. Ramadan himself stole, the two
12   firearms with obliterated serial numbers.
13         The homemade silencer that Mr. Ramadan filmed himself
14   shooting out the window of an apartment complex, his making
15   homemade pipe bombs, the storage locker full of weapons, all
16   completely ignored by Mr. Ramadan.  We talk about his flight
17   risk.  His family is not in the United States and Mr. Ramadan
18   is a dual citizen and there's no reason to believe he wouldn't
19   leave if he had a chance.  He was caught with escape gear in
20   his cell at Milan.  And when asked about it, gave two different
21   stories to two different judges, including yourself, Your
22   Honor.
23         Finally, his repeated lies to the Court have to be
24   taken into consideration.  At every opportunity he has misled
25   this Court and there's no reason to believe that would change

1   should he be released on bond.  The government working with

2   defense counsel has done everything we could.  We offered a

3   bench trial, as the Court is well aware, to Mr. Ramadan and he

4   responded he would only take that if we granted him bond and

5   provided copies of the grand jury transcript, which is

6   statutory -- restricted by Rule 60 and Sixth Circuit case law.

7          He asked for a conditional plea which the government

8   took through its supervision chain all the way to D.C., gained

9   approval for and at which point now he's not interested in.

10          The fact of the matter is, it's not the government

11  that is delaying this case.  Mr. Ramadan is responsible for the

12  overwhelming majority of the delay here and the rest is due to

13  COVID, which is unfortunate.  But Mr. Ramadan has already had

14  COVID and now has those antibodies and there are zero pending

15  cases in the detention center.

16          So, you know, first, there are no grounds under 3142

17  to open this hearing.  But even if they were, he is a danger

18  and a flight risk and the government will maintain that

19  position until this case resolved.  However Mr. Ramadan chooses

20  to resolve it.  Thank you.

21          THE COURT:  All right.  Thank you.

22          Do you have any rebuttal, Mr. Densemo?

23          MR. DENSEMO:  Yes, Your Honor.  The government forgets

24  that Mr. Ramadan's attorneys -- not Mr. Ramadan.  Mr. Ramadan's

25  attorney filed a motion because the government -- not these two

1     U.S. attorneys.  But the prior U.S. attorneys were playing fast

2     and loose with discovery and we had to make repeated discovery

3     requests.  With every discovery request we made, we received

4     new discovery.  Discovery that the U. S attorney's office said

5     wasn't there.

6            So the idea that Mr. Ramadan and his attorneys were

7     just filing motions because we had nothing better to do is

8     mistaken.  We filed these discovery motions because we had to.

9     Because the U.S. Attorney's Office, the prior U.S. attorneys

10    weren't complying with their discovery obligations.

      Mr. Salzenstein and Mr. Moon have.  And maybe if they were the

11    attorneys at the beginning of the case, the case would have

12    been resolved a lot quicker.  But because we had the attorneys

13    on the case that we had at the beginning, there were a lot of

14    problems and it was heavily litigated and it had to be heavily

15    litigated.  So those motions that were filed were filed by

16    Mr. Ramadan's attorneys because they needed to be filed.

17

18           Also, the government wanted the deposition testimony

19    of Phillip Prader (ph).  They filed a motion to have

20    Mr. Prader's testimony in deposition form.  That required -- we

21    objected to that.  The government -- Judge Battani ruled in the

22    government's favor.  We then had to go to California to take

23    the deposition of Mr. Prader.  Obviously, that took a lot of

24    time as well.

25           We asked for a conditional plea early on in these

1   proceedings.  We were denied.  We didn't even get -- it wasn't

2   even considered.  A conditional plea has only been offered

3   within the last 30 days or the last -- to be honest with you,

4   within the last two weeks.

5          Now as to this issue about a bench trial, Mr. Ramadan

6   initiated those conversations.  I initiated those conversations

7   about whether or not a bench trial in this case would make

8   sense.  Not the government.  It wasn't the government saying,

9   hey, Mr. Ramadan, how about a bench trial and he said, well, no

10  I'll do a bench trial in exchange for this.

11         My point is, Your Honor, the government wants to put

12  all of this on Mr. Ramadan as if somehow he's responsible for

13  COVID and for his lawyers being lawyers and doing what they

14  need to do.  Mr. Ramadan is not responsible for all of this

15  delay.  He has litigated this case with the assistance of his

16  attorneys in the way that it needed to be litigated.

17         The suppression issue is a very important issue and

18  one that is still evolving.  That took a great deal of time to

19  research that and to file the motions and to have the hearing

20  and for Judge Battani to issue a ruling.

21         There's discovery in this case, Your Honor, on at

22  least four different devices.  One of them is an eight terabyte

23  hard drive filled to capacity.  And there is discovery on other

24  external hard drives as well.  That information had to be

25  downloaded which took weeks to download from the devices that

1    the U.S. Attorney's Office had on to our external hard drive

2    and then we had to make arrangements to get those devices into

3    the prison.

4              So the idea that Mr. Ramadan has wasted all of these

5    times, Your Honor, is a false notion.  That's not true.  That's

6    not true at all.  So to say that he's responsible for all these

7    delays is an unfair statement to place on him.  But then, Your

8    Honor, if you look at this case and you take away the ISIS,

9    there's no basis to detain Mr. Ramadan.

10             And Mr. Hank -- I'm sorry.  Mr. Moon brings that up

11   and it's unfortunate that he brings up that because we were

12   going so well in terms of this hearing without that having to

13   be introduced.  But I think that is in the background of all of

14   this, that Mr. Ramadan is being blamed for ISIS.  Despite the

15   fact that -- as I indicated in my motion, despite the fact that

16   Mr. Ramadan had said I don't believe in violence.  I don't

17   believe in the violence that that group engages in.  I believe

18   in some religious tenets.

19             Nobody ever says anything about that.  No one has ever

20   said Mr. Ramadan said I don't believe in the violence that that

21   group engages in.  And then you couple that with the fact that

22   Mr. Ramadan has never engaged in any violence that supports

23   what any group that is counter to this country.  And it's a

24   shame that we have to continually talk about this instead of

25   talking about normal bail reform issues.  Well, if we talk

1    about normal bail reform issues -- I mean, bail factors,

2    Mr. Ramadan wins, Judge.  He wins hands down because you pretty

3    much check every box in his favor.

4         He hits every box -- employment, lack of criminal

5    history, presumption in his favor, nonviolent offenses, family

6    ties.  All of those things you check in Mr. Ramadan's box.  And

7    as I indicated, Judge, it just boggles my mind why he is still

8    in custody.  And he should be released, Your Honor, and we're

9    asking that he be released today.

10        THE COURT:  Okay.  Thank you.

11        Linda -- excuse me one moment.

12        What time is my next hearing is it 11:30 or 12:00?

13        THE CLERK OF THE COURT:  Let me check the calendar,

14   Judge.

15        THE COURT:  Just give me one moment, everyone.

16      (Momentary pause.)

17        THE COURT:  All right.  It's at 1:00.  I thought it

18   was sooner than that.  I'm fine, then.

19        All right.  I'm prepared to rule on this motion for

20   bond.

21        Under the Bail Reform Act detention is allowed under

22   these circumstances:  Where there is a presumption in favor of

23   release only if there is no condition or combination of

24   conditions that will reasonably assure appearance and safety of

25   the community.  It is the burden of the defendant to show that

1   he is not a flight risk or a danger to the community.  And in

2   making that determination, the Court is required to take into

3   account on the nature of charges, whether there was a weapon

4   involved, the weight of the evidence, the history and

5   characteristics of the defendant, the nature and seriousness of

6   danger.  And then it is the government's burden to prove by

7   clear and convincing evidence that no condition can ensure the

8   safety of the community and to demonstrate by a preponderance

9   of evidence that no condition can reasonably assure the

10  appearance of the defendant.

11       The bail determination in this case was denied 40

12  months ago and there is a record that has been made that

13  certainly was justifiable at the time and justified the

14  detention of Mr. Ramadan.  And I don't need to make a record

15  again of those determinations that were made by the Court.

16       But in addition to the Bail Reform Act, the Court has

17  available to it a couple of other provisions of the law that it

18  can take into account if it is reconsidering that issue of

19  bail.  One is 3142(g).  It says, "In addition, a bail hearing

20  can be reopened before or after determination by the judicial

21  officer at any time before trial if the judicial officer finds

22  that information exists that was not known to the movant at the

23  time of the hearing and that has a material bearing on the

24  issue whether there are conditions of release that will

25  reasonably assure the appearance of such person as required and

1  the safety of any other person in the community."

2        And the Court also has available to it 3142(f) which

3  says:  "The Court may permit the temporary release of an inmate

4  in the custody of the United States Marshal or another

5  appropriate --"

6        AUTOMATED VOICE:  Your meeting has ended.

7     (At 11:45 a.m., defendant video disconnected.)

8        THE COURT:  How do we get him back?

9        THE INTERPRETER:  Yes, Your Honor, the interpreter is

10  still on the jail on a cell phone.

11        THE CLERK OF THE COURT:  Can you ask is the -- can you

12  ask them to reconnect the video?

13        THE INTERPRETER:  He has already requested.

14     (At 11:49 a.m., defendant's video reconnected.)

15        THE COURT:  I believe his call concluded when I was

16  about to talk about the provision of 3142(f) which allows a

17  bail hearing to be reopened as well.

18        MR. DENSEMO:  Yup.

19        THE COURT:  And that statute says:  "The Court may

20  permit the temporary release of an inmate in the custody of the

21  United States Marshal or another appropriate person to the

22  extent that the Court determines such release to be necessary

23  for preparation of the person's defense or for another

24  compelling reason."

25        And the Court finds it appropriate to reopen the bail

1   determination in this case under both of those provisions.  So

2   that is the bail law.  I think that there's some overriding

3   principles, considerations that come into play in this decision

4   as well.  One, is the presumption of innocence.  And because

5   pretrial detainees are presumed innocent, they are entitled to

6   more considerate treatment and conditions of confinement than

7   criminals whose conditions of confinement are designed to

8   punish.  The Supreme Court said that in *Youngberg versus Romeo*,

9   457 U.S. 307,322 a 1982 case.

10          Another overriding principle and consideration have

11  been touched on by Mr. Densemo here and that has to do with

12  potential due process clause violations.  And some courts have

13  held that extended pretrial detention can violate the due

14  process clause.  Mr. Densemo cited us to one.

15          Another, *United States versus Millan*, M-i-l-l-a-n,

16  4 F.3d 1038, a Second Circuit case, 1993 and that court held,

17  "When detention becomes excessively prolonged, it may no longer

18  be reasonable in relation to the regulatory goals of detention

19  in which event a violation of due process occurs."

20          The Fifth Amendment due process clause right against

21  pretrial punishment is an omnipresent consideration in criminal

22  cases.  The Court held in *Bell versus Wolfish*, 441 U.S. 520,

23  1979, "The determination whether these restrictions and

24  practices constitute punishment in the constitutional sense

25  depends on whether they are rationally related to a legitimate,

1   nonpunitive governmental purpose and whether they appear

2   excessive in relation to that purpose."

3         So those are some over -- that's the law. Some

4   overriding principles that this Court has certainly been

5   thinking about. The Ramadan case has weighed very heavily on

6   me. As Mr. Densemo pointed out, I don't think in 20 years I've

7   had a case quite like this where a person was in pretrial

8   detention for this long, particularly, where he was approaching

9   the -- certainly has approached the lowest guideline point and

10   with other considerations, good time considerations, being

11   thrown in perhaps has exceeded the amount of time that he would

12   serve if the Court were to sentence him.

13         So although COVID-19 is a recent and evolving

14   development, courts addressing similar applications have

15   allowed that COVID-19 in conjunction with other factors

16   particular to a defendant may constitute an emergency

17   warranting relief under the Bail Reform Act for that defendant.

18         That is to say the COVID-19 pandemic is not by itself

19   a basis for release of a pretrial detainee for which the Court

20   has already held a detention hearing and ordered the defendant

21   detained. Instead, the paramount consideration under sections

22   3142(g) and (i) that I just cited to continues to be the

23   individual circumstances of the particular pretrial detainee.

24   And that was held recently in several cases out of the District

25   of Maryland, United States versus Filbro (ph) and another case.

1   And I'm not sure what district court that came out of.

2           So in the end, a defendant is not entitled to

3   temporary release under Section 3142 based solely on

4   generalized COVID-19 fears and speculation.  Rather, the Court

5   must make an individual determination as to whether the

6   COVID-19 concerns present such a compelling reason in a

7   particular case that temporary release becomes necessary.

8           In this motion that has been filed for bail there are

9   three basic reasons given:  The increase in COVID cases at

10  Milan, the lack of access to counsel that Mr. Ramadan says he

11  has not had and the fact that he is a pretrial detainee.

12          With respect to the number of cases at Milan, I know

13  that the statistics that we have now are that there's zero

14  cases.  We had statistics that have waxed and waned since

15  March.  They were low over the course of the summer.  It seems

16  like in December they became quite high and there was a general

17  lockdown.  And that only goes to how fluid this pandemic is and

18  how unpredictable it is.  And while it may not be the fault of

19  anybody on this call, it does effect the basic rights that this

20  Court outlined before.  Particularly, where we are talking

21  about a -- where we are talking about a pretrial detainee.

22          So I do think -- this Court does find that there are

23  compelling reasons under 3142(f) for the release of Mr. Ramadan

24  and the Court believes that some of these compelling reasons

25  are also information that was not known to this Court when the

1   original bail hearing was held.  And those things include that

2   Mr. Ramadan has now, in fact, contracted COVID.  He has

3   fortunately survived it.  But I think that the jury is still

4   out on whether and how people can contract COVID all over

5   again.

6          Mr. Moon, you said now he's got antibodies developed,

7   but that's not entirely true.  I mean, we don't know and we

8   don't know about the risk of reinfection.  The CDC has talked

9   about the probability of transmission of potent dangerous

10  organisms and that has increased by the crowded conditions in

11  places and places like Milan.  And so maybe it is relief to

12  Mr. Ramadan that he's already contracted COVID, but we really

13  don't know about the risk of reinfection.

14         So the question becomes would he have gotten COVID if

15  he were not in the kinds of crowded conditions that are present

16  in Milan as a pretrial detainee, and that is a consideration

17  that this Court takes into account.  And that is information

18  that was not known at the time of the initial bail hearing.

19         He has also served a substantial percentage of the

20  sentence that this Court might impose on him.  Mr. Moon has

21  said that the government may be asking for time in excess of

22  the guidelines that have been calculated.  And I don't know

23  that these are correct calculations, but Mr. Bellamy from our

24  probation department has come up with calculations that agree

25  with those of the government, at least at this moment in time,

48

1    and those guidelines are 51 to 63 months.

2           Mr. Densemo says that that works out to be 85 percent.

3    With the 41 months that he's already served, he has served 85

4    percent of what would be a five-year sentence in that guideline

5    range.  And with good time credit that he may be entitled to

6    under the First Step Act, he may even be eligible for release.

7    If not right now, but released sooner.  And so we have here

8    someone who has not been convicted of a crime.  The government

9    has substantial evidence that the crimes he's charged with have

10   been commited, but there has been no conviction here.

11          Another thing that the Court believes is a compelling

12   reason under 3142(f) is that with this pretrial detention,

13   Mr. Ramadan has not had the benefit of any programs that

14   someone who has been convicted of a crime would have had the

15   benefit of.  And we incarcerate people for punitive reasons.

16   We also incarcerate them hopefully for rehabilitative reasons

17   and that's why these programs have been developed.  And

18   Mr. Ramadan has not had the benefit of any of those things and

19   it's very concerning to the Court that he may be near the end

20   of a sentence that I would impose on him and he has not enjoyed

21   any of those programs.

22          One of the factors under 3142(f) is that it is

23   necessary -- release is necessary for the person to be able to

24   assist in the preparation of a person's defense.  I have no

25   reason to doubt that Mr. Moon, in fact, received the

1    information that he conveyed to the Court.  And I have no
2    reason to doubt that as an officer of the court that
3    Mr. Densemo is telling us about the access problems that he has
4    had in meeting with his client.  And it's not just
5    Mr. Ramadan's access within the prison facility to the
6    information, it sounds like he has had that access, but access
7    to his attorney to consider the issues that are still on this
8    table.  If that has been compromised because of COVID, because
9    of lockdowns, because of systems that are in place that are
10   supposed to work but are not working, the Court does believe
11   that that would be a factor under 3142(f) to allow for his
12   temporary release.

13          We also have found out -- and this was not something
14   that was presented to the Court before.  And I know that there
15   have been courts that have said where inmates are being
16   released to family members, that may constitute an appropriate
17   person and a compelling reason as well for the release of the
18   defendant.  We have here a sister who is on the line who has
19   agreed to be a third-party custodian for Mr. Ramadan and that
20   was not presented to the Court before.

21          So I know that the lawyers have talked about a number
22   of other things that are appropriately a part of this record.
23   I don't believe that it's necessary for me to get to those
24   things, the things that I have just placed in the record are
25   sufficient under 3142(g) and sufficient under 3142(f) to allow

1   for Mr. Ramadan's release.

2          I do hope that Mr. Ramadan, having already contracted

3   COVID and knowing the seriousness of this, is going to take the

4   conditions that the Court sets on him very, very seriously and

5   make certain that he isn't exposing himself again or

6   potentially exposing other people by not abiding by the

7   conditions.  One of which is going to include his house arrest.

8          Ms. Trevino, I did ask you to take a look at potential

9   conditions that we could set.  Did you send those to me?  Do I

10  have them now?

11         MS. TREVINO:  Yes, Your Honor, Patricia Trevino from

12  Pretrial Services.  Maureen Shock, supervisor, E-mailed those

13  to you.

14         THE COURT:  Okay.  All right.  Thank you.  I'll take a

15  look at them.

16         Ms. Ramadan, is it Ramadan as well who is on the line,

17  the sister?

18         THE COURT:  Does your sister speak English?

19         MS. RAMADAN:  This is her.  I'm speaking, Your

20  Honor.

21         THE COURT:  Okay.

22         MS. RAMADAN:  Asma Ramadan.

23         THE COURT:  Could you --

24         MS. RAMADAN:  First name ...

25         THE COURT:  Go ahead.

1    MS. RAMADAN:  First name is A-s-m-a.  Last name

2    exactly like Yousef, R-a-m-a-d-a-n.

3    THE COURT:  All right.  Ms. Ramadan, I think you had a

4    conversation the other day with Ms. Lara Catrell from the court

5    about you potentially being a third-party custodian for your

6    brother.

7    MS. RAMADAN:  Yes, Your Honor.

8    THE COURT:  And I hope you understand the importance

9    of the role that you have assumed to undertake and the duty

10   that you have as a third-party custodian.  Which is, number

11   one, he's going to be in your home.  He's going to be under

12   house arrest.  He's going to be on a tether.  There are

13   conditions that you will be aware of that he must abide by and

14   it's going to be your responsibility to make sure he does that.

15   Do you understand?

16   MS. RAMADAN:  Yes, Your Honor.

17   THE COURT:  And it's also going to be your

18   responsibility to let whoever is going to be supervising him

19   know immediately if there are any conditions that the Court

20   sets that your brother doesn't abide by.  Do you understand

21   that?

22   MS. RAMADAN:  Yes, Your Honor.

23   THE COURT:  And are you going to be able to do that?

24   MS. RAMADAN:  Yes, Your Honor.

25   THE COURT:  I just want to get to these conditions so

1  that we've made a complete record.  One moment.

2          You said Maureen sent them to me -- there we go.  One

3  minute.

4          These are the conditions, Ms. Ramadan and Mr. Ramadan,

5  and I want to make sure that I have your agreement on these

6  conditions.  Number one, you cannot violate any federal, state

7  or local law during the period of time that you are on release.

8  You have to cooperate in the collection of a DNA sample.  You

9  have to notify the Court or your supervising officer in writing

10 before you make any change of your residence or change in a

11 telephone number.  You must appear for any court proceeding as

12 required and if there is an additional sentence to be imposed

13 on you, you must surrender to serve that sentence.

14          You will be given -- you will be notified of when your

15 next appearance will be.  We don't quite know what that is

16 given this fluid situation with COVID.

17          You are going to be in the custody of Asma Ramadan.

18          Your name is going to be as part of these papers,

19 Ms. Ramadan, and you will sign a separate third-party

20 agreement.

21          You will have certain reporting requirements,

22 Mr. Ramadan, and you have to abide by that.  You have to

23 surrender your passport to Pretrial Services --

24          MS. RAMADAN:  Your Honor?

25          THE COURT:  Yes, ma'am?

1           MS. RAMADAN:  Are these conditions for me?

2           THE COURT:  They are conditions for your brother, but

3    you have to be aware of them so that you can make certain he

4    does them.

5           MS. RAMADAN:  Okay.

6           THE COURT:  You have to surrender your passport and

7    you are to not obtain any other passport or other international

8    travel documents.  You do have another passport, Mr. Ramadan?

9    You have dual citizenship?

10          MS. RAMADAN:  Are you talking to me?

11          THE DEFENDANT:  Is she talking to me?  I believe so.

12          THE COURT:  Yes, I am.

13          THE DEFENDANT:  All of my passports the government

14   took them from me in the airport.  And all my -- even my

15   documents, I believe they still have it.  But I do have the

16   Sicilian (ph) citizenship and United States citizenship.

17          THE COURT:  Okay.  All right.  Your travel is going to

18   be -- you can put yourself back on mute.

19          THE DEFENDANT:  (Complies.)

20          THE COURT:  Your travel is restricted to the Eastern

21   District of Michigan and you are not to possess a firearm, a

22   destructive device or any other dangerous weapon.  You also are

23   ordered to participate in home incarceration and you are

24   restricted to 24-hour a day lockdown except for medical

25   necessities and court appearances or other activities that are

1    specifically approved by the Court.  You will have a tether

2    attached to you and you must submit to have that attached.

3              Ms. Trevino, you can remove the payment requirement.

4              And then finally I think it's -- we've already said

5    it.  But you can't change your address, but you also must

6    reside with your sister unless you're given permission to

7    reside otherwise.

8              So, counsel, those are the conditions.  Mr. Moon, I

9    know you don't agree with the release, but is there any other

10   condition that you believe the Court should impose?

11             MR. MOON:  As for conditions, Your Honor, we ask that

12   Mr. Ramadan and his family or through his family be prohibited

13   from contacting any of the witnesses in this case.  Either in

14   person, via phone, E-mail, text, by a family member.  You know,

15   no contact with any witnesses in anyway, please.

16             THE COURT:  Okay.  All right.

17             MS. TREVINO:  Your Honor, this is Patricia Trevino

18   from pretrial services.  May I address the Court?

19             THE COURT:  You may.

20             MS. TREVINO:  On the record -- and you may have said

21   this.  I was writing things down.

22             Did the condition of not obtaining a passport or other

23   international travel documents, was that added on the record?

24             THE COURT:  It was.

25             MS. TREVINO:  Okay.  Thank you.

1            THE COURT:  Let me just go back.  You must surrender

2    any passport and not obtain a passport or other international

3    travel documents.

4            MS. TREVINO:  Thank you, Your Honor.

5            THE COURT:  Mr. Moon, that's your addition?

6            MR. MOON:  Yes, Your Honor.

7            THE COURT:  All right.  Thank you.

8            Mr. Densemo?

9            MR. DENSEMO:  Your Honor, we would like a witness list

10   so that I can give that to Mr. Ramadan so he will know who he's

11   not to contact.

12           THE COURT:  All right.  That's fair.

13           You can do that, Mr. Moon?

14           MR. MOON:  Yes, Your Honor.

15           MR. DENSEMO:  And, Your Honor, I'd like the Court to

16   consider home detention versus home incarceration.  And the

17   reason for that is that if Mr. Ramadan wants to come and see

18   me, I believe that we would need a stipulated order between

19   Mr. Salzenstein and Mr. Moon and I.  So there would have to be

20   constant court authority for Mr. Ramadan to even leave his home

21   for any reason.  At least that's my understanding with my other

22   client that's on home incarceration.  Every time he has to go

23   to a medical appointment, I have to call the U.S. attorney to

24   get a stipulation for him to be allowed to do so for any

25   purposes like that and it just becomes really cumbersome as

1   opposed to allowing home detention and then the individual can

2   just provide the information to pretrial and pretrial can give

3   the individual the authorization to go to medical appointments,

4   religious services, grocery shopping, things like that.

5           THE COURT:  I just want to go back and look at how

6   this is worded.  It isn't my intention to require that there be

7   a stipulation every time, but let me see what this says.

8           MR. DENSEMO:  Patty, I think you can talk to that.  Am

9   I correct in that or am I incorrect?

10          THE COURT:  It says, "You are restricted except for

11  medical necessities and court appearances or other activities

12  specifically approved by the court."

13          So medical, court appearances, I don't think that

14  requires a stipulation from the government.

15          But, Ms. Trevino, how does this typically work?

16          MS. TREVINO:  Typically, they are on restricted

17  24-hour lockdown to their home.  Except for those reasons when

18  someone has to see their attorney, they will contact pretrial

19  services, U.S. Attorneys and it gets entered into a court

20  order.  I ...

21          MR. DENSEMO:  I think home incarceration serves the

22  same purpose, Your Honor.  It just eliminates the necessity of

23  the Court intervention.  The U.S. Attorneys and the attorneys

24  and the Court having to enter an order.  At least that's my

25  understanding.

1      I think Patty can still maintain the same level of

2 supervision and restrictions through home detention, it's just

3 that we wouldn't have to constantly be -- I wouldn't have to

4 constantly call Hank or Doug to get a stipulation for him to go

5 to go someplace.

6      MR. MOON:  Your Honor, from the government's position,

7 we have no objection.  If Ms. Trevino knows that he's going to

8 visit his attorneys, the government doesn't need to be involved

9 in that conversation.

10      THE COURT:  Okay.  All right.  I'm going to leave it

11 at home incarceration.  It's not my intention that the

12 government stipulate to these exceptions.

13      Mr. Densemo, right now it says for medical necessities

14 and court appearances.  We can add in there attorney visits and

15 I think it's just a matter of notification.

16      MR. DENSEMO:  That's fine.

17      THE COURT:  From Mr. Ramadan to pretrial services.

18      MR. DENSEMO:  That's fine.  That's fine, Your Honor.

19      THE COURT:  All right.

20      MS. TREVINO:  Yes.  Everything will have to be

21 approved, if he leaves his home, from the pretrial services

22 officer.

23      MR. DENSEMO:  That's fine.

24      THE COURT:  Okay.  All right.  Is there anything more

25 that anyone has before we close the record?

1    MS. TREVINO:  Your Honor, would you like us to place

2  the tether on him at Milan before he is -- or as he is

3  released?

4    THE COURT:  That would probably make the most sense.

5  Somebody can do it at Milan?

6    MS. TREVINO:  Yes.  We can make arrangements for an

7  officer to go out there and I would just want the record to

8  reflect that he cannot be released unless we're there to place

9  the tether on him.

10    THE COURT:  Okay.

11    MR. MOON:  Your Honor, two quick issues.  One, just

12  for clarity, is this a temporary release and if so, is there an

13  end to that release or is this a permanent release?

14    THE COURT:  Well, the wording of that statute says

15  temporary detention.  I am -- I don't have an end date for that

16  at this point in time.  I think that, you know, perhaps we can

17  revisit it when the parties have come to the court and said

18  that you maybe want to put a plea on the record.  But I don't

19  have an end date right now because things are just too fluid.

20    If anything happens, if Mr. Ramadan doesn't abide by

21  anything, that will, of course, end it immediately.  But we'll

22  see.

23    MR. MOON:  And then second, Your Honor, we would ask

24  that the Court stay this order for one week so the United

25  States can decide whether to appeal.

1          THE COURT:  Okay.  I deny that request.

2          MR. MOON:  Thank you, Your Honor.  Nothing further

3     from the United States.

4          THE COURT:  Okay.

5          MS. TREVINO:  And, Your Honor, we're going to

6     coordinate with the Marshals Service in Milan.  I'm not sure

7     how long it will take to -- we'll try to get that done today,

8     but it may not get done until tomorrow.  I'm not sure because

9     we haven't had a case such as this case at the detention

10    center, but we will keep the Court and Mr. Densemo and the

11    government apprised of how long that's going to take.

12         THE COURT:  Okay.  All right.  Thank you.

13         Anything more?

14         MR. DENSEMO:  There's no way that you guys can meet

15    him at his house and put the tether on today?

16         MS. TREVINO:  We could do that.  It will be up to the

17    judge.  We do it at the facilities when they're released and we

18    also have done it at their home.  That's completely up to the

19    Court.  We will not know from the time he's released to the

20    time he gets home where his whereabouts are without the GPS

21    tether.

22         MR. DENSEMO:  I think Ms. Ramadan will pick him up as

23    his third-party custodian and be with him at her home

24    throughout the balance of the day.

25         Am I right about that, Asma?

1    MS. RAMADAN:  I'm sorry, Andrew.  Can you repeat what

2  you said, please.

3    MR. DENSEMO:  You will pick him up at the facility and

4  take him right to your home and he will be there for the

5  balance of the day waiting for pretrial?

6    MS. RAMADAN:  Yes.  Also, I would like to know when is

7  the day to pick him up.

8    MR. DENSEMO:  That would be today if the judge allows

9  it.

10    THE COURT:  Two questions?  Is Milan -- can he be

11  released that quickly and, Ms. Ramadan, are you able to get him

12  today?

13    MS. RAMADAN:  I live about 20 minutes away.  It's

14  snowing right now.  So it's about 25 minutes away from Milan.

15  It's not that far.

16    THE COURT:  Okay.

17    MR. DENSEMO:  And it's my understanding, Your Honor,

18  that Mr. Ramadan, he doesn't have any holds or warrants or

19  anything like that.  So he could be released within the hour.

20    MS. TREVINO:  And Your Honor, I do have an officer in

21  the field within the Ann Arbor area that I put on notice that

22  if you ordered him to be placed on tether at Milan, he can do

23  that.

24    THE COURT:  Okay.  All right.  So if he can get there

25  to Milan, let's get it on.  And then you can coordinate the

1  time that Ms. Ramadan needs to arrive there, but it sounds like
2  it could happen.
3        Your officer is able to get to Milan pretty swiftly,
4  Ms. Trevino?
5        MS. TREVINO:  Yes.  We already had someone ready just
6  in case a release order was implemented and I will call him on
7  the phone to give him details and we'll get the paperwork to
8  the third-party custodian to get signed, the bond paperwork for
9  Mr. Ramadan to sign and we'll contact the marshals and Milan to
10 see how quickly or what time we can get that done.
11       THE COURT:  Okay.  All right.  Thank you.
12       Is there anything more?
13       MR. DENSEMO:  No, Your Honor.
14       THE COURT:  No.  Okay.  All right.  Thank you everyone
15 and this hearing is adjourned.
16     (At 12:21 p.m., matter concluded.)
17                          -   -   -
18
19
20
21
22
23
24
25

```
 1                C  E  R  T  I  F  I  C  A  T  E

 2

 3          I, Darlene K. May, Official Court Reporter for the

 4    United States District Court, Eastern District of Michigan, do

 5    hereby certify that the foregoing is a true and correct

 6    transcript, to the best of my ability, from the record of

 7    proceedings in the above-entitled matter.  I further certify

 8    that the transcript fees and format comply with those

 9    prescribed by the Court and the Judicial Conference of the

10    United States.

11

12    January 16, 2021         /s/ Darlene K. May
      Date                     Darlene K. May, CSR, RPR, CRR, RMR
13                             Federal Official Court Reporter
                               Michigan License No. 6479
14

15

16

17

18

19

20

21

22

23

24

25
```