UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff, CR. NO. 17-20595

v.

HON. VICTORIA A. ROBERTS

YOUSEF RAMADAN,

Defendant.

---

**DEFENDANT'S OMNIBUS PRETRIAL MOTION IN LIMINE**

---

Yousef Ramadan, by his counsel Andrew Densemo & Amanda Bashi of the Federal Community Defender, requests this Court exclude or limit irrelevant and prejudicial exhibits testimony at his upcoming trial. Mr. Ramadan is charged with possession of two firearms with obliterated serial numbers, possession of a stolen firearm, and possession of an unregistered silencer. (ECF No. 113, Superseding Indictment.) All of the items at issue were discovered in a storage locker in Ann Arbor on August 23, 2017.

This motion will address four categories of evidence: (1) exhibits and witness testimony from the search of Mr. Ramadan's luggage at the Detroit airport On August 15-16, 2017; (2) references by any witness to terrorism investigation or similar

terminology; (3) certain photo and video exhibits taken from Mr. Ramadan's electronic devices; and (4) references to the fuel filter at issue in this case as a "silencer." Mr. Ramadan will address each of these categories in turn.

**1. Government Exhibits 1 through 5 and Witnesses 1 through 4 (hereinafter "airport evidence")**

On August 15, 2017, Mr. Ramadan and his family attempted to board a flight to Jordan, with the ultimate destination of Bethlehem. Mr. Ramadan had packed export-controlled items in his checked luggage, which caught the attention of Transportation Security Administration (TSA) and Customs & Border Patrol (CBP) officers. Due to these items, they asked Mr. Ramadan and his family to deplane for questioning. At some point in the course of the questioning, these agents also searched all of the Ramadan family's luggage.

None of the items found during these searches are illegal items for which Mr. Ramadan faces charges. Nonetheless, the government seeks to introduce a bundle of airport evidence – five exhibits and four witnesses[1] – regarding the events at the airport and the items found in Mr. Ramadan's luggage.

---

[1] The government's Witnesses 1 through 4 are listed and their testimony described as follows:

1. TSA Officer Shannon Vasher – "testimony may generally involve his initial search of Mr. Ramadan's checked luggage on August 15, 2017 at the [airport]."
2. CBP Officer Anthony Haeck – "testimony may generally involve his interaction with Mr. Ramadan and his family on August 15, 2017, at the [airport]."
3. CBP Officer Matthew Robinson – "testimony may generally involve his interaction with Mr. Ramadan and his family on August 15, 2017 and his involvement, knowledge and participation in the subsequent border inquiry that

*a. Airport Witnesses*

The government proffers that Witnesses 1 through 4 will testify about their initial search of Mr. Ramadan's luggage at the airport, about their interactions with Mr. Ramadan at the airport, and about the "border inquiry" that took place. These topics offer little, if any, probative value of the crimes charged. We can be sure of this because three of these four witnesses testified about these events at Mr. Ramadan's motion to suppress hearing, which took place on several dates over the course of nine months.

From these witnesses' prior testimony on the record, we know that none of them located anything illegal on Mr. Ramadan or within his luggage. None of them were involved in searching the storage unit where the items charged in the indictment were found. None of these witnesses had involvement in tracing the firearms or performing tests on any of the items. Further to the point, witness number 1, TSA Officer Shannon Vasher, never interacted with Mr. Ramadan or his family at all; Vasher did nothing more than alert other officers about an item in Mr. Ramadan's luggage that was subject to export controls. It bears repeating that none of the firearms at issue in the case were found in Mr. Ramadan's luggage.

---

took place on this same date at the [airport], including but not limited to the search of Mr. Ramadan's baggage after it was removed from the plane."

4. CBP Officer Charles Schmeltz – "testimony may generally involve his involvement, knowledge and participation in the border inquiry involving Mr. Ramadan on August 15, 2017 at the [airport] including but not limited to the items and information found in Mr. Ramadan's luggage and his participation (along with other agents/officers) in interviewing Mr. Ramadan."

These airport witnesses' prior testimony also offers a preview of how prejudicial it will be for them to take the stand at Mr. Ramadan's trial. With the exception of TSA Officer Vasher, the other three officers introduce themselves as current and former members of the "terrorism task force" or "counterterrorism team" or "homeland security" team or "tactical terrorism response team (TTRT)" or "joint terrorism task force (JTTF)" (*See, e.g.*, ECF No. 61, PageID.864, Testimony of CBP Officer Schmeltz.) Because these terms are not unique to these airport witnesses, Mr. Ramadan addresses this issue more fully in Section 2 of this brief. Regardless, even if the term "terrorism" is not used to introduce themselves, explaining that they work on an unnamed tactical team at the airport is could be a dog whistle for the same.

The government might argue that it needs Witnesses 1 through 4 to establish how FBI agents came to learn of the storage locker in Ann Arbor (where they located the firearms in the indictment). In other words, the government would like to "tell the story" of the case. While the defense respects the government's need to put on a case and meet its burden, these witnesses offer little probative value of any material fact at issue. The jury at this trial will have to evaluate whether Mr. Ramadan possessed the illegal firearms in the indictment, and Witnesses 1 through 4 did not locate, discover, test, view, or otherwise have any interaction with those items. The jury need not know every investigative step, and it would be sufficient for the government's other, non-airport witnesses to testify that they came to learn of a storage locker in Ann Arbor, for which they obtained a search warrant, and located the items inside.

Additionally, calling four different airport witnesses to testify as to generally the same information will be cumulative, and a waste of time, particularly considering none of the four officers recovered any items at issue in the indictment.

Even if the government believes the inception of the investigation is relevant, the Advisory Committee Notes to Federal Rule of Evidence 403 provide:

> [C]ertain circumstances call for the exclusion of evidence which is of unquestioned relevance. These circumstances entail risks which range all the way from inducing decision on a purely emotional basis, at one extreme, to nothing more harmful than merely wasting time, at the other extreme. Situations in this area call for balancing the probative value of and need for the evidence against the harm likely to result from its admission.

The harm likely to result from the testimony of four airport witnesses is significant. In addition to the cumulative nature of their testimony, the inference jurors will likely draw from these witnesses is that Mr. Ramadan did something wrong, criminal, and potentially dangerous at the airport. In reality, he packed export-controlled items that he should not have packed. But with his trial set to begin on September 9, 2021, just two days shy of the 20th anniversary of the September 11th terrorist attacks on the United States, the government's insistence that its storytelling begin at the airport has the potential to seriously bias the jury -- before they have heard or seen any evidence relevant to the actual criminal charges for which Mr. Ramadan stands trial.

***b. Airport Exhibits***

The government, through the airport witnesses referenced above, also seeks to introduce some of the export-controlled items found in Mr. Ramadan's luggage. Specifically, the government seeks to introduce:

| Govt. Exhibit No. | Description |
|---|---|
| 1 | Photographs of all the notable items found in Mr. Ramadan's luggage |
| 2 | Body armor |
| 3 | Optic scope |
| 4 | Taser and cartridges |
| 5 | Soft body armor and carrier |

None of these items are the firearms Mr. Ramadan is charged with possessing illegally. They were items he packed in his checked luggage and that he should not have packed. Mr. Ramadan asks that they be precluded.

As discussed above, the government might assert that these Airport Exhibits are what caused TSA and CBP officers to become suspicious and inquire further, and that the jury needs to hear that context. But in reality, what the jury will take away from the Airport Exhibits is that Mr. Ramadan tried to bring potentially dangerous items onto a commercial flight. Quite frankly, these Airport Exhibits help tell the story of someone who the Airport Witnesses viewed as a potential terrorist. This storyline is highly prejudicial and offers at best minimal probative value to the government's case. The potential probative value (that Mr. Ramadan likes guns, or that he's more likely to possess an illegal gun because he packed these items) can certainly be established through the more-than-75 other exhibits the government intends to introduce.

For these reasons, Mr. Ramadan respectfully requests the Court to exclude Exhibits 1 through 5, and exclude Witnesses 1 through 4.

In the alternative, should the Court allow these witnesses to testify, Mr. Ramadan requests that their testimony be (1) limited to evidence with probative value as to an element of the charged offenses, and (2) contain no reference to their membership or role on special terrorism or homeland security teams within the CBP or TSA.

**2. Terrorism and/or homeland security terminology**

In addition to the Airport Witnesses referenced in Section 1 above, FBI Agents Brand and Banach have also previously testified in this case. In the course of introducing themselves at the beginning of their testimony, all of these witnesses have included reference to their current and former membership on a "terrorism task force" or "counterterrorism team" or "tactical terrorism response team (TTRT)" or "joint terrorism task force (JTTF)" (*See, e.g.*, ECF No. 61, PageID.864, Testimony of CBP Officer Schmeltz.)

References to terrorism or homeland security investigations are not appropriate in this trial. Those terms are irrelevant, not probative of the elements the government must prove, and highly prejudicial. This is particularly true for a trial that is set to begin on September 9, 2021 – two days before the 20th anniversary of September 11, 2001.

The government has agreed that it will ask leading questions during the portion of these witnesses' testimony when they introduce themselves. Mr. Ramadan's concern is eased by this resolution. Nonetheless, Mr. Ramadan would like to emphasize the

importance of solidifying this issue prior to the start of witness testimony. Research has shown that admonitions, instructions to disregard, and limiting instructions are generally ineffective.[2] Research has also shown that the "halo effect" at criminal trials is real: jurors tend to infer other negative characteristics about a person when some unfavorable information has been received.[3] The negative inference to be made from several witnesses – even unintentionally or unprompted by the government – mentioning their membership on a "joint terrorism task force" at the time they investigated Mr. Ramadan is that the government initially viewed Mr. Ramadan as posing a terroristic threat to the United States and its citizens. This inference is unduly prejudicial.

**3. Specific unduly prejudicial and/or cumulative photo and video exhibits**

The government plans to introduce several photos and videos of Mr. Ramadan holding, shooting, and cleaning firearms. None of the firearms in these videos are the firearms with which Mr. Ramadan is charged for illegally possessing. Mr. Ramadan would like the Court to preclude certain of these photos and videos, in limine, for the following reasons:

---

[2] *See* J. Alexander Tanford, *The Law and Psychology of Jury Instructions*, 69 NEB. L. REV. (1990), available at https://digitalcommons.unl.edu/nlr/vol69/iss1/4. *See also* David Alan Sklansky, *Evidentiary Instructions and the Jury as Other*, 65 STAN. L. REV. 407 (2013), available at http://www.stanfordlawreview.org/wp-content/uploads/sites/3/2013/03/Sklansky_65_Stan._L._Rev._407a.pdf.

[3] *See* Tanford, n.2 *supra*.

| Govt. Exhibit No. | Description | Bases for defense in limine request |
|---|---|---|
| 57 | Video of Mr. Ramadan unboxing a new Kimber Pro firearm at his home. | Mr. Ramadan legally purchased the Kimber Pro. The government will be introducing those purchase records, as well as the trace reports showing that Mr. Ramadan owned that firearm. Much of the video, however, contains his children. The proximity of his children in the video is prejudicial. Moreover, the video is cumulative of the other evidence the government will present about Mr. Ramadan's ownership of the Kimber Pro, including approximately ten photos of him with the Kimber Pro. All of which is only of limited relevance to his possession of the firearms in the indictment – none of which are the Kimber Pro. |
| 64 | Video of Mr. Ramadan cleaning a Kimber pistol, Howa rifle, and PW Arms rifle | The basis for this objection is substantially the same as the objection for Exhibit 57. |
| 70 | Video of Mr. Ramadan with Kimber Pro in waistband | The basis for this object is substantially the same as the objection for Exhibit 57. |
| 66 | Video of Mr. Ramadan wearing body armor and mask, with Howa rifle | In this nine second video, Mr. Ramadan puts on a black mask with a slit for the eyes, and then removes it while asking the person taking the video to stop filming. The moments with him in the mask are brief but impactful. There is no mistaking that the mask Mr. Ramadan wears in the video is similar to masks worn by ISIS militants in media and popular culture depictions. The obvious prejudice from this video far outweighs the probative value to the government, particularly where the government will introduce several other media showing Mr. Ramadan with the Howa, and trace reports that show Mr. Ramadan owned the Howa. As such, it is both cumulative and unduly prejudicial. |

Mr. Ramadan also asks that some of the government's cumulative exhibits be pared down. Specifically:

| Govt. Exhibit Nos. | Description | Bases for defense in limine request |
|---|---|---|
| 40(c) 40(d)<br>40(e)<br>40(f)<br>40(g)<br>58<br>60<br>61 | Photos and videos of Mr. Ramadan at Devon Storage Facility. | Mr. Ramadan understands these photos and videos are relevant to a material fact at trial. However, some of the photos are the same except that Mr. Ramadan is striking different poses. As to the videos, they similarly don't add anything to one another. This number of photos and videos are cumulative and will be a waste of time. |
| 40(a)<br>40(b)<br>57<br>64<br>70 | Photos and videos of Mr. Ramadan with a Kimber Pro | There is limited relevance of these photos, as the Kimber Pro is not a firearm at issue in this case. Nonetheless, the government will also be introducing the Kimber Pro itself, Kimber Pro ammunition, Kimber Pro magazines, Mr. Ramadan's purchase records for the Kimber Pro, and the trace reports showing he owned the firearm. These photos and videos are unnecessarily cumulative. (Mr. Ramadan also maintains his argument above that Exhibits 57 and 64 are unduly prejudicial.) |
| 40(h)<br>40(j)<br>40(k)<br>40(m)<br>40(n)<br>40(r)<br>40(s)<br>64<br>67 | Photos and videos of Mr. Ramadan with a Howa rifle | There is limited relevance of these photos, as the Howa rifle is not a firearm at issue in this case. Additionally, the government will be introducing the Howa itself, along with the trace reports showing Mr. Ramadan owned the firearm. These photos and videos are unnecessarily cumulative. (Mr. Ramadan also maintains his argument above that Exhibits 64 and 66 are unduly prejudicial.) |
| 40(i)<br>40(k)<br>40(n)<br>40(s)<br>40(t)<br>40(u)<br>64<br>67<br>69 | Photos and videos of Mr. Ramadan with a PW Arms rifle | There is limited relevance of these photos, as the PW Arms rifle is not a firearm at issue in this case. Additionally, the government will be introducing the PW Arms rifle itself, along with the trace reports showing Mr. Ramadan owned the firearm. These photos and videos are unnecessarily cumulative. (Mr. Ramadan also maintains his argument above that Exhibit 64 is unduly prejudicial.) |

**4. References to the fuel filter as a "silencer" – a legal conclusion.**

The government plans to introduce a Wix fuel filter (Exhibit 15) and photos they took of the Wix fuel filter (Exhibit 11). However, throughout the government's exhibit list, it refers to the Wix fuel filter *not* as a fuel filter, but as a "silencer." Exhibit 11 is labeled as photographs of "firearms and silencer." Exhibit 15 is the fuel filter itself, but is labeled as "homemade silencer." Exhibits 34 and 35 are reports authored by the government's firearm expert, and they are labeled as "silencer reports."

Whether or not that fuel filter is a silencer will be a key issue in Mr. Ramadan's trial. The jury will have to decide that question. As it stands, the government has labeled its exhibits with its own legal conclusion, when the item itself has printed upon it that it is a fuel filter manufactured by Wix. Mr. Ramadan is concerned it will attempt to do the same in the presence of the jury. For this reason, Mr. Ramadan asks the Court to limit the government's reference to the fuel filter as a silencer, particularly in its exhibit labels and references to the exhibits in the presence of the jury.

Respectfully submitted,

**FEDERAL COMMUNITY DEFENDER**
**EASTERN DISTRICT OF MICHIGAN**

s/Amanda Bashi
AMANDA BASHI & ANDREW DENSEMO
Attorneys for Defendant
613 Abbott Street, Suite 500
Detroit, Michigan 48226
(313) 967-5845
E-mail: amanda_bashi@fd.org

Dated: August 31, 2021