UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,                    Case No. 17-cr-20595

                        Plaintiff,           Hon. Victoria A. Roberts

v.

YOUSEF MOHAMMAD RAMADAN,

                        Defendant.
_____/

### GOVERNMENT'S RESPONSE TO [258] DEFENDANT'S OMNIBUS PRETRIAL MOTION IN LIMINE

The government respectfully requests that the Defendant's

pretrial motion in limine—ECF No. 258, PageID.3907—be denied for

the reasons stated herein.

**1.   Government Witnesses 1 through 4 and Exhibits 1 through 5 are both necessary background and highly probative**

Defendant Ramadan claims that Government witnesses 1 through

4 are unnecessary background, cumulative and offer little probative

value to the issues in the case. With all due respect, Mr. Ramadan is

wrong. The government has the burden of proof in this case beyond a

reasonable doubt.  It is a high burden, intentionally so, and the

government is entitled to put on its case. The government has already

made concession after concession to streamline this case (including not

eliciting any testimony or evidence from the airport witnesses, unless the door is opened by the defense) regarding the ISIS images or videos found that evening, the tip that the airport witnesses were made aware of that indicated that Ramadan was affiliated with Hamas, the images of the pipe bomb or explosives, or even that the officers were working on any tactical team that had terrorism in its name). What Ramadan now asks the Court to do is gut its case to nothing more than presentation of a search of a storage locker without telling any of the story and without admitting highly probative evidence. But, the evidence Mr. Ramadan seeks to exclude is both necessary and critical background evidence **and** is highly probative evidence of Mr. Ramadan's possession of the items found in the storage locker.

First, with respect to background evidence, the Sixth Circuit has repeatedly recognized that background evidence or *res gestae* evidence is properly admissible at trial. *United States v. Sanders*, 820 F. App'x 3675, 368-69 (6th Cir. 2020). Background evidence consists of those "other acts that are inextricably intertwined with the charged offense or those acts, the telling of which is necessary to complete the story of the charged offense." *Id*. (citations omitted). In order to be proper background evidence, it must have a "causal, temporal or spatial

connection with the charged offense." *Id.* "Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witnesses testimony, or completes the story of the charged offense." *Id.* Background evidence is equally probative in conspiracy cases as it is to gun cases. *United States v. McCreary*, 2009 WL 4042128, at *2-4 (E.D. Mich. 2009).

The challenged witnesses and evidence do just that—they are, first, necessary and critical background evidence. Witness Vasher will testify to initial alarm that triggered the search of Mr. Ramadan's checked baggage on August 15, 2017 at DTW and the export-controlled body armor found therein (and his notification to his superiors that triggered the subsequent investigation).

Witness Robinson will testify to: (a) his interaction with Mr. Ramadan that evening, including his interaction just prior to Mr. Ramadan's boarding the plane, and his interactions with Mr. Ramadan after the body armor was discovered; (b) Mr. Ramadan's critical admissions (see below); and (c) his supervision and participation in the subsequent search of Mr. Ramadan's 15 checked bags. Witness Robinson will testify that the search revealed items such as armor

plates, three load bearing vests (armor plate carriers), a bullet proof vest, gun magazines and holsters, a Taser with two extra cartridges and an extra battery pack, law-enforcement grade pepper spray, rifle scopes, tactical knives, a gas mask, a remote-controlled aerial drone, a combat carrying bag and certain electronic devices. These items were photographed (government's Exhibit 1) and a few of the items that were not subsequently returned to Mr. Ramadan (the export-controlled items—proposed as Exhibits 2-5, including the body armor—Exhibit 2—that triggered the events that evening). These items (and two others) will all be admitted through Officer Robinson per agreement with defense counsel.

Witness Haeck, who was working with Officer Robinson, will offer substantially different, important and relevant testimony. While he will also testify to Mr. Ramadan's critical admissions (see below), he will testify that Mr. Ramadan was given the chance to return to the plane to retrieve personal belongings once it was determined that he was going to miss the flight (while his family would be allowed to continue with the flight). Officer Haeck (alone) witnessed Mr. Ramadan returning to the plane, and, in the process he observed Mr. Ramadan attempt to secretly dump a hard drive into his wife's bag. Mr. Ramadan was

prevented from doing so, and his entire family was, thereafter, asked to depart the plane. Mr. Ramadan's hard drive had highly relevant images and videos showing Mr. Ramadan with firearms (among several other things), all of which were discussed during his subsequent interview.

Finally, Witness Schmeltz will testify to the interview of Mr. Ramadan that evening. He will testify to his questioning of Mr. Ramadan regarding the body armor and how Mr. Ramadan's statements did not make sense, requiring further inquiry. Schmeltz will testify that he and his partner then paused the interview so that they could review what was in Mr. Ramadan's luggage and so that they could conduct a media exam of Mr. Ramadan's electronic devices (to include the hard drive) and Mr. Ramadan's cellphone. When they did so (and asked for Mr. Ramadan's cellphone unlock password) Ramadan asked for immunity for whatever was found, and when that was not forthcoming, Ramadan became hostile and aggressive (requiring that he be handcuffed). Schmeltz will testify he then reviewed all of the items found in Mr. Ramadan's luggage which, as a whole, raised substantial additional concerns because the military, tactical and firearms related items did not match Mr. Ramadan's story at all. He will also testify regarding the preliminary results of the media review and specifically

regarding the videos and images that he viewed involving Mr. Ramadan with all kinds of firearms (but omitting testimony regarding the ISIS propaganda and pipe bomb, etc.). He will then testify to how his review of all of the items recovered, along the hard drive, triggered additional questioning about firearms (among other things). And from there, he will testify about critical admissions Ramadan made about multiple firearms that he stored in a storage locker, the types of firearms, where they were stored (in an unnamed storage locker), and his offer to take the officers to the storage locker once the interview was complete.  And, Witness Schmeltz will testify that, when the interview ended, and the officers asked Mr. Ramadan to take them to the storage locker, Mr. Ramadan: (a) completely changed his story about the firearms (saying he lied about the storage locker and that his guns were really with a friend who he would not identify); and (b) got extremely angry and hostile yet again (just as he had done earlier when the agents wanted to review his media).

Thus, as a threshold matter, all of the evidence is critical background or *res gestae* evidence. The testimony and evidence are inextricably intertwined with the charged offenses, the telling of which is necessary to complete the story. They clearly involve a prelude to the

charged offense (the search warrant which was executed just eight days later after the storage locker was found), is directly probative of the charged offense, forms an integral part of a witness' testimony and completes the story of the charged offense. And, importantly, the government has already agreed to avoid (unless the door is opened by defense) all reference to images and videos reviewed that evening regarding ISIS, ISIS propaganda, the HSI tip involving Ramadan and his alleged link to Hamas, and the images of the pipe bomb (and to have the witnesses avoid reference to terrorism assignments or roles).  The government has already gone above and beyond to limit and tailor the airport testimony to the issues involved in this case. *See Sanders* and *McCreary*, *supra*.

But, even if this were not the case, the testimony and evidence is highly probative beyond being background or *res gestae*. Witnesses Haeck and Robinson will both testify that Mr. Ramadan stated that his wife knew nothing about the military and tactical items recovered from the baggage, that he shielded her from these items, and that they were his and his alone. This is a critical admission because the storage locker (which contained the same or similar type tactical, military and firearms related items) was in his wife's name (with Mr. Ramadan

listed as a "friend" not husband) and goes to show the items in the storage locker were his, not his wife's or anyone else's. The testimony and exhibits are also critical because many of the same type of items found in Exhibits 1-5 (at the airport) were also recovered from the the storage locker, including items such as holsters, firearm scopes, military items, tactical knives, taser items, etc. This evidence is, therefore, highly probative as the same or similar firearm, tactical and military items and paraphernalia were found both in Mr. Ramadan's luggage at the airport (which he admitted was his) and the storage locker. The fact that each and every item found in both locations were not the exact same does not mean it is not highly probative—the airport photos and evidence are substantial probative evidence of Mr. Ramadan's ownership and possession of the same or similar military, tactical and firearms items found in the storage locker (in addition to being necessary and tailored background evidence).

Mr. Ramadan's motion to preclude this testimony and exhibits should be denied.

## 2. <u>Terrorism or Homeland Security Terminology is a Non-Issue</u>

Issue two has already been resolved.  The government has agreed to talk to the airport witnesses prior to their testimony and request that they refer to counterterrorism teams or terrorism task forces generically, without reference to terrorism or counterterrorism.  As stated in the motion, the government has agreed to lead the airport witnesses in this regard and will do so.

## 3. The government's photographs and videos are not unduly prejudicial or cumulative.

When the defendant was stopped at the airport on August 15, 2017, he had hundreds if not thousands of relevant photographs and videos on electronic devices in his possession. They reveal, among other material, his frequent use of three lawfully purchased firearms[1] that were later discovered in a storage locker leased in his wife's name. The government will seek to attribute the use and possession of those firearms and other items in that storage locker to the defendant because the proofs will establish that the two pistols and the silencer that are the subject of the Superseding Indictment (which unlike the

---

[1] The three firearms are a Kimber Pro pistol, a Howa rifle, and a PWP Arms rifle.

lawfully purchased items had their serial numbers obliterated) were found in that same storage locker along with the lawfully purchased firearms and other material and paperwork belonging to the defendant. The government intends to offer a handful of photographs and videos (less than a dozen with respect to each lawfully purchased firearm) that show the defendant possessing and using the lawfully purchased firearms found in the subject storage locker.  Even fewer photographs and videos will show the defendant at the storage facility.

Against this backdrop, the defendant argues that the photographic and video evidence with respect to the lawfully purchased firearms and the Devon storage facility is both prejudicial and unnecessarily cumulative.

As to prejudice, the defendant argues that government exhibit 57 is prejudicial because his children appear in the video. Unlike some of the other videos that the government has agreed to refrain from showing, this video does not appear to show unsafe gun handling by the defendant involving his children. Rather they appear in the video as observers, watching as the defendant opens the box containing the Kimber Pro firearm he just purchased that day (the very one found in the storage locker), and they engage him in innocuous conversation.

Although the defendant states that the mere proximity of the children is unfairly prejudicial (which it is not), the defendant does not explain how that is the case nor does he even cite the relevant FRE 403 standard, which requires that the probative value be substantially outweighed by the danger of unfair prejudice. The assertion that there is any prejudice, let alone substantial prejudice simply because his children appear in a video, is unsupported by any case or common sense. The children do not handle the weapons, and there is no evidence they are at risk.

Further and importantly, the evidence will establish that government exhibit 57 is highly probative and critical for an additional reason. We know the precise date Mr. Ramadan purchased the Kimber Pro found in the storage locker—November 18, 2016 (through various documents that will be admitted at trial including documents found in the storage locker itself). According to the Metadata associated with Exhibit 57, the video of Mr. Ramadan opening the gun box containing the Kimber Pro was November 18, 2016, the very day he purchased it from Cabela's per the known documentation. This video, therefore, corroborates the accuracy of the data contained in the Metadata. This is of critical importance because the accuracy of dates that other videos

or images were created is also critical to the government's case, including the video showing the stolen Jennings firearm along with a Star Carpet van (the Metadata of which shows that it was created on the exact same day Mr. Ramadan cleaned the home where the gun was stolen (as part of his job at Star Carpet Cleaning, which will be verified through Star Carpet records). Accordingly, this suggests that, as a general matter, the timestamps on the metadata created by that device are accurate (including for critical videos where the dates matter).

The defendant objects to government exhibits 64 and 70 for the same reason as it finds government exhibit 57 objectionable.  (Mot. at 9, ECF No. 258, PageID.3915.)  Government exhibit 64 shows the defendant at a table cleaning **three of the firearms** found in the storage unit (the Kimber Pro pistol and the Howa and PW Arms rifles). A child briefly appears in the video standing next to the defendant while he cleans the firearms, and another child is (apparently) recording the video. As with government exhibit 57, the defendant does not explain how mere a child's proximity to the cleaning is prejudicial at all, let along how the probative value is substantially outweighed by unfair prejudice, and the assertion does not appear to be borne out at all by the video.  Again, the children do not handle the weapons, and there

is no evidence they are at risk. Moreover, the Metadata for government exhibit 64 (which shows the defendant cleaning all three lawfully purchased weapons found in the storage locker along with the Ruger and Jennings pistols containing obliterated serial numbers) reveals that the video was recorded on June 19, 2017, a mere two months before the charged possession, which is critical to showing his ongoing and current possession of guns found in the storage locker shortly thereafter.

Similarly, government exhibit 70 shows the defendant handling the Kimber Pro pistol found in the storage unit, loading a magazine, and pointing a laser at the camera.  Indistinct children's voices can be heard in the background for much of the video, and a child appears on a couch for the last portion of the video while the defendant reveals the firearm that his is carrying, concealed.  As with government exhibit 57, the defendant does not explain how a child's mere proximity to the cleaning of weapons is prejudicial at all, let alone meets the 403 standard, and the assertion does not appear to be borne out by the video.  No child handles a weapon or appears to be at risk.  Metadata will reveal the recording took place on February 18, 2017 and establish his ongoing possession of the pistol on that date.

On the issue of prejudice, the government notes that it has long thought that it had reached an understanding with the defendant in as much as videos would not be shown where children were holding weapons or firing weapons (which there are many). This was a concession the government willingly made. The last-minute request to remove these videos because of the mere presence of children was simply not something the government could accede to. Each video was chosen for a specific reason, and the defendant has not established that the probative value is "substantially outweighed" by unfair prejudice. Fed.R.Evid. 403.

Finally, the defendant objects to government exhibit 66—a nine second video—because it shows the defendant wearing and then removing a knit hat that may be pulled over the face. The basis for the objection is that it is similar to masks worn by ISIS militants as depicted in the media and popular culture. ECF No. 258, PageID.3916. The government disagrees with the defendant's characterization of the mask and disputes that the video is unfairly prejudicial. It appears to be a hat designed and worn to keep the head warm, as opposed to a mask designed to keep the wearer's identity a secret. True, it could be worn in a manner to cover much of the face, as many winter hats can,

14

but in any event, the defendant appears in the video wearing it on the top of his head.  He pulls it over his face, for a split second, in what appears to be the act of removing it.  This brief video, which is the only video showing the defendant in possession of just the Howa rifle (found in the storage unit) is in no way unfairly prejudicial to the defendant, and Metadata will reveal that the video was taken on January 8, 2015, evidencing his continuous and long-term possession of body armor and military-type gear of the type found at the airport and in the storage locker.

For all of these reasons, the highly probative value of these videos is not substantially outweighed by any unfair prejudice, which the defendant has not established whatsoever.

As to defendant's arguments about the cumulative nature of the evidence, although the government would be well within its rights to submit the bulk of the relevant photographic and video evidence to establish the defendant's use and possession of his firearms—necessarily probative of his use and possession of the storage locker where they were found—the government has voluntarily agreed to pare down the evidence to the bare minimum, both in terms of the volume of material to be used at trial and with respect to evidence that, though

relevant and without conceding the point, might have been prejudicial to the defendant. For example, the government has agreed to refrain from showing photographic material that appears to show the defendant offering support to ISIS while possessing his firearms. The government has likewise agreed to refrain from introducing photographs that show the defendant's minor children handling or firing weapons (or the defendant pointing a firearm at the head of a dog). And, as noted, the government has eliminated the bulk of the photographic and video evidence available to it even though the sheer importance of guns and tactical gear (of the type found at the airport and the storage locker) to Mr. Ramadan is a clearly probative issue in the case. Further, the videos to be shown to the jury with respect to the challenged exhibits are short and will consume but a small fraction of the trial time.

The defendant states that the government can prove ownership of the firearms with purchase records and ATF trace reports. (Mot. at 10, ECF No. 258, PageID.3916.) But purchase records and trace reports establish the date of a historical first sale of a firearm, not necessarily ongoing ownership and possession. The defendant points out that government will be introducing the firearms themselves, including

those lawfully purchased, and that is certainly true.  But the government is also entitled to prove the defendant exercised dominion and control over those firearms after he acquired them, as discussed above along with the ongoing importance of the military, tactical items and firearms found both at the airport (which Ramadan admitted was his) and in the storage locker. And the government is entitled to prove the importance of firearms and military paraphernalia (of the same type found in the storage unit along with the Ruger and Jennings firearms). The very modest number of photographs and videos will help do just that.

To put the defendant's argument that the evidence will be cumulative (before a single exhibit has been admitted) in perspective, the defendant is objecting to less than five minutes of video with respect to the Kimber Pro pistol (exhibits 57 and 70), less than 20 minutes with respect to the PWP Arms rifle (exhibits 67 and 69), nine seconds with respect to the Howa (exhibit 66), and one video less than three minutes long containing multiple firearms (exhibit 64).  The defendant also objects to three videos less than three minutes long, in total, with respect to his presence at Devon self-storage (exhibits 58, 60, and 61).

On its face, nothing suggests that this is the "needless presentation of cumulative evidence" justifying the exclusion of evidence (which the probative value must be substantially outweighed by the needless presentation of cumulative evidence).  *See* Fed.R.Evid. 403.  In the unlikely event that such a modest presentation of evidence is cumulative, that will not become apparent until the time of trial when it is considered in conjunction with the body of evidence as a whole.  And that is the time when such an objection should be made, if at all.  *See Ross University School of Medicine v. Brooklyn-Queens Health Care*, 2012 WL 6091570 (Dec. 7, 2012 E.D. NY) citing *United States v. Jamil*, 707 F.2d 638, 643 (2d Cir. 1983) (reversing trial court's pretrial ruling that evidence was cumulative: "At this stage of litigation, when the trial has not yet been put before a jury it is premature to conclude that this evidence is cumulative."); *see also United States v. Verges*, 2014 WL 559573 (Feb. 12, 2014 E.D.VA) ("without knowing the substance of the Government's case, the Court cannot determine [in a pretrial context whether] a witness's testimony would be impermissibly cumulative").

Somewhat counterintuitively, the objection to the alleged cumulative nature of the evidence follows the government's futile efforts

to seek stipulations with respect to the defendant's ownership of the lawfully purchased firearms, among other matters. Although it should be noted that such stipulations would not prevent the government from presenting its case "as it sees fit" because "a defendant may not stipulate or admit his way out of the full evidentiary force of the case against him, *see U.S. v. Walker*, 428 f.3d 1165, 1168 (8th Cir. 2005) citing *Old Chief v. United States*, 519 U.S. 172, 186 (1997) (internal quotes omitted), it is a particularly pernicious argument to make when the defendant will be permitted to argue at trial that the government failed to meet its burden of proof beyond a reasonable doubt on the very issue the defendant seeks to hamstring the government.

In short, the photographic and video evidence is, and highly probative and is not substantially outweighed by unfair prejudice or cumulativeness.

### 4. The government should be permitted to refer to the homemade silencer as such.

The government has charged the defendant with possessing an unregistered silencer and expects the proofs to establish that the defendant possessed a homemade silencer constructed out of a modified fuel filter. The defendant asks the Court to limit the government's

reference to the homemade silencer as a silencer, "particularly in its exhibit labels and references to the exhibits in the presence of the jury". The government has agreed to label the silencer in the exhibit lists presented to the jurors as a "alleged" or "purported" silencer[2]. But that is as far as the government is willing to go.  Relabeling or redacting other documents or restricting the government's ability to call the homemade silencer what it is in the government's eyes would unnecessarily restrict the government's ability to present and argue its case, just as requiring the defendant's counsel to call it a silencer would impair the defense of the case.

Respectfully submitted,

SAIMA S. MOHSIN
Acting United States Attorney

s/ Douglas C. Salzenstein
Douglas C. Salzenstein
Jonathan Goulding
Assistant U.S. Attorneys
211 W. Fort St.
Detroit, MI 48226
Dated: September 2, 2021          doug.salzenstein@usdoj.gov

---

[2] The government had thought this accommodation addressed the defendant's concerns on this issue.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 2, 2021, I filed the foregoing

Response using the Court's CM/ECF system, which will send notice to

all registered parties.

<u>s/<i>Douglas C. Salzenstein</i></u>
Assistant U.S. Attorney
