UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.                           Case No. 17-20595
                                   Honorable Victoria A. Roberts

YOUSEF MOHAMMAD RAMADAN,

      Defendant.

_____/

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S OMNIBUS MOTION IN LIMINE [ECF No. 258]**

## I.    INTRODUCTION

The government charges Yousef Mohammad Ramadan with (1) possession of two firearms with obliterated serial numbers; (2) possession of a stolen firearm; and (3) possession of an unregistered silencer.

Federal law enforcement officers discovered the charged items on August 23, 2017, when they lawfully searched a storage locker in Ann Arbor, Michigan rented to Ramadan's wife. The officers learned of the storage unit during an August 15, 2017 interview of Ramadan at the Detroit Metropolitan Airport. Customs and Border Patrol officers removed the Ramadan family from a flight to Jordan after they discovered body armor and tactical gear in Ramadan's checked baggage.

Law enforcement investigated Ramadan for terrorism related activity. Despite the investigation, the government never filed a terrorism related offense against Ramadan.  This is a gun case, nothing more.

Before the Court is Ramadan's omnibus motion in limine [ECF No. 258].  The Court held a hearing on the motion on September 7, 2021.

Ramadan dedicates much of the motion to reiterating the Court's duty to: (1) limit the government's presentation of this case to relevant evidence related to the three charged gun offenses; and (2) warn the government to steer clear of evidence related to terrorism activity.

In light of some of the evidence the government seeks to introduce – and the extreme prejudice reference to terrorism or development of terrorism related themes would cause – Ramadan's concerns are well-founded.  The Court shares them.

The Court will not allow evidence beyond that which is necessary to establish res gestae and the elements of the charged offenses.  Moreover, the government and its witnesses must not use or refer to terrorism related terminology – as explained further below.  Such terminology is irrelevant, highly prejudicial, and not probative of Ramadan's alleged possession of illegal firearms. If the government attempts to develop a "terrorist theme" or if its witnesses use terrorism terminology, the Court will consider available

and appropriate remedies to alleviate and/or cure prejudice to Ramadan – including limiting instructions and possible mistrial.

For the reasons below, the Court **GRANTS IN PART** and **DENIES IN PART** Ramadan's motion.

## II.    ANALYSIS

Ramadan's motion addresses four categories of evidence: (1) exhibits and witness testimony from the search of Ramadan's luggage at the Detroit Metropolitan Airport on August 15-16, 2017; (2) references by any witness to terrorism investigation or similar terminology; (3) certain photo and video exhibits taken from Ramadan's electronic devices; and (4) references to the seized fuel filter as a "silencer."

### A.    Exhibits and Witness Testimony from the Search of Ramadan's Luggage at the Airport on August 15, 2017

On August 15, 2017, Ramadan and his family boarded a flight to Jordan. They checked 15 bags of luggage. Ramadan packed certain export-controlled items in his checked luggage, including body armor, a taser, taser cartridges, rifle/optic scopes, soft body armor, a carrier, and other tactical gear associated with armed combat. These items prompted Customs and Border Protection ("CBP") officers and Transportation Security Agency ("TSA") officers to search Ramadan's luggage.

The government submits photographs of the notable export-controlled items in Ramadan's checked luggage as proposed Exhibit 1 and proposes to present to the jury the actual body armor (Exhibit 2), optic scope (Exhibit 3), taser and cartridges (Exhibit 4) and soft body armor and carrier (Exhibit 5) as Exhibits 1-5.

The government will call four witnesses to testify about the items found in Ramadan's luggage and their interactions with him at the airport – including the time they spent questioning him.

Ramadan moves to exclude Exhibits 1-5 and some or all of the witnesses' testimony. He argues this evidence is not relevant, highly prejudicial and that all of the witnesses' testimony taken together is cumulative. He says the Court should exclude it under Fed. R. Evid. 403 because the danger of unfair prejudice and jury confusion substantially outweighs its probative value.

The government contends that the exhibits and witness testimony should be admitted as res gestae or background evidence, and because the evidence is probative of Ramadan's possession and control over illegal firearms and other items found in the storage locker.

### 1.    Applicable Law

The Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid. 403.

The Sixth Circuit recognizes the admissibility of res gestae evidence in limited circumstances when the evidence includes conduct that is "inextricably intertwined" with the charged offense. *United States v. Clay*, 667 F.3d 689, 697-98 (6th Cir. 2012). "The [res gestae] principle contains severe limitations as to 'temporal proximity, causal relationship, or spatial connections' among the other acts and the charged offense." *Id*. at 698 (quoting *United States v. Hardy*, 228 F.3d 745, 749 (6th Cir. 2000)).

### 2.    Airport Proposed Exhibits 1-5

The search of Ramadan's luggage revealed three armor plate carrier vests, a bullet proof vest, gun magazines and holsters, a taser, taser cartridges, a battery pack, rifle scopes, law enforcement grade pepper spray, tactical knives, a gas mask, a remote-controlled aerial drone, a combat carrying bag, and certain electronic devices. [ECF No. 260, PageID.3924].

The government says this evidence is relevant to show Ramadan's control over a storage locker and ownership and possession of illegal firearms found in the storage locker.  During the hearing, the government informed the Court that the same optic scope, taser, and taser cartridges that were found in Ramadan's luggage were also found in the storage locker.

The Court allows photographs of the export-controlled items which were also found in the storage locker – i.e., the optic scope, taser, and taser cartridges.  The Court finds that these pictures are properly admitted as background evidence in part and because the pictures of these items are probative of Ramadan's possession and control over the storage locker and items contained there.

Otherwise, the Court excludes Exhibits 1-5: the Court excludes photographs of the other export-controlled items – which were not found in the storage locker – and excludes the actual export-controlled items (Exhibits 2-5).

As Ramadan argues, this evidence is more prejudicial than probative. From it the jury could conclude Ramadan is a terrorist fighter traveling to the Middle East. Moreover, because none of the items found in Ramadan's

luggage is illegal or part of the underlying charges, allowing the evidence would pose a serious danger of jury confusion.

Unlike the optic scope, taser, and taser cartridge, these items were not found in the storage locker.  The probative value of this evidence is minimal – especially considering the government has a significant amount of other, stronger evidence tying Ramadan to the locker. That evidence includes Ramadan's own admission to officers that he had a storage locker with firearms in it.  The government also has evidence related to Ramadan that was found in the storage locker: the lawfully purchased guns registered to Ramadan, gun paperwork with Mr. Ramadan's name on it, and the optic scope, taser and taser cartridges.  The government has at least four videos and five photos of Ramadan driving to the storage facility, punching in the passcode, and standing within the building.  Finally, the government seeks to admit transcripts of phone calls Ramadan made after his arrest, where he discusses his control over the storage locker.

The danger of unfair prejudice and jury confusion substantially outweighs the probative value of the airport exhibits.

Except for photographs of the optic scope, taser, and taser cartridges – which were found both in Ramadan's luggage and the storage locker – the Court excludes government proposed Exhibits 1-5.

7

The Court GRANTS IN PART and DENIES IN PART Ramadan's motion with respect to this issue.

### 3. Airport Witnesses and Testimony Regarding Export Controlled Items

The four witnesses the government plans to call work in various government security agencies at the airport and were involved in the events leading up to the search of Ramadan's storage locker: (1) TSA officer Shannon Vasher, (2) CBP officer Anthony Haeck, (3) CBP officer Matthew Robinson, and (4) CBP officer Charles Schmeltz.

Vasher ran one of Ramadan's checked bags through an x-ray scanner but was unable to ascertain its contents. He opened the bag and found body armor plates that were designed to fit into a bulletproof vest. Vasher concluded that the armor plates were export-controlled, meaning that a traveler needed to secure appropriate documentation before taking them out of the country. Without that documentation, Vasher alerted his supervisor, who in turn notified CBP officers. [ECF No. 110, PageID.2225].

Robinson advised Ramadan that he would have to disembark from the plane and complete necessary paperwork pertaining to the export-controlled items and that he likely would not be able to fly to Jordan.

Robinson supervised the subsequent search of Ramadan's 15 checked bags. [ECF No. 260, PageID.3923]. In addition to the tactical gear,

the bags also contained three computers, a hard drive, five external hard drives, digital cameras, a DVD, a sim card, and four iPhones. [ECF No. 19, PageID.49].

The government says Robinson will testify: (1) to his supervision and participation in the search of Ramadan's luggage; and (2) "that the search revealed items such as armor plates, three load bearing vests (armor plate carriers), a bullet proof vest, gun magazines and holsters, a Taser with two extra cartridges and an extra battery pack, law-enforcement grade pepper spray, rifle scopes, tactical knives, a gas mask, a remote-controlled aerial drone, a combat carrying bag and certain electronic devices" [ECF No. 260, PageID.3923-24];

Schmeltz interviewed Ramadan and questioned him about the body armor. Schmeltz was unable to obtain any information from Ramadan about where he worked and why he had the body armor; Ramadan allegedly changed his story several times. He claimed to be a journalist and then a construction worker. Seeking answers about the purpose of the body armor and trip, Schmeltz asked Ramadan's for his phone password. Ramadan became upset and asked for immunity for anything found on the phone, Schmeltz declined. Schmeltz examined all the items found in Ramadan's luggage and reviewed Ramadan's media. The media revealed

videos and images portraying Ramadan with a variety of firearms. Schmeltz continued questioning Ramadan. Ramadan admitted that he had multiple firearms stored in an unnamed storage locker. He described the types of firearms he had and offered to take officers to the storage locker after the interview. [ECF No. 260, PageID.3926]. But Ramadan recanted these admissions at the end of the interview, saying he lied about the storage locker and that his guns were really with an unidentified friend. [ECF No. 260, PageID.3926].

The government says Schmeltz will testify: (1) "to his questioning of Mr. Ramadan regarding the body armor and how Mr. Ramadan's statements" did not make sense, requiring further inquiry" [*id.*, PageID.3925]; (2) "that he and his partner then paused the interview so that they could review what was in Mr. Ramadan's luggage and so that they could conduct a media exam of Mr. Ramadan's electronic devices" [*id.*]; and (3) that he examined "all of the items found in Mr. Ramadan's luggage which, as a whole, raised substantial additional concerns because the military, tactical and firearms related items did not match Mr. Ramadan's story at all" [*id.*].

While Robinson and Schmeltz may testify regarding the export-controlled items found both in Ramadan's luggage and the storage locker –

i.e., the optic scope, taser, and taser cartridges – they may not testify regarding the excluded export-control items.  The government may only present that officers found the optic scope, taser, and taser cartridges, which led them to further investigate Ramadan and led them to the storage locker.

Additionally, the last topic listed above – i.e., Schmeltz's proposed testimony that the items found in Ramadan's luggage "raised substantial additional concerns because the military, tactical and firearms related items did not match Mr. Ramadan's story at all" – is concernable.  As Ramadan says, this testimony is an example of the government's use of "benign descriptions of Schmeltz's testimony to obscure what [may] be significant testimony alluding to or directly discussing terrorism, and the airport witnesses' suspicion that … Ramadan posed a terroristic threat to the United States."  [ECF No. 261, PageID.3944].  Testimony about or alluding to terrorism will not be allowed.

The Court GRANTS IN PART and DENIES IN PART Ramadan's motion on this issue.

### 4.   Shannon Vasher's Testimony

Vasher will testify regarding the initial alarm that triggered the search of Ramadan's luggage and the seizure of export-controlled body armor.

As discussed above, the Court excludes the export-controlled body armor (Exhibit 2) and photographs of the body armor.

The Court will allow Vasher to testify generally about what export-controlled items are, the paperwork required, and what triggered the search of Ramadan's luggage, so that the jury has context concerning the eventual search of the storage locker. The Court finds that this is important res gestae evidence. *Clay*, 667 F.3d at 697-98.

How Ramadan came to the attention of law enforcement is an important part of the government's story. It places the charges against Ramadan in context. But Vasher need only testify that Ramadan had export-controlled items in his luggage; in doing so he may refer to the optic scope, taser, and taser cartridges and introduce the photograph(s) of those items.  However, beyond that, any details about the excluded items creates a danger of confusing the jury and/or unfairly prejudicing Ramadan; this substantially outweighs the probative value of the items.

The Court GRANTS IN PART and DENIES IN PART Ramadan's motion with respect to the testimony of Vasher.

### B.    Terrorism and/or Homeland Security Terminology

Ramadan argues that references to terrorism and/or homeland security investigations are not appropriate; he says those terms – and

similar or related terminology – are irrelevant, not probative of the offense elements the government must prove, and highly prejudicial.

The government says this issue is resolved because it "has agreed to talk to the airport witnesses prior to their testimony and request that they refer to counterterrorism teams or terrorism task forces generically, without reference to terrorism or counterterrorism. . . . [T]he government has agreed to lead the airport witnesses in this regard and will do so."  [ECF No. 260, PageID.3929].

The government's agreement to prepare its witnesses resolves this issue.  The Court underscores that references to terrorism, homeland security, and/or similar or related terms will not be allowed.  Without limitation, this includes references to ISIS, Hamas, caliphate, terrorism investigations, what airport witnesses were concerned about when interrogating Ramadan and searching his luggage, and other themes related to terrorism.  Such terminology is irrelevant, highly prejudicial, and not probative of Ramadan's alleged possession of illegal firearms.

The Court GRANTS Ramadan's motion on this issue.

### C.    Photograph and Video Exhibits Taken from Ramadan's Electronic Devices

The firearms leading to charges against Ramadan were found in a storage locker at Devon Storage Facility.  Also in that locker were three

firearms that Ramadan legally purchased: a Kimber Pro pistol, a Howa rifle, and a PW Arms rifle.  The government proposed exhibits include videos and photographs of Ramadan with each of those firearms and photographs and videos of Ramadan at the Devon Storage Facility.

Ramadan moves to exclude four videos.  He says they are prejudicial *and* unnecessarily cumulative.  He also moves to exclude several other videos and photographs as unnecessarily cumulative only.

The government wishes to admit the videos to show Ramadan's continuous ownership, control, and possession of the storage locker and items found in the locker.

### 1.   Four Videos Ramadan Says are Prejudicial and Unnecessarily Cumulative

#### a.   Video with a Black Ski Mask (Government Proposed Exhibit 66)

Ramadan moves to exclude government proposed Exhibit 66 as unfairly prejudicial.  After the hearing, the government informed the Court that it withdraws this exhibit.

Ramadan's motion is MOOT with respect to his request to exclude government proposed Exhibit 66.

### b.    Three Videos Containing Ramadan's Children (Government Proposed Exhibits 57, 64, and 70)

Government proposed Exhibit 57 is a video of Ramadan unboxing his Kimber Pro pistol on the day he allegedly purchased it from Cabela's. Ramadan says this video is prejudicial because his children are part of the video.  He also says the video is cumulative of other evidence the government will present to show his ownership of the Kimber Pro pistol.

Ramadan makes the same objection regarding the government's proposed Exhibits 64 and 70.  Exhibit 64 is a video of Ramadan cleaning his three lawfully purchased firearms – with children watching – in June 2017.  Proposed Exhibit 70 is a video of Ramadan playing with his Kimber Pro pistol – placing it in and taking it out of his waistband, loading and unloading a magazine and bullet in the chamber, and aiming the laser scope at the camera – with his children in the same room.

The government says these videos are highly probative because they reveal Ramadan's ongoing use of the firearms that were later discovered in the storage locker leased in his wife's name.  The government says it "will seek to attribute the use and possession of those firearms and other items in that storage locker to [Ramadan]" to show Ramadan's control over the storage locker "because . . . two pistols and the silencer that are the subject of the Superseding Indictment . . . were found in that same storage locker

15

along with the lawfully purchased firearms."  [ECF No. 260, PageID.3929-30].

Essentially, the government plans to introduce the videos to show that Ramadan's continuous use and possession of his legal firearms that were in the storage locker, make it more likely that he used and possessed the firearms with obliterated serial numbers and the silencer found in the same locker.

With respect to Exhibit 57, the government believes it is also probative because it corroborates the accuracy of the metadata in the video.  Specifically, the video of Ramadan opening the Kimber Pro box shows that he opened it on November 18, 2016, the same day he purchased it from the store.  The government says this corroborates the accuracy of all the timestamps in the metadata of the device used to record videos critical to the government's case.  Presumably, Ramadan used the same device to record illegal items.

The government says Exhibit 64 is particularly relevant because it shows Ramadan cleaning all three legally owned firearms in June 2017 – just two months before they were found in the same storage unit where the charged firearms were found; it says this is of critical importance to demonstrate Ramadan's ongoing possession of the guns found in the

16

storage locker.  Ramadan says that if the Court allows this video, it should only allow an excerpt of the video that does not show his children. Or, alternatively, he says the government could admit still shots of the video with the date but without his children.

Exhibit 70 was recorded on February 18, 2017.  The government contends this also corroborates ownership and possession of the items found in the storage locker.

Despite any probative value of the challenged videos, they have a danger of being highly prejudicial. They depict Ramadan handling dangerous firearms around his children, explaining to his children how to use the laser scope, and pointing the firearms around his apartment and at the camera.  Additionally, the jury could conclude from Ramadan's use and handling of lawful firearms, that he was more likely to own and possess the illegal guns he is charged with.

Despite the danger of prejudice, the Court will allow Exhibit 64 as long as the government can create an excerpt of the video that does not contain Ramadan's children.  Alternatively, the government can introduce still shot photographs of the video with the relevant date without Ramadan's children in them.  The Court agrees with the government that Exbibit 64 is of critical importance; it has significant probative value of

17

Ramadan's continuous control over items in the storage locker and helps establish a timeline.  The video shows Ramadan with all three of the legal firearms approximately two months before the search of the storage locker – where the three legal firearms were found.  Moreover, since the Court is excluding Exhibits 57 and 70, and Ramadan withdrew Exhibit 66, this is the only video of Ramadan possessing the Kimber Pro and Howa rifles.  The danger of unfair prejudice does not substantially outweigh the probative value of this video.

The probative value of Exhibits 57 and 70 is not as significant considering the government has a different video (i.e., Exhibit 64) and photographs of Ramadan using the Kimber Pro and Howa – closer to the date of the search of the storage locker – to show continued control of those firearms.  Moreover, by its own admission, the government has a video of Ramadan possessing the illegal Jennings firearm [*see* ECF No. 260, PageID.3932], and it submits several videos and exhibits showing Ramadan accessing the storage facility.  The government also has paperwork showing Ramadan legally owns the firearms found at the facility.

Considering the other, non-prejudicial evidence the government can use to show Ramadan's ownership and possession of the items in the storage facility, the Court finds that the risk of unfair prejudice created by

the admission of Exhibits 57 and 70 substantially outweighs their probative value.  There is no need to admit the exhibits showing Ramadan handling dangerous weapons around children. Ownership can be established in far less prejudicial ways.

If there is an issue at trial regarding the accuracy of the metadata, the government can request to admit these videos for that purpose at that time.

The Court GRANTS Ramadan's motion to exclude government proposed Exhibits 57 and 70 without prejudice to the government to renew its request if the accuracy of the metadata on videos pertaining to the illegal firearms becomes an issue.

The Court DENIES Ramadan's motion to exclude Exhibit 64, so long as the government can create an excerpt of the video that does not show Ramadan's children.  Or, if it cannot do that, the government can submit still shot photographs of the video with the relevant date stamp which do not show Ramadan's children.

### 2.  Videos and Photographs Ramadan Says are Unnecessarily Cumulative

Ramadan moves to exclude several videos and photographs of him with the three lawfully owned firearms and of him at the storage locker/ facility, not because they are prejudicial, but because they are cumulative.

These videos and photographs are listed on page 10 of Ramadan's motion.  During the hearing, the government withdrew Exhibit 67.

The Court will not exclude any of these videos or photographs as cumulative at this juncture.  Ramadan may raise this issue at trial if it appears the evidence is redundant.

The one video that the Court finds objectionable is government proposed Exhibit 69.  This video shows Ramadan with his lawfully owned PW Arms rifle. It is nearly 10 minutes long.

There is no reason the government needs to present such a long video of Ramadan with this rifle – especially since the government also presents photographs and other evidence showing Ramadan's ownership and continued possession of the firearm.  At most, the Court will allow two to three minutes of this video.  The government must shorten the video for presentation to the jury.

The Court GRANTS IN PART and DENIES IN PART WITHOUT PREJUDICE Ramadan's motion with respect to his request to exclude the videos and photographs on page 10 of its motion as cumulative.

### D.    References to the Fuel Filter as a "Silencer"

The government charges Ramadan with possession of an unregistered silencer.  The government says it expects to establish that

Ramadan possessed a homemade silencer constructed out of a modified "Wix fuel filter" – seen in the image below:



The government's proposed exhibits include: (1) a photo of the Wix fuel filter – originally labeled on the exhibit list as "firearms and homemade silencer" (Exhibit 11); (2) the Wix fuel filter itself – originally labeled as "homemade silencer" (Exhibit 15); and (3) reports authored by its firearm expert – originally labeled "silencer reports" (Exhibits 34 and 35).

In response to Ramadan's motion, the government relabeled the above exhibits as: "firearms and purported homemade silencer" (Exhibit 11); "purported homemade silencer" (Exhibit 15); and (3) "examination worksheets" (Exhibits 34 and 35).

Ramadan asks the Court to "limit the government's reference to the fuel filter as a silencer, particularly in its exhibit labels and references to the exhibits in the presence of the jury."  [ECF No. 258, PageID.3917].

The government says "[r]elabeling or redacting other documents or restricting the government's ability to call the homemade silencer what it is in the government's eyes would unnecessarily restrict the government's ability to present and argue its case."  [ECF No. 260, PageID.3940].

In his reply, Ramadan acknowledges that the government "is going to present evidence that [the fuel filter] is a silencer, and it will use the word silencer with its relevant witnesses."  [ECF No. 261, PageID.3951].  However, he says that "handing the jury an exhibit index on the first day of trial" with the labels "silencer" and/or "homemade silencer" amounts to "handing the jury a legal conclusion it will be asked to make."  [*Id.*].

Ramadan is correct that the government must prove that the fuel filter is a "device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer."  18 U.S.C. § 921(a)(24).  The jury must decide if the Wix fuel filter fits this definition.

The government already revised the labels to include "purported" for Exhibits 11 and 15 and "examination worksheets" for Exhibits 34 and 35.  The Court finds these changes sufficient, especially considering the parties informed the Court during the hearing that Ramadan himself refers to the Wix fuel filter as a "silencer" in government Exhibit 51.  Moreover, the

22

government may use the term "silencer" and may introduce evidence to try to establish that the Wix fuel filter is a "silencer."

With respect to this issue, the Court DENIES Ramadan's motion.

## III.   CONCLUSION

The Court **GRANTS IN PART** and **DENIES IN PART** Ramadan's omnibus motion in limine [ECF No. 258] – as set forth above.

**IT IS ORDERED**.

s/ Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  September 7, 2021