UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

Plaintiff,

v.

YOUSEF MOHAMMAD RAMADAN,

Defendant.

/

Case No. 17-cr-20595

Hon. Victoria A. Roberts

## GOVERNMENT'S SENTENCING MEMORANUDM

## I.  INTRODUCTION

In September 2021, a jury convicted Mr. Ramadan of unlawfully possessing: (1) a firearm with an obliterated serial number, (2) a stolen firearm (that also had an obliterated serial number), and (3) an unregistered firearm silencer. The Probation Department correctly calculated an advisory guideline range of 63 to 78 months in prison. PSR ¶ 77. The government respectfully submits that a sentence of at least 78 months is "sufficient, but not greater than necessary."

A sentence of at least 78 months is justified for many reasons. As a threshold matter, it is warranted because this is not a typical "status" offense. Instead, Ramadan personally stole at least one of the charged firearms, obliterated the weapon's serial number himself so it could not be traced, and personally manufactured a firearm silencer so he could, among other things, fire a pistol out

of his apartment window (in a residential neighborhood) without being heard or caught.

A sentence of at least 78 months is also warranted because Ramadan favors the views of the Islamic State in Iraq and al-Sham (ISIS), a designated-terrorist-organization. Ramadan's views related to ISIS has never waned. Even after he was detained, he scrawled graffiti at the Milan Detention Center that was translated to include "Islamic Caliphate." And, Ramadan's claim that he does not support the "violent" side of ISIS is simply not believable given: (a) the military-type items he attempted to take with him to Israel; (b) the ISIS images and videos that he saved on his hard drives—many of which depicted ISIS's most violent acts (including beheadings, executions and bombings); (c) the photographs of Ramadan posing with guns while making the very same ISIS hand gesture that ISIS fighters make on the battlefield; and (d) the photograph and videos that Ramadan recorded showing a pipe bomb at this home in Israel.

Ramadan has also exhibited a history of violence, anger issues, and outright cruelty. Videos saved to his hard drives show Ramadan filming and organizing dog fighting—videos in which dogs are killed in the most cruel and inhumane manner while Ramadan and others laugh and treat the killings like sport. Other videos record multiple instances of road rage (one in which Ramadan pepper sprayed the

other driver), hostile confrontations with police officers, and a confrontation with a parking attendant who Ramadan called a "white fuckin' asshole."

Finally, a sentence of at least 78 months is warranted based on Ramadan's unique pattern of providing false information to the government and the Court. Your Honor has outlined Mr. Ramadan's many lies and false statements, deeming him to be "entirely untrustworthy." ECF No. 190, PageID.3362. Ramadan's many lies to the Court require a substantial punishment.

Under these unique circumstances, the government requests a sentence of at least 78 months, followed by a three-year term of supervised release.

## II.    BACKGROUND

The Court presided over the jury trial and is more than familiar with the background of the case. The background is also summarized in multiple pleadings— *e.g.*, ECF No. 183, PageID.2748-53—and Court Orders—*e.g.*, ECF No. 190, PageID.3350-54—and will not be repeated here.

## III.    ADVISORY GUIDELINE RANGE

The Probation Department correctly calculated an advisory guideline range of 63 to 78 months in prison. PSR ¶ 77. Ramadan objected to two guideline scores (and other non-guideline paragraphs), including the inclusion of 2-points under USSG § 3C1.1 for Ramadan's obstruction of justice, and 4-points under USSG § 2K2.1(b)(4)(B) for his possession of a firearm with an obliterated serial number.

The government's responses to Ramadan's guideline-based objections are summarized below.

## A.  Obstruction of Justice, USSG § 3C1.1

USSG § 3C1.1 provides that if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigative, prosecution or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels."  Obstruction of justice includes "committing, suborning or attempting to suborn perjury" and "providing materially false information to a judge or magistrate judge." *United States v. Payton*, 516 F. App'x 553, 555 (6th Cir. 2013); USSG § 3C1.1 Application Note 4(E)-(F).

### 1.  Perjury

In order to support an obstruction enhancement based on perjury, a district court "must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice . . . under the perjury definition."  *United States v. Murray,* 66 F. App'x 600, 607 (6th Cir. 2003) (quoting *United States v. Dunnigan*, 507 U.S. 87, 95 (1993)). The court must "identify for the record at least some specific instances of conflicting testimony and specify which portions of the defendant's testimony [s]he finds materially

perjurious." *Id.* The elements of perjury are: "(1) a false statement under oath, (2) concerning a material matter, (3) with the willful intent to provide false testimony." *United States v. Payton*, 516 F. App'x 553, 555 (6th Cir. 2013).

"Material information is information that, if believed, would tend to influence or affect the issue under determination." *Murray,* 66 F. App'x at 607 (quoting *United States v. Crousore*, 1 F.3d 382, 385 (6th Cir. 1993)); USSG § 3C1.1 Application Note 6. Testimony is willful if it is designed to influence the judge's decision on a motion to suppress. *Payton*, 516 F. App'x at 555.

Accordingly, contrary to that argued by Ramadan, materiality does not require that the testimony be material to the guns or silencer at issue at trial. Instead, testimony is "material" if it would influence or affect an issue under determination, and this would apply to a defendant's suppression hearing testimony. *See e.g.*, *Murray,* 66 F. App'x at 607-09; *Payton*, 516 F. App'x at 554-56; *United States v. Barnett*, 939 F.2d 405, 407-08 (7th Cir. 1991); *United States v. Mitchell*, 227 F. App'x 472, 474-75 (6th Cir. 2007). Information or testimony is material, moreover, regardless whether there were alternative bases for denying a motion to suppress, like the border exception here or the automobile exception in other cases. *Payton*, 516 F. App'x at 556 (citing *United States v. Smaw*, 993 F.2d 902, 904 (D.C. Cir. 1993)).

Under this standard, Ramadan committed obstruction of justice. Ramadan filed a motion to suppress both his statements and the alleged fruit of the alleged unlawful statements. ECF No. 20, PageID.203-06, 209, 215-17. Ramadan argued that his statements were involuntary because, among other reasons, he gave them without the benefit of *Miranda* warnings (in a custodial interview), after asking for a lawyer and an interpreter, and after the agents threatened and assaulted him. *Id*. Ramadan requested an evidentiary hearing to prove-up these assertions. *Id*.

Mr. Ramadan was granted an evidentiary hearing and he testified on his own behalf. His testimony included lies and false statements—all made on direct examination, not cross examination—to support his claim that his statements were involuntary and not *Mirandized* (in custody), including:

- That he asked for a lawyer, but was told he was not entitled to one, and that he had to speak to the officers, ECF No. 80, PageID.1449-50 (transcript pp 168-69);

- That one of the officers told Mr. Ramadan that "he [would] send me to Guantanamo" if he did not talk and cooperate, ECF No. 80, PageID.1451-52 (transcript pp 170-71); ECF No. 81, PageID.1489-90 (transcript pp 31-32);

- That he remained handcuffed the entire time he was interviewed by FBI and HSI agents, ECF No. 81, PageID.1481-82 (transcript pp 23-24);

- That, after being asked about his travel plans, he asked for a lawyer, said he was not going to say anything, and that he wanted an interpreter, ECF No. 81, PageID.1489-90 (transcript pp 31-32);

- That one of the agents physically assaulted Mr. Ramadan and called him a "sand n*gger." Mr. Ramadan specifically testified that one of

the agents "yelled at me, he told me to stand up, turn, and he took off his handcuffs and put them on me,  And he lifted up, and he hit me two punches on my stomach. Who do you think you are, you sand n\*gger." Mr. Ramadan also testified that the agent "twisted my ear and pulled my hair." Mr. Ramadan then stood up and showed Judge Battani precisely where the agent allegedly punched him. ECF No. 81, PageID.1506-08 (transcript pp 48-50); and

- That one agent said that if Mr. Ramadan did not take him to the weapons "I'm going to keep on hitting you all night." ECF No. 81, PageID.1507-09, (transcript pp 49-51).

After Ramadan testified, he filed a supplemental brief in which he relied upon and cited to his lies. Ramadan cited to specific pages of the transcript—including his testimony that one of the officers told him that he "would be going to Guantanamo," and his testimony that the "federal agents used physical coercion," including punching him twice, twisting his ear and pulling his hair. ECF No. 97, PageID.1869-70. And, Ramadan argued that this testimony showed that his airport statements were involuntary, and that he was "in custody" for purposes of *Miranda*. ECF No. 97, PageID.1866-71. Accordingly, Ramadan simply cannot argue that his lies were not relevant to the issues before the Court—they were specifically made on direct examination and referenced in his supplemental brief in order to influence and affect the issues under determination—and they were willful—designed to influence Judge Battani's decision.

Indeed, we know Ramadan's false testimony was both material and willful because Judge Battani was forced to address and analyze Ramadan's testimony

when rendering her decision, ultimately concluding that Ramadan (and his testimony under oath) were "not credible." ECF No. 110, PageID.2267. Judge Battani began her opinion by explaining that Ramadan contended that "the statements he made . . . were involuntary, in light of (i) the conduct of the agents during his interrogation, which allegedly included handcuffing and physical assault . . ." ECF No. 110, PageID.2223. Judge Battani then summarized Ramadan's relevant testimony, including testimony that he allegedly asked for a lawyer and an interpreter (but was denied), that the officers allegedly "threatened to send him to Guantanamo," that he allegedly remained handcuffed throughout the entire interview with the HSI and FBI agents, that one of the agents handcuffed him with his arms behind his back, lifted him by the arms, and punched him twice in the stomach, called him a "[s]and n*gger," twisted his ear, pulled his hair, and threatened to "keep on hitting [him] all night." ECF No. 110, PageID.2228, 2234, 2236-37. And, when rejecting Ramadan's legal claim that the agents' questioning and actions created an atmosphere tantamount to custodial interrogation (requiring *Miranda* warnings), Judge Battani once again cited Ramadan's specific testimony regarding being threatened (including being sent to Guantanamo); that he was called a "[s]and n*gger," had his ear twisted, his hair pulled; that he was punched in the stomach; and that he was refused a lawyer and translator. ECF No. 110,

PageID.2267. Judge Battani then rejected Ramadan's testimony, finding that Ramadan was not credible and that the interview was not custodial:

> The Court finds that Defendant's testimony on certain of these points is not credible.

ECF No. 110, PageID.2267. Judge Battani went on to explain exactly why she "credit[ed] the testimony of the officers and agents over Defendant's account," noting that against one "single and fairly modest inconsistency [by an officer], there are a number of reasons [which she outlined] to discount Defendant's testimony about certain aspects of his interactions with the officers and agents." ECF No. 110, PageID.2269-70.Two points were properly scored under § 3C1.1.

## 2. Providing Materially False Information to the Court

Two points should also be scored under USSG § 3C1.1 because Ramadan provided materially false information to your Honor as part of his emergency motion for pretrial release from detention. ECF No. 181, PageID.2721-23, 2731; USSG § 3C1.1 Application Note 4(F). Ramadan represented to the Court that he had diabetes and chronic asthma so that he could obtain pre-trial release during the Covid-19 pandemic, pursuant to 18 U.S.C. § 3142(i). *Id.* The Court flatly rejected this assertion, concluding that "Ramadan's statement that he has diabetes is entirely false, and his subsequent position that he 'thinks' he has diabetes is far from a compelling reason to justify release where all available medical records undermine his baseless lay opinion." ECF No. 190, PageID.3359-60. Likewise, the

Court concluded that "Ramadan failed to provide any justification in his reply brief for falsely claiming that he had chronic asthma. His fabrication of having asthma does not constitute a compelling reason for his release." ECF No. 190, PageID.3360. The Court concluded:

> Ramadan made several additional untruthful statements to the Court related to his Motion for Release. Even though all of his medical records demonstrated that he does not have diabetes or asthma, Ramadan misrepresented to the Court that he had those medical conditions and they constituted a compelling reason necessitating his release.

ECF No. 190, PageID.3362.

The Sixth Circuit has held that providing false information to the Court in order to obtain pretrial release constitutes obstruction under § 3C1.1 because the defendant provided materially false information to a Judge. *United States v. Charles*, 138 F.3d 257, 266-67 (6th Cir. 1998) (false information relevant to pre-trial release); *United States v, Lee,* 181 F.3d 105, *2 (6th Cir. 1999) (unpublished) (false information relevant to pre-trial release); *see also United States v. Williams,* 940 F.2d 176, 181 (6th Cir. 1991) (false information during identify hearing).

## B.   <u>Obliterated Serial Number, USSG § 2K2.1(b)(4)(B)</u>

Next, Ramadan objected to scoring four points under USSG § 2K2.1(b)(4)(B) for having a firearm with an obliterated serial number, claiming the scoring constituted double counting. Ramadan is wrong and his objection is

directly addressed by USSG § 2K2.1's Application Notes.

The jury unanimously convicted Ramadan of three counts, including Count Two, possession of a stolen firearm in violation of 18 U.S.C. § 922(j). The offense involved a stolen Jennings firearm that also had an obliterated serial number. And, USSG § 2K2.1 Application Note 8 specifically provides that 4-points should be applied "if the offense involved a stolen firearm or stolen ammunition." The PSR correctly scored the guidelines and Defendant's objection should be rejected.

## IV.   ARGUMENT

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered by sentencing courts in imposing a "sentence sufficient, but not greater than necessary."

A sentence of at least 78 months is just that, "sufficient, but not greater than necessary"—it takes into consideration the nature, circumstances and seriousness of the offense, Ramadan's history and characteristics, the need for punishment and deterrence, and the need to protect the public and promote respect for the law.

Ramadan's offenses are both serious and atypical. Part of his offenses are, admittedly, a "status" crime—he possessed two firearms with obliterated serial numbers. Those crimes are, however, serious in their own right as they involve "crime" guns—guns that cannot be traced. But, Ramadan did not just possess crime guns. As the trial testimony bore out, he *personally* stole one of the guns

from Phillip Prather—a 93-year-old man who trusted Ramadan to clean his carpets. Ramadan then *personally* obliterated the gun's serial number so it could not be traced and brought it here to Michigan. Ramadan also *personally* manufactured a homemade silencer. And, as your Honor knows from trial, Ramadan did not create a silencer out of curiosity. He actually recorded himself (see example embedded below) attaching the silencer to a firearm (his Ruger pistol) and shooting the gun out of his apartment window—one that backed up to a golf driving range. *See* Ex. 1 (ariel photos of area surrounding complex). He placed countless people at risk by carelessly shooting a gun out of an apartment complex window. The nature and circumstances of his crime are dangerous and serious and warrant, by itself, a significant punishment.



A sentence of at least 78 months is also more than warranted, moreover, based on Ramadan's history and characteristics, as well as the need to protect the public. Ramadan is, by his own admission, held the views of ISIS—and admitted, when questioned at the airport, that he believed in what ISIS was doing at the time, and supported ISIS's vision of an Islamic Caliphate.[1] PSR ¶ 25. And, while Ramadan also asserted, in the same interview, that he did not support ISIS's violent methods, his claim is belied by every piece of evidence obtained in this case  Ramadan's clearly has a propensity toward violence based upon photos and videos that he downloaded to his hard drives.

---

[1] On or about October 15, 2004, the U.S. Secretary of State designated al Qaeda in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act (the "INA") and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.  On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the INA and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name.  The Secretary also added the following aliases to the FTO listing: the Islamic State of Iraq and al-Sham (*i.e.*, "ISIS"), the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production.  On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS.  To date, ISIS remains a designated FTO.

First, as is documented below, Ramadan photographed himself with weapons while making the very same hand gesture (first two photos) that ISIS fighters make on the battlefield (third photo).[2]

 



Even more telling, Ramadan's hard drives were filled with hundreds of saved images and videos of ISIS propaganda—videos and images that included

---

[2] Raising a single index finger is a gesture commonly found in images of ISIS supporters. According to an article titled, "ISIS Sends a Message" in the journal Foreign Affairs, the gesture symbolizes the "tawhid," or the oneness of God. The article compared this gesture to the salute used by the Nazis. *See* Foreign Affairs Article.

some of the most violent terrorist acts committed by ISIS in support of the Caliphate, including beheadings and executions of kneeling prisoners. See Sealed Exhibit 2 (sample of photos) and Sealed Exhibit 3 (sample of videos filed in the traditional manner).

Ramadan's claims regarding his lack of support of ISIS's violent methods is, in the end, simply inconsistent with the violent images and videos that he downloaded and saved to his hard drives and—of all things—chose to take with him when he traveled to the Middle East. And, despite Ramadan's assertion that he is not an anti-Semite, the downloaded and saved images include slogans such as: "We are coming to kill you O Jews." *See* Sealed Ex. 2. Ramadan also filmed himself driving by a restaurant, yelling "Fuck Israel" to patrons standing outside. *See* Ex. 4 (video filed in the traditional manner).

Ramadan's views related to ISIS continued, moreover, even after his arrest and detention. On February 22, 2018, Milan staff discovered graffiti and what appeared to be Arabic writing on the walls and floor of a detention cell where Ramadan was housed. ECF No. 86, PageID.1664. On February 23, 2018, an investigator observed graffiti on the walls of Ramadan's cell, and determined that the graffiti appeared to match the graffiti found previously inside the detention cell. *Id*. The BOP staff took photographs of the graffiti, and the Arabic writing was translated. Ramadan's writing included: "Islamic Caliphate." *Id*.; Ex. 4 (graffiti).

Other aspects of Ramadan's history and characteristics, moreover, show a clear propensity for violence, cruelty and irresponsibility that is hard to fathom. As the Court knows from trial, Ramadan had an entire folder of images and videos saved in a folder labeled "dirty work." Within this folder, Ramadan intentionally saved numerous videos, that he recorded, showing he and his associates participating in dog fighting—the videos show the torture and killing of dogs by other dogs, while Ramadan and the others watch, prod the dogs to kill, laugh and treat the killing of hapless animals as sport. It is disgusting and beyond words. A sample of the videos is submitted as Exhibit 6 so the Court can understand who the defendant truly is. This is a sample. There are many more. All of the dog fighting videos lead to the death or critical injury of small dogs like the one pictured below.



Ramadan's dangerousness and irresponsibility does not, however, stop here. Another picture taken from Ramadan's electronic media shows a homemade pipe bomb (pictured below). *See* Ex. 7. Metadata taken from the picture shows that it was taken in a location consistent with Ramadan's house in Palestine, at a time when travel records show that he was in Palestine. *Id*. Ramadan told the officers the bomb was like a large firework that would make a loud bang when detonated, and that these items were sometimes used to throw at soldiers overseas. ECF No. 86, PageID.1649. Pipe bombs have no peaceful purpose. No socially acceptable use. They are tools used to indiscriminately wound, destroy, and kill.



Other images and videos are equally problematic—showing, at best, extremely poor judgment, at worst, clear dangerousness to those around him. These include videos of Ramadan forcing his young son to smoke a cigarette, *see*

Sealed Exhibit 8, multiple videos of Ramadan having his son shoot a semi-automatic weapon—without any ear protection—off the balcony of his apartment, *see, e.g.*, Sealed Exhibit 9, an image of his young daughter holding a semi-automatic firearm pointed at her face, *see* Sealed Exhibit 10, an image of Ramadan with a gun pointed at the head of a terrified little dog while he smiles for the camera, *see* Exhibit 11, and uncharged allegations of child cruelty involving Ramadan's daughter on October 22, 2015, *see* PSR ¶ 52 and ECF No. 86, PageID.1660.

Ramadan's dangerousness extends to many other areas: he has exhibited ongoing anger management issues that place himself and others in danger; and he has no respect for the law or authority, portraying himself as the "victim" in nearly every one of these situations. He has been involved, for example, in multiple road rage incidents (always, somehow, the other drivers' fault). *See* Exhibit 12 (videos filed in the traditional manner). Indeed, in yet another road rage incident (that was, of course, the other driver's fault), Ramadan stopped his car at a rest stop and challenged the driver of the other car, asking him if he "want to go [fight]." Ramadan then got out, walked around his car, approached the other driver, pepper sprayed the driver in the face, then got back in his car and fled. *See* Ex. 13 (video filed in the traditional manner).

Ramadan filmed yet another confrontation with a parking garage attendant, calling the attendant a "white fuckin' asshole". *See* Ex. 14 (video filed in the traditional manner). And, Ramadan has twice videotaped traffic stops where, unprovoked, he became belligerent with the law enforcement officers. In the videos, Ramadan is heard raising his voice and cursing at the police officers, telling one, "I hope you die, bitch…f*cking assh*le." *See* Ex. 15 (video filed in the traditional manner).

A sentence of at least 78 months is also justified by Ramadan's unique pre- and post-arrest pattern of providing false information to the government and the Court. Indeed, from the moment Ramadan encountered the CBP officers at the airport, through his suppression hearing and his ultimate release on bond, he has engaged in a consistent pattern of providing false information to the government and to the Court, including:

- When interviewed by law enforcement officers at the airport on August 15, 2017, the defendant provided false information about his gun ownership and the location of those guns. The defendant also provided false information about a pipe bomb photographed at his residence in Bethlehem, Israel, claiming instead that he had downloaded the photograph from the internet.

- The defendant falsely testified under oath at a suppression hearing in front of Judge Battani, claiming that he was subject to physical and verbal abuse at the airport.

- While in pretrial detention, the defendant was found with escape paraphernalia and provided two implausible accounts to the Court to explain himself.

- The defendant misrepresented his health condition to the Court in an attempt to secure his release, falsely stating he had asthma and diabetes.

- The defendant claimed to have been interrogated by the FBI while in pretrial detention, but an investigation determined that no such interrogation took place.

ECF No. 190, PageID.3358-63. Based on these lies, your Honor has concluded that Ramadan is "entirely untrustworthy." ECF No. 190, PageID.3362. Your Honor pointedly explained that because the record was "replete with instances of lies, deceitful activity and general untrustworthiness, the Court finds that Ramadan has no credibility and cannot be trusted." ECF No. 190, PageID.3362.

Under these circumstances, a sentence of at least 78 months is warranted and justified.[3]

The government expects that Ramadan will request a sentence of time-served, claiming, as he has done throughout this case, that he was a victim of government overreach and discrimination based on his religion or other factors. Nothing could be further from the truth. Mr. Ramadan is no victim. He is, among other things, a convicted criminal who stole a firearm from an elderly man, obliterated its serial number, and manufactured an illegal firearm silencer. And, any suggestion that Mr. Ramadan was treated improperly at the airport is utter nonsense—a fantasy created to avoid responsibility for his actions. Ramadan

---

[3] In addition to his conduct in this case, the defendant lied to the Social Security Administration to fraudulently obtain benefits. PSR ¶ 46.

clearly hopes that if he repeats his lies enough times, they will somehow become true. They are not. Here are the undisputed facts:

- Mr. Ramadan and his family were allowed to board the plane with minimal to no questioning so that they could proceed on their fight to Israel;

- Thereafter, improper export-controlled body armor was found in Ramadan's checked luggage. The officer who found the body armor had no idea who Mr. Ramadan was, what his name was, or anything about Mr. Ramadan, when he located the body armor. Indeed, the body armor was discovered as a result of an automated alarm triggered by Ramadan's luggage;

- Because Ramadan packed export-controlled body armor in his luggage, CBP officers were obligated to speak to Ramadan and investigate the items. The officers told Ramadan that they would need to speak to him and that he would probably miss his flight as a consequence;

- Ramadan and his family were brought to the secondary inspection area and Ramadan was asked about this travel plans and the export-controlled items. Ramadan's responses did not make sense, based on the officers' training and experience, including Ramadan's answers regarding his employment and reasons for traveling to Israel. And, during this time, the officers also learned of a 2010 HSI tip that alleged that Ramadan was associated with the terrorist group Hamas (who control the very area Ramadan was traveling to), that Ramadan killed two people in Israel, and that he was recruiting people in the United States to kill people;

- While this was occurring, other CBP officers began searching Ramadan's luggage. The officers discovered armor plates, three load bearing vests (armor plate carriers), a bullet proof vest, gun magazines and holsters, a Taser with two extra cartridges and an extra battery pack, law-enforcement grade pepper spray, rifle scopes, tactical knives, a gas mask, a black mask, a remote-controlled aerial drone, a combat carrying bag, and numerous electronic devices, including cellphones, tablets, memory cards, and external hard drives; and

- Thereafter a review of Ramadan's electronic media was commenced. Ramadan's files included photos and videos of Ramadan wearing combat vests and possessing/carrying firearms, violent ISIS photographs and videos (including images of ISIS fighters wearing black masks similar to the mask found in Ramadan's luggage), and photos and videos of a suspected pipe bomb.

It was this conduct, and nothing else, that led to the questioning of Ramadan regarding his travel plans and the items found in Ramadan's luggage and electronic media. It would have been reckless and irresponsible for the officers and agents to ignore what was presented to them at the border that night—including the lies told by Ramadan regarding his firearms. Ramadan's attempts to shift blame to others, and cast anyone other than himself as the victim, represent nothing more than Ramadan's continued and consistent inability to accept responsibility for his actions.

Ramadan is always the victim in his own mind, even after a jury convicted him after less than 45 minutes of deliberation. But, he has no one to blame but himself. And, his refusal to accept responsibility—along with his highly questionable history and characteristics outlined above—should give the Court grave concern. The fact that Ramadan has not violated the conditions of his pretrial release does not mean he is a changed person. It just means he is not stupid and did not violate the terms of his bond while he awaited trial and sentencing. Mr. Ramadan is who the facts show him to be, not who defense counsel imagines he might become despite all evidence—accumulated over many years—to the

contrary. He is a dangerous and cruel person, with clear anger issues, who is a narcissist, a manipulator and a liar, who cannot and will never accept any responsibility for his actions. Nothing has changed. A substantial sentence is, therefore, needed to deter Mr. Ramadan. To punish him. To protect the public based on his history and characteristics. And to reflect the seriousness of the offense and promote respect for the law despite his many lies to the Court.

Respectfully Submitted,

Dawn N. Ison
United States Attorney

/s Douglas C. Salzenstein
DOUGLAS C. SALZENSTEIN
JONATHAN GOULDING
Assistant United States Attorneys
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9196
doug.salzenstein@usdoj.gov

Date: December 30, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on December 30, 2021 I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Andrew Densemo and Amanda Bashi.

/s Douglas C. Salzenstein
DOUGLAS C. SALZENSTEIN
Assistant United States Attorney