```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3   UNITED STATES OF AMERICA,

 4                  Plaintiff,

 5   -v-                                  Case No. 17-20595

 6   YOUSEF MOHAMMAD RAMADAN,

 7                  Defendant.
     _____/
 8
                               SENTENCING
 9
                 BEFORE THE HONORABLE VICTORIA A. ROBERTS
10                     United States District Judge
                 Theodore Levin United States Courthouse
11                   231 West Lafayette Boulevard
                           Detroit, Michigan
12                         February 28, 2022

13   APPEARANCES:

14   FOR THE PLAINTIFF:     Douglas C. Salzenstein
                            Jonathan Goulding
15                          United States Attorney's Office
                            211 West Fort Street
16                          Suite 2001
                            Detroit, MI 48226
17
     FOR THE DEFENDANT:     Andrew Densemo
18                          Amanda N. Bashi
                            Federal Defender Office
19                          613 Abbott
                            5th Floor
20                          Detroit, MI 48226

21
     ALSO PRESENT:          John Brand, FBI Special Agent
22                          Nashwa Kattowah, Interpreter

23

24            To Obtain a Certified Transcript Contact:
              Shacara V. Mapp, CSR-9305, RMR, FCRR, CRR
25                     www.transcriptorders.com
```

1                          TABLE OF CONTENTS

2   MATTER                                                     PAGE

3   Sentencing                                                  3

4   WITNESS

5   None

6   EXHIBITS

7   None

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1  Detroit, Michigan
 2  February 28, 2022
 3  3:30 p.m.
 4                              *     *     *
 5          CASE MANAGER:  All rise.
 6          United States District Court for the Eastern District
 7  of Michigan is now in session.  The Honorable Victoria A.
 8  Roberts presiding.
 9          Calling the case, United States of America versus
10  Yousef Ramadan, Case Number 17-20595.
11          Counsel, your appearances.
12          MR. SALZENSTEIN:  Good afternoon, Your Honor.  Doug
13  Salzenstein and Jonathan Goulding on behalf of the United
14  States.  And also at the table is FBI Special Agent John
15  Brand.
16          THE COURT:  All right.  Thank you.  Good afternoon.
17          MR. SALZENSTEIN:  Good afternoon, Your Honor.
18          MR. DENSEMO:  Good afternoon, Your Honor.  Andrew
19  Densemo on behalf of Mr. Ramadan.
20          Ms. Bashi:  Good afternoon, Your Honor, Amanda Bashi
21  on behalf of Mr. Ramadan who is seated with us.
22          THE COURT:  Thank you.  You can take your seats.
23          CASE MANAGER:  Ms. Kattowah, would you please stand?
24  Please raise your right hand.
25                              *     *     *
```

|   |   |
|---|---|
| 1 | NASHWA KATTOWAH |
| 2 | was called as an interpreter, and having been first duly sworn, |
| 3 | swears to translate from Arabic to English and English to |
| 4 | Arabic truthfully and accurately. |
| 5 | *     *     * |
| 6 | THE COURT:  Good afternoon. |
| 7 | THE INTERPRETER:  Good afternoon, Your Honor. |
| 8 | THE COURT:  And how do you pronounce your last name? |
| 9 | THE INTERPRETER:  Kattowah, Your Honor. |
| 10 | THE COURT:  Kattowah? |
| 11 | THE INTERPRETER:  Yes. |
| 12 | THE COURT:  Okay.  Thank you. |
| 13 | This is the time that the Court has set to impose |
| 14 | sentence on Mr. Ramadan.  I have -- before we get started, I |
| 15 | have a Presentence Investigation Report prepared by Kody |
| 16 | Bellamy, and he is here.  It was originally prepared on |
| 17 | December 7, 2021.  It was revised on January 3, 2022.  There |
| 18 | are still outstanding objections. |
| 19 | I have a sentencing memorandum filed by the |
| 20 | Government, and I have a sentencing memorandum filed by the |
| 21 | defendant. |
| 22 | Is there anything else I should have here?  Oh, and I |
| 23 | have -- the Government did send in the videos, clippings, that |
| 24 | are part of their sentencing memorandum.  I do have those. |
| 25 | Okay.  Anything else that I should have? |

```
 1              MR. SALZENSTEIN:  No, Your Honor.

 2              THE COURT:  All right.

 3              MR. DENSEMO:  No, Your Honor.  Thank you.

 4              THE COURT:  Thank you.

 5              Mr. Ramadan, good afternoon.

 6              THE WITNESS:  Good afternoon, Your Honor.

 7              THE COURT:  Mr. Ramadan, did you read, or have read

 8    to you, the Presentence Investigation Report?

 9              THE WITNESS:  I did not read it all, but I read most

10    of it.

11              THE COURT:  Okay.  You can use the microphone if you

12    would, and you can remain seated.

13              THE WITNESS:  Okay.

14              THE COURT:  You didn't read all, but you read most?

15              THE WITNESS:  Yes.

16              THE COURT:  Okay.  Use the microphone.

17              THE WITNESS:  Yes.

18              THE COURT:  And did the parts that you didn't read,

19    get read to you?

20              THE WITNESS:  No.

21              THE COURT:  Okay.  What didn't you read?

22              THE WITNESS:  Which is --

23              THE COURT:  Can you tell me?

24              THE WITNESS:  Yes.  What Mr. Kody tell me about my

25    family, and the medical reports I give to him.  And basically
```

```
 1    also, I read, you know, saying about the accusation the
 2    Government was talking about me.
 3              THE COURT:  All right.  You know that Mr. Densemo
 4    filed objections to this report?
 5              THE WITNESS:  Yes, I know.
 6              THE COURT:  And are you in agreement with the
 7    objections that he filed?
 8              THE WITNESS:  Yes.
 9              THE COURT:  And are there any objections you have to
10    this report, that Mr. Densemo did not formally object to?
11              THE WITNESS:  Based of my knowledge, no.
12              THE COURT:  I'm sorry, say it again.
13              THE WITNESS:  Based of my knowledge, no.
14              THE COURT:  No, you have no other objections?
15              THE WITNESS:  No.  No, Your Honor.
16              THE COURT:  Okay.  All right.
17              And there are four still outstanding, so let me --
18    let me address those.
19              Mr. Densemo, your first two objections do not have
20    anything to do with the guideline calculations.  Do you want
21    me to resolve anything in connection with objections one and
22    two?
23              MR. DENSEMO:  Yes.  I would like to have the -- the
24    objected to language excised from the report as to objection
25    number one.
```

 1             THE COURT:  All right.  And that objection has to do,
 2    primarily, with his behavior while in custody, correct?
 3             MR. DENSEMO:  That's correct, Your Honor.
 4             THE COURT:  Okay.  All right.
 5        So I -- do you want to say anything more than what it
 6    is here, and then I'll hear from the Government?
 7             MR. DENSEMO:  The only thing I would add as to that
 8    objection, Your Honor, is that my objection is that it is, to
 9    my mind, unfair to pick and choose of -- when this information
10    is included in the Presentence Investigation Report.  Either
11    it's applicable to everyone, or it's not.  And it seems to me
12    that a lot of extraneous information has been introduced in
13    Mr. Ramadan's case in particular.  And that appears to
14    continue to be the case.
15        If I were -- if I were seeing this information, if
16    this was standing information that was included in everyone's
17    Presentence Investigation Report, I would have no objections.
18    Because then, across the board, this information is being
19    applied to everyone equally, and it's being considered
20    equally.  I just have a problem with it appearing in this
21    case, and especially given the lack of reliability.
22             THE COURT:  Mr. Densemo, let me just interrupt you a
23    moment.  Can you use the microphone, please?
24             MR. DENSEMO:  Sure.  I'm sorry, Your Honor.
25             Given the unreliability of the information, as I

1    indicate, we don't know the underlying circumstances that led

2    to the -- the sanctions or the tickets in custody.  The

3    Government says, well, Mr. Ramadan had every opportunity to

4    consult with his lawyers, he's been free on bond, and he could

5    have given his side of the story.

6         Well, nobody's side of the story is given in -- in

7    these sanctions.  And we don't know what caused them or what

8    led to them, if they were valid, if they were legitimate, or

9    if these were just tickets that were handed out fairly easily

10   because Mr. Ramadan was in the wrong place at the wrong time,

11   or said the wrong thing to -- at the wrong time, to the wrong

12   person.

13        So again, I don't see the fairness in including it in

14   the report and asking you to draw conclusions about

15   Mr. Ramadan based upon its inclusion in the report.

16        THE COURT:  Okay.  Thank you.

17        Response from the Government.

18        MR. SALZENSTEIN:  Thank you, Your Honor.

19        First, with respect to this idea that it's not

20   included in every single defendant's Presentence Investigation

21   Report.  The defendant has cited nothing that indicates that

22   inclusion of this information is improper.  And it's included

23   in Presentence Investigation Reports when it's relevant,

24   including when it's relevant here, when you have a defendant

25   who has a history of misconducts along with having escape

 1   paraphernalia in his prison, Your Honor.  And all this

 2   information, when it occurs, with respect to a particular

 3   defendant, is relevant.  It's relevant to both the 3553(a)

 4   factors, the nature and history and characteristics of this

 5   defendant.  It's also relevant to the Bureau of Prisons in

 6   terms of designation, and security issues.

 7          And so, all of this is -- is relevant, Your Honor.

 8   And it's relevant when it's applicable.

 9          And clearly, Mr. Ramadan has multiple infractions

10   while at Milan.  This idea that well, maybe he was in the

11   wrong place at the wrong time.  There's administrative

12   processes if Mr. Ramadan was asserting that.  He's had ample

13   opportunity to do that.  These are facts, Your Honor.  These

14   are facts that he received all these tickets.

15          The information about the escape paraphernalia has

16   been referenced in multiple proceedings in this -- in this

17   Court and before Judge Battani, Your Honor.  And everything

18   that's stated in here is accurate and relevant.  Relevant to

19   both 3553(a), and relevant to the Bureau of Prisons'

20   assessment.  And there's not been a single case or anything to

21   say that putting post incarceration conduct, I mean, pre --

22   while awaiting trial is improper.

23          So for all those reasons, Your Honor, it's -- we ask

24   that the information which is entirely accurate be continued

25   in the -- in the report.

1    Your Honor could -- is free to disregard it

2    completely if you feel based on Mr. Densemo's arguments that

3    you should not give much or any weight to it, but it's

4    accurate in its facts.

5         THE COURT:  Okay.  Thank you.

6         The Court overrules this objection.

7         Mr. Densemo, you're correct.  It doesn't make its way

8    into all Presentence Investigation Reports, but I certainly

9    have seen defense -- the defendant's conduct while in pretrial

10   custody in many, many, many Presentence Investigation Reports.

11        The Court agrees with Mr. Bellamy and the Government

12   that this is relevant 3553(a) that the Court can take into

13   account.  Even if he wasn't in custody, the Court often always

14   takes into account, the conduct of Defendant before -- before

15   the imposition of sentence.  So objection number one is

16   overruled.

17        Defendant has objection two, which has to do with the

18   descriptions that are included in paragraphs 22 through 29.

19   Mr. Densemo, do you want to supplement your objection?

20        MR. DENSEMO:  Your Honor, this objection has to do

21   with the accuracy and lack of objectivity of the information.

22   Of course, this information is not information that Kody

23   Bellamy wrote, I mean that he authored himself.  This is

24   information coming from the agents and their reports, of what

25   -- and what -- in the principal interrogation of Mr. Ramadan

1    at the airport.

2          And the information that was given to Mr. Bellamy is

3    wholly subjective, and in a number of areas, inaccurate.  And

4    we have objected to this information, or these representations

5    time and time again.  And the -- the idea that this subjective

6    representation by the agents should make its way into the

7    presentence report is -- is completely unfair.

8          Again, I pointed to an example in the -- in my

9    objections, where the agents says, you know, Mr. Ramadan

10   wasn't giving accurate answers.  Well, the agents have no way

11   of knowing if Mr. Ramadan is giving accurate answers or not.

12   Their position is, they weren't satisfied with the answers he

13   gave, so they framed it in terms of providing information that

14   was -- that was inaccurate and deceitful.

15         This whole case has been about -- well, not this

16   whole case.  The beginning of this case was about what

17   happened at the airport.  Mr. Ramadan had a -- Mr. Ramadan

18   said, this is what happened at the airport.  The agent said

19   something different.  It wasn't recorded.  So we don't know

20   what exactly happened at that airport during that

21   interrogation, during those 14 to 16 hours where Mr. Ramadan

22   was interrogated by the agents.

23         Mr. Ramadan has, time and time again, asked for a

24   recording of that interrogation.  So there would be no doubt

25   as to who -- who was saying -- who said what and who did what.

1   The recording was never produced to the defense.  The

2   Government has insisted that that recording is not available.

3   And it seems to me, Your Honor, that for something that

4   started out in the way that this thing started out, that a

5   recording would have been made and preserved if, in fact, it

6   supported what the Government was saying.  It raises some

7   doubt in my mind or some suspicion in my mind that the

8   recording wasn't preserved because it supported what

9   Mr. Ramadan was saying and it did not support what the

10   Government was saying.

11   But be that as it may, Your Honor, our point is that

12   the information that was provided to Mr. Bellamy is subjective

13   information based upon the subjectivity of police officers

14   during interrogation.  And in large part, it was inaccurate.

15   We have indicated time and time again that Mr. Ramadan didn't

16   say certain things about ISIS.  He didn't say certain things

17   about the caliphate.  He didn't say certain things about his

18   family, or a possession of weapons.

19   Those things, Your Honor, are a matter of -- we don't

20   know where the truth lies in terms of who said what.

21   So if we don't know, if we're not certain in this

22   regard, that information should not be included in the

23   Presentence Investigation Report.  I recognize that the

24   offense conduct should be included, but the offense conducts,

25   Your Honor, could have been -- should have been.

| | |
|---|---|
| 1 | Mr. Ramadan was stopped at the airport along with his |
| 2 | family for having export-controlled items.  They were taken to |
| 3 | secondary inspection.  They were questioned for 16 hours.  He |
| 4 | was questioned.  Based upon that questioning, officers |
| 5 | developed probable cause or suspicions or reasons to search |
| 6 | his storage unit.  They obtained a search warrant.  Upon |
| 7 | execution of the search warrant, they found two firearms with |
| 8 | obliterate -- an obliterated serial number, one they believed |
| 9 | to be stolen, and a fuel filter which they believed to be a |
| 10 | silencer.  That is the offense conduct.  And based upon the -- |
| 11 | based upon the discovery of those items, Mr. Ramadan was |
| 12 | charged. |
| 13 | What's wrong with that offense conduct in terms of -- |
| 14 | in terms of setting out -- because it sets out exactly what |
| 15 | happened, and why Mr. Ramadan was charged.  And it sets out |
| 16 | the offense conduct in this case, which is the possession of |
| 17 | firearms with an obliterated serial number, possession of |
| 18 | firearms, and possession of a silencer.  That is the offense |
| 19 | conduct and that's the offense conduct that should be listed |
| 20 | in the report and not the other flotsam and jetsam that was |
| 21 | included. |
| 22 | THE COURT:  All right.  Thank you. |
| 23 | Mr. Salzenstein, you have a response? |
| 24 | MR. SALZENSTEIN:  Yes, Your Honor. |
| 25 | First, Mr. Densemo keeps referring to this recording |

```
 1    of the interview.  That's not true, Your Honor.  This has been
 2    gone over multiple times.  There was never a recording of that
 3    interview.  Mr. Densemo knows that --
 4            MR. DENSEMO:  Now, Your Honor, I --
 5            MR. SALZENSTEIN:  I did not interrupt you, Mr.
 6    Densemo.
 7            MR. DENSEMO:  I'm not going to --
 8            THE COURT:  Excuse me.  Excuse me.
 9            MR. DENSEMO:  I'm not going to sit here and --
10            THE COURT:  Excuse me.
11            MR. DENSEMO:  -- be called a liar.  The only --
12            THE COURT:  Excuse me.  Mr. Densemo, please.  I'll
13    let you respond.
14            MR. DENSEMO:  All right.
15            MR. SALZENSTEIN:  The only issue about a recording
16    ever being not preserved, Your Honor, was video recording
17    throughout the airport, Your Honor, because that is not
18    preserved normally.  You know, video cameras out and about.
19    That is the only issue, Your Honor.  There was never an issue
20    about a recording being made of this interview.
21            With respect to the content of the offense conduct,
22    Your Honor, everything in here is accurate and has been
23    supported by the testimony from witness after witness after
24    witness at the suppression hearing, and witness after witness
25    after witness at the trial.  This isn't bias.  This is --
```

1   there's very few facts in here, Your Honor, that are even in

2   dispute.  The only one that he -- specific, that I can tell,

3   that Mr. Densemo is questioning is in paragraph 24, which

4   indicates that when questioned by agents about the items found

5   in his luggage, Ramadan stated that he wanted to be a

6   photographer and wanted to film the conflict in Palestine.

7   One hundred percent accurate.

8          When questioned further about his possession of the

9   equipment, Ramadan could not give an answer and appeared

10  nervous.  That's exactly what the witnesses testified, both

11  during the suppression hearing and at trial.

12         Agents sequestered that Ramadan unlock his cellphones

13  and laptops so agents could review.  He refused.  One hundred

14  percent accurate.  He became upset, one hundred percent

15  accurate.  And was placed in restraints until he calmed down.

16  This is all one hundred percent accurate, Your Honor.  There is

17  nothing inaccurate in this

18         This is the offense conduct supported by the

19  testimony on the record in multiple hearings, Your Honor, and

20  it should be continued in this report.

21         THE COURT:  All right.  Thank you.

22         Do you have a short response, Mr. Densemo?

23         MR. DENSEMO:  Your Honor, it's our understanding that

24  the airport does record the videos, but that since there was

25  no request to preserve it, it was recorded over and that there

 1    was no record of it.  But there initially had been a record of

 2    it.  That's our understanding.  But there was a 90-day time

 3    period within which that could have been preserved.  There was

 4    no request by the Government to ever preserve any recordings.

 5    I don't believe there was ever any attempt by the Government

 6    to ever determine -- to ever obtain a recording of the

 7    interview.

 8            The Government says that everything in there is

 9    accurate and that, well -- and that we agree with that.  Well,

10    let me -- for the record, we don't agree with what the agents

11    testified to and that's why we challenged the agents'

12    testimony at the suppression hearing.  And that's why there

13    was a two- to three-month suppression hearing, because we

14    disagreed with the agent's description of what had taken place

15    during the course of that interrogation.  So the suggestion is

16    that everything is accurate and that the defense agrees with

17    that is -- is a fantasy and it's wholly inaccurate.

18            Again, I don't see the relevance in putting all of

19    that in the report in the first place, and making that a part

20    of the offense conduct because it's not.  This is something

21    that happened that had to do with a terrorism investigation

22    that was not supported.  Had this -- had Mr. Ramadan been

23    charged with something along those lines, that would have been

24    relevant to the offense conduct.  It is not, in this

25    particular case.  But yet, it still finds its way, thanks to

1    the Government, into the Presentence Investigation Report.

2           So again, it's not necessary.  It's not needed.  And

3    again, I think it's just being offered as a distraction.

4           THE COURT:  All right.  I'm ready to make a ruling on

5    this.  A couple of points.  I mean, just because information

6    is accurate doesn't mean that it has to make its way into a

7    Presentence Investigation Report.  Because if that were the

8    case, we would have Presentence Investigation Reports that are

9    the size of a bible.  I think the reports should have accurate

10   information.  But everything isn't material to a description

11   of the offense conduct.

12          Much of what is in these paragraphs, 22 through 29 --

13   is that your challenge?  -- is background information.  As

14   Mr. Salzenstein said, it did come out during the course of the

15   trial.  Not all of it did.  And there are parts of this that I

16   will strike from the report because I don't think that it's

17   relevant.  Some of it, I did not allow to come out during the

18   trial testimony.  Some may have come out during the

19   suppression hearing.  But in the end, not all of this

20   information that is in the offense conduct was part of the

21   trial.

22          I am looking, particularly, at paragraphs 24 and 25

23   now.  And there is language in these paragraphs I will strike.

24          In paragraph 24, the first sentence will remain as

25   is.  And then, the next sentence, when questioned further

```
 1    about his possessions of the equipment, Ramadan could not give

 2    an answer and appeared nervous.  I will strike that.  The

 3    third sentence will stay in.

 4         In paragraph 25, I will leave the first sentence as

 5    it is written.  And then my intention is to strike the middle

 6    part of that paragraph 25, beginning with the next sentence on

 7    the devices, and through the line that begins, "built them

 8    outside the United States."

 9         And everything else, I will leave in this report.

10         Do you have that, Mr. Bellamy?

11         PROBATION:  Yes, Your Honor.

12         THE COURT:  All right.  Thank you.

13         Defense objection number three is to the adjustment

14    for obstruction of justice, in paragraphs 31 and 32 on page

15    seven.

16         Mr. Densemo, please.

17         MR. DENSEMO:  Your Honor, the objection appears to --

18    my objection is that, I don't see where Mr. Ramadan obstructed

19    justice, especially in any material manner.  Again, this gets

20    -- this gets back to the Government's continually calling

21    Mr. Ramadan a liar and a manipulator.  And they haven't point

22    -- the Government is -- is upset with Mr. Ramadan because

23    Mr. Ramadan filed a motion.  His -- I filed a motion.

24    Ms. Fitzharris and I filed motions objecting to his detention

25    and questioning at the airport because we believed that to be
```

1 illegal. A search of his media could not be done under those

2 circumstances. And we went on to describe what we believe

3 happened during the course of that interrogation for 16 hours

4 that he was there, and Mr. Ramadan's recollection of some of

5 the things that had occurred to him during the course of that

6 interrogation.

7   The agent's position was that Mr. Ramadan wasn't

8 entitled to an attorney. So no, he wasn't advised of an

9 attorney. He wasn't given an attorney. And even if he had --

10 even if he had asked for one, he would not have been given an

11 attorney. Our position was, that's illegal. You can't do

12 that, agent.

13   The law is that you cannot search his electronic

14 media, even at that border. You need more in order to do

15 that. And I'm not -- I'm not going to get into the whole

16 search issue, but the Government is saying because

17 Mr. Ramadan, through his attorneys, did that, he obstructed

18 justice, and that he obstructed justice by saying that the

19 agents engaged in conduct that was illegal.

20   When Judge Battani found that the agents hadn't

21 engaged in any kind of illegal conduct, well, criminal

22 defendants often come to court and say police officers, agents

23 have engaged in illegal conduct, and this is what they did.

24 They searched me. They patted me down. They did not advise

25 me of Miranda rights. They ignored so and so. They did all

```
1    of these things to me, Judge.  And the Judge makes a
2    determination if, in fact, the officer's conduct was illegal.
3    Sometimes the Judge, often times, most times, judges across
4    this country, state and federal, side with the law
5    enforcement.  Not all the time.  But for the most part,
6    suppression motions aren't granted.  That doesn't mean that
7    the individual has obstructed justice by asserting their
8    Fourth -- their constitutional rights as to the -- as to a
9    search and seizure, or as to questioning.
10           So the idea that Mr. Ramadan obstructed justice based
11   upon his request for a suppression of evidence is ridiculous.
12           The other argument that the Government makes is that
13   Mr. Ramadan advised the Court that he believed that he had
14   been questioned by a federal agent, that a federal agent had
15   come to Milan and attempted to question him.  And the
16   Government said that's obstruction of justice, even though the
17   defense brought that to the Court's attention and said, Judge,
18   we believe an agent tried to talk to our client and we want to
19   advise the Government that no attempts should be made to
20   contact Mr. Ramadan for any -- for this case or in any other,
21   or connected to anything else.
22           THE COURT:  Mr. Densemo, I just want to short circuit
23   this a moment -- for a moment.  I am at a little bit of a
24   disadvantage because it was Judge Battani and not I, who
25   presided over that suppression hearing.
```

1    But Judge Battani made certain findings.  And I am

2  not free, I think, to reject those findings.  And she made

3  findings regarding credibility of witnesses.  And I think that

4  this is what this obstruction, these obstruction points boil

5  down to.

6    3C1.1 says it is obstruction to provide materially

7  false information to a judge or magistrate judge.  Material is

8  defined as evidence, facts, statement or information that if

9  believed, would tend to influence or affect the issue under

10  determination.

11    And she made findings concerning that, that would

12  suggest that she did not believe the testimony of Mr. Ramadan

13  and that she believed his testimony to be fabricated.  So I

14  just want to put the focus here.  I know what you're arguing.

15  These are the same arguments you made to Judge Battani.  But

16  she made a finding, and I think I have to accept it.

17    MR. DENSEMO:  I think Judge -- Judge Battani's

18  position was that she found the officer's testimony to be more

19  credible than Mr. Ramadan.  That's not to suggest that

20  everything that Mr. Ramadan was saying to her, she

21  disbelieved.  Now, I don't think she made that finding, that

22  she disbelieved everything that Mr. Ramadan said.

23    And, in fact, Judge -- Judge Battani found that there

24  had been some inconsistencies in the officer's test -- what

25  she -- which she phrased as inconsistent statements.

1          But again, there's no determination by that, that
2     that officer was lying, that he had engaged in perjury.  And I
3     think the same should hold true for Mr. Ramadan.  Just because
4     the judge found that the officer's -- she -- she believed or
5     gave more credibility to the officer's account than
6     Mr. Ramadan, that doesn't mean that Mr. Ramadan obstructed
7     justice as a result of his testimony.
8          And I think most importantly, Your Honor, ultimately,
9     it was determined that when the judge ruled against us, that
10    Mr. Ramadan did not have a right to an attorney at the border.
11    He -- you know, that the search at the border was legal.
12         So any statements made by Mr. Ramadan were -- would
13    not have affected that determination, if the judge, in fact,
14    made that ruling that he was not entitled to an attorney, and
15    that the search of his electronic equipment at the border was
16    a -- was a legitimate search at that point in time.
17         I don't see how that obstructed justice in any
18    material or meaningful manner.  And I believe the -- the
19    enhancement should not be applied in this case.
20         THE COURT:  All right.  Thank you.
21         Mr. Salzenstein.
22         MR. SALZENSTEIN:  Thank you, Your Honor.  And I'm
23    going to be brief based on Your Honor's comments.
24         First, with respect to that last argument that there
25    were alternative basis to deny the motion to dispress -- to

1    suppress.  That argument has been explicitly rejected by the

2    Sixth Circuit.  We said in Payton, 516 Federal Appendix, at

3    556, that it doesn't matter whether there are alternative

4    basis for denying a motion to suppress.  Like any alternative

5    basis, as long as the testimony, as Your Honor indicated, was

6    fabricated, and it went to a material issue in that motion,

7    which it did, most clearly, because the entire basis for that

8    testimony was to try to suppress those statements and the

9    fruits of those statements based on, allegedly, being in

10   custody and allegedly being -- those statements being

11   involuntarily based on the defendant being beaten, et cetera.

12   Which, the judge deemed that testimony, as Your Honor

13   indicated, to be fabricated.

14         And the case law is clear on this point, and in

15   Payton, Murray, Mitchell, Barnett, if a defendant lies, as the

16   defendant here did, as to a material issue in a suppression

17   hearing.  And imagine if he had been successful in those lies,

18   Your Honor.  What would have happened?  The evidence would

19   have been suppressed and the case would have gone away.

20   That's the whole point of filing a motion to suppress.  That's

21   why it's material in this case.

22         And the defendant is not being given an obstruction

23   enhancement because he asserted his constitutional rights,

24   he's being given an obstruction enhancement because he lied to

25   the Court.  He perjured himself.  That's where the line is

1    drawn.  That's where the two points come in.  And we've shown

2    this is material because not only did the defendant testify to

3    -- to support those claims, but the defendant, himself, cited

4    to his own testimony that the judge later found to be

5    fabricated, in their supplemental brief.  It was clearly

6    material.  It was clearly done to influence the decision of

7    the Court, Your Honor.  And that's just one reason, the

8    perjury.

9         The second reason the defendant's, which we've

10   briefed -- the defendant's false statements about his diabetes

11   and chronic asthma that he made to the Court.  We cited the

12   case law, the Charles, the Lee, the Williams case.  Again,

13   that is providing false information to the Court that also

14   independently would warrant an obstruction enhancement.

15        And based on the record, Your Honor, and essentially

16   Defendant's pattern -- and it's not just the Government that

17   has noted Mr. Den -- Mr. Ramadan's pattern of lying.  The

18   Court also made that same exact conclusion in the motion for

19   bond, your Honor.  I could quote it, but I know Your Honor's

20   familiar with it.

21        And based on the entire record, the Government

22   requests two points as Probation scored, for obstruction.

23        THE COURT:  All right.  Thank you.  I'm prepared to

24   rule.

25        With respect to the last point that Mr. Salzenstein

1    made concerning a reason why Mr. Ramadan should be assessed

2    these points, it has to do with a hearing that this Court held

3    when it ultimately denied him bond for the first time, in May

4    of 2020.  And I went back, and I looked at the transcript of

5    that hearing, and he was then represented by Mr. Korn.  And,

6    at issue were certain videos and whether statements made in

7    those videos were fabricated.  And at issue also, was whether

8    Mr. Ramadan had diabetes and asthma.  And Mr. Korn went on to

9    say how Mr. Ramadan firmly believed that he had those

10   conditions, that they were not fabricated, that he had

11   asserted that he had those conditions long before this matter.

12   Well, maybe not long before, but records from January of 2019

13   revealed that he believed he had those conditions.  And I just

14   want to -- long before COVID was an issue.  And that was the

15   basis for why he was trying to get released.

16        During the course of that hearing, Mr. Ramadan said

17   to the Court this.  He said, "And also, when it comes down to

18   my medical record, me and my attorney, we discussed this issue

19   and we both agreed not to put it in the motion but somehow it

20   was in the motion.  So I think it was miscommunication between

21   me and my attorney."

22        I'm not going to rely upon the testimony or the

23   statement that Mr. Ramadan gave during the course of the bond

24   hearing I held, but the Court does rely on what happened in

25   the hearing before Judge Battani on the motion to suppress, to

1    overrule this objection.

2            There were determinations that the Judge made with

3    respect to that motion to suppress.  The matter at issue, the

4    issue under determination was a significant one.  It was

5    whether the charges were going to go forward or not.  And the

6    Court does believe that there is enough in this record to show

7    that Mr. Ramadan did make false statements under oath.  That's

8    what Judge Battani found.  And those statements concern a

9    material matter.  And the Court believes it was with the

10   intent to provide false testimony.

11           So, for all of those reasons, that objection is

12   overruled.

13           I think that there is one remaining, and it has to do

14   with the obliterated serial number.

15           MR. DENSEMO:  Yes, Your Honor.

16           And our -- our position is that it just seems -- it

17   just seems counterintuitive to assess additional points for

18   either possession of a stolen firearm or possession of a

19   firearm with an obliterated serial number when, in fact, the

20   statute contemplates that conduct.  The charge contemplates

21   that conduct.

22           I understand what Mr. Bellamy is saying, that the

23   offense of possession of an unregistered firearm does not

24   include those enhancements.  And since they are -- since these

25   counts are grouped and that -- that offense or that particular

1    charge did not garner any enhancements, then under the --

2    since that is included in these counts of convictions, then

3    that -- those enhancements imply -- apply.

4           But it seems to me that we're still assessing

5    enhancements for offenses that contemplate that kind of

6    conduct.  Possession of stolen firearms, possession of a

7    firearm with an obliterated serial number.  We're still

8    attaching those points because that -- that factor is present

9    in the charge.  And it just seems to me that it's double

10   counting, Your Honor.

11          I -- I agree with Mr. Bellamy that there may be --

12   probably is some support for it in the guidelines, but it just

13   seems to me that that should not be included.  Those

14   enhancements should not be included under the facts of this

15   case given what we know about the firearms that are involved.

16          THE COURT:  Okay.  Thank you.

17          Mr. Salzenstein.

18          MR. SALZENSTEIN:  Your Honor, this issue is directly

19   addressed by the guidelines, themselves.  Defendant was

20   convicted of three separate counts; possession of a firearm

21   with an obliterated serial number; Count Two, most importantly

22   here, possession of a stolen firearm; and Count Three,

23   possession of an unregistered silencer.

24          Application note eight addresses this head on.  The

25   last sentence indicates, however, if the offense involved the

1    stolen firearm or stolen ammunition, apply Section (b)(4)(A),

2    the four points.  And, of course, the reason is obvious, Your

3    Honor.  If we had just charged Mr. Ramadan with possession of

4    a stolen firearm, of course he would be applied -- the four

5    points would apply for the obliteration.  Simply because he

6    was simply convicted of an obliteration count doesn't negate

7    the correct calculation of the guidelines for Count Two.

8            And because all the offenses are ultimately grouped,

9    those are the guidelines.  Count Two is a ten-year offense.

10   Application note eight directly addresses this.

11           And the -- the Government submits that the objection

12   should be overruled.

13           THE COURT:  All right.  Thank you.

14           The Court overrules this objection also.

15           The defendant's offenses was grouped.  They all

16   involved application of 2K2.1.  Then, because it also involved

17   a silencer under 26 U.S.C., 5845(a), 2K2.1(a)(5) applies.  One

18   gun had an obliterated serial number.  That gets us to

19   2k2.1(b)(1)(A), which directs that you add four.  The only

20   question I had was, why not just two?  Because it -- there was

21   one stolen firearm and one with obliterated.

22           But 1B1.1 says, where you have an application, a note

23   that has two different levels as part of the same, it says

24   apply the greatest.  And so, other support in the guidelines

25   for the calculation that Mr. Kody did, and the Courts will --

1    those four points will remain as part of the guideline

2    calculation.

3              All right.  Any other objection that I need to deal

4    with now?

5              MR. DENSEMO:  No, Your Honor.

6              THE COURT:  All right.

7              MR. SALZENSTEIN:  Your Honor, the only thing I would

8    request before we proceed to sentencing argument, I'm a little

9    concerned still that Mr. Ramadan indicated that he has not

10   reviewed the entire PSR.  And when he answered Your Honor's

11   questions, he said, "Based on my knowledge, I have no further

12   objections."

13             That knowledge is based on, from my understanding

14   today, and it could be wrong, not a complete reading of the

15   PSR.  And I would request that we take a 5- or 10-minute

16   break, let Mr. Ramadan look at any of the sections.  There's

17   an interpreter here, if needed.  And just to verify for the

18   record that there are no further objections for the PSR as a

19   whole, versus the section that Mr. Ramadan read himself.

20             THE COURT:  Mr. Densemo?

21             MR. DENSEMO:  I have no objection to that, Your

22   Honor.

23             THE COURT:  Okay.  All right.  We will take a few

24   moments then.

25             MR. SALZENSTEIN:  Thank you, Your Honor.

 1          THE COURT:  You're welcome.

 2      (Recess taken from 4:14 p.m. to 4:22 p.m.)

 3          CASE MANAGER:  All rise.

 4          THE COURT:  All right.  Thank you.

 5          Everyone, you can take your seats.

 6          Mr. Densemo, did Mr. Ramadan have a chance to review

 7  the portions of the Presentence Investigation Report that he

 8  had not read before?

 9          MR. DENSEMO:  Yes, Your Honor.  It's my understanding

10  he just reviewed those sections with the aid of the

11  interpreter.

12          THE COURT:  All right.  And does he have any further

13  objections to the presentence report?

14          MR. DENSEMO:  No, not the presentence report, Your

15  Honor, no.

16          THE COURT:  All right.  Thank you.

17          Mr. Salzenstein, are you satisfied?

18          MR. SALZENSTEIN:  I am.  Thank you, Your Honor.

19          THE COURT:  All right.  Thank you, very much.

20          All right.  So with those objections resolved, the

21  offense level is 26, the criminal history category is one, the

22  guideline range that the Court must take into account is 63 to

23  78 months, and I will hear from the Government.

24          MR. SALZENSTEIN:  Thank you, Your Honor.  Can I

25  remain seated?

1          THE COURT:  You can, yes.  Just use the microphone.

2    Thank you.

3          MR. SALZENSTEIN:  Your Honor, the Government has

4    requested a sentence of at least 78 months.  In this case, 78

5    months being the top of the advisory guideline range.

6          And we filed a sentencing memo detailing most of our

7    reasons, but what I want to do this afternoon is address the

8    arguments made by Mr. Ramadan in his sentencing memo, and

9    addressing two main things.

10         During the course of my argument, I will address what

11   I consider to be utterly baseless criticisms that the

12   Government, in this case, is biased or prejudiced against

13   Mr. Ramadan based on his religion or what have you.

14         But I want to focus in, and I'll address that in the

15   context, of what I think is Mr. Densemo's overarching argument

16   made in the sentencing memo which is, why is there any need to

17   impose additional custodial time with respect to Mr. Ramadan.

18         Mr. Densemo rephrased it as, why impose six to twelve

19   more months of prison time when he's already served 41 months

20   in custody.  And I think now, we'll be arguing for slightly

21   higher, obviously.  Sixty-three months is an additional 22

22   months from the bottom of the guideline range.

23         But again, I think the question is the same.  Why

24   does the Government believe that we should impose more time,

25   and why do we ask the Court to do so?  And from the

1    Government's perspective, Your Honor, I think the answer to

2    that question is easy.  There's been lots of references to

3    this being a run-of-the-mill case, a run-of-the-mill gun case,

4    and Defendant being a run-of-the-mill defendant.  And the

5    Government sees this case very different, Your Honor.  And

6    primarily because Mr. Ramadan is not a run-of-the-mill

7    defendant.  And it has nothing to do with his religion or any

8    of the other nefarious accusations lunged by the defense

9    towards the Government.  It has nothing to do with that.

10          It has everything to do with the defendant's history

11   over his entire lifetime, and consideration of the 3553(a)

12   factors.

13          And where I want to start, Your Honor, is just the

14   base line.  There's all these accusations about the Government

15   has considered this improper factor and that improper factor.

16   But if you look at the guidelines, Your Honor, the base line

17   of where this case starts, without consideration of any of

18   that, where a defendant with a criminal history of 26 and a --

19   I'm sorry, an offense level of 26 and a criminal history of

20   one would start.  And that base line is 63 to 78 months for

21   any defendant, like Mr. Ramadan, who has refused to take

22   responsibility for his actions.

23          From start to finish of this case, Mr. Ramadan has

24   completely refused to accept any responsibility for his

25   actions.

```
 1              Mr. Ramadan referenced a quote on quote, "trial tax"
 2    in his sentencing memo.  Arguing the Government was trying to
 3    impose a trial tax in this case because Mr. Ramadan elected to
 4    go to trial.  No, Your Honor.  Mr. Ramadan's guidelines are
 5    different for that very reason.  He refuses to accept
 6    responsibility for his actions.  He has no remorse at all.
 7    That's what makes him and his guideline range increase
 8    post-trial, not he's being penalized.  He's different than
 9    other defendants who have accepted responsibility, who have
10    shown remorse for their actions.  And we are talking four plus
11    years.
12              And, of course, the 3553(a) factors focus in on the
13    history and characteristics of this defendant.  He's not being
14    treated differently.
15              And I would agree with defense counsel, that if this
16    was an ordinary defendant who is different than all the
17    reasons I'm about to get into, we might agree that this is a
18    case to vary below the guidelines, that no more prison time is
19    necessary, but this is not an ordinary defendant.  And I'm not
20    going to state that just based on my opinion.  I'm going to
21    give you facts, Your Honor, that lead based on the record,
22    that support the Government's assessment of who Mr. Ramadan
23    is.
24              Who he really is, absent the self-interest that he
25    has shown -- or in his self-interest in the last year when
```

1    he's been on bond, to do the bear minimum and comply with the

2    Court's orders.  But who is he when his self-interest is not

3    on the line?  The record is disturbing, Your Honor, in many

4    respects.  The record shows a long documented by his own

5    recordings and his own words, history of anti-social behavior

6    that from the Government's perspective borders on being

7    pathological, borders on being sociopathic.  And I do not use

8    these terms lightly, Your Honor.  I'm not doing it for

9    theatrical reasons here in court.  I'm going to give you

10   examples of each of these as I go through.

11        Mr. Ramadan, the fact from the record, is a

12   pathological liar.  Your Honor has clearly found that in your

13   opinion.  And I understand the section on diabetes and chronic

14   asthma, but the statements in the opinion were based on a

15   broader spectrum of conduct.  And I'll get into specific

16   instances throughout this case, from start to finish of his

17   many lives.

18        By his own admission, he has anger and impulse

19   control issues.  I will highlight some examples of those.

20   He's been deceitful in most -- in almost every situation.  He

21   steals and lies about it.  He's cruel, Your Honor.  And I will

22   go into the examples of his cruelty that are documented by his

23   own videos.  He lacks empathy for anyone, Your Honor, family,

24   friend, associate, or anyone he deems a foe.

25        He's a narcissist, Your Honor.  And he's so much so

1    that he videoed himself doing and committing the most depraved

2    and anti-social things, including the dog fighting which I'll

3    get into.  Including, stealing.  And he's always the victim,

4    Your Honor, always.  In every situation he places himself in,

5    he is the victim.

6              Your Honor, I started with saying he's a pathological

7    liar.  I indicated Your Honor found that -- and quote, Your

8    Honor, "Ramadan has a history of lying and engaging in

9    deceitful and fraudulent behavior which makes him entirely

10   untrustworthy."  That was the record of ECF number 90 at 3362.

11             In that opinion, Your Honor, you documented for

12   example, his multiple lies about the escape paraphernalia he

13   had at Milan.  And he told two different stories in two

14   different hearings.  And Your Honor indicated it appears that

15   Ramadan had difficulty keeping his lies straight.  And neither

16   of his stories, quote, "seem even remotely plausible."

17             And I ask Your Honor, how many times has Mr. Ramadan

18   lied in this case?  From start to finish, it's been so easy

19   and natural for him.  He lied at the airport multiple times.

20   Ultimately, leading to a change in his story about the guns.

21   He lied, as Judge Battani found at the detention hearing.  In

22   sworn under oath to the Court, he fabricated testimony.  He

23   lied about the FBI agent coming to visit him in prison.

24             I think, it sounds like the Court disagrees, he lied

25   about his health conditions.  He lied about escape

1    paraphernalia.  His underlying conviction deals with lying.

2    Lies to the Social Security Administration to obtain

3    disability benefits for his children.  I said he's cruel and

4    acts in a depraved manner.

5            Your Honor, we attached Exhibit 6, which were

6    dogfighting videos that the defendant recorded and

7    participated in.  Those were a portion, a small portion of the

8    videos that the defendant had on his hard drives.

9            And what I wanted to highlight, who this defendant

10   was.  What was his demeanor during those videos?  I hope Your

11   Honor got a chance to watch them.  At least, they're difficult

12   to move forward quickly.  He's laughing during those videos

13   while animals are being tortured and killed.  He's encouraging

14   the fighting.

15           Your Honor, he lacks empathy.  I think you see that

16   in every situation documented.  And I'm not just considering

17   with other people.  I consider the defendant lacks empathy,

18   even with family members.

19           Exhibit 8, we attached, he's forcing his young son to

20   smoke.  And I'm not trying to criticize him or saying he

21   should receive 78 months because he's a bad father.  He may or

22   may not be.  But it's the lack of empathy you see in these

23   videos.

24           Exhibit 9, he's shooting off of a balcony, a gun out

25   into a parking lot.  His sons have no head or ear protection.

 1     And you can see in the video, it's hurting their ears.  You

 2     hear it.

 3             I didn't attach this, Your Honor, but this was

 4     addressed and shown in the earlier bond hearing, the first

 5     one.  There was the video of Mr. Ramadan sitting at a table

 6     with his wife trying to instruct his kids on how to get a

 7     bullet in the magazine of a gun, and he's screaming at them

 8     because they couldn't do it.  Again, this is who he is.

 9             There's the child cruelty allegations that were

10     documented in our earlier brief on docu -- or ECF 86 at page

11     1660.  Those are from October of 2015.  You combine that with

12     anger and impulse control issues, which he admits he has on

13     page 12 of his brief.  But these aren't just contained where

14     it's affecting no one else.

15             We presented Exhibits 12 and 13, examples of road

16     rage.  Three of them involving the defendant, where he

17     recorded it.  And again, you're looking -- this pattern that I

18     talked about.  He's gotten into multiple road rage incidents.

19     Again, I'm sure you're going to hear it, he's always the

20     victim.  Never anyone else.  He just gets into multiple

21     instances of road rage.

22             Exhibit 13, he actually got off at a stop, confronted

23     the other person, asked, do you want to go, got out of his car

24     and pepper strayed -- pepper sprayed him in the face.  That's

25     not someone who just has minor anger and impulse control

 1     issues.  He's acted in multiple times that he's recorded,

 2     belligerent to law enforcement officers documented at Exhibit

 3     15.  One of which he says, "I hope you die, bitch, and fucking

 4     asshole."  -- to the police officers.

 5              He's got a history of engaging in theft and other

 6     dangerous activities.  You have the gun in this case, Your

 7     Honor, that's being called a status crime.  A run-of-the-mill

 8     case.  It's not a run-of-the-mill case, Your Honor, when

 9     you're employed to clean carpets, you're entrusted, and you go

10     in and you steal a 90-year-old man's gun.  That's not a

11     run-of-the-mill case.  And that wasn't the only instance of

12     theft involving Mr. Ramadan at his employment.

13              We didn't present this at trial because we agreed,

14     but there was an incident he also stole an AR-15 rifle.  We

15     had the witnesses lined up.  We presented the pictures at

16     other hearings.  He took pictures of multiple individual's

17     personally identifiable information; checks, credit cards,

18     front and back, driver's licenses all on his hard drives.  And

19     most dangerous, we've shown this to Your Honor, he took a

20     picture of an individual who worked at an airport, of his

21     government ID, of his airport security card, and his uniform,

22     of a DHS employee who had access to the airport.  That's not

23     normal behavior, Your Honor, in any way.

24              And all of this, Your Honor, when I'm saying this

25     defendant is different, is before you even get to these

1    accusations involving Mr. Ramadan's unquestioned support of

2    ISIS.  You don't even need to consider that to understand that

3    he is different, that he warrants a sentence, at a minimum, at

4    the bottom of the guideline range.

5         But the defense has challenged us on this.  They

6    argue we're biased and prejudiced against Mr. Ramadan based on

7    his religion.  That's the only reason we are bringing up ISIS.

8    That's the only reason he was stopped.  They basically say it.

9    That couldn't be further from the truth.

10        Anyone, no matter their religion, the color of their

11   skin, who presented the way Mr. Ramadan presented at that

12   airport, would have been screened the exact same way.  With

13   the same tips, the same stuff in his luggage, I'll go over it

14   in a second, the same information on his hard drive.

15        And yes, it is true, Your Honor, that we did not

16   charge Mr. Ramadan with material support.  Obviously, that

17   requires proof beyond a reasonable doubt.  And we certainly

18   exercise our discretion in choosing to not charge him with

19   that.  And I will sit here and say I don't think we had proof

20   beyond a reasonable doubt, to charge material support.  But

21   that doesn't mean we should ignore his support for ISIS, or

22   pretend that it doesn't exists.

23        ISIS is a violent terrorist organization.  You cannot

24   separate violence from ISIS.  And substantial evidence exists

25   that Mr. Ramadan supports ISIS and its violence, Your Honor.

1    And I ask you to think about what happened at the

2 airport that August evening.  Mr. Ramadan was leaving the

3 country for an extended period of time.  He was taking items

4 with him for that trip and he also had a storage unit which we

5 know very well, to store things that he didn't need to bring

6 with him.

7    What did he choose to bring in those bags, spread out

8 all throughout his baggage?  Not some clothes, some family

9 belongings.  But spread through all that was military

10 paraphernalia.  Two level-two armor plates that he just bought

11 two weeks earlier.  Three load-bearing vest that you put the

12 plates into.  A bullet-proof vest, a rifle scope, a bracket

13 designed to mount a rifle scope on an AR-15, multiple folding

14 tactical knives, a taser, including two extra cartridges, a

15 gas mask, blast mask, a remote-controlled aerial drone,

16 miscellaneous gun ammunition, and magazines, a black gun thigh

17 holster, a shoulder holster, a combat carrying bag,

18 walkie-talkies, a firearm mounted military grade flashlight.

19 This is what he chose to bring with him, Your Honor.  And he

20 gave the story at the airport that he was just going to be a

21 press.  He was just going to correspond with the Palestinian

22 Israeli conflict.  It's not consistent at all with what he had

23 in his luggage, what his purpose was for traveling when, at

24 that time, Your Honor, in 2017, the fighting with ISIS was

25 still going on.

1           And also what I think is significant, Your Honor,

2    what did he choose to bring with him on this trip?  Multiple

3    hard drives.  He brought them on this trip.  They were that

4    important to him.  One of which he tried to conceal in his

5    wife baggage -- in his wife's bag when he got off the plane.

6    And on that hard drive, in the dirty work folder, had all of

7    this, what I would consider depraved material on it, the

8    dogfighting, the other material.  And I'm not going to go over

9    it.

10          We've attached, under seal, the ISIS videos and the

11   ISIS images.  These are horrific, Your Honor.  There's an

12   image of a man with his head completely severed on top of his

13   body.  The videos, we submitted three, Your Honor, are

14   horrific, showing men kneeling and being executed.  These

15   aren't just war videos, Your Honor.  These are videos the

16   defendant watched, saved, and were important enough that he

17   thought to bring them with him on his trip.  Horrible videos,

18   Your Honor.

19          And we know for a fact, and we attached these to our

20   sentencing memo, that when he has guns, Your Honor, he poses

21   with the one finger Islamic hand gesture that we cited the

22   article that it has been equated to the Nazi salute.  He posed

23   -- those are him posing in his home.  Facts, Your Honor, who

24   Mr. Ramadan is over his life's history.

25          His actions and his words.  They continued while he

1    was in prison, Your Honor.  It didn't just end.  He wrote

2    graffiti on the wall supporting ISIS.  He had escape

3    paraphernalia.  And basically, you have all of that on one

4    side of the scale, and on the other side of the scale, you

5    have that during his pretrial release since January of 2020,

6    he hasn't committed a crime that we know of, or done anything

7    because we don't -- that we know of.

8          And that entire lifetime of history should be of

9    anti-social behavior, cruelty, impulse control.  It's supposed

10   to be contradicted by a period of time when it's entirely in

11   his self-interest to not get in trouble?  He's not a stupid

12   man.  He's a smart man.  He's a manipulator.  He's a liar.

13   And he knows exactly when he can get in trouble and when he

14   can't.

15         We have one character letter from an employer who has

16   known him for a few months.  That's it.  In the entirety of

17   the sentencing memo, that's pretty much all you can say

18   positive about Mr. Ramadan.  And it's positive, I admit that,

19   slightly, but it doesn't overcome a lifetime of behavior that

20   speaks for itself.

21         And considering all of that, Your Honor, in the

22   3553(a) factors, we believe that it supports a sentence of at

23   least 78 months in this case, and we are requesting that

24   sentence.  Thank you.

25         THE COURT:  All right.  Thank you, Mr. Salzenstein.

```
 1            Mr. Densemo.
 2            MR. DENSEMO:  Your Honor, based upon what
 3   Mr. Salzenstein just said, that there was very little support
 4   for Mr. Ramadan, I would like to ask Mr. Nagi Kahala to come
 5   up and speak to the Court real -- really briefly, Your Honor.
 6   He was Mr. Ramadan's very first employer when the Court
 7   released him on bond.  And he indicated to me that he would
 8   like to say something to the Court on behalf of Mr. Ramadan.
 9            THE COURT:  All right.  What did you say his name is?
10            MR. DENSEMO:  Nagi Kahal, K-a-h-a-l.
11            THE COURT:  All right.  Mr. Kahal, where are you?
12   Mr. Kahal, could you --
13            MR. DENSEMO:  He can sit and talk into the
14   microphone.
15            THE COURT:  All right.  Please come.
16            MR. DENSEMO:  I see we are joined by two other
17   prosecutors that were on Mr. Ramadan's case as well, Your
18   Honor.  We would like to welcome them.
19            MR. SALZENSTEIN:  I'm not sure how that's relevant,
20   Your Honor.  Should we name everyone in the courtroom?
21            THE COURT:  No, Your Honor.
22            THE WITNESS:  My name is Nagi Kahala.  I would just
23   like to just say that Mr. Ramadan --
24            THE COURT:  Mr. Kahala, with an A on the end, it is?
25            THE WITNESS:  Yes, Mr. Kahala.
```

```
 1              THE COURT:  Could you bring the microphone closer?
 2   Thank you.
 3              THE WITNESS:  Mr. Ramadan worked with us and, you
 4   know, I don't know all of the details of the case, but I'm
 5   just kind of showing up here to give the support and, you
 6   know, state what I saw in terms of all the good things that
 7   come -- you know, I come from a background where I like to
 8   applaud people's good behaviors.  And I just want to come out
 9   and say, you know, he worked with us, nothing but good things.
10   Always on time.  Always happy.  And, you know, some of the
11   stuff I sat here and listened to, again, I don't know all the
12   details, but my eyebrows are still arched.  I can't believe
13   it.
14              He's nothing but great things.  You know, he shows up
15   early, goes home late.  More or less, you know, the best team
16   player, your perfect help.
17              And, you know, he's had a tough, tough go, you know,
18   in life.  You know, there's -- I guess the odds were stacked
19   against him or whatever, you know, but long story short, he's
20   had hurdles that he's had to go through as well, you know,
21   being away from family.  You know, we saw some of the
22   articles.  We have -- we have a very firm belief that, you
23   know, everybody deserves a second chance.  And that's one of
24   the big reasons why, you know, when he reached out, we -- we
25   offered him a job.
```

```
 1              And we know that, you know, having a family, needing
 2    to support a family is not easy.  So I just, you know, wanted
 3    to bring that up and, you know, hope that he can get all this
 4    behind him and he can, you know, be reunited with his family
 5    soon.
 6              THE COURT:  Mr. Kahala, what kind of work did
 7    Mr. Ramadan do for you?
 8              THE WITNESS:  Landscaping, snow removal.
 9              THE COURT:  And can you tell me when?  Approximately,
10    was the time frame?
11              THE WITNESS:  He started working with us, I don't
12    remember the exact date off the top of my head.  I don't have
13    my phone, but I want to say sometime in January or February,
14    last year.
15              THE COURT:  Of 2020?  20 --
16              MR. DENSEMO:  2021.
17              THE COURT:  2021.
18              MR. DENSEMO:  Yeah, when he was released.
19              THE COURT:  Yes.  Okay.  All right.  Thank you, very
20    much.
21              THE WITNESS:  No problem.
22              MR. DENSEMO:  Thank you, sir.
23              THE WITNESS:  Yep.
24              THE COURT:  Mr. Densemo.
25              MR. DENSEMO:  Thank you, Your Honor.
```

 1          There's one thing that I agree with the Government

 2     probably the only thing, when Mr. Salzenstein says that

 3     Mr. Ramadan is not an ordinary defendant.

 4          And I should point out for the record that there are

 5     two other United States attorneys in this courtroom who are

 6     also on Mr. Ramadan's case.  And this case is important enough

 7     for two other attorneys, Mr. Moon, Hank Moon, and Mike Martin,

 8     who I believe Mr. Mike Martin is the head of one of the

 9     divisions in the U.S. Attorney's Office.  So this ordinary gun

10     case, Your Honor, is not ordinary to them.

11          And I had hoped that we could get through this like I

12     have gotten through so many gun cases over the past 30 years.

13     But I -- but unfortunately, I had a feeling that it wasn't

14     going to go that way, that this wasn't just going to be a

15     straight ordinary gun case.  And I sat in my office and I

16     prepared this very lovely seven-page allocution that was

17     devoid of any controversy or name calling or finger pointing,

18     and I did a real good job.  I did a really good job of just

19     making this just a very simple guideline case, and a 3553(a)

20     case.  And I get here, and I hear psychopath, sociopath,

21     pathological liar, depraved, manipulator, narcissist, ISIS,

22     cruel, lacks empathy.  I have not heard all of those words

23     strung together about my murder clients when I was in

24     Recorders Court.  I have not heard those words strung together

25     about my -- about my clients who were rapists when I was in

1    Recorders Court, but here we are.

2           Here we are with two guns and a fuel filter, and

3    you're going to this length to get six to twelve more months

4    out of this man.  For what?  For what?  Just to make

5    yourselves feel good.

6           You know, one of my favorite artists is Gill

7    Scott-Heron, and he wrote this poem once called, *I Wasn't

8    Going to Make Any More Poems Like This*.  And he was talking

9    about how all of the poems that he had written had been filled

10   with rage and disappointment and anger and fear.  And he said

11   that these words have blanketed my tablet long enough, and I

12   thought I wasn't going to write any more poems like this.

13   Well, I'm tired of writing these poems myself.

14          Yousef Ramadan is not the Four Horsemen of the

15   Apocalypse.  He is not going to bring down American.  America

16   is very, very, very strong, and it can withstand a lot.  And

17   it will withstand a great deal.  But well it -- what it cannot

18   withstand is intolerance, intolerance wrapped in something

19   else, wrapped in the guise of justice.

20          If this was Joe Blow charged with those two guns and

21   the fuel filter, those guys in the back of the courtroom

22   wouldn't be here.  We wouldn't have two prosecutors and the

23   federal agent sitting there.  But it's Yousef Mohammed

24   Ramadan.  And that's what makes this not an ordinary case, as

25   sad as that is.

1           The Government acts as if Yousef Ramadan didn't live

2     before he went to jail.  And they act as if he hasn't matured

3     and gotten older.  They act as if he hasn't suffered, that he

4     hasn't learned.  Believe me, Judge, he's learned.  The lessons

5     that they have tried to impart to him, he's learned.  His

6     family has learned.  His community has learned.  You Google

7     his name and you see something you don't want to be associated

8     with.

9           Judge, I'm going to get back and go over the

10    allocution that I -- I had originally intended to present to

11    the Court.  It won't take that long.

12          Your Honor, what I'd like to know or would like you

13    to consider is that this fuel filter that drives the

14    guidelines in this case is a 26 U.S.C. offense, a tax code

15    offense.  It prohibits the failure to register a certain kind

16    of firearm, not the possession of the device itself.

17          The point is, silencers aren't illegal to possess.

18    And failure to register one and pay the legal -- the tax

19    associated with that registration constitutes an illegality.

20          Several members of Congress in the House and Senate

21    have proposed the legislation to remove silencers from the

22    definition of firearms.

23          On March 3, 2021, Representative Mark Jacobs

24    introduced House Bill 95, which was a bill to amend the

25    Internal Revenue Code of 1986, to remove silencers from the

1    definition of firearms and for other purposes.  A similar bill

2    had been proposed in 2019 by a group of U.S. senators.

3           The offense level in this case, 18, is used because

4    the fuel filter's considered an unregistered silencer.

5    Otherwise, the offense level would be based on 2K2.1(a)(7), or

6    offense level of 12.  If the offense level is the starting

7    point for 922(j) and 922(k) charges, there's no enhancement

8    for obliterated serial numbers or stolen firearms.  And

9    arguably, if there were to be an enhancement, the highest

10   offense level would be 24 and not 26.

11          The guidelines for criminal history category offense

12   -- criminal history category, one; offense level, 20, is 33 to

13   41 months.  I believe this is the -- one of the guideline

14   range possibilities the Probation Department initially

15   calculated when the Court was considering whether to release

16   Mr. Ramadan on bond.  This range is also consistent with one

17   of the plea offers made by the Government to Mr. Ramadan.

18          That plea offer had a range of 41 to 51 months.  But

19   the Government incorrectly had Mr. Ramadan as a criminal

20   history category of two instead of one.  The actual guideline

21   range would have been 37 to 46 months under that plea

22   agreement.  In that plea offer, offense level was the starting

23   point.  Two points were added for the three firearms and four

24   points were added for the obliterated serial number.  There

25   was no obstruction enhancement.

1          The point is that the Government has been more than

2     willing to accept a significantly lower term of incarceration

3     as sufficient for purposes of deterrence, promoting respect

4     for the law, just punishment, and protecting the public.

5          The very first offer made by the Government to

6     defense counsel was a renunciation of citizenship and a quote

7     on quote, "short period of incarceration of 20 months or so."

8          The Government's request for a top-of-the-guideline

9     sentence is a substantial deviation from its previously stated

10    positions.  This deviation is singularly attributable to

11    Mr. Ramadan having exercised his right to a trial.

12         The stolen firearm enhancement and obliterated serial

13    number enhancement, even if they are arguably applicable,

14    aren't particularly predictive of future criminal conduct

15    under the circumstances of this case.

16         Mr. Ramadan didn't have a felony conviction or

17    misdemeanor, for that matter, which suggested that he used

18    firearms to commit crimes.  Therefore, his possession of

19    firearms does not raise the kind of red flags a convicted

20    felon's would.

21         So his alleged possession of two firearms with

22    obliterated serial numbers and possibly stolen does not have

23    the same connotations typically attributed to so-called

24    felons.

25         The notion that firearms are, per se, dangerous in

1    the hands of convicted felons cannot be pinned to Mr. Ramadan.

2    And the attending argument, that previously convicted felons

3    possessing stolen firearms with obliterated serial numbers are

4    even more dangerous is even less salient because there's

5    little reason to believe that Mr. Ramadan possessed these

6    firearms with the intent to utilize the guns in future

7    criminal activity.  In fact, one of the firearms was a vintage

8    weapon which had five essential parts missing from it which

9    made it inoperable in five different ways.

10          The firearms were found packed away in a storage

11   locker.  By all indications, Mr. Ramadan had his family -- and

12   his family were permanently relocating to Palestine.  Even if

13   his family's relocation may not constitute complete

14   abandonment of the contents of the locker, it does not re --

15   it does reveal a relinquishment of access and possession for

16   the foreseeable future.

17          The enhancements, therefore, aren't predictive of

18   future conduct and their contribution to ratcheting up the

19   guidelines for purposes of punishment, deterrence, promoting

20   respect for the law, and ensuring the safety of the community

21   is a basis for this Court to find that the guideline range

22   calculated by the Probation Department, even if accurate, is

23   greater than necessary to satisfy the objections of

24   sentencing.

25          Taken together, offense level 18 coupled with the

1    enhancement for stolen firearms, number of firearms,

2    obliterated serial number and obstruction of justice are --

3    bring about a guideline that is greater than necessary to

4    accomplish these objectives.

5         Mr. Ramadan has already felt the weight,

6    dehumanization, isolation, danger, health risks, and

7    deprivation of a prison sentence.  He lived under these

8    conditions for nearly four years.  He had never been in

9    custody before.  He wasn't accustomed to imprisonment, and it

10   had a tremendous impact on his mental and physical condition.

11        For almost four years, he was separated from his

12   former life and his family.  He hasn't seen his wife and

13   children for what is approaching five years.  He hasn't been

14   present in their lives for any important events that have

15   taken place during that time period.  He wasn't able to attend

16   the funeral of his beloved father.  He has been vilified in

17   the American media, and branded a terror -- terrorist, with no

18   proof and no opportunity to be heard.

19        His photograph -- his photographs and libelous

20   stories painting him as an enemy of America are immediately

21   available on the internet.  He has had to rebuild his life

22   from scratch.

23        Yousef has been employed since coming to the U.S.  He

24   has always supported himself and his family through his labor.

25   When you granted him bond, you granted him his freedom in

1   January of 2021.  He obtained employment immediately.  He held

2   that job until he obtained a job with Smith's Towing.  He has

3   managed to move out of his sister and brother-in-law's

4   apartment, and he has obtained his own place.

5           During the 13 months after his release from prison,

6   Yousef has not violated his bond condition once.  He has

7   appeared at every court appearance and followed the rules of

8   his supervision to the letter.  And a report from Pretrial

9   Services, Mr. Clifford, advised the Court of Mr. Ramadan's

10  superlative adjustment to supervision.  He recommends that

11  Mr. Ramadan be allowed to surrender if he's returned to

12  custody.  And he does not review Mr. Ramadan as a risk of

13  flight or a danger to the community.

14          Yousef's conduct over the past 13 months has proven

15  that the Court's decision to release him was warranted and

16  appropriate.  We argued that Yousef wasn't a risk of flight or

17  a danger to the community over the Government's vehement

18  objections and dire forecast.

19          Yousef has proven that the Court's assessment of him

20  was correct, and that of the Government, erroneous.  He took

21  the opportunity that was given to him, and he took advantage

22  of it.  He has been able to rebuild his life and support his

23  family once again.  He has been able to obtain employment, an

24  automobile, housing, and saved money for the future.  He has

25  adjusted well to supervision and he has an excellent

1    relationship with his supervising officer.

2          He hasn't had any contact with law enforcement other

3    than a traffic ticket since being released.

4          The question becomes:  How does society benefit from

5    returning Mr. Ramadan to prison for six to twelve months?  The

6    more important question is, do any of us benefit from Yousef

7    being returned to prison?  What is the marginal utility of

8    that six to twelve months of non-productive activity?  And

9    isn't -- and isn't it actually counterproductive to prohibit

10   clearly beneficial rehabilitative conduct that Yousef is

11   currently involved in?  And do we really want to substitute it

12   -- substitute that for the illusion of safety and deterrence?

13         The Government can't answer that question because

14   social science experts have proven that incarceration is

15   criminal genic.  The conditions of prisons actually promote

16   recidivism.

17         Yousef is burdened with many of the conditions which

18   contribute to recidivism such as:  Drug addiction, childhood

19   abuse and neglect, mental illness, instability, alcoholism,

20   lack of education and job skills and poverty.  Yousef has none

21   of these challenges to deter him from continuing the

22   successful path he finds himself on, a path of his own

23   creation.

24         Judge, I'm asking you to look at Mr. Ramadan in a

25   linear fashion and not in the temporal loop that the

1    Government wants you to view him.  To constantly look back,

2    seven, eight, ten years ago and view Mr. Ramadan through the

3    prism of his youth and the -- some regrettable decisions that

4    may he have -- he might have made.

5         Four years -- the almost four years that he spent in

6    prison, Your Honor, is more than sufficient punishment.  The

7    Court can also place him on supervision.  And the Court knows

8    that he is very amenable to supervision.

9         Mr. Clifford -- as Mr. Clifford indicates, Pretrial

10   Services, a division, a branch of the Government does not view

11   Mr. Ramadan as a danger to the community.  And he isn't.

12        He's taken the opportunity that you've given him,

13   Your Honor, and he's running with it.  He's shown the Court

14   who he is when he's not in prison, when he's not under

15   pressure, when he's not isolated, when he's not dealing with

16   the dehumanization and degradation of prison.  He's showing

17   you who he is after having dealt with not being with his

18   family for over five years.  For having lived with his sister

19   and brother-in-law and having to rebuild his life as best he

20   could.

21        He's been punished, Your Honor.  He's felt the sting

22   of incarceration.  He knows what imprison -- he knows what

23   prison is.  He doesn't need to go back to be reminded.

24        I apologize for my outbursts.  I didn't mean to, and

25   I'm deeply sorry for having done so.  I've just known this

```
 1    young man for a very long time, now, and I do love him, and I
 2    care about him a great deal.  I've gotten to know him.  And
 3    all of these words, all of these harsh, harsh things have been
 4    said about him, I cannot abide.  He's a good guy, Judge.  He
 5    really is.  He's made some mistakes, but he's starting to make
 6    up for them.
 7           Every time I've known -- every time I've met Yousef,
 8    he's always been pleasant.  He's always been respectful.  He's
 9    one of the nicest guys I have ever represented, I have ever
10    known.  He suffered a lot.  He's done -- he's been through a
11    lot.  He doesn't need to go back to prison, Judge, to
12    accomplish any of the objectives.  The Government's gotten its
13    point across.
14           I believe, Your Honor, that the time that he's
15    already served is more than sufficient, and we would ask the
16    Court to impose a sentence of time served, with any period of
17    supervision the Court believes appropriate.
18           Thank you, Your Honor.
19           THE COURT:  Thank you, Mr. Densemo.
20           Mr. Ramadan, do you want to address the Court before
21    sentencing?
22           THE WITNESS:  Yes, Your Honor.  Let me know when you
23    ready.
24           MR. DENSEMO:  Go ahead.
25           THE WITNESS:  Go ahead?
```

 1             THE COURT:  Yes, you can speak.  Use the microphone,

 2     please.

 3             THE DEFENDANT:  Well, first of all, I want to thank

 4     you for giving me a chance to come outside the jail on a bond.

 5     I have prove myself first, to you and to the rest -- whoever

 6     care about me, and to the Government, too.  I'm not that guy

 7     they was talking about.  And also, prove to them and prove to

 8     you, I wasn't the guy they was talking about in the last --

 9     about me doing bad things.  And I got way better from before.

10     I was young.

11             In the past, I did make mistakes and try -- try best

12     I can to learn from these mistakes and to be a better person

13     for me and for the community.

14             And Mr. Densemo, he covered a lot of things I was --

15     I want to talk about.  Especially, also when I came out, I got

16     my CDL license which is this -- you have to go to school for a

17     month and a half, and it was really hard for me to get it and

18     to try to prove myself.  I got better.

19             And also, I was supporting my family, sending money

20     every -- every -- you know, every month to support them for

21     living over there.  And I was paying my taxes.  And the same

22     time, I opened a company, but I wasn't to move forward with it

23     just in case anything if anything went wrong today, in the

24     sentencing.  I hope not.  I hope -- I believe you will give me

25     another chance to prove more of myself, and to be a better

1    person in the community.

2          When -- when I was in jail, I suffer a lot,

3    especially every time, every court date, my pictures and

4    videotapes was on the news while I was in jail.  Everybody was

5    who I am.  Everybody was treating me different from anyone,

6    even -- even, you know, the guards over there, they used to

7    treat me really bad just because -- most of them, ex-military

8    and serve in the military, even they call me -- used to call

9    me terrorist.  I filed complaints about them, no one did

10   anything about it.  They call me terrorist.  They say, what

11   are you doing here, thank God you don't have the vest on you

12   so you can blow up.  And these racist comments, said nigger,

13   camel jack, stuff like that, you know.

14         And they used to -- I want to address another thing.

15   The tickets I used to get from -- from the report, which is

16   the -- from that jail, prison in Milan, most of them, it just

17   because I was praying.  The guard get me because I was too

18   loud to practice my First Amendment, to pray.  And other ones

19   because I want to go to my discovery, and he said -- he give

20   me ticket.  And stuff like for why I got the ball off the

21   ring, the basketball ring.  They told me I was trying to

22   escape.  So they try -- they try to make me look bad anyway,

23   but I'm not like that.  They try to make me I'm that guy on

24   the TV, which is, I never think to be like this person on TV.

25   I'm not like this.  I'm totally different guy.

1          When they -- when the Government talked about the

2     dogs and fight dogs, is it -- I think, is it right?  No, it's

3     wrong.  But I was young.  It wasn't here in U.S.A., it was in

4     overseas.  And overseas -- - in overseas, this normal, it's

5     legal, it's not illegal.  But now, I think way different.  I

6     feel so badly inside from watching these dogs fight.  I love

7     dogs, and I love all the animals.  But I did something wrong,

8     yes.  I watched these fight which is, over there, it's legal.

9     It's like here, it's legal for people to fight in sport.  They

10    call it sport.  That one, over there, it's sport, too, and

11    it's normal.  But here, I never went to any of these, like,

12    events.  I wasn't going.  Because when I came from there, I

13    recognize, this is wrong, and I promise myself, never do it

14    again.  And I never did it again.

15          And also, I never used any drugs.  No drugs or, you

16    know, I don't even drink now or use any drugs.  The Court,

17    they test me when they came doing -- I mean, the probation

18    officer, they test me, and I wasn't having any level in my --

19    in my blood.

20          In -- me, in jail, I was everything -- I can't access

21    to the calls most the time because they sanction me and they

22    send me to solitary confinement which is, we call it the shoe

23    or the hole.  I was there for many, many times for not

24    necessary stuff, just me because I'm Yousef from Iran, because

25    I been on TV, because I'm Muslim.  Yes, me, the whole case

1    because I'm Muslim.  Like Mr. Densemo was saying, because if

2    it was different guy, you will see different approach from the

3    Government.

4         But anyway, I was treated different, even, they send

5    me for small reason to that solitary confinement which is, I

6    stay there for many, maybe, months, two months, a week, two

7    weeks, three weeks.  No phones.  Food's not that good, like

8    really bad.  No clothes.  And open jails -- and open doors and

9    stuff.  Like, I believe it's really crucial it was, you know,

10   time to me, you know, I couldn't even contact my attorney if I

11   want while inside this prisons.  I couldn't even, you know,

12   see my discovery that time because they just give me --

13        Okay.  Also, my reputation in the community.  It's

14   hard for me to live again like before because of what happened

15   in TV and media.  And I don't believe my -- my life's going to

16   be like before.  Especially, I can't even find better jobs

17   like before.  And I have limited options now.

18        I was thinking to open my company, like I said, to

19   just be myself so I avoid all this stuff.  But anyway, now I

20   move away from my family.  I didn't see my family for almost

21   five years now, and I really miss my family.  I want to see

22   them.  And I'm away from them, a lot of birthday happen.  A

23   lot of things in their life I was away from them.  This really

24   impact me hard.  And I did learn about it, you know.  I'm not

25   going to do nothing really bad in the future to just not make

```
 1    me separated from my family.  I'm still separated from my
 2    family because this case.
 3            And also, my family's -- a lot of members my family
 4    die; my dad, my uncle, my wife father, my uncle.  Her uncle,
 5    too, die.  A lot of friends, they just pass away.  Me doing --
 6    while I was on laptop.
 7            I want to -- I want to talk about something.  Really,
 8    if you give me chance, I want to perform a lie detective test,
 9    me and the agents, just to show you I'm not lying about what
10    happened, just to prove to you, not -- just so you feel
11    comfortable.  And I did tell my attorney about this before.
12    Just to show you I'm not lying.  I wasn't lie.  The many --
13    there were many players, and they change my words just because
14    they have the power.
15            And if it wasn't right, like, they persuade me I was
16    the terrorist and I was the important guy in the airport, and
17    they catch someone that much valuable.  If I'm that person,
18    why did they -- they didn't present the video?  The video have
19    everything against them.  That's why they never showing it.
20    All the other evidence show up, suddenly.  But this video
21    never show up.
22            I learned from my mistakes, and I hope you understand
23    how much suffer I went through, Your Honor.  And me going back
24    to jail, I don't see it to help any -- anyone, or can -- no
25    one going to get benefits of me going spend more time.
```

1           After I came out, I establish my new life.  And I

2    have a job now, and did what I did in the past.

3           Also, I never have -- get -- have chance to get any

4    programs the prison provided when I was locked up.  So I

5    didn't even have chance to get to religious program or drugs

6    program, or even to get help from inside the prison.

7           Matter of fact, you know, I was always, you know, I

8    can't because I wasn't even going to prison.  I was just

9    locked up in detention center, so I didn't have any chance to

10   do this.  So I -- please take this in consideration, too.

11          Lastly, I don't want to take too much time.  I

12   really, you know, believe in second chance.  And it been too

13   long since this accusations the Government, they was talking

14   about.  Now, I'm a different person.  I'm more mature.  I'm

15   almost 35 years old, and I learned from my mistakes.  And

16   everyone, I believes, have second chance in this life.  And me

17   going to jail just is going to make it, you know, not benefits

18   me.

19          Please, I believe, you know, if you don't mind, to

20   give me time served so I can keep proving, you know, I'm not

21   that type person.  I'm a good citizen, paying my taxes.  And

22   I'm proud to be, you know, this type of guy, you know, an

23   American citizen.  I'm -- I'm not, you know, threat to the

24   community or risk flight which is, you know, the Government

25   was saying all the time so I can't have a bond.  I prove to

1    you I'm the opposite.  I'm not that guy.

2            So please, you know, give me time served so I can go

3    back to my family and keep doing good for the community and

4    for my family.

5            And that's it.  I appreciate you.

6            THE COURT:  Thank you, Mr. Ramadan and counsel.

7            As the Court said earlier in this hearing, the

8    finding with respect to the guideline range is based on an

9    offense level of 26, a criminal history category of one.  And

10   the guideline range that the Court is to take into account

11   here in imposing sentence on Mr. Ramadan is 63 to 78 months.

12           The defendant asked the Court to give him time

13   served, which is approximately 41 months.  The Government is

14   asking the Court to sentence Mr. Ramadan at the top of the

15   guideline range, and impose a sentence of 78 months.  There

16   are a number of factors that the Court must take into account

17   in trying to figure out what, in the end, is a sentence that

18   is sufficient and not greater than necessary.

19           The Court is to consider the nature and the

20   circumstances of the offense, the history and the

21   characteristics of the defendant under 3553(a).  The Court is

22   to impose a sentence that reflects the seriousness of the

23   offense, and promotes respect for the law, provides just

24   punishment, deters both specific and general, and a sentence

25   that will protect the public from further crimes of the

 1   defendant.

 2          With respect to the nature and the circumstances of

 3   the offense, those are well-known to all of those who have

 4   participated in this case.  Mr. Ramadan was charged with three

 5   offenses:  Possession of a firearm with an obliterated serial

 6   number, possession of a stolen firearm, and possession of an

 7   unregistered silencer.

 8          He was charged in 2017.  He did spend 41 months at a

 9   detention center.  We did have a trial in this matter, in

10   September of last year, and a jury returned a guilty verdict

11   against Mr. Ramadan on all three of those counts.  And the --

12   the evidence against Mr. Ramadan was -- was quite substantial.

13   I don't think that there is any doubt that he committed these

14   crimes.  There isn't any doubt that the jury got -- got it

15   correctly and returned the right verdict.

16          So now, here we are at sentencing.  The -- the

17   Government asked the Court to take into account a number of

18   factors, I guess, history and characteristics of the defendant

19   that it believes warrants a sentence at the top of the

20   guideline range.  And I wrote down these adjectives

21   Mr. Salzenstein, as Mr. Densemo did, because I've never quite

22   heard this list of adjectives used for any defendant that I've

23   had to sentence, let alone, to sentence someone on -- on these

24   kinds of charges which are -- are fairly routine.  And what

25   the Government says is, they may be routine, they may be

1     run-of-the-mill, but Mr. Ramadan is not that.

2             He's a psychopath.  He's a sociopath.  He's a

3     narcissist.  He's demonstrated anti-social behavior.  He's a

4     liar.  He has no remorse.  He has no empathy for anyone.  He's

5     cruel.  He's depraved.

6             And as you were using those adjectives,

7     Mr. Salzenstein, I just had to ask myself, given the nature of

8     these offenses and all of the history in this case, are these

9     adjectives things that I should take into account in trying to

10    make the decision to return Mr. Ramadan to prison?  And I say

11    no.  I come out on the other side of that.  There have been

12    any number of defendants who have appeared before this Court.

13    I haven't liked a lot of them.  They have had some of these

14    characteristics that you lay out, Mr. Salzenstein, but have I

15    ever sentenced someone to prison, you know, because he's a

16    liar?  Because I perceive him to be a narcissist?  Which, a

17    lot of defendants are.  And I can't say I have done that.

18            I have tried to rely upon the crime, the seriousness

19    of the offense, the factors that I just talked about, a

20    sentence that is going to promote respect for the law and

21    provide just punishment, a sentence that is going to deter the

22    defendant.  And I honestly can't say that these are the kinds

23    of adjectives that I have relied upon in trying to figure out

24    something as -- as grave as whether to send someone to prison

25    or not.

1              That is -- those are your observations of

2    Mr. Ramadan.  We have the observations of Mr. Densemo, who has

3    been his lawyer for a substantial period of time, who says he

4    loves him.  I don't think I've ever heard a criminal defense

5    lawyer say that he loves his client, but I accept the

6    sincerity of that.  I heard the statements of Mr. Kahala, who

7    wants to support, did support Mr. Ramadan when I first

8    released him in January of 2021.  And he said he has nothing

9    but great things to say for him, and that he's a good team

10   player.  I have the letter from Mr. Ramadan's current

11   employer, Smith's Towing.

12             And so, on the other side of psychopath, sociopath,

13   narcissist, anti-social behaviorist, liar, no remorse, we have

14   the observations of people who have worked with him closely,

15   and who believe in him, and who talk about second chances.

16   And that's something that this Court has a very strong belief

17   in also.  I hold that out for everybody that I -- that appears

18   in front of me for sentence.  I hold out the hope, the belief

19   that there is going to be rehabilitation and they will be able

20   to turn their lives around.

21             What is important to this Court is that since January

22   of '21, Mr. Ramadan has abided by all of the conditions that

23   the Court has imposed on him.  He has been gainfully employed

24   with two employers.  He obtained a CDL license, not an easy

25   thing to obtain.  He doesn't have any prior convictions,

1    felony convictions.  I believe there's one misdemeanor.  He

2    has been married for ten years.  He has four children.  I

3    believe that the children and wife are -- may all be in

4    Palestine now.

5            He lived successfully with his sister.  He now is on

6    his own.  He is supporting his family.  And he is doing all of

7    those things that Courts want defendants to do when they are,

8    you know, released from prison, when they are trying to put

9    their lives back on track.

10           It is also important to the Court that Mr. Ramadan

11   did serve 41 months before he went to -- before he was

12   released.  Now, this is a 2017 case.  It didn't go to trial

13   until 2021.  He did not have the benefit of any programs,

14   which are important if we are considering whether somebody can

15   be rehabilitated and returned to society.  And we don't allow

16   pretrial detainees to have the benefit of any of that formal

17   rehabilitation.  And that's important to this Court as well,

18   as I try to figure out what sentence is the sentence that is

19   sufficient and not greater than necessary.

20           The Court heard the allocution by Mr. Ramadan.  He's

21   looking for an opportunity to prove himself.  He does admit to

22   his mistakes.  He attributes part of that to his youth.  He

23   does say he made mistakes, and he is trying to learn from

24   them.  He is more mature.

25           If I take him at his word, Mr. Ramadan is saying all

1    of those things that are necessary for a success story.  He is

2    conducting his life that way.  And the Court believes there

3    isn't any good purpose that will be served by returning

4    Mr. Ramadan to prison.

5           I've taken into account, the Sentencing Reform Act.

6    I've taken into account, 3553(a), and I do sentence

7    Mr. Ramadan to time served.

8           He is going to be placed on supervision for a term of

9    two years.  He is ordered to pay a special assessment of $300.

10   It's due immediately.

11          The Court waives the imposition of a fine and the

12   costs of supervision due to Mr. Ramadan's lack of financial

13   resources.

14          Mandatory drug testing is suspended based on the

15   Court's determination that he poses a low risk of future

16   substance abuse.

17          Pursuant to 34 U.S.C., 40702, Mr. Ramadan is to

18   cooperate with the collection of a DNA sample as directed by

19   Probation.

20          While on supervision, he is to abide by the standard

21   conditions adopted by this Court, and shall comply with the

22   following special conditions:

23          Due to the nature of the offense, you must submit

24   your person, residence, office, vehicle, papers, business, or

25   place of employment and any property under your control to a

 1    search.  Such a search shall be conducted by a U.S. probation

 2    officer at a reasonable time and in a reasonable manner based

 3    upon reasonable suspicion of contraband or evidence of a

 4    violation of a condition of release.  Failure to submit to

 5    such a search may be grounds for revocation.  And you must

 6    warn any resident that the premises may be subject to

 7    searches.

 8            Due to your formal -- your lack of formal education

 9    and history of memory loss and mental health concerns, the

10    Court imposes these conditions:

11            You are to participate in an educational services

12    program, and follow the rules and regulations of that program.

13    It may include high school equivalency preparation, English as

14    a second language classes, and other classes designed to

15    improve your proficiency in skills such as reading, writing,

16    mathematics, or computer use.

17            You are to submit to a psychological psychiatric

18    evaluation as directed by Probation.

19            You are to participate in a mental health treatment

20    program and follow the rules and regulations of that program.

21            Probation, in consultation with the treatment

22    provider will supervise your participation in the program.

23    You are to participate in a cognitive behavioral treatment

24    program, and follow the rules of that program, which may

25    include group sessions led by a counselor, or participation in

1    a program administered by Probation.

2            Because of the documented instances of anger that you

3    have exhibited, Mr. Ramadan, you are to participate in a

4    program aimed at addressing specific interpersonal or social

5    areas.  For example, domestic violence, anger management,

6    marital counseling, financial counseling, cognitive skills,

7    and parenting.

8            That is the sentence of this Court.  Is there any

9    objection?

10            MR. SALZENSTEIN:  Your Honor, I know you're going to

11   disagree with this, but for the record, given the 35 percent

12   reduction from the bottom of the guideline, the Government

13   would object on procedural reasonableness grounds.  The Sixth

14   Circuit has held that the greater the variance, the more

15   explanation that must be given.  And the Government does not

16   believe that post-release conduct in this case overcomes the

17   history and characteristics of the defendant, the danger, the

18   need to protect the public, and the other 3553(a) factors.

19            So that's the only Bostic objection I have, Your

20   Honor.

21            For the record, and I talked to defense counsel about

22   this beforehand, we attempted to come to an agreement with

23   respect to forfeiture of the -- the two weapons and the

24   silencer, Your Honor.  We can't come to an agreement, so I am

25   making an oral motion, Your Honor, to forfeit the two firearms

1    and silencer in this case.

2           There was a Superseding Indictment providing notice

3    to the defendant, of the Government's intention to forfeit the

4    firearms and the silencer if convicted.  By virtue of his

5    conviction and the evidence being presented at trial, and the

6    juror's conclusion that the firearms and silencer were

7    involved in the offenses of conviction.

8           For this reason, the defendant's interest in the

9    firearms and silencer should be forfeited to the United

10   States.  And the Government will submit a proposed order of

11   forfeiture for entry pursuant to this motion, after defense

12   has a chance to respond, of course.

13          And we request forfeiture be included in the judgment

14   in this case.  And we will e-mail the forfeiture language to

15   the Court.

16          THE COURT:  All right.  Thank you, Mr. Salzenstein.

17          Just for the record, and I believe I am correct on

18   this, Mr. Sal -- Mr. Ramadan would typically serve, what is

19   it, 85 percent of the sentence that is imposed?

20          MR. DENSEMO:  That's correct, Your Honor.

21          MR. SALZENSTEIN:  Yes.  I think there's good time

22   potential credits --

23          THE COURT:  Yes.

24          MR. SALZENSTEIN:  -- up to 85 percent.

25          And I do believe if he had gone back to prison, now,

```
 1    there's additional potential good time credits under the First
 2    Step Act, Your Honor.
 3            THE COURT:  Right.  So if I had given him -- if I had
 4    sentenced in the guideline range, and given him the low end,
 5    63, I think 85 and he's served 41, he would have 12, 13 months
 6    that he would actually serve, correct?
 7            MR. SALZENSTEIN:  Those calculations are usually
 8    calculated by the Bureau of Prisons, Your Honor, considering
 9    the total sentence, Your Honor.  So it still is a -- a 35
10    percent reduction from the bottom of the guidelines.
11            THE COURT:  Okay.  All right.
12            I hear your objection, but I have no inclination to
13    send Mr. Ramadan back to prison for 12 or 13 months given the
14    track that his life is on now.  And I'll see if you appeal,
15    the Sixth Circuit says anything about that.
16            Do I need to take up the disagreement over the
17    forfeiture now?  Are you going to file a motion?
18            What is your disagreement, Mr. Densemo to forfeit the
19    firearms and the silencer?
20            MR. DENSEMO:  I'm sorry, Judge, what was your
21    question?
22            THE COURT:  What is your objection to forfeiture?
23            MR. DENSEMO:  Mr. Ramadan isn't certain what that
24    entails, Your Honor, so he's not comfortable stipulating to
25    it.  There may be some -- there's some question as to whether
```

```
 1    or not by virtue of stipulating to forfeiture, he is in some

 2    way making some admission that he has some sort of equitable

 3    or ownership interest which would go to whether he possess --

 4    go to the defense, and whether he is waiving or making

 5    admissions for purposes of appeal, Your Honor.  So he just

 6    isn't comfortable to stipulating that.

 7           We have no objection to it, I don't believe, in

 8    theory.  But insofar as stipulating to it, Your Honor,

 9    Mr. Ramadan isn't comfortable doing that because he doesn't

10    know what that would -- legally what that, you know -- what

11    ramifications that would have.

12           THE COURT:  All right.  So Mr. Salzenstein, are you

13    filing a motion?  How is this going to come back to me?

14           MR. SALZENSTEIN:  Your Honor, I'm making an oral

15    motion.  If you would like us to file a formal written motion,

16    we certainly can.

17           THE COURT:  I want to know what the formal written

18    response is to the forfeiture.  So yes, if you would do that,

19    please.

20           MR. SALZENSTEIN:  Yes, sir -- ma'am.

21           THE COURT:  All right.

22           MR. DENSEMO:  Your Honor, Ms. Bashi, I think, has

23    something that she wants to address to the Court real quick.

24           MS. BASHI:  Your Honor, I know you're asking about

25    objections, and this isn't an objection.  I just wanted to --
```

1    as you know, Mr. Ramadan has been working, and the Court did

2    modify his bond conditions to allow him, as a CDL driver, to

3    travel outside of the district.  And my understanding is the

4    standard conditions of supervision that the Court has imposed

5    today would, again, restrict Mr. Ramadan from leaving the

6    district.  So I just wanted to clarify that with the Court as

7    of today, whether that standard condition remains or whether

8    Mr. Ramadan may be permitted to leave the district for work

9    purposes.

10            THE COURT:  Right now, he is permitted to leave the

11   district.  But what are the -- what are the parameters,

12   because I don't remember?

13            MR. BASHI:  The parameters of his travel?

14            THE COURT:  Yes.

15            MR. DENSEMO:  I think the -- the Court allowed him to

16   travel outside the district with permission -- I'm sorry, with

17   permission from Pretrial Services so long as he notifies

18   Pretrial Services.

19            THE COURT:  Yes.

20            MR. DENSEMO:  So, you know, he can travel to Ohio and

21   I believe Kentucky and maybe one other state.  I forget, but

22   there's another state.  The Court specifically stated what

23   states Mr. Ramadan could travel to with permission of Pretrial

24   Services.

25            THE COURT:  Right.

1            Are you asking that I continue that?

2            MR. DENSEMO:  Yes, Your Honor, we are.

3            THE COURT:  All right.  I will.

4        Mr. Ramadan, I want to tell you that you have certain

5    appellate rights.  And typically, they must be exercised

6    within ten days of imposition of sentence.  If you cannot

7    afford a lawyer, the Clerk of the Court can provide some

8    necessary assistance to you.

9            Is there anything else before we adjourn?

10           Yes, Mr. Bellamy.

11           PROBATION:  Kody Bellamy on behalf of Probation.

12   Your Honor, just for clarity in the judgment, the Court's

13   intention was, as to Counts One, Two, and Three of the

14   Superseding Indictment, time served on each count to be served

15   concurrently, and as to Counts One, Two and Three, two years

16   supervised release to be served concurrently?

17           THE COURT:  That's true, yes.

18           PROBATION:  Thank you.

19           THE COURT:  All right.  Thank you.

20           Anything else from counsel before we adjourn?

21           MR. SALZENSTEIN:  Not from the Government, Your

22   Honor.

23           MR. DENSEMO:  No, Your Honor.  Thank you.

24           THE COURT:  All right.  Thank you.  We're adjourned.

25      (The proceeding was adjourned at 5:43 p.m.)

```
 1                        *     *     *

 2                  C E R T I F I C A T E

 3        I certify that the foregoing is a correct transcription of

 4     the record of proceedings in the above-entitled matter.

 5

 6     S/ Shacara V. Mapp                        03/18/2022

 7     Shacara V. Mapp,                          Date

 8     CSR-9305, RMR, FCRR, CRR

 9     Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```